**FRANCIS ALEXANDER, LLC**
Francis Malofiy, Esquire
Attorney ID No.:  208494
The Beasley Building
1125 Walnut Street
Philadelphia, PA 19107
T:  (215) 500-1000
F:  (215) 500-1005
E:  francis.malofiy@beasleyfirm.com
*Law Firm / Attorney for Plaintiff*

---

### IN THE UNITED STATES DISTRICT COURT FOR
### THE EASTERN DISTRICT OF PENNSYLVANIA

---

| | |
|---|---|
| DANIEL V. MARINO<br>    *Plaintiff* | NO.: |
| **VS.** | ***JURY TRIAL DEMANDED*** |
| USHER;  *etal*<br>    *Defendants* | |

---

### PLAINTIFF'S COMPLAINT
### MUSIC COPYRIGHT INFRINGEMENT &
### RELATED CLAIMS

---

Plaintiff Daniel V. Marino, by and through counsel, Francis Alexander, LLC, brings this suit against Defendants and avers as follows:

**PREAMBLE**

1.        In March 2004 superstar Usher released *Confessions,* his fourth studio album.[1]

2.        The album was an instant commercial success in the United States, selling 1.1 million copies in its first week.  The album has sold over 10 million copies in the US and has been certified diamond in sales by the Recording Industry Association of America (RIAA).

---

[1] See attached (2) *Confessions* album releases copies of the CD case;  Exhibit "G".

According to *Billboard*, it is the second best-selling album of the 2000s decade in the US and has been regarded by music writers as Usher's greatest work.

3.      The *Confessions* album was the coming together of the best musicians, artists, producers, and executives from the music industry to collaborate on the album including: Antonio "LA" Reid, Jermaine Dupri, Lil Jon, Rich Harrison, James Samuel "Jimmy Jam" Harris III and Terry Lewis, Robin Thicke, Bryan-Michael Cox, Just Blaze, Dre & Vidal, Bobby Ross Avila, Issiah Avila, James "Big Jim" Wright, R. Kelly, Jadakiss, Alicia Keys, Ludacris, The Neptunes, Sean Puffy Combs "P. Diddy", among others.

4.      Out of hundreds of songs only 14 tracks made the cut to be included on the *Confessions* album.  One of the 14 songs - "Bad Girl" - was written and produced by Dan Marino along with his producing partner Dante Barton and lyricist Will Guice.

5.      Disputes between Dan Marino, his producing partner Dante Barton, and lyricist Will Guice arose after Dan Marino learned that he wasn't properly credited as the songwriter and producer of "Bad Girl."

6.      The song "Bad Girl" as allegedly written and recorded by artist Usher and other alleged authors is nothing more than a **slavish copy** of Dan Marino's work where Defendants had **direct access** and **directly copied** both the underlying composition and the sound recording of "Club Girl".[2]

7.      To date Dan Marino has not been properly credited as the songwriter, producer, or copyright holder of "Bad Girl" originally known as "Club Girl".

8.      This is an action to enforce the copyright of the song "Club Girl" and "Bad Girl" written and produced by Dan Marino which is an original work of art under the legal causes of

---

[2] *See attached lyrics of "Club Girl" and "Bad Girl"; Exhibit "H".*  **Listen** *to attached CD of the recording of "Club Girl" and "Bad Girl"; Exhibit "I".* **LISTEN TO RECORDINGS OF CLUB GIRL & BAD GIRL:** www.marinovusher.com

action of Direct Copyright Infringement, Contributory Copyright Infringement, and Vicarious

Copyright Infringement under Federal Law;  Breach of Contract, Breach of Fiduciary Duties,

Misrepresentation, and Fraud under Pennsylvania law;  among other related causes of action.


### JURISDICTION AND VENUE

9.     This action is brought, and subject matter jurisdiction lies within this Court,

pursuant to 28 U.S.C. §§ 1331 and 1338.  This Court has federal question jurisdiction in this

matter in that Plaintiff seeks damages and injunctive relief against the defendants named herein

under Sections 501 through 505 of the Copyright Act of 1976, 17 U.S.C. § 101 et seq.  The Court

has pendant jurisdiction over any claims asserted herein which arise under state law, including,

without limitation, claims seeking imposition of a constructive trust and performance of an

accounting, in that such claims flow from a common nucleus of operative facts.

10.     Venue lies within this Court pursuant to 28 U.S.C. Sections 1391(b)(1) – (3),

1391(c), 1391(d), and 1400(a) in that all defendants reside for venue purposes and are subject to

personal jurisdiction in this District, and that a substantial part of the events or omissions giving

rise to Plaintiff's claims occurred in the Eastern District of Pennsylvania.  In particular, on

information and belief, each of the individual defendants reside in the United States and/or are

citizens of the United States and therefore can be sued in any district including this District, the

song "Bad Girl" originally known as "Club Girl" was written, produced, and recorded in

Philadelphia, Pennsylvania, and plaintiff and many of the defendants of this action are either

citizens of the state of Pennsylvania, are incorporated in Pennsylvania, have their principal place

of business in Pennsylvania, or carry on a substantial, ongoing business activities in this District,

and hence are subject to personal jurisdiction and reside for venue purposes in this District.

Furthermore, a substantial part of the defendants' acts and omissions in exploiting the musical composition and musical work at issue that give rise to Plaintiff's claims for copyright infringement occurred in Philadelphia, Pennsylvania.

11.     Therefore for all the reasons so stated, the District Court of the Eastern District of Pennsylvania has proper jurisdiction to hear this matter.

**PARTIES**

***PLAINTIFF***

***Plaintiff***                                                              ***"Marino"***

12.     Plaintiff Daniel V. Marino ("Marino") is an individual who resides in and is domiciled in Philadelphia County, Pennsylvania and is also a citizen of the state of Pennsylvania.

13.     Marino is a professional songwriter, musician, producer, and engineer of musical sound recordings.[3]

14.     The song "Club Girl" and "Bad Girl" was written, produced, and recorded by Dan Marino along with his producing partner Dante Barton and lyricist Guice.

---

[3] Marino's parents, Italian immigrants, signed him up for piano lessons at the young age of 8 years old. However, it was not until high school that he began to take music seriously. Marino became proficient with the guitar at the age of 18 years old. During his teenage years Marino became deeply involved in writing songs and creating music which evolved into building a band that was offered a major record deal by Ruffhouse Records and Philadelphia International. Originally a rock musician at heart, Marino cultivated his skill as a writer and producer by working with different artists and forming his own recording studio. Marino went on to produce Silvertide's first album right before they signed a major record deal with Clive Davis, music industry magnate and COO of Sony Music Entertainment. Shortly after breaking Silvertide, Marino went to find the incredibly talented and Grammy nominated Melody Gardot and started to produce her debut album. Marino not only had a major influence on Melody Gardot's signature sound, but also was a personal mentor to her and helped her recover through her tragic accident by buying for her a guitar and teaching her to play guitar which was instrumental in her recovery. Marino, a member of the Recording Academy, has worked with a number of artists including Hezekiah Jones, Mike Pinto, and Jack Frost. He soon segued into writing, recording, and producing R&B records and artists. Marino along with his producing partner Barton and lyricist Guice went on to write, produce, and record the song "Club Girl" which was later recorded and released by Usher as "Bad Girl" on his top-selling, award-winning *Confessions* album and which is the subject of this litigation. Marino has now formed a new record, production, and publishing company.

15.     Marino holds the original musical works copyright and a sound recording copyright in both "Club Girl" and "Bad Girl".


### DEFENDANT - SONGWRITERS

**Dante E. Barton**                                    **"Barton"**

16.     On information and belief, defendant Dante Edward Barton ("Barton") is an individual who resides in Philadelphia County and Montgomery County, Pennsylvania and is domiciled in the state of Pennsylvania and is also a citizen of state of Pennsylvania;  addresses as follow:  103 Sterling Drive, North Wales, PA 19454.  835 Pleasant Road, Lansdowne, PA 19050;

17.     Barton is affiliated with performing rights organization BMI.  CAE/IPI No.: 464658226.

18.     Barton is credited with 37.50% of the songwriting credit for the song "Bad Girl".

19.     Barton is credited with 50% of the songwriting credit for the song "Club Girl".


**William C. Guice**                                    **"Guice"**

20.     On information and belief, defendant William C. Guice ("Guice") is an individual who either resides in Camden County, New Jersey and is believed to be either a citizen of state of New Jersey;  address as follows:  1 Elena Court, Voorhees, NJ 08043; or resides in Ohio and is believed to be a citizen of the state of Ohio.

21.     Guice is currently affiliated with performing rights organization ASCAP. CAE/IPI No.:  345229467.

22.     Guice is credited with 37.50% of the songwriting credit for the song "Bad Girl".

23.     Guice is credited with 50% of the songwriting credit for the song "Club Girl".


**Usher**                                               **"Usher"**

24.     On information and belief, defendant Usher, aka Usher Terry Raymond, IV ("Usher") is an individual who resides in Fulton County, Georgia and is domiciled in Georgia and is also a citizen of state of Georgia;  address as follows:  133 Peachtree Street, NE Suite 4070, Atlanta, GA 30303.

25.     Usher is affiliated with performing rights organization ASCAP.  CAE/IPI No.: 340981462.

26.     Usher is credited with 5.0% of the songwriting credit for the song "Bad Girl".


**Bobby Ross Avila, Jr.**                               **"B. Avila"**

27.     On information and belief, defendant Bobby Ross Avila, Jr. ("B. Avila") is an individual who resides in San Bernardino County, California and is believed to be a citizen of state of California;  address as follows:  12385 Royal Oaks Drive, Rancho Cucamonga, CA 91739.

28.     B. Avila is affiliated with performing rights organization BMI.  CAE/IPI No.: 227451577.

29.     B. Avila is credited with 3.50% of the songwriting credit for the song "Bad Girl".


**Issiah Avila, Jr.**                                   **"I. Avila"**

30.     On information and belief, defendant Issiah Avila, Jr. ("I. Avila") is an individual who resides in San Bernardino County, California and is believed to be a citizen of state of California;  address as follows:  P.O. Box 922 Rialto, CA 92377.

31.     I. Avila is affiliated with performing rights organization BMI.  CAE/IPI No.: 241201528.

32.     I. Avila is credited with 3.50% of the songwriting credit for the song "Bad Girl".


**James Samuel "Jimmy Jam" Harris III**                 **"Harris"**

33.     On information and belief, defendant James Samuel "Jimmy Jam" Harris III ("Harris") is an individual who resides in Los Angeles County, California and is believed to be a citizen of state of California;  address as follows:  1809 Olympic Blvd Santa Monica, CA 90404.

34.     Harris is affiliated with performing rights organization ASCAP.  CAE/IPI No.: 125105225.

35.     Harris is credited with 6.50% of the songwriting credit for the song "Bad Girl".


**Terry Steven Lewis**                              **"Lewis"**

36.     On information and belief, defendant Terry Steven Lewis ("Lewis") is an individual who resides in Los Angeles County, California and is believed to be a citizen of state of California;  address as follows:  P.O. Box 3117 Santa Monica, CA 90408.

37.     Lewis is affiliated with performing rights organization ASCAP.  CAE/IPI No.: 125215020.

38.     Lewis is credited with 6.50% of the songwriting credit for the song "Bad Girl".

*Defendant Songwriters*

39.     Defendant songwriters:  Barton, Guice, Usher, B. Avila, I. Avila, Harris, and Lewis may be referred to herein collectively as "Defendant Songwriters".


## DEFENDANT – PUBLISHERS

*Defenders of Music*                            *"Defenders of Music"*

40.     On information and belief, defendant Defenders of Music ("Defenders of Music") c/o EMI April Music, Inc., c/o EMI Music Publishing;  Attn:  Audrey Ashby is an entity of unknown form that is either a corporation or a division of a corporation, with its principal place of business and or registered address in New York County, New York;  address as follows:  75 9th Avenue, Floor 4, New York, NY 10011;  telephone:  212-492-1200;  fax:  212-492-1865 email:  copyrightadmin@emimusicpub.com.

41.     Defenders of Music is a music publishing company that exploits musical works.

42.     Defenders of Music is affiliated with the performing rights organization BMI. CAE/IPI No.:  358185729.

43.     Defenders of Music publishes music written by defendant B. Avila.

44.     Defenders of Music is credited with 1.75% of the publishing credit attributed to B. Avila for the song "Bad Girl".

45.     Defenders of Music publishes music written by defendant I. Avila.

46.     Defenders of Music is credited with 1.75% of the publishing credit attributed to I. Avila for the song "Bad Girl".

47.     Upon information and belief, Defenders of Music is B. Avila and I. Avila's publishing company by and which they publish songs through, or jointly with other publishing companies.

### *EMI Music Publishing, Inc.*                    *"EMI"*

48.     On information and belief, defendant EMI Music Publishing, Inc. ("EMI") c/o EMI Music Publishing;  Attn:  Audrey Ashby is Connecticut, qualified to do business in the state of New York, with its principal place of business as follows as either:  1290 Avenue of the Americas, New York, NY or 75 9th Avenue, Floor 4, New York, NY 10011;  telephone:  212-492-1200;  fax:  212-492-1865  email:  copyrightadmin@emimusicpub.com.

49.     EMI is a music publishing company that exploits musical works.

50.     EMI is affiliated with the performing rights organization ASCAP.  CAE/IPI No.: 128633767.

51.     EMI publishes music written by defendant Harris.

52.     EMI is credited with 3.25% of the publishing credit attributed to Harris for the song "Bad Girl".

53.     EMI publishes music written by defendant Lewis.

54.     EMI is credited with 3.25% of the publishing credit attributed to Lewis for the song "Bad Girl".

55.     EMI publishes music written by defendant Usher.

56.     EMI is credited with 2.50% of the publishing credit attributed to Usher for the song "Bad Girl".

57.     Upon information and belief, EMI April is a publishing company who administers the publishing for defendant publishers Flyte Tyme.

58.     Upon information and belief, EMI April is a publishing company who administers the publishing for defendant publishers UR-IV.

59.     At all times relevant hereto, defendant EMI is the parent company to EMI April and EMI Blackwood publishing entities which are directed, controlled, and managed by defendant EMI.

**Flyte Tyme Tunes**                            **"Flyte Tyme"**

60.     On information and belief, defendant Flyte Tyme Tunes ("Flyte Tyme") c/o EMI April Music, Inc., c/o EMI Music Publishing;  Attn:  Audrew Ashby is an entity of unknown form that is either a corporation or a division of a corporation, with its principal place of business and or its registered address in New York County, New York;   address as follows:  75 9th Avenue, Floor 4, New York, NY 10011;  telephone:  212-492-1200;  email:  copyrightadmin@emimusicpub.com.

61.     Flyte Tyme Tunes is a music publishing company that exploits musical works.

62.     Flyte Tyme is affiliated with the performing rights organization ASCAP. CAE/IPI No.:  122643110.

63.     Flyte Tyme publishes music written by defendant Harris.

64.     Flyte Tyme is credited with 3.25% of the publishing credit attributed to Harris for the song "Bad Girl".

65.     Flyte Tyme publishes music written by defendant Lewis.

66.     Flyte Tyme is credited with 3.25% of the publishing credit attributed to Lewis for the song "Bad Girl."

67.     Upon information and belief, Flyte Tyme is Harris and Lewis's publishing company by and which they publish songs through, or jointly with other publishing companies.

***For The World***                                ***"For The World"***

68.     On information and belief, For The World ("For The World") is a fictitious name registration publishing company controlled and managed by defendant Guice in Philadelphia County, Pennsylvania;  address as follows:  1375 Westbury Drive, Philadelphia, PA 19151; telephone:  215-437-4228.

69.     For The World is a music publishing company that exploits musical works.

70.     For The World is affiliated with the performing rights organization ASCAP. CAE/IPI No.:  345720861.

71.     For The World publishes music written by defendant Guice.

72.     For The World is credited with 18.75% of the publishing credit attributed to Guice for the song "Bad Girl".

73.     For The World is credited with 25% of the publishing credit attributed to Guice for the song "Club Girl".

74.     Upon information and belief, For The World is defendant Guice's publishing company by and which he publishes songs through, or jointly with other publishing companies.

75.     At all times relevant hereto, For The World is directed, controlled, managed, and owned by defendant Guice.

*IN2N Musicworks*                              *"IN2N Musicworks"*

76.     On information and belief, IN2N Musicworks ("IN2N Musicworks") c/o Horipro Entertainment Group, Inc., Attn:  Tim Stehli is an entity of unknown form that is either a corporation or a division of a corporation, with its publishing operations in Davidson County, Tennessee;  address as follows:  818 18th Avenue South, Nashville, TN 37203;  telephone:  615-255-9837;  email:  carrie@horipro.com.

