# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| DANIEL V. MARINO, | |
| Plaintiff, | 11 Civ. 6811 (PSD) |
| v. | **DECLARATION OF** |
| | **MICHAEL EIDEL__** |
| USHER (a/k/a Usher Terry Raymond IV); SONY MUSIC ENTERTAINMENT; EMI APRIL MUSIC, INC.; EMI BLACKWOOD MUSIC, INC.; JAMES SAMUEL HARRIS III; TERRY STEVEN LEWIS; BOBBY ROSS AVILA, JR.; ISSIAH AVILA, JR.; WILLIAM C. GUICE; DANTE E. BARTON; DESTRO MUSIC PRODUCTIONS, INC.; DEFENDERS OF MUSIC; FLYTE TYME TUNES; SUBLIME BASEMENT TUNEZ; UR-IV MUSIC, INC.; WARNER-TAMERLANE PUBLISHING CORP.; MARK PITTS; BYSTORM ENTERTAINMENT; TOMMY VAN DELL; and IN2N ENTERTAINMENT GROUP, LLC, | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MICHAEL EIDEL, declares as follows:

1. I am a partner at Fox Rothschild LLP, co-counsel for Defendants Usher Raymond IV a/k/a Usher, Sony Music Entertainment, EMI April Music Inc., EMI Blackwood Music Inc., Warner-Tamerlane Publishing Corp., UR-IV Music, Inc., Bystorm Entertainment, Mark Pitts, Issiah Avila, Bobby Ross Avila, Sublime Basement Tunez, Defenders of Music, Flyte Tyme Tunes, James Samuel Harris III, and Terry Steven Lewis (collectively, the "Moving Defendants"). I am familiar with the matters set forth herein.

2.   Attached hereto is a true and correct copy of the Expert Report of Dr. Michael A. Einhorn, dated July 12, 2013, highlighted and bracketed to reflect material the Moving Defendants seek to have stricken.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed at Philadelphia, Pennsylvania, on this 19th day of July 2013.

/s/ Michael Eidel
MICHAEL EIDEL



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| *Daniel V. Marino*         Plaintiff | Civil Action  11-cv-6811 |
| *v.* | Judge:    Paul S. Diamond |
| *Usher, et al.*         Defendants | |

**EXPERT REPORT**
**OF MICHAEL A. EINHORN, Ph.D.,**

**ON BEHALF OF PLAINTIFF**

SUBMITTED TO -
FRANCIS ALEXANDER MALOFIY
FOR THE LAW FIRM
FRANCIS ALEXANDER, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
T: (215) 500-1000  F: (215) 500-1005

*Subject to change as more information becomes available*

**Amended:  July 12, 2013**

**TABLE OF CONTENTS**

1 INTRODUCTION……………………………………...…..…….…..…..3

2. STATEMENT OF QUALIFICATIONS…………..………..…….……… 4

3. DOCUMENTS REVIEWED………………………..………………….,.. ,6

4. SUMMARY OF CONCLUSIONS………………………………..……...7

5. PLAINTIFF DAMAGES……………..………..…………………….....14

6. LABEL REVENUES:  2004-2013………………………………….....18

7. ARTIST ROYALTIES:  2004-2013………………………….........…21

8. PUBLISHER ROYALTIES:  2004-2013………………………......…22

9. STATUTE OF LIMITATIONS…………………………………….…….. 25

10. PRODUCER ROYALTIES …………………..………..……….…….…..27

11. SYNCHRONIZATION LICENSES…………………………..…….…29

12. PERFORMANCE ROYALTIES,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,… 30

13. COSTS AND APPORTIONMENT…………………………………...31

14.  CONCERT REVENUES………………………………………..…….33

15. CONCLUSION………………………………….…………………….. 36

## 1.  INTRODUCTION

1.1) I have been asked by Francis Malofiy, counsel for plaintiff Daniel Marino, for my expert valuation of actual damages and defendant profits resulting from a presumed infringement of Mr. Marino's authorship, ownership, and production rights in a musical composition and sound recording of a song  originally called "Club Girl" -- and later named "Bad Girl" -- which was imprinted as a track on Usher's *Confessions* album that was released in March, 2004 by Sony Music Entertainment  SME; herein including its predecessor companies and/or subsidiaries).  This report is an amended version of an original submitted on July 8, 2013.

1.2)  With later additions from co-defendants Dante Barton and Will Guice, plaintiff Daniel Marino co-wrote and co-produced CLUB GIRL,  which was an underlying musical composition and sound recording upon which  BAD GIRL was copied. Plaintiff contends that his rights of  ownership and income participation were infringed when BAD GIRL appeared on the Usher's multi-platinum *Confessions* album without proper attribution, and without subsequent receipt of due royalty checks that were sent to other listed publishers and producers with rights in the composition or sound recording.   The plaintiff also suffers lost future earnings and intangible losses owing to his lost connection with the second highest selling record released in this century.

1.3) The album *Confessions* was released on Laface Records/Jive/Zomba, an American record label owned by SME. The album was first released on March 23, 2004. A Special Edition was issued on October 5, 2004. The song also appeared in digital singles and albums and a related DVD release.

3

1.4) The record label (Sony) earned profits from the sale and licensing of music products bearing the work/track of BAD GIRL, while the recording artist (Usher) and record producers (Flyte Tyme, Destro Music, AB Experience (Avila Brothers)) respectively earned artist and producer royalties for their work in the production of the master recording for the track. Usher also earned concert revenues from live performances of BAD GIRL.

1.5)      Also compensated for their rights in the musical composition are the listed writers and publishers of BAD GIRL. The listed co-writers of BAD GIRL are Dante E. Barton, William Guice, James Harris, Terry Lewis, Bobby Avila, Isaiah Avila, and Raymond Usher. The listed publishers of BAD GIRL are EMI April, Flyte Tyme Tunes, Defenders of Music, Sublime Basement, Warner-Tamerlane, IN2N Music, IN2N Musicworks, For the World, Scan Disc Publishing, and UR-IV Music. Both writers and publishers may have earned some royalty amount for its share of the composition as it was used in mechanical, synchronization, and public performance applications.

1.6)      I am paid an hourly rate of $400 for report-writing, and $600 for appearance at testimony. I am not related to any of the parties, nor do I have any financial interest in the outcome of this matter.

## 2.   STATEMENT OF QUALIFICATIONS

2.1) As a professional economist, I have worked since 1997 in the area of media and intellectual property. My curriculum vita is attached as Appendix A.

