# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
DANIEL V. MARINO,                                          :
                                                          :
                                    Plaintiff,            :      11 Civ. 6811 (PSD)
                                                          :
                    v.                                    :
                                                          :
USHER (a/k/a Usher Terry Raymond IV); SONY                :
MUSIC ENTERTAINMENT; EMI APRIL MUSIC,:
INC.; EMI BLACKWOOD MUSIC, INC.; JAMES                    :
SAMUEL HARRIS III; TERRY STEVEN LEWIS; :
BOBBY ROSS AVILA, JR.; ISSIAH AVILA, JR.; :
WILLIAM C. GUICE; DANTE E. BARTON;                        :
DESTRO MUSIC PRODUCTIONS, INC.;                           :
DEFENDERS OF MUSIC; FLYTE TYME                            :
TUNES; SUBLIME BASEMENT TUNEZ; UR-IV :
MUSIC, INC.; WARNER-TAMERLANE                             :
PUBLISHING CORP.; MARK PITTS; BYSTORM :
ENTERTAINMENT; TOMMY VAN DELL; and                       :
IN2N ENTERTAINMENT GROUP, LLC,                            :
                                                          :
                                    Defendants.           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOVING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

JONATHAN D. DAVIS, P.C.
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 687-5464

-and-

FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, Pennsylvania 19103
(215) 299-2000

*Attorneys for the Moving Defendants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

MARINO AUTHORIZED THE EXPLOITATION OF *BAD GIRL* ............................................. 4

   1.   Marino Admits He Impliedly Licensed *Bad Girl* ............................................. 4

   2.   Marino Does Not Dispute He Authorized Barton To Make A Deal .................................. 5

THE UW AGREEMENT IS VALID AND BINDING .................................................................. 6

   1.   The Terms Of The UW Agreement ...................................................................... 6

   2.   The Scope Of The Rights Conferred By The UW Agreement ........................................ 7

   3.   Whether Marino Is Bound By The UW Agreement Is Inconsequential ............................. 9

A REGISTRATION WAS NEVER FILED
FOR THE *CLUB GIRL* SOUND RECORDING .......................................................................... 12

NEITHER PITTS NOR BYSTORM COMMITTED ANY INFRINGING ACTS ....................... 14

MARINO IS NOT ENTITLED TO ANY TOURING REVENUES ........................................... 15

   1.   The Public Performances of *Bad Girl* Were Authorized .................................... 15

   2.   No Causal Nexus Exists Between Concert
       Revenues And Alleged *Bad Girl* Performances ................................................. 16

MARINO IS NOT ENTITLED TO RECOVER
DAMAGES OR PROFITS ARISING OUTSIDE THE U.S. ......................................................... 18

CONGRESS HAS NOT CREATED AN
ATTRIBUTION CLAIM OR REMEDY MARINO CAN PURSUE .......................................... 20

CONCLUSION ......................................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Badasa v. Mukasey*,
    540 F.3d 909 (8th Cir. 2008) ............................................................................ 19

*Bing Shun Li v. Holder*,
    400 Fed. App'x 854 (5th Cir. 2010) .................................................................. 19

*Bodenstab v. J.R. Blank & Associates, Inc.*,
    Nos. 88 C 6125, 88 C 6135, 1989 WL 84617 (N.D. Ill. July 17, 1989) ................... 10

*Brownmark Films, LLC v. Comedy Partners*,
    800 F. Supp. 2d 991 (E.D. Wis. 2011) ............................................................... 9

*Burkitt v. Flawless Records, Inc.*,
    Civil Action No. 03-2483, 2005 WL 6225822 (E.D. La. June 13, 2005) ................. 10

*Corbello v. DeVito*,
    832 F. Supp. 2d 1231 (D. Nev. 2011) ................................................................ 10

*Davis v. Blige*,
    505 F.3d 90 (2d Cir. 2007) ........................................................................... 9, 10

*Malibu Media, LLC v. John Does*,
    Civil Action No. 12-2078, 2013 WL 30648 (E.D. Pa. Jan. 3, 2013) ........................ 9

*Positive Black Talk, Inc. v. Cash Money Records, Inc.*,
    No. Civ. A. 02-0425, 2003 WL 1522941 (E.D. La. Mar. 20, 2003) ........................ 13

*Reed Elsevier, Inc. v. Muchnick*,
    559 U.S. 154, 130 S. Ct. 1237 (2010) ........................................................... 12, 13

*Shannon v. GfK Custom Research LLC*,
    No. 4:13-CV-682 CAS, 2013 WL 2395009 (E.D. Mo. May 30, 2013) .................... 19

*Silvers v. Sony Pictures Entertainment, Inc.*,
    402 F.3d 881 (9th Cir. 2005) ............................................................................. 9

*Sybersound Records, Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008) ......................................................................... 10

*U.S. v. Lawson*,
    677 F. 3d 629 (4th Cir. 2012) .......................................................................... 19

**Statutes**

17 U.S.C. § 106A ................................................................................................. 20

ii

17 U.S.C. § 201(d)(1) ................................................................................................ 10

17 U.S.C. § 204(a) ...................................................................................................... 4

17 U.S.C. § 411(a) .................................................................................................... 12

17 U.S.C. § 504(b) .................................................................................................... 17

**Other Authorities**

*Black's Law Dictionary* (7th ed. 1999) .................................................................. 10

Setlist.fm: About,
    *available at* http://www.setlist.fm/about (last visited Oct. 31, 2013) ...................... 16

Setlist.fm: Terms Of Use,
    *available at* http://www.setlist.fm/help/terms (last visited Oct. 31, 2013) ............... 16

