UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

DANIEL V. MARINO,

_Plaintiff,_

vs.

USHER (a/k/a Usher Terry Raymond IV);
SONY MUSIC HOLDINGS, INC.; EMI
MUSIC PUBLISHING, INC.; JAMES
SAMUEL HARRIS III; TERRY STEVEN
LEWIS; BOBBY ROSS AVILA, JR.; ISSIAH
AVILA, JR.; WILLIAM C. GUICE; DANTE E.
BARTON; DESTRO MUSIC PRODUCTIONS,
INC.; DEFENDERS OF MUSIC; FLYTE
TYME TUNES; SUBLIME BASEMENT
TUNEZ; UR-IV MUSIC, INC.; WARNER-
TAMERLANE PUBLISHING CORP.; MARK
PITTS; BYSTORM ENTERTAINMENT;
TOMMY VAN DELL; IN2N
ENTERTAINMENT GROUP, LLC,

_Defendants_

11 Civ. 6811 (PSD)

BEFORE THE HONORABLE
PAUL S. DIAMOND

**MOVING DEFENDANTS' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Moving Defendants filed a motion seeking sanctions against Plaintiff's attorney,

Francis Malofiy, Esq., under 28 U.S.C. § 1927 and the Court's inherent powers.[1]  Last month,

the Court conducted an evidentiary hearing (the "Sanctions Hearing") to address the Moving

Defendants' contention that Respondent Malofiy engaged in sanctionable conduct when he

---

[1] "Moving Defendants" refers to Defendants IN2N Entertainment Group, LLC, Thomas van
Dell, Usher Raymond IV, Sony Music Entertainment, EMI April Music Inc., EMI Blackwood
Music Inc., Warner-Tamerlane Publishing Corp., UR-IV Music, Inc., Bystorm Entertainment,
Mark Pitts, Issiah Avila, Jr., Bobby Ross Avila, Jr., Sublime Basement Tunez, Defenders of
Music, Flyte Tyme Tunes, James Samuel Harris and Terry Steven Lewis.

communicated with William Guice, an unrepresented defendant, in violation of Rule 4.3 of the Pennsylvania Rules of Professional Conduct ("Rule 4.3"), thereby multiplying the proceedings in this case and imposing upon the Moving Defendants additional costs, expenses and attorney's fees, which they now seek to recover from him.

The Moving Defendants respectfully submit these proposed findings of fact and conclusions of law based upon the record from the Sanctions Hearing and upon the submissions filed by each side in this action.[2]

## I.  FINDINGS OF FACT

The Moving Defendants have established the following facts warranting sanctions against Respondent Malofiy:

### BACKGROUND

1. On October 28, 2011, Plaintiff Daniel Marino filed the above-captioned action, naming, among others, William Guice as a defendant.  (ECF Doc. 1.)

2. On November 17, 2011, Plaintiff filed an Amended Complaint which alleges a variety of state and federal claims against defendants, including Defendant Guice.  (ECF Doc. 2.)

3. A summons to the Amended Complaint was issued on November 17, 2011, and Plaintiff served process on Defendant Guice in Aurora, Colorado on February 14, 2012.  (ECF Doc. 31 at p. 5.)  The proof of service was executed by the process server on February 15, 2012 (*id.*), but was not filed until June 14, 2012 (*id.*).

4. On June 14, 2012, Plaintiff requested entry of Defendant Guice's default for failure to timely respond to the Amended Complaint.  (*Id.* at 1.)

---

[2] The Sanctions Hearing transcripts are referred to herein as "1/6/14 Tr. at [page:line]" and "1/28/14 Tr. at [page:line]."

5. The Moving Defendants filed a joint motion for sanctions against Respondent Malofiy on October 8, 2013 (the "Sanctions Motion"), for violating Rule 4.3 and thereby unreasonably and vexatiously multiplying discovery proceedings, and for his disrespectful and offensive behavior towards the Court, defense counsel, witnesses and support personnel. (ECF Docs. 105 and 105-1 – 105-11.)   Respondent Malofiy opposed the Sanctions Motion and Moving Defendants replied to his opposition.  Each side filed supplemental papers.  (ECF Docs. 117, 117-1 – 117-3, 119, 119-1 – 119-4, 121, 122, 123 and 124.)

6. By Order To Show Cause, dated November 19, 2013 (the "OTSC"), the Court, among other things, ordered a hearing to determine whether to impose sanctions against Respondent Malofiy under Rule 4.3, 28 U.S.C. § 1927 and the Court's inherent powers.  (ECF Doc. 126 at 6.) The Court stated in the OTSC that "[i]t appears" the testimony of Respondent Malofiy and Defendant Guice "will be necessary."  (*Id*.)

7. The parties' counsel appeared before this Court for the Sanctions Hearing on January 6 and 28, 2014.

8. On each hearing date, the Court afforded Respondent Malofiy ample opportunity to present whatever relevant, admissible evidence he possessed to rebut the contention that he had violated Rule 4.3.  (*See, e.g.*, 1/28/14 Tr. at 77:25-78:4.)

9. Before the Court closed the Sanctions Hearing, Respondent Malofiy, through his counsel, said he would submit telephone records concerning his communications with Defendant Guice.  (*Id.* at 73:16-18; 76:2-8.)  The Court imposed a deadline of January 31, 2014, for Respondent Malofiy's counsel to notify the Court and defense counsel if he was supplementing the record with any such records.  The date passed without notification either way from Malofiy's counsel and the record has not thereafter been supplemented.

**RESPONDENT MALOFIY**

10. Respondent Malofiy was admitted to the Bar of the Commonwealth of Pennsylvania (the "Pennsylvania Bar") on October 14, 2008.   He practices under the firm name Francis Alexander,    LLC    in    Philadelphia,    Pennsylvania.    (1/6/14    Tr.    at    124:2-6; www.padisciplinaryboard.org.)

11. During the Sanctions Hearing, Respondent Malofiy was disruptive, making gestures and facial expressions in full view of the Court and the witness box.   On multiple occasions, Respondent Malofiy attempted to non-verbally communicate to the Court and Guice. Respondent Malofiy's behavior was so disruptive that he was admonished by the Court.  The Court warned him multiple times to curb his misconduct.  (*Id.* at 21:22-25; 25:8-12).  The Court even initiated a recess so that Respondent Malofiy's counsel could address it.  (*Id.* at 25:8-12).

12. Despite having the opportunity, Respondent Malofiy – who is accused of professional misconduct – vacillated about whether to testify, but ultimately decided not to testify in his own defense.  The Court finds his decision not to testify very surprising. The law permits this Court to make, and it will make, an adverse inference against Respondent Malofiy based on his silence. The permissible inference is that had Respondent Malofiy testified, his testimony would have been unfavorable to him.

**DEFENDANT GUICE**

13. Defendant Guice provided credible testimony that was consistent with his deposition testimony.  (*Compare* ECF Doc. 105 at Ex. A *passim* (Tr. of Deposition of William C. Guice, dated May 2, 2013) and Ex. C *passim* (Tr. of Deposition of William C. Guice, dated June 4, 2013) *with* 1/6/14 Tr. at 125:2-14; 134:23-135:7.)

