IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL MARINO, | : | |
| Plaintiff, | : | |
| v. | : | Civ. No. 11-6811 |
| | : | |
| USHER, et al., | : | |
| Defendants. | : | |

Diamond, J.                                                                                    May 21, 2014

## MEMORANDUM

Throughout this copyright litigation, Plaintiff's Counsel, Francis Malofiy, has behaved in a flagrantly unprofessional and offensive manner. Seventeen of the twenty Defendants in this action have moved for the imposition of sanctions against Mr. Malofiy. I decline to impose sanctions for Malofiy's abusive, disruptive discovery conduct, serious though that is. Rather, I will impose sanctions because Malofiy: (1) inveigled an inculpatory affidavit from unrepresented Defendant William Guice; and (2) after falsely assuring Guice that he was only a witness, entered a default against him.

## I.    PROCEDURAL HISTORY

Plaintiff Daniel Marino filed his Complaint on October 28, 2011, and his Amended Complaint on November 17, 2011. Plaintiff alleged that he and two others—Dante Barton and William Guice—had co-authored the song "Club Girl," later renamed "Bad Girl" and recorded by "Usher" Raymond IV. Because Plaintiff did not receive writing and producing credit for the song, he brought copyright infringement and related claims against Barton, Guice, Usher, and seventeen others who helped make and distribute Usher's recording. (Doc. Nos. 1, 2.)

After several extensions, discovery closed on October 2, 2013. (Doc. No. 98.) Defendants filed this Sanctions Motion on October 8, 2013. (Doc. No. 105.) I conducted an evidentiary

hearing on January 6 and January 28, 2014, during which Messrs. Guice and Marino testified. Malofiy, who is represented by counsel, chose not to testify. Malofiy and moving Defendants subsequently submitted proposed factual findings and conclusions of law. (Doc. Nos. 148-151.)

## II.   FACTUAL FINDINGS

I discuss here only those facts relevant to Defendants' Sanctions Motion.  I have fully set forth the factual history of this matter in the companion Memorandum I have also issued today granting summary judgment in Defendants' favor.  I make the instant findings based on all the evidence presented to me, including the testimony of Mr. Guice (which I credit) and the testimony of Mr. Marino (which I discredit).

Moving Defendants have proven the following facts with clear and convincing evidence. Magnetar Tech. Corp. v. Six Flags Theme Park Inc., 886 F. Supp. 2d 466, 481 (D. Del. 2012) (basis for sanctions must be established by clear and convincing evidence); Ali v. Tolbert, 636 F.3d 622, 627 (D.C. Cir. 2011) (same); Novo Nordisk A/S v. Mylan Pharm., Inc., No. 09-2445, 2010 WL 4981831, at *5 (D.N.J. Dec. 2, 2010) (same).

### A.   *Discovery Misconduct*

Malofiy's behavior throughout discovery was outrageous.  I will set out several examples.

The Parties were unable to schedule depositions because of Malofiy's refusal to consent to mutually agreeable dates and locations.  (See Doc. Nos. 70-74.)  When depositions finally took place, Malofiy did what he could to disrupt or obstruct them.  At Malofiy's request, I directed all counsel to refrain from making repeated, lengthy objections. (See Avila Dep. at 57-58.)    His request notwithstanding, Malofiy himself continually made lengthy speaking objections.  In a single deposition, he made 65 speaking objections *after* I directed the Parties to refrain from the practice. (See Marino Dep. at 52-53 ("Objection. . .You have to be very specific here. You are playing

games. If it's a company, it's a company.  If it's an LLC, it's an LLC. . ."); <u>id.</u> at 62-63 ("Objection. Now you are getting tricky again there. Can't do that. Can't do that."); <u>id.</u> at 63 ("Don't be tricky. Ask straight questions, get a straight answer.  Isn't that what you want, the truth, or do you want something else? Do you want lies?"); <u>id.</u> at 168 ("Objection. I think he answered this question before the break. . . . Do it 100 times. What you want is a little piece of information, but what you are getting is you are getting the truth and you can't handle the truth."); <u>id.</u> at 258-60 ("Let me tell you something, I don't have to deal with this kind of BS. What is happening here is you ask the same question for about an hour and a half."); <u>id.</u> ("This is nauseating—wait. This is nauseating."); (<u>see also</u> <u>id.</u> at 47, 50, 52, 62, 94, 113, 130, 140, 148, 149, 154, 156, 157, 158-62, 165, 168-70, 173, 180, 184, 188, 193, 201-02, 205-07, 212-13, 215-16, 238-41, 251, 258-61, 262, 269-70, 281, 284, 297, 307, 311, 317, 321, 325-28, 357-58, 362-63, 369-71, 372, 400-03, 406, 412-13, 418-22, 428-29, 430-32, 432-33, 452, 453-54, 459-60, 468, 485, 494, 500-01, 516, 523-24, 528, 529-30, 539-40, 550, 555-56, 558-59, 564, 568-69, 572.)

