UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIEL V. MARINO,<br>*Plaintiff*<br><br>V.<br><br>USHER, *et al.,*<br>*Defendants* | NO.: 11-CV-06811<br><br>BEFORE THE HONORABLE<br>PAUL S. DIAMOND |

# PLAINTIFF'S BRIEF IN OPPOSITION TO GRANT OF SUMMARY JUDGMENT FOR DEFENDANT GUICE

**"The core purpose of copyright law is to secure a fair return for an author's creative labor and thereby to stimulate artistic creativity for the general public good."**[1]

It is important in understanding this dispute not to lose the forest for the trees. The simple fact that must not be forgotten is that plaintiff Daniel Marino wrote *Club Girl* and *Bad Girl*, and that Defendants—including William Guice—deliberately took more credit and money than they were legally due and hid this from Plaintiff for years. This is wrong and it must be corrected.

The record clearly demonstrates that Plaintiff wrote the underlying musical composition for *Club Girl* and *Bad Girl* and that all Defendants were aware that he was the main songwriter of these songs. The evidence further demonstrates that defendants Guice, Barton, Tommy van Dell, and IN2N entered into secret, illegal contracts and agreements—and fraudulently registered *Club Girl*'s and *Bad Girl*'s copyright without Daniel Marino as an author and owner—in such a way as to attempt to deliberately extinguish all of Plaintiff's undisputed ownership and authorship of the songs *Club Girl* and *Bad Girl* and claim the resulting benefits for themselves.

---

[1] <u>Veeck v. S. Bldg. Code Congress Int'l Inc.</u>, 241 F.3d 398, 402 (5th Cir.2001) (quotation marks removed).

In considering Plaintiff's brief on why summary judgment should not be granted to Mr. Guice, the Court must construe all disputed facts in favor of Plaintiff.  Given that copious evidence shows that Guice and all other Defendants engaged in a purposeful scheme to completely erase Plaintiff's rights out of existence so they could claim more credit than they were due, this case must go to a jury to decide if Daniel Marino is an author, owner, and whether defendants are liable to Plaintiff for an accounting, copyright infringement, and other relief.

*****

## I.   MATTER BEFORE THE COURT

Whether summary judgment should be granted in favor of defendant William Guice.

## II.   QUESTIONS PRESENTED

When Plaintiff is an uncredited author of an underlying work, should a jury determine the extent of the percentage of coownership and authorship in the underlying work, and an accounting for the use of his work, and should a jury determine Plaintiff's percentage of coownership and authorship in a derivative work and any accounting due from the use of his work in a derivative?

*Suggested Answer: Yes*

When there are genuine disputes of material fact regarding the percent ownership and authorship in a song and a derivative work, is it reversible error for the Court to grant summary judgment for defendants who are necessary to a jury's determination of ownership and authorship?

*Suggested Answer: Yes*

When Plaintiff had explicitly requested equitable relief for a determination of ownership and authorship of a song and derivative work, was it reversible error for the Court to dismiss defendants who were necessary to that determination?

*Suggested Answer: Yes*

## III.  Facts

Plaintiff Dan Marino first conceived of the musical composition that is now known as *Club Girl* in 2001, along with some of the lyrics. See Exhibit 1 – Deposition of Daniel Marino, p.101:18–21. Marino was explicit in his deposition that when he created the song that he did not originally intend for it to be merged with any other musical expression:

> Q.   Did you register your own work?
>
> A.   All I know is that when I record[ed] it, when I wrote it, it is my [song].
>
> Q.   Did you ever have an opportunity to look at any copyright registration with respect to *Club Girl*?
>
> A.   Mr. Davis, I think I said it several times. The song that I recorded that I wrote on my own, that I produced and engineered on my own is my song. I didn't feel that I really had to go check on my close friends for anything until after I realized it was stolen from me.
>
> Q.   Let me understand that. Based on your statement, are you forgetting about your testimony that you said Mr. Guice and Mr. Barton contributed to that song, *Club Girl*?
>
> A.   **After I wrote it, after I recorded it on my own, they added to it.**

Marino Depo, at pp.135–37: see also Exhibit 14 - Amended Complaint, Exhibit I (showing that a Marino-only version of *Club Girl* existed before Guice and Barton added to it).

A few days after creating the song, Marino played the song for defendant Dante Barton, who later added drum parts, Marino Depo. at 102:15–103:19, and defendant William Guice, who later added lyrics, id. at 103:20–24. It was at this time that Marino, Barton, and Guice agreed to create a collaborative work named *Club Girl*. Id. at p.104. It is, however, important to note that although, Marino, Barton, and Guice often collaborated on songs, by no means was each song created by one of the individuals always intended to be merged with the others' work upon its original conception. See Amended Complaint, Exhibit I (showing that a Marino only version of *Club Girl* existed before Guice and Barton added to it); Exhibit 16 – Plaintiff's Discovery Documents 38–40 (listing many songs where the entire trio are not credited). Accordingly, the only person who can claim credit for Plaintiff's work on the musical composition underlying *Club*

*Girl* is plaintiff Dan Marino.[2] The Court correctly noted that: "Plaintiff created the basic melody, chord progressions, and tempo." Exhibit 11 - SJ Opinion (*Doc. No. 104*), at p.2.

When collaborating on a piece of music, the trio had agreed that they would split the writing credit equally—and that Barton and Marino would split the producing credit in half. Marino Depo, pp.137–38. This was, in fact, the deal on *Club Girl*. Id. As a logical part of this deal, Marino only agreed to allow his musical composition to be used in the song *Club Girl* on the condition that he actually received the proper 33% credit from his collaborators, Guice and Barton. See generally Marino Depo.

Around the time the trio created *Club Girl* in 2002, Marino, Guice, and Barton grew acquainted with a certain publishing figure, defendant Thomas ("Tommy") van Dell. Van Dell was intimately aware that Guice, Barton, and Marino collaborated to create *Club Girl*, and that Marino was a driving force in the song's creation. Marino Depo., at pp.501–02. Van Dell and Plaintiff discussed the exploitation of *Club Girl*, and van Dell told Plaintiff that van Dell's company, defendant IN2N, was Plaintiff's publisher. Id.

