## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
DANIEL V. MARINO,                                   :
                                                    :
                             Plaintiff,             :    11 Civ. 6811 (PSD)
                                                    :
                    v.                              :    **DECLARATION OF**
                                                    :    **JONATHAN D. DAVIS**
USHER (a/k/a Usher Terry Raymond IV); SONY          :
MUSIC ENTERTAINMENT; EMI APRIL MUSIC,               :
INC.; EMI BLACKWOOD MUSIC, INC.; JAMES              :
SAMUEL HARRIS III; TERRY STEVEN LEWIS;              :
BOBBY ROSS AVILA, JR.; ISSIAH AVILA, JR.;           :
WILLIAM C. GUICE; DANTE E. BARTON;                  :
DESTRO MUSIC PRODUCTIONS, INC.;                     :
DEFENDERS OF MUSIC; FLYTE TYME                      :
TUNES; SUBLIME BASEMENT TUNEZ; UR-IV                :
MUSIC, INC.; WARNER-TAMERLANE                       :
PUBLISHING CORP.; MARK PITTS; BYSTORM               :
ENTERTAINMENT; TOMMY VAN DELL; and                  :
IN2N ENTERTAINMENT GROUP, LLC,                      :
                                                    :
                             Defendants.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JONATHAN D. DAVIS declares as follows:

1.  I am the sole shareholder of Jonathan D. Davis, P.C. (the "Davis Firm"), attorneys for Defendants Usher Raymond IV a/k/a Usher, Sony Music Entertainment, EMI April Music Inc., EMI Blackwood Music Inc., Warner-Tamerlane Publishing Corp., UR-IV Music, Inc., Bystorm Entertainment, Mark Pitts, Issiah Avila, Bobby Ross Avila, Sublime Basement Tunez, Defenders of Music, Flyte Tyme Tunes, James Samuel Harris III, and Terry Steven Lewis (collectively, the "Moving Defendants") in the above-captioned action.  I am fully familiar with the matters set forth herein.

1

2.  I submit this declaration in support of the Moving Defendants' motion, pursuant to Fed. R. Civ. P. 54 and 17 U.S.C. § 505, for an order directing Plaintiff Daniel V. Marino to pay the Moving Defendants their costs, including reasonable attorney's fees that they incurred as the "prevailing parties" in this copyright action (the "Motion for Costs and Fees").  Excluding the costs of this motion, the Moving Defendants seek costs, including reasonable attorney's fees, totaling $1,525,301.85.

3.  The Moving Defendants will submit their costs, including reasonable attorney's fees, for this Motion for Costs and Fees in their response to Plaintiff's anticipated opposition to this motion.

## BACKGROUND

4.  On October 28, 2011, Plaintiff commenced this action by filing a complaint, which was amended the following month.  (Doc. Nos. 1 and 2.)

5.  The Amended Complaint consisted of 505 paragraphs and purportedly alleged claims against the Moving Defendants for direct and vicarious copyright infringement, an accounting, and a constructive trust concerning the musical composition and sound recording for *Bad Girl*.  On May 21, 2014, the Court dismissed the Amended Complaint against the Moving Defendants.  (Doc. No. 155.)

6.  In the Amended Complaint, Plaintiff alleged that in 2003 he and Defendants Dante Barton and William Guice co-wrote *Club Girl* and he and Barton co-produced that work. Plaintiff also claimed that, even though he participated in the creation of the derivative work, *Bad Girl*, he was denied credit as a co-author, co-producer, and co-owner of both *Club Girl* and *Bad Girl*.

7.   Plaintiff's lawsuit against the Moving Defendants was doomed from the start and should never have been filed against them.  Plaintiff admitted in his pleadings and during his deposition that he was a co-author of *Club Girl* together with Barton and Guice.  As this Court remarked, "Plaintiff repeatedly admits the 'fundamental truth' that 'Club Girl' was jointly created."  (Doc. No. 154 at 7.)

8.   Plaintiff's admission that he co-authored *Club Girl* barred him from arguing that Barton and Guice could not, without his consent, exploit *Club Girl*, or create derivative works of *Club Girl*.  The copyright law is unambiguous:  absent a written agreement to the contrary, a copyright co-owner can authorize the use of a joint work by a third party.  (*See id*. (remarking that "Plaintiff's response to this dispositive point is not intelligible[.]").)