77.     IN2N Musicworks is a music publishing company that exploits musical works.

78.     IN2N Musicworks's registered address is in Montgomery County, Pennsylvania; address as follows:  1400 Mill Creek Road, Gladwyne, PA 19035;  telephone:  215-862-1112.

79.     IN2N Musicworks's principal place of business in Bucks County, Pennsylvania; address as follows:  41 W. Ferry Street, Suite A, New Hope, PA 18938;  telephone:  215-862-1112.

80.     IN2N Musicworks is affiliated with the performing rights organization ASCAP. CAE/IPI No.:  435923841.

81.     IN2N Musicworks publishes music written by defendant Guice.

82.     IN2N Musicworks is credited with 18.75% of the publishing credit attributed to Guice for the song "Bad Girl".

83.     IN2N Musicworks is credited with 25% of the publishing credit attributed to Guice for the song "Club Girl".

84.     Upon information and belief, IN2N Music is one of Tommy Van Dell's publishing companies by and which he publishes songs through for artists, or jointly with other publishing companies.

85.     Upon information and belief, IN2N Musicworks is a publishing company who administers the publishing for defendant publisher For The World.

86.     Upon information and belief, Horipro Entertainment Group, Inc., is a publishing company who administers the publishing on behalf of IN2N Musicworks for defendant For The World.

87.     At all times relevant hereto, defendant IN2N Entertainment Group, LLC is the parent company to IN2N Musicworks publishing which is directed, controlled, and managed by defendant Tommy Van Dell.

***Scan Disc Publishing***                          ***"Scan Disc"***

88.     On information and belief, Scan Disc Publishing ("Scan Disc") is defendant Barton's publishing company and is a fictitious name registration publishing company address in Montgomery County, Pennsylvania;  address as follows:  103 Sterling Drive;  North Wales, PA 19454;  email:  destromusic@yahoo.com.

89.     Scan Disc is a music publishing company that exploits musical works.

90.     Scan Disc is affiliated with the performing rights organization BMI.  CAE/IPI No.:  432178766.

91.     Scan Disc publishes music written by defendant Barton.

92.     Scan Disc is credited with 18.75% of the publishing credit attributed to Barton for the song "Bad Girl".

93.     Scan Disc is credited with 25% of the publishing credit attributed to Barton for the song "Club Girl".

94.     Upon information and belief, Scan Disc is Barton's publishing company by and which he publishes songs through, or jointly with other publishing companies.

95.     At all times relevant hereto, Scan Disc is directed, controlled, managed, and owned defendant Barton.


**_IN2N Music_**                                    **_"IN2N Music"_**

96.     Upon information and belief, IN2N Music ("IN2N Music") c/o Horipro Entertainment Group, Inc., Attn:  Tim Stehli is a division of IN2N Entertainment Group, LLC, is an entity of unknown form that is either a corporation or a division of a corporation, with its publishing operations in Davidson County, Tennessee;  address as follows:  818 18th Avenue South, Suite 100, Nashville, TN 37203;  telephone:  615-255-9837;  fax:  615-255-9841;  email: john@horipro.com.

97.     IN2N Music's registered address is in Montgomery County, Pennsylvania; address as follows:  1400 Mill Creek Road, Gladwyne, PA 19035;  telephone:  215-862-1112.

98.     IN2N Music's principal place of business in Bucks County, Pennsylvania; address as follows:  41 W. Ferry Street, Suite A, New Hope, PA 18938;  telephone:  215-862-1112.

99.     IN2N Music is a music publishing company that exploits musical works.

100.    IN2N Music is affiliated with the performing rights organization BMI.  CAE/IPI No.:  428902057.

101.    IN2N Music publishes music written by defendant Barton.

102.    IN2N Music is credited with 18.75% of the publishing credit attributed to Barton for the song "Bad Girl".

103.    IN2N Music is credited with 25% of the publishing credit attributed to Barton for the song "Club Girl".

104.    Upon information and belief, IN2N Music is one of defendant Tommy Van Dell's publishing companies by and which he publishes songs through for artists, or jointly with other publishing companies.

105.    Upon information and belief, Horipro Entertainment Group, Inc., is a publishing company who administers the publishing on behalf of IN2N Music for IN2N Music.

106.    At all times relevant hereto, defendant IN2N Entertainment Group, LLC is the parent company to IN2N Music publishing which is directed, controlled, and managed by defendant Tommy Van Dell.

### *Sublime Basement Tunez*                     *"Sublime Basement"*

107.    On information and belief, defendant Sublime Basement Tunez ("Sublime Basement") is an entity of unknown form that is either a corporation or a division of a corporation, with its principal place of business and or its registered address in San Bernardino County, California;  address as follows:  772 Lorraine Place Rialto, CA 92376, and or Attn: Clara Avila, P.O. Box 922, Rialto, CA 92377;  telephone:  951-809-1298;  email: abexperience@hotmail.com.

108.    Sublime Basement is a music publishing company that exploits musical works.

109.    Sublime Basement is affiliated with the performing rights organization BMI. CAE/IPI No.:  194541259.

110.    Sublime Basement publishes music written by defendant B. Avila.

111.    Sublime Basement is credited with .875% of the publishing credit attributed to B. Avila for the song "Bad Girl".

112.    Sublime Basement publishes music written by defendant I. Avila.

113.    Sublime Basement is credited with .875% of the publishing credit attributed to I. Avila for the song "Bad Girl".

### *UR-IV Music, Inc.                                     "UR-IV"*

114.    On information and belief, defendant UR-IV Music, Inc. ("UR-IV") c/o EMI April Music, Inc., c/o EMI Music Publishing, Attn:  Audrey Ashby is an entity of unknown form that is either a corporation or a division of a corporation, with its principal place of business and or its registered address in New York County, New York:  address as follows:  75 9th Avenue, Floor 4, New York, NY 10011;  telephone:  212-492-1200;  email:  copyrightadmin@emimusicpub.com.

115.    UR-IV is a music publishing company that exploits musical works.

116.    UR-IV is affiliated with performing rights organization ASCAP.  CAE/IPI No.:  440476664.

117.    UR-IV publishes music written by defendant Usher.

118.    UR-IV is credited with 2.50% of the publishing credit attributed to Usher for the song "Bad Girl".

119.    Upon information and belief, UR-IV is Usher's publishing company by and which he publishes songs through, or jointly with other publishing companies.

### *Warner-Tamerlane Publishing Corp.            "Warner-Tamerlane"*

120.     On information and belief, defendant Warner-Tamerlane Publishing Corp. ("Warner-Tamerlane") is an entity of unknown form that is either a corporation or a division of a corporation, with its principal place of business and or its registered address in Los Angeles, California;  address as follows:  10585 Santa Monica Blvd., Los Angeles, CA 90025;  telephone: 310-441-8600;  fax:  310-470-7101.

121.     Warner-Tamerlane is a music publishing company that exploits musical works.

122.     Warner-Tamerlane is affiliated with the performing rights organization BMI. CAE/IPI No.:  185314175.

123.     Warner-Tamerlane publishes music written by defendant B. Avila.

124.     Warner-Tamerlane is credited with .875% of the publishing credit attributed to B. Avila for the "Bad Girl".

125.     Warner-Tamerlane is a music publishing company that publishes music written by I. Avila.

126.     Warner-Tamerlane is credited with .875% of the publishing credit attributed to I. Avila for the song "Bad Girl".


***Defendant Publishers***

127.     Defendant publishers:  Defenders of Music, EMI (EMI April & EMI Blackwood), Flyte Tyme, Guice (For The World), IN2N Entertainment Group, LLC (IN2N Music, IN2N Musicworks), Barton (Scan Disc), Sublime Basement, UR IV, and Warner Tamerlane may be referred to herein collectively as "Defendant Publishers".

### *DEFENDANT – COMPANIES*

***Destro Music Productions, Inc.***                    ***"Destro Music"***

128.    On information and belief, defendant Destro Music Productions, Inc. ("Destro Music") is a Pennsylvania corporation with its registered address in Delaware County, Pennsylvania;  address as follows:  2501 Alfred Drive,  Suite A, Lansdowne, PA 19050.

129.    Destro Music is a music production company engaged in the business of creating and producing musical works compositions and musical sound recordings.

130.    Destro exploited the musical works composition of the song "Bad Girl".

131.    Destro exploited the sound recording of the song "Bad Girl".

132.    Destro exploited the musical works composition of the song "Club Girl".

133.    Destro exploited the sound recording of the song "Club Girl".

134.    Destro Music is owned in part by plaintiff Marino.

135.    Marino owns a 50% interest in Destro Music.

136.    Destro Music is owned in part by defendant Barton.

137.    Barton owns a 50% interest in Destro Music.

138.    Destro Music is owned in equal 50% parts by plaintiff Marino and defendant Barton.

139.    Destro Music is the parent for defendant company Underworld Entertainment.

140.    Destro Music is the parent for defendant company Wavelab Recording Studio.

141.    At all times relevant hereto defendant Barton directed, controlled, and managed Destro Music.

**Underworld Entertainment**                              **"Underworld"**

142.     On information and belief, Underworld Entertainment ("Underworld") is an entity of unknown form believed to be operating as a fictitious name and as a division of defendant Destro Music Productions, Inc., with its principal place of business and or its registered address in Delaware County, Pennsylvania;  address as follows:  835 Pleasant Road, Yeadon, PA 19050.

143.     Underworld is a record company engaged in the business of developing artists, and in the business of creating, manufacturing, selling, and distributing musical works compositions and musical sound recordings.

144.     Underworld exploited the musical works composition of "Bad Girl".

145.     Underworld exploited the musical sound recording of Bad Girl".

146.     Underworld exploited the musical works composition of "Club Girl".

147.     Underworld exploited the musical sound recording of "Club Girl".

148.     Underworld is owned in part by plaintiff Marino.

149.     Marino owns a 50% interest in Underworld.

150.     Underworld is owned in part by defendant Barton.

151.     Barton owns a 50% interest in Underworld.

152.     Underworld is owned in equal 50% parts by plaintiff Marino and defendant Barton.

153.     Underworld Entertainment is reported and identified by the Pennsylvania Department of State as being owned by defendant Destro Music Productions, Inc.

154.     Underworld is a subsidiary of defendant Destro Music Productions, Inc.

155.    At all times relevant hereto defendant Barton directed, controlled, and managed Underworld Entertainment.


***Wavelab Recording Studio***                              ***"Wavelab"***

156.    On information and belief, Wavelab Recording Studio ("Wavelab") is an entity of unknown form believed to be operating as a fictitious name and as a division of defendant Destro Music Productions, Inc., with its principal place of business and or its registered address in Delaware County, Pennsylvania;  address as follows:  835 Pleasant Road, Lansdowne, PA 19050.

157.    Wavelab is a recording studio engaged in the business of providing the tools, equipment, operations, and space to create musical works compositions and musical sound recordings.

158.    Wavelab is owned in part by plaintiff Marino.

159.    Marino owns a 50% interest in Wavelab.

160.    Wavelab is owned in part by defendant Barton.

161.    Barton owns a 50% interest in Wavelab.

162.    Wavelab is owned in equal 50% parts by plaintiff Marino and defendant Barton.

163.    Wavelab Recording Studio is reported and identified by the Pennsylvania Department of State as being owned by defendant Destro Music Productions, Inc.

164.    Wavelab is a subsidiary of defendant Destro Music Productions, Inc.

165.    At all relevant times hereto, Wavelab is the recording studio owned and operated by Marino and Barton.

166.     Marino and Barton entered into a multi-year lease with the landlord for the Wavelab Studio space at 1 Old Bridge Road, Philadelphia, PA.

167.     At all times relevant hereto, Wavelab is the recording studio where the song "Club Girl" and parts of the song "Bad Girl" were recorded.

168.     At all times relevant hereto defendant Barton directed, controlled, and managed Wavelab.


***Bystorm Entertainment***                                    ***"Bystorm"***

169.     On information and belief, defendant Bystorm Entertainment ("Bystorm") is an entity of unknown form that is either a corporation or a division of a corporation, with its principal place of business and or its registered address in New York County, New York; address as follows:  550 Madison Avenue, 10th Floor, New York, NY 10022;  telephone:  646-450-4042.

170.     Bystorm is a record company engaged in the business of developing artists, and in the business of creating, manufacturing, selling, and distributing musical works compositions and musical sound recordings.

171.     Bystorm is a party in interest to defendant Usher.

172.     Bystorm exploited the musical works composition of the song "Bad Girl".

173.     Bystorm exploited the sound recording of the song "Bad Girl".

174.     Bystorm exploited the musical works composition of the song "Club Girl".

175.     Bystorm exploited the sound recording of the song "Club Girl".

176.     Bystorm is directed, controlled, managed, and owned by defendant Mark Pitts.

**Sony Music Holdings, Inc.**                    **"Sony"**

177.    On information and belief, defendant Sony Music Holdings, Inc. ("Sony") is a corporation or a division of a corporation, with its principal place of business and or its registered address in New York County, New York;  address as follows:  550 Madison Avenue, New York, NY 10022.

178.    Sony is a record company engaged in the business of developing artists, and in the business of creating, manufacturing, selling, and distributing musical works compositions and musical sound recordings.

179.    Sony is the parent of Arista.

180.    Sony owns and has successor liability, continuing rights, obligations, benefits, and liabilities for the Arista record label.

181.    Sony is the parent of LaFace.

182.    Sony owns and has successor liability, continuing rights, obligations, benefits, and liabilities for the LaFace record label.

183.    Sony is a party in interest to the song "Bad Girl" and "Club Girl".

184.    Sony is a party in interest to defendant Usher.

185.    Sony exploited the musical works composition of the song "Bad Girl".

186.    Sony exploited the sound recording of the song "Bad Girl".

187.    Sony exploited the musical works composition of the song "Club Girl".

188.    Sony exploited the sound recording of the song "Club Girl".

189.    Sony is the parent to subsidiary Arista which is currently either consolidated, active, or defunct.  *See below.*

190.    Sony is the parent to subsidiary LaFace Records which is currently either consolidated, active, or defunct. *See below.*

**Arista Records**                                    **"Arista"**

191.    On information and belief, Arista Records ("Arista") is an entity of unknown form that is either a corporation or a division of a corporation, with its principal place of business and or its registered address in New York County, New York;  address as follows:  6 West 57th St New York, NY 10019.

192.    Arista is a record company engaged in the business of creating, manufacturing, selling, and distributing musical sound recordings.

193.    Arista is a subsidiary of Sony.

194.    Arista is a party in interest to defendant Usher.

195.    Arista exploited the musical works composition of the song "Bad Girl".

196.    Arista exploited the sound recording of the song "Bad Girl".

197.    Arista exploited the musical works composition of the song "Club Girl".

198.    Arista exploited the sound recording of the song "Club Girl".

**LaFace Records**                                    **"LaFace"**

199.    On information and belief, LaFace Records ("LaFace") is an entity of unknown form that is either a corporation or a division of a corporation, with its principal place of business and or its registered address in New York County, New York;  address as follows:  6 West 57th St New York, NY 10019.

200.    LaFace is a record company engaged in the business of creating, manufacturing, selling, and distributing musical sound recordings.

201.    LaFace is a subsidiary of Sony.

202.    Arista is a party in interest to defendant Usher.

203.    LaFace exploited the musical works composition of the song "Bad Girl".

204.    LaFace exploited the sound recording of the song "Bad Girl".

205.    LaFace exploited the musical works composition of the song "Club Girl".

206.    LaFace exploited the sound recording of the song "Club Girl".

207.    Sony and its related or past subsidiaries (Arista and LaFace) may be collectively referred to as "Sony".


**IN2N Entertainment Group, LLC**                    **"IN2N Entertainment"**

208.    IN2N Entertainment Group, LLC ("IN2N Entertainment") is a limited liability company with its registered address in Montgomery County, Pennsylvania;  address as follows: 1400 Mill Creek Road, Gladwyne, PA 19035;  telephone:  215-862-1112;  and its principal place of business in Bucks County, Pennsylvania;  address as follows:  41 W. Ferry Street, Suite A, New Hope, PA 18938;  telephone:  215-862-1112.