2.2)  From July 2000 to the present date, I have served as a testifying economist in court cases involving the valuation of the intellectual property owned by commercial artists, software designers, writers, publishers, musicians, record labels, photographers, actors, cartoonists, television producers, cable companies, and radio stations. A complete list of my testifying engagements is included in my attached resume.

2.3)  I have written 38 professional articles in the area of intellectual property in law journals and periodicals.  I have delivered 36 professional lectures or CLE seminars related to these topics. I am also the author of the book *Media, Technology, and Copyright: Integrating Law and Economics* (Edward Elgar Publishers).

2.4)  I testified as an expert at deposition and/or trial on damages for infringement of intellectual property rights in the cases of *Universal Music v. Fitness Quest* (N. D. Ohio, 2004), *Bridgeport Music et al. v. Universal Music et al*. (M. D. Tenn., 2006), *Thomas Turino et al. v. Universal Music et al.,* (C. D. Cal., 2006), *Bridgeport Music Inc. v. Smelzgood Entertainment, et al*.  (M. D. Tenn., 2007),   *TMTV Corp. v. Mass Productions*, Inc.   (D. P. R., 2009). *Malibu Textiles v. Carol Anderson, Inc. Inc.* (S.D.N.Y, 2008), *Serendip LLC et al. v. Warner Bros. Entertainment Inc.*, (C.D. Cal., 2009), *Carpal Therapy Inc. v. Jennifer Graham* (Sup. Ct. Indiana, 2009), *Chris Lester v. U2, Apple Computer, and Universal Music* (C.D. Cal., 2009), *Kilter, Inc. v. Avon Corporation,* (S.D.N.Y., 2011). *Rafael Vergara Hermosilla   v.   The Coca Cola Company*, (S.D. Fl.,  2011),  *Zooey Deschanel v. Steve Madden, et al.* (Sup. Ct. Calif., 2011),  *PML Clubs v. Gold Suit, Inc,,* (N.D. Texas, 2012),  *Ryan Lessem and Douglas*

*Johnson v. Universal Music Group* (S.D.N.Y. 2012), and *East West v. Caribbean Crescent, Inc.* (N.D. Va. 2012).

2.5) My expert analysis of infringement damages in *Bridgeport Music et al. v. Universal Music et al.* was upheld on appeal by the Sixth Circuit. Defendant did not challenge my expert analysis of damages in *Bridgeport Music Inc. v. Smelzgood Entertainment, et al.* in its appeal to the Sixth Circuit.

2.6) I have never been disqualified from testifying in court, nor limited in any manner related to the applied standards, concepts, or techniques of the economics profession.


**3. DOCUMENTS REVIEWED**


Second Amended Complaint

Sony Music Entertainment

**SME-00001-00051**
**SME-00052-00085**
**SME-00086-01766**
***01768-01770 Pro Tools Discs***
**SME-01768 – 03571**
**SME-03572 – 05429**
**SME-05430 – 06409**
**SME – 06598 – 14962**


In2n Entertainment Group, Llc.

**IN2N 00001-00463**
**IN2N 000464_10569.0001 – 000583_33829.0002**
**IN2N 000584_1H11 – 000589**

Emi Blackwood Music, Inc.
Emi April Music, Inc.
**EMI 00001-00343**

Warner-Tamerline Publishing Corp
**WTP 00001-00232**

Terry Steven Lewis
James Samuel Harris, Iii

Flyte Tyme Tunes
**HLFT 00001-02866**

UR-IV Music Inc.
**UR 00001 - 00750**

Usher's  'Confessions'  Album  Hits  10  Million  in  U.S.  Sales, http://www.billboard.com/articles/news/482065/ushers-confessions-album-hits-10-million-in-us-sales,  retrieved 6/24/2013

Connolly,  Marie, and Krueger, Alan *Rockonomics: The Economics of Popular Music,* National Bureau of Economic Research, Working Paper No. 11282.

Wikipeda,  *OMG Tour*, http://en.wikipedia.org/wiki/OMG_Tour,   retrieved 7/7/2013.

How much does the band make for a concert?, at  http://www.sixthman.net/blog/2009/09/27/how-much-does-the-band-make-for-a-concert/  retrieved 7/6/2013.

Fuoco-Karasinski, Christina ,  "Usher goes all out on his "OMG Tour"".  *Sound Spike*.. (November 22, 2010).

*Pollstar Artist Tour History Report*, Usher,   March 1, 2004 through October 26, 2012

Letter, Michael Eidel to Judge Paul Diamond, June 11, 2013

MTV Top Stories, Usher Proves He's 'The Truth' At Tour Kickoff, **http://www.mtv.com/news/articles/1490004/usher-proves-hes-truth-at-tour-launch.jhtml, August 6, 2004 (retrieved July 1, 2013)**

## 4. SUMMARY OF CONCLUSIONS

4.1)  I am advised that a plaintiff in a copyright matter may recover as damages all identified  amounts that he  might  have earned had his rights been upheld in his underlying composition and sound recording    Defendants are jointly liable for this amount.

4.2)  In addition, plaintiff may recover severally from each individual defendant any additional profits that may not have been accounted for in the calculation of actual damages.

4.3)   Actual damages in this matter result from uncollected royalties owing to Mr. Marino's  rights in the original composition and sound recording CLUB GIRL.  These amounts include mechanical/digital royalties, performance royalties,  and synchronization royalties and neighboring rights in the original sound recording.  I have depicted below these damage amounts including an assumed imputation that lost foreign mechanical royalties are proportional to 46% of domestic mechanical royalties.  This imputation for foreign royalties should be revised based on additional data on foreign collections that may become available, or eliminated altogether depending on legal ruling regarding its appropriate inclusion.

4.4)  I shall impute Mr.  Marino's rightful share of mechanical, digital, performance, and synchronization royalties to be 1/3 of imputed royalty totals for each, reflecting his role as one of three songwriters in the original composition  CLUB GIRL.  From the inception of the album (March, 2004) until March, 2013, I estimate below that the plaintiff lost the opportunity to earn (at one third share)   publisher royalties amounting to $439,128 in mechanical/digital royalties, $4,984 in synchronization royalties, and some unidentified amount for performance royalties.  As before, these numbers are based on actual data reported by the defendants, and stated imputations and assumptions regarding royalty rates, writer shares, and sound recording valuations reported fully in Section 5.  The total valuation of lost publisher royalties is $444,112.

4.5)   Damages shares can then be imputed to each publisher based on its respective share of total publishing revenues earned from BAD GIRL.  Without a valuation for performance royalties, I then imputed the following damage and revenue totals to each publisher in 2004-2013.

Case No. 11-cv-6811                                    Michael A. Einhorn, Ph.D.