U.S. Copyright Office Form PA,
    *available at* http://www.copyright.gov/forms/formpa.pdf (last visited Oct. 31, 2013) ...... 12, 14

YouTube: Terms of Service,
    *available at* http://www.youtube.com/t/terms (last visited Oct. 31, 2013) ............... 19

**Treatises**

1 Nimmer on Copyright 6-12[c] ............................................................................... 10

The Moving Defendants respectfully submit this reply memorandum of law in further support of their motion for summary judgment.[1]  Doc. No. 102.  Plaintiff does not dispute a single material fact identified by the Moving Defendants because most of those facts are binding admissions made by him.  Doc. No. 102-2 at 16-28.[2]

## PRELIMINARY STATEMENT

Marino pretends to be a passive participant in his biggest achievement in music:  Usher's decision to use *Club Girl* to create and then exploit the derivative work *Bad Girl*.  Marino was not just along for the ride.  The contribution the Trio (Marino, Barton and Guice) made to Usher's award-winning *Confessions* album was not by chance.  Marino wanted it to happen, authorized it and then celebrated the album's success at the music industry's most prestigious night, the GRAMMY AWARDS:



---

[1] This reply memorandum incorporates the definitions in the Moving Defendants' memorandum of law in support of their motion for summary judgment (the "Moving Brief").  Doc. No. 102-2. The above photograph of Marino (right) and Barton (center) at the 2005 GRAMMY AWARDS is an exhibit to the Amended Complaint and was also produced by Marino in discovery.

[2] Page references to ECF filed documents refer to the ECF-assigned page numbers appearing at the top of each page.

"Facts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence."  John Adams, December 1770.

Marino's wishes or passions cannot overcome the cold record.  Marino and his *Club Girl* co-authors, Barton and Guice, agreed that *Club Girl* should be exploited and transformed into *Bad Girl*.  He participated in the decision to authorize Usher to rework *Club Girl* and then exploit its derivative, *Bad Girl*.  And he authorized Barton to negotiate the deal for its exploitation.

Marino knew changes were being made to *Club Girl* and he approved them.  He eagerly anticipated the release of the *Confessions* album, celebrated the album's release, accepted a share of *Bad Girl*'s royalties from Barton, participated in a magazine cover-article discussing *Bad Girl*'s creation, attended Usher's concert in Philadelphia where Usher performed *Bad Girl*, and the following year appeared in-person at the GRAMMY AWARDS where *Confessions* was honored.[3]

Marino never refutes and thereby necessarily concedes that: (1) he cannot sue his *Club Girl* co-authors for copyright infringement; (2) he granted an implied non-exclusive license to exploit the *Club Girl* derivative, *Bad Girl*; (3) he authorized Barton to negotiate the deal that permitted *Bad Girl* to be exploited on the *Confessions* album; and (4) he authorized the exploitation of *Bad Girl* impliedly by his conduct and expressly under the UW Agreement, which he authorized Barton to enter into on his behalf.

---

[3] Marino's assertion that the Moving Defendants knew of his purported involvement in *Bad Girl* or *Club Girl* is uncorroborated.  Doc. No. 109 (Plaintiff's Omnibus Answer in Opposition to The Motions for Summary Judgment ("Opp.")) at 4 n.2.  Whether they knew about him is immaterial because his purported copyright claims do not survive based on such knowledge.  His assertion that he did not benefit from *Bad Girl* is belied by, among other things, his acceptance of royalties and the media attention he received following the song's commercial release.  *Compare id.* at 4-5 *with* Doc. No. 102-2 at 23-27.

To Marino, none of these undisputed facts has any consequence.  But under the U.S. Copyright Act, those facts matter because ownership of a work, or permission to use it through an express or implied license, is a complete defense to copyright infringement.  This case was never more than a dispute among Marino and his *Club Girl* co-authors, Barton and Guice, and his own company, Destro Music.  He cannot make this a different case by ignoring what he admittedly did and said, all of which defeat his claims.  And his legal positions defy basic copyright principles and legal precedent:

*First*, federal courts recognize, as a matter of law, that an "exclusive" license granted by less than all of a joint work's authors is a valid "non-exclusive" license.

*Second*, there is no exception to the copyright registration requirement.  A sound recording can only be registered by filing Form SR with the U.S. Copyright Office.  Marino is without a sound recording registration for *Club Girl*.

*Third*, Usher was entitled to sing *Bad Girl*, a song he jointly owns with others.  Marino cannot recover any touring revenues by relying on an "assumption" to satisfy his initial burden of showing that those revenues were attributable to *Bad Girl*.

*Fourth*, Marino's claim for foreign concert revenues for Usher's singing of *Bad Girl* also fails as matter of law because here there is no domestic "predicate act" of infringement for a foreign public performance of a song.

*Finally*, the U.S. Copyright Act provides no claim or remedy for attribution of a musical composition or sound recording.

Since no rational trier of fact could find the Moving Defendants liable to Marino for copyright infringement, the Moving Defendants' summary judgment motion must be granted.

## MARINO AUTHORIZED THE EXPLOITATION OF *BAD GIRL*

### 1.  **Marino Admits He Impliedly Licensed *Bad Girl***

Courts routinely find implied licenses to dispose of misdirected copyright claims on much thinner factual records than here.  The record developed in this case leaves Marino no room to dispute that the Trio granted, at the very least, a non-exclusive implied license allowing *Bad Girl* to be created and exploited.  Doc. No. 102-2 at 46-54.  A license granted by any joint author covering the intended use is sufficient to defeat an infringement claim by another joint author.