4

14. Despite his attempts to secure a *pro bono* lawyer, Defendant Guice has never had legal representation in this action.  (1/6/14 Tr. at 63:14-24; 64:13-17.)  He also appeared at the Sanctions Hearing unrepresented by counsel. (*Id. passim*)

15. Defendant Guice is 37 years old, is unmarried, and has two minor children.  He currently lives at a friend's house in Los Angeles, California, and has no source of income.  (*Id.* at 11:13-23; 12:4-11; 65:16-21.)  Guice is a high school graduate.  (*Id.* at 14:1-10.)  He has neither been arrested for nor convicted of a crime involving a dishonest act or a false statement.  (*Id.* at 93:11-95:25.)  Guice has been unemployed for a year and a half; his last job was as a "milieu counselor" at a residential facility for troubled youth where he earned at most $12.25 per hour.  His sister, who supervised the youth facility, helped him obtain the job.  (*Id.* at 12:12-13:11.)  When Guice worked as a music professional, he barely made a living.  (1/6/14 Tr. at 13:15-25; 64:19-65:15.)  Based on his education, employment and experience, the Court finds that Defendant Guice lacks sophistication in matters concerning the legal system and the responsibilities it imposes on litigants.  (*Id.* at 110:4-8.)  This finding is buttressed by Defendant Guice's testimony regarding Respondent Malofiy's manipulation of him after Guice received the Amended Complaint.

## **SERVICE OF THE AMENDED COMPLAINT UPON GUICE**

16. Defendant Guice was served with a copy of the Amended Complaint on Valentine's Day, February 14, 2012.  (Ex. D-1, 1/6/14 Tr. at 16:1-4.)  Before receiving the Amended Complaint, Guice had never been named as a party in a civil action.  (1/6/14 Tr. at 18:3-6; 66:19-21.)  Defendant Guice saw his name on the first page of the Amended Complaint, but did not understand why it was there.  (*Id.* at 18:14-23.)  He "skimmed" the pleading to try to understand

it based upon his limited education and experience.  He could neither make sense of it nor comprehend its impact, if any, upon him.  (*Id.* at 18:8-13; 14:1-10.)

17. Unable to understand the Amended Complaint because of its "wordage and everything," Guice telephoned Respondent Malofiy, whose name and telephone number appeared on the first page of the pleading.  This telephone call occurred "sometime around Valentine's Day, 2012" (the "First Phone Call").  (*Id.* at 20:5-7; 18:8-13; 16:20-17:14; 57:25-58:9; 29:13-16.)

## THE FIRST PHONE CALL

18. In the First Phone Call, Defendant Guice introduced himself to Respondent Malofiy.  Respondent Malofiy recognized his name and identified himself as the "attorney, representing Dan Marino."  (*Id.* at 20:8-20.)  Respondent Malofiy did not "advise" Defendant Guice "to secure counsel."  (*Id.* at 21:4-5; *see* 123:17-22.)  He did not ask if Defendant Guice was "represented by a counsel," or whether he was "getting a lawyer."  (*Id*. at 20:21-25.)  He did not inform Defendant Guice that he may be able to obtain a "court-appointed lawyer."  (*Id.* at 21:1-3.)  Respondent Malofiy did not say to Guice that he would not speak to him unless he hired a lawyer.  (*Id.* at 21:15-17.)

19. Before Respondent Malofiy spoke with Defendant Guice, he knew that Defendant Guice's interests were in conflict with the interests of Respondent Malofiy's client.  Even though Respondent Malofiy had prepared and filed the Amended Complaint, he did not inform Guice in the First Phone Call that he was a "defendant" (*Id.* at 24:7-9) and that Plaintiff Marino was seeking money damages from him (*Id.* at 22:16-22; 23:2-8).  Instead, Respondent Malofiy used that phone call to put Guice at ease by telling him "to not worry about" the Amended Complaint (*Id.* at 59:8-11) because Plaintiff and Guice were "friends and … never had any quarrels … or ill

manner towards one another .... " (1/6/14 Tr. at 22:16-22; 23:2-8).   Guice thought he was "helping" Plaintiff Marino, his "old friend," in his lawsuit against Usher.  (*Id.* at 24:3-6; 50:6-16.)

20. Respondent Malofiy's statements to Guice did not express or imply that Respondent Malofiy was disinterested.   Instead, Respondent Malofiy's statements implied that he and Defendant Guice had an *aligned* interest:  helping Plaintiff Marino receive money from the use of *Club Girl* in *Bad Girl*.  Respondent Malofiy did not make any effort to correct Guice's misunderstanding, but rather, intentionally sought to foster it.   Respondent Malofiy misled Defendant Guice and deprived him of "important information that [he] should have known" before agreeing to speak with Respondent Malofiy as an unrepresented party.  (*Id.* at 51:1-9.)

21. Respondent Malofiy did not inform Guice that he was speaking to Respondent Malofiy at "[his] own risk," that "it might not be in [Guice's] best interest to speak to" him, and that whatever he told Respondent Malofiy "could [be] use[d] against [him]" in the lawsuit.  (*Id.* at 21:6-13; 22:2-3; 22:13-15; 23:15-24:2.)   He never told Guice that Guice's interests were adverse to Plaintiff's interests.  (*Id.* at 22:4-7.)   Guice did not understand he was "defending against anything" (*Id.* at 25:1-6) and Respondent Malofiy told him that he was a "witness" (*Id*. at 26:3-5).  Respondent Malofiy never explained to Guice the difference between a "defendant" and a "witness." (*Id.* at 26:6-9.)

22. During the First Phone Call, Respondent Malofiy lulled Guice into the false belief that it would not "hurt" Guice to talk to Respondent Malofiy and that Plaintiff Marino "didn't want anything from" Guice.  (*Id.* at 23:15-24:2.)  Respondent Malofiy asked Guice questions and sought Guice's cooperation for his client's benefit, all the while knowing that Guice was unrepresented and was implicating himself in alleged wrongdoing.  (*Id.* at 26:16-28:11.)  He also asked Defendant Guice to sign an affidavit to memorialize Guice's "side of the story" about "the

song, Bad Girl." (*Id.* at 30:19-31:10.)  Respondent Malofiy did not inform Defendant Guice that providing him with such an affidavit could potentially hurt Guice in the lawsuit.  (*Id.* at 31:11-13.)  Respondent Malofiy said he would call Guice back on February 23, 2012 to take Defendant Guice's statement.  (1/6/14 Tr. at 32:9-32; 58:6-19.)

### THE SECOND PHONE CALL

23. At noon on February 23, 2012, Respondent Malofiy and Guice spoke a second time by telephone (the "Second Phone Call").  (Ex. R-2; *see generally* 1/6/14 Tr. at 33:14-34:3 (recognizing three phone calls for "the event to fall … right").)  During the Second Phone Call, Guice, without counsel, provided Respondent Malofiy his "side of the story."  After that call, but on the same day, Respondent Malofiy prepared what he characterized as an "affidavit" for Defendant Guice to review (the "Guice Affidavit").[3]  (1/6/14 Tr. at 31:18-20; 38:13-19; Ex. R-2 at p. 1.)  Respondent Malofiy did not advise Defendant Guice to secure counsel in the Second Phone Call and the Guice Affidavit does not state otherwise.  (Ex. D-2 at p. 2.)