    In making an objection that is, unfortunately, representative of his conduct, Malofiy went on:

> I want to object, if he's not going to define the words he's using in his questions, it's silly for you to answer, because you don't know how to answer them. So, naturally, what's going to happen is you're going to get an answer that's not even responsive to your question because your question hasn't even been defined, when it was asked to be defined by the witness.  Now you gave him instructions in the beginning and made it very clear.  You said this gentlemen, the witness, if he doesn't understand your question let me know.  He's not a professional expert.  It's his first case and his first deposition in his entire life of fifty—how many years sir? . . . Fifty three years, and if he asked you a question saying, you sir, can you define a word, and you can't define the words that you're using in a question, well that poses a serious problem.  Because the answer you're going to get, as you know, is not going to be an answer that's going to be responsive to your question.   If this gentleman, following your instructions, asks you to define a word, or a question, I think it's imperative, and the burden is upon you, by providing him that instruction, to clarify your question or the word that you are using.

(Bricklin Dep. 40-42; <u>see also</u> Guice Dep. at 7-9, 13-14; Stewart Dep. at 79-80; Einhorn Dep. at 46, 64-65; Leak Dep. at 75-76; Calderone Dep. at 30-31, 57-59, 137-39, 165-66; Famulari Dep. at 172; Pardo Dep. at 162).)

More disturbing are Malofiy's sexist, abusive remarks.  For instance, during one deposition, Malofiy stated the following to Defense Counsel:

> MALOFIY: Don't be a girl about this . . .

> DEFENSE COUNSEL: Mr. Malofiy, I would appreciate you not referring me to as a girl, which you have done repeatedly off the record and on the record.

(Stewart Dep. at 79-80).

The record teems with similarly abusive comments, or worse.  (<u>See, e.g. also</u>, Guice Dep. June 4, 2013 ("Usher has 130 million. . . . I'm going to take every penny of it."); Marino Dep. 62-63 ("Don't be tricky . . . Do you want lies?"); <u>id.</u> at 148 ("You don't like the truth, it disturbs you. You've never seen the truth in a deposition."); <u>id.</u> at 150 ("You don't like the answer, too bad. The answer is the answer."); <u>id.</u> at 168-70 ("You can't handle the truth."); <u>id.</u> at 256-60 ("I don't have to deal with this kind of BS."); <u>id.</u> ("I'll shut it down. I'll shut it down. That is what I will do, I'll say, next question, and we'll go."); <u>id.</u> ("This is nauseating."); Guice Dep. June 4, 2013 at 172 ("I'll call the Judge.  He doesn't like you at all."); Marino Dep. at 206-07 ("You coached him to hell, and the Judge came and slammed you. Slammed you."); Guice Dep. June 4, 2013 at 91 ("You're like a little kid with your little mouth."); <u>id.</u> at 146 ("This is bullshit."); Marino Dep. at 362-63 ("I've never seen any lawyer do this so bad ever."); Marino Dep. at 321 ("[Counsel], you are defending thieves and you are acting like somebody who should be hanging out with them at this point.").)

During one deposition, Malofiy became so aggressive that he prompted the following

exchange with *pro se* Defendant Tommy van Dell:

> MALOFIY:   Are you done, Tom?
>
> VAN DELL:  I'm done.  And for the record, I would like to say that I feel—
> this is subsequent to the LA depositions—that I *feel menaced*
> *and threatened by Mr. Malofiy and his continual outbursts*
> *and seemingly anger-driven conduct today and also during the*
> *Los Angeles deposition really concerned me.*
>
> MALOFIY:   What I am concerned about is, you rooked a man who wrote a
> song.  You stole $200 million, you and the defendants, and he
> got nothing.  And you're a cheat, and you cheated this man.
> You rooked him out of a song.  And everyone made money,
> including you, and you put it in your pocket.
>
> And now you're sitting here trying to play spin doctor.  And if
> I'm a little upset, I am.  And I'm going to represent my client.
> I'm going to be a zealous advocate.  And that's what I'm
> required to do.  You took the money, you put it in your pocket,
> and you ran.  And now you want to stick your head in the sand
> and pretend that no one knew that Mr. Marino wrote the song
> when you knew, and you told him that he was part of your
> publishing company.  And that's the truth.

(Guice Dep. June 4, 2013 at 146-47) (emphasis supplied).

Malofiy's written submissions to the Court are as bad.  He captioned one of his filings:
"Response in Opposition Re Joint Motion for Sanctions by Moving Defendants *Who are Cry*
*Babies*." (Doc. No. 117) (emphasis supplied).  In opposing the instant Motion, Malofiy accused
Defendants of engaging in "clearly immoral and illegal behavior."  (Doc. No. 117 at 2, 3; see also
id. at 4 (characterizing sanctions Motion as "busy work); id. ("This motion is a ridiculous attempt
by defense counsel to burden Malofiy with fake work . . . it is: hogwash and claptrap."); id. at 5
(describing Defendants as having "ripped off" his client); id. at 6 ("[D]efense counsel are lying
through their teeth.").)  Malofiy's November 12, 2013 Sur Reply is captioned "Plaintiff's Response
to Defendants' Incessant Complaining," and begins as follows: "Defendants' behavior is getting to
be absolutely ridiculous.  On November 5, 2013, [Defense Counsel] wrote the Court one of the most
sophomoric letters I have seen. . . ."  He characterizes Defense Counsel as "bizarre," "off kilter,"

"absurd," "professional complainers," "juvenile," and "petty."  (Doc. No. 121.)