What Plaintiff did not know is that while van Dell was making these representations to Plaintiff, van Dell was signing publishing agreements with only Guice and Barton. See Exhibit 4 - In2N Co-Publishing Agreements. In these publishing agreements, Guice and Barton transferred to Van Dell a collective fifty percent of all the rights in *Club Girl* to Van Dell, taking full credit for the song at Marino's expense. See Publishing Agreement, see generally Exhibit 5 – Deposition of Thomas van Dell (stating that he did not think Marino was a songwriter and never credited him for writing *Club Girl*).[3]

---

[2] Although the song eventually known as *Club Girl*, which contained a beat and lyrics—both later added to Plaintiff's underlying composition—was explicitly understood and intended by the trio to be a collaborative effort where credit was equally shared, because Marino did not initially intend his composition to be merged with Barton or Guice's additions, it is inaccurate to characterize *Club Girl* as a "joint work."

[3] Plaintiff had a conversation with van Dell on an airplane back from a songwriting trip to Nashville. Van Dell told Plaintiff he would give him fifty percent of his song, and Plaintiff told van Dell that seventy-five percent was more fair. Marino Depo., at pp.501–02. Van Dell shook his hand. Plaintiff contends that van Dell signed the deal with Guice and Barton because they were willing to take the

Mr. Guice's claims to have been ignorant of Marino's exclusion from the publishing agreement are wholly incredible for two reasons: (1) Marino's exclusion from the publishing agreements that Guice and Barton signed at the same time is rather glaring given that the trio agreed to share the songs equally, (2) Guice has explicitly stated that he signed a "co-pub" agreement, showing that he was fully aware that he and Dante Barton were getting credit but Daniel Marino was not.[4] Guice Depo II, p.101 ("I was in a co-pub situation").

After obtaining the rights to *Club Girl*, Van Dell then negotiated with Usher's agent, Mark Pitts, to have the song *Club Girl* placed on Usher's upcoming *Confessions* album as the song *Bad Girl*. Van Dell Depo, p.189. Van Dell admits that Marino was entirely cut out of this process. See id. at p.188 (stating that only Guice and Barton, not Marino, retained a combined 75% royalty credit for writing *Bad Girl*).[5] Guice would have known that Marino was being excluded from credit because Guice and Barton signed a contract with Usher granting them each 37.5% royalty credit for writing the song *Bad Girl*. See UW Agreement at p.7. Simple math dictates, given that Marino, Guice, and Barton, were each supposed to get 33.33% credit, Guice must have known he was taking some of Marino's credit as only 25% remained. Yet, Mr. Guice stated in his depo that he thought the 37.5% he got "was fair." Guice Depo II, at 135:21.

Perhaps even more egregious and revealing than Guice taking more than he was entitled to for songwriting royalties is that the UW Agreement specifically retains Mr. Guice as a coproducer, and promises him 3% producer royalties based on that role. See UW Agreement, p.1–3. Mr. Guice

---

fifty percent van Dell originally offered. IN2N, van Dell's company, also failed to properly credit Marino on songs van Dell must have known Plaintiff wrote. Id. at 504.

[4] Guice claims Barton told him this was a work for hire. First, this is hearsay and inadmissible and cannot be considered the Court. Second, it is contradicted by Barton's signed note. See Amended Complaint, Exhibit F. Third, it is unsupported by any other evidence in the record and cannot support a grant of summary judgment given the huge factual discrepancies. Four, it is explicitly contradicted by Mr. Guice's testimony in the first Guice deposition which, while struck by the judge, can nevertheless be used to impeach Mr. Guice's credibility.

[5] Given that the Court acknowledges, as it must, that plaintiff Daniel Marino wrote *Club Girl* and *Bad Girl*, and given that all defendants admit he was not credited, it is beyond plaintiff's understanding how the Court could have entirely dismissed all defendants but Guice, Barton, and Destro from the suit. Very clearly, even if no infringement occurred, Daniel Marino is entitled to both an injunctive relief on ownership and an accounting.

is obviously aware that he was paid as a producer because he signed the UW Agreement and took the money. Id. There is just one problem: **there is not a shred of evidence that Mr. Guice has ever produced anything** or has ever had any role with *Club Girl* and *Bad Girl* other than that of a lyricist and singer.[6] Moreover, Mr. Guice admits he never did any production with Plaintiff or Barton. Guice Depo. II, p.75. Mr. Guice has even testified that Marino and Barton "did the production, they did the music, they created music, created beats, created tracks" in the trio's collaborations. Guice Depo. II, p.52. Furthermore, Mr. Marino has testified that any production was supposed to be split between himself and Barton, Marino Depo. at 137–38, and Barton has admitted that Marino coproduced *Bad Girl* and *Club Girl*. Exhibit 12 – Barton Note to Marino – Oct. 2007 (signed note from Dante Barton stating that Plaintiff coauthored and coproduced *Club Girl* and *Bad Girl*). Guice simply is not a producer and for him to claim credit and royalties on that basis is outrageous. Lastly, Guice taking credit for producing *Bad Girl* is even more troubling given the fact that Marino, over the course of seven phone calls with Usher and his people, actually did the production of *Bad Girl*. Marino Depo., at 346–351 (describing how Plaintiff worked extensively with defendants to produce and revise *Bad Girl*). Given that Mr. Guice was frequently in the studio with Barton and Marino, and was keenly interested in the progress of the song, there is virtually no way he could not have known that it was Marino who actually produced the song.

The record is clear that defendant Guice took credit for work he never did and that he knew exactly what he was doing when he signed these contracts and excluded Plaintiff. But in addition to taking credit and money that was not their's, Guice and Barton also illegally gave away Plaintiff's copyright interest to defendant Usher and his label:

> [Usher] shall have the exclusive unrestricted, perpetual right throughout the universe to use, distribute, sell and exploit ["*Club Girl/Bad Girl*"] in any and all media, by any and all methods and formats.

---

[6] When Plaintiff attempted to impeach Guice's credibility at the sanctions hearing with this evidence, he was prevented from doing so. The Court found Guice credible, despite the fact that there is an overwhelming amount of evidence his testimony has been contradictory and untruthful.