9.   Indeed, this Court recognized that "Barton and Guice each had the authority to grant a non-exclusive license to a third party [to exploit *Club Girl*] without Plaintiff's consent," and even if they had attempted to convey an exclusive license, the Third Circuit has foreclosed the argument that it would nullify any license to a third party.  (*Id*. at 9-10.)

10. Because Plaintiff was blind to the facts he alleged, and uninformed about or indifferent to the controlling law, he sullied the reputations of well-known, respected, and commercially successful performers, musicians, and producers, as well as the prominent record and music publishing companies behind these professionals that have invested enormous time and money in developing their careers.

11. Plaintiff's reckless and baseless claims injured the reputations of Usher, James Samuel Harris III (p/k/a Jimmy Jam) and Terry Steven Lewis (an award-winning songwriting and producer team), as well as Bobby and Issiah Avila (also an award-winning songwriting and producer team).  The blemish Plaintiff placed on the Moving Defendants was wiped away only

when this Court awarded them a complete victory, dismissed the Amended Complaint in its entirety, granted judgment in their favor, and determined that the "[M]oving Defendants did nothing wrong." (*Id*. at 14.)

12. Had Plaintiff recognized from the start that he had no valid or meritorious claims against the Moving Defendants, they would have been spared this costly fiasco, which includes 175 docket entries covering, among other things:  eleven litigated motions, two petitions and three *pro hac vice* requests, forty docketed letters to the Court, and thirty-nine court orders.  This action also spawned twenty-three depositions in New York, Philadelphia, Los Angeles, and Denver; a court-mandated settlement conference sabotaged by Plaintiff;[1] and the retention by the Moving Defendants of multiple expert witnesses capable of providing opinions on various musicological and music production issues, music royalty accounting practices, and music industry customs and practices.  This lawsuit also forced the Moving Defendants to divert valuable time and effort from their usual business and personal activities to address the Plaintiff's serious but false accusations.

13. Throughout, Plaintiff's counsel subjected the Moving Defendants to unethical, outrageous, and humiliating conduct.  Plaintiff even explicitly sought Usher's economic ruin.  At one deposition, Plaintiff's counsel proclaimed he would take "every penny" of Usher's purported "$130 million" and the purported "$30 million [he makes] a year." (Doc. No. 102-7 (Guice Dep. Day 2) at 14.)  In short, this lawsuit was a nightmare for the Moving Defendants.

---

[1] After fact discovery ended, Magistrate Judge Timothy Rice held a settlement conference on August 29, 2013.  By then Plaintiff knew or should have known that his claims were meritless.  Yet, rather than lower the $2.5 million settlement demand Plaintiff made during the initial Case Management Conference – and despite this Court's decision severely limiting Plaintiff's potentially recoverable damages (Doc. No. 75) – Plaintiff increased his demand four-fold from $2.5 million to $10 million.

14. As this Court recognized, any claims that Plaintiff may have relating to *Club Girl* or *Bad Girl* lay against Barton and Guice, his co-writers, who failed to acknowledge Plaintiff's claimed participation in the creation of *Club Girl*, or to account to him for the money they received from the exploitation of *Bad Girl*.  This dispute was never more than a state law matter between Plaintiff and Barton and Guice.  But Plaintiff recognized that he could not recover from his economically challenged former partners, so he futilely expanded the scope of his lawsuit to include the Moving Defendants – whom he knew or should have known were not liable to him – in the hopes of achieving a financial recovery for himself.

15. Reasonable attorney's fees and costs are awarded to "prevailing parties" under the Copyright Act to deter improvidently filed actions and to create incentives for defendants to litigate meritorious defenses rather than to settle cases solely to avoid the inconvenience of litigation.  Congress recognized the financial burdens these types of cases impose upon litigants and the need to make whole those who are wrongly sued for their undeserved troubles in defending baseless lawsuits.

16. This Court should award the Moving Defendants their full costs, including attorney's fees, which total $1,525,301.85, exclusive of this Motion for Costs and Fees.  The costs and fees the Moving Defendants seek are reasonable and proportionate to the chaos Plaintiff forced them to endure unnecessarily for almost three years.  The Davis Firm's representation of each Moving Defendant required individual consideration, and the breadth of the work it performed for them varied based on whether they were an entity or individual as well as the nature of each defendant's alleged role in the claimed infringement.