209.    IN2N Entertainment exploited the musical works composition of the song "Bad Girl".

210.    IN2N Entertainment exploited the sound recording of the song "Bad Girl".

211.    IN2N Entertainment exploited the musical works composition of the song "Club Girl".

212.    IN2N Entertainment exploited the sound recording of the song "Club Girl".

213. IN2N Entertainment is directed, controlled, managed, and owned by defendant Van Dell.

214. IN2N Entertainment controls and is parent to the publishing company IN2N Music.

215. IN2N Entertainment controls and is parent to the publishing company IN2N Musicworks.

### *Defendant Companies*

216. Defendant companies:  Destro (Underworld, Wavelab) Bystorm, Sony (Arista, LaFace), and IN2N Entertainment, may be referred to herein collectively as "Defendant Companies".

### <u>DEFENDANT – INDIVIDUALS (not previously named as a defendant above)</u>

*Mark Pitts*                              *"Pitts"*

217. On information and belief, defendant Mark Pitts ("Pitts") is an individual who resides in Bergen County, New Jersey and is believed to be a citizen of state of New Jersey; address as follows:  43 Old Quarry Road, Englewood, NJ 07631.

218. Pitts was Usher's A&R representative at all times relevant hereto.

219. Pitts directs, controls, manages, and owns defendant Bystorm Entertainment.

220. Pitts exploited the musical works composition of the song "Bad Girl".

221. Pitts exploited the sound recording of the song "Bad Girl".

222. Pitts exploited the musical works composition of the song "Club Girl".

223. Pitts exploited the sound recording of the song "Club Girl".

**_Tommy Van Dell_**                                  **_"Van Dell"_**

224.     On information and belief, defendant Tommy Van Dell ("Van Dell") is an individual who resides in New Hope, PA and is believed to be a citizen of state of Pennsylvania; address as follows:  41 W. Ferry Street, Suite A, New Hope, PA 18938.

225.     On information and belief, Van Dell directs controls, manages, and owns defendant company IN2N Entertainment Group, LLC.

226.     On information and belief, Van Dell directs controls, manages, and owns defendant publisher IN2N Music.

227.     On information and belief, Van Dell directs controls, manages, and owns IN2N Musicworks.

228.     Van Dell exploited the musical works composition of the song "Bad Girl".

229.     Van Dell exploited the sound recording of the song "Bad Girl".

230.     Van Dell exploited the musical works composition of the song "Club Girl".

231.     Van Dell exploited the sound recording of the song "Club Girl".

232.     Van Dell was instrumental in fostering the songwriting team of Marino, Barton, and Guice.


**_Defendants_**

233.     **Defendants Songwriters** (Barton, Guice, Usher, B. Avila, I. Avila, Harris, and Lewis); **Defendants Publishers** (Defenders of Music, EMI (EMI April, EMI Blackwood), Flyte Tyme, Guice (For The World), IN2N Entertainment (IN2N Music, IN2N Musicworks), Barton(Scan Disc), Sublime Basement, UR IV, and Warner Tamerlane);  **Defendants**

**Companies** (Destro, (Underworld, Wavelab), Bystorm, Sony (Arista, LaFace), and IN2N Entertainment); and **Defendant Individuals** (Mark Pitts and Van Dell), may all collectively be referred to herein as "Defendants".

## INTRO TO SONGWRITING, PRODUCTION & SOUND RECORDING

234.    *Songwriting -* can be described as writing both music and lyrics to a song. Someone who solely writes lyrics may be called a lyricist, and someone who only writes music may be called a composer.  Songwriters are musicians who write and compose the song structure, chord progressions, lyrics, and melody.

235.    *A Producer -* is an individual working within the music industry, whose job it is to oversee and manage the recording (i.e. "production") of an artist's music.  A producer has many roles that may include, but are not limited to, gathering ideas for the project, selecting songs and/or musicians, coaching the artist and musicians in the studio, controlling the recording sessions, and supervising the entire process through mixing and mastering.  Producers also often take on a wider entrepreneurial role, with responsibility for the budget, schedules, and negotiations.  The music producer's job is to create, shape, and mold a piece of music.

236.    *Engineering -* can be described as the technical aspect of recording—the placing of microphones, the turning of pre-amp knobs, the setting of levels.  The physical recording of any project is done by an engineer... the nuts and bolts.  Audio engineering concerns the creative and practical aspects of sounds and music.

237.    *Comparison Analysis of the respective roles of Songwriter, Producer, and Engineer as compared to the movie industry* – A music **producer** can be compared to a film

director, as the person who creatively guides or directs the process of making a record, like a director would a movie.  The audio **engineer** would be more the cameraman of the movie.  The **songwriter** would be analogous to the writer of the script of the movie.

238.     ***"Shopping" defined -*** shopping generally means presenting artists, musical works compositions, and sound recordings to record companies with the goal of securing a music recording or music publishing agreement (the proverbial "deal").  The idea is that a strategic relationship with an entity capable of funding and administering the recording, manufacturing, distribution and promotion of recorded products will enhance an individual artist or musical group's artistic and business stature, assets, and income.

## **RELATIONSHIP BETWEEN MARINO & BARTON**

239.     In 1996, plaintiff Marino met defendant Barton in Westbury Lane in the Overbrook section of Philadelphia.

240.     Marino was nineteen years old at the time and Barton was four years older at twenty-three years of age.

241.     The two individuals instantly became very close friends as they had a common bond of both being interested in music on a professional level.

242.     Marino was a multi-instrumentalist;  his primary instrument being guitar.

243.     Marino had also played with local musicians and played in bands in and throughout the greater Philadelphia area.

244.     Marino's musical interests and talents were writing songs, producing, recording, and engineering musical sound recordings.

245.     Barton had been a member of a local rap/hip-hop group.

246.    Barton did not play any instruments;  however, he did acquire a "drum-machine" which he learned to use to "make beats".

247.    Marino and Barton each had an ear for what sounded good.

248.    The two individuals developed a sincere friendship driven by their respect for each others talents and their goals in creating music together.

249.    Marino and Barton's talents complimented each other:  Marino created the music and Barton made the "beats" to accompany the music.

250.    Together Marino and Barton formed a songwriting and record production team.

251.    They originally worked in Barton's family's house and also in a studio in West Philadelphia at 42nd and Lancaster Avenue.

252.    Eventually the two would begin to write, produce, and record musical works compositions and musical sound recordings and develop artists in and throughout the Philadelphia area.

253.    As early as 1996, Marino and Barton had an attorney draft a contract for their work with artists.

254.    Marino and Barton received recognition in producing a record for Cynthia Horn, which gained the attention of Gamble and Huff from Philadelphia International Records[4], as well as Joe Nicolo from Ruff House Records and Studio 4.[5]

---

[4] Kenneth Gamble and Leon A. Huff are an American songwriting and record production team who have written and produced over 170 gold and platinum records and had formed Philadelphia International Records.  They were pioneers of Philadelphia soul and were inducted into The Rock and Roll Hall of Fame in 2008.

[5] Joe Nicolo launched Ruffhouse Records out of Studio 4 operations, and it moved more than 100 million units through Sony distribution and was responsible for the careers of Lauryn Hill, the Fugees, Cypress Hill, Kriss Kross and Wyclef Jean.  Ruffhouse alone accounted for 12 of Columbia Records 39 Grammy nominations during the 90s.

255.    In 1997 Joe Nicolo offered Cynthia, Marino, and Barton a record deal.  Marino and Barton had a production/artist/record label contract drafted for the Cynthia project.  Cynthia decided not to move forward with her music career and the deal fell apart.

256.    Shortly thereafter, in or about 1999, Marino started an on-location recording business called Nocturnal Noise and produced, engineered, and recorded hundreds of artists and bands in and throughout the Philadelphia metropolitan area.

257.    During the same time that Marino had started Nocturnal Noise, Barton had a room in recording Studio 4 and continued his musical endeavors, the two continued to stay in touch and remain close friends.


## COLLABORATION BETWEEN MARINO, BARTON, & GUICE

258.    In or about 2001, Marino and Barton began to work with musical artist, Guice.

259.    Marino and Barton believed that Guice had talent which they deemed noteworthy and believed that together the three could collaborate in creating musical works compositions and music sound recording projects.

260.    In or about 2001, Marino, Barton, and Guice formed a powerful songwriting trio ("Trio").

261.    Of the songwriting Trio, Marino was the only person who could play an instrument(s).

262.    Marino was also the only member of the Trio who also had an understanding of music theory and the language and notation of music including, song structures, keys, chords, and the fundamental parameters of elements of music including rhythm, harmony, melody, structure, form, and texture of music.

263.    Although Marino was the only member who had an understanding of music theory and could play instruments, Marino, Barton, and Guice were all actively involved in this process of taking songs from inception, creation, production, and recordation.

264.    The songwriting collaboration between Marino, Barton, and Guice broke down into a simple yet effective formula:

a.    Marino would write and rough out a song – framing out the song structure, tempo, chord progression, and basic melody of the song;

b.    Marino and Barton would then record the song together;

c.    Barton, with Marino's input, would then use a drum machine to make a "beat" to the song;

d.    Marino and Barton would then work together with an artist (sometimes Guice) to help complete the song by finishing up, adding to, or modifying the lyrics and making adjustments to the song to allow it to be completed.

265.    From the late 1990s to roughly 2004, Marino, Barton, and Guice wrote somewhere around 100 songs together.

266.    The agreement between the parties was that the three would share equally in the songwriting credits should any of the hundreds of songs they wrote together become successful.

**BUSINESS RELATIONSHIP BETWEEN MARINO & BARTON**

267.    This collaboration between Marino, Barton, and Guice soon brought Marino and Barton together to form a professional songwriting and production team, recording studio, and record label.

268.     In or about mid 2002, roughly seven years after forming their friendship, Marino and Barton again began to collaborate more seriously on a professional level in writing, producing, and recording songs.

269.     Marino and Barton believed that by combining their respective musical strengths and talents they could write, produce, and record songs that could then be "shopped" to artists, A&R managers, publishing houses, or larger record labels.

270.     Marino and Barton also believed that by combining their respective musical strengths and talents they could also develop artists to help push their professional musical goals as well as the musical careers of the artists or acts they were working with.

271.     In or about the end of 2002 to early 2003, Marino and Barton moved out of Studio 4 and began to look for a new music recording studio of their own.

272.     Although there were discussions for Guice to become part of the Underworld Entertainment label group, it was upon Guice's wish to not become involved in the business of music or music production and studio recording as he believed that he was an "artist" and felt that if he committed to the "business of music" it would taint him and shift his focus from being an "artist" to being a "businessman".  Guice had expressed to Marino and Barton that he could not sacrifice his purity as an "artist" with the "business of music" or commit to the responsibilities in operating a recording studio, record label, and fully commit as part of a songwriting and production team.

273.     Although Guice chose not to be part of the "business of music", the collaboration between Marino, Barton, and Guice caused Marino and Barton to focus their attentions on formally creating a songwriting and production team built around a business model which included songwriting and production, the recording studio, and record label.

274.     In or about February 2003, Marino and Barton found their new recording studio ("Studio") which was located in the City of Philadelphia at 1 Old Bridge Road, Philadelphia, PA.

275.     Marino and Barton both entered into a long-term multi-year lease for the ("Studio") at $1200 per month which they split equally at $600 each.

276.     Now having recording facilities of their own, Marino and Barton decided to formally go into business together as a songwriting and record production team.

277.     It was agreed between Marino and Barton that since Barton was four years older, had a strong personality, was "street smart", and had more knowledge and experience when it came to handling business matters, that he would be responsible for forming the business, incorporating and structuring the business venture, dealing with the finances, and handling much of the negotiations for deals.

278.     It was agreed between Marino and Barton that since Marino was more talented as a songwriter, musician, and engineer, that he would focus on writing the songs, and then recording these songs.

279.     It was agreed between Marino and Barton that since both were equally talented in music production and since both had good ears, that together they would produce the songs that Marino would originally create, the end result being that the sum was greater than the parts.

280.     The respective roles between Marino and Barton in this songwriting and music production team could be defined as follows:

    a.     Marino – Primary Songwriter & Engineer, and Co-Producer

    b.     Barton – Primary Businessman, Secondary Songwriter & Engineer, and Co-Producer

281.    The relationship between Marino and Barton was built upon valuing and respecting each others talents, strengths and weaknesses.  Both Marino and Barton were bound together through a deep personal friendship and admiration for the other, and were driven by a strong interest and desire to succeed professionally in the music industry.

282.    In or about 2003, after having signed the lease for the Studio, Marino and Barton began to operate their music business venture through a corporation.

283.    Barton had represented to Marino that there were benefits to operating in corporate form and that rather than spend the time and money to form a new corporation, that they should use a corporation that Barton had incorporated years earlier but was dormant with little to no activity.  Barton had suggested that Marino and Barton should use a prior corporation he formed called Destro Music Productions, Inc.

284.    Marino was initially not fond of the name Destro Music Productions, Inc. because "Destro" was a nick-name/street-name/artist-name that Barton had used in his past and Marino didn't want it to be an issue of confusion going forward.

285.    Marino however agreed to use Destro Music Productions, Inc. as the corporation by and which Marino and Barton would conduct business, persuaded by Barton's representations that it would be faster and cheaper than having to form a new corporation, paying a lawyer, and the additional filing fees associated with opening a new corporation.

286.    In or about 2003, Marino and Barton opened joint banking accounts and business banking accounts for their music businesses.

287.    It was agreed that Marino and Barton would each own an equal 50% interest in Destro Music Productions, Inc.

288.    It was also agreed that Marino and Barton would each be 50/50 partners in their music business ventures.

289.    Marino and Barton's musical business model was broken into three main divisions.[6]

a.    **Songwriting & Production Team – "**Destro Music" was Marino and Barton's songwriting and production company engaged in the business of creating and producing musical works compositions and musical sound recordings.

b.    **Recording Studio** – "Wavelab Recording Studios" was Marino and Barton's recording studio engaged in the business of providing the tools, equipment, operations, and space to create musical works compositions and musical sound recordings.

c.    **Record Label** – "Underworld Entertainment" was Marino and Barton's record label engaged in the business of developing artists, and in the business of creating, manufacturing, marketing, promoting, selling, and distributing musical works compositions and sound recordings.

290.    The songwriting and production team of Marino & Barton (Destro Music) worked out of their recording studio (Wavelab) and created and recorded musical sound recordings which were distributed through their label (Underworld).

---

[6] Marino and Barton based their business model on what they had discovered to be a common blueprint in the music industry - when a songwriting/production team develop ties with a studio and a record label.  Marino and Barton envisioned that their business paradigm should be akin to Philadelphia International Records or Ruffhouse Records, music enterprises which they aspired to become.  The songwriting/production team of Gamble & Huff worked out of Sigma Sound Studios where the music is recorded and the record label that distributes their musical sound recordings is their label Philadelphia International Records.  The songwriting/production team of Nicolo & Schwarz worked out of their recording studio Studio 4 where the music is recorded and the record label that distributes their musical sound recordings was their label Ruffhouse Records.  Similarly, the songwriting/production team of Marino & Barton "Destro Music" worked out of their studio "Wavelab Recording Studios" where the music is recorded and the record label that distributes their musical sound recordings was their label "Underworld Entertainment."

## COMMERCIAL SUCCESS OF THE SONG "BAD GIRL"

291.    From roughly 2002 to roughly 2004, Marino, Barton, and Guice wrote somewhere around 100 songs together.

292.    The agreement between the parties was that the three would share equally in the songwriting credits should any of the songs they wrote together would become successful.

293.    In or about early 2002, Marino, Barton, and Guice collaborated on a song Marino had initially written which was initially recorded as "Club Girl".

294.    The collaboration between Marino, Barton, and Guice for the song "Club Girl" broke down into their standard creative formula:

　　　　a.    Marino had the "initial seed of creativity" and wrote the song "Club Girl" by himself and on his own – framing out the song structure, tempo, chord progression, and basic melody of the song.

　　　　b.    Marino then met Barton in the studio and together they recorded the song "Club Girl" which Marino had created.

　　　　c.    After the initial recording of the song, Barton, with Marino's help, then used a drum machine to make a "beat" to Marino's recorded song;

　　　　d.    Marino and Barton then completed the song by collaborating with Guice who was instrumental in adding the lyrics to the song and also helped in reworking Marino's initial melody line.

295.    Tommy Van Dell was a publishing agent who had worked with Marino, Barton, and Guice for many years and mentored and fostered the Trio as a songwriting team, including buying a computer for the Trio to record songs with in Wavelab Studios, flying the Trio to

Nashville to work on songwriting and recording and covering all costs including the airfare, hotel, and all accommodations, introducing the Trio to the Horipro music publishing house and a handful of music studios in Nashville.