## PUBLISHER BREAKDOWN

| ROYALTIES 2004—2013 | TOTAL ROYALTIES | ACTUAL DAMAGES | ADDITIONAL REVENUE |
|---|---|---|---|
| IN2N Music | $249,813 | $83,271 | $166,542 |
| Scan Disc Publishing | $249,813 | $83,271 | $166,542 |
| IN2N Musicworks | $249,813 | $83,271 | $166,542 |
| For the World | $249,813 | $83,271 | $166,542 |
| EMI Music April | $119,910 | $39,970 | $79,940 |
| Flyte Tyme | $86,602 | $28,867 | $57,735 |
| Defenders of Music | $46,632 | $15,544 | $31,088 |
| UR-IV | $33,308 | $11,103 | $22,206 |
| Warner-Tamerlane | $23,316 | $7,772 | $15,544 |
| Sublime Basement | $23,316 | $7,772 | $15,544 |
| **Total** | **$1,332,338** | **$444,113** | **$888,225** |

4.6)  I understand that plaintiff recovery may be limited by the statute of limitations to an interval extending from October, 2008 to the present.  Based on the best information made available to me, I estimate that the plaintiff in this abbreviated period lost the opportunity to earn one third shares in mechanical/digital, performance,  and synchronization royalties. Respective amounts are $13,938,   $1,576, and $3,000 in synchronization royalties.

4.7)  By publisher, estimated damages and related revenues then sum to $18,514, imputed as follows.

### PUBLISHER BREAKDOWN

| 2008-2013 | ROYALTIES | DAMAGES | ADDITIONAL REVENUE |
|---|---|---|---|
| IN2N Music | $10,414 | $3,471 | $6,943 |
| Scan Disc Publishing | $10,414 | $3,471 | $6,943 |
| IN2N Musicworks | $10,414 | $3,471 | $6,943 |
| For the World | $10,414 | $3,471 | $6,943 |

9

*Case No. 11-cv-6811*                                    *Michael A. Einhorn, Ph.D.*

| | | | |
|---|---|---|---|
| EMI Music April | $4,999 | $1,666 | $3,333 |
| Flyte Tyme | $3,610 | $1,203 | $2,407 |
| Defenders of Music | $1,944 | $648 | $1,296 |
| UR-IV | $1,389 | $463 | $926 |
| Warner-Tamerlane | $972 | $324 | $648 |
| Sublime Basement | $972 | $324 | $648 |
| **Total** | **$55,542** | **$18,514** | **$37,028** |

4.8)  Songwriters were also paid performance royalties directly by ASCAP or BMI.   By paid writer, earnings and assigned damages (at one third valuation) are as follows.

| ROYALTIES 2008-2013 | TOTAL ROYALTIES | ACTUAL DAMAGES | ADDITIONAL REVENUE |
|---|---|---|---|
| Dante Barton | $1,773.00 | $591 | $1,182 |
| Will Guice | $1,773.00 | $591 | $1,182 |
| James Harris | $307.32 | $102 | $205 |
| Terry Lewis | $307.32 | $102 | $205 |
| Bobby Avila | $165.48 | $55 | $110 |
| Isaac Avila | $165.48 | $55 | $110 |
| Raymond Usher | $236.40 | $79 | $158 |
| **Total** | **$4,728** | **$1,576** | **$3,152** |

4.9)  In addition to publishers who receive royalties for their take of Mr. Marino's share, the record label (Sony), artist (User), and producers (Flyte Tyme, Destro Music) earned revenues from the infringement.   In so doing, each may receive a valuation of actual damages. .

10

Case No. 11-cv-6811                                      *Michael A. Einhorn, Ph.D.*

4.10)   The below chart shows the revenues earned by Song, Usher, and the two producers in the course of this putative infringement.  These revenues may include the dollar amount from both albums and singles, as well as licensing revenues.   I am advised that each defendant bears the responsibility of proving deductible costs and determining a profit apportionment for non-infringing elements that may have added value to the final product.

**DEFENDANT REVENUES\**

| | **2004-2013** | **2008-2013** |
|---|---|---|
| **LABEL REVENUES** *(in dollars)* | | |
| | | |
| **Domestic Physical Sales** | | |
| Albums | $107,520,000 | $2,532,000 |
| DVDs | $1,100,000 | $0 |
| | | |
| **Digital Sales** | | |
| Albums | $1,350,000 | $624,000 |
| Singles | $474,000 | $99,000 |
| | | |
| **International Licensing** | $13,796,000 | $23,000 |
| | | |
| **Other Licensing** | $26,000 | $11,000 |
| | | |
| **Total Label Revenues** | $124,266,000 | $3,289,000 |
| | | |
| **ARTIST ROYALTIES** *(in dollars)* | $27,102,299 | $766,893 |

11

*Case No. 11-cv-6811*                               *Michael A. Einhorn, Ph.D.*

**PRODUCER ROYALTIES**
    (in dollars)

| | | |
|---|---|---|
| Flyte Tyme | $154,412 | $6,102 |
| Destro Music/Underworld | $109,910 | $5,322 |
| **Total Royalties** | **$264,322** | **$11,424** |

4.11)  Besides royalties paid, Usher's earnings should also include an imputation for his income earned from recoverable concert revenues in which the song was performed. Despite many requests, defendant has not provided adequate documentation for any such imputation, which may implicate *inter alia* a guaranteed income of perhaps one million dollars for every tour appearance.  Total domestic and foreign concert revenues in 2004-2012 and 2008-2012 respectively summed to $122,541,351 (153 shows) and $90,025,471 (107 shows)   The song appeared on set lists from two tours, *The Truth Tour* (2004-2005) and *The OMG Tour* (2010-2011), which respectively earned $28,988,920 (46 shows) and $39,257,824 (40 shows) at domestic venues alone.

4.12)  In addition to rights in the musical composition CLUB GIRL, I am advised that Mr. Marino held ownership rights in the neighboring master recording of the original track CLUB GIRL.  As explained more fully in Section 5, a sum of $494,142 reflects a royalty in 2004-2013 that Sony should have paid to the owner of the original sound recordings, and is therefore a component of actual damages that can be attributed to the label. Consequently, label revenues can be categorized as $494,142 actual damages, and $123,771,858 in additional label revenues.  The resulting attribution in 2008-2013 is $15,684 actual damages, and $3,233,016 additional label revenues.