Marino refutes neither the undisputed facts nor the law governing implied licenses, which is fatal to his case.  Opp. at 20.  Because exclusive licenses must be in writing, an implied license, which is based on a copyright owner's conduct, is necessarily non-exclusive.  *See* 17 U.S.C. § 204(a); Doc. No. 102-2 at 46.  The implied license is not based on the "supposition" of a non-exclusive license.  Opp. at 20.  Rather, Marino's admitted conduct created a non-exclusive implied license that is a complete defense to Marino's infringement claims.  Marino's joint authors did the same by their admitted conduct.  Doc. No. 102-2 at 46-54.

Marino knew Barton was trying to commercially exploit *Club Girl* – a song the Trio jointly created – by "shopping" it to music industry insiders.  Their efforts were successful.  Usher expressed interest in the song and the Trio discussed how best to exploit *Club Girl*:  "The decision was that we were going to allow Usher to sing the song."  Marino Dep. at 145-46.  The Trio rejected its other option of allowing Guice to use the song, a "pretty obvious" decision to Marino.  *Id.* at 518-19.

Marino authorized Barton to negotiate the deal with Usher's company, Fast Pace, which Barton handled.  The Trio fully supported the creation of *Bad Girl* using *Club Girl*.  Davis Decl., Ex. D at 113-20 (Guice Dep. (June 4, 2013)).  When Usher's people asked for the Pro-tools files

for *Club Girl* so they could make changes and additions to the existing work, Marino and Barton had the files delivered to California.  Marino Dep. at 253.  The Trio did not object as *Club Girl* was transformed into *Bad Girl*, with Guice helping Usher understand the lyrics and Barton assisting Usher's producers in the final mixing of the song.

When Marino's family and friends learned of his success they congratulated him.  Marino described hearing *Bad Girl* on the radio as a "[b]ig accomplishment."  Marino Dep. at 197-98.  Even when Marino realized he did not receive the credit he desired, he never instructed anyone to stop selling or distributing *Bad Girl* or the *Confessions* album.  He just pursued Barton to fix the credits.

After *Confessions* was released and Marino and Barton celebrated the inclusion of *Bad Girl* on the album, the Trio sat down for an interview to discuss how the song was selected.  The following year, Marino and Barton used complimentary tickets Barton received to attend the GRAMMY AWARDS.  Marino Dep. at 437.  And later that same year, Barton accounted to Marino, paying him $4,553.06 from the "mechanical royalties" he received for *Bad Girl*.  Underworld, the company Marino co-owns with Barton, has earned producer royalties for *Bad Girl* ever since its release.  Not until the filing of the Complaint did Marino object to *Bad Girl*'s exploitation.

*None* of the foregoing is or can be disputed by Marino.

### 2. Marino Does Not Dispute He Authorized Barton To Make A Deal

Marino does not dispute that he authorized Barton to negotiate the deal for Usher's company (Fast Pace) to exploit *Bad Girl*.  He pleaded the authorization in the Amended Complaint and testified to it at his deposition.  Doc. No. 102-2 at 43-45.

Even though Marino's signature does not appear on the UW Agreement, he is bound by the acts of his "duly authorized agent," Barton, because Marino admittedly vested Barton with

the power to make an agreement with Fast Pace so that *Bad Girl* could be included on the *Confessions* album.  Doc. No. 102-2 at 43-46.  The written agreement Barton negotiated grants Fast Pace and Usher's record company the right to exploit *Bad Girl*.

To the extent that Barton and Guice earned more money than Marino from the use of *Club Girl* in *Bad Girl*, Marino must pursue his wayward agent, Barton, and his *Club Girl* joint authors, Barton and Guice.  If Marino is entitled to any recovery, it rests with them, not the Moving Defendants.

## THE UW AGREEMENT IS VALID AND BINDING

Marino argues "exclusivity" as if it were a talisman to save his copyright claims from dismissal by invalidating the UW Agreement, which allows for the exploitation of *Bad Girl*. Marino's exclusivity argument goes nowhere.  Regardless of whether Marino is bound under the UW Agreement by his agent's acts, Fast Pace obtained the express written right to exploit *Bad Girl*, which it is entitled to enforce.  Even if Marino is not bound by his agent's acts, the UW Agreement is still valid and binding as to Barton and Guice and immunizes the Moving Defendants from infringement claims.[4]

### 1.   The Terms Of The UW Agreement

Paragraph 1(b) of the UW Agreement addresses the *Bad Girl* sound recording.  It provides that the *Bad Girl* Master is either a "work made for hire" under the U.S. Copyright Act, or if it does not so qualify, then all rights in the Master "including the sound recording copyright,

---

[4] Marino's arguments concerning the UW Agreement ignore that Barton and Guice each granted IN2N the right to license all of the musical composition rights necessary to create and exploit *Bad Girl*.  *See* Doc. No. 114 at 6-7; *see also* Davis Decl., Exs. R and S at ¶ 2 (Barton and Guice Publishing Agreements).  The permission that IN2N granted the joint authors and record company to create and exploit *Bad Girl* provides yet another basis for summarily dismissing Marino's copyright infringement claims.

*but excluding the copyright in the underlying musical composition*" are "automatically assigned to [Fast Pace] by this agreement."[5]  Davis Decl., Ex. Q at ¶ 1(b) (emphasis added).

Paragraph 1(b) further provides that "[w]ithout limiting the foregoing, Company and we (and our respective designees) shall have the exclusive unrestricted, perpetual right throughout the universe to use, distribute, sell and exploit the Masters in any and all media, by any and all methods and formats."[6]  *Id*.

In addition, the executed Letter of Direction attached as Exhibit A to the UW Agreement provides that the "Producer and [Fast Pace] hereby assign to [LaFace Records] all of our right and title to the copyrights in perpetuity throughout the universe in *and to such Masters*, records derived therefrom and any and all renewals and extensions of such copyrights."  *Id.*, Ex. A at ¶ 6 (emphasis added).