### THE THIRD PHONE CALL

24. After the Second Phone call, but on the same day before 5:19 p.m., Respondent Malofiy again called Defendant Guice (the "Third Phone Call").   Respondent Malofiy tape recorded the Third Phone Call.  (Exs. D-2 at p. 1; Exs. R-1 and R-2.)  He sought and secured Defendant Guice's oral acknowledgment that he was "comfortable" with the Guice Affidavit and that he was "swearing" to the truth of his statements.  (Exs. R-1 and R-2.)  During that call, Respondent Malofiy referred to Guice as "bud," ingratiating himself with Guice.  He informed Guice that he prepared the Guice Affidavit from "notes" he took during their earlier call that day,

---

[3] The word "affidavit" is in quotation marks because the writing created by Respondent Malofiy and thereafter signed by Defendant Guice is not notarized and therefore cannot be treated as an affidavit.

that he didn't "want to put anything down that [Guice was] not comfortable with," and that he "wanted to run through [the] affidavit" to avoid going "back-and-forth" with Guice.  (Exs. R-1 and R-2.)  By his banter and friendly attitude, Respondent Malofiy continued to mislead Guice and imply that he was disinterested or trying to help Guice.  Respondent Malofiy then read the Guice Affidavit to Guice over the phone.  Guice asked Respondent Malofiy to "switch out" the curse words, which he did.  (Exs. R-1 and R-2.)  During the Third Phone Call, Respondent Malofiy did not advise Defendant Guice to secure counsel (Exs. R-1 and R-2), which was the same omission he had made in the two prior phone calls.  (1/6/14 Tr. at 35:2-7.)

25.  As prepared by Respondent Malofiy, the Guice Affidavit stated that Defendant Guice called Respondent Malofiy "on February 23, 2012 around noon to set the record straight and express my frustration that Dan was not properly credited as a songwriter or producer…." (ECF Doc. 105-2.)  This statement is false because Guice contacted Respondent Malofiy on February 14, 2012, but not to "set the record straight" or express "frustration" that Plaintiff Marino did not received credit.  Guice called to find out what the papers he received were about. Respondent Malofiy then contacted Defendant Guice on February 23, 2012 to obtain Guice's statement regarding *Club Girl* and *Bad Girl*.

26. By February 23, 2012, Respondent Malofiy had interrogated Defendant Guice, obtaining information that he believed to be highly incriminating and extremely beneficial to Plaintiff's claims.  Respondent Malofiy's suggestion to Defendant Guice at this late date that he could review the Guice Affidavit with a lawyer did not comply with Rule 4.3.  The adverse impact to Guice was already complete (as was the corresponding gain to Plaintiff and Respondent Malofiy), and Respondent Malofiy knew it.

## RESPONDENT MALOFIY EMAILED THE GUICE AFFIDAVIT

27. On February 23, 2012, at 5:19 p.m., Respondent Malofiy sent Defendant Guice an email attaching a copy of the Guice Affidavit for Guice to sign that excluded the curse words. (1/6/14 Tr. at 34:4-15; Ex. D-2 at p.1; *compare* Ex. R-2 *with* Ex. D-2 at p. 2)  The subject line of the email reads "Marino v. Usher," without referencing any other defendants, such as Guice. The email did not advise Guice to secure counsel before signing the affidavit.  (Ex. D-2 at p. 1; 1/6/14 Tr. at 37:1-25).

28. Respondent Malofiy purportedly sent Defendant Guice an email on February 24, 2012 at 4:23 p.m., which Guice cannot recall, reminding him to return a signed copy of the Guice Affidavit, and stating that Guice could add, change or modify the document and that if he wanted to "review it with a lawyer, that's fine too."  (Ex. D-2 at p. 1; 1/6/14 Tr. at 41:8-17; 41:22-42:2).  The February 24, 2012 email does not advise Defendant Guice to secure counsel. (Ex. D-2 at p. 1; 1/6/14 Tr. at 76:4-8.)  Respondent Malofiy's statement in his February 24, 2012 email was too little, too late.  But even if Respondent Malofiy told Defendant Guice to secure counsel before Guice purportedly gave his "side of the story," that advice would not have given Respondent Malofiy the right to imply that he was a disinterested lawyer or that Guice's interests and Plaintiff Marino's interests were not adverse.

29. Defendant Guice did not "thoroughly and properly [go] over" the Guice Affidavit, "especially, the first line that says defendant," because he was "going off of what [he] was told" and "what he wasn't being told" by Respondent Malofiy.  (*Id.* at 75:4-17.)  Guice did not consider having a lawyer review the affidavit because he was "under the impression … [he] wasn't on trial, so [he] didn't feel the need that [he] had to and it wasn't said that [he] needed to" and he thought he was a witness.  (*Id.* at 39:14-20; 75:4-19.)  He signed the Guice Affidavit and delivered it to Respondent Malofiy.  (*Id.* at 43:5-16; 38:23-39:9).

30. Respondent Malofiy did not contact Defendant Guice between February 2012 and the spring of 2013. (*Id.* at 43:18-22; 88:15-18.)  Other than the boiler-plate language printed on the summons, which Guice either did not observe or understand, Respondent Malofiy never told Guice that the law required him to file an answer to the Amended Complaint.  (*Id.* at 29:25-30:11.)  Respondent Malofiy never told Defendant Guice what a "default" was, or that he was not excused from responding to the Amended Complaint even though he had given his statement to Respondent Malofiy.

31. Defendant Guice never responded to the Amended Complaint. On June 14, 2012, Respondent Malofiy caused the Clerk to enter a default against Defendant Guice for his failure to timely answer the Amended Complaint.  (*Id.* at 44:1-3; ECF Doc. 31.)

## THE PHILADELPHIA AND DENVER DEPOSITIONS

32. In the spring of 2013, Respondent Malofiy called Guice to arrange for his deposition in Philadelphia, Pennsylvania (the "Philadelphia Deposition") but failed to inform Guice that he obtained a default against Guice in June 2012 for not timely answering the Amended Complaint. (*Id*. at 44:22-24.)  During the call, Respondent Malofiy neither asked Guice if he was represented by counsel nor advised him to secure counsel for his deposition.  (*Id.* at 44:15-21.)  Instead, he attempted to prepare Defendant Guice for his upcoming deposition by advising him that the deposition would concern only the Guice Affidavit.  (*Id.* at 46:16-22; 88:19-25.)

33. Respondent Malofiy paid for Defendant Guice's air travel, accommodations (a "beautiful hotel") and expenses for the Philadelphia Deposition to ensure his attendance.  (*Id.* at 46:7-15; 54:3.)   During Respondent Malofiy's questioning of Guice at the Philadelphia Deposition, Respondent Malofiy did not inform Guice that his default had been taken.  During questioning by one of the Moving Defendants' counsel, Jonathan Davis, Esq., Guice learned for

the first time that Respondent Malofiy obtained a default against him for not timely answering the Amended Complaint, and that Plaintiff Marino was seeking money damages against him. (*Id.* at 47:24-48:21; 92:18-21.) Guice was "ang[ry]," "confused" and "infuriated" that Respondent Malofiy had taken advantage of and made a "fool" of him. (*Id.* at 48:5-10; 48:16-21; 49:12-21.)