      B.  *Conduct Pertaining to William Guice*

Defendant Guice is 37 years old and has two minor children.  Because he is unemployed, he currently lives at a friend's house in Los Angeles.  (Tr. Jan. 6, 2014 at 11:13-23; 12:4-11; 65:16-21.)  A high school graduate, Guice previously worked in Columbus, Ohio as a skycap.  (Guice Dep. June 4, 2013 at 22.)  He was last employed 18 months ago as a "milieu counselor" at a Colorado youth facility, where he earned approximately $12.25 an hour.   His sister, who supervised the facility, helped him get the job and allowed Guice to live with her during that time.  (Id. at 14:1-10; 12:12-13:11; see also id. at 162 ("I got enough to worry about.  I got one foot in my sister's house and one foot in the street.").)  When Guice worked in the music industry, he barely made a living.  (Tr. Jan. 6, 2014 at 13:15-25; 64:19-65:15.)

Guice lacks sophistication in legal matters and knows virtually nothing about copyrights.  (Id. at 110:4-8; Guice Dep. June 4, 2013 at 83-84, 163-64)  Before this case, Guice had never been a party in a civil action.  He was served with Plaintiff's Amended Complaint on February 14, 2012.  (Id. at 16:1-4.)  Guice did not know why his name was on the first page of the document.  (Id. at 18:14-23.)  Although he reviewed the pleading, he did not understand that Marino was suing him.  (Id. at 18:8-13; 14:1-10.)

     "[S]ometime around Valentine's Day, 2012," Guice (then living in Colorado) telephoned Malofiy, whose name and telephone number were on the pleading's first page.  (Id. at 20:5-7; 18:8-13; 16:20-17:14; 57:25-58:9; 29:13-16.)  Malofiy said that he represented Plaintiff and that Guice had no obligation to speak with him.  Malofiy did not ask if Guice was represented by counsel, nor did he advise Guice to obtain counsel.  (Id. 20-21.)  Malofiy did not inform Guice that Marino's interests were adverse to Guice's.  (Id. at 21.)  To the contrary, Malofiy untruthfully assured Guice:

"don't worry about it, he [Plaintiff] is not coming after you, it's everyone else." (Id. at 32:2-8.) Malofiy thus dishonestly convinced Guice that Marino was pursuing claims against only Barton and moving Defendants.  (Id. at 23-24.)

During this first conversation, Malofiy discussed with Guice the substance of Plaintiff's lawsuit, including the failure to give Plaintiff credit for writing and producing "Club Girl/Bad Girl." (Id. at 27-28.)  Guice sought to help Plaintiff.  Malofiy persuaded Guice to sign an affidavit memorializing their discussion.  (Id.)  When the two spoke a second time, Malofiy again elicited Guice's "side of the story." (Tr. Jan. 6. 2014 at 31:18-20; 38:13-19; Ex. R-2 at 1.)  Once again, Malofiy did not advise Guice to secure counsel or inform him that Plaintiff and Guice had adverse interests.  (Id.)  After the second conversation ended, Malofiy drafted an affidavit for Guice's signature.  (Id.)

Later that day, Malofiy called Guice; once again Malofiy did not advise Guice to secure counsel or inform him that Marino's interests were adverse to his.  With Guice's permission, Malofiy tape recorded this third conversation. (Doc. No. 148 at Ex. D-2; Exs. R-1 and R-2.) Malofiy read Guice the draft affidavit, which included, *inter alia*, Guice's admission to the elements of Plaintiff's accounting, constructive trust, and breach of contract claims.  (Doc. No. 79, at 14.) The affidavit also included: the statement that Guice was "a named defendant"; Guice's acknowledgment that he, Barton, and Marino created "Club Girl" together; and Guice's belief that Marino was entitled to producing and writing credit.  (Id.)  After Guice suggested minor changes to omit profanity, Malofiy persuaded Guice to acknowledge that he was "comfortable" with the affidavit.  (Exs. R-1 and R-2.)  Several hours later, Malofiy emailed Guice a revised draft.  (Tr. at 34:4-15; Ex. D-2 at 1.) The subject line of the email reads "Marino v. Usher," (mentioning no other Defendants).  Once again, Malofiy did not advise Guice to secure counsel before reviewing and signing the affidavit.  (Ex. D-2 at 1; Tr. Jan. 6, 2014 at 37:1-25.)

The next afternoon, apparently concerned that he had not heard from Guice, Malofiy reminded Guice by email to return a signed copy of the affidavit, stating that Guice could modify the document, and that if he wanted to "review it with a lawyer, that's fine too." (Ex. D-2 at 1.) Without consulting an attorney, Guice signed the affidavit and returned it to Malofiy. (Id. at 43:5-16; 38:23-39:9.)

Relying on Malofiy's misrepresentations, Guice did not believe he was obligated to respond to the Amended Complaint and never did so. Without informing Guice, on June 14, 2012, Malofiy caused the Clerk of this Court to enter a default against Guice for his failure to answer the Amended Complaint. (Id. at 44:1-3; Doc. 31.)

In the spring of 2013, Malofiy called Guice to arrange for his videotaped deposition in Philadelphia. Once again, Malofiy did not advise Guice to retain counsel or that Marino's interests were averse to those of Guice. Malofiy paid for Guice's air travel from Colorado, accommodations, and expenses. (Id. at 46:7-15; 54:3.) Guice could not afford to hire a lawyer. Moreover, he did not believe he needed counsel because Malofiy had untruthfully told Guice that he was only a witness. (Guice Dep. June 4, 2013 at 144 ("I was told I was a—I was a witness. . . . ." Defense Counsel: "Did [Malofiy] make representations to you that proved to be untrue? . . . . Guice: "I would say—I would say yes.").)