<u>See</u> UW Agreement.[7] Plaintiff never authorized this and Guice and Barton had no right to give his rights away.

During this time period, Plaintiff believed that he was part of this deal due to the representations of van Dell, Guice, and Barton, and also that he was being credited for his intellectual property. <u>See generally</u> Marino Depo. To that end, Plaintiff helped Usher, Pitts, and Lewis engineer and produce the song *Bad Girl* and all defendants knew, or should have known, with certainty that defendant Marino was the original author of *Club Girl* and *Bad Girl* given his extensive participation in crafting the final product. For instance, Plaintiff participated in at least six phone calls between defendants Pitts, Lewis, and Usher regarding the production of *Bad Girl*, and all defendants were explicitly aware that Marino had written the guitar music that drove the track. Marino Depo., at pp.346–351 (stating that defendant Lewis told Plaintiff, "Dan, that guitar [in *Club Girl* and *Bad Girl*] is f***ing hot"); <u>see also</u> Exhibit 2 - Marino Affidavit, ¶6. In addition, the sound track of *Club Girl*, which Plaintiff produced and engineered, is used in *Bad Girl*, which Plaintiff produced and engineered. <u>See</u> Deposition of Plaintiff's Engineering and Production Expert Brian Bricklin, at pp.296–301 (stating that *Bad Girl* and *Club Girl* use the "same exact sound recordings"). Plaintiff did this work, and allowed Defendants, including Guice, to work with his musical composition only because he expected to be credited. <u>See generally</u> Marino Depo. This was clearly a reasonable expectation, as everyone else who worked on the songs received more than their fair share of credit. However, when *Confessions* was released, Plaintiff was only credited as playing guitar. Marino Depo., p.441: 11–16; <u>see</u> Exhibit 10 – *Confessions* Liner Notes.

Plaintiff asked defendants Barton, Guice, van Dell, and Bobby Ross Avila about his writing credit and[8] was repeatedly told by Barton and van Dell that it was a mistake and it was being fixed;

---

[7] The Court impermissibly interprets evidence against Plaintiff. Specifically, the Court found that "Plaintiff testified that he was excited when he learned of the contract" but that he never bothered to read it. SJ Opinion, at p.3. Plaintiff actually testified that he was excited to learn that Barton had negotiated some sort of deal with Usher; no contract is *ever* mentioned by Plaintiff. For the Court to put words in Plaintiff's mouth in such a manner is reversible error. The first time Plaintiff learned about any contracts related to this matter is when Defendants produced them in discovery.

[8] The Court found that Plaintiff only confronted defendant Barton about the incorrect credits. SJ Opinion (*Doc. No. 154*), p.3–4. Plaintiff clearly stated in his deposition and Affidavit that many other defendants were confronted, Marino Depo, at pp.232:3–7, 234:9–13, 237; Marino Affidavit,

Bobby Avila assured him it would get worked out. Id. at 225, 232:3–7, 234:9–13, 237; 374–84; 403–04; Marino Affidavit, ¶6. In addition, Mr. Marino consulted an attorney who drafted a letter to Usher and his people notifying them of the problem; that lawyer testified that he believed the letter had been sent. Exhibit 8 – Deposition of Simon Rosen, at p.34:10–16[9]; Exhibit 9 – Simon Rosen Draft Letter. Defendant Guice specifically admits that Marino approached him after *Confessions* was released because Marino was confused about not receiving writing credit on the song. Guice Depo. II, p.37:7–11. Defendant Guice also saw that Marino was not credited as a writer on the album's liner notes. See *Confessions* Liner Notes; Guice Depo. II, at pp.33–35, 56:20–25.

Plaintiff's concerns about the credits were assuaged at the time, and he did not retain the attorney or further investigate the matter, because van Dell—whom Plaintiff believed to be his publisher—and his business partner, Dante Barton, told him there was a problem with the credit splits for **all the authors** and that Marino's incorrect credits on the liner notes were being rectified. Marino Depo., at p.374–84; Marino Affidavit, at ¶4. In February 2005, nearly a full year after *Confessions* was released, he spoke with defendants Bobby Ross Avila at the Grammy Awards. Marino Depo., at 374; Marino Affidavit, at ¶4. Again, Marino was assured by defendants that he was working with "good people" and that it would get worked out. Marino Depo., at 374; Marino Affidavit, ¶6.

In fact, the actual credit splits for *Bad Girl* **were** still being determined as late as November 2005. We know this because Barton showed Plaintiff a letter from attorney Wallace Collins in November 22, 2005—approaching two years after the release of *Bad Girl*—proving that money for the song was "tied up" and not moving. Marino Depo., at p.383; Marino Affidavit, ¶7; Amended Complaint, at ¶391; Exhibit 13 - Collins Nov. 2005 Invoice. The letter was an invoice for legal services Collins had provided and stated that the bill was

> "in connection with **extensive, ongoing negotiation with IN2N and HoriPRO's legal counsel**, and with RCA/BMG business affairs department (an accounting personnel), and preparation and reivsions [sic] to letter of direction **for release of**

---

¶¶4–7, and defendant Guice specifically admitted Marino approached him about the matter. Guice Depo II, p.37:7–11. The Court had a duty to construe all disputes of fact in favor of Plaintiff and failed to do so.

[9] Notably, the letter, dated October 5, 2004, shows that Marino believed at that time that IN2N was his publisher.

> **mechanical royalties on Usher's recording of "*Bad Girl*"**; correspondence, discussion and miscellaneous disbursements related thereto."

Collins Nov. 2005 Invoice. Plaintiff, believing that Collins was his attorney[10] and that IN2N was his publisher, relied on Barton's representations and the content of the letter which stated that negotiations on the royalties continued until at least early 2006. Around this time, Plaintiff did receive a check for $4,553.06 that defendant Barton maintained was part of their overdue mechanical royalties. Marino Depo., at p.477–80.[11] Barton told Plaintiff when giving him the check, "we got paid, here is your cut." Id. at 478. Plaintiff took Barton's representation at face value that these were royalties for *Club Girl/Bad Girl* as he had no reason to dispute it.