17. The significant legal fees billed by local counsel, Fox Rothschild LLP ("Fox Rothschild"), are not sought by the Motion for Costs and Fees because the New York-based

Davis Firm is the "lead counsel" for the Moving Defendants and were required to engage local counsel to serve in that capacity.

## THE DAVIS FIRM

18. The Davis Firm handles all types of commercial litigation, but primarily litigates in the entertainment field, where it has prosecuted and defended copyright, trademark, contract, employment, and talent-related disputes in the music, publishing, theater, and motion picture industries.

19. Over the years, the Davis Firm has represented A-list recording artists and celebrities, personal managers, business managers, record companies, music publishers, and music producers, including Akon, Mary J. Blige, Sean "Diddy" Combs, Roger Daltrey, Carly Rae Jepsen, Carole King, Nas, Arista Records, Asylum Records, Bad Boy Records, Bertelsmann Music Group, Cash Money Records, Home Box Office, Inc., Sony Music Entertainment, Trackmasters, UMG Recordings, Inc., Warner-Chappell Music, Inc. and Warner Music Group.

20. The Moving Defendants agreed to pay the Davis Firm periodically based upon an agreed upon hourly rate for each attorney. The Moving Defendants also agreed to pay all costs and expenses incurred by or paid by the Davis Firm in the course of the representation (treated as disbursements on the Davis Firm invoices).

21. When preparing the invoices to the Moving Defendants, which are attached as Exhibit A, I exercised, to the best of my abilities, billing judgment so that the invoices would not contain any excessive, redundant, or otherwise unnecessary time-charges.

22. The invoices are redacted only to exclude matters protected by the attorney-client privilege and the work product doctrine and time-charges that the Moving Defendants do not seek to recover from Plaintiff, exclusive of the costs on the Motion for Costs and Fees. Those

redacted fees and costs arose primarily from the sanctions motion and hearings against attorney Francis Malofiy and the travel time and other costs incurred by counsel from travel between New York and Philadelphia.  The Moving Defendants have reduced the legal fees they seek to recover for each time entry containing a trip to or from the forum by two hours to account for that travel and excluded any lodging and meal charges.

      **(a)** **<u>Attorney Davis</u>**

23. I graduated from Villanova University School of Law in 1982.  I was admitted to practice law in the State of New York in March 1983 and in the State of New Jersey in December 1982.  I am admitted to practice law before the U.S. District Court for the Southern and Eastern Districts of New York, the U.S. District Court for the District of New Jersey, the U.S. Court of Appeals for the Second, Fourth, and Sixth Circuits and the United States Supreme Court.

24. In May 1993, following a brief association with another start-up firm, I established Jonathan D. Davis, P.C.  Before that, I served as an associate attorney at Gold, Farrell & Marks, a highly regarded entertainment litigation boutique that later merged with the national law firm.  I have been litigating copyright matters for nearly 29 years.  In that time, I served as lead or co-lead trial counsel to multiple entertainment companies and entertainers, and have represented clients in many cases with reported decisions concerning copyright and other entertainment-related issues.  I have continuously practiced law since my admission to the bar.

25. The time I spent on this lawsuit has been billed at the hourly rate of $500.00, which has remained constant throughout this case.  This rate is fair and reasonable and is equal to or less than the prevailing rate for intellectual property attorneys with my credentials, skills, and experience in New York City where I regularly practice law.  I am informed and believe that my

rate is a reasonable rate for attorneys in the Philadelphia legal community who have similar credentials, skills and experiences.  *See* Declaration of Michael Eidel, dated July 11, 2014 ("Eidel Declaration").  In 2013, my hourly rate increased to $600.00 per hour for new matters, but it was not changed for this case.

26. My hourly rate for this matter is within the range that the National Law Journal reports that Philadelphia law firms have charged for "partners."  (*See* Doc. No. 161-1 (the "2013 Billing Survey).)

27. The 2013 Billing Survey includes partner billing rates for eight Philadelphia law firms.  Of the rates reported by those firms, the lowest reported partner rate is $300.00 per hour and the highest partner rate is $1,050.00 per hour, with reported averages from $475.00 to $640.00 per hour.  My hourly rate falls squarely within the ranges Philadelphia firms charge for partner level attorneys.