296.    Van Dell encouraged the Trio to focus on marketable musical styles incorporating a blend of contemporary R&B fused with pop, funk, hip-hop, soul, go-go, rock and new wave.

297.    Van Dell believed the Trio had a certain songwriting talent and abilities and represented to the group that he wished to "sign" them to his publishing label.

298.    In or about November of 2002, Van Dell brought Marino, Barton, and Guice all the way from Philadelphia to recording studios in Nashville, Tennessee so that the Trio could engage, collaborate, and write music with some of the best musical talents in the industry including Tommy Simms[7], Kate Bradshaw[8], and Billie Myers[9].

299.    In fact one of the recording studios and collaborations occurred in Tommy Simms studio in Brentwood, Tennessee which is outside of Nashville.

300.    Barton and Guice felt out-of-place and could not engage with the other musicians in the songwriting or creative process which took place in the studios in and around Nashville.

301.    Marino, on the other hand, felt at home in collaborating with these talented musicians and engaged in the creative process because of his abilities as a songwriter, multi-

---

[7] **Tommy Sims** is a renowned bassist, songwriter, record producer and bandleader.  From 1987 to 1989 he was the bassist of the popular Christian rock band White Heart which he left to become a studio musician and producer. During 1992-1993, he played bass on the Bruce Springsteen and the "Other Band" Tour.  He is also a songwriter, who wrote Eric Clapton's "Change the World" which won the Grammy Award for Song of the Year in 1997.  Other songs of his have been recorded by Bonnie Raitt, Garth Brooks, Cher, BlackStreet, Toni Braxton and BabyFace among others. Tommy has also worked with Michael Bolton, Kelly Clarkson, Michelle Williams of Destiny's Child, and others.

[8] **Kate Bradshaw** is an American singer, songwriter, from New Jersey who plays guitar and piano and writes and performs in the Pop, R&B, and Rock genre.

[9] **Billie Myers** is an English recording artist who wrote the notable hit and her signature song "Kiss the Rain."  The song was released in 1997 as the lead single of the album *Growing Pains* which was produced by Desmond Child and released by Universal Records.

instrumentalist, his understanding of music theory, song structure, musical keys, and chord progressions.

302.    While the group was in Nashville for the musical songwriting collaboration, Barton had told Marino that Van Dell was going to be the Trio's publisher and was signing Marino, Barton, and Guice to his publishing company.

303.    Van Dell, after working with the Trio was immediately drawn and seized upon the song "Club Girl" and wished to exploit this musical work composition and musical sound recording.

304.    Originally Marino and Barton were trying to "break" Guice as an artist and had planned the song "Club Girl" to be Guice's break-out hit;  however, when the opportunity presented itself from major artist Usher, even Guice who was partial to the song because he wished to exploit it to break his career decided with Marino and Barton to push the song to Usher which was in the interest of Marino, Barton, and Guice.

305.     Van Dell wished to exploit this musical work compositions and the musical sound recording "Club Girl" and was the publishing agent who was instrumental in helping the Trio "shop" and contract the song "Club Girl" to Usher and Usher's representatives.

306.    The song "Club Girl" was included on a certain demo album that was "shopped" and distributed to defendant Usher.

307.    Mark Pitts[10] who was Usher's A&R representative at all times relevant hereto was instrumental in selecting, and contracting the song "Club Girl" and "Bad Girl" which was one of 14 songs that was included on Ushers *Confessions* album.

---

[10] **Mark Pitts** - has molded the careers of Usher, TLC, Chris Brown, Notorious B.I.G., Nas, Cee-Lo, Faith Evans, and Ciara to acclaim.  He co-found Bad Boy Records with Sean Puffy Combs and managed The Notorious B.I.G. to success, and ultimately branched-off to start his own powerhouse and became CEO of Bystorm Entertainment, in 1994.  His

308.     Pitts was the music industry executive who contracted for and "put the deal together" for the song "Club Girl", later, "Bad Girl" written and produced by Marino, Barton, and Guice and which was included on Usher's album.

309.     Marino, Barton, and Guice, agreed that Barton (on behalf of Marino, Barton, and Guice) would be responsible for and handle the negotiations for the songwriting credits for the Song with Pitts, Bystorm Entertainment, Usher, Usher's representatives, Usher's record label(s), publishing companies, and any other parties in interest.

310.     Consistent with their prior agreement, Marino, Barton, and Guice agreed that each would share equally (a respective 1/3 interest) in the songwriting credits of the Song.

311.     Marino, Barton, and Guice agreed that Barton (on behalf of the Trio) would be responsible for and handle the negotiations for their publishing deal with Van Dell and his publishing company.

312.     Consistent with their prior agreement, Marino, Barton, and Guice agreed that they would share equally (a respective 1/3 interest) in the publishing deal with Van Dell and his company.

313.     Marino and Barton agreed that Barton (on behalf of Marino, Barton, and their production company Destro Music) would be responsible for and handle the negotiations for the productions credits for the song "Club Girl" and "Bad Girl" with Pitts, Bystorm Entertainment, Usher, Usher's representatives, Usher's record label(s), publishing companies, and any other parties in interest.

---

reputation led L.A. Reid to tap him as Sr. Vice President of A&R for Arista Records in 2000.  He is the President of Urban Music for the Zomba Label group.

314.    Consistent with their prior agreement, Marino and Barton agreed that each would share equally (a respective 50% interest) in the production credits of the song "Club Girl" and "Bad Girl".

315.    Marino and Barton agreed that Barton (on behalf of Marino, Barton and their record label Underworld Entertainment) would be responsible for and handle the negotiations for royalty credits and any other credits for the Song with Pitts, Bystorm Entertainment, Usher, Usher's representatives, Usher's record label(s), publishing companies, and any other parties in interest.

316.    Consistent with their prior agreement, Marino and Barton were each to share equally (a respective 50% interest) in any royalty credits or other credits they received on behalf of their record label Underworld Entertainment or individually of the song "Club Girl" and "Bad Girl".

## USHER'S CONFESSIONS ALBUM

317.    Defendant Usher[11] is an immensely successful musical artist who has recorded numerous hit songs and has achieved worldwide stardom over the past ten years.

318.    Defendant Arista Records and LaFace Records are in the business of creating, manufacturing, selling, and distributing musical works compositions and musical sound recordings, including the musical works composition and sound recording of "Club Girl" and

---

[11] **Usher**, formally named Usher Terry Raymond IV and born October 14, 1978, is an American recording artist, dancer, and actor who performs under the mononym **Usher**.  He is considered around the world to be the reigning King of R&B.  The RIAA ranks Usher as one of the best-selling artists in American music history, having sold over 23 million copies in the United States alone.  To date, he has sold over 65 million records worldwide, making him one of the Best selling music artists of all time. Usher, has won numerous awards including seven Grammy Awards, four World Music Awards, six American Music Awards, and twenty two Billboard Music Awards.

"Bad Girl" credited to the artist, Usher, who at the relevant times was on the Arista imprint and the LaFace imprint, both of which are now subsidiaries to Sony.

319.    On information and belief, during 2003 - 2004, Usher began working on and recording his fourth studio album titled *Confessions*.

320.    On March 23, 2004, superstar Usher released his fourth studio album *Confessions* which was released on the Arista imprint and the LaFace imprint, both of which are now subsidiaries of Sony.

321.    The album was an instant commercial success in the United States, selling 1.1 million copies in its first week.  Usher earned several awards, including a Grammy Award for Best Contemporary R&B Album.  The album has sold over 10 million copies in the US and has been certified diamond in sales by the Recording Industry Association of America (RIAA).  According to *Billboard*, it is the second best-selling album of the 2000s decade in the US and has been regarded by music writers as Usher's greatest work.

322.    The *Confessions* album was the coming together of the best musicians, artists, producers, and executives from the music industry to collaborate on the album including: Antonio "LA" Reid, Jermaine Dupri, Lil Jon, Rich Harrison, James Samuel "Jimmy Jam" Harris III and Terry Lewis, Robin Thicke, Bryan-Michael Cox, Just Blaze, Dre & Vidal, Bobby Ross Avila, Issiah Avila, James "Big Jim" Wright, R. Kelly, Jadakiss, Alicia Keys, Ludacris, The Neptunes, Sean Puffy Combs "P. Diddy", among others.

323.    Out of hundreds of songs only 14 tracks made the cut to be included on the *Confessions* album.  One of the 14 songs - "Bad Girl" - was written and produced by Dan Marino along with his producing partner Dante Barton and lyricist Will Guice.

**USHER'S ALBUM CREDITS FOR THE SONG "BAD GIRL"**

324.   Usher's *Confessions* albums credit the following individuals or entities for their

contributions to the song "Bad Girl" as follows:

a.   **Written by:**
   i.   James Harris III;
   ii.   Terry Lewis;
   iii.   Usher Raymond;
   iv.   Dante Barton;
   v.   Wil Guice;
   vi.   Bobby Ross Avila;
   vii.   Issiah J. Avila.

b.   **Published by:**
   i.   EMI April Music, Inc.        (ASCAP);
   ii.   Fyte Tyme Tunes             (ASCAP);
   iii.   UR IV Music                (ASCAP);
   iv.   EMI April Music, Inc.       (ASCAP);
   v.   ScanDisc                     (BMI);
   vi.   IN2N Music                  (BMI);
   vii.   For The World              (BMI);
   viii.   IN2N                      (BMI);
   ix.   Sublime Basement Tunez      (BMI);
   x.   Defenders of Music           (BMI);

c.   **Produced by:**
   i.   Destro Music for Underworld Entertainment/Bystorm
        Entertainment;
   ii.   Harris and Terry Lewis for Flyte Tyme Productions, Inc.

d.   **Co-Produced by:**
   i.   Bobby Ross Avila & IZ for for A.B. Experience/Flyte Tyme
        Productions, Inc.

e.   **Recorded by:**
   i.   Matt Marrin at the Village Recorders, LA, CA & Flyte Tyme
        West, Santa Monica, CA.

f.   **Additional Recording by:**
   i.   Dante "Destro" Barton at Wavelab Recording, Philadelphia, PA

g.   **Mixed by:**
   **i.**   Serban Ghenea at MixStar Studios, Virginia Beach, VA.

h.  **Assisted by:**
   i.   Tim Roberts

i.  **Additional Pro-Tools Engineer:**
   i.   John Hanes

j.  **Additional Drum Programming, Guitar & Keyboards:**
   i.   Bobby Ross Avila

k.  **Percussion & Scratches:**
   i.   IZ

l.  **Guitar:**
   i.   Daniel Marino

m.  **Background Vocals:**
   i.   Usher;
   ii.  Tony "Prof" Tolbert

## THE ALBUM CREDITS FOR THE SONG "BAD GIRL" ARE WRONG

325.    Marino, Barton, and Guice were all very excited that the song they wrote and recorded was picked up by a superstar artist – Usher, that it was distributed by a major label, that the Trio had signed a publishing deal, and that they achieved a level of success in the music industry realized by few.

326.    Joined by their love of music, this was a dream-come-true for Marino, Barton, and Guice who could now hear their song "Bad Girl" being played on the radio.

327.    After hearing that Usher's newly released *Confessions* album was available in stores, Marino ran down to Tower Records on Broad Street in Philadelphia and no sooner did he purchase the album that his joy quickly turned to disappointment.

328.    Marino unwrapped the cellophane of the CD casing and just as soon as he read the credits in the CD liner, his heart sunk – *he wasn't properly credited.*

329.    Marino again, this time carefully, re-read the credits for the song "Bad Girl" and to his shock and disbelief discovered he wasn't credited as the writer of the Song.

330.    Marino again, carefully, read the credits for the song "Bad Girl" and to his shock and disbelief discovered that he wasn't credited as the producer of the song.

331.    Marino's heart sunk after he slowly re-read the CD liner that he wasn't properly credited as the songwriter.

332.    Marino discovered after reading the CD liner that seven (7) other individuals were credited as the writers of the song including his songwriting partners Barton and Guice as well as Usher among many others whom he never had met or worked with on the song "Club Girl" or "Bad Girl".

333.    Marino, Barton, and Guice should have been the only individuals credited as the songwriters for "Bad Girl" and "Club Girl".

334.    Marino discovered after reading the CD liner that he wasn't properly credited individually as the producer of the song.

335.    Marino discovered after reading the CD liner that Marino and Barton's production company – Destro Music – was credited.

336.    Marino discovered after reading the CD liner that Harris and Lewis were credited individually as producers of the song "Bad Girl" whom Marino had never met or worked with on the song "Bad Girl" or "Club Girl".

337.    Marino discovered after reading the CD liner that Marino wasn't credited individually for "Additional Recording".

338.    However, Marino discovered after reading the CD liner that Barton was credited for "Additional Recording".

339.    Marino and Barton should have each been individually correctly credited as the providing the "Recording" of the song "Bad Girl".

340.    Marino discovered after reading the CD liner that Marino's recording studio – Wavelab Recording Studios – wasn't properly credited as "Recorded by".

341.    However, Marino and Barton's studio - Wavelab Recording Studio - is credited as "Additional Recording".

342.    Wavelab Recording Studio should have been credited as "Recorded by Marino and Barton at Wavelab Recording Studio" and "Additional Recording" by the other names/studios credited for their limited contributions.

343.    Marino and Barton's record label – Underworld Entertainment – wasn't properly credited.

344.    Underworld was credited as being the entity which Destro Music produced the song "Bad Girl" for, however, Bystorm Entertainment was also identified which Marino was not familiar with.

345.    For Marino, this was a surreal, bitter-sweet event because:

    a.    **Marino wasn't properly credited as the songwriter;**

    b.    **Marino wasn't properly credited as the producer;**

    c.    **Marino's recording studio wasn't properly credited; and**

    d.    **Marino's record label wasn't properly credit.**


**BREAKDOWN OF SONGWRITING CREDITS FOR "BAD GIRL"**

346.    Defendant Songwriters are credited as songwriter/composers of the work titled "Bad Girl" and claim to have written "Bad Girl."

347.    Defendant Songwriters have been credited as follows in the writing of "Bad Girl" identified with their current performing rights organization and CAE/IPI #:

| | | | | |
|---|---|---|---|---|
| a. | Bobby Ross Avila, Jr. | BMI | 3.50% | 227.45.15.77 |
| b. | Issiah Avilla, Jr. | BMI | 3.50% | 241.20.15.28 |
| c. | Dante Edward Barton | BMI | 37.50% | 464.65.82.26 |
| d. | William C. Guice | ASCAP | 37.50% | 345.22.94.67 |
| e. | Harris James Samuel III | ASCAP | 6.50% | 125.10.52.25 |
| f. | Terry Steven Lewis | ASCAP | 6.50% | 125.21.50.20 |
| g. | Raymond Usher | ASCAP | 5.00% | 340.98.14.62 |

## BREAKDOWN OF PUBLISHING CREDITS FOR "BAD GIRL"

348.    Defendant Publishers are credited as publishers ("Defendant Publishers") of the work titled "Bad Girl".

349.    Defendant Publishers have been credited as follows as publishers in the work "Bad Girl" identified with their current performing rights organization and CAE/IPI #:

| | | | | |
|---|---|---|---|---|
| a. | Defenders of Music | BMI | 3.50% | 358.18.57.29 |
| b. | EMI April Music, Inc. | ASCAP | 9.00% | 128.63.37.67 |
| c. | Flyte Tyme Tunes | ASCAP | 6.50% | 122.64.31.10 |
| d. | For the World | ASCAP | 18.75% | 345.72.06.61 |
| e. | IN2N Music | BMI | 18.75% | 428.90.20.57 |
| f. | IN2N Musicworks | ASCAP | 18.75% | 435.92.38.41 |
| g. | Scan Disc Publishing | BMI | 18.75% | 432.17.87.66 |
| h. | Sublime Basement Tunez | BMI | 1.75% | 194.54.12.59 |
| i. | UR IV | ASCAP | 2.50% | 336.22.15.90 |
| j. | Warner-Tamerlane | BMI | 1.75% | 185.31.41.75 |

## BREAKDOWN OF SONGWRITING CREDITS FOR "CLUB GIRL"

350.    Defendant songwriters Barton and Guice are credited as songwriter/composers of the work titled "Club Girl" and claim to have written "Club Girl."