4.13)  In total, composite damages and revenue are accounted as follows:

12

|  | **2004-2013** | **2008-2013** |
|---|---|---|
| **Publisher Revenues** | | |
| Assigned Damages | $444,113 | $18,514 |
| Additional Revenues | $888,225 | $37,028 |
| *Total Revenues* | *$1,332,338* | *$55,542* |
| | | |
| **Label Revenues** | | |
| Assigned Damages | $494,142 | $15,684 |
| Additional Revenues | $123,771,858 | $3,273,016 |
| *Total Revenues* | *$124,266,000* | *$3,289,000* |
| | | |
| *Artist Revenues* | *$27,102,299* | *$766,893* |
| *Producer Revenues* | *$264,322* | *$11,424* |

4.14)  Total damages and revenues are then as follows:

|  | **2004-2013** | **2008-2013** |
|---|---|---|
| **Total Assigned Damages** | **$938,255** | **$35,774** |
| **Total Additional Revenues** | **$152,026,704** | **$4,091,513** |
| *Total Revenues* | *$152,964,959* | *$4,1127,287* |

13

*Case No. 11-cv-6811*                                          *Michael A. Einhorn, Ph.D.*

## 5,  PLAINTIFF DAMAGES

5.1) I  am advised that a plaintiff in a copyright matter may minimally recover as joint damages all identified  amounts that the plaintiff may have earned had his rights been upheld in the underlying composition and sound recording  CLUB GIRL in which he had invested his creative efforts.

5.2)  In this regard, plaintiff would have earned – were no infringement to have arisen -- income from uses of BAD GIRL (mechanical, direct, synchronization, and public performance formats) in which he held a presumptive share from his authorship of the underlying work CLUB GIRL.

5.3)     Regarding the payment of mechanical/digital royalties for the work, Sony has to date failed to produce a complete itemized statement of royalties that it paid for mechanical/digital rights.  The most recent document provided by Sony ranges from March, 2004 to September, 2011 (Schedule 5, SME02517; see also 2518, 2825, 4806). Now nearly two years behind on reported data, the company promises updated numbers, but has yet to provide them to this expert. Sony's behavior is prejudicial to the plaintiff because it understates the royalty totals over which recovery may be possible.

5.4)  Moreover, Sony's numbers are one page compilations that are not supported by any primary document that can be used to confirm independently the accuracy of any stated dollar amount. Even if numbers were up to date, it is impossible to confirm whether any presented royalty amount is based on any meaningful sales.

5.5)Finally, Sony has failed to produce any statement of mechanical royalties paid for the period (October 28, 2008 to present) that it actually believes is covered by the statute of limitations. Were the Court to limit the allowed recovery period to this smaller period, the

14

amounts presented above  would  be limited  to the immediate charge of establishing the correct royalty valuation for the allowed historic interval.

5.6)     Facing a deficient presentation of data, I have then necessarily constructed estimates of lost mechanical royalties based on other documents provided by Sony.

5.7)   As shown on Sony's Profit & Loss from March, 2004 to March, 2013 (SME00085, 1770), the label sold domestically a total of 9,714,824 physical album units and earned a gross revenue total of $107,520,000 from these sales (priced at $11.06).  These reported numbers may then be somewhat deficient, as the album was certified by the RIAA as diamond (exceeding 10 million domestic units) in 2012. The company also earned from digital sales of the single track BAD GIRL an additional $474,000 (SME00085).  At an imputed unit rate of $0.70 per digital track, I estimate the number of digital single units sold to be 677,143. The company also earned $1,350,000 from digital sales of the album. At a unit rate of $7.00 per digital album, I estimate the number of sold digital albums to be 192,857.

5.8)   As one of three writers of CLUB GIRL, Mr.  Marino's anticipated royalty payment for physical album sales is a reasonable proportion of a full royalty rate base of 8.5 cents per infringing album track (or $825,760).  A full royalty rate of 8.5 cents corresponds to the full statutory rate in effect from March, 2004 to December, 2005, which is the interval over which most albums were sold.

5.9)   I imputed royalties for digital singles and albums using a full rate base of 8.8 cents per infringing single (or $76,560).  A full royalty rate of 8.8 cents corresponds to the midpoint of two statutory rates in effect before and after December, 2005 (i.e., 8.5 cents and 9.1 cents per track).  The use of the midpoint here reflects the fact that digital singles

were sold later in the product cycle and thus more likely to be priced at the second rate, which is higher.

5.10)   As one of three original songwriters in the original composition, plaintiff Daniel Marino would expectedly have earned some fraction of the full domestic royalty amounts of $825,760 and $76,560. I shall assign to Mr. Marino's co-writer royalty share a sum of 1/3 of the total $902,320, but reserve the right to modify this assignation as additional information becomes available.

5.11)   Accordingly, the plaintiff is due for the sum of $300,773 for his imputed share of mechanical/digital royalties arising from domestic sales of albums and singles in 2004-2013.   If the assignation were modified to 2/3, Mr. Marino's due royalty would be $601,546.

5.12)   If limited to a recovery period of October 28, 2008 to March, 2013,  I estimate from the best available reported data in 2008-2013 that Sony sold domestically a total of 228,933 physical  albums (if unit priced at $11.06),  141,428 digital singles (if unit priced at $0.70), and 89,143 digital albums (if unit priced at $7.00  (SME14963).

5.13)   At an estimated full statutory royalty rate of 9.1 cents that would have been in effect over the entire shortened period, plaintiff would have been due – at one third ownership -- for a payment of $13,938 for his share of mechanical/digital royalties earned from domestic sales of  albums and singles used in the limited period.

5.14)   Based on  available data on relative  domestic  and  foreign  record  sales,   (see Section 8), I have assumed that  foreign royalties can be set at 46 percent of the domestic total if no additional information is made available.  If this assumption is unchanged, the resulting total for lost domestic and foreign mechanical royalties in 2004-2013 is then

*Case No. 11-cv-6811*                                        *Michael A. Einhorn, Ph.D.*

$439,127. As there are no reported foreign album sales in 2008-2013, I shall not make any adjustments for foreign album sales in this period.   Nonetheless, I do remain unconvinced that no foreign sales were made of this album.

5.15)   Plaintiff may also recover a share of synchronization royalties in which the composition was made available for integration with video use. As explained in Section 12, there were at least five synchronizations of the song since 2004, totaling $14,953. Since 2008, there was one synch, valued at $9,000.  With a putative one third share, plaintiff may then recover as actual damages an amount of $4,984 or $3,000, depending on the court's ruling on equitable tolling and the statute of limitations.

5.16)   Plaintiff may also recover a share of performance royalties paid for uses on broadcast media and live events.  I estimate that total payouts in 2008-2013 summed to $9,456; see Section 11.    At one third valuation, plaintiff would have received $3,152, which can be considered a part of actual damages. I have not seen any data suitable to estimating this total for earlier years.