Because the *Bad Girl* musical composition is explicitly *excluded* from the assignment in Paragraph 1(b), permission to use and exploit the *Bad Girl* musical composition is addressed in Paragraph 11(a), which states that "[t]he musical compositions and other materials embodied on the Master … are hereby licensed" to Fast Pace and to Usher's record company.  *Id.* at ¶ 11(a).

## 2.  The Scope Of The Rights Conferred By The UW Agreement

Plaintiff's contention that the *exclusive* language that applies only to the *sound recording* invalidates the entire UW Agreement is contrary to both common sense and the law.  The UW

---

[5] The *Bad Girl* sound recording was created by adding newly recorded sounds (*i.e.*, music and lyrics) to musical files in the *Club Girl* sound recording that features Guice's vocal performance. The *Bad Girl* sound recording is a separate work that features Usher's vocal performance in place of Guice's vocal performance.  Marino's opposition to this motion demonstrates his confusion.  The "Master" that is assigned to Fast Pace is the sound recording of *Bad Girl* delivered under the UW Agreement, and not the sound recording of *Club Girl* created before that agreement was made.  Davis Decl., Ex. Q.

[6] The UW Agreement concerns only the delivery of one "Master," *Bad Girl,* as it expressly provides:  "All references to Masters hereunder shall be read and deemed to refer to one (1) Master."  Davis Decl., Ex. Q at preamble.

7

Agreement's language and structure eliminates any doubt as to whether the licensing of the musical composition is *exclusive* or *non-exclusive*.  It is *non-exclusive*.

Neither the UW Agreement nor the Letter of Direction assigns (*i.e.*, transfers) the copyright in the *Bad Girl* musical composition to anyone.  The *Bad Girl* musical composition is expressly *excluded* from the assignment language in Paragraph 1(b).[7]  Marino's statement to the contrary is objectively false.  Not only is that indisputable from the four corners of the documents, it is also indisputable from the copyright registrations issued for the *Bad Girl* musical composition.  None of the registrations name any Sony entity or predecessor-in-interest as a copyright claimant or owner of the *Bad Girl* musical composition.  Davis Decl., Exs. N, O, & P.

The UW Agreement uses language that transfers to Fast Pace a copyright ownership interest in the *Bad Girl* sound recording, which is different than the "license" provision for the *Bad Girl* composition.  The UW Agreement first provides that the *Bad Girl* Master is a "work made for hire," which would mean that the *Bad Girl* Master is owned by Fast Pace.  Alternatively, it includes language that assigns the *Bad Girl* Master to Fast Pace.

The UW Agreement does not impair anyone's rights to use or exploit the unregistered *Club Girl* master (*i.e.*, the sound recording) or the registered *Club Girl* musical composition.[8]

---

[7] The "licensing" language in Paragraph 11(a) is not modified by the word "exclusive" or any similar word, and it is free from the exclusivity language in Paragraph 1(b), that is, Fast Pace and LaFace Records shall have the "exclusive unrestricted, perpetual right … to exploit" the *Bad Girl* Master.  Davis Decl., Ex. Q at ¶ 1(b).

[8] IN2N registered the *Club Girl* musical composition and the *Bad Girl* musical composition. Doc. No. 102-2 at 28.  The *Club Girl* sound recording was never registered.

### 3.   Whether Marino Is Bound By The UW Agreement Is Inconsequential

Marino argues he is bound by the UW Agreement, and because he is bound, the agreement's "*exclusive*" rights that are granted without his signature or assent are invalid. Marino cites no authority for that proposition.  Marino's counterintuitive theory is preposterous and defeats the intent of the parties to the transaction.  To the extent the UW Agreement contains any *exclusive* grant, its presence does not invalidate the UW Agreement.

When a joint author grants someone permission to use a copyrighted work he owns, the intent to provide authorization is not invalidated because the authorization is couched as an *exclusive* license without all joint authors signing the grant.  A license – whether *exclusive* or *non-exclusive* – is still a license.  The type of license determines its scope and who is bound by it.

Under Marino's construction of joint authorship, Marino has a veto right to defeat his joint authors' rights to convey or transfer ownership in any of the Trio's joint works.  That is not the law and a joint author cannot prevent another joint owner from "unilaterally" alienating his interest in the joint work by sale or gift.[9]  *See Brownmark Films, LLC v. Comedy Partners*, 800 F. Supp. 2d 991, 996 (E.D. Wis. 2011).  In *Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007), the Second Circuit explained that an owner may convey his rights "permanently or temporarily," but "he cannot convey more than he owns."  *Id.* at 99.  Marino does not allow Barton and Guice to do even that much.

Copyright interests are divisible and freely transferable.  *Silvers v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881, 897-98 (9th Cir. 2005).  A copyright may be transferred in

---

[9] No "magic words" are required to satisfy the writing requirement under § 204(a) of the U.S. Copyright Act. *Malibu Media, LLC v. John Does*, Civil Action No. 12-2078, 2013 WL 30648, at *7 (E.D. Pa. Jan. 3, 2013).  If it were otherwise, a joint owner could thwart a transferring joint owner's grant, despite his intent to make the transfer.

whole or *in part* by any means of conveyance.  17 U.S.C. § 201(d)(1) (emphasis added).  *See Bodenstab v. J.R. Blank & Associates, Inc.,* Nos. 88 C 6125, 88 C 6135, 1989 WL 84617, at *1-2 (N.D. Ill. July 17, 1989) (citing 1 Nimmer on Copyright 6-12[c] at 6-32) (rejecting claim that grant of "worldwide exclusive right" to third-party was *null and void* without his consent, explaining that transfer of exclusive right requires "consent of all joint owners" and the lack thereof "merely grants a license of the right but does not nullify the agreement itself").