34. Defendant Guice testified that he did not know the legal definition of a "default" until the Court defined it for him at the first day of the Sanctions Hearing, on January 6, 2014. (1/6/14 Tr. at 44:25-45:8; 87:10-14.) Guice also did not understand the significance of being named a defendant in the Amended Complaint until he was questioned at the Philadelphia Deposition by defense counsel where Guice first recognized he had been misled by Respondent Malofiy, who told him he was a witness only. (*Id.* at 78:24-79:9.) Upon learning he was a "defendant," Guice became worried that he could be "held accountable" to Plaintiff Marino. (*Id.* at 49:22-50:16.) Recognizing Defendant Guice might provide testimony that would harm Respondent Malofiy, Respondent Malofiy attempted to provide Guice legal advice and obstructed the questioning by defense counsel by lecturing them that Guice was unrepresented and should understand the consequences of his testimony. (*Id.* at 112:6-14; ECF Doc. 105 at Ex. C (Transcript of Deposition of William C. Guice, dated June 4, 2013) at 4:21-14:24.)

35. The Philadelphia Deposition ended at Defendant Guice's direction when he learned that (i) Respondent Malofiy obtained a default against him for not timely answering the Amended Complaint and (ii) Plaintiff Marino was pursuing him for money damages. (1/6/14 Tr. at 51:25-52:2; 55:21-24; 76:9-77:4.) After the deposition ended, Plaintiff Marino stopped Defendant Guice on the sidewalk and told Guice: "[D]on't worry about it … we're not coming after you. You're going to be okay, don't worry about it." (*Id.* at 53:2-54:14.)

36. On the same day, May 2, 2013, the parties' counsel jointly contacted the Court to seek direction on how to proceed with the continuation of the Guice deposition.  The following day, Judge Legrome D. Davis, on behalf of the Court, issued an order extending the "the deadline for William Guice's deposition … until Friday, May 31, 2013, so Mr. Guice can retain counsel." (ECF Doc. 76.)  Defense counsel then attempted to reschedule the Guice Deposition, communicating with Guice and Respondent Malofiy through multiple emails.  (ECF Doc. 80 at pp. 8-13.)  Respondent Malofiy obstructed the continuation of the deposition by unilaterally declaring that "THERE WILL BE NO DEPOSITION OF MR. GUICE UNLESS HE HAS COUNSEL." (*Id.* at pp. 15-16).

37. Because of Respondent Malofiy's officious conduct, defense counsel asked the Court yet again to determine whether the Guice Deposition could proceed without Guice having counsel.  (*Id.* at pp. 3-4.)  By order, dated May 29, 2013, the Court rejected Respondent Malofiy's objections to the continuation of the deposition and further extended the time to complete the Guice Deposition until June 7, 2013, providing that "[i]f Mr. Guice is willing to continue his deposition without counsel, he may do so."  (ECF Doc. 81.)  Defendant Guice's deposition was completed in Denver, Colorado, on June 4, 2013, where Guice then lived (the "Denver Deposition").  The deposition was attended by Respondent Malofiy and defense counsel. (1/6/14 Tr. at 55:12-24.)

38. Respondent Malofiy never offered to mitigate the effects of his misconduct.  Instead, he has been and continues to be resolute in his position that his actions toward Defendant Guice and defense counsel were entirely proper and in compliance with the Rules of Professional Conduct.

## MARINO'S SANCTIONS HEARING TESTIMONY

39. Plaintiff Marino testified at the Sanctions Hearing in an attempt to rebut Defendant Guice's testimony that Marino confronted him on the sidewalk after the unexpected and premature ending of the Philadelphia Deposition.   Plaintiff Marino denied that he stopped Guice on the street to assure him that it was "going to be okay" and that Guice should not to "worry about" the lawsuit. (*Id*. at 53:15-54:14.)   Plaintiff Marino denied that Respondent Malofiy had instructed him to speak with Guice after the deposition.  (1/28/14 Tr. at 4:10-25; 13:5-14:13.)

40. Plaintiff Marino's testimony was not credible and was, in many respects, evasive.  He appeared to purposely misunderstand questions even though the questions were reasonably clear.  To several questions, he stated he did not "know;" he did not "recall;" or he did not "remember." (*Id.* at  11:24-12:1;  15:5-6;  15:13-16;  16:3-4;  17:17-19;  17:23-24;  19:16-17;  19:21;  20:14-16; 23:18-20.)  But when it served his or his lawyer's interests, Plaintiff Marino's memory improved. (*Id.* at 4:10-25; 19:19-20:21 (Court troubled by memory lapse on a significant point).)

41. Although he ultimately admitted speaking with Guice at the Philadelphia Deposition, Plaintiff Marino confused when and where it happened.  (*Id.* at 9:1-12:16.)  Marino first testified on direct examination that his conversation with Defendant Guice occurred at the second deposition, the Denver Deposition, and that Guice's conversation was focused on whether Plaintiff Marino was still paying for his airfare home.  On cross-examination, Marino reversed himself, admitting that his conversation with Guice occurred in Philadelphia, and recognizing that Guice did not require airfare to Colorado because he lived there.  By itself, this contradictory testimony permits the Court to give little weight, if any, to  Marino's testimony.

42. More specifically, Plaintiff Marino remembered talking to Guice "on a break … outside of the attorney's office," but telling him only:  "I'm sorry that it has to go down this way,

but I have to do what I need to do to protect my rights," (*Id.* at 4:10-21.)  Despite his presence at

the Philadelphia Deposition, and  the sudden ending of the deposition so Guice could attempt to

obtain counsel, Plaintiff Marino denied that Guice was "upset" because of Guice's "surprise" in

learning that he was a "defendant," not a mere witness, was defaulted in the action, and could be

liable to Marino for "money damages." (*Id.* at 14:15-18:5; 20:2-21:3; 23:7-25:15.)     Plaintiff

Marino's denials cannot be credited.  Guice was upset at his deposition because he learned for

the first time that he was a defendant whom Marino was pursuing for damages.  No other

explanation is plausible based on the circumstances.

### RESPONDENT MALOFIY'S PROFESSIONAL MISCONDUCT

43. The deposition transcripts and court record reveal a pattern of discourteous and

abusive behavior by Respondent Malofiy.   Such unprofessional behavior is evident in his

correspondence to defense counsel and the Court, as well as filings on the ECF filing system.

(OTSC at pp. 3-4 (identifying multiple examples with ECF Doc. Nos.); 1/6/14 Tr. at 138:15-19

("attendant circumstances"); *see* Docket Text (as entered by Respondent Malofiy) at ECF Doc.

117 (insulting Moving Defendants as "Cry Babies").)  Respondent Malofiy repeatedly lectured

the Moving Defendants' counsel, calling their clients evil and saying so at almost every available

opportunity.  (1/6/14 Tr. at 117:14-23.)  While the Court has elected not to sanction Respondent

Malofiy for his repeated discourteous and abusive behavior, that crude behavior can be and is

considered by the Court as evidence of Respondent Malofiy's intended and bad faith violation of

Rule 4.3.