Guice thus attended his May 2, 2013 deposition unrepresented. Malofiy led Guice through his affidavit, and had him swear to its truth. After Malofiy completed his examination, Defense Counsel's questioning of Guice revealed that Guice did not know: the meaning of "defendant"; that he was a party to the copyright litigation; that Plaintiff was seeking money damages from him personally; or that Malofiy had obtained a default against him. (Id. at 47:24-48:21; 92:18-21.) For instance, Guice testified as follows:

> DEFENSE COUNSEL: Do you understand that Mr. Marino who's sitting across the
> table from me is seeking money from you?

> GUICE: Well -- well, that part -- I didn't know he was seeking it from me personally.
>
> DEFENSE COUNSEL: Yeah.  He is seeking money from you and he's asking you to pay him monies that you received from the exploitation of Bad     Girl.  Did you understand that?
>
> GUICE: No, I did not.
>
> \* \* \* \*
>
> DEFENSE COUNSEL: So all the time you were talking with Mr. Malofiy you didn't understand that Mr. Marino was suing you for money damages and for relief with respect to Club Girl and Bad Girl?
>
> MALOFIY:   Objection.
>
> GUICE: No, I didn't. And that's . . . the level of my ignorance. . . .

(Guice Dep. May 2, 2013 at 171-74.)

Guice became "ang[ry]," "confused," and "infuriated" that Malofiy had taken advantage of and made a "fool" of him.  (Tr. Jan 6, 2014 at 48:5-10; 48:16-21; 49:12-21; see also Guice Dep. June 4, 2013 at 147 ("I would say I was duped.").)  The Philadelphia deposition session abruptly ended at Guice's request.  (Tr. Jan 6, 2014 at 51:25-52:2; 55:21-24; 76:9-77:4.)  His upset was evident.  (Guice Dep. May 2, 2013 at 206-07 (Video Operator: "We're adjourning the deposition with witness Mr. William Guice." Guice: "Not a witness. A defendant now at this point.  I guess I've always been a defendant.").)

Later that day, the Parties contacted my Chambers, seeking direction.  Because I was unavailable, another judge issued an order extending the "the deadline for William Guice's deposition . . . until Friday, May 31, 2013, so Mr. Guice can retain counsel."  (Doc. No. 76.) Defense Counsel then attempted to schedule the continued Guice deposition.  (Doc. No. 80 at 8-13.) Having done all he could to take advantage of Guice being unrepresented, Malofiy sanctimoniously declared that "THERE WILL BE NO DEPOSITION OF MR. GUICE UNLESS HE HAS COUNSEL."  (Id. at 15-16.)

I further extended the time to complete the Guice deposition so that he could obtain counsel. (Doc. No. 81.)  I also advised that "[i]f Mr. Guice is willing to continue his deposition without counsel, he may do so."  (Id.)  Guice's deposition was completed in Denver, Colorado, on June 4, 2013; Guice attended the deposition unrepresented because he could not afford a lawyer.

## III.   LEGAL STANDARDS

Moving Defendants seek sanctions against Malofiy.  See, e.g., Carter v. Albert Einstein Med. Ctr., 804 F.2d 805, 808 (3d Cir. 1986) (attorney is liable for sanctions where attorney, rather than client, is responsible for challenged conduct).  Defendants base their Motion on 28 U.S.C. § 1927 and the Court's inherent authority.  Gaiardo v. Ethyl Corp., 835 F.2d 479, 484 (3d Cir. 1987) (§ 1927 sanctions may only be imposed on attorney, not client).  As the movants, Defendants must show by clear and convincing evidence that sanctions are warranted.  Rich Art Sign Co. v. Ring, 122 F.R.D. 472, 474 (E.D. Pa. 1988); see also Gregory P. Joseph, Sanctions: The Federal Law Of Litigation Abuse § 17(A)(5) (2008); Ali, 636 F.3d at 627.

### A. *Section 1927*

"Any attorney or other person admitted to conduct cases in any court of the United States . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927.   To impose sanctions under this statute, I must find that an attorney "has (1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional misconduct."  In re Schaefer Salt Recovery, Inc., 542 F.3d 90, 101 (3d Cir. 2008) (citing In re Prudential Ins. Co. Am. Sales Practice Litig., 278 F.3d 175, 188 (3d Cir. 2002)).  I may not impose sanctions for misunderstanding, bad judgment, or well-intentioned zeal.  Zuk v. E. Pennsylvania

Psychiatric Inst., 103 F.3d 294, 297 (3d Cir. 1996) (willful bad faith or intentional misconduct is required).  "An attorney's conduct must be egregious, stamped by bad faith that violates recognized standards in the conduct of litigation."  Grider v. Keystone Health Plan Central, Inc., 580 F.3d 119, 142 (3d Cir. 2009) (internal quotations omitted).

    *B.  Inherent Authority*

The Court may also impose sanctions pursuant to its inherent power to discipline attorneys who appear before it.  In re Prudential Ins. Co., 278 F.3d at 188-89.  Such sanctions could be warranted in various circumstances, including "cases where a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  Id. at 189 (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991)).  Sanctions may be imposed pursuant to this inherent power even if much of the misconduct at issue is also sanctionable under statute or rules of court.  Id.