In June 2006, Plaintiff was again told by Barton that negotiations were ongoing. Marino Affidavit, ¶7.  Barton even went so far as to reassure plaintiff by signing and endorsing a note in October 2007 stating "Daniel Marino co-authored, co-produced & co-owens [sic] '*Club Girl* & *Bad Girl*.'" Barton Note to Marino – Oct. 2007; Marino Depo., pp.492–93 (recounting Barton saying "yeah, sure, it is your song, and he signed it for me").

Up until Barton disappeared in 2009, Plaintiff was told repeatedly by Barton that the splits were being worked out by lawyers and that the money was in in trust. Marino Affidavit, ¶7; Amended Complaint, ¶391.  Marino chose not to proceed with legal action because Barton, his best friend and business partner, assured him everything was being worked out, as did the man he believed was his publisher, Tommy van Dell. Relying on the continued assurances of these two men was objectively reasonable.

Plaintiff never received any lump sum payment[12] or full royalties for his role as a producer, or for his role in writing *Club Girl* and *Bad Girl*—facts which are, as far as Plaintiff knows, undisputed by the parties.

---

[10]  Marino Depo., at p.473.

[11]  The Court found that Plaintiff received royalties for his work as a musician on *Bad Girl*. SJ Opinion, p.4. There seems to be a misunderstanding on the Court's part because musicians, unless also a songwriter, do not receive royalties. Thus, when Barton gave money to Marino, and Marino understood it to be mechanical royalties, Marino Depo., p.270–72, those royalties could only have been for being a songwriter.

[12]  The Court found that: "Once the UW Agreement was executed, Barton, Guice, and Plaintiff each received a lump sum payment." SJ Opinion, p.3. The Court fails to offer a citation to the record

After the album was released—and while reassuring Plaintiff about the credit issue—defendant van Dell, Guice, and Barton engaged in blatantly illegal conduct behind Plaintiff's back. Despite van Dell acknowledging to Plaintiff that the writing credits were wrong, and assuring Plaintiff that the writing credits were being fixed (Marino Depo. at 403–05; Marino Affidavit, ¶4) van Dell's company, defendant IN2N, misregistered the copyright for *Club Girl* and *Bad Girl* in 2004, falsely representing to the Copyright Office that only Guice and Barton had written *Club Girl*.[13] See Copyright Registrations for *Club Girl*, *Bad Girl*. It should be noted that under the Copyright Act, such an act is subject to criminal penalties. See 17 U.S.C § 506(e). Later, *Bad Girl* was similarly misregistered by IN2N, see Copyright Registrations for *Club Girl*, *Bad Girl*, although it took years following the release of *Confessions* to figure out the appropriate credit splits. Marino Affidavit, ¶7; Collins November 2005 Invoice.

It is important to view these illegal registrations alongside Guice and Barton signing the secret publishing deals with IN2N, and their later UW Agreement with Usher; both claimed more credit than they were due under the trio's oral songwriting agreement. This illegal and fraudulent registration shows that all defendants at all points intended to completely divest Dan Marino of any claim in his own work by assigning his rights away and taking his credit.

The record is thus explicitly clear that van Dell, Barton, and Guice were all fully aware of Marino's role in writing *Club Girl* and *Bad Girl* and, in concert, deliberately robbed Marino of credit and payment by filing a false copyright registration and signing void contracts.

---

for this assertion. Plaintiff has no idea where the Court conjured this conclusion from. Plaintiff had no idea the UW Agreement existed until discovery was conducted, and there is simply no evidence whatsoever that a lump sum payment was ever made to Marino. It was an abuse of discretion and reversible error for the Court to find as it did, and shows a lack of familiarity with the most basic facts of this case.

[13] The Court found that defendant Barton registered the *Club Girl* copyright. SJ Opinion, at p.2. It is undisputed that IN2N, Tommy van Dell's company, actually registered the copyright. See Copyright Registration for *Club Girl*, *Bad Girl*. For the Court to essentially create this "fact" out of thin air is manifestly reversible error, as was the finding that defendants van Dell and IN2N did nothing wrong.

## IV.   Legal Standard for Summary Judgment

Under Rule 56(f) summary judgment may be granted for a party, "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There must be an absence of any genuine issue of material fact. <u>See</u> Celotex, 477 U.S. at 323. An issue is material only if it could affect the result of the suit under governing law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The facts must be viewed "in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. <u>Hugh v. Butler Cnty. Family YMCA</u>, 418 F.3d 265, 267 (3d Cir. 2005). Summary judgment is only appropriate if the party in entitled to judgment as a matter of law. <u>See</u> <u>Celotex</u>, 477 U.S. at 322; <u>Wisniewski v. Johns-Manville Corp.</u>, 812 F.2d 81, 83 (3d Cir. 1987).

*****

## V.   Argument

### a. Even if All Copyright Infringement Claims Fail, New Third Circuit Precedent Requires this Case Be Sent to a Jury

The Court cites in its Summary Judgment Opinion a recently decided Third Circuit copyright case for the proposition that an attempt to convey an exclusive license results in the conveyance of only a nonexclusive license, defeating Plaintiff's copyright claims.[14] Brownstein v. Lindsay, 742 F.3d 55, 68 (3d Cir. 2014). This case was decided after Summary Judgment had been briefed by the parties. The Third Circuit has observed that this is the first time it has "faced a joint authorship claim squarely on the merits." Id. at 64. Plaintiff suggests that the Court has completely missed the point of Bernstein and the huge implications it has for this case.

In short, Bernstein is directly on point and unequivocal supports the idea that Plaintiff has valid claim for coownership and an accounting against all defendants. Furthermore, there is no statute of limitations bar to plaintiff's coownership and accounting relief. Given this, the case must proceed to trial against all defendants, including Mr. Guice, to determine the extent of Plaintiff's rights.

**Bernstein's Holding Means that Plaintiff is Entitled to a Jury Trial for a Determination of Ownership and an Accounting from All Defendants**

The Third Circuit stated in Bernstein that joint authors who license a work must account to their coauthor for all profits derived from that license:

> With respect to licensing a joint work, each co-author is entitled to convey non-exclusive rights to the joint work without the consent of his co-author. 1 Nimmer on Copyright § 6.10. See Davis, 505 F.3d at 98-100. The only caveat is that the licensing author must account to his co-author for his fair share of profits from any non-exclusive license. 1 Nimmer on Copyright § 6.12.