**(b)  Attorney Williams**

28. Derek A. Williams, who is employed by the Davis Firm as Counsel, has worked continuously on this case.  He has substantially contributed to:  (i) the letters and motions that have been submitted to the Court, (ii) all phases of discovery, including the taking and defending of depositions, and (iii) the necessary preparation for court proceedings.

29. Mr. Williams graduated from the University of Pennsylvania Law School in 2000 and is admitted to practice law in New York and Illinois, and before the U.S. District Court for the Southern and Eastern Districts of New York.

30. Upon graduating from law school, Mr. Williams spent two years serving as a law clerk to the Honorable Deborah A. Batts in the United States District Court for the Southern District of New York.  In 2002 – shortly after his clerkship ended – he joined the Litigation

Department of Patterson Belknap Webb & Tyler LLP ("PBWT"), a full-service law firm in New York City where he worked until joining the Davis Firm in March 2010.

31. At the Davis Firm, Mr. Williams has focused his practice on entertainment and intellectual property law matters.  The Declaration of Derek A, Williams, which is attached hereto as Exhibit B, briefly describes Mr. Williams's credentials, skills, and legal experience.

32. Mr. Williams's time spent on this matter was billed at the hourly rate of $425.00.[2] Based upon the rates typically charged for intellectual property matters, Mr. Williams's hourly rate is fair and reasonable for an attorney with his credentials, skills, and experience in New York City where he regularly practices law, and, upon information and belief, in Philadelphia. *See* Eidel Declaration.

   **(c)  Attorney Guard**

33. Jessica L. Guard, who is an associate attorney at the Davis Firm, has been working on this lawsuit since March 2013 when she became employed.   Ms. Guard graduated from The Ohio State University, Moritz College of Law in 2010, where she served on the law review.   Before joining the Davis Firm, she worked as a litigation associate at Cadwalader, Wickersham & Taft, LLP.  Ms. Guard has performed a variety of tasks on this matter, including working on letters, motions, and discovery responses; document collection and production; legal research and brief writing; and development and execution of discovery and trial strategies.  The Declaration of Jessica L. Guard, which is attached hereto as Exhibit C, briefly describes Ms. Guard's credentials, skills, and legal experience.

---

[2]   Under the firm engagement letter with the Moving Defendants, Mr. Williams's time should have been billed at the rate of $425.00 per hour, but was mistakenly billed at $400.00 per hour. Beginning in October 2013, the correct rate was charged.  The Davis Firm did not rebill the Moving Defendants for the difference.

34. Ms. Guard's time spent on this matter was billed at the hourly rate of $340.00. Based upon the rates typically charged for intellectual property matters, Ms. Guard's hourly rate is fair and reasonable for an attorney with her background, skills, and experience in New York City, where she regularly practices law and, upon information and belief, in Philadelphia. *See* Eidel Declaration.

## THE DAVIS FIRM'S SERVICES

35. The Davis Firm began representing the Moving Defendants in or around January 2012, shortly after Plaintiff filed his Amended Complaint.  Because the Davis Firm represents fifteen of the Defendants, it assumed the lead role in defending the case, including, among other things, strategy, motion practice, letters to the Court, questioning of witnesses at depositions, and leading the sanctions hearing.  The legal fees and costs described below were billed by the Davis Firm to the Moving Defendants for this lawsuit.  The disbursements are expenses incurred on behalf of the Moving Defendants.  The hours spent and disbursements incurred by the Davis Firm were pursued and undertaken solely for the purpose of achieving a successful outcome in this case for the Moving Defendants.

36. Every phase of this lawsuit was made more difficult and costly because of Plaintiff's inflexibility, gamesmanship, and improper conduct.  Regardless of the task, from the simplest stipulations, to coordinating deposition schedules or agreeing upon responses to written discovery, to insuring that Plaintiff timely copied Moving Defendants with papers submitted to the Court, Plaintiff never made an easy time of it for defense counsel, preferring, instead, to incite disagreement with them, and to compel frequent contact with the Court to resolve unnecessary disputes.

37. Each of the litigation tasks reflected in the Davis Firm invoices were necessary to successfully defend the Moving Defendants against the Plaintiff's frivolous claims. Many of the tasks performed were made necessary by Plaintiff's surprising and improper conduct.