351.    These defendant songwriters have been credited as follows in the writing of "Club Girl" identified with their current performing rights organization and CAE/IPI #:

| | | | | |
|---|---|---|---|---|
| a. | Dante Edward Barton | BMI | 50.00% | 464.65.82.26 |

| | b. | William C. Guice | ASCAP | 50.00% | 345.22.94.67 |

## BREAKDOWN OF PUBLISHING CREDITS FOR "CLUB GIRL"

352.    Defendant publishers Scan Disc Publishing and Songs of HEG are credited as publishers of the work titled "Club Girl" according to the performing rights organizations.

353.    These defendant publishers have been credited as follows as publishers in the work "Club Girl" identified with their current performing rights organization and CAE/IPI #:

| | a. | Scan Disc Publishing | BMI | 50.00% | 432.17.87.66 |
| | b. | Songs of HEG | BMI | 50.00% | 503.47.22.86 |

## BREAKDOWN IN THE RELATIONSHIP BETWEEN MARINO & BARTON

354.    Usher's *Confessions* album was released on March 23, 2004, and after the release of the album, Marino and Barton continued to work together everyday in their studio Wavelab making and recording music and working with various artists.

355.    In fact, Wavelab Studios, Underworld Entertainment, and Destro Music Productions began to generate a "buzz" from the success of the song "Bad Girl" which was included on Usher's *Confessions* album, and subsequent albums and releases.

356.    To Marino, everything in his relationship with Barton seemed the same – each day they still worked together writing, producing, and recording music, and the two continued to spend time together outside of the Studio.

357.    During the time before and after the release of Usher's *Confessions* album, Marino and Barton's respective roles were unchanged, that is:

    a.    Marino – Primary Songwriter & Engineer, and Co-Producer;

    b.    Barton – Primary Businessman, Secondary Songwriter & Engineer, and Co-Producer.

358.    Marino, after discovering that he wasn't properly credited on the "Bad Girl" song, immediately drove to Marino and Barton's recording studio where the two had spent countless hours each day, over the course of many years - Wavelab Recording Studios on Old Bridge Road in Philadelphia.

359.    That day Marino and Barton had planned to commemorate their great achievement of two close friends who actually "made-it" in the music industry as professionals – the song they wrote and produced together was playing on the radio, all over the world, by one of music's top superstars – Usher.

360.    When Marino arrived at the studio, Barton had already begun celebrating the success of the CD and was "popping champagne" in the control room.

361.    However, the festive nature of the celebration quickly turned sour as Marino pulled the CD out and showed it to Barton and declared that ***the credits are wrong and need to be fixed.***

362.    Barton had responded that he too was surprised when he learned how the Song was credited on the CD liner but that he didn't know how to "break" the news to Marino about the mistake.

363.    Barton explained that there was <u>absolutely nothing intentional</u> done and that is was <u>nothing more than a "mistake"</u> and a <u>"printing error"</u> and that Barton would see to it that the credits were corrected to properly reflect Marino's writing and production of the song "Bad Girl" along with other corrections as listed above.

364.    Barton further expressed to Marino that they had been best of friends for nearly 10 years, had lived, slept, and ate together, and broke bread at each other's homes and that

whatever mistake was made in the printing of the CD liner was <u>purely accidental</u> and that it would be corrected.

365.    Barton had stressed to Marino that he needed to "stop trippin'" and "trust his friend" that Barton's "word is bond" and that he would make sure that the credits would be corrected to properly reflect Marino as songwriter and producer and the other changes that needed to be made.

366.    Barton further expressed to Marino that they were a team;  that the team works; that they wrote and produced one of the top songs out on the radio and pleaded to Marino to stay focused on the "music-end" so that Barton could stay focused on the "business-end" to make things happen for them both.

367.    Marino believed the representations his close friend, songwriting, production, and business partner had made to him.

368.    Marino felt comforted and reassured that his good and trusted friend of nearly 10 years who spent nearly everyday together with him in the studio working on music as a team would not betray him.

369.    At the time, Marino even felt bad for confronting Barton in an accusatory manner regarding the credits.

370.    The simple truth is that Marino believed Barton.

371.    Shortly thereafter, Marino had asked Barton when they would be getting paid for the songwriting, production, and ownership in the song "Bad Girl" and Barton had replied that once all the credits were resolved that they would get paid.

372.    In May of 2004, a couple months after the release of Usher's *Confessions* album, Marino, Barton, and Guice began to receive much acclaim for their songwriting and production skills in having one of the songs they wrote, produced, and recorded make Usher's album.

373.    Anthony J. Caroto and Yaron Gabai, both members of the Recording Academy[12] had featured Marino, Barton, and Guice in Philadelphia's own local music publication Origivation and interviewed all three individuals for their contributions in songwriting, producing, recording, and distributing the Song "Bad Girl" / "Club Girl".  A full blown feature interview was conducted, as well as a pictorial spread taken at Marino and Barton's recording studio – Wavelab Studios in Philadelphia.  *See attached Origivation Article;  Exhibit "A".*

374.    Marino, Barton, and Guice were all present for the interview and the photo shoot and presented the truth regarding their songwriting, production, and recording of the Song which they each represented to the interviewer and it was further published in May of 2004 that:

     a.    **"Bad Girl" was a song written by Marino, Barton, and Guice.**

     b.    **The songwriting team was Marino, Barton, and Guice.**

     c.    **Marino and Barton were the Producers.**

     d.    **The song was recorded at Wavelab Recording Studios.**

     e.    **Underworld Entertainment was the label for the group.**

     f.    **Usher's team of producers asked for the Pro-Tools audio files so that Usher could sing over the verse and hook.**

---

[12]  The Academy recognizes the best in music through the GRAMMY Awards to establishing itself as the preeminent arts advocacy and outreach organization in the country.  Celebrating music through the GRAMMY Awards for more than 50 years, The Recording Academy continues its rich legacy and ongoing growth as the premier outlet for honoring achievements in the recording arts and supporting the music community.  The GRAMMYs are the only peer-presented award to honor artistic achievement, technical proficiency and overall excellence in the recording industry, without regard to album sales or chart position.  The Academy's mission statement is simple, but represents the heart and soul of the organization's efforts: to positively impact the lives of musicians, industry members and our society at large.

*See attached <u>Origivation</u> Magazine Article titled "Welcome to the World of 'Underworld Entertainment'" and advertised on the cover as ""Confessions" of a Record Producer"; Exhibit "A".*

375.     Weeks turned to months and the credits for "Bad Girl" still were not corrected and Marino received no money.  Each time Marino would inquire whether the credits were fixed, he was met with reasons, explanations, and excuses by Barton that it was "being taken care of."

376.     Thereafter, Marino again made inquiries to Barton as to whether or not the credits had been corrected and when would they begin to be paid for the song.  Barton answered him that it was "being taken care of" that "these things take time" that it was "going through corporate" that it was being "dealt and handled by A&R" that it was "tied up on Usher's end" and that "Usher's people are dragging their feet".

377.     Marino also spoke to Guice who agreed with Marino that Marino should have been properly credited as an equal songwriter with Barton and Guice, and as an equal producer with Barton.  Guice further went on to say that the whole thing was "wrong" and that Barton was the one who needed to fix the credits to reflect Marino as a songwriter and producer of the song "Bad Girl".  Guice additionally stated that it was Barton's matter to handle and postured a hands-off approach and that it was an issue that Marino needed to resolve with Barton.

378.     Shortly thereafter, Marino lost contact with Guice when Guice moved out of state.

379.     In October of 2004, after some time had passed and after being met with excuses by Barton, Marino decided to seek legal counsel.

380.     October 5, 2004, a letter was drafted by attorney Simon J. Rosen, Esquire where Marino had asserted that he co-authored, co-produced, co-owned the master recording, and performed lead guitar on the song entitled "Club Girl/Bad Girl" but was not properly credited as

such in the credits of Usher's released *Confessions* album.  *See attached Letter by Simon J. Rosen, Esquire dated October 5, 2004;  Exhibit "B".*

381.     In October 2004, a contingency fee agreement was also drafted in anticipation of litigation should Barton not agree to rectify the issues with proper accreditation on the song "Bad Girl" and "Club Girl".  *See attached Contingency Fee Agreement by Simon J. Rosen, Esquire dated October ___, 2004;  Exhibit "C".*

382.     Marino presented this Letter along with the Contingency Fee Agreement to Barton, whose duty and responsibility it was to handle the business affairs, and told Barton that he would file a law suit if the credits weren't corrected and adjusted to reflect Marino's co-authorship, co-production, and co-ownership in the Song.

383.     Barton told Marino that he was "wacked" and that he was "crazy" and "trippin'" to threaten a lawsuit and to doubt their "friendship" and Barton's "loyalty" and "destroy" what they built.

384.     After receiving the Letter and the Contingency Fee Agreement, Barton, however, **promised** to Marino that he would promptly handle the matter to correct all the issues regarding the credits.

385.     Barton further **promised and represented** to Marino that he would take care of the improper credits and begged him to trust him as they were "brothers", that they "grew up together" and that he would not "screw his friend, writing and producing partner over" that it was merely an unintentional "mistake".

386.     In February 2005, Barton assured Marino that the credits were "being handled by Usher's people" and presented to Marino two invitational tickets for the Grammy's which they received from "Usher's people" because of their contributions on the album.

387.    Marino and Barton flew to Los Angeles to attend the 47th Grammy Awards, where Usher's *Confessions* album won many awards.  *See attached Picture of Marino and Barton at the Grammy's;  Exhibit "D".*

388.    After getting "comped" to the Grammy's and being star-struck by the success of the Album and the attention Marino and Barton had received in going to the Grammy's, Marino had a renewed faith in Barton and Barton further impressed upon Marino that it was just a matter of time before the credits were fixed and then the money would start to come in, as continually represented by Barton.

389.    In or about the Fall of 2005, Barton had represented to Marion that the reason the credits and money from the song "Bad Girl" was taking so long was because the lawyers were putting together a "Royalties Resolution" and that there were extensive and ongoing negotiations with the publisher, legal counsel, RCA/BMG business affairs department (and accounting personnel) regarding the royalties and credits for Usher's recording of "Bad Girl".

390.    In or about the Fall of 2005, Marino had demanded that Barton to produce something to "ease his nerves" or prove to him that *something* was being done to fix the credits and the royalties.

391.    In response to Marino's demand, Barton presented to Marino a letter from an attorney in New York who had drafted recording agreements for Marino and Barton for their record label – Underworld Entertainment.

392.    Barton presented an invoice to Marino from Wallace Collins, Esquire, dated November 22, 2005 in which it confirmed Barton's representations to Marino.  The invoice is captioned as regarding a "Mechanical Royalties Resolution … in connection with extensive, ongoing negotiations with IN2N and HoriPRO's legal counsel, and with RCA/BMG business

affairs department (and accounting personnel), and ***revisions to letter of direction for release of mechanical royalties on Usher's recording of "Bad Girl"***.   *See attached Letter from Wallace Collins, Esquire dated November 22, 2005;  Exhibit "E".*

393.    The presentation of the letter along with Barton's continued representations that everything was "being handled" to correct the issues with credits and royalties instilled a renewed faith for Marino in Barton and in the belief – as represented – that the matters were being corrected by professionals and that they take time and that Marino would be properly credited and would eventually receive the credit and monies he deserves.

394.    Marino felt reassured that his close friend and partner would not deceive him and he trusted him in good faith, after all, they continued to work daily in their Studio.

395.    In June of 2006, Barton again explained that there were issues with the credits that prevented payment and that "adjustments" were made because of a "mistake in the writing credits" and therefore the credits and money would be tied up until "the attorneys" rectified the situation.

396.    Each time Marino asked Barton to give him an update on what was going on with the credits and his royalties, he was told that the "money was in trust",  "lawyers are taking care of everything", "the money is in escrow and that he would be getting paid", and that "the lawyers and industry executives are working it all out".

397.    In or about the summer of 2006, Barton did share with Marino mechanical songwriting royalties from the song "Bad Girl" in the amount of $4,553.06 in an effort to "tide-over" Marino and assuage any doubts that Marino might have.  These monies were alleged by Barton to be part of the monies trapped "in escrow" because of the dispute regarding the songwriting and other credits that Barton was allegedly correcting.

398.     In or about late October to early November of 2007, Marino finally confronted Barton and demanded that he sign a statement confirming that Marino co-authored, co-produced, and co-owns the songs "Club Girl" and "Bad Girl".  Barton, reluctantly signed the statement claiming that it was *entirely unnecessary*.  This statement was written on a copy of the Letter from Attorney Simon J. Rosen, Esquire which Marino confronted Barton with originally in 2004. *See attached Letter from Attorney Simon J. Rosen, Esquire dated October 5, 2004 with statement signed by Barton dated October 2007;  Exhibit "F".*

399.     Weeks, months, and years went by and Marino and Barton continued to work side-by-side in the Studio working with various artists on projects as a songwriting and production team, recording studio, and record label.

400.     In fact, Marino believed that he and Barton were in the struggle together and it was just a question of time before the credits and royalties got sorted so that they could finally enjoy the benefits of their successful song "Bad Girl" and "Club Girl".

401.     Marino patiently waited, trusting his friend, and believing that once the credits were corrected, that their payday was coming and they would receive the royalties that were sitting in "escrow".

402.     However, sometime during the summer or fall of 2009, Marino went to Wavelab Recording Studios to work on a project with his friend and music partner, but Barton never showed.

403.     Marino was surprised that Barton had never showed that day or called to give him "heads up" as to his whereabouts.  The next day, the same thing happened - Barton again didn't show.  The following day, again there was no sign of Barton.  There was no message from Barton or phone call, no email, or text – nothing.

404.    Marino thought it odd and bizarre that he wasn't able to get in contact with Barton and thought that either he went on a much needed vacation or that something bad might have happened to Barton.  Marino attempted to contact friends, family, business partners, and musical contacts.  Marino was genuinely concerned for Barton who unexpectedly disappeared without any notice or explanation, without packing, and leaving many of his personal possessions, gear, and things in the studio.

405.    To Marino, Barton's behavior was bizarre in that he just stopped showing up at the Studio.  Marino tried to track down Barton and find out what had happened to his friend and business partner.  Marino was getting no answers, no replies, no messages, and was met with excuses as to the whereabouts of Barton.

406.    In or about late October to early November 2009, Marino began to organize the Studio and discovered a file folder which was tucked away in a box that had some of Barton's personal effects.

407.    After not being able to contact Barton, and Barton, not returning Marino's calls or emails, Marino decided to leaf through the file folder to see if it was anything important or things he could throw away.  **What Marino saw made him sick.  He discovered that Barton had been hiding royalty statements from Marino for the song "Bad Girl" where Barton and Guice had received hundreds of thousands of dollars over the course of many years, in fact, right from the release of the Usher's Confessions album including tens of thousands of dollars in advances.**

408.    Marino began to panic and wondered if he would ever be properly credited for his authorship or production in the song "Bad Girl" and "Club Girl".  Marino also thought of the hundreds of thousands of dollars he lost because he was deceived and betrayed by his friend and

business partner.  Just as soon as Marino started to piece together the puzzle of deception, he

emotionally and mentally shut down without the ability to process that reality.

409.    Being deceived and betrayed by his close friend and business partner of more than

10 years, Marino was left emotionally and mentally crippled.  Dumb, foolish, ignorant, and

naïve, Marino felt like the stupidest person on the planet.  Not only was Marino's self-esteem

destroyed but his hope, faith, and love of music lost.  For Marino, it was more than an issue of

money, it was an issue of trust and the betrayal by his close friend, his songwriting, production,

and business partner whom he lived with and worked with daily.  For Marino, it was also a

songwriter's worst experience – the loss of his own creation and the ***denial of the 'right of***

***attribution'*** among many other loses and injuries as plead throughout this complaint.

410.    Marino's first response to discovering how Barton, his good friend and partner,

betrayed him was to be consumed in a state of denial.  To Marino, everything felt surreal, like a

dream, as if being in a strange mean world with the hope that tomorrow he would wake up and

he would open Usher's *Confessions* album, read the CD liner notes and discover that he was

properly credited and that his relationship with his close friend and partner was unchanged.  For

Marino, denial was his response in this life-changing and traumatic situation.  It was Marino's

way of coping with the shock.

411.    Marino's mind and body could not process the reality of what had occurred; for

months his system shut down, overwhelmed with hurt, fear, anxiety, panic, and disbelief.