5.17)   Finally, I am also advised that Mr. Marino held full rights in the original sound recording CLUB GIRL that would rightfully have been licensed in addition to rights in the musical composition in which three writers held equal shares. In general industry practice, sound recording rights are generally negotiated and may predictably fall between zero and the full mechanical rate for the composition.  I shall assign to Mr. Marino's rights in the sound recording an imputation of half the full mechanical rate.  At this valuation, lost royalties amount to $494,141 in the 2004-2013 interval, or $15,720 in 2008-2013.   If Mr. Marino's rights in the sound recording are not found valid, the plaintiff should recover a producer fee comparable to those received by Flyte Tyme and Destro Music (Section 10).

*Case No. 11-cv-6811*                                    *Michael A. Einhorn, Ph.D.*

5.18)  I have not imputed any additional producer royalty to Mr. Marino for his efforts in the studio to produce a master recording,  and  reserve the right to amend my results as more information becomes available.

5.19)  Mr. Marino would rightfully also received compensation for use of his studio in recording BAD GIRL. The label paid recording expenses for the entire album *Confessions* of an amount of $2,261,868.  If costs are proportionally assigned based on the number of tracks (14), Mr. Marino could have received as much as $161,562 in payments for his recording costs.

5.20)  Finally, Mr. Marino lost the opportunity to earn future royalties from his composition and sound recording.  Based on the last full year of reported sales, I estimate that Mr. Marino could have earned $2000 in mechanical royalties and $3000 in sound recording royalties.   Taking a straightline depreciation over a remaining life of 25 years (3% discount rate), Mr. Marino's lost future earnings in 2014-2039 amount to $47,095. With a five year lifetime, the lost earnings sum to $11,674.    For the life of the copyright (95 years), lost earnings sum to $83,333.

## 6. LABEL REVENUES FROM *BAD GIRL:* 2004-2013

6.1)  In addition to publisher and writer royalties itemized above, plaintiff may recover individually from defendant Sony Music Holdings (and its label subsidiaries Laface, Jive, and Zomba) profits earned from the sale of infringing record products bearing the infringing musical composition

6.2)  In determining profit earned from a record label, plaintiff bears the responsibility of proving only defendant revenues earned from the sale of any infringing physical or digital

product. As a co-defendant, Sony would need to present offsetting costs and the means of apportioning the value of any product or license into infringing and non-infringing elements.

6.3)  As a revenue-producing release, the track BAD GIRL was a component of Usher's smash album, *Confessions,* which Sony released in March, 2004. The song was released in many different formats, including album, single, and DVD.   The song was also made available for sale as a download, and licensed for ringtones, ringbacks, and streaming services.

6.4)  Before apportionment and deduction of costs, Sony earned from March, 2004 through March, 2013 the following revenues (see SME00085

**LABEL REVENUES:  2004-2013**

| | |
|---|---|
| Digital Singles……………. | $474,000 |
| Digital Albums | $1,350,000 |
| Physical Sales Album….. | $107,520,000 |
| Physical Sales DVD | $1,100,000 |
| International Licensing Revenue | $13,796,000 |
| Licensing | $26,000 |
| **Total  Gross Revenues** | **$124,266,000** |

6.5)  The itemized amount of gross international revenues reflects only licensing fees that the label earned for sales in foreign markets.   If sales made by Sony's foreign subpublishers are allowably recovered, international sales revenues for the defendant

should be adjusted upward to $50,848,000 thousand (SME01770).  The sales total is then

$175,114,000, itemized as follows.

**LABEL REVENUES:  2004-2013**

| | |
|---|---|
| Digital Singles………………… | $474,000 |
| Digital Albums | $1,350,000 |
| Physical Sales Album….. | $107,520,000 |
| Physical Sales DVD | $1,100,000 |
| International Sales Revenue | $50,848,000 |
| Licensing | $26,000 |
| **Total  Gross Revenues** | **$175,114,000** |

For the sake of conservatism, I have included only the lower revenue estimates in the

**Summary of Conclusions** in Section 4, but reserve the right to bring up the higher if the

Court rules that it is appropriate to include the value of foreign subpublisher sales in the

damage calculation.

6.6) I do believe that each amount itemized above implicates a product or license that in

some way involves the use of an infringing musical composition and sound recording.

6.7)  I am advised that plaintiff bears the responsibility to attest to revenue totals.  The

defendant may attempt to prove offsetting costs and apportion some amount of this total to

non-infringing elements outside of the  musical composition BAD GIRL.

6.8) Sony has provided no  primary backup documentation that could be used to confirm

or dispute the accuracy of any of these amounts made on Sony's compilation sheet cited

above.  This deficiency is far greater than anything I have encountered in previous work as a testifying expert in a music matter. I am aware that the plaintiff counsel had asked for this information repeatedly. I then reserve the right to amend my numbers if new information becomes available.


## 7. ARTIST ROYALTIES:  2004-2013

7.1)  Plaintiff may also recover artist revenues earned from the infringing use of BAD GIRL.

7.2)  As the recording artist, defendant Usher earned royalties from the sale of infringing albums and DVDs in domestic, foreign, and special markets. From some unspecified time (presumably March, 2004) until June, 2011, this amount totals to $27,008,620 (Schedule 4a, SME01777; see also 1778-2303), with later data not provided.

7.3)  This amount in 7.2 implicates recordings sold in album formats and should be assigned  to infringing and non-infringing valuations bearing the same apportionment  as defendant will offer in regard to album revenues.

7.4)  Usher also earned in the same interval royalties from the sale of the single BAD GIRL in domestic and foreign markets totaling to $93,679.  (Schedule 4b, SME02304; see also 2307-2516)  This amount implicates direct use of the infringed musical composition without attachment of other non-infringing tracks.

### 8. PUBLISHER ROYALTIES:  2004-2013

8.1)  Sony also paid mechanical royalties to defendant publishers for use of the musical composition BAD GIRL imprinted in sound recordings that were sold in physical and digital markets.

8.2)  As explained in Section 5, Sony has not provided a complete and verifiable statement of publisher royalties paid until the present date, and I have necessarily determined likely payments based on sales data reported elsewhere. (i.e., see SME02518, 02825, 04806)

8.3)  As explained in Section 5, I estimate that Sony sold in March, 2004 – March, 2013 a total of 9,714,824 units in domestic physical sales, 677,143 in digital singles,  and 192,857 in digital albums.  Its foreign subpublishers may have sold a total of 4,726,833 revenue-producing units outside of the U.S.