The courts have consistently held that a joint author who grants an *exclusive* license without the consent of his joint authors has granted, as a matter of law, a *non-exclusive* right to use the joint work.  *See Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1145-46 (9th Cir. 2008); *Burkitt v. Flawless Records, Inc.*, Civil Action No. 03-2483, 2005 WL 6225822, at *11 (E.D. La. June 13, 2005) (quoting 1 Nimmer on Copyright 6.12[c] at 6-39) ("'a grant executed by less than all of the joint owners of a copyright is necessarily non-exclusive, it follows that any such grant constitutes a non-exclusive license'").[10]

In *Corbello v. DeVito*, 832 F. Supp. 2d 1231 (D. Nev. 2011), the court explained that "[p]artial ownership of joint works can be transferred or licensed" and that "the exclusivity of a license granted by a joint owner does not apply against the other joint owners, who, having done nothing to alienate their own rights, may continue to exploit or further license the work."  *Id.* at 1243 (citing *Blige*, 505 F.3d at 100).  It observed that "[i]n a sense, then, such a license is both exclusive and nonexclusive."  *Id.* at 1244.

---

[10] *See generally Black's Law Dictionary* 1670-71 (7th ed. 1999) ("*Omne majus continent in se minus*" (*i.e.*, "Every greater thing contains in itself the less."); "*Omne majus minus in se complectitur*" (*i.e.*, "Every greater thing embraces in itself the lesser.").

The law fully supports the common sense conclusion that the UW Agreement is not invalid.[11]  Even though the copyright law holds Barton and Guice to whatever *exclusive* transfers they have made in that agreement, those transfers are "non-exclusive" as to Marino to the extent he may have an ownership interest in the *Bad Girl* musical composition or sound recording.

Finally, Guice's deposition testimony about the rights he granted concerning *Bad Girl* does not affect the legal analysis above.[12]  Guice is not a lawyer and is unqualified to offer legal opinions concerning the consequences of his actions or of the UW Agreement.  *See* Davis Decl., Ex. C at 61 (Guice Dep. (May 2, 2013)) ("I have no -- no experience in law or contracts or the ins and outs of them.  You know, I'm – I'm still actually learning how to decipher certain things as far as music goes in contracts 'cause I know people put wordage in there[.]").  Moreover, Guice testified about his understanding of *his rights*.  Guice did not testify about how, if at all, the UW Agreement affected *Marino's rights*.  What matters is not what Guice *thinks* the UW Agreement provides, but what it says and means under the law.  Moreover, Guice and Barton's lawyer, Wallace E.J. Collins, Esq., testified that the UW Agreement's assignment provision

---

[11] In the Moving Brief, the Moving Defendants cited § 115 of the U.S. Copyright Act to illustrate that the copyright regime prevents an author of a published musical work from restricting its further use by granting an exclusive license.  Sony is not relying on a § 115 compulsory license to exploit the *Bad Girl* musical composition.

[12] To try and support his erroneous argument that the UW Agreement is an *exclusive* transfer, Marino selectively quotes Guice's first day of deposition testimony that does not address the UW Agreement specifically and was obtained by Marino's counsel without allowing Guice the opportunity to review the agreement.  *See* Davis Decl., Ex. C at 58-66 (Guice Dep. (May 2, 2013)).  A month later, when Guice's deposition was resumed, and after counsel for the Moving Defendants gave Guice time to review the UW Agreement, Guice admitted that his understanding of the UW Agreement was based only on what Marino's counsel told him.  Davis Decl., Ex. D at 84-86, 90-92 (Guice Dep. (June 4, 2013)).  As the deposition transcript shows, Plaintiff's counsel attempted to interrupt defense counsel's questioning through inappropriate comments and objections, but after having reviewed the UW Agreement, Guice recognized that the *Bad Girl* musical composition was *excluded* from the assignment in Paragraph 1(b) of the UW Agreement.  *Id*. at 88-92.

11

assigns only the *Bad Girl* Master (*i.e.*, the sound recording copyright) and does not transfer any ownership interest in the *Bad Girl* musical composition.[13] *See* Davis Reply Decl., Ex. AA at 30-31, 34-35, 46-48 (Collins Dep.).

Accordingly, Marino's infringement claims must be dismissed.

## A REGISTRATION WAS NEVER FILED
## FOR THE *CLUB GIRL* SOUND RECORDING

Before Marino can pursue a copyright infringement claim based on a sound recording of *Club Girl*, he or his joint authors must have a registration for that work. *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157, 130 S. Ct. 1237 (2010) (explaining that registration is a pre-requisite before filing a copyright infringement claim); 17 U.S.C. § 411(a).

Marino cannot identify any copyright registration for the *Club Girl* sound recording because it does not exist. Marino tries to skirt this requirement by claiming that the registrations IN2N filed for the *Club Girl* and *Bad Girl musical compositions* suffice for registering the *Club Girl sound recording*. He is wrong.

Plaintiff, Barton, Guice and IN2N never filed a copyright registration for the *Club Girl* or *Bad Girl* sound recording. He argues the "registrations" IN2N filed for the *Club Girl* and *Bad Girl* musical compositions reference "Compact disc[s]" and cover the sound recordings. Opp. at 22. What he calls "registrations" are not the actual registrations issued by the U.S. Copyright Office but information available on the government's searchable website database.[14] *Id.* at 22-23.

---

[13] "Davis Reply Decl." refers to the Declaration of Jonathan D. Davis, dated October 31, 2013.