## II.  CONCLUSIONS OF LAW

### A.  The Court's Power To Impose Sanctions

#### i. 28 U.S.C. § 1927

1. 28 U.S.C. § 1927 provides:  "Any attorney or other person admitted to conduct cases in any court of the United States … who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  Sanctions under § 1927 may be imposed only on the offending attorney, not on his clients.  *Boykin v. Bloomsburg Univ. of Pennsylvania*, 905 F. Supp. 1335, 1346 (M.D. Pa. 1995).

2. To comply with the Constitution's due process requirements, a court must provide the party to be sanctioned with notice and some opportunity to respond to the charges.  *Jones v. Pittsburgh National Corp.*, 899 F.2d 1350, 1357 (3d Cir. 1990).  The appropriateness of sanctions under § 1927 is a matter trusted to the sound discretion of the court.  *Boykin*, 905 F. Supp. at 1347 (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 505 (3d Cir. 1991)).

3. "'[U]nder § 1927, an attorney's conduct must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation."  *Grider v. Keystone Health Plan Central, Inc.*, 580 F.3d 119, 142 (3d Cir. 2009) (quoting *LaSalle Nat'l Bank v. First Connecticut Holding Croup, L.L.C. XXIII*, 287 F.3d 279, 289 (3d Cir. 2002)) (internal quotations omitted); *see also Jones*, 899 F.2d at 1357 (interpreting "vexatious" in § 1927 "as requiring a showing of bad faith").  Bad faith does not need to be established by one particular act but by the totality of circumstances.  *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 278 F.3d 175, 189 (3d Cir. 2002); *Ferguson v. Valero Energy Corp.*, 454 Fed. App'x 109, 114 (3d Cir. 2001) (affirming over $100,000 sanctions award that included attorney's fees, costs

and expenses under § 1927 and the court's inherent powers for counsel's misconduct at trial that multiplied proceedings).

4. Although bad faith is often referred to as a requirement before a court may tax attorney's fees and costs under § 1927, *Baker Indus., Inc. v. Cerberus Ltd.*, 764 F.2d 204, 208-09 (3d Cir. 1985), the presence of "intentional misconduct" is an independent basis for sanctioning attorney misconduct under that section.  *See In re Schaefer Salt Recovery, Inc.*, 542 F. 3d 90, 101 (3d Cir. 2008) (quoting *In re Prudential*, 278 F.3d at 188) (offending conduct must be done "in bad faith or by intentional misconduct").

5. Willful bad faith or its proxy, intentional misconduct, is required because absent such culpable conduct, "an attorney who might be guilty of no more than a mistake in professional judgment in pursuing a client's goals might be made liable for excess attorneys' fees under section 1927." *Baker Indus.*, 764 F.2d at 209; *see also Grider*, 580 F.3d at 142 (quoting *LaSalle Nat'l Bank*, 287 F.3d at 289) (noting that conduct must have "'resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal'").

6. While the bad faith necessary to support a sanction under § 1927 may be found "in light of the entire record," the better practice is for a court to make an explicit bad faith finding. *Baker Indus.*, 764 F.2d at 209.  Willful bad faith is present when counsel attempts to distort the record of the proceedings.  *Id*.  It may be shown through the "intentional advancement of a baseless contention that is made for an ulterior purpose, *e.g.*, harassment or delay." *Ford v. Temple Hospital*, 790 F.2d 342, 347 (3d Cir. 1986).

7. Bad faith may also be inferred when the Respondent's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose.  *GMAC Bank v. HTFC Corp.*, 248 F.R.D. 182, 196-97 n.18 (E.D. Pa. 2008)

(citing *In re Minniti*, 242 B.R. 843, 850 (Bankr. E.D. Pa. 2000)); *Alphonso v. Pitney Bowes, Inc.*, 356 F. Supp. 2d 442, 452 (D.N.J. 2005).

8. While "the principal purpose of sanctions under § 1927 is 'the deterrence of intentional and unnecessary delay in the proceedings,'" intentional delay is not a requirement for awarding sanctions under § 1927. *See In re Schaefer*, 542 F. 3d at 101 (quoting *Zuk v. E. Pa. Psychiatric Inst. of the Med. Coll. of Pa.*, 103 F.3d 294, 297 (3d Cir. 1996)).

9. A party seeking sanctions under 28 U.S.C. § 1927 must show its entitlement by a preponderance of the evidence, the usual standard in civil proceedings. Although there is no Third Circuit case squarely addressing the issue, most cases considering sanctions under § 1927 do not apply a heightened burden of proof, such as the "clear and convincing" standard that governs civil contempt proceedings.[4] *But see Horizon Unlimited, Inc. v. Richard Silva & SNA, Inc.*, No. CIV. A. 97-7430, 1999 WL 675469, at *4 (E.D. Pa. Aug. 31, 1999) (stating "[t]here is no clear and convincing evidence" to support finding of "bad faith," but citing no authority that bad faith under § 1927 is proved by more than a preponderance of the evidence); *E.E.O.C. v. U.S.*

---

[4] The burden for civil contempt requires "clear and convincing" evidence and that heightened burden is stated expressly in the case law. *Federal Trade Commission v. Lane Labs-USA, Inc.*, 624 F.3d 575, 582 (3d Cir. 2010) (quoting *John T. v. Del. Cnty. Intermediate Unit*, 318 F.3d 545, 552 (3d Cir. 2003)) (internal quotations omitted) (stating civil contempt "elements must be proven by clear and convincing evidence"); *Camerons Hardware Inc. v. Independence Blue Cross*, 363 Fed. App'x 197, 200 (3d Cir. 2010) (same). The lack of Third Circuit authority reciting any heightened burden under 28 U.S.C. § 1927 supports this Court's conclusion that none applies. Moreover, if the "clear and convincing" standard applies to this motion, it is federal law – not Pennsylvania law – that defines that burden. The "clear and convincing" standard falls between the criminal standard of beyond a reasonable doubt and the preponderance of the evidence standard in non-criminal matters. It requires evidence that satisfies the Court that there is an "abiding conviction that the truth of its factual contentions are highly probable." *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (internal quotations omitted); *see also U.S. v. Georgiou*, Criminal Action No. 09-88, 2010 WL 701892, at *1 (E.D. Pa. Mar. 1, 2010) (quoting *Black's Law Dictionary* 251 (6th ed. 1990)) ("Clear and convincing evidence is defined as '[p]roof which requires more than a preponderance of the evidence but less than proof beyond a reasonable doubt. Clear and convincing proof will be shown where the truth of the facts asserted is highly probable.'").

*Steel Corp.*, 877 F. Supp. 2d 278, 292 (W.D. Pa. 2012) (stating bad faith must be shown by clear and convincing evidence, but citing cases that do not support the proposition).

### ii. <u>The Court's Inherent Powers</u>

10. The "inherent power of the court overlays the entire litigation process and 'extends to a full range of litigation abuses.'"  *Derzack v. Co. of Allegheny, Pa.*, 173 F.R.D. 400, 412 (W.D. Pa. 1996) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)).  "A federal court has the authority to, and must not avoid the responsibility for, monitoring the conduct of all litigants and attorneys who come before it."  *Id.* at 411.  "The court's obligation is to protect not only litigants who may suffer from abusive litigation practices of their adversaries, but also to promote the proper function of a fair and effective judicial system which, while it is adversarial, need not also be callous, uncivil, sneaky or booby-trapped.  When it becomes so, the courts must act decisively."  *Id.* (inherent powers are the "mother source of the authority and responsibility of the courts to control the conduct of litigation").