**IV.**   **DISCUSSION**

It is difficult to convey the poisonous atmosphere created by Malofiy's continual belligerence to opposing counsel.  Recently proposed amendments to the Federal Rules of Civil Procedure emphasize the need—repeatedly recognized by the courts—for opposing counsel to cooperate with each other.  See, e.g., Committee Note to Preliminary Draft of Proposed Amendment to Fed. R. Civ. P. 1 ("Rule 1 is amended to emphasize that just as the court should construe and administer these rules to secure the just, speedy, and inexpensive determination of every action, so the parties share the responsibility to employ the rules in the same way.  *Most lawyers and parties cooperate to achieve these ends.*"); Grider, 580 F.3d at 125 ("one expects. . . civility and professionalism" from experienced attorneys during discovery); Huggins v. Coatesville Area Sch. Dist., No. 07-4917, 2009 WL 2973044, at *4 (E.D. Pa. Sept. 16, 2009) ("Treating an adversary with advertent discourtesy, let alone with calumny or derision, rends the fabric of the law."); GMAC

Bank v. HTFC Corp., 248 F.R.D. 182, 184 (E.D. Pa. 2008) ("The issue of how to rein in incivility by counsel in depositions has been the subject of considerable interest in the legal profession for some time.")

Cooperation between opposing counsel is entirely consistent with a lawyer's obligations to his or her client, and ensures the efficient and rational resolution of civil litigation. Indeed, without such cooperation, litigation would break down, as it almost did here. Malofiy's unprofessional behavior throughout discovery was the antithesis of cooperation. See Pa. R. Prof. Conduct 3.5(g) ("A lawyer shall not engage in conduct intended to disrupt a tribunal"); id. at Cmt. 5 ("The duty to refrain from disruptive conduct applies to any proceeding of a tribunal, including a deposition.").

Malofiy, who has been a member of the Pennsylvania bar since 2008, contends that I should excuse this behavior as a function of his inexperience and his need of a "mentor." (Tr. Jan. 6, 2014 at 3-4; Tr. Jan. 28, 2014 at 52-54, 63-67.) I reluctantly accept that Malofiy's conduct was, at least in part, a function of the grotesquely exaggerated zeal common to less experienced lawyers. Accordingly, although I condemn Malofiy's discovery behavior, I decline to impose sanctions on that basis.

Malofiy's treatment of unrepresented Defendant, Guice, however, is quite another matter. Defendants have shown by clear and convincing evidence that this conduct is egregious and sanctionable under both § 1927 and the Court's inherent authority.

   A.  *Section 1927*

Moving Defendants have presented clear and convincing evidence that Malofiy contravened all four prongs of the In re Schaefer Salt sanctions test. First, Malofiy misrepresented to Guice that Plaintiff had not sued him, but, rather, was suing "everyone else." (Tr. Jan. 6 2014 at 22 (Guice: "[I]t was told to me that it was against everyone but me." Defense Counsel: "That's what Attorney

Malofiy told you?" Guice: "Yes.").)  Guice learned only during his own deposition that Malofiy had not been truthful and that he had entered a default against Guice, thus causing Guice to end the Philadelphia deposition session prematurely.  This necessitated two Court rulings extending the time for his deposition so Guice could try to obtain counsel.  His deposition resumed some four weeks later in Colorado.  Malofiy thus "multiplied proceedings" and "increase[ed]" their costs." § 1927; In re Schaefer Salt, 542 F.2d at 102.

Courts have repeatedly sanctioned counsel under § 1927 for causing similar delays.  See e.g., Hilburn v. Bayonne Parking Auth., __ F. App'x __, 2014 WL 1328146 (3d Cir. Apr. 4, 2014) (upholding sanctions where counsel delayed deposition by filing frivolous opposition brief requiring continuance); Carlson v. Bosem, No. 06-13904, 2007 WL 1841067, at *2 n.4 (11th Cir. June 28, 2007) ("[S]anctions may be imposed on a person causing a delay or otherwise frustrating the examination of a deponent."); Manville Sales Corp. v. Paramount Sys., Inc., No. 86-4157, 1988 WL 3855 (E.D. Pa. Jan. 20, 1988) ("[C]ounsel's conduct in making his own judicial determination to whether or not the witness should or should not be produced for deposition rises to the level appropriate for sanctions under 28 U.S.C. § 1927 and the inherent power of the court."); Nike, Inc. v. Top Brand Co. Ltd., 216 F.R.D. 259, 276 (S.D.N.Y. 2003) ("When counsel's conduct unnecessarily delays the discovery proceedings, § 1927 sanctions are appropriate."); Morales v. Zondo, Inc., 204 F.R.D. 50, 55-57 (S.D.N.Y. 2001) (attorney ordered to pay counsel fees where  he unnecessarily delayed deposition); Unique Concepts, Inc. v. Brown, 115 F.R.D. 292, 293-94 (S.D.N.Y. 1987) (counsel's obstructive conduct during deposition warranted sanctions under § 1927).

Moreover, Malofiy's behavior toward Guice was obviously "vexatious and unreasonable." In re Schaefer Salt, 542 F.2d at 102.  Malofiy's conduct served no legitimate purpose.  He lied to

Guice that Marino was not proceeding against him, thus convincing Guice that he did not need to respond to Marino's Amended Complaint.  Having thus dishonestly ensured Guice's failure to respond, Malofiy entered a default against Guice for that failure.  It is difficult to imagine more vexatious or unreasonable behavior.  United States v. Ross, 535 F.2d 346, 349 (6th Cir. 1976) (unreasonable and vexatious conduct is an "intentional departure from proper conduct").