---

[14] Plaintiff respectfully disagrees with the Third Circuit on this point. The Third Circuit cites to dicta in Davis. v. Blige for the proposition that an invalid exclusive license becomes a nonexclusive license. In fact, Davis v. Blige's holding was on a different basis altogether, one that Plaintiff believes is logically sound. See Part V.B. Moreover, courts have mocked the idea that an exclusive license can simply morph into a nonexclusive license: it is illogical that "a nonexclusive license should function as a sort of consolation prize for [the] failure to successfully secure an exclusive license." Weinstein Co. v. Smokewood Entm't Grp., LLC, 664 F. Supp. 2d 332, 345 n.9 (S.D.N.Y. 2009). To the extent law in the Third Circuit disagrees with Weinstein, it should be changed.

Brownstein, 742 F.3d at 68.

Plaintiff, the Court held, is a joint author of *Club Girl* with Dante Barton and Wil Guice, a fact which is not in dispute. SJ Opinion, at pp.1–2, 7–8 ("Plaintiff created the basic melody, chord progressions, and tempo; Plaintiff and Barton recorded the song; Barton created the "beat"; and Guice wrote the lyrics and reworked the melody."). The Court has also held that a nonexclusive license was granted by Guice and Barton to the other defendants in the case. Id. at 9–12. Thus, it is plain that a jury should determine Dan Marino's ownership interest in *Club Girl*, and that defendant Guice and Barton owe Plaintiff an accounting for all their profits,[15] in an amount to be determined by a jury.

But Brownstein goes much further than merely stating that Plaintiff is owed an accounting by his joint authors, Guice and Barton. Brownstein also addresses derivative works made with the underlying work. The Court held that with respect to derivative works:

> [E]ven if [a plaintiff] is not a co-author of some of the derivative versions of [the underlying work], he remains the co-author of the underlying work and has an ownership interest in derivative versions of the [the underlying work] to the extent that they incorporate the underlying work. **The extent of [plaintiff]'s authorship and ownership of these derivative works is a factual question that must be decided by a jury.**

Brownstein, 742 F.3d at 68 (emphasis added). Moreover, the Brownstein court holds that nonexclusive licenses, like the ones Guice and Barton granted to the other defendants, have no effect on Plaintiff's copyright ownership.

It is undisputed that the musical composition of *Club Girl*, the song which Plaintiff coauthored, was used to create *Bad Girl*. Therefore, Brownstein unambiguously requires that a jury trial take place against Mr. Guice, and all defendants, to determine the extent of plaintiff Dan Marino's "authorship and ownership" of *Club Girl* and *Bad Girl*, and the subsequent accounting that he should be owed from Mr. Guice, and all defendants. Moreover, defendants registered and

---

[15] Plaintiff explicitly requested an accounting from all defendants in his Complaint. See Amended Complaint, ¶¶446–49. The Court dismissed that claim, holding that it was preempted by the Copyright Act. Plaintiff also specified that he was requesting an accounting in his relief requested, and also asked for injunctive relief that Plaintiff be found an author of *Club Girl* and *Bad Girl*. Id. at ¶¶497–98, 500.

exploited a sound recording of "*Bad Girl*"[16] which uses Plaintiff's musical composition and sound recording that he personally wrote, recorded, played, engineered, and produced; a jury determination of ownership and an accounting with respect to that sound recording is also necessary.

It is crucial that all defendants be kept in this case for the purpose of determining ownership and an accounting: Guice and Barton have taken huge amount of credit and benefits clearly attributable to Plaintiff's ownership claims; van Dell and IN2N are the publishers who receive part of the royalties and other monies attributable to Plaintiff's ownership stake; Sony actually pays the mechanical royalties to songwriters and is thus necessary to this case; Usher's company, Fast Pace, is the production company and it has received monies attributable to Plaintiff's; and all other defendants because they necessarily retain part of Plaintiff's rights.

To the extent this Court has dismissed those defendants, perhaps in the mistaken belief that they are not necessary to an accounting, Plaintiff notes that the court has not yet issued a Rule 54(b) order finalizing their dismissal, and that the Court may revise its order at any time. See Fed. R.C.P. 54(b). The Court commented in its SJ Opinion that it believes those moving Defendants did nothing wrong. SJ Opinion, at p.14. Plaintiff strongly disagrees with that conclusion; but whether they did anything wrong is irrelevant. Liability for the use of another person's work under Copyright Law, whether infringement or for an accounting, is based on strict liability. Given that there is no actual dispute about whether Plaintiff is an owner of the underlying copyrighted work (*Club Girl*),[17] and there is a factual question regarding how much of the derivative work, *Bad Girl*, Plaintiff owns, all defendants must be kept in this case and to dismiss them is reversible error. Plaintiff encourages the Court to revise its order as there are clear factual issues indicating that Defendants are clearly liable to Plaintiff for coowner and accounting relief.[18]

---

[16] The Court's SJ Opinion claims that there is no sound recording of *Bad Girl*. SJ Opinion, at p.13. Plaintiff is not sure what the basis for this conclusion is, as the Copyright Office lists a sound recording registration for *Bad Girl* (Reg. No. SR0000354784) and a sound recording for the *Confessions* album (Reg. No. SR0000352165).

[17] Although even the Court acknowledges that the evidence overwhelming supports Plaintiff's position that he is the original author of *Club Girl*.

[18] Plaintiff in no way waives its alternative and supplemental arguments that Defendants committed infringement.

Given that there is no dispute that Plaintiff is a joint author of *Club Girl*, and there are factual disputes about how much of *Bad Girl* Plaintiff owns, and how much of an accounting Plaintiff is owed by all defendants, this case must go to trial against Guice, and all other defendants.