38. In the opening remarks to the January 6, 2014 sanctions hearing, the Court succinctly summarized some of the difficulties defense counsel endured because of Plaintiff's counsel:

> I issued an order on the 19th of November, setting up this hearing. I should point out that it was only after I set up the hearing, in preparation for this hearing today that I closely read, at least, some of the discovery in this case.
>
> Mr. Stretton, there are cases, as you know, where I always let the parties call me when they have a discovery dispute. I try to handle them right away and there are enormously complex cases with many lawyers, where I get no calls. And then there are cases where I get calls seemingly everyday. This was among the latter. *And in reviewing the transcript, I realized it was among the latter entirely because of your client, Mr. Malofiy.*
>
> His irrational, offensive behavior, his inability to respect the job of the other side, his seeming belief that he is on the side of the angels and anybody who tries to represent his client in opposition to Mr. Malofiy is somehow working for the devil.  * * *

(Sanctions Hearing Transcript, dated 1/6/14 at 2-3 (emphasis added), attached hereto as Exhibit D.)

39. Although Mr. Malofiy had more interaction with the Moving Defendants and defense counsel than his client, when Mr. Marino appeared for his deposition in June 2013, he exhibited behavior very similar to that of his counsel. At one point during his deposition, Mr. Marino addressed counsel for the Moving Defendants and said: "Mr. Davis, you are defending thieves and you are acting like somebody who should be hanging out with them at [this] point." (Doc. No. 105-5 (Marino Dep.) at 321.)   Later Plaintiff charged that the manner in which his

deposition was being conducted was "so untruthful, man, lying, stealing and cheating."  (*Id.* at 443.)  Then, addressing Mr. Davis, he said:  "You are a part of it.  You are making money on my song that was stolen from me."  (*Id.*)  Minutes later, Plaintiff parroted his attorneys refrain that Mr. Davis was trying to trick Plaintiff:  "It has be[en] a little bit tricky throughout the day with you."  (*Id.* at 448.)

A. <u>**The Pleadings And Key Motions**</u>

40. Putting aside the fact that Plaintiff failed to state a valid copyright claim against any of the Defendants, Plaintiff alleged state law claims that he knew or should have known were preempted by the Copyright Act.  The Moving Defendants moved under Fed. R. Civ. P. 12(b)(6) to dismiss the Amended Complaint.  The Court granted the motion in part, dismissing the accounting and constructive trust claims because they were preempted under the Copyright Act.  Absent Plaintiff's blindness to the facts and law, this motion would not have been necessary.

41. Believing the Court may have misapprehended the facts admitted in Plaintiff's Amended Complaint, as applied to the controlling law, the Moving Defendants filed a motion requesting the Court to reconsider its decision denying, in part, the motion to dismiss the Amended Complaint against the Moving Defendants.  The Moving Defendants took that additional step in the hopes of avoiding the extensive and costly discovery that was certain to ensue if the action continued.  Without opinion, the motion was denied by the Court during the scheduling conference on January 9, 2013.

42. Before the motion for reconsideration was decided, the Moving Defendants filed their Answer to the Amended Complaint.  The Amended Complaint consisted of 505 paragraphs, running 83 pages, with an additional 28 pages of exhibits.  The length of the pleading was

excessive and contained irrelevant and unnecessary allegations and information.  That Plaintiff did not comply with the command in Fed. R. Civ. P. 8 to provide "a short and plain statement showing that the pleader is entitled to relief" needlessly increased the time and expense the Moving Defendants expended in preparing their joint responsive pleading.

43. Unable to achieve an early dismissal of all of the claims, the Moving Defendants next sought judgment on the pleadings under Fed. R. Civ. P. 12(c) to the extent the copyright claims sought relief beyond the applicable three-year statute of limitations and to strike the demand for punitive and exemplary damages.  The Court granted the motion, which dramatically reduced the potential damages that Plaintiff could recover.

44. The Court's decision on the Rule 12(c) motion barred Plaintiff from seeking copyright damages prior to October 28, 2008 when the song *Bad Girl* would have enjoyed its strongest economic activity.  The decision also struck the demand for punitive and exemplary damages because such relief is not recoverable under the Copyright Act as a matter of law. Plaintiff knew or should have known that he overstated the scope and nature of the damages he could seek against the Moving Defendants.  Absent Plaintiff's blindness to the facts and law, this motion would not have been necessary.