412.    Marino's was left with a feeling of grief.  He couldn't stop hurting; he couldn't

eat, he couldn't sleep, he couldn't do anything except for wallow and hurt.  Marino had

attempted to rebuild his life and surround himself with people who genuinely care.  However,

Marino could not prevent his remorse from turning into a deep depression.

413.   After having been nearly destroyed emotionally, mentally, personally, and financially from such a deceptive and dishonest betrayal of worldly proportions, Marino's mind and body completely shut down - it was more than Marino could take at that time.

414.   And now comes Marino being mentally, emotionally, and physically able to address this situation files this suit.

## COUNTS[13]

## COUNT I – DIRECT COPYRIGHT INFRINGEMENT OF "CLUB GIRL" AND BAD GIRL"

### MARINO v. BARTON, GUICE, USHER, B. AVILA, I. AVILA, HARRIS, LEWIS, DEFENDERS OF MUSIC, EMI, FLYTE TYME, IN2N ENTERTAINMENT, SUBLIME BASEMENT, UR-IV, WARNER-TAMERLANE, DESTRO MUSIC, BYSTORM, SONY, PITTS, & VAN DELL

415.   Plaintiff hereby incorporates by reference the preceding paragraphs and repeats and realleges each of the allegations as if fully set forth here

416.   On information and belief, Defendants were aware in. of, participated in, and contributed to the exploitation of the musical work and sound recording of "Bad Girl" and "Club Girl" including the marketing, selling, distribution, and exploitation of "Bad Girl" and "Club Girl" in the Unites States of America, and including in the Eastern District of Pennsylvania, through sales of CDs, radio and television airplay, and otherwise.

---

[13] "Defendants" as used in the "Counts" section of this Complaint refer to the defendants named in the Count Headings.

417.    On information and belief, Defendants have earned millions of dollars in revenue from their exploitation of "Bad Girl" and "Club Girl" and continue to actively exploit the musical work and sound recording worldwide through sales of CDs, radio and television airplay, and otherwise.

418.    Defendant Songwriters B. Avila, I. Avila, Barton, Guice, Harris, Lewis, and Usher are improperly credited as songwriters of the musical work "Bad Girl" and have improperly alleged to have written "Bad Girl."

419.    Defendant songwriters Barton and Guice are improperly credited as songwriters of the musical work "Club Girl" and have improperly alleged to have written "Club Girl" on their own and by themselves without Plaintiff's co-authorship.

420.    Defendant Songwriters had **access** to Plaintiff's work "Club Girl" and **slavishly** copied both the underlying musical composition and the sound recording by incorporated substantial, original portions of Plaintiff's musical work and sound recording of "Club Girl" in Defendant Songwriters musical work and sound recording "Bad Girl."

421.    Defendants further had **direct access** of the work "Club Girl" and copied elements of the song "Bad Girl" and "Club Girl" which are original expressive elements of the musical work and sound recording of the song "Club Girl" and "Bad Girl" written and recorded by Plaintiff.

422.    There is far more than a *substantial similarity* between the two works "Bad Girl" and "Club Girl".  There is an almost *identical similarity* due to Defendant Songwriters' **slavish copying** of the underlying musical composition and the sound recording of "Club Girl."

423.    Defendants never sought or obtained Plaintiff's permission to copy, duplicate, perform, exploit, or otherwise use Plaintiff's underlying musical composition and sound

recording "Club Girl" in Defendant Songwriters' alleged musical work and sound recording, "Bad Girl," or at all, or in any other subsequent exploitations of Plaintiff's work.

424.    Defendants' copying, duplication, use, performance, and exploitation of "Club Girl" in the underlying musical composition and sound recording of "Bad Girl" constitute infringements of Plaintiff's copyright in the musical work and sound recording of "Club Girl" and "Bad Girl".

425.    Defendants' infringing acts were willful, deliberate, and committed with prior notice and knowledge of Plaintiff's copyrights.  At a minimum, Defendants acted negligently and recklessly in regards to Plaintiff's copyrights – his musical works copyright and sound recording copyright in both "Club Girl" and "Bad Girl".

426.    In engaging in the acts complained of herein, Defendants, among other things filed false copyright applications for the musical work "Bad Girl", falsely listing Defendant Songwriters as the songwriters of the musical work and/or record owners of the sound recordings of said work of art.[14]

427.    In engaging in the acts complained of herein, defendants Barton and Guice, among other things filed false copyright applications for the song "Club Girl", falsely listing Barton and Guice as the songwriters/composers of the musical work and/or record owners of the sound recordings of said work of art.[15]

428.    In engaging in the acts complained of herein, Defendants, among other things, also failed to properly credit Plaintiff as the author, songwriter, producer, and publisher and/or copyrights holder of "Bad Girl" and falsely implied that legal authorization was obtained from Plaintiff as copyright owner of "Club Girl."

---

[14] Under 17 U.S.C. § 506(e), it is unlawful for "any person who knowingly makes a false representation of material fact in the application of copyright registration"
[15] *Id.*

429.    On information and belief, each and all of the Defendants received tens of thousands of dollars individually, in some cases hundreds of thousands individually, and collectively in excess of tens of millions of dollars, and other valuable benefits and consideration from their copying of both the underlying composition and the sound recording of "Club Girl" in the musical composition and sound recording of "Bad Girl", both works directly infringing Plaintiff's copyrights in the musical work and sound recording, and in any other uses that may have been made thereof, which may include reproduction, derivatives, distribution, performance, and display of said works, authorized by Defendants, without Plaintiff's consent, including the "Club Girl" / "Bad Girl" excerpt intro which appears on the officially released Usher video for the song "My Boo" feat. Alicia Keys[16], and any and all other musical works, sound recordings, samples, ringtones, etcetera.

## COUNT II – CONTRIBUTORY COPYRIGHT INFRINGEMENT

## MARINO v. BARTON, GUICE, & DESTRO MUSIC

430.    Plaintiff hereby incorporates by reference the preceding paragraphs and repeats and realleges each of the allegations as if fully set forth herein.

431.    Defendants contributorily infringed on Plaintiff's copyrights by intentionally inducing or encouraging direct infringement of the music work and sound recording of "Club Girl" and "Bad Girl" as has been fully set forth in detail throughout this complaint.

---

[16] "My Boo" is a song duet performed by Usher and Alicia Keys and written by Usher, Keys, Jermaine Dupri, Adonis Shropshire, and Manuel Seal, Jr.  The officially released music video for "My Boo" was directed by both Usher and music video director Chris Robinson.  The clip was filmed in New York City and the storyline of the video is a reflection of the songs lyrics.  The first 45 seconds of footage starts with Usher in a living room watching and listening to a video for "Bad Girl", a song from *Confessions*.  The "Bad Girl" intro features Usher singing the song in a club setting while admiring a scantily-dressed woman.  He turns the set off and slumps down on the sofa before laying on it with his foot propped up.  After a moment of silent, nostalgic reflection, he begins to sing the intro of "My Boo".  The music video debuted on MTV *Total Request Live* at number nine on September 16, 2004.  It remained on the countdown for twenty-seven days, becoming the only *Confessions* video to chart.

432.    Through their conduct alleged herein, said defendants knowingly and systematically induced, caused, materially contributed to and participated in the infringement of Plaintiff's copyrighted musical work and sound recording of both "Club Girl" and "Bad Girl".

433.    Said defendants infringed contributorily by intentionally inducing and/or encouraging direct infringement of the musical works copyright and sound recording copyright afforded to both "Club Girl" and "Bad Girl".

434.    Said defendants had knowledge of the infringing activity, and nonetheless, induced, and/or materially contributed to the infringing conduct of the direct infringers of Plaintiff's copyrighted musical work and sound recording of both "Club Girl" and "Bad Girl".

## COUNT III – VICARIOUS COPYRIGHT INFRINGEMENT

## MARINO v. BARTON, GUICE, USHER, B. AVILA, I. AVILA, HARRIS, LEWIS, DEFENDERS OF MUSIC, EMI, FLYTE TYME, IN2N ENTERTAINMENT, SUBLIME BASEMENT, UR-IV, WARNER-TAMERLANE, DESTRO MUSIC, BYSTORM, SONY, PITTS, & VAN DELL

435.    Plaintiff hereby incorporates by reference the preceding paragraphs and repeats and realleges each of the allegations as if fully set forth herein.

436.    Defendants vicariously infringed on Plaintiff's copyrights by profiting from direct infringement while declining to exercise a right to stop or limit the direct infringement of Plaintiff's musical work copyright and sound recording copyright in "Club Girl" and "Bad Girl" as has been fully set forth in detail throughout this complaint.

437.    Defendants received direct financial benefits from such vicarious infringement.

438.    Defendants had and have the right and ability to supervise the direct infringer.

439.    Defendants received a direct financial benefit and the ability to control the direct infringer.

440.    On information and belief, Defendants have and had the right and ability to control the unauthorized reproductions, derivatives, distribution, performance, and display of Plaintiff's copyrighted music work and sound recording in "Club Girl" and "Bad Girl" and the unauthorized copying, distribution, sale, and exploitation to the public of said songs.

441.    On information and belief, Defendants received a direct financial and economic benefit from the infringement of Plaintiff's musical works and sound recording copyrights in "Club Girl" and "Bad Girl".

## COUNT IV - CONSTRUCTIVE TRUST

## MARINO v. BARTON, GUICE, USHER, B. AVILA, I. AVILA, HARRIS, LEWIS, DEFENDERS OF MUSIC, EMI, FLYTE TYME, IN2N ENTERTAINMENT, SUBLIME BASEMENT, UR-IV, WARNER-TAMERLANE, DESTRO MUSIC, BYSTORM, SONY, PITTS, & VAN DELL

442.    Plaintiff hereby incorporates by reference the preceding paragraphs and repeats and realleges each of the allegations as if fully set forth herein.

443.    By virtue of their wrongful conduct, Defendants illegally received money and profits that rightfully belonged to Plaintiff.

444.    Defendants are therefore involuntary trustees, holding the gross receipts from their product sales and revenues to the extent attributable to the musical work and sound recording of "Bad Girl" and therefore attributable to the infringement of Plaintiff's copyrights herein.

445.     Defendants hold such moneys and funds on behalf of and subject to a first and prior lien against all others and in favor of Plaintiff.  On information and belief, Defendants hold this illegally received money and profits in the form of bank accounts, real property, and personal property that can be located and traced.

446.     Plaintiff is entitled to the remedy of a constructive trust in view of Defendants' wrongful infringement of Plaintiff's copyright in the musical work and in the sound recording of "Club Girl" and "Bad Girl" which Plaintiff is the co-author, co-producer, and co-owner of.


**COUNT V - FOR AN ACCOUNTING**

**MARINO v. BARTON, GUICE, USHER, B. AVILA, I. AVILA, HARRIS, LEWIS, DEFENDERS OF MUSIC, EMI, FLYTE TYME, IN2N ENTERTAINMENT, SUBLIME BASEMENT, UR-IV, WARNER-TAMERLANE, DESTRO MUSIC, BYSTORM, SONY, PITTS, & VAN DELL**

447.     Plaintiff hereby incorporates by reference the preceding paragraphs and repeats and realleges each of the allegations as if fully set forth herein.

448.     Under 17 U.S.C. Section 504, Plaintiff may recover any and all profits of Defendants that are attributable to their acts of infringement.

449.     A balance is due from Defendants, and each of them, to Plaintiff for misappropriation of profits and gross receipts arising from or attributable to Defendants' copying, reproduction, performance, use, sale, and exploitation of Plaintiff's musical work and sound recording of "Club Girl" and "Bad Girl" and consequent violation and infringement of Plaintiff's copyrights in "Club Girl" and "Bad Girl".

450.     The exact amount of money due from Defendants is unknown to Plaintiff and can only be ascertained though an accounting.  Plaintiff seeks an order from this Court directing Defendants to provide Plaintiff with an accounting and payment of the amount due as a result of the accounting, plus interest.

## COUNT VI - BREACH OF SONGWRITING AGREEMENT

## MARINO v. BARTON & GUICE

451.     Plaintiff hereby incorporates by reference the preceding paragraphs and repeats and realleges each of the allegations as if fully set forth herein.

452.     From roughly 2002 to roughly 2004, Marino, Barton, and Guice wrote somewhere around 100 songs together.

453.     The agreement between Marino, Barton, and Guice was that the three would share equally in the authorship and songwriting credits should any of the songs they wrote together become successful.

454.     In or about early 2002, Marino, Barton, and Guice collaborated on a song Marino had initially written which was recorded as "Club Girl".

455.     The collaboration between Marino, Barton, and Guice for the song "Club Girl" broke down into their standard songwriting creation formula:

     a.    Marino had the "initial seed of creativity" and wrote the song "Club Girl" by himself and on his own – framing out the song structure, tempo, chord progression, and basic melody of the song.

     b.    Marino then met Barton in the studio and together they recorded the song "Club Girl" which Marino had created.

c.      After the initial recording of the song, Barton, with Marino's help, then used a drum machine to make a "beat" to Marino's recorded song;

d.      Marino and Barton then completed the song by collaborating with Guice who was instrumental in adding the lyrics to the song and also helped in reworking Marino's initial melody line.

456.    Marino, Barton, and Guice, agreed that Barton (on behalf of Marino, Barton, and Guice) would be responsible for and handle the negotiations for the songwriting credits for the song "Club Girl" and "Bad Girl" with Pitts, Bystorm Entertainment, Usher, Usher's representatives, Usher's record label(s), publishing companies, and any other parties in interest.

457.    Consistent with their prior and continuing agreement, Marino, Barton, and Guice agreed that they would share equally (a respective 1/3 interest) in the songwriting credits for the song "Club Girl" and "Bad Girl" and in any monies, royalty credits, or any royalties or any credits they received on behalf of the publishing and/or individually for the songs "Club Girl" and "Bad Girl".

458.    The songwriting agreement was breached and Marino did not receive his respective 1/3 interest in the songwriting credit or the conferred benefits that would naturally flow, monetary and otherwise.

## COUNT VIII - BREACH OF PUBLISHING AGREEMENT
## MARINO v. BARTON & GUICE

459.    While the group was in Nashville for the musical songwriting collaboration, Barton had told Marino that Van Dell was going to be the Trio's publisher and was signing Marino, Barton, and Guice to his publishing company.

460.    Marino, Barton, and Guice agreed that Barton (on behalf of the Trio) would be responsible for and handle the negotiations for their publishing deal with Van Dell and his publishing company and any other publishing deals and would be responsible for and handle the negotiations for any related royalty credits and any other credits for the song "Club Girl" and "Bad Girl" with Pitts, Bystorm Entertainment, Usher, Usher's representatives, Usher's record label(s), publishing companies, and any other parties in interest.

461.    Consistent with their prior and continuing agreement, Marino, Barton, and Guice agreed that they would share equally (a respective 1/3 interest) in the publishing deal with Van Dell and his company and in any monies, royalty credits, or any royalties or any credits they received on behalf of the publishing and/or individually for the songs "Club Girl" and "Bad Girl".

462.    The publishing agreement was breached and Marino did not receive his respective 1/3 interest in the publishing credit or the conferred benefits that would naturally flow, monetary and otherwise.

## COUNT IX - BREACH OF PRODUCTION AGREEMENT
## MARINO v. BARTON, & DESTRO MUSIC

463.    The relationship between Marino and Barton was built upon valuing and respecting each others talents, strengths and weaknesses.  Both Marino and Barton were bound

together through a deep personal friendship and admiration for the other, and were driven by a strong interest and desire to succeed professionally in the music industry.

464.   In or about 2003, after having signed the lease for the Studio, Marino and Barton began to operate their music business venture through a corporation.

465.   Marino and Barton used Destro Music Productions, Inc. was used as their 'umbrella' corporation by and through which they conducted business and which the songwriting and production, recording studio, and record label were formed under.

466.   Marino and Barton based their business model on what they had discovered to be a common blueprint in the music industry - when a songwriting and production team develop ties with a studio and a record label.

467.   The songwriting and production team of Marino & Barton (Destro Music) worked out of their recording studio (Wavelab) and created musical works and sound recordings which were distributed and/or exploited through their label (Underworld).

468.   Marino and Barton's musical business model was broken into three main divisions.

   a.   **Songwriting & Production Team – "**Destro Music" was Marino and Barton's songwriting and production company engaged in the business of creating musical works and producing sound recordings.

   b.   **Recording Studio** – "Wavelab Recording Studios" was Marino and Barton's recording studio engaged in the business of providing the tools, equipment, operations, and space to create musical works and sound recordings.

    c.    **Record Label** – "Underworld Entertainment" was Marino and Barton's record label engaged in the business of developing artists, and in the business of creating, manufacturing, marketing, promoting, and distributing musical works and sound recordings.