8.4)     Record labels pay mechanical/digital royalties to publishers, who receive transferred ownership shares and act on behalf of the songwriters who created the work in the first place.  Publisher shares in label royalties are as follows

### OWNERSHIP INTERESTS IN *BAD GIRL*

**37.5 percent writer interest controlled by Barton,**

    IN2N Music:               18.75%

    Scan Disc Publishing:      18.75%

**37.5 percent writer interest controlled by Guice**

    IN2N Musicworks:        18.75%

    For the World:           18.75%

22

**13 percent writer interest controlled by Harris and Lewis**

    EMI April:               6.5 %

    Flyte Tyme Tunes:     6.5 %

**7 percent writer interest controlled by B. Avila and I. Avila**

    Defenders of Music:    3.50%

    Sublime Basement:    1.75%

    Warner-Tamerlane:    1.75%

**5 percent writer interest controlled by Usher**

    EMI April:               2.50%

    UR-IV Music:         2.50%

8.5)  For all writers except Usher, I imputed a royalty rate per sold domestic track based on the statutory rate established at the Copyright Office. – 8.5 cents (2004-2006), 9.1 cents (2007-2013). This is industry custom and practice for compensating non-artist publisher shares of musical compositions.  For example,  the two publishers representing non-artist Dante Barton received  in 2004-2005  an imputed total share of 37.5 percent of 8.5 cents per track (or 3.1875 cents).  Payment increased to 3.4125 cents per track after 2005.

8.6) As a performing artist with a controlled share in a composition, Usher would have earned in 2004-2005 a lower base rate of 7.26 cents per track (SME00694) for his due royalty payment,  which was then assigned to his 5 percent that was collected by his two publishers (EMI and UR-IV). Based on this track rate and publisher share, Usher's

publishers then earned a sum of .0363 cents per track. This amount may be somewhat higher after 2005, and I reserve the right to amend properly.

8.7) Based on the publisher/writer shares and the rate imputations reported above, mechanical royalties for sales of physical albums and digital singles in 2004-2013 were paid to each publisher as follows:

### DOMESTIC ROYALTIES

| | |
|---|---|
| IN2N Music | $169,185 |
| Scan Disc Publishing | $169,185 |
| IN2N Musicworks | $169,185 |
| For the World | $169,185 |
| EMI Music April | $81,209 |
| Flyte Tyme | $58,651 |
| Defenders of Music | $31,581 |
| UR-IV | $22,558 |
| Warner-Tamerlane | $15,791 |
| Sublime Basement | $15,791 |
| **Total** | **$902,318** |

8.8) I have not seen any representative dollar or unit aggregates regarding mechanical royalties collected by publishers from foreign collection societies. If such numbers are not forthcoming, I assume that foreign royalties can be imputed at a share of 46% of the domestic total. This number is based on the ratio of foreign to domestic sales revenues in 6.5. I then reserve the right to modify this assumption for foreign publisher royalties as more information becomes available.

8.9) With a 46% increase for foreign royalties, total mechanical royalties for reproduction of BAD GIRL in 2004-2013 are $1,303,997.

*Case No. 11-cv-6811*                                              *Michael A. Einhorn, Ph.D.*

### DOMESTIC AND FOREIGN ROYALTIES

| | |
|---|---|
| IN2N Music | $247,010 |
| Scan Disc Publishing | $247,010 |
| IN2N Musicworks | $247,010 |
| For the World | $247,010 |
| EMI Music April | $118,565 |
| Flyte Tyme | $85,630 |
| Defenders of Music | $46,108 |
| UR-IV | $32,935 |
| Warner-Tamerlane | $23,054 |
| Sublime Basement | $23,054 |
| **Total** | **$1,303.997** |

## 9.  STATUTE OF LIMITATIONS

9.1) I am advised that the defendants contend that damage recovery is confined to a limited period from October, 2008 to March, 2013.  I have then recalculated my results to confirm to this limited period. I have necessarily used data from Sony made available from July, 2008, and understand that a downward adjustment may be necessary to handle the overage of four months.

9.2)  Before apportionment and deduction of costs,   Sony earned from July, 2008 through March, 2013 the following revenues from the sale of singles, albums, and DVDs in domestic digital and physical markets, international markets, and licensing in special markets  (SME14963):

**LABEL REVENUES:  2008-2013**

| | |
|---|---|
| Digital Singles…………………. | $99,000 |
| Digital Albums | $624,000 |
| Physical Sales Album….. | $2,532,000 |
| International Licensing Revenue | $23,000 |
| Licensing | $11,000 |
| **Total  Gross Revenues** | **$3,289,000** |

9.3)  Valued at $11.06 per album, I estimate that Sony sold domestically a total of 228,933 physical albums in the limited period. Valued at $0.70 per track, I estimate that Sony sold a total of 141,428 digital tracks in the same period.   Based on a valuation of $7.00 per download, I estimate that Sony sold a total of 89,143 digital albums in the period.  Based on a licensing royalty of 32 percent, I estimate that Sony's foreign subpublishers earned a total  of $71,875 from the sale of singles.

9.4)  As before,  I have seen no backup documentation that could be used to confirm the accuracy of any of these amounts and reserve the right to amend numbers if new information becomes available.

9.5)  I estimate that composite artist royalties received from infringing albums and DVD sales during this limited period are $726,184.  I obtained this number by prorating total artist royalties categorized in SME01777 and specified in §7.2   by their corresponding periodic revenue totals in SME00085 (supra §5.7) and SME14963 (supra §5.14).   As before, some fraction of album royalties should be apportioned to the infringing track.

*Case No. 11-cv-6811*                                   *Michael A. Einhorn, Ph.D.*

9.6)  I also estimate that composite artist royalties from sales of the single during the limited period are $40,709.  I obtained this number by prorating reported artist royalties (Schedule 4, SME01778) by their corresponding single domestic revenue totals in SME00085  and SME14963.  All of this revenue amount is attributable to direct use of the infringing track BAD GIRL.

9.7)  Consistent with its history of record sales,   Sony paid mechanical royalties to defendant publishers for use of the musical composition in singles and albums sold in the limited period.  Valued at  publisher shares and mechanical rates described in Section 8, the estimated dollar  split for sales of  albums and singles in 2008-2013 is as follows

**ROYALTIES**

| | |
|---|---|
| IN2N Music | $7,840 |
| Scan Disc Publishing | $7,840 |
| IN2N Musicworks | $7,840 |
| For the World | $7,840 |
| EMI Music April | $3,763 |
| Flyte Tyme | $2,718 |
| Defenders of Music | $1,463 |
| UR-IV | $1,045 |
| Warner-Tamerlane | $732 |
| Sublime Basement | $732 |
| **Total** | **$41,814** |

## 10.  PRODUCER ROYALTIES

10.1)    As the producer of the track BAD GIRL, Flyte Time earned producer royalties for each unit sold.  The appropriate royalty rates are 3.15% of revenues related to sales of the physical track, and 2.28% related to sales of the digital.