[14] The "Compact disc" reference in the online records describes the *deposit copy* IN2N submitted with each Form PA musical composition registration. As the instructions to Form PA provide, a *deposit copy* of the work *must* be submitted and must consist of "copies or phonorecords representing the entire work for which registration is made." *See* U.S. Copyright Office Form PA, *available at* http://www.copyright.gov/forms/formpa.pdf (last visited Oct. 31, 2013). The

To maintain an action for copyright infringement, a valid copyright registration is a prerequisite. *Reed Elsevier, Inc.*, 559 U.S. at 157. Marino contends that the IN2N musical composition registrations are sufficient because, if not, it would simply elevate "form over substance." Opp. at 23. He cites no authority holding that the Supreme Court's decision in *Reed Elsevier* is inapplicable to an unregistered sound recording or that any exception exists to the registration requirement. In fact, one case Plaintiff cites confirms that separate registrations are required for a sound recording and the underlying musical composition. *See Positive Black Talk, Inc. v. Cash Money Records, Inc.*, No. Civ. A. 02-0425, 2003 WL 1522941, at *2-3 (E.D. La. Mar. 20, 2003).

A *sound recording* registration can constitute registration of the accompanying musical composition, but the opposite is not true. The U.S. Copyright Office instructions to Form PA state that Form PA cannot be used to register a sound recording:

> Use Form PA to register the underlying musical composition or dramatic work. ***Form SR has been developed specifically to register a "sound recording" as defined by the Copyright Act -*** a work resulting from the "fixation of a series of sounds," separate and distinct from the underlying musical or dramatic work. Form SR should be used when the copyright claim is limited to the sound recording itself. (In one instance, Form SR may also be used to file for a copyright registration for both kinds of works - see (4) below.) Therefore:
>
> (1) ***File Form PA if you are seeking to register the musical or dramatic work, not the "sound recording," even though what you deposit for copyright purposes may be in the form of a phonorecord.***
>
> \* \* \*
>
> (4) ***File Form SR if you are the copyright claimant for both the underlying musical or dramatic work and the sound recording, and you prefer to register both on the same form***.

official certified registrations make no reference to the nature of the deposit copy. *See* Davis Decl., Exs. M and N.

13

> (5) File both forms PA and SR if the copyright claimant for
> the underlying work and sound recording differ, or you prefer to
> have separate registration for them.

U.S. Copyright Office Form PA (emphasis added).

Form PA is used only to register a musical composition.  IN2N filed a Form PA for the musical composition *Club Girl* and another for *Bad Girl*.  Under IN2N's agreements with Barton and Guice, IN2N was authorized only to register musical compositions they composed.[15]  *See* Davis Decl., Exs. R and S at ¶ 2(a) (Barton and Guice Publishing Agreements) (granting IN2N exclusive rights in "all compositions written by [Barton/Guice]," including the "right to secure copyright and renewal rights therein and thereto.").  IN2N could not and did not register any sound recording created from the fixation of any of the musical compositions composed by Barton or Guice.

Because no registration was ever filed for the *Club Girl* sound recording, Marino's copyright infringement claims based on that sound recording must be dismissed.

### NEITHER PITTS NOR BYSTORM COMMITTED ANY INFRINGING ACTS

The Moving Brief establishes that Marino's copyright claims against Pitts and Bystorm are time-barred because there is no evidence that either one has committed any infringing act or profited in any way from *Bad Girl* since October 28, 2008.  Neither Pitts nor Bystorm wrote *Bad Girl*, own any interest in either the *Bad Girl* sound recording or musical composition, or collected any royalties or income from the exploitation of *Bad Girl* since October 28, 2008.

Marino does not oppose the dismissal of his direct infringement claims against Pitts and Bystorm.  And he did not allege a contributory infringement claim against any of the Moving Defendants.  For his vicarious infringement claim, Marino mentions only that Pitts was Usher's

---

[15] The Barton and Guice Publishing Agreements cover only "musical compositions created by [Barton/Guice], alone or in collaboration with others" during the relevant time frames.  *Id*.

14

A&R representative before the release of *Confessions* and remains so today, and that Pitts had some involvement with *Bad Girl* before it was released in 2004. Finally, putting aside its admissibility, Marino's reliance on the 2004 *origivation magazine* article does not raise a factual issue because it concerns events that occurred outside of the limitations period.

In sum, none of the acts Marino identifies occurred on or after October 28, 2008 or concern Bystorm. And while Marino tries to lump Pitts and Bystorm together, there is nothing in the discovery record that evidences either Pitts or Bystorm having any *direct* – let alone an indirect – financial interest in any infringement claimed, or the right and ability to supervise the claimed infringing activity. Accordingly, Marino's claims against Pitts and Bystorm must be dismissed.

## MARINO IS NOT ENTITLED TO ANY TOURING REVENUES

Marino cannot recover touring revenues because concert performances of *Bad Girl* were and are authorized, and no causal connection exists between the claimed infringement of *Club Girl* and Usher's concert revenues.

### 1.   The Public Performances of *Bad Girl* Were Authorized

Marino claims he controls public performances of *Bad Girl* by again arguing that the UW Agreement is invalid. As already demonstrated, the UW Agreement is valid whether or not it binds Marino. *See supra at* 9-12. In addition, Marino does not dispute that he is a registered BMI writer. To the extent that Marino has any interest in the *Bad Girl* musical composition, his BMI membership automatically permits third parties the right to publicly perform it domestically. Doc. No. 102-2 at 58-59.