11. Sanctions under the court's inherent powers "may be imposed 'to promote judicial efficiently, and to deter abuse of judicial process.'"  *Boykin*, 905 F. Supp. at 1347 (quoting *Quiroga*, 934 F.2d at 505).  "'Among the implied and incidental powers of a federal court is the power to discipline attorneys who appear before it.'"  *Administrator-Benefits For The Exxonmobil Savings Plan v. Williams*, Civil Action No. 09-72, 2009 WL 5204482, at *4 (D.V.I. Dec. 21, 2009) (quoting *Fellheimer, Eichen & Braverman v. Charter Tech., Inc.*, 57 F.3d 1215, 1224 (3d Cir. 1995)).

12. Federal courts possess the inherent power to "assess attorney's fees" for acts committed "in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Chambers*, 501 U.S. at 45-46; *In re Prudential*, 278 F.3d at 181 & n.4, 188-89.  *See generally Chambers*, 501 U.S. at 59 (Scalia, J., dissenting) (explaining that the bad faith requirement "in no way means that *all*

sanctions imposed under the courts' inherent authority require a finding of bad faith") (emphasis in original).

13. Because a court's inherent power to sanction is not displaced by rules or statutes, *Boykin*, 905 F. Supp. at 1347 (citing *Chambers*, 501 U.S. at 46-48), inherent power may be used to impose sanctions even when much of the conduct at issue is also sanctionable under statue or court rules. *Chambers*, 501 U.S. at 42-43 n.8, 50.

**B.  Rule 4.3**

14. The OTSC limited the Moving Defendants' motion for sanctions to address the allegation that Respondent Malofiy violated Rule 4.3 when he first spoke to Defendant Guice in February 2012.   Thus, for the Moving Defendants to prevail on their Sanctions Motion, Respondent Malofiy must have committed a violation of Rule 4.3.

15. Rule 4.3 provides:

> (a) In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested.

> (b) During the course of a lawyer's representation of a client, a lawyer shall not give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the lawyer knows or reasonably should know the interests of such person are or have a reasonable possibility of being in conflict with the interests of the lawyer's client.

> (c) When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer should make reasonable efforts to correct the misunderstanding.

16. Rule 4.3 has two comments.   The first comment states, in pertinent part:  "An unrepresented person, particularly one not experienced in dealing with legal matters, might assume that a lawyer is disinterested in loyalties or is a disinterested authority on the law even when the lawyer represents a client.   In order to avoid a misunderstanding, a lawyer will

typically need to identify the lawyer's client and, where necessary, explain that the client has interests opposed to those of the unrepresented person."

17. The second comment explains, in pertinent part, that: "The Rule distinguishes between situations involving unrepresented persons whose interests may be adverse to those of the lawyer's client and those in which the person's interests are not in conflict with the client's. In the former situation, the possibility that the lawyer will compromise the unrepresented person's interests is so great that the Rule prohibits the giving of any advice, apart from the advice to obtain counsel.  Whether a lawyer is giving impermissible advice may depend on the experience and sophistication of the unrepresented person, as well as the setting in which the behavior and comments occur."

18. Respondent Malofiy's misconduct was both "intentional" and "unreasonable." Respondent Malofiy is presumed to intend the natural and probable consequences of his actions or inactions.  *Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 514 n.19 (1979); *McCleester v. State Farm Mut. Auto. Ins., Co.*, No. 3:CV-08-0010, 2009 WL 3182047, at *6 (M.D. Pa. Sept. 30, 2009).  By not adhering to Rule 4.3, it is presumed, especially given the lack of evidence to the contrary, that Respondent Malofiy engaged in intentional misconduct.

19. Violating a Rule of Professional Conduct is *per se* unreasonable because those rules establish the standards by which all attorneys must conduct their affairs as licensed members of the Bar.  The Professional Rules of Conduct are objectively applied and make no allowances for inexperienced attorneys or attorneys who lack mentors.  Applying a subjective standard would clearly and quickly prove unworkable.  Thus, a lawyer who violates a Rule of Professional Conduct like Rule 4.3 has acted "unreasonably."  Using the law to set the standard of care for

what constitutes reasonable and unreasonable conduct is a familiar tort law principle that informs the analysis here.[5]

### C.  Respondent Malofiy's Failure To Testify At The Sanctions Hearing

20. The Court is entitled to make an adverse inference against Respondent Malofiy for choosing not to testify at the Sanctions Hearing in his own defense.  Indeed, during the Sanctions Hearing, the Court gave Respondent Malofiy and his counsel fair warning that it would be "prudent if you assume that I credited [the testimony of] Mr. Guice."  (1/6/14 Tr. at 134:23-135:1.)  The Court also informed Respondent Malofiy and his counsel that: "Well, I can't tell you there aren't going to be professional repercussions.  If your client testifies and I discredit him, for instance, I might even be obligated to inform the Disciplinary Board."  (1/6/14 Tr. at 105:7-10.)  The Court is permitted to infer that Respondent Malofiy remained silent because his testimony would have been unfavorable to avoiding monetary sanctions against him and disciplinary action by the Disciplinary Board.

#### i. The Law Governing "Missing Witnesses" Permits The Court To Make An Adverse Inference Against Respondent Malofiy

21. Respondent Malofiy's decision not to testify at the Sanctions Hearing and to remain silent makes him a "missing witness."  Under well-settled principles governing missing witnesses and evidence, Respondent Malofiy's absence from the witness stand also permits the adverse inference that his testimony would have been unfavorable to his defense against the Sanctions Motion.

---

[5] The negligence *per se* theory recognizes that "through an individual's violation of a statute or ordinance, it is possible to show that the individual breached his duty to behave as a reasonable person: in other words that the individual is 'negligent *per se*.'"  *McCloud v. McLaughlin*, 837 A.2d 541, 545 (Pa. Super. 2003); *see also Diggs v. Susquehanna Center for Nursing and Rehab.*, No. 944 S 1996, 1996 WL 1044797, at *3 (Pa. Com. Pl. 1996) (quoting Black's Law Dictionary 540 (6th ed. 1983)) (stating that "[n]egligence per se has been defined as 'conduct, whether of action or omission, which may be declared and treated as negligence without any argument or proof as to the particular supporting circumstances … because it is in violation of a statute …'").

22. Where a party "fails to produce witnesses within its control who presumably are best informed on the subject [at issue], especially if their relations with such party are not hostile but are friendly, so that their bias, if any, would be in such party's favor, it may be inferred that [their testimony] would be unfavorable to such party." *Vigderman v. U.S.*, 175 F. Supp. 802, 808 (E.D. Pa. 1959); *see also N.L.R.B. v. Metropolitan Regional Council of Carpenters*, 316 Fed. App'x 150, 157 n.8 (3d Cir. 2009) (when a party fails to call a witness who may reasonably be assumed to be favorably disposed to the party, an adverse inference may be drawn regarding any factual question on which the witness is likely to have knowledge); *McElroy v. Cessna Aircraft Co.*, 506 F. Supp. 1211, 1219-20 (W.D. Pa. 1981) ("Federal and state law provides that an adverse inference of fact may be drawn where, without explanation, a party fails to call witnesses or present evidence that would be expected under the circumstances."); *Harms, Inc. v. Sansom House Enterprises, Inc.*, 162 F. Supp. 129, 135 (E.D. Pa. 1958) (stating the "familiar principle that inferences may be drawn from silence and from failure to produce evidence"). *See generally Interstate Circuit v. U.S.*, 306 U.S. 208, 226 (1939) (stating that "[t]he production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse" and that "[s]ilence then becomes evidence of the most convincing character"); *Mammoth Oil Co. v. U.S.*, 275 U.S. 13, 51 (1927) ("It is certainly a maxim that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other to have contradicted.") (internal quotations omitted).