Finally, Malofiy's discussions with Guice are the paradigm of bad faith and intentional misconduct.  Although a lawyer's violation of the Rules of Professional Conduct cannot, alone, make out a violation of § 1927, an intentional violation can confirm that the lawyer acted in bad faith.  Gomez v. Vernon, 255 F.3d 1118, 1134 (9th Cir. 2001) (violation of "ethical and professional duty" constitutes bad faith and intentional misconduct under both § 1927 and court's inherent power).  The Eastern District, like virtually all others, has adopted the rules of conduct of the state in which the Court is located.  E.D. Pa. Civ. R. 83.6.  Malofiy violated Pennsylvania Rule of Professional Conduct 4.3, which provides as follows:

> (a) In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested.
>
> (b) During the course of a lawyer's representation of a client, a lawyer shall not give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the lawyer knows or reasonably should know the interests of such person are or have a reasonable possibility of being in conflict with the interests of the lawyer's client.
>
> (c) When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer should make reasonable efforts to correct the misunderstanding.

Pa. R. Prof. Conduct. 4.3.  The Comment to the Rule provides that to avoid misunderstandings, an attorney may need to "explain that the client has interests opposed to those of the unrepresented person," especially if the person is confused.  Id. at Cmt. 1.

Nearly every state has enacted some version of 4.3, recognizing that it is critical to protect unrepresented individuals from what occurred here.  Rule 4.3 Dealing with Unrepresented Person, Ann. Mod. Rules Prof. Cond. 4.3 (explaining purpose of rule and variations adopted by different states); Michael P. Richman & Geoffrey S. Goodman, Communicating with Unrepresented Parties Ethical Issues for the Estate Professional, Am. Bankr. Inst. J., June 2007, at 24 (collecting cases, explaining Model Rule, scope, and purpose, and explaining that "the attorney's role as an advocate for his or her client must be made crystal clear to the unrepresented party"); Russell Engler, Out of Sight and Out of Line: The Need for Regulation of Lawyers' Negotiations with Unrepresented Poor Persons, 85 Cal. L. Rev. 79 (Jan. 1997); Victoria J. Haneman, The Ethical Exploitation of the Unrepresented Consumer, 73 Mo. L. Rev. 707 (Summer 2008) ("[I]ronic, but an unrepresented party will often rely on the perception of superior knowledge and expertise in the opposing attorney."); see also In re Air Crash Disaster, 909 F. Supp. 1116 (N.D. Ill. 1995); In re Katrina Canal Breaches Consol. Litig., No. 05-4182, 2008 WL 2066999 (E.D. La. May 14, 2008); Andrews v. Goodyear Tire & Rubber Co., Inc., 191 F.R.D. 59 (D.N.J. 2000); Conn. Ethics Op. 01-17 (2001); D.C. Ethics Op. 321 (2003); Mont. Ethics Op. 011115 (2001); Sisk v. Transylvania Cmty. Hosp., Inc., 695 S.E.2d 429 (N.C. 2010); In re Millett, 241 P.3d 35 (Kan. 2010).

Although Guice's confusion was manifest both as to the copyright litigation as well as his and Marino's status in the litigation, Malofiy did not ask Guice if he had a lawyer, did not advise Guice to get a lawyer, and did not explain to Guice that Marino's interests were adverse to Guice's. Malofiy's manipulation of Guice is exactly what Rule 4.3 was intended to prevent. Richman & Goodman, Communicating with Unrepresented Parties, at 24 ("[T]he attorney's role as an advocate for his or her client must be made crystal clear to the unrepresented party."); id. at n.2 ("Courts . . . . have found violations of Rule 4.3 in cases where lawyers have prepared documents for the signature of an unrepresented party without explaining the potential adverse consequences of signing the

documents."); X-It Prod. L.L.C. v. Walter Kiddie Portable Equip. Inc., No. 00-513, 2002 WL 1769804 (E.D. Va. June 25, 2002) (lawyer violated Rule 4.3 by allowing unrepresented defendant to believe mistakenly the lawyer was disinterested); Brown v. St. Joseph Cnty., 148 F.R.D. 246, 254 (N.D. Ind. 1993) ("An attorney must make clear to the unrepresented [party] the lawyer's role in the case, including the nature of the case, the identity of the lawyer's client, *and the fact that [his client] is an adverse party*.") (emphasis added) (internal quotations omitted); Jones v. Allstate Ins. Co., 45 P.3d 1068 (Wash. 2002) (en banc) (claims adjuster for Allstate violated Rule 4.3 by failing to correct the plaintiff's misunderstanding that the adjuster had her best interests at heart in the settlement of a claim); see also In re Michelman, 616 N.Y.S.2d 409 (App. Div. 1994); Disciplinary Counsel v. Rich, 633 N.E.2d 1114 (Ohio 1994); Attorney Q v. Miss. State Bar, 587 So. 2d 228 (Miss. 1991).

Even worse, Malofiy's dishonest assurances that Marino was not seeking damages from Guice caused Guice to make damaging—albeit unreliable—statements. This grossly unprofessional conduct meets § 1927's bad faith and intentional misconduct standard. Cf. Price v. Trans Union, L.L.C., 847 F. Supp. 2d 788, 797 (E.D. Pa. 2012) (no bad faith under § 1927 where attorney's conduct complied with Rule 4.3).