**The Statute of Limitations Does Not Limit Plaintiff's Recovery or Ownership Claim**

<u>Brownstein</u> adopts the express repudiation rule with respect to claims of joint authorship. 742 F.3d at 70. The express repudiation rule states that the Copyright Act's three year statute of limitations only begins to run against a joint author seeking to be declared a coowner when his coauthorship is ***expressly repudiated*** by another joint author. <u>Id.</u>

Here, Plaintiff's claim to be a joint author was never expressly repudiated, and thus there is no statute of limitations issue with respect to his request for an accounting. The Court noted in its Order denying Defendants' Motion to Dismiss (Doc. No. 42), that the "Parties do not dispute that Plaintiff co-authored the song" and that the statute of limitations would only be an issue if there was a question raised later in the litigation as to whether Plaintiff actually owns *Club Girl*. <u>Id.</u> at 6. This case is now at the summary judgment stage, and it is apparent that no defendant has managed to dispute that Plaintiff owns a third of *Club Girl*. The Court itself observed that the Plaintiff, Guice, and Marino agreed to "share songwriting credit if any of their co-authored songs became successful," and "Plaintiff created the basic melody, chord progressions, and tempo" for *Club Girl*, a joint work. SJ Opinion, at p.6. Moreover, there is no dispute that Plaintiff's joint authors never repudiated his joint authorship claim. Therefore, Plaintiff's ownership and accounting claims are not affected by the statute of limitations and he may recover an accounting back to the release of *Bad Girl* in 2004.

Plaintiff also notes that to the extent the other defendants in this case failed to raise Plaintiff's coownership and accounting claims, they have waived the right to oppose them and they must face a trial by jury.

*****

### B. IN THE ALTERNATIVE, ALL THE CONTRACTS AND LICENSES ARE VOID BECAUSE ALL DEFENDANTS CONSPIRED TO EXTINGUISH PLAINTIFF'S COPYRIGHTS

Defendant Guice and defendant Barton represented to their partner, Daniel Marino, that any collaborative work between the three would result in equal songwriting credit, and coproduction credits split between Marino and Barton. Instead, Guice and Barton entered into a series of illegal contracts, and misregistered a copyright, demonstrating that they never intended to be bound by the trio's original agreement. Under the reasoning of Davis v. Blige, the joint authorship of *Club Girl* must be declared void, as well as every contract Guice and Barton entered into, because they were part of a scheme to extinguish Plaintiff's copyrights.

**Legal Standard**

Copyright infringement is, at its most basic, the use of someone else's protected expression without permission. See Davis v. Blige, 505 F.3d 90 (2d Cir. 2007). In Davis v. Blige, a coauthor of a joint work sued several third party defendants for infringement. Another co-author tried to undermine the suit by retroactively authorizing the use of the work by the defendants. Id. at 91. The Second Circuit was concerned that permitting such an authorization would immunize infringers from liability after they had already impermissibly used copyrighted material, because it would extinguish the property rights (the right to sue) of a copyright holder. The Second Circuit therefore held that because retroactive licensing extinguishes some of a copyright holder's copyrights, it is therefore invalid and cannot be used as a defense to copyright infringement. Id. at 109.

Although the instant case is not specifically about retroactivity, the broader principle at work in Davis is that bad actors should not be allowed to act in such a manner as to try to extinguish a copyright holder's copyrights. This logically must apply even to joint authors when one joint author becomes a joint author but intends to deliberately take a coauthor's credit and royalties and extinguish his copyrights.[19]

---

[19] Plaintiff understands that Brownstein has held that a copyright owner's actual copyright is not technically extinguished by an invalid exclusive license because it becomes an implied nonexclusive license. Brownstein, 742 F.3d at 68. Plaintiff first disagrees with this statement of the law and

Plaintiff understands that <u>Brownstein</u> has observed in dicta that a copyright owner's actual copyright is not technically extinguished by an invalid exclusive license that impermissibly attempts to transfer Plaintiff's rights because it becomes an implied nonexclusive license. <u>Brownstein</u>, 742 F.3d at 68. Plaintiff first disagrees with this statement of the law and suggests the Court follow <u>Weinstein</u>, *supra*, which observes that a failure to convey an exclusive license should not result in a "consolation prize" nonexclusive license. Plaintiff also asserts that in cases involving astounding levels of conspiracy and deceit, such as when *both the licensor and licensee defendants* engage in a deliberate conspiracy to take credit for plaintiff's work and attempt to transfer his exclusive copyrights, all contracts and joint authorship agreements should be invalidated and Plaintiff should be held to hold an undivided interest in his portion of the underlying work, and he should be allowed to sue all defendants for infringement.

### APPLICATION

The case before the Court is closely analogous with <u>Davis</u>, as Mr. Guice, Mr. Barton, and and Mr. van Dell—and all other defendants—conspired to deprive Plaintiff of all property rights in *Club Girl/Bad Girl*. Every agreement or license that allowed Defendants to achieve this goal must be declared void—including the joint authorship agreement, the Publishing Agreements, and the UW Agreement—as they were part of a conspiracy to exploit and extinguish Plaintiff's copyrights.

Guice, Barton, and Plaintiff entered into an oral collaboration agreement wherein each songwriter was supposed to receive equal songwriting credit, and Barton and Marino were supposed to split the producing credits. Marino Depo, pp.137–38. However, Guice and Barton never honored this agreement, as shown by their entering into publishing agreements that transferred fifty percent of *Club Girl* to IN2N and van Dell. <u>See</u> IN2N Co-Publishing Agreements. This impermissibly contracted away all of Plaintiff's monetary interest and also attempted to extinguish his copyrights. Barton and Guice then signed a contract with Usher taking more credit

---

suggests the Court follow <u>Weinstein</u>, *supra*. Plaintiff also asserts that in cases involving astounding levels of conspiracy and deceit, such as here, that such bad acts, when committed in concert by *both the licensor and licensee defendants*, should be held to invalidate all contracts and joint authorship agreements.

than they were due under their songwriting agreement with Marino, and also gave Usher the purported **_exclusive_** rights to distribute and use the songs. See UW Agreement. This agreement obviously impermissibly attempted to contract away Plaintiff's rights. Following the signing of these contracts, IN2N then fraudulently registered _Club Girl_ so that it appeared that Guice and Barton authored 100% of the song—excluding Marino. See Copyright Registration for _Club Girl_, _Bad Girl_. IN2N also fraudulently registered _Bad Girl_, excluding Marino. Id.