45. Despite the Court having dismissed the bulk of Plaintiff's recoverable damages under the Copyright Act, Plaintiff disregarded this Court's Order, dated April 24, 2013, and submitted Michael Einhorn's financial expert report that sought damages and profits accruing before October 28, 2008.  The Moving Defendants moved to strike the report to the extent it exceeded the permitted potential damages and to exclude from evidence any expert testimony relating to damages or profits for the disallowed period.

46. The motion to strike was yet another instance where the Moving Defendants were compelled to react with motion practice because Plaintiff knowingly or recklessly ignored the facts or the law to overstate his case.  Absent such conduct, the motion to strike would not have been necessary.

47. After the close of discovery, the Moving Defendants moved for summary judgment on September 30, 2014.  (Doc. Nos. 102 *et seq.*)  It was a massive undertaking because it required the distillation and assimilation of thousands of pages of written discovery and multiple depositions to extract the undisputed facts that warranted judgment in the Moving Defendants' favor.  It also required extensive legal research on issues that were both simple and complex.  The initial submissions filled three large loose leaf binders and analyzed and discussed numerous legal issues.

48. Plaintiff saddled the Moving Defendants' with even more work on their motion by filing not one but two lengthy opposition briefs to the summary judgment motion.  One brief posed as a sur-reply when it was in reality an entirely new brief, making arguments that were never mentioned in the first brief.  The Moving Defendants' response to the sur-reply was almost as long as their original brief because of the breadth of the new material presented, all because of Plaintiff's intentional or reckless misstatement and misinterpretation the law.  If Plaintiff had limited his opposition to the summary judgment motion to a single submission and exercised discipline in the arguments he made, the Moving Defendants would not have incurred the substantial costs required to successfully defend themselves against Plaintiff's meritless copyright claims.

49. Recently, Plaintiff filed three baseless motions concerning the Court's dismissal of the Amended Complaint against the Moving Defendants.  Plaintiff moved for an order to

clarify the Order, dated May 21, 2014, regarding whether Moving Defendants' could now seek costs under § 505 of the Copyright Act (Doc. No. 156), and then moved for an order to correct the Court's "clerical mistake" in dismissing "all claims" against the Moving Defendants (Doc. No. 167), asserting the existence in the case of open "claims of ownership, an accounting, constructive trust, attribution, or other equitable relief …." (*Id.* at 2.)  Plaintiff also moved to strike the Moving Defendants' opposition to the second motion because it was filed in the form of a letter.  (Doc. No. 171.)  The Court summarily denied these motions.  (Doc. Nos. 157, 172 and 173.)  Absent Plaintiff's blindness to the facts and law, the Moving Defendants could have avoided incurring any legal expense in connection with these futile motions.

**B.  The Discovery**

50. The number of defendants named in this action and Plaintiff's inability to focus his case greatly increased the discovery costs and burdens upon the Moving Defendants and their counsel.  The Davis Firm represented 15 of the 20 named defendants.  In addition, because Plaintiff opposed bifurcating discovery, the Moving Defendants had to collect and produce documents and information regarding liability and damages.

51. The collection and production of documents was an enormous and burdensome undertaking, as Plaintiff's discovery requests were first sprung on the Moving Defendants on March 18, 2013, shortly before the depositions were ordered to begin in April 2013.   The requests were broad and unfocussed, resulting in objections by the Moving Defendants and the Court's intervention to rule on various aspects of the requested party and non-party discovery demanded by Plaintiff.  (*See* Doc. Nos.  82-87.)  In all, the Moving Defendants produced tens of thousands of pages of documents in a very short window, all of which were extensively reviewed

for responsiveness, redacted as necessary, stamped with productions numbers, and then produced.

52. Furthermore, Plaintiff's counsel noticed and deposed every party defendant and expert witness.  The Plaintiff's approach caused the Moving Defendants to incur substantial legal fees because the Davis Firm lawyers had to prepare for and attend those depositions.  In all, the following persons and entities were deposed by Plaintiff's counsel:

- Usher Raymond and UR-IV Music, Inc.