469.    Marino and Barton each own a 50% interest in **Destro Music Productions, Inc.**

470.    Marino and Barton each own a 50% interest in **Underworld Entertainment.**

471.    Marino and Barton each own a 50% interest in **Wavelab Recording Studios.**

472.    Marino and Barton agreed that Barton (on behalf of Marino, Barton, and their production company Destro Music) would be responsible for and handle the negotiations for the productions credits for the song "Club Girl" and "Bad Girl" with Pitts, Bystorm Entertainment, Usher, Usher's representatives, Usher's record label(s), publishing companies, and any other parties in interest.

473.    Consistent with their prior and continuing agreement, Marino and Barton were each to share equally (a respective 50% interest) in any monies, royalty credits, or any royalties or any credits they received on behalf of their production company **Destro Music** or individually for the songs "Club Girl" and "Bad Girl".

474.    The Production Agreement was breached and Marino did not receive his respective 50% interest in the production credit or the conferred benefits that would naturally flow, monetary and otherwise.

## COUNT X - BREACH OF RECORDING STUDIO AGREEMENT
## MARINO v. BARTON, & DESTRO MUSIC

475.     Marino and Barton agreed that Barton (on behalf of Marino, Barton and their record studio Wavelab Recording Studio) would be responsible for and handle the negotiations for royalty credits and any other credits for the Song with Pitts, Bystorm Entertainment, Usher, Usher's representatives, Usher's record label(s), publishing companies, and any other parties in interest.

476.     Consistent with their prior and continuing agreement, Marino and Barton were each to share equally (a respective 50% interest) in any monies, royalty credits, or any royalties or any credits they received on behalf of their recording studio **Wavelab Recording Studio** or individually for the songs "Club Girl" and "Bad Girl".

477.     In addition, when Barton failed to pay rent for Wavelab Recording Studios as agreed and according to the lease and pay half of the costs and expenses associated with the Studio as agreed and left Marino with a large rent balance from the landlord upwards of $22,000.

478.     The Recording Studio Agreement was breached and Marino did not receive his respective 50% interest or the conferred benefits that would naturally flow, monetary and otherwise.

## COUNT XI - BREACH OF RECORD LABEL AGREEMENT
## MARINO v. BARTON, & DESTRO MUSIC

479.     Marino and Barton agreed that Barton (on behalf of Marino, Barton and their record label Underworld Entertainment) would be responsible for and handle the negotiations for royalty credits and any other credits for the Song with Pitts, Bystorm Entertainment, Usher, Usher's representatives, Usher's record label(s), publishing companies, and any other parties in interest.

480.     Consistent with their prior and continuing agreement, Marino and Barton were each to share equally (a respective 50% interest) in any monies, royalty credits, or any royalties or any credits they received on behalf of their record label **Underworld Entertainment** or individually for the songs "Club Girl" and "Bad Girl".

481.     The Record Label Agreement was breached and Marino did not receive his respective 1/3 interest or the conferred benefits that would naturally flow, monetary or otherwise.


**COUNT XII – BREACH OF FIDUCIARY  DUTIES**

**COUNT XIII – MISREPRESENTATION**

**COUNT XIV – FRAUD**

**MARINO v. BARTON, & DESTRO MUSIC**

482.     Plaintiff hereby incorporates by reference the preceding paragraphs and repeats and realleges each of the allegations as if fully set forth herein.

483.     Defendant Barton made material misrepresentations of fact to Plaintiff regarding the copyrights, credits, royalties, income, and other benefits received or conferred form "Club Girl" and "Bad Girl".  These material misrepresentations of fact have been fully set forth at length and detail in the preceding paragraph and throughout this complaint.

484.     Barton further made misrepresentations of fact to Plaintiff regarding Barton's intentions, assurances, promises, agreements, and contracts with Plaintiff, not only as it relates to the copyrights, credits, royalties, publishing, income, and other conferred benefits, but also as it relates to their ongoing songwriting, production, and business partnerships and their record label venture (Underworld Entertainment), their studio venture (Wavelab Recording Studio), and their production venture (Destro Music).

485.     Barton engaged in a pattern of behavior that they knew, or reasonably should have known, that Plaintiff would rely on his misrepresentations, and Plaintiff was justified in his reliance upon these misrepresentations to his detriment, (and to Barton's benefit), and as a result of the foregoing, Plaintiff has suffered and continues to suffer damages.

486.     By engaging in these and other evasive, dilatory, inconsistent, and litigious practices, Barton had mislead Plaintiff repeatedly and has acted and continues to act with an absence of good faith, and in contravention of his fiduciary duties and other duties to Plaintiff and Plaintiff's interest, which amounts to gross misrepresentation and fraud.

487.     Barton made representations with actual knowledge of their falsity at the time they were made, or in reckless disregard of their truth or falsity.

488.     Barton had knowledge of the actual copyrights, songwriting, production, recording, distribution, publishing, royalty credits, and other credits in the songs "Bad Girl" and "Club Girl" and Barton had knowledge of the actual income and monies received and benefits conferred, as these were negotiated by Barton.  Barton had exclusive access to such knowledge, such that Barton had a duty to advise Plaintiff, who was his music songwriting, production, and business partner, and was responsible for negotiating and correcting the credits on behalf of Plaintiff, as it was the parties understanding and his responsibility to fix and correct the mistakes as more fully set forth throughout this complaint and as Barton had promised.

489.     Plaintiff justifiably relied upon the material misrepresentations of Barton and such fraudulent concealment by Barton was made during the course and scope of his role and duty to Plaintiff in their music songwriting, production, publishing, and professional business relationship and ventures.

490.    As a result of the foregoing, the Plaintiff has suffered serious damages and harms which continue to this day, including but not limited to not being properly credited in copyright and not being properly credited as the songwriter, producer, and owner or "Club Girl" or "Bad Girl" and not receiving the monetary benefits and other conferred benefits that Plaintiff is entitled.

## **RELIEF REQUESTED**

491.    WHEREFORE, Plaintiff respectfully requests judgment against Defendants, and each of them, jointly and severally, as follows:

492.    That the Court enter judgment against Defendants, and each of them, that Defendants have infringed Plaintiff's rights in the copyrights in the musical works composition and sound recording of "Club Girl" under 17 U.S.C. Section 501, and that the infringement by Defendants, and each of them, was willful and infringed Plaintiff's rights in the copyright in the musical works composition and sound recording of "Bad Girl" under 17 U.S.C. Section 501, and that the infringement by Defendants, and each of them, was willful;  and otherwise injured the business reputation and business of Plaintiff through the acts and conduct set forth in this Complaint.

493.    That the Court enter judgment against Defendants, and each of them, for the damages suffered by Plaintiff as a result of the infringement complained of herein, as well as disgorgement of any profits of Defendants attributable to their infringement, including the value of all gains, profits, advantages, benefits, and consideration derived by Defendants from and as a result of their infringement of Plaintiff's (1) musical works copyright and (2) sound recording copyright in "Club Girl," independently, and including in connection with the composition and sound recording of "Bad Girl".

494.    That the Court enter judgment against Defendants, and each of them, or in the alternative, if Plaintiff so elects, in lieu of recovery of their actual damages and Defendants' profits, for a 17 U.S.C. Section 504(c) award of statutory damages against Defendants, or any of them, for all copyright infringements (willful or otherwise) involved in this action as to each work in question.

495.    That the Court enter judgment against Defendants, and each of them, that Defendants, and each of them and each of their respective officers, agents, and employees, and all persons acting in concert with them, be enjoined preliminarily, during the pendency of this action, and permanently thereafter, from infringing the copyrights in "Club Girl" and "Bad Girl" in any manner and from distributing, selling, advertising, broadcasting, publishing, or communicating, in the United States or elsewhere, any visual or sound recordings including those identified in this Complaint), as well as any sheet music, commercials, or other merchandise or materials that use, contain, or refer to all or part of the musical composition "Club Girl," including the musical composition and sound recording of "Bad Girl".

496.    That the Court enter judgment against Defendants, and each of them, that the Court enters an order pursuant to 15 U.S.C. Sections 503 and 509 mandating the impounding of all infringing copies of "Bad Girl" and any other materials prepared by Defendants that use, contain, or refer to any copies of the musical compositions and sound recording of "Club Girl" or any portions thereof.

497.    That the Court enter judgment against Defendants, and each of them, that the Court declares, adjudges, and decrees that Defendants, and each of them, have been and are involuntary and constructive trustees, holding the gross receipts from the aforesaid production, broadcast, distribution, sale, or other exploitation of "Bad Girl," to the extent attributable to

"Club Girl" or Defendants' misuse of the protectable interests of Plaintiff in "Club Girl" and "Bad Girl", and that Defendants, and each of them, hold all such monies and funds on behalf of and subject to a first and prior lien against all others and in favor of Plaintiff.

498.    That the Court enter judgment against Defendants, and each of them, that Defendants, and each of them, be required to account for and pay over to Plaintiff all gains and profits derived by Defendants, and each of them, from or attributable to production, broadcasting, licensing, distributing, sale, or other exploitation of "Club Girl" or "Bad Girl", or any other uses of all or part of "Club Girl" or "Bad Girl" made or authorized by Defendants, or any of them, in any format, media, or market, in connection with the composition and all sound recording of "Bad Girl".

499.    That the Court enter judgment against Defendants, and each of them, and Order the injunctive relief of the correction of the copyright record of "Club Girl" and "Bad Girl" to reflect Plaintiff's authorship and ownership in the musical works copyright and sound recording copyright of both songs.

500.    That the Court enter judgment against Defendants, and each of them, and Order a trustee of Plaintiff's choosing with the Court's approval, to manage all future income streams that flow from the authorship, ownership, or exploitation of the songs "Club Girl" and "Bad Girl".

501.    That the Court enter judgment against Defendants, and each of them, and Order the injunctive relief in declaring that Plaintiff was denied his "right of attribution" and his due credit for his authorship, production, and recording of "Club Girl" and Bad Girl".

502.    That the Court enter judgment against Defendants, and each of them, inclusive of punitive damages to punish the Defendants for their outrageous conduct and evil motives.

503.    That the Court enter judgment against Defendants, and each of them, inclusive of exemplary damages to set an example for others.

504.    That the Court enter judgment against Defendants, and each of them, for reasonable attorney fees and costs of suit incurred herein.

505.    That the Court enter judgment against Defendants, and each of them, for such other and further relief in favor of Plaintiff as the Court deems just, necessary, and appropriate.

506.    Plaintiff further demands a trial by jury on all issues so triable.

*****

Respectfully submitted,
**FRANCIS ALEXANDER, LLC**

*s/ Francis Malofiy*

Francis Malofiy, Esquire
Attorney ID No.:  208494
The Beasley Building
1125 Walnut Street
Philadelphia, PA 19107
T:  (215) 500-1000
F:  (215) 500-1005
E:  francis.malofiy@beasleyfirm.com
*Law Firm / Attorney for Plaintiff*

*October 27, 2011*

DATED

## **VERIFICATION - PLAINTIFF**

I, Daniel V. Marino, hereby state that I am the Plaintiff in this action and that the statements of fact made in the foregoing Plaintiff's Complaint are true and correct upon personal knowledge and to the best of my information and belief.  I further understand that the statements herein are made subject to the penalties of 18 Pa. Cons. Stat. Ann. § 4904 relating to unsworn falsification to authorities.

*s/ Daniel Marino*
DANIEL V. MARINO

*October 27, 2011*
DATE

## VERIFICATION - COUNSEL

I, Francis Malofiy, Esquire herby state that I am the attorney for the Plaintiff; that I have examined the pleadings and the entire investigation file made on behalf of Plaintiff; and that I have taken this verification to assure compliance with the pertinent rules and that I have prepared and reviewed the foregoing Plaintiff's Complaint and that the facts set forth are true and correct to the best of my knowledge, information, and belief; and that this statement is made subject to the penalties of 18 Pa.C.S.A. §4904, which relates to unsworn falsification to authorities.

**\*\*\*\*\***

**FRANCIS ALEXANDER, LLC**
*s/ Francis Malofiy*
Francis Malofiy, Esquire
Attorney ID No.: 208494
The Beasley Building
1125 Walnut Street
Philadelphia, PA 19107
T: (215) 500-1000
F: (215) 500-1005
E: francis.malofiy@beasleyfirm.com
*Law Firm / Attorney for Plaintiff*
*October 27, 2011*
DATED

## CERTIFICATE OF SERVICE

I, Francis Malofiy, Esquire of the Law Firm Francis Alexander, LLC hereby certify that a true and correct copy of the foregoing Plaintiff's Complaint was filed with the Court of record and served upon the parties to this suit, as addressed, by proper service of process, and/or through the electronic filing system, fax, email, and/or by placing the foregoing Plaintiff's Complaint in the United States Mail – First Class, postage prepaid, addressed as follows:

*****

**FRANCIS ALEXANDER, LLC**
*s/ Francis Malofiy*
Francis Malofiy, Esquire
Attorney ID No.:  208494
The Beasley Building
1125 Walnut Street
Philadelphia, PA 19107
T:  (215) 500-1000
F:  (215) 500-1005
E:  francis.malofiy@beasleyfirm.com
*Law Firm / Attorney for Plaintiff*
*October 27, 2011*
DATED

# EXHIBIT LIST

A.   ORIGIVATION MAGAZINE – MAY 2004

B.   LETTER - SIMON J. ROSEN, ESQUIRE – October 5, 2004

C.   CONTINGENT FEE AGREEMENT - SIMON J. ROSEN – October ___, 2004

D.   PICTURE OF MARINO AND BARTON AT THE GRAMMY'S

E.   INVOICE FROM WALLACE COLLINS, ESQUIRE – November 22, 2005

F.   SIGNED STATEMENT BY BARTON STATING MARINO WRITER OF SONGS

G.   CD CASE COPY OF THE TWO *CONFESSIONS* ALBUM RELEASES

H.   PLAINTIFF MARINO VERIFICATION - SIGNATURE

**EXHIBIT "A"**

**ORIGIVATION MAGAZINE – MAY 2004**



May 2004 / Volume 3, Issue 6     FREE PUBLICATION!

# origivation
## magazine

Sup... Local Music since 2001

# "Confessions" of a
# Record Producer

plus
# Sugarcult
# The Dresden Dolls
# Brides of Destruction  Brazil
## The Primadonnaz - 4 Way Street - Helen Back - Pale Reason

www.origivation.net          www.origivation.com          www.origivation.org

# origivation magazine

May 2004 Vol. 3, Issue 6

# ♡ LETTERS Dear Origivation...

Got something to say, do ya? email us: info@origivation.com
or old skool it: 4100 Main Street, Philadelphia, PA 19127

**Publisher/ Editor:**
Anthony J. Caroto

**Assistant Editor:**
Yaron Gabai

**Copy and Line:**
Erik Caplan

**Contributors:**
Yaron Gabai
Shel Hoachlander
Dena Marchiony
Robin Parry
Dom Pinelli
Kevin Scaltrito

**Mailing Address:**
Origivation Magazine
PO Box 1412
Havertown, PA 19083

www.origivation.com
info@origivation.com

Origivation Magazine is an Oh How Purty Publication. Any duplication of this magazine is highly encouraged so long as you give us the credit! All rights reserved copyright 2004 Oh How Purty Publications

**On the cover:**
Underworld Entertainment
photo: Yaron Gabai

Opinions expressed in this magazine may not reflect the views of Origivation. So if you don't like what you read, take it up with whoever wrote it. Don't cry like a little bitch.

Anthony J. Caroto
Yaron Gabai
Shel Hoachlander
and Vex X
are members of
the Recording Academy
(www.grammy.com)

Not much love this month. Most of the emails revolved around topics like, "How do we get on the cover?" "What are the Philly Music Awards?" "When will my band's CD review be printed?" and "Why are you so damn sexy?"

*Thank you for all the promotion for Hallman Groove. The show was a blast. We had about 300 people come out and all the bands played great sets. I plan on doing it again within the next few months.*
*Shane B.*

*Hello Editor Anthony DeCaroto,*
*Just wanted to let you know of Original band nights, that me and my friend Matt Perkins run, On Mondays at the Bridgeport Ribhouse that started on April 5th, its going great. The Ribhouse has music, 6 days a week. We have 25 bands participating in the original band*
nights. Starting on May 20th will be at the Whitpain Tavern on Thursdays. I heard of you from PJ from Guitar center, guitarist of FUSE. My Name is Carl Pierce Vocalist for the Band.... MISPLACED RELIX
Thanx for your time, Carl
From now on I am to be referred to as "DeCaroto." Thanks. (My last name is just Caroto for you slower readers and breeders.)