10.2)  Based on documents available from July, 2008 to December, 2012,  Flyte Tyme earned a total of $3,831 for royalties on physical sales and $2,271 for royalties on digital sales (SME05430-6597).  The royalty total for the limited period is $6,102. Subject to apportionment, plaintiff may recover a share of this amount if the court rules that the statute of limitations limits recovery to 2008-2013.

10.3) If the court allows recovery from March, 2004, I have extrapolated separately these physical and digital royalty payments to reflect royalty amounts paid to Flyte Tyme over the entire historic interval.

10.4)  Extrapolating based on revenues earned from the sale of physical albums, I estimate that Flyte Tyme earned for royalties on physical units  a total of $143,557 since March, 2004.

10.5)  Extrapolating based on revenues earned from the sale of digital tracks,  I estimate that Flyte Tyme earned for royalties on digital units a total of $10,855 since March, 2004.

10.6)  Total producer royalties earned by Flyte Tyme in 2004-2012 are $154,412.

10.7)  For Destro Music Productions, I estimate that the producer earned $2,738  in digital royalties and $2,584 in physical royalties in 2008-2012 (SME01403-1767).   The royalty total is $5,322.  If allowable, these numbers can be extrapolated for 2004-2013 to $13,088 (digital) and $96.822 (physical).   Total estimated producer royalties in 2004-2012 for Destro Music amount to $109,910.

10.8)  I understand that AB  was paid producer royalties under a contract with Flyte Tyme. I reserve the right to itemize AB's income when I can review proper documentation from Flyte Tyme.

## 11. SYNCHRONIZATION LICENSES

11.1) The musical composition BAD GIRL seems to have been licensed at least five times

in 2004-2013 for synchronization with video.

### SYNCHRONIZATION LICENSES

| | | | |
|---|---|---|---|
| 11/11/2004: | MTV's MADE:  STEP DANCER | $360 | (EMI00060) |
| 11/23/ 2004: | FASHION ROCKS | $4841 | (EMI00054) |
| 5/12/ 2005: | ONE NIGHT, ONE STAR | $645 | (EMI00062) |
| 10/17/ 2007: | TRACES OF TRAGEDY | $107.50 | (EMI00066) |
| 10/28/2011: | USHER:  LIVE FROM LONDON | $8999.55 | (EMI00071) |

11.2)  I do not believe that this list is complete and reserve the right to add numbers.  For

example, I have been advised that BAD GIRL appeared on the music video for "My Boo",

featuring Usher and Alicia Keys, and some imputation for synchronization royalties is

possible.    The song later became a smash hit and was presumably influenced by works

included on the video; this may attest to some additional value of BAD GIRL.

11.3)  Based on §11.1, total licensing revenues from synchronizations in 2004-2013 sum

to $14,953.

11.4)  From July, 2008 to the present, total synchronization revenues sum to $9,000.

11.5)  Each of the amounts above can be assigned to each publisher through the shares

splits set forth in Section 8.     The results are included in the assigned royalties in the

**Summary of Conclusions**, Section 5

**12.PERFORMANCE ROYALTIES**

11.1)  Despite frequent requests by plaintiff counsel, each defendant (except Usher) has failed to turn over any statement regarding performance royalties received from either ASCAP or BMI.

11.2)  From Usher's records, I have been able to determine that the songwriter earned from ASCAP a performance royalty total of $473 in 2008-2012.

11.3)  ASCAP's records identify Usher as having collected a 5% share of royalties paid for the song.

11.4)  Making the assumption that ASCAP and BMI paid equal credits for the song, I estimate that total performance royalties in 2008-2012 amounted to $9,456.

11.5)  ASCAP and BMI pay half of each due royalty check to the respective writers, thus bypassing the publisher. Collection shares of the performance royalties are as follows:

**COLLECTION INTERESTS IN PERFORMANCE ROYALTIES**

**Publishers**

| | |
|---|---|
| IN2N Music: | 9.375% |
| Scan Disc Publishing: | 9.375% |
| IN2N Musicworks: | 9.375% |
| For the World: | 9.375% |
| EMI April: | 3.25% |
| Flyte Tyme Tunes: | 3.25% |
| Defenders of Music: | 1.75% |
| Sublime Basement: | 0.875% |

| | |
|---|---|
| Warner-Tamerlane: | 0.875% |
| EMI April: | 1.25% |
| **UR-IV Music:** | **1.25%** |
| | |
| **Total:** | **50%** |

**Songwriters**

| | |
|---|---|
| Dante Barton | 18.75% |
| Will Guice: | 18.75% |
| James Harris | 3.25% |
| Terry Lewis | 3.25% |
| Bobby Avila | 1.75% |
| Isaac Avila | 1.75% |
| Raymond Usher | 2.5% |
| **Total** | **50%** |

11.5)  The total collection of $9,456 can be assigned to each publisher and writer through the collection shares set forth in Section 8.     The results are included in the assigned royalties in the **Summary of Conclusions**, Section 5.

# 13.  COSTS AND APPORTIONMENT

13.1)  As a co-defendant, Sony Music would bear the burden of proving costs and providing an apportionment technique for valuing infringing and non-infringing components of any record release of the single BAD GIRL and the album *Confessions.*

13.2) Sony may attempt to deduct from product revenues for single and album sales components for publisher and artist royalties, manufacturing costs, distribution costs, and overhead.

13.3) These costs are deductible only if they can be directly related to the actual release of the product, and must not then represent some apportionment of a common or historic cost that would be incurred regardless.

13.4)    Publisher royalties for mechanical and digital rights in musical compositions are a legitimate deduction from label revenues arising from sales of singles and albums, *if accurately reported*.   The label may deduct from product revenues all accurately reported costs for publisher royalties.

13.5)  In addition to publisher revenues, Usher earned on album and single sales a royalty as the recording artist, while Flyte Time and Destro earned producer royalties for each sold track.  The label may deduct from product revenues all accurately reported artist and producer royalties.

13.6)  As a cost directly related to the production of its sound recordings, Sony may attempt to deduct from sales revenues the *manufacturing* costs of all physical units sold. However, these costs are not deductible if they simply reflect payment to any entity owned by Sony itself.   Rather, reported manufacturing costs here would simply be transfers within the Sony entity and not necessarily reflective of any truly incurred manufacturing expense.