Even absent Marino's BMI membership, because *Bad Girl* is a joint work of authorship, each of its joint authors (Barton, Guice, Lewis, Harris, Usher and the Avilas) has the right to use or license the work. Each joint author is admittedly a member of a performing right's society.

15

By such membership, they authorized the public performance of the *Bad Girl* composition. *See*, *e.g.*, Davis Decl., Ex. Z at ¶ 4 (BMI Writer Application Form).

And finally, Usher's performance of *Bad Girl* is not an infringement because he is a joint owner of *Bad Girl*, an authorized derivative of *Club Girl*, and thus he always possessed the independent right to perform it himself.

### 2. No Causal Nexus Exists Between Concert Revenues And Alleged *Bad Girl* Performances

The undisputed facts make it impossible for Plaintiff to meet his initial burden of demonstrating a causal link between the alleged infringement and Usher's guaranteed or contingent compensation. Nothing Plaintiff's paid expert opines explains how Usher's guaranteed or contingent revenue is connected to Usher's decision to perform *Bad Girl*. All he states is that Usher earned money from touring and that Marino should get a portion of it.[16]

Marino does not have admissible evidence that Usher performed *Bad Girl* in concert since October 28, 2008. In the Expert Report of Michal A. Einhorn, Ph.D., Amended July 12, 2013, Dr. Einhorn relies on a third-party website, which disclaims the accuracy of its user-generated information, to purportedly show that Usher performed *Bad Girl* at four concerts since October 28, 2008. Doc. No. 110-2 at 65 (Exhibit F to Opp.) (citing to a www.setlist.fm search query).[17] But then in his Rebuttal Report, dated August 26, 2013, Dr. Einhorn scraps his reliance on the "setlist" website, and instead relies on his *own unsupported assumption* that Usher

---

[16] Dr. Einhorn's reports will be, if necessary, the subject of a *Daubert* motion to preclude his many unreliable opinions.

[17] Setlist.fm is a "wiki-like service" where "[a]nyone who likes to share their knowledge about setlists is welcome to add and edit setlists[.]" Setlist.fm: About, *available at* http://www.setlist.fm/about (last visited Oct. 31, 2013). The website's content is provided "'as is' and without warranties of any kind, either express or implied … including, without limitation, implied warranties of … accuracy … and fitness for a particular purpose[.]" Setlist.fm: Terms Of Use, *available at* http://www.setlist.fm/help/terms (last visited Oct. 31, 2013). *See infra* n.18.

performed *Bad Girl* at every one of his concerts.  Doc. No. 110-2 at 105-06 (Exhibit G to Opp.) (stating "I shall then assume that the song was performed in all 45 U.S. concerts and rely upon defendant to disprove me with sworn verifiable evidence" and implicitly making the corresponding assumption concerning foreign concerts).

Plaintiff's approach is backwards.  His burden is not met by making a simple assumption. If that were permissible, then the burden imposed by the law would be meaningless and impossible *not* to satisfy.  Not only is Dr. Einhorn's assumption incapable of satisfying Marino's initial burden, but the actual content of the assumption – that Usher sang *Bad Girl* in concert – remains legally insufficient to establish causation.

Even if Usher sang *Bad Girl*, and there is no admissible proof that he did, there would still be no conceivable connection between its performance and either the guaranteed or contingent revenue.  The burden would only shift to Usher *after* Marino made the required causal connection that there are "profits of the infringer that are attributable to the infringement[.]"  17 U.S.C. § 504(b).

Marino cannot establish the causal connection by merely saying that Usher earns money by singing songs.  He must do more.  Marino was required to come forward with admissible facts supporting a causal connection that Usher's touring revenues were generated because of his performance of *Bad Girl*.

Marino's interpretation of the *Bouchat* case conflates *Bad Girl* with the entire concert experience, arguing that people attend "concerts" to hear musicians and performers "perform songs."  Opp. at 29-30.  In reality, *Bad Girl* is not, and would never be, the sum total of any Usher concert.  Marino has failed to come forward with admissible evidence that people attended Usher's concerts for the purpose of hearing Usher sing *Bad Girl*, and because they attended for

that purpose, profits from the concert are "attributable" to the alleged infringement.  Marino is not entitled to touring revenues, whether domestic or foreign.

**MARINO IS NOT ENTITLED TO RECOVER
DAMAGES OR PROFITS ARISING OUTSIDE THE U.S.**

Plaintiff's reliance on the "Predicate Act Doctrine" to recover foreign profits is misplaced.  Opp. at 31-33.  Though some courts have applied the doctrine, Marino fails to explain why it applies here, or even to allege the required predicate act to seek extraterritorial damages.  He focuses only on the allegedly infringing foreign concert performances, which are not infringements under the U.S. Copyright Act.  Any such performance by Usher could not flow from a predicate act of infringement in the U.S. because the allegedly infringing conduct would be the act of him singing *Bad Girl* on foreign soil.

Plaintiff relies on cases where an act of copying in the U.S. was the predicate act for an extraterritorial infringement, or where there was a failure by defendant to refute plaintiff's allegation of a predicate act in the U.S.  Opp. 31-33.  Notably, these cases involve allegations of unauthorized reproduction or distribution in the U.S. that enabled or gave rise to further reproduction or distribution abroad.  None involves a foreign live performance.

Though other courts have adopted the "Predicate Act Doctrine," Marino offers no explanation of the predicate act in this case or how any supposed extraterritorial "damages" flow from such an act.  Instead, Plaintiff erroneously argues that the record supports that *Bad Girl* was sung abroad and that such performances violated the U.S. Copyright Act.