23. For a fact finder to make the adverse inference, the evidence in question must be within the party's possession or control, *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 96 (3d Cir. 1983), and the missing evidence must not be cumulative, *Cromling v. Pittsburgh and Lake Erie R.R. Co.*, 327 F.2d 142, 149 (3d Cir. 1964) (citing 2 Wigmore, Evidence, 3d ed. 1940, § 287)

(explaining that no adverse inference can be drawn "from the failure to call a witness whose testimony would only be cumulative of other evidence"). Although a common sense appraisal determines the weight of the negative inference, *Cromling*, 327 F.2d at 149, the rule permitting the inference applies with particular force when the witness is a party, *McElroy*, 506 F. Supp. at 1219-20.

24. A party's failure to call a supporting witness to rebut evidence when "strongly encouraged" by the court to do so, as apparent here, "requires that the [c]ourt draw an adverse inference that the testimony of those witnesses would have been unfavorable to [the party]." *Shetterly v. Crown Controls Corp.*, 719 F. Supp. 385, 398 (W.D. Pa. 1989) (citing *S.E.C. v. Scott*, 565 F. Supp. 1513, *aff'd*, 734 F.2d 118 (2d Cir. 1984)).

### ii. The Fifth Amendment Permits The Court To Make An Adverse Inference Against Respondent Malofiy Choosing Not Testifying At The Sanctions Hearing

25. By choosing not to testify at the Sanctions Hearing, Respondent Malofiy is in the same position he would have been in had he invoked his constitutional privilege against self-incrimination. In each circumstance, the law permits the fact-finder to make an adverse inference against the silent party.

26. The Fifth Amendment of the U.S. Constitution, which prohibits any person from being compelled in any criminal case to be a witness against himself, "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Baxter v. Palmigiano*, 425 U.S. 308, 316 (1976) (internal quotations omitted).

27. The privilege against self-incrimination applies differently in civil and in criminal cases.  In criminal cases, where the stakes are higher, and the state's only interest is to convict, no adverse inference results from a defendant's decision to invoke the privilege or to remain silent.  *Baxter*, 425 U.S. at 318-19.  In civil non-criminal cases – such as this case – the Fifth Amendment permits the fact-finder to make the adverse inference that is prohibited in the criminal context even where the constitutional right is not invoked but the witness chooses not to testify.  *Id*.

28. The "prevailing rule" is that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]"  *Baxter*, 425 U.S. at 318.  While silence alone, in the absence of other evidence, is insufficient to support an adverse *decision* against one who refuses to testify, *id.* at 317, where other evidence exists to support an adverse decision, a fact-finder is entitled to infer that the party has chosen silence because his testimony would have been unfavorable.

29. Courts routinely impose an adverse inference against a party who elects not to testify in a non-criminal matter.  *In re Saghir*, No. M-2-238, 2009 WL 4437951, at *8, *13 (S.D.N.Y. Nov. 30, 2009) (drawing and applying adverse inference against attorney in disciplinary proceeding and striking attorney from roll); *Rubin Quinn Moss Heaney & Patterson, P.C. v. Kennel*, 832 F. Supp. 922, 932 (E.D. Pa. 1993) (citing *Baxter*, 425 U.S. at 318) (applying negative inference against a lawyer whose refusal to respond to questioning provided "[f]urther evidence of [the lawyer's] misconduct" because the totality of the evidence supported it); *see also LiButti v. U.S.*, 178 F.3d 114, 117, 120 (2d Cir. 1999) (explaining that adverse inference under Fifth Amendment "may be given significant weight because silence when one would be expected to speak is a powerful persuader"); *S.E.C. v. Graystone Nash, Inc.*, 25 F.3d 187, 190-91

25

(3d Cir. 1994) (citing *Baxter*, 425 U.S. at 318) (stating that principle that invoking privilege "may not be too 'costly' does not mean that it must be 'costless'" and noting there may be "some disadvantages for the party who seeks its protection" such as an adverse inference); *Pagel, Inc. v. S.E.C.*, 803 F.2d 942, 947-48 (8th Cir. 1986) (affirming SEC's application of adverse inference to revoke broker-dealer registration for securities law violation because SEC did not rely solely on refusal to testify); *Arthurs v. Stern*, 560 F.2d 477, 478 (1st Cir. 1977) (physician disciplinary board "not constitutionally forbidden from drawing an adverse inference" against "a doctor [who] refuses to testify at a disciplinary hearing"); *Jackson v. Microsoft Corp.*, 211 F.R.D. 423, 433 (D. Wash. 2002) (quoting *S.E.C. v. Colell*, 139 F. 3d 674, 677 (9th Cir. 1998) ("'Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof.'").

## III. <u>CONCLUSION</u>

The Court concludes that Respondent Malofiy has been provided the required due process protections under the U.S. Constitution. He received notice of the Sanctions Motion and filed multiple papers opposing it. The Court then held two hearings in which Respondent Malofiy had the opportunity to present testimony and evidence to defend himself. Respondent Malofiy presented testimony from Plaintiff Marino who was not a credible witness. Respondent Malofiy chose not to testify, despite having the opportunity to do so and being apprised by his counsel of the consequences of remaining silent. At the hearing, the Court provided both sides ample opportunity to call witnesses, submit evidence, and to supplement the record or resume the hearing. Each side was also provided the opportunity to submit proposed Findings of Fact and Conclusions of Law.

While the Court informed counsel for Respondent Malofiy that it did not have a preference concerning Respondent Malofiy's decision whether to testify, (1/6/14 Tr. at 98:2-10), the Court expressed its preliminary assessment that Guice's testimony was "awfully persuasive," (*id.* at 110:7), and even volunteered that "when a lawyer is accused of unprofessional conduct and doesn't take the stand to say he acted professionally," that is "very surprising," (*id*. 106:15-19).   Respondent Malofiy was present for the entire Sanctions Hearing, heard the Court's preliminary assessment, and elected not to testify.   Respondent Malofiy cannot support his defense against sanctions by refusing to testify, particularly if any part of his defense is based on misunderstanding, bad judgment, or well-intentioned zeal.

Both the Fifth Amendment of the United States Constitution and the law concerning missing witnesses permit this Court, in the exercise of its discretion as a fact-finder, to impose an adverse inference against Respondent Malofiy based upon his decision to remain silent and not to testify at the hearing.   The Court concludes that the record supports making an adverse inference against Respondent Malofiy.