Malofiy bases the bulk of his arguments against sanctions on his challenge to Guice's credibility. (See, e.g., Doc. No. 150, at 16-18, 22, 28-37.) I fully credit Guice's testimony, however. He was a compelling witness.

Malofiy also argues that Guice's statement in the affidavit that he was a defendant, combined with Malofiy's belated email advice ("if you want to review [the affidavit] with a lawyer, that's fine too") demonstrate that Malofiy complied with Rule 4.3. (Doc. No. 79, at 14; Doc. No. 150, at 17.) I do not agree. Malofiy did not provide Guice with the draft affidavit until after their

second discussion.  By then, Malofiy had repeatedly violated the Rule.  In any event, as I have found, regardless of what Malofiy wrote in the draft affidavit, Guice did not understand the meaning of the word "defendant."  Similarly, Malofiy made his email suggestion that Guice could review the affidavit with a lawyer after their third conversation.  By this point, Malofiy had convinced Guice he was only a witness and did not need a lawyer.  Accordingly, even assuming the suggestion fulfilled Malofiy's obligations under Rule 4.3 (and plainly it did not), it, too, was made only after Malofiy had repeatedly violated the Rule.

Finally, contrary to Malofiy's arguments, he needed neither more experience nor a "mentor" to know that he was obligated not to: (1) violate the Rules of Professional Conduct; and (2) lie to an unrepresented party about whether Malofiy's client was proceeding against him.  These transgressions were intentional and outrageous.

In sum, moving Defendants have shown that Malofiy's conduct respecting Guice meets the four Schaefer Salt criteria:  Malofiy multiplied discovery proceedings, thus increasing their cost.  In re Schaefer Salt, 542 F.2d at 102.  Malofiy's behavior certainly was "unreasonable and vexatious." Keller, 55 F.3d at 94.  Finally, in light of his repeated, intentional violations of Rule 4.3, Malofiy acted in bad faith and with "intentional misconduct."  Gomez, 255 F.3d at 1134; Loatman, 174 F.R.D. at 600; Price, 847 F. Supp. 2d at 797.  In these circumstances, I am compelled to conclude that Malofiy's behavior is sanctionable under § 1927.

### B.  *Inherent Authority*

Because, as I explain below, the remedies available under § 1927 cannot fully correct the harm caused by Malofiy's egregious conduct, I will also impose sanctions pursuant to the Court's inherent authority.  Ferguson v. Valero Energy Corp., 454 F. App'x 109, 114 (3d Cir. 2011) ("Even

though inherent-authority sanctions are generally disfavored where another provision—such as § 1927—authorizes sanctions, . . . <u>Prudential</u> allows a district court to [impose sanctions pursuant to its inherent authority] when the conduct is egregious or where the statutory provision is not adequate to sanction the conduct. . . .").

Malofiy undoubtedly "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." <u>Chambers</u>, 501 U.S. at 45-46.  As I have explained, Malofiy violated Rule 4.3.  Through his misrepresentations, Malofiy induced Guice to sign an inculpatory affidavit.  Malofiy had Guice repeat those admissions under oath at his deposition.  In thus taking improper advantage of an unsophisticated, impoverished, unrepresented party and violating a rule of Professional Conduct, Malofiy's conduct is sufficiently egregious to trigger the Court's inherent authority.  <u>See, e.g.</u>, <u>Erickson v. Newmar Corp.</u>, 87 F.3d 298, 303 (9th Cir. 1996) (intentional violation of RPC warranted sanctions under the court's inherent power); <u>In re Complaint of PMD Enters. Inc.</u>, 215 F. Supp. 2d 519, 530 (D.N.J. 2002) (same); <u>Eagan by Keith v. Jackson</u>, 855 F. Supp. 765, 791 (E.D. Pa. 1994) (same);  <u>Belote v. Maritrans Operating Partners, L.P.</u>, No. 97-3993, 1998 WL 136523 (E.D. Pa. Mar. 20, 1998) (same); <u>Chambers v. Heidelberg, USA, Inc.</u>, No. 04-583, 2007 WL 1544255 (D.N.J. May 25, 2007) (same).

## V.    <u>SANCTIONS</u>

I am obligated to consider the range of permissible sanctions and explain why less severe alternatives are inadequate or inappropriate.  <u>Republic of the Phil. v. Westinghouse Elec. Corp.</u>, 43 F.3d 65, 74 (3d Cir. 1994).

### A.  *Section 1927*

Sanctions available under Section 1927 are quite limited: a court may require an attorney "to

satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred" because of the bad faith conduct.  Ferguson v. Valero Energy Corp., 454 F. App'x 109, 112 (3d Cir. 2011). Here, the second day of Guice's deposition was entirely the result of Malofiy's improper actions. Malofiy is properly charged with any increased costs Defendants thus incurred.

### B.  *Inherent Authority*

The range of available sanctions is broader under the Court's inherent authority.  In circumstances analogous to those presented here, courts imposing sanctions pursuant to that authority typically have disqualified counsel, excluded evidence, and revoked *pro hac vice* admissions.  Garrett v. Nat'l R.R. Passenger Corp., No. 89-8326, 1990 WL 122911 (E.D. Pa. Aug. 14, 1990) (excluding evidence); Inorganic Coatings, Inc. v. Falberg, 926 F. Supp. 517 (E.D. Pa. 1995) (disqualifying counsel).