It is one thing if a joint author attempts to license a work he helped write to someone else and does not properly do it. It is another thing entirely when the defendant licensor (Guice, Barton) deliberately take their co-author's credit and then, with the knowledge of the licensees (van Dell, IN2N, Usher, etc.) attempt to transfer all of the of the coauthor's copyrights away. Copyright law should not sanction blatant fraud and permission to use a copyright should not be allowed when it was obtained by fraudulent means.

Thus, under Davis v. Blige, when defendants engage in a concerted and fraudulent scheme to divest Plaintiff of his valid copyrights, all joint authorship agreements, contracts, and licenses that are a product of that fraudulent activity should be declared void. Thereafter, Plaintiff should retain sole ownership over his contribution to the previous joint work, and should be allowed to sue all defendants for copyright infringement.

*****

**c.** In the Alternative, Defendant Guice is Liable for Copyright Infringement Because *Club Girl* is Not a Joint Work and the Use of Plaintiff's Musical Composition was Not Authorized

**Legal Standard**

The Copyright Act defines a joint work as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. It is crucial to realize that the intent the works be merged must be held **at the time a plaintiff is actually creating the work**. See Shapiro Berstein v. Vogel, 161 F.2nd 406 (1947); Brownstein v. Lindsay, 742 F.3d 55, 68–69 (3d Cir. 2014) (explaining a joint work exists only "if Person A writes lyrics to a song and intends for a composer to write the score, Person B who writes the score becomes a co-author in the work"). If a work is independently composed and copyrightable, but then later merged with another author's work into a single work, the resulting product is not a joint work, but a "composite" or collective work. Edward B. Marks Music Corp. v. Jerry Vogel Music Co., 140 F. 2d 266, 267 (2d Cir. 1944); 17 U.S.C. §§ 101, 304 (recognizing composite and collective works other than joint works); see also Thomson v. Larson, 147 F.3d 195 (2d Cir. 1998). A joint work is distinguished from a composite work by the degree of ownership each author retains; specifically, coauthors of joint works are entitled to undivided ownership in the entire work and can authorize the use of their work, Brownstein, 742 F.3d at 64, while the owners of a collective work simply own only their distinctive parts of the copyright and cannot authorize the use of the whole work. 17 U.S.C. § 201.

An author may orally authorize the use of his work with an implied license, but the licensee must actually request that the licensor create the work for the licensee's use. Weinstein Co. v. Smokewood Entm't Grp., LLC, 664 F. Supp. 2d 332, 344 (S.D.N.Y. 2009). In addition, although the Court found that Plaintiff had granted an implied license to defendants to use his work, by virtue of having worked with them, Plaintiff disagrees entirely with that statement of the law. If compensation, benefit, or credit is clearly expected from the conduct and words of the parties in exchange for an implied license, and the alleged licensee provides absolutely no compensation, benefit, or credit to the alleged licensor, then any license or authorization to use the work is totally null and void. Plaintiff draws support from this statement from the cases the Court cited in its SJ Opinion. SJ Opinion, at p.11. Notably, in nearly every single case the Court cited in its SJ Opinion

to support the idea plaintiff gave an implied license to defendants to use his work, all of them had actually fully compensated or credited in some way the plaintiff.[20] Thus, the case law is clear that the grant of an implied license in the contingent on receiving the initially expected consideration.

If there is no valid implied license, even a person also credited on a collective work can be liable for infringement if he purports to use and authorize the use of another author's copyrighted work.

### Application

There is copious evidence that plaintiff Daniel Marino, at the time he originally created the musical composition underlying *Club Girl*, did not have the intention that his music be merged with any other work. Marino Depo., at pp. 135–37. Plaintiff created the music for *Club Girl* on his own, as a standalone song, and only later brought that music to the attention of Guice and Barton who, after hearing the material, voiced a desire to add to the material. Id. at pp.102:15–103:24, 104, 135–37. Given this evidence, there is a factual dispute for the jury about whether Plaintiff is the sole author of the underlying musical composition in *Club Girl*, and whether *Club Girl* is a joint or collective work under the Copyright Act.

Furthermore, Plaintiff, as sole author of the musical composition of *Club Girl*, did not grant any implied license to Mr. Guice to use his musical composition in the collective work named *Club*

---

[20] In almost every single case the Court cites for the proposition that Plaintiff granted an implied license to defendants, the person who granted an implied license was actually paid for his work. MacLean Assoc., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc., 952 F.2d 769, 778–79 (3d Cir. 1991) (plaintiff gave implied license because he distributed his work to the defendants in return for payment); Nat'l Ass'n for Stock Car Auto Racing, Inc. v. Scharle, 184 F. App'x 270, 275 (3d Cir. 2006) (plaintiff gave implied license to his work because he was paid for his work and continued to create the work after being told he would not be credited); I.A.E., Inc. v. Shaver, 74 F.3d 768, 776 (7th Cir. 1996) (plaintiff gave implied license because he received compensation for his architectural drawings); see also Effects Associates, Inc. v. Cohen, 908 F.2d 555 (9th Cir. 1990) (widely cited case—plaintiff gave an implied license because he received over $50,000 for the work he gave defendants). The one exception is Lowe v. Loud Records, No. 01-1797, 2003 WL 22799698 (E.D. Pa. Nov. 20, 2003), where the plaintiff was not paid but only because the Plaintiff in that action stated explicitly that he had created the work voluntarily ***and that he expected nothing in return his work***. Id. In this case, there is copious evidence that Daniel Marino expected payment and credit from the very beginning, that it was the understanding of all parties that each individual was to be paid and credited, and furthermore that all writers and producers were actually credited and paid for their work except Marino.

*Girl*. It is a question of fact for the jury to determine whether there was any implied license given to use Plaintiff's work, as Plaintiff did not receive his expected compensation under the song writer agreement.