- Bobby Avila and Sublime Basement Tunez

- Terry Lewis and Flyte Tyme Tunes

- James Harris and Flyte Tyme Tunes

- Issiah Avila and Defenders of Music

- Thomas van Dell

- Wade Leak (Sony Music Entertainment)

- Thomas Pardo (Sony Music Entertainment)

- Vincent Famulari (EMI Blackwood Music Inc./EMI April Music Inc.)

- Gary Calderone (Warner-Tamerlane Publishing Corp.)

- Mark Pitts and Bystorm Entertainment

- William Guice

- Dante Barton

- Gary Cohen (economic expert for Moving Defendants)

- Johnny Wright (custom and practice expert for Moving Defendants)

- Lawrence Ferrara, PhD (musicology expert for Moving Defendants)

- Robert Allen (music valuation expert for Moving Defendants)

53. In addition, Plaintiff's counsel noticed and scheduled many third-party depositions, but never deposed any of these persons and entities:

- Serban Ghenea (music engineer)
- Matt Marrin (music engineer)
- John Hanes (music engineer)
- Village Recorders
- MixStar Studios

Even though none of these depositions were taken, Plaintiff's noticing of the depositions caused the Moving Defendants to spend substantial time and money scheduling and preparing for them.

54. In defending the Moving Defendants, the Davis Firm deposed the following persons:

- Daniel Marino
- Alexander Stewart (musicology expert for Plaintiff)
- Michael Einhorn (economic expert for Plaintiff)
- Brian Bricklin (engineering expert for Plaintiff)
- Simon Rosen (Plaintiff's alleged former lawyer)
- Wallace Collins (Plaintiff's alleged former lawyer)

55. In all, the Davis Firm deposed eight witnesses, including experts (*i.e.*, Marino, Guice, van Dell, Stewart, Einhorn, Bricklin, Collins and Rosen (by local counsel)) and defended the depositions of fourteen party witnesses and experts (*i.e.*, Raymond/UR-IV Music, Issiah Avila/Defenders of Music, Bobby Avila/Sublime Basement Tunez, Harris/Flyte Tyme Tunes, Lewis/Flyte Tyme Tunes, Leak/Sony Music Entertainment, Pardo/Sony Music Entertainment, Famulari/EMI Blackwood Music Inc. and EMI April Music Inc., Calderone/Warner-Tamerlane

17

Publishing Corp., Pitts/Bystorm Entertainment, Cohen, Wright, Ferrara, and Allen).   For the depositions, the Davis Firm had to review documents, court submissions and, in some cases, prior deposition testimony, to prepare the witness for his deposition or to depose the witness.

### SUMMARY OF FEES AND COSTS

56. The Davis Firm's legal fees and costs are detailed in the invoices that were prepared by it during the course of this action based on contemporaneous time records that were prepared by each attorney time-keeper.  *See* Exhibit A.[3]   The Davis Firm intends to supplement its submission with the legal fees and costs that have and will be incurred in connection with this motion, which are all recoverable under the law.

| Period | Hours/ JDD | Fees | Hours/ DAW | Fees | Hours/ JLG | Fees | Total Fees | Disbursemt. |
|---|---|---|---|---|---|---|---|---|
| Jan. 2012 | 17.3 | 8,650 | 4.8 | 1,920 | 0 | 0 | 10,570 | 0 |
| Feb. 2012 | 12.6 | 6,300 | 27.1 | 10,840 | 0 | 0 | 17,140 | 447.50 |
| March 2012 | 22.9* | 11,375 | 67.1 | 26,840 | 0 | 0 | 38,215 | 24.00 |
| April 2012 | 3.5 | 1,750 | 1.8 | 720 | 0 | 0 | 2,470 | 4.09 |
| May – July 2012 | 12.6 | 6,300 | 44.1 | 17,640 | 0 | 0 | 23,940 | 28.23 |
| Aug. – Sept. 2012 | 14.1 | 7,050 | 13.5 | 5,400 | 0 | 0 | 12,450 | 0 |
| Oct. 2012 | 60.5 | 30,250 | 53.6 | 21,440 | 0 | 0 | 51,690 | 0 |
| Nov. – Dec. 2012 | 14.9 | 7,450 | 23.9 | 9,560 | 0 | 0 | 17,010 | 24.27 |
| **Subtotal: 2012** | **158.4** | **$79,125** | **235.9** | **$94,360** | **0** | **0** | **$173,485** | **$528.09** |
| * This invoice contains one time-slip entry where Mr. Davis's time was billed at $450 per hour. | | | | | | | | |