*Last month's issue was the best yet. I've been reading the magazine for a while now, but most times I have no idea who the band is on the cover. I've seen Still Standing a bunch of times so seeing them on your cover made my day. Keep up the great work!*
*Amanda K.*

*Thanks for putting Still Standing on the cover. My sexy boys certainly deserved it!*
*Kellie M.*



**In the Studio**

**Indre Studios**
www.indresstudios.com
Oomfabric has been in the studio working on its four-song EP (tentatively titled Reproduction of Original Hits)
www.grumfabric.com

Brainstorm is now recording its first album, with plans to wrap by Fall '04.
www.brainstormcrew.com

Topgart has returned to Indre Studios to continue working on its third album - a song awaited full-length.
www.targartrocks.com

**Skylab Studios**
www.recordme.com
The Andy Browne Trio is finishing up production on songs for our full length dvd release for Shut Eye Records. The band released Chemical Road Promo in 2003
www.andybrowne.com

**Future Sound Studios**
www.futuresoundstudios.com
Phoenix Rise has 3 songs currently in the mixing process. A late summer release is expected.
www.phoenixrise.net

**Wallenstein Studios**
www.wallenstein.com
Always a busy place, Miralles are finishing up "The Climb" while the Van Randells, Danny Boy?, Scarecrow and Mr. Nice Guy are in sessions with studio owner Walt Collins

# Table of Contents

## The Articles

Snuff 12
4 Way Street 12
Sugarcult 14
Brazil 16
Birdie 22
Brides of Destruction 24

## Live Reviews

The Dresden Dolls 27
Helen Back 27
Pale Reason 29

## CD Reviews

13 new local and national bands 30-31

## Columns

Love Letters, Dear Origivation 4
In the Studio 4
Music News 7
Who Owns the Masters 8
Bands You Should Know 10
Question of the Month 32
GOYA 34
Reader Submissions 35
Need a Band Find a Band 38





Welcome to the world of UNDERWORLD ENTERTAINMENT

It's unsuspecting and partially hidden, but it's there. From Kelly Drive it looks like an abandoned house or possibly a workshop or storage facility. However, amiss their urban camouflage resides Wavelab Studios, home to UNDERWORLD ENTERTAINMENT.

Destro
Marino
Guice

Creating new, exciting beats and sounds, usually in the vein of hip-hop/R&B, the three men of The Underworld have reached a new level of success after only two years.

In March 2004, R&B superstar Usher released *Confessions*, his fifth studio album. Musicians and artists from all over the industry, including The Neptunes and R. Kelly, pitched ideas and songs, but only 14 tracks made the cut. One of these was "Bad Girl" by Dan Marino, Dante "Destro" Barton and Will Guice (rhymes with "nice,") a group formally known as Underworld Entertainment.

Amazing. Three Philly boys done good in a big way. Like most success stories, the first meetings are always created by chance.

"Chris's (Burkett, good friend of Marino) parents lived next door to me," Barton says. "Since I didn't allow smoking in my house, my sister always had to go outside. Chris and she had began to talk about my work as a producer. Then one day he came up and gave me a tape. Honestly, I didn't like the music but I saw some direction. I though this could really work if it had the right direction. So one day I said that we should hook up. We started doing stuff together but it just wasn't working out, but Dan and I just stuck together."

Marino and Destro's first collabora tion was in the vein of Portishead and "tripped out type of stuff." The two even caught the interest of Ruffhouse Records, but the project never flourished.

While keeping in contact, the two started up their own projects - Marino started up Nocturnal Noise with fellow audio slave Chrissy Hamilton, a mobile performance recording studio, while Destro began producing for Joe Nicolo (of Butcher Brothers fame) at Judgement Records. Again, fate appeared.

"One day while I was in the studio I heard Will doing this hook and knew I had to work with him," says Destro. "Then we crossed paths in the hallway and it's been on ever since. That was like three years ago."

The two became an instant songwriting team. Soon after, Marino joined the two embarking a journey, which would eventually become Underworld Entertainment. The first order of business was to relocate into a bigger facility. At the time, UWE was occupying a small space below Studio 4, which was being used primarily for mixing and mastering any recent on-site recording jobs.

The threesome, now formally known as Underworld Entertainment, was ready to start a new venture. Seeking talent locally, UWE began to take on artists from several genres - and being very choosy at that. It was more than just a bunch of recording sessions for them. They were looking for artists that not only had the desire and talent, but had the potential as well. And so goes the old saying- think big, be big. Their main client, was none other than their own partner- Will Guice. The "superstar of the team" as they put it.

Eventually the team would like to move to someplace where the action really is.

"Philly has a lot of talent, but there's no real industry here. The industry is in New York, Atlanta and California. At some point we may want to be in the mix where it's really happening at," says Destro

Adds Guise"I can see that people who are "on" and did records are in their own little world. People like us we're not anything to them. This is the City of Brotherly Love and people don't want to help each other out."

To date, Underworld Entertainment has produced music for Shaliek Rivers (Universal Records), Jack Frost (Sony Music) and Smitty (J Records).

*(Continued on page 20)*

**So just how did "Bad Girl" get on Usher's album?**

"We were shopping Will as an artist. A friend of mine name General took the CD to Arista Records and gave it to Mark Pitts who is Usher's A&R," Destro explains. "He fell in love with the stuff and wanted to sign Will, but it didn't work out. He loved that one song, it was the ninth track on the CD, he said "I gotta do something with this song". At one point he was trying to get Will a single deal for it but that didn't work out."

The song, which was originally called Club Girl", continued to burn heavy in Pitts' mind. Loving the song as he did, he continued to shop it around to other artists such as Santana and eventually Usher.

Once in Ushers camp, the song was given additional support by Jermaine Dupree, L.A. Reid, Tommy Mottola and even Usher's own mother!

Meetings were called.

Usher and his team of producers asked for the Pro-Tool files to cut the first verse and hook. Guise, who held his music like his own child, was at first hesitant to give up the song but was eventually swayed by the big picture of future possibilities.

"A lot of people just say stuff and just blow smoke up your butt. I loved the song so much, the way I sang it. But then it started to become more real to me so I let him have the song." Says Guise

As of press time, Usher's album, "Confessions", has remained at number one on the Billboard charts and has sold over 2.3 million copies in the USA alone, 1.1 million in only the first week. "Bad Girl", a highly considered third single, rests comfortably at track nine.

USHER

Underworld Entertainment continued from page 19

## "For a minute I'll get discouraged, but then it seems I always end up bouncing back some kind of way."
### -Will Guice

Will Guice came to Philadelphia by way of Lima, a small town in Ohio. After touring in Lima as a member of several groups, Guice relocated to Philly where he hooked up with Boyz II Men until their record label Stone Creek.

"That was a cool situation but they didn't really know what they were doing. To many other politics were going on with Stony so I had to get out of that situation."

Opting to move back to Ohio, Guice stayed in contact with Boyz II Men member Wanya Morris. Morris, who believed in Guice, moved him back to Philly and into his home. The two worked on music together until the project evolved into an album titled "Millennium Renaissance". Despite heavy, worldwide promotion, the album never caught on, but a man like Guice can't be kept down.

"For a minute I'll get discouraged, but then it seems I always end up bouncing back some kind of way. I was gonna end up going back to Ohio if I didn't meet Destro. I wanted to stay here but nothing was happening. Philly is a mecca for soul music. New York is right there. I'm a city dude. It all just works out. A path was made and I'm just on it. I got people with me on my side. It's gonna be crazy."

Guice's album will be released sometime this summer.



## "It's like a producer's dream come true to work with a superstar act."
### -Destro

Destro started out as the 'DJ' of a group signed to Skywalker Records (owned by Luke Skywalker of 2 Live Crew).

"The leader of the group made beats and I was always intrigued by that. Eventually I got my own equipment and started making my own beats. Ever since then I've been doing my own thing. I was one of those locally known producers involved with a few projects like Da Youngstas and stuff like that. Then I thought, you know What? I'm gonna concentrate on this. Just making beats."

While working solo, Destro also hooked up with Stevie G and started a company called Against All Odds Entertainment. At the same time, checking in time at a producer for Bill Nicole at Judgment Records.

"It's always been a progression. I want up in a situation that just gets better and better. And now we're here. It's like a producer's dream come true to work with a superstar act. This was a lifetime goal for me, and I'm not done yet. It's just one more step towards what we really want. It's a huge step that some people would use to sit back and think I made it. We want to finish it. I don't have reservations..."



## "I picked up a guitar for the first time when I was 18."
### -Dan Marino

"I picked up a guitar for the first time when I was 18. It was from a flea market. My friends and I just started playing with ever. We were pretty wild. When I met Destro I wasn't even into the whole recording aspect. Then I started listening to what he and my friend Noah were doing and started getting into it. I started wanting to play and record myself so my girl friend went out and got me a little ace track for my birthday. I couldn't even figure it out. That was it. I just got into the music."

Marino took musician set beam, cultivated his skill as a musician by working with different artists as well as a significant amount of one-ha distributing through National Music.

If the playing more or the R&H staff, for some reason, didn't do it, it's as pretty. You sit down and just go out of sorts and then layer them on top of each other.

Marino is also credited with recording the first album LP which was distributed specifically for a sold out LA appearance in 2002.



Underworld Entertainment: www.wavelabstudio.com

**EXHIBIT "B"**

**LETTER - SIMON J. ROSEN, ESQUIRE – October 5, 2004**

October 5, 2004   **DRAFT**

Mr. Daniel Zucker
Sr. Director, Legal & Business Affairs
Zomba/Jive

Urgent! via fax to: 212-989-6603

RE: My client: Daniel V. Marino et al.
    My afected composition: "Club Girl:
    Your artist: Usher
    Your affected composition: "Bad Girl"

Dear Mr. Zucker:
    Please be informed that this office represents Daniel V.
Marino.  Mr. Marino co-authored, co-produced, co-owned the master
recording, and performed lead guitar on a song entitled, "Club
Girl".  Mr. Marino's publishing entity co-administers and co-owns
the publishing on "Club Girl".
    Usher's song, "Bad Girl", on his "Confessions" LP, features
a sample of "Club Girl", which was done without my client's advance
knowledge, consent or approval.  The "Club Girl" sample also
appears the song "My Boo" feat. Alicia Keys, which appears on the
recently released reissued version of the "Confessions" LP, and
also appears on the "My Boo" video.
    My client's guitar performance, attendant to his co-production
and co-authorship, is clearly the feature of the sample usage.
    Accordingly, your record companies are hereby directed to
CEASE AND DESIST any and all continued unlawful usage of "Bad Girl"
featuring my client's copyrighted work and performance.  This would
be inclusive but not limited to recalling all product, be it in the
form of vinyl, CD, video, and all other media.
    I would also request that you direct this letter to BMG's
publishing arm, as my client's claims affect the splits on "Bad
Girl", and ensuing publishing monies paid.
    Kindly confirm in writing your receipt of this correspondence.

                              Sincerely yours,

sr/sst cc: DVM marino-8

                              Simon J. Rosen, Esq



EXHIBIT "C"

CONTINGENT FEE AGREEMENT - SIMON J. ROSEN – October ___, 2004

## CONTINGENT FEE AGREEMENT

I, DANIEL V. MARINO, agree to employ The Law Office of SIMON JEFFREY ROSEN, ESQ. as my attorney to represent my legal interests against all responsible parties regarding my claims arising out of my co-production, co-authorship, co-publishing, co-administration and musicianship regarding the song, "Club Girl", which song was used on Usher's song, "Bad Girl".

I acknowledge that I have not retained any other counsel relative to this claim.

Compensation to my attorney shall be as follows: One-Third (1/3) of any and all gross recovery, through suit, settlement or otherwise.

Attorney Rosen agrees to advance the reasonable and necessary legal expenses if litigation is required, and he shall be reimbursed out of these expenses out of my share of any recovery, promptly upon receipt of proceeds. My attorney agrees to keep all costs to a reasonable minimum.

If no recovery is gained, I owe no legal fee or costs to my attorney.

Should I decide, without just cause (just cause meaning negligence, recklessness, or intentional wrongdoing), to fire my attorney. then I agree to pay a sum equal to Two Hundred Dollars ($200.00) per hour for time spent on the case, plus reimbursement of all costs advanced by Attorney Rosen.

I acknowledge receipt of a duplicate original of this Agreement.

Dated: October _ , 2004

_____
Daniel V. Marino

_____

marino-cfa

EXHIBIT "D"

**PICTURE OF MARINO AND BARTON AT THE GRAMMY'S**



## EXHIBIT "E"

**INVOICE FROM WALLACE COLLINS, ESQUIRE** – November 22, 2005

EX.

**WALLACE COLLINS, ESQ.**
Attorney-at-Law
254 West 54th St. (14th flr)
New York, NY 10019
212-245-7300

As of November 22, 2005

Dante Barton
Wil Guice
835 Pleasant Rd.
Yeadon, PA 19050

Re: Invoice/Mechanical Royalties Resolution

FOR PROFESSIONAL SERVICES RENDERED:

-April thru November'05-

    in connection with extensive, ongoing negotiation with IN2N and HoriPRO's legal counsel, and with RCA/BMG business affairs department (and accounting personnel), and preparation and reivsions to letter of direction for release of mechanical royalties on Usher's recording of "BAD GIRL"; correspondence, discussions and miscellaneous disbursements related thereto........................................................$7,500.00[1]

Subtotal.........................................................$7,500.00

\*     Total Outstanding Balance Due
    as of the above date.....................................$7,500.00

Payment due upon receipt.
Interest on unpaid balance at the rate of 1.5% per month.
Bills sent to collection will be subject to additional charge(s).

---

  [1] $3,750.00 each as per the letter of direction agreement

EXHIBIT "F"

SIGNED STATEMENT BY BARTON STATING MARINO WRITER OF SONGS

*IClosed   2004*

*Daniel MARINO co-authored, co-produced & co-owns*
*"Club Girl & Bad Girl"*

X DfoBf~

DRAft

October 5, 2004

Mr. Daniel Zucker
Sr. Director, Legal & Business Affairs
Zomba/Jive

Urgent! via fax to: 212-989-6603

RE: My client: Daniel V. Marino et al.
My affected composition: "Club Girl:
Your artist: Usher
Your affected composition: "Bad Girl"

Dear Mr. Zucker:

Please be informed that this office represents Daniel V.
Marino. Mr. Marino co-authored, co-produced, co-owned the master
recording, and performed lead guitar on a song entitled, "Club
Girl". Mr. Marino's publishing entity co-administers and co-owns
the publishing on "Club Girl".

Usher's song, "Bad Girl", on his "Confessions" LP, features
a sample of "Club Girl", which was done without my client's advance
knowledge, consent or approval. The "Club Girl" sample also
appears the song "My Book" feat. Alicia Keys, which appears on the
recently released reissued version of the "Confessions" LP, and
also appears on the "My Book" video.

My client's guitar performance, attendant to his co-production
and co-authorship, is clearly the feature of the sample usage.

Accordingly, your record companies are hereby directed to
CEASE AND DESIST any and all continued unlawful usage of "Bad Girl"
featuring my client's copyrighted work and performance. This would
be inclusive but not limited to recalling all product, be it in the
form of vinyl, CD, video, and all other media.

I would also request that you direct this letter to BMG's
publishing arm, as my client's claims affect the splits on "Bad
Girl", and ensuing publishing monies paid.

Kindly confirm in writing your receipt of this correspondence.

r/sst cc: DVM marino-8

Sincerely yours,

Simon J. Rosen, Esq



**EXHIBIT "G'**

**CD CASE COPY OF THE TWO *CONFESSIONS* ALBUM RELEASES**





EXHIBIT "H'

PLAINTIFF MARINO VERIFICATION - SIGNATURE

## VERIFICATION - PLAINTIFF

I, Daniel V. Marino, hereby state that I am the Plaintiff in this action and that the statements of fact made in the foregoing Plaintiff's Complaint are true and correct upon personal knowledge and to the best of my information and belief. I further understand that the statements herein are made subject to the penalties of 18 Pa. Cons. Stat. Ann. § 4904 relating to unsworn falsification to authorities.

*s/ Daniel Marino*
DANIEL V. MARINO

*October 27, 2011*
DATE