13.7)  Sony may also attempt to deduct fees related to amounts paid for *distribution* of its recordings.  However, distribution fees are often based on a fixed percentage of product

revenues and do not then necessarily reflect any truly incurred expense.   As before, transfer payments within the Sony organization are not properly deductible.

13.8)   Sony may also attempt to deduct amounts related to an apportionment of *company overhead and related costs* among units sold, including the infringing recordings. The imputed amounts are generally based upon some formulaic assignment of common and/or historic costs, but without any real bearing to the infringing event.

13.9)  I am advised that the defendants bear the responsibility of apportioning the worth of BAD GIRL from every album sale or album royalty on which the  song appears, and must then present a credible means of performing this assignment.


**14.   CONCERT REVENUES**

14.1)  Depending on the court's ruling on the domain of statute of limitations,  I would expect to add to Usher's payable revenues a share of his take at each concert where BAD GIRL was performed in the relevant recovery period.  This could implicate two major tours -- *The Truth Tour* (2004-2005) and the more successful *OMG Tour* (2010-2011)

14.2)  Using assumptions based on information and belief, it will be necessary to *estimate* a touring amount because the defense has redacted from provided tour documents information related to the artist's guarantee and back end share of concert revenues (UR00868, see Section 6a).  It is then impossible to determine Usher's actual earnings from any concert where the song was performed.

14.3) I have confirmed that BAD GIRL was performed for certain at each of the following OMG concerts in the U.S. in 2010-2011:

| Las Vegas | November 13, 2010 |
|---|---|
| Greensboro | December 7, 2010 |
| New York City | December 13, 2010 |
| Omaha | May 22, 2011 |

http://www.setlist.fm/search?query=artist:%28usher%29+song:%28bad+girl%29+country:%28usa%29+date:[2008-10-27+TO+2013-07-10]

14.4) This list of implicated OMG concerts is not exhaustive. Indeed, I expect minimally that the song was a standard part of a 20-23 song playlist that Usher may have sung at most, if not all, of the OMG concerts that he performed in 2011-2012.

14.5)  Usher performed the OMG concert 45 times in American cities in November 1 – December 31, 2010 and April 27 – June1, 2011. Using Pollstar data, I determined that gross revenues from the sale of tickets in these 45 domestic tour stops (46 tour shows) amounted to $39,257,824.

14.6)  On a purported  Profit and Loss statement showing tour revenues (UR00893-5), Defendant seems to claim for OMG tour revenues for U.S. performances of $5,766,060. However, he provides no documentation to support this number, or account for evident deductions from box office receipts that would explain the disparity.

14.7) Moreover, it is clear from the contract itself that some revenues (redacted) were not included in this revenue total.  (see UR00871, Section 6c(iv)). These revenues may yet be relevant to Usher's compensation. I have not been able to determine any accounting to show how the purported revenue, how it may be relevant to the issue at hand, and how

Usher may have received other revenues (including guarantees) outside of his share of specified amounts on the profit and loss statements.

14.8)  Indeed, the defendant's P&Ls are simply an instrument for calculating a back-end adjustment for the purpose of splitting any remaining residual pooled income between Usher and his promoter.  The base of Usher's earnings at an event are earned through a guaranteed amount that is not figured in these P&Ls.  (UR00868l; see Section 6a).  Indeed, distribution from the pooled revenues occurs only if the due share of pooled income amount exceeds the guarantee.  This may not always occur.   Thus I am missing a core component of Usher's compensation package.

14.9)    According to Pollstar, Usher performed OMG live in October 2008- December 2012 in over thirty foreign cities.  The artist also appeared at other musical events in the U.S. outside of the OMG Tour.    Besides domestic OMG concerts, Usher's events in 2008-2012 then included foreign OMG concerts (e.g., Munich, 3/4/2011), benefit concerts (William J. Clinton Foundation; 10/15/2011), salutations (Whitney Houston; 10/15/2012), radio station promotions (KIIS FM; 5/15/2010), and small venues (House of Blues; 11/25/2008). Total domestic and foreign concert revenues in 2008-2012 summed to $90,025,471 (94 city stops; 107 shows).

14.10)   Usher also performed in 2004-2008 at additional concerts in the U.S. and internationally.   While I have not seen set lists for the music played at these events, staged concerts in 2004-2005  took place in *The Truth Tour,*  which began in June, 2004, immediately after the release of *Confessions* (March, 2004) for the presumptive purpose of promoting the new album. As Usher performed BAD GIRL on the tour on August 5, 2004, it is possible the artist regularly performed the song throughout the tour.   Total

domestic ticket revenues for *Truth Tour* events amounted to $28,988,920 (38 city tour stops; 40 tour shows).

14.11)  Total domestic and foreign concert tickets in 2004-2013 sum to $122,541,351 (138 city stops; 153 shows).

14.12)  At a minimum, Usher earned a guaranteed income for each concert performed. Minimal earnings are then the multiple of number of concert events and the guarantee. Based on information and belief, I believe that Usher's guarantee may have ranged from $500,000 to $1,000,000 per night on each tour concert.    At an assumed guarantee of $500,000 per tour show, Usher may have earned minimally a tour revenues of $43,000,000. *Defendant has refused to disclose the amount of Usher's guarantee for his two tours.*

14.13)  I also reserve the right to amend the result to recognize his guarantee and back-end concert income, as well as earnings from merchandising and concessions.

14.14)  As defendant has not made information available, I also reserve the right to modify my results based on reasonable assumptions based on other representative data.


## 15.  CONCLUSION

This report does not include a valuation for the intangible damage that continues to affect the career of Daniel Marino.  As a young songwriter/producer, Mr. Marino lost the opportunity to receive future royalties and professional credit for his participation on a multiplatinum album that propelled its artist to fame and earned a ranking as the second best-selling album of this century.  The intangible losses to Mr. Marino's professional reputation as a songwriter are then considerable.

The above testimony is my personal independent assessment and is an accurate representation of what I will testify to should I be so called.

Amounts are subject to change as more information becomes available.

_____
Michael A. Einhorn, Ph.D.

*Case No. 11-cv-6811*                                   *Michael A. Einhorn, Ph.D.*

The above testimony is my personal independent assessment and is an accurate representation of what I will testify to should I be so called.

Amounts are subject to change as more information becomes available.

Michael A. Einhorn, Ph.D.

I

**Appendix A**

Professional Resume of Michael A. Einhorn