Plaintiff is not entitled to any recovery for any extraterritorial performance of *Bad Girl* because, factually, he has not come forward with any admissible evidence that such performances ever occurred or that any domestic act occurred that would constitute a predicate act.  As a legal matter, steps taken in the U.S. preliminary to a foreign performance are not

18

infringing acts. *Robert Stigwood Group, Ltd. v. O'Reilly*, 530 F.2d 1096, 1100-01 (2d Cir. 1976) (rejecting argument that defendants assemblage and arrangement in the U.S. of "all the necessary elements for the performances" triggered right to damages for foreign performances).

Plaintiff claims that "Defendants' own experts concede that Usher regularly sang *Bad Girl* when he performed overseas."  Opp. at 33.  This blatant untruth is based on testimony Marino's counsel elicited by asking if the witnesses recognized Usher and the *Bad Girl* song in video snippets strung together in a DVD created by Marino.  Opp. at 33-34.

When confronted about the DVD, Plaintiff's counsel admitted that the DVD and inserted descriptions between each clip – which purport to describe the date and location of each alleged performance – were homemade by *Marino* using unknown, third party-sourced materials from the Internet.[18]  *See* Davis Reply Decl., Ex. BB at 274-76 (Allen Dep.).  Plaintiff lacks personal knowledge or any proof that the excerpted performances occurred on the date or place referenced by his homemade headings.

---

[18] Marino admits that the video clips were obtained from YouTube.  Courts have routinely acknowledged the unreliability and inadequacy of "evidence" culled from online user-generated content.  *See Badasa v. Mukasey*, 540 F.3d 909, 910 (8th Cir. 2008) (questioning authority of Wikipedia entries); *U.S. v. Lawson*, 677 F. 3d 629, 650-51 (4th Cir. 2012) (same); *Bing Shun Li v. Holder*, 400 Fed. App'x 854, 857 n. 4 (5th Cir. 2010) (same); *Shannon v. GfK Custom Research LLC*, No. 4:13-CV-682 CAS, 2013 WL 2395009, at *2 (E.D. Mo. May 30, 2013) (finding LinkedIn page not a "sufficiently reliable source").  Moreover, YouTube's Terms of Service caution users that no guarantees are made as to the accuracy of any content:

> Content is provided to you AS IS … ***YouTube is not responsible for the accuracy, usefulness, safety, or intellectual property rights of or relating to such Content***.  You further understand and acknowledge that ***you may be exposed to Content that is inaccurate***, offensive, indecent, or objectionable….

YouTube: Terms of Service, *available at* http://www.youtube.com/t/terms (last visited Oct. 31, 2013) (emphasis added).  Contrary to Marino's suggestion, his homemade DVD is inadmissible to establish whether a "backing track" (pre-recorded music) appeared on any clip.  For that reason and others, the video clips also cannot be used as the basis of any expert opinion.

19

The referenced testimony has no evidentiary value other than to show the witness's uninformed observation that someone appearing to look like Usher sung a song that sounded, in some cases, like *Bad Girl* in one or possibly more unknown venues on some date. *See*, *e.g.*, Davis Reply Decl., Ex. CC at 382 (Ferrara Dep.); Ex. BB at 277, 302-05 (Allen Dep.); and Ex. DD at 253 (Wright Dep.). Plaintiff cannot recover any damages or profits for foreign performances under the "predicate act doctrine" or based on unauthenticated and inadmissible video snippets.

## CONGRESS HAS NOT CREATED AN ATTRIBUTION CLAIM OR REMEDY MARINO CAN PURSUE

Marino admits that the U.S. Copyright Act denies him an attribution claim. Without legal support, Marino is stuck inviting the Court to create a new "common law tort action" to grant him a remedy that Congress has not legislated. Opp. at 35. The Court should reject Plaintiff's invitation.

That Congress did not create a statutory cause of action for attribution of musical works and sound recordings is not, as Marino blithely describes, a "loophole," but rather a purposeful omission. *See Id.* The statute expressly limits attribution rights. In section 106A, Congress grants the rights of attribution and integrity only to "Certain Authors," namely the "author[s] of a work of visual art[.]" 17 U.S.C. § 106A(a). In Section 106A(b) it reaffirms again the limitation in the subparagraph titled "[s]cope and exercise of rights" by stating: "[o]nly the author of a work of visual art has the rights conferred by subsection (a) in that work[.]" 17 U.S.C. § 106A(b). As a matter of law, Marino has no right to pursue a claim for attribution of any work at issue here.

## CONCLUSION

For all of the forgoing reasons and for the reasons stated in the Moving Brief, the Moving Defendants respectfully request the Court grant them summary judgment on Counts I and III of the Amended Complaint and such other relief as the Court deems just and proper.

Dated: October 31, 2013
      Philadelphia, Pennsylvania

                          Respectfully submitted,

                          JONATHAN D. DAVIS, P.C.

By:    s/ Jonathan D. Davis
        Jonathan D. Davis
        Derek A. Williams
        99 Park Avenue
        Suite 1600
        New York, New York 10016
        (212) 687-5464

        FOX ROTHSCHILD LLP

By:    s/ Michael Eidel
        Michael Eidel
        Matthew Olesh
        2000 Market Street, 20th Floor
        Philadelphia, PA 19103
        (215) 299-2000

        *Attorneys for Defendants*
        *Usher Raymond IV, Sony Music*
        *Entertainment, EMI April Music Inc., EMI*
        *Blackwood Music Inc., UR-IV Music, Inc.,*
        *Warner-Tamerlane Publishing Corp., Mark*
        *Pitts, Bystorm Entertainment, Issiah Avila,*
        *Bobby Ross Avila, Defenders of Music, Flyte*
        *Tyme Tunes, Sublime Basement Tunez,*
        *James Samuel Harris III, and Terry Steven*
        *Lewis*