The testimony of Defendant Guice alone was clear and convincing evidence (even though that is not the applicable burden of proof) that Respondent Malofiy intentionally violated Rule 4.3 and that Respondent Malofiy knew of the violation at the time of its commission.   The Court finds that Respondent Malofiy violated Rule 4.3 in his first conversation with Defendant Guice when he, among other things, did the following:  (a) failed to advise Defendant Guice to secure counsel; (b) failed to apprise Guice that Guice was a defendant; (c) implied that he was disinterested and that his client had a common interest with Guice; (d) failed to correct Guice's misunderstanding that Respondent Malofiy was not disinterested; and (e) failed to advise Guice that Plaintiff Marino was seeking money damages against him.

27

Respondent Malofiy is presumed to know the ethical rules that govern all attorneys and ignorance is no excuse. The purported absence of a mentor does not remotely defend Respondent Malofiy's misconduct and his torrent of unwarranted accusations against defense counsel. Respondent Malofiy had resources available to help him consider the propriety of his conduct, including consulting with the lawyers from the Beasley Firm, where, during the time at issue, he was Of Counsel and maintained his law offices.

In addition, the attendant circumstances surrounding Respondent Malofiy's violation of Rule 4.3 demonstrate he acted in bad faith and intentionally by, among other things: (i) misleading Defendant Guice to provide him with statements against Guice's own interests, including those in the Guice Affidavit; (ii) failing to disclose to Guice the need to timely respond to the Amended Complaint; (iii) obtaining a default against Guice in the belief it would provide Respondent Malofiy with an advantage in the lawsuit over the defendants; (iv) failing to apprise Guice to obtain counsel for his deposition, obstructing the Guice Deposition (both during the deposition and in securing its continuation); (v) repeatedly engaging in disrespectful and offensive conduct toward defense counsel, witnesses, and litigation support; (vi) erroneously excusing his improper behavior as zealous representation of his client; (vii) intentionally accusing Defendant Guice of egregious criminal conduct, in open court at the Sanctions Hearing, without a good faith basis to do so; and (viii) failing to voluntarily take steps to mitigate the damage arising from his misconduct.

Malofiy engaged in bad faith conduct to obtain the Guice Affidavit, which he considered to be the treasure of the Incas, to secure for himself and his client a hoped-for multi-million dollar verdict or settlement. The Court finds that Respondent Malofiy's conduct was motivated by financial gain, causing him to abdicate his responsibilities and duties to comply with Rule 4.3.

There is no evidence in the record and there was no attempt by Respondent Malofiy to introduce any evidence that his conduct resulted from any misunderstanding, bad judgment, or well-intentioned zeal.  Argument from Respondent Malofiy's counsel that Respondent Malofiy, for example, misunderstood Rule 4.3 or exercised bad judgment is unsupported by the evidentiary record.  And argument from Respondent Malofiy's counsel by itself is insufficient to satisfy his client's burden of production or persuasion on these defenses.  *Semper v. Santos*, 845 F.2d 1233, 1237 (3d Cir. 1988) ("The arguments of counsel are not evidence[.]"); *see also Post v. St. Paul Travelers Ins. Co.*, 629 F. Supp. 2d 477, 480-81 n.4 (E.D. Pa. 2009) ("Statements of counsel … are not evidence creating an issue of material fact capable of defeating a motion for summary judgment.").  The Court concludes that Respondent Malofiy unreasonably and vexatiously multiplied and extended the proceedings in this matter because of his violation of Rule 4.3.

This Court concludes that sanctions against Respondent Malofiy are necessary and appropriate under 28 U.S.C. § 1927 and under this Court's inherent powers.

This Court sanctions Respondent Malofiy to punish his misconduct, to deter future abuse of the judicial process, and to promote judicial efficiency.

The adverse inference the Court imposes against Respondent Malofiy is not a necessary component to the findings of fact enumerated above or any of the Court's other findings or conclusions.

The Court would have sanctioned Respondent Malofiy based on Defendant Guice's testimony, regardless of whether or not it imposed an adverse inference against him.  Thus, even without the permissible adverse inference, the Moving Defendants have met their burden of proof for the Court to impose sanctions under 28 U.S.C. § 1927 and under the Court's inherent

powers, whether the burden of proof requires a preponderance of the evidence or clear and convincing evidence.

Having decided to sanction Respondent Malofiy, the Court must consider the appropriate sanction.

Under both § 1927 and the Court's inherent powers, the Court concludes that the appropriate sanction in this case requires that Respondent Malofiy reimburse the Moving Defendants for the costs, expenses and attorney's fees they reasonably incurred as a result of Respondent Malofiy's unreasonable and vexatious conduct.  But to determine the exact amount the Moving Defendants are owed requires additional evidentiary proof.

The Moving Defendants are hereby ordered to submit their proof regarding the costs, expenses and attorney's fees they reasonably incurred because of Respondent Malofiy's misconduct on or before _____, 2014.  Respondent Malofiy has until _____ _____ to submit his response, if any.

Because additional sanctions against Respondent Malofiy may be appropriate to further the goals of imposing sanctions, the Court reserves its final decision concerning the scope of the appropriate sanctions until after the Court receives the submissions described in the preceding paragraph.

Dated:  February 28, 2014
      Philadelphia, Pennsylvania

                             Respectfully submitted,

                             JONATHAN D. DAVIS, P.C.

                             s/ Jonathan D. Davis
                             Jonathan D. Davis
                             Derek A. Williams
                             *Admitted pro hac vice*
                             99 Park Avenue

Suite 1600
New York, New York 10016
Telephone:  (212) 687-5464
Fax:  (212) 557-0565
Email:  jdd@jddavispc.com
Email:  daw@jddavispc.com

FOX ROTHSCHILD LLP

s/ Michael Eidel
Michael Eidel
Matthew Olesh
2000 Market Street, 20th Floor
Philadelphia, PA 19103
Telephone:  (215) 299-2000
Fax:  (215) 345-7507
Email:  meidel@foxrothschild.com

*Attorneys for Defendants Usher Raymond IV,
Sony Music Entertainment, EMI April Music
Inc., EMI Blackwood Music Inc., UR-IV
Music, Inc., Warner-Tamerlane Publishing
Corp., Mark Pitts, Bystorm Entertainment,
Issiah Avila, Jr., Bobby Ross Avila, Jr.,
Defenders of Music, Flyte Tyme Tunes,
Sublime Basement Tunez, James Samuel
Harris III, and Terry Steven Lewis*

MANATT, PHELPS & PHILLIPS,
LLP

/s/Mark S. Lee
Mark S. Lee
*Admitted pro hac vice*
11355 West Olympic Boulevard
Los Angeles, CA  90064-1614
Telephone:  (310) 312-4000
Fax:  (310) 312-4224
Email:  mlee@manatt.com

ROGERS & ASSOCIATES, LLC

/s/Lance Rogers
Lance Rogers
Bruce L. Castor, Jr.
26 East Athens Avenue

Ardmore, PA 19003
Telephone:  (610) 649-1880
Fax:  (877) 649-1880
Email:  Lance@RogersCounsel.com
Email:  Bruce@RogersCounsel.com

*Attorneys for Defendant*
*IN2N Entertainment Group, LLC*

_____

Thomas van Dell, *Pro Se*
10900 Wilshire Blvd., Suite 1400
Los Angeles, CA 90024
Telephone:  (310) 443-5332
Email:  vandell@hudcan.com

Filed Electronically
Dated:  February 28, 2014