The reliability of both the Guice affidavit and his related deposition testimony is tainted by Malofiy's unprofessional conduct.  Exclusion of the affidavit and testimony is thus warranted. Garrett, 1990 WL 122911, at *2 ("[P]laintiff should be precluded during the course of the trial from using any statement, information or evidence received from [the witness]."); Belote v. Maritrans Operating Partners, L.P., No. 97-3993, 1998 WL 136523 (E.D. Pa. Mar. 20, 1998) (same); Lennen v. John Eppler Mach. Works, Inc., 1997 WL 566078 (E.D. Pa. Sept. 5, 1997) (same).

Having considered other available sanctions, I conclude that no lesser sanction than the exclusion of the improperly obtained evidence would be adequate.

### VI.    OPENING DEFAULT

In the companion Memorandum I have also issued today, I dismissed Plaintiff's claims

against almost all Defendants. As I noted there, the record suggests that Dante Barton alone wronged Marino. Yet, Plaintiff's default against Guice—obtained through Malofiy's violations of Rule 4.3—remains intact. In these circumstances, I will grant moving Defendants' request to open that default.

A. *Standards*

When default is entered against a party who has failed to plead or otherwise defend, it may be vacated upon a showing of "good cause." Fed. R. Civ. P. 55(b); <u>Dambach v. United States</u>, 211 F. App'x 105, 109 (3d Cir. 2006) (citing <u>$55,518.05 in U.S. Currency</u>, 728 F.2d 192, 195 (3d Cir. 1984)). A court may also relieve a party from a default under Rule 60 for "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b). The Third Circuit "does not favor entry of defaults," preferring instead for cases to be "decided on their merits." <u>$55,518.05 in U.S. Currency</u>, 728 F.2d at 195.

In considering whether "good cause" exists to set aside a default, I must consider "whether the plaintiff will be prejudiced; whether the defendant has a meritorious defense; and whether the default was the result of defendant's culpable conduct." <u>Yellow Book Sales v. White</u>, No. 10-3062, 2011 WL 830520, at *2 (E.D. Pa. Mar. 10, 2011) (quoting <u>Miles v. Aramark Corr. Serv.</u>, 236 F. App'x 746, 751 (3d Cir. 2007)).

B. *Discussion*

Here, Guice appears to have meritorious defenses to Plaintiff's claims for direct, contributory, and vicarious copyright infringement. <u>Brownstein v. Lindsay</u>, 742 F.3d 55, 68-69 (3d Cir. 2014) (it is axiomatic that a joint author of a copyrighted work cannot sue his co-owner for infringement). Moreover, I have already stricken as time-barred damages accruing before October 28, 2008. (Doc. No. 75.)

Further, prejudice would not accrue to Plaintiff. Prejudice exists when "plaintiff's claim

would be materially impaired because of the loss of evidence, an increased potential for fraud or collusion, substantial reliance on the entry of default, or other substantial factors." Dizzley v. Friends Rehab. Program, 202 F.R.D. 146, 147-48 (E.D. Pa. 2001); see also Feliciano v. Reliant Tooling Co., 691 F.2d 653, 657 (3d Cir. 1982). Litigating a claim on the merits does not constitute prejudice. Choice Hotels Int'l, Inc. v. Pennave Assocs., Inc., 192 F.R.D. 171, 174 (E.D. Pa. 2000) ("The fact that a plaintiff will have to litigate an action on the merits rather than proceed by default does not constitute prejudice.") (citations omitted). As I have explained, Guice appears to be entitled, at least, to partial summary judgment. Plaintiff is free to continue litigating the remaining claims against Guice. There is no risk of evidence loss. Further, there has been no substantial reliance on the default because, as Malofiy has repeatedly noted, he has not yet sought a default judgment. (Guice Dep. May 2, 2013 at 191.)

Finally, the default is not the result of Guice's culpable conduct. There is culpability when the conduct leading to entry of default was "willful, intentional, reckless or in bad faith." Momah v. Albert Einstein Med. Ctr., 161 F.R.D. 304, 308 (E.D. Pa. 1995). Guice defaulted because of Malofiy's false assurances that Guice was only a "witness" and so did not have to answer the Amended Complaint. Plaintiff may not profit from his attorney's misconduct.

In sum, because all of the Aramark criteria have been met, I will open the default against Guice.

VII.    **<u>CONCLUSION</u>**

Defendants have shown clearly and convincingly that Attorney Francis Malofiy has acted disgracefully: lying to an unsophisticated, impoverished, unrepresented Defendant, thus convincing that Defendant to expose himself (probably baselessly) to substantial liability.   Malofiy also needlessly increased discovery costs.   Denying Plaintiff the "fruits" of Malofiy's misconduct and requiring Malofiy to pay these increased costs are the least sanctions I can impose.

In suggesting that Malofiy's misconduct was the result of inexperience, Malofiy's extremely experienced counsel acknowledged "[i]f I was doing something like this now, I certainly would warrant sanctions and possibly removal from practice."  (Tr. Jan. 28, 2014 at 53.)  Whether Malofiy should be removed from practice is a question properly answered in another forum.

An appropriate Order follows.


                                                        */s/ Paul S. Diamond*


                                                        _____
May 21, 2014                                            Paul S. Diamond, J.