**First**, it is undisputed that Mr. Guice did not request that the work be made, as required for an implied license. See Weinstein Co. v. Smokewood Entm't Grp., LLC, 664 F. Supp. 2d 332, 344 (S.D.N.Y. 2009) (stating that implied license can only exist if licensee [Guice] requested the work in question be made). **Second**, Plaintiff only allowed defendant Guice to use his work with the clear understanding that he was to receive credit and remuneration for the use of his work. Marino Depo., pp.137–38 (stating that the explicit deal between each contributor was that each would receive 33% credit for their work, and that Barton and Marino would split the producing credits). Shockingly, Mr. Guice professes ignorance of Marino's exclusion, but the evidence is clear that from early in this dispute defendant Guice intended to take Plaintiff's credit and royalties, as evidenced by the publishing contract he signed with van Dell, and the UW Agreement he signed with Usher. See IN2N Co-Publishing Agreements; UW Agreement. Especially revealing is that Mr. Guice claimed producer royalties despite knowing that it was actually Marino who produced the song with Barton, and that Guice had no involvement with the production of *Club Girl* and *Bad Girl*. Guice Depo. II, p.52; Marino Depo., at pp.346–351. Given that there is more than enough evidence to raise a material factual dispute about whether Guice deliberately took Plaintiff's share of the producer royalties and part of the songwriting credit and royalties—and thus voided any implied license—this case must go to a jury.[21]

That any implied license from Plaintiff to defendant Guice for the use of Plaintiff's work is void is only common sense. Every case finding the existence of an implied licenses from a plaintiff to a defendant notes that the plaintiff either received expected compensation for his work, or never expected compensation in the first place. If a man walked into a Starbucks, ordered a coffee, and then walked out without paying when it was placed in front of him, could the man defend himself by claiming that Starbucks authorized him to take the coffee? Of course not; in the real world taking

---

[21] Against, Plaintiff is nowhere listed as an author of *Club Girl* or *Bad Girl*, and has received no remuneration for the use of *Club Girl* and *Bad Girl*, he did not give authorization to defendant Guice to use Plaintiff's work, implied or otherwise. As Plaintiff pointed out in an earlier brief, authorization to use Plaintiff's work is entirely contingent on consideration for that work actually being received. Page 147, 171 Marino Depo., pursuant to the explicit deal between Guice, Barton, and Plaintiff.

someone's stuff without payment is called theft. The result cannot be any different in copyright law; the contrary position defies logic and makes for horrible public policy.[22] If an implied license is valid under these circumstances, then there is absolutely nothing to stop a licensee from promising compensation to a licensor, withholding it when the project is finished, and then claiming copyright law actually protects the bad actor. This is not fair and it is not just.[23]

Finally, because Defendants, including Guice, attempted to extinguish all of Plaintiff's copyrights, as delineated in Part V.B, any implied licenses must be declared void. When Defendants engaged in a concerted course of action to extinguish Plaintiff's copyrights, then it is wholly disingenuous for them to later state that Plaintiff 's coauthors implicitly licensed them to use Plaintiff's rights—the very rights they attempted to deprive him of.

The evidence indicates that *Club Girl* is not a joint work, that defendant Guice deliberately and illegally took credit and royalties for Plaintiff's musical expression in *Club Girl*, and *Bad Girl*, and that Guice thus voided any implied license he had been given to use that work. There are therefore material questions of fact that allow a factfinder to find Guice liable for direct copyright infringement and this case should proceed to a jury.

*****

---

[22] To the extent that the law currently supports the idea that authorization can be obtained even if the authorizee deliberately withholds the due consideration, it should be changed.

[23] Furthermore, to the extent it is considered that contract law is the proper way to address these concerns, such a position is demonstrably incorrect. An implied license arises explicitly under copyright law, and is a creature of copyright law. Whether or not that implied license is valid or invalid must be decided under copyright law, not contract.

## VI.   Wil Guice Breached His Contracts with Plaintiff

**Legal Standard**

The elements of breach of contract require Plaintiff to prove (1) a contract exists between Guice and Plaintiff, (2) that Guice breached a duty imposed by the contract, and (3) that breach caused damages to Marino. J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc., 792 A.2d 1269 (Pa. Super. 2002). An implied in fact contract can be implied by the conduct of the parties. Id.

**Application**

Plaintiff, Wil Guice, and Dante Barton had a songwriting agreement by which they agreed that any work resulting from the collaborative effort of the trio would be split three ways. Pursuant to that agreement, Guice, Barton, and Plaintiff, wrote and produced a song named *Club Girl*. Defendant Guice, although he had contracted to give Plaintiff 33% credit and compensation for the use of *Club Girl*, breached the songwriting agreement by going behind Plaintiff's back with Dante Barton and signing publishing agreements taking part of Plaintiff's interest for himself and giving the rest away to IN2N and Tommy van Dell. Furthermore, Guice received pecuniary benefit from this publishing agreement, at Plaintiff's expense. Guice then breached the contract again by going behind Plaintiff's back with Barton and signing a contract with Usher and his label, taking 37.5% royalty credit in the song *Bad Girl*, as did Dante Barton. Barton and Guice received 75% credit for *Bad Girl* while Plaintiff received nothing. Later, Guice was aware of IN2N misregistering the copyright in *Club Girl* to exclude Marino, giving Guice more credit than he was due. This also breached the contract and has materially harmed Plaintiff.

The statute of limitations is no bar to this claim. Plaintiff was deliberately misled by Guice, and Barton for years as to the truth of his lack of credit. Plaintiff had no idea until 2009 that Guice had potentially breached the contract, and did not know the extent of his bad faith until the other defendants revealed the publishing agreements and UW Agreement during discovery. Therefore there are material disputes of fact that require this breach of contract claim to go to a jury.

## VII.  Conclusion

Plaintiff asks for judgment in its favor.


*****

*Respectfully submitted,*

## Francis Alexander, LLC

*/s/ Francis Malofiy*
Francis Malofiy, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 105
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*

*/d/ June 6, 2014*

# Certificate of Service

To all counsel of record and parties.

*****

*Respectfully submitted,*

## Francis Alexander, LLC

*/s/ Francis Malofiy*
Francis Malofiy, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 105
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*

*/d/ June 6, 2014*