---

[3] On any invoice where a time-charge entry is partially redacted and the hours and costs are replaced with new amounts, that reflects the Davis Firm's good faith attempt to apportion conservatively the hours attributable to the tasks for which legal fees are sought.  The result of the conservative apportionment is to reduce the overall amount of fees sought from Plaintiff.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Jan. 2013 | 62.3 | 31,150 | 42.60 | 17,040 | 0 | 0 | 48,190 | 0 |
| Feb. 2013 | 36.7 | 18,350 | 39.6 | 15,840 | 0 | 0 | 34,190 | 0 |
| March 2013 | 29.1 | 14,550 | 29.5 | 11,800 | 24.8 | 8,432 | 34,782 | 0 |
| April 2013 | 167.1 | 83,550 | 204.2 | 81,680 | 120 | 40,800 | 206,030 | 15,894.28 |
| May 2013 | 107.5 | 53,750 | 122.9 | 49,160 | 144.1 | 48,994 | 151,904 | 17,726.36 |
| June 2013 | 36.3 | 18,150 | 83.9 | 33,560 | 58.3 | 19,822 | 71,532 | 6,901.89 |
| July 2013 | 68.9 | 34,450 | 130.2 | 52,080 | 33.2 | 11,288 | 97,818 | 5,000 |
| Aug. 2013 | 78.7 | 39,350 | 198 | 79,200 | 110.7 | 37,638 | 156,188 | 9,458.89 |
| Sept. 2013 | 154 | 77,000 | 131.6 | 52,640 | 110.5 | 37,570 | 167,210 | 4,851.05 |
| Oct. 2013 | 74.6 | 37,300 | 106.6 | 45,305 | 118.8 | 40,392 | 122,997 | 11,448.19 |
| Nov. 2013 | 70.4 | 35,200 | 79.3 | 33,702.50 | 49.2 | 16,728 | 85,630.50 | 7,349.75 |
| Dec. 2013 | 24.5 | 12,250 | 38.1 | 16,192.50 | 0 | 0 | 28,442.50 | 0 |
| **Subtotal: 2013** | **910.1** | **$455,050** | **1,206.5** | **$488,200** | **769.6** | **$261,844** | **$1,205,094** | **$78,630.41** |
| | | | | | | | | |
| Jan. 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Feb. 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| March 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| April 2014 | .3 | 150 | 0 | 0 | 0 | 0 | 150 | 58,153.35 |
| May 2014 | 8.6 | 4,300 | 2.7 | 1,147.50 | 0 | 0 | 5,447.50 | 0 |
| June 2014 | 6.4 | 1,561 | 5.3 | 2,252.50 | 0 | 0 | 3,813.50 | 0 |
| **Subtotal: 2014** | **15.3** | **$6,011** | **8** | **$3,400** | **0** | **0** | **$9,411** | **$58,153.35** |
| | | | | | | | | |
| **Grand Total** | **1,083.8** | **$540,186** | **1,450.4** | **$585,960** | **769.6** | **$261,844** | **$1,387,990** | **$137,311.85** |

57. Exclusive of the legal fees on this motion, the Moving Defendants seek to recover legal fees of $1,387,990 and costs of $137,311.85 for an aggregate amount of $1,525,301.85. The disbursement costs include the cost of deposition transcripts/videos, expert fees, travel,

19

hotel, copying costs, Federal Express, compact discs and certified documents from the Library of Congress.

58. The Davis Firm made every reasonable effort to minimize the legal fees and costs incurred in the defense of this meritless copyright action.

## **CONCLUSION**

59. The Moving Defendants would not have incurred the legal fees and costs described above absent Plaintiff's blindness to the indisputable facts, and indifference or unawareness of the controlling law.

60. As the "prevailing parties" in this copyright action, the Moving Defendants should be awarded, pursuant to Fed. R. Civ. P. 54 and 17 U.S.C. § 505, their costs, including reasonable attorney's fees, in the aggregate amount of $1,525,301.85, subject to the supplementation of this Motion for Costs and Fees to cover the costs of making this motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at New York, New York, on July 11, 2014.


                                        /s/ Jonathan D. Davis
                                        JONATHAN D. DAVIS