# United States District Court
## Eastern District of Pennsylvania

Daniel V. Marino,
*Plaintiff*

v.

Usher, *et al.,*
*Defendants*

No.: 11-cv-06811

Before the Honorable
Paul S. Diamond

---

# Praecipe to Attach Verification and Exhibit to Plaintiff's Omnibus Response in Opposition to Moving Defendants' Motions for Costs and Fees

## To the Clerk of Court:

Kindly attach the following to Plaintiff's Omnibus Response in Opposition to Moving Defendants' Motions for Costs and Fees:

- Plaintiff Daniel Marino's Verification

- Deposition of Daniel Marino

*****

*Respectfully submitted,*
Francis Alexander, LLC

*/s/ Francis Malofiy*
Francis Malofiy, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 105
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*

*/d/ August 1, 2014*

# Certificate of Service

I hereby certify that a true and correct copy of the foregoing Praecipe to Attach Verification and Exhibit to Plaintiff's Omnibus Response in Opposition to Moving Defendants' Motions for Costs and Fees has been electronically filed with the Court via the ECF Filing System, served upon all counsel of record via electronic mail, and e-mailed to William Guice and Thomas van Dell.

Jonathan D. Davis, P.C.
Jonathan D. Davis, Esquire
Derek A. Williams
99 Park Avenue | Suite 1600
New York, NY 10016
T:  (212) 687-5464
E: jdd@jddavispc.com
E: DAW@jddavispc.com

Fox Rothschild, LLP
Michael Eidel, Esquire
Matthew Olesh, Esquire
2000 Market Street, 20th Floor
Philadelphia, PA 19103
T:  (215) 299-2000
E: MEidel@foxrothschild.com

*Attorneys for Defendants*
*Usher Raymond IV a/k/a Usher ("Usher"), Sony Music Entertainment, EMI April Music, Inc., EMI Blackwood Music, Inc., Warner-Tamerlane Publishing Corp., UR-IV Music, Inc., Bystorm Entertainment, Mark Pitts, Issiah Avila, Jr., Bobby Ross Avila, Jr., Sublime Basement Tunez, Defenders of Music, Flyte Tyme Tunes, James Samuel Harris III, and Terry Steven Lewis*

Manatt, Phelps & Phillips, LLP
Mark S. Lee, Esquire
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
T:  (310) 312-4000
F:  (310) 312-4224
E:  mlee@manatt.com

Rogers & Associates, LLC
Lance Rogers, Esquire
25 Elliot Avenue
Bryn Mawr, PA 19010
T:  (610) 649-1880
F:  (877) 649-1800
E:  lance@rogerscounsel.com
*Attorney for Defendant*
*IN2N Entertainment Group, LLC ("IN2N")*

Thomas Van Dell
10900 Wilshire Blvd., Suite 1400
Los Angeles, CA 90024
T:  (310) 443-5332
E:  vandell@hudcan.com
*Defendant, Pro Se*

William C. Guice
16794 East Tufts Avenue
Aurora, CO 80015
*Defendant, Pro Se*
E: guicemanmusic@gmail.com

Samuel C. Stretton, Esquire
301 South High Street
West Chester, PA 19381-3231
E: s.stretton@verizon.net

*****

*Respectfully submitted,*
Francis Alexander, LLC

*/s/ Francis Malofiy*
Francis Malofiy, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 105
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*

*/d/ August 1, 2014*

# Verification

I verify that the facts in Plaintiff's Omnibus Response in Opposition to Moving Defendants' Motions for Costs and Fees are true, accurate, and correct.

/s/  Daniel V. Marino

Date:  August 1, 2014

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

- - -

DANIEL V. MARINO,            :

    vs.                      :

RAYMOND, et al.        : No.
                         11-cv-6811(PSD)


- - -
May 3, 2013
- - -

Videotape deposition of Daniel

V. Marino, taken pursuant to notice,

was held at the Law Offices of Fox

Rothschild, 2000 Market Street,

Philadelphia, Pennsylvania, commencing

at 11:14 a.m., on the above captioned

date, before Kathleen Ruccolo,

Professional Reporter and Notary

Public in and for the Commonwealth of

Pennsylvania.

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street, 8th Floor
Philadelphia, PA  19103



Page 2

1  APPEARANCES:
2
3  FRANCIS ALEXANDER, LLC
   BY:  FRANCIS MALOFIY, ESQUIRE
   The Beasley Building
4  1125 Walnut Street
   Philadelphia, Pennsylvania 19107
5  (215) 500-1000
   Representing the Plaintiff
6
7  JONATHAN D. DAVIS, P.C.
   BY:  JONATHAN D. DAVIS, ESQUIRE
   BY:  DEREK A. WILLIAMS, ESQUIRE
8  99 Park Avenue, Suite 1600
   New York, New York 10016
9  (212) 667-5464
   Jdd@jddavispc.com
10 Representing Usher Raymond, Sony Music
   Entertainment, EMI April Music, Inc.,
11 EMI Blackwood Music, Inc., UR-IV
   music, Inc., Warner-Tamerlane
12 Publishing Corp., Mark Pitts, Bystorm
   Entertainment, Issiah Avila, Jr.,
13 Bobby Ross Avila, Jr., Defenders of
   Music, Flyte Tyme Tunes, Sublime
14 Basement Tunez, James Samuel Harris
   III and Terry Steven Lewis
15
   FOX ROTHSCHILD
16 BY: MICHAEL EIDEL, ESQUIRE
   2700 Kelly Road
17 Suite 300
   Warrington, Pennsylvania 18976
18 (215) 345-7500
   Meidel@foxrothschild.com
19 Representing Usher Raymond, Sony Music
   Entertainment, EMI April Music, Inc.,
20 EMI Blackwood Music, Inc., UR-IV
   music, Inc., Warner-Tamerlane
21 Publishing Corp., Mark Pitts, Bystorm
   Entertainment, Issiah Avila, Jr.,
22 Bobby Ross Avila, Jr., Defenders of
   Music, Flyte Tyme Tunes, Sublime
23 Basement Tunez, James Samuel Harris
   III and Terry Steven Lewis
24

Page 3

1  APPEARANCES:
2  ROGERS & ASSOCIATES
   BY: LANCE ROGERS, ESQUIRE
3  25 Elliott Avenue
   Bryn Mawr, Pennsylvania 19010
4  (610) 649-1880
   Lance@RogersCounsel.com
5  Representing IN2N Entertainment Group
6
   ALSO PRESENT:
7
   Chris Capitano, Videographer
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1           - - -
2        I N D E X
3           - - -
4  Testimony of:  Daniel V. Marino
5  By:  Mr. Davis          10, 546
6  By:  Mr. Rogers          513
7           - - -
8        E X H I B I T S
9           - - -
10 NO.      DESCRIPTION          PAGE
11 Marino-1   Notice                13
12 Marino-2   Amended Complaint      22
13 Marino-3   Resume                39
14 Marino-4   Commercial Lease       73
15 Marino-5   Copy of Check          78
16 Marino-6   Affidavit              90
17 Marino-7   Song Lyrics           204
18 Marino-8   Magazine Article      243
19 Marino-9   Affidavit             265
20 Marino-10  Documents             280
21 Marino-11  Invoice               386
22 Marino-12  10/5/04 Letter        417
23 Marino-13  Recording Agreement   465
24 Marino-14  10/5/04 Letter        488

Page 5

1           - - -
2        E X H I B I T S
3           - - -
4  NO.      DESCRIPTION          PAGE
5  Marino-15  2-1-04 Letter         546
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



2 (Pages 2 to 5)

Page 6

```
 1             - - -
 2         DEPOSITION SUPPORT INDEX
 3             - - -
 4
 5   Direction to Witness Not to Answer
 6   Page Line    Page Line    Page Line
 7    29  16     325  22     423   3
 8    429   2     430   6     432   8
 9    432  15     432  24    557  20
10
11   Request for Production of Documents
12   Page Line    Page Line   Page Line
13     18  16
14
15   Questions Marked
16   Page Line    Page Line   Page Line
17   None
18
19
20   Stipulations
21   Page Line    Page Line   Page Line
22     7   1
23
24
```

Page 7

```
 1        (By agreement of
 2   counsel, the sealing, filing
 3   and certification are waived;
 4   and all objections, except as
 5   to the form of the question,
 6   are reserved until the time of
 7   trial.)
 8            - - -
 9         PROCEEDINGS
10            - - -
11        VIDEOGRAPHER:  We are
12   now on the record.  This
13   begins DVD number one in the
14   deposition of Daniel Marino in
15   the matter of Marino versus
16   Raymond, et al in the United
17   States District Court, Eastern
18   District of Pennsylvania,
19   docket number 11-CV-6811
20   (PSD).
21        Today is Friday,
22   May 3, 2013, and the time is
23   11:14 a.m.  This deposition is
24   being taken at 2000 Market
```

Page 8

```
 1   Street, Philadelphia,
 2   Pennsylvania, at the request
 3   of Fox, Rothschild LLC.  The
 4   videographer is Christopher
 5   Capitano of Magna Legal
 6   Services, and the court
 7   reporter is Kathy Ruccolo of
 8   Magna Legal Services.
 9        Will counsel for all
10   parties present state their
11   appearances and whom they
12   represent.
13        MR. DAVIS:  Jonathan
14   Davis and Derek Williams for
15   defendants Usher Raymond, Sony
16   Music Entertainment, EMI April
17   Music, Inc., EMI Blackwood
18   Music, Inc., Warner-Tamerlane
19   Publishing Corp., UR-IV Music,
20   Inc., Bystorm Entertainment,
21   Mark Pitts, Issiah Avila,
22   Bobby Ross Avila, Sublime
23   Basement Tunez, Defenders of
24   Music, Flyte Tyme Tunes, James
```

Page 9

```
 1   Samuel Harris and Terry Steven
 2   Lewis.
 3        MR. ROGERS:  Lance
 4   Rogers, from Rogers & Edile,
 5   on behalf of defendant IN2N
 6   Entertainment Group, LLC.
 7        MR. EIDEL:  Michael
 8   Eidel, Fox Rothschild, for the
 9   same defendants as Mr. Davis
10   and Mr. Williams.
11        MR. MALOFIY:  Hi, how
12   you doing?  My name is Francis
13   Malofiy.  I represent the
14   plaintiff in this matter,
15   Daniel Marino, who is being
16   deposed.
17        VIDEOGRAPHER:  Will the
18   court reporter please swear in
19   the witness.
20        Daniel Marino, after
21   having been duly sworn, was
22   examined and testified as
23   follows:
24            - - -
```



3 (Pages 6 to 9)

1              EXAMINATION
2                 - - -
3    BY MR. DAVIS:
4         Q.    Would you please state
5    your name for the record?
6         A.    Daniel Marino.
7         Q.    And what's your
8    address, please?
9         A.    1520 South Dorin
10   Street, Philadelphia, Pennsylvania
11   19146.
12        Q.    Thank you.  Mr. Marino,
13   you have attended a number of these
14   depositions, isn't that correct?
15        A.    That's correct.
16        Q.    In this case?
17        A.    Yes.
18        Q.    So you are familiar
19   with the procedures of how a
20   deposition is conducted?
21        A.    Not as a witness, but I
22   have been in many, yes, in this case,
23   yes.
24        Q.    I'm just going to go

1    over a few instructions with respect
2    to the deposition so that we can work
3    through this as quickly and as
4    efficiently as possible.  If you don't
5    understand any question that I ask,
6    please let me know.  I'll try to
7    rephrase it.  If you want to take a
8    break, that is fine, but not during
9    any question.  After you've answered
10   your question, if you need to take a
11   break and if it is an appropriate
12   moment in the questioning, that is
13   fine, and you can leave the room at
14   that time.  When you leave the room,
15   you cannot confer with your lawyer.
16        Is there any reason
17   that your testimony today would not be
18   reliable?  Are you taking any
19   medication, have you consumed any
20   alcohol that would affect your ability
21   to answer the questions that I ask you
22   today?
23        A.    No.
24        MR. MALOFIY:  Before we

1    go further, I'm just going to
2    reserve our right to read and
3    sign.
4         MR. DAVIS:  That is
5    fine with me.  The only other
6    stipulation that we have with
7    respect to the conduct of the
8    deposition would be objections
9    as to form only.  All other
10   objections reserved for the
11   time of trial.
12        MR. EIDEL:  Agreed.
13        MR. MALOFIY:  That's
14   fine.
15   BY MR. DAVIS:
16        Q.    Now, your lawyer may
17   take a position with respect to some
18   of the questions that I have.  You've
19   seen this in the previous depositions.
20   There may be an objection.  He is
21   allowed to object to the question.  He
22   can't give an extended colloquy about
23   the question.  Once that happens, you
24   still have to answer the question,

1    unless it concerns a privileged matter
2    between attorney and client, and Mr.
3    Malofiy I'm sure will instruct you
4    when that occasion arises.  Do you
5    understand that?
6         A.    I do.
7         MR. DAVIS:  All right.
8    Okay.  Mark as Marino
9    Exhibit 1 the second amended
10   Notice of Deposition to be
11   videotaped, and I'm going to
12   hand that to the witness.  Let
13   me give a copy, of course, to
14   plaintiff's counsel.
15        - - -
16        (At this time a
17   document was marked for
18   identification as Exhibit No.
19   Marino-1.)
20        - - -
21        MR. MALOFIY:  Dan, let
22   me see that.  Thanks.
23        THE WITNESS:  This mic
24   keeps falling off.  I'm trying



Page 14

1   here.
2       MR. ROGERS:  Just for
3   the record, while you were
4   looking for your document a
5   moment ago Mr. Marino handed
6   something to his attorney that
7   looked like a wallet.  For the
8   record, I would like the
9   record to reflect that.
10      THE WITNESS:  Yeah, I
11  could clearly state that that
12  was annoying my buttocks
13  sitting down in the seat.
14      MR. ROGERS:  Thank you.
15      MR. DAVIS:  Handing a
16  copy of the notice to counsel
17  and counsel.
18  BY MR. DAVIS:
19      Q.    Mr. Marino, have you
20  seen this document before?
21      A.    I don't recall seeing
22  it, because I've seen so many
23  documents, but I am aware of the
24  videotaped deposition, yes.

Page 15

1       Q.    You are aware that that
2   deposition was going to take place
3   today, May 3rd?
4       A.    Yes.
5       Q.    Did you understand that
6   that deposition was going to begin at
7   9:30 a.m. in the morning?
8       A.    9:30, no.  I was under
9   the impression it was 10:00 a.m.
10      Q.    Did your counsel tell
11  you that?
12      A.    I'm not sure.  I just
13  remember 10:00 a.m.
14      Q.    Do you see at the
15  second to last line of the notice, it
16  says May 3rd, beginning at 9:30 a.m.?
17      A.    I do see that.
18      MR. DAVIS:  And I note
19  for the record that the
20  deposition began approximately
21  ten minutes after 11:00, and
22  I'll also note for the record
23  that we did not hear from Mr.
24  Malofiy until we reached out

Page 16

1   to him at approximately, I
2   would say it was 10:25.
3       MR. MALOFIY:  I
4   actually sent an e-mail to
5   everybody, I sent an e-mail to
6   all counsel, and I say, we
7   are running late, we will be
8   there about 10:30.
9       MR. DAVIS:  We sat here
10  for more than an hour before
11  we heard back from Mr.
12  Malofiy, and when we did hear
13  from him at approximately
14  10:30, he said he was walking
15  from his office, which IS I
16  believe is on 9th Street, to
17  20th Street, not recognizing
18  the urgency of the deposition,
19  and that lawyers were sitting
20  here waiting for the arrival
21  of the witness.
22      MR. MALOFIY:  I'm going
23  to respond to that, because
24  you are raising all this

Page 17

1   claptrap, and it is getting
2   tired.
3       The issue is I told
4   everyone we are running late.
5   There is reasons for us
6   running late.  You can ask my
7   client about that, but to say
8   that I didn't reach out to
9   counsel beforehand was wrong,
10  and I made it very clear that
11  we needed to start this
12  deposition at 10:00
13  originally, not as noticed.
14      MR. EIDEL:  Mr.
15  Malofiy, you said you sent an
16  e-mail to all counsel?
17      MR. MALOFIY:  Yes.
18      MR. EIDEL:  When was
19  that?
20      MR. MALOFIY:  That was
21  roughly 9:00 something.
22      MR. EIDEL:  9:00
23  something.
24      MR. MALOFIY:  Yes.



Page 18

1        MR. EIDEL:  Just for
2   the record, I just didn't get
3   it.
4        MR. DAVIS:  None of us
5   got it.  None of us got it.
6        MR. EIDEL:  I didn't
7   receive it, either.
8        MR. DAVIS:  And no one
9   had a conversation about
10   starting this deposition at
11   any time other than at 9:30,
12   but let's move on.
13        MR. MALOFIY:  I
14   disagree with you.  We can
15   move on.
16        MR. DAVIS:  * And I'd
17   ask you to send us a copy of
18   that e-mail from whatever time
19   it is you said you sent it so
20   we have a record of it, but
21   none of us received it.
22   BY MR. DAVIS:
23        Q.    We'll begin.
24   Mr. Marino.  What we are attempting to

Page 19

1   do is obtain what information you have
2   with respect to the claims you have
3   asserted against my clients.  Do you
4   understand that?
5        A.    I do.
6        Q.    Okay.  I would hope
7   that you'll give me your truthful and
8   best testimony for each question.
9        A.    I will.
10        Q.    For the last 11 years,
11   Mr. Marino, have you had a cell phone?
12        A.    I have, yeah.
13        Q.    Okay.
14        A.    Well, let me think
15   about that.  Most of that time.  I'm
16   not quite sure about, like, 11 years
17   ago or 10 years ago, but most of that
18   time.
19        Q.    Well, in 2002 did you
20   have a cell phone?
21        A.    Yes.
22        Q.    In 2003?
23        A.    Yeah.
24        Q.    And in 2004?

Page 20

1        A.    Yes.
2        Q.    Can you think of any
3   year since that period that you didn't
4   have a cell phone?
5        A.    No.
6        Q.    Did you have access to
7   the Internet since 2002?
8        A.    Yes.
9        Q.    All right.  Did you
10   maintain an e-mail address since 2002?
11        A.    No.  I have had many
12   e-mail addresses.
13        Q.    You had no e-mail
14   address?
15        A.    I had an e-mail
16   address, yes.
17        Q.    My question is, did you
18   have one in 2002?
19        A.    Yes.
20        Q.    Did you have one in
21   2003?
22        A.    Yes.
23        Q.    Did you have one in
24   every year thereafter up to the

Page 21

1   present time?
2        A.    Yes.
3        Q.    Did you have the
4   ability to text from your phone since
5   2002?
6        A.    I don't recall.  I may
7   have had a pager then.
8        Q.    You had a pager?
9        A.    I believe.
10        Q.    Did you have access to
11   the mail service since 2002?
12        A.    Can you define mail
13   service?
14        Q.    US Postal Service.
15        A.    Yes.
16        Q.    And you knew where a
17   Federal Express office was, or a UPS
18   office?
19        A.    Sure, I could have
20   found one.
21        Q.    Did you have access to
22   transportation since 2002?
23        A.    Yes.
24        Q.    Bus, car?



Page 22

1     A.    Absolutely.
2     Q.    Train, plane?
3     A.    Feet.
4     Q.    You could walk, too?
5     A.    That's right.
6     Q.    I'm going to show you
7  what we are going to mark as
8  Plaintiff's Exhibit 2 -- Marino
9  Exhibit 2.
10              - - -
11           (At this time a
12      document was marked for
13      identification as Exhibit No.
14      Marino-2.)
15              - - -
16  BY MR. DAVIS:
17     Q.    This is the complaint
18  that -- the Second Amended Complaint
19  that you filed in this action?
20     A.    Okay.  Sure.  Can I
21  give this back to somebody?
22     Q.    Do you recognize that
23  document?
24     A.    Well, obviously I'm not

Page 23

1  going to sit here and go through the
2  whole thing, but I do believe I do
3  recognize it, yes.
4     Q.    That is the complaint
5  you had your lawyer file in, I believe
6  it was sometime in November of 2011?
7     A.    It appears to be it,
8  yes.
9     Q.    Is there any more
10  recent version of that complaint that
11  you are aware of?
12     A.    Well, I would have to
13  go through the whole thing to see if
14  this is the amended one.
15     Q.    Well, it says it --
16  what does the cover say?
17     A.    It says, amended
18  complaint.
19     Q.    Do you know of any
20  other complaint --
21     A.    No.
22     Q.    -- that was prepared or
23  served since that --
24     A.    No.

Page 24

1     Q.    -- pleading?  Did you
2  provide all the facts that are
3  contained in that document?
4     A.    Yes.
5     Q.    You communicated those
6  facts to your lawyer?
7     A.    I did.
8     Q.    And when I say, facts,
9  I mean the allegations that you made.
10     A.    Yes.
11     Q.    Okay.
12     A.    I say facts.
13     Q.    Did anyone assist you
14  in developing the information that is
15  contained in that complaint?
16           MR. MALOFIY:
17     Objection.
18           THE WITNESS:  No.
19  BY MR. DAVIS:
20     Q.    No one from your family
21  or friends or anyone else?
22     A.    In this complaint, no.
23     Q.    It is solely your
24  information; is that correct?

Page 25

1     A.    That's right.
2     Q.    Did Mr. Malofiy do any
3  investigation for you of your claims?
4           MR. MALOFIY:
5     Objection, crossing into
6     work-client privilege here.
7           MR. DAVIS:  I'm asking
8     the fact.
9  BY MR. DAVIS:
10     Q.    Did he do any
11  investigation?
12     A.    What do you mean by
13  investigation?
14     Q.    Do you know if he
15  contacted any people on your behalf
16  with respect to any of the allegations
17  you made in this complaint?
18     A.    No.
19     Q.    He didn't?
20     A.    I -- no, not that I
21  know of.
22     Q.    Did you ask him to?
23     A.    No.
24     Q.    So this is solely your



1  beliefs that are reflected in this
2  document?
3       A.    Absolutely.
4       Q.    Okay.  Did you read the
5  amended complaint before Mr. Malofiy
6  filed it?
7       A.    I did.
8       Q.    Did you read it word --
9  cover to cover?
10      A.    I did.
11      Q.    And did you look at
12 every exhibit that is attached to the
13 complaint?
14      A.    If this is the same one
15 that you provided me with that we
16 handed in, yes.
17      Q.    I assure you that is
18 the same one.
19      A.    Okay.
20      Q.    Did you read each
21 exhibit cover to cover?
22      A.    Yeah.
23      Q.    Did you make any
24 corrections to the amended complaint

1  before it was filed that Mr. Malofiy
2  had drafted for you?
3       A.    Can you say that again?
4       Q.    Did you make any
5  corrections to the amended complaint
6  before Mr. Malofiy filed it with the
7  court?
8       A.    Isn't the amended part
9  the changes?
10      Q.    Well, was there only
11 one draft of an amended complaint, or
12 did it have several drafts?
13           MR. MALOFIY:  You are
14      crossing the attorney-client
15      privilege here.
16           MR. DAVIS:  Are you
17      instructing him not to answer?
18           MR. MALOFIY:  No, I'm
19      just telling you what you are
20      doing.
21 BY MR. DAVIS:
22      Q.    Were there other drafts
23 of this before it was filed?
24      A.    No, this is it.

1       Q.    This is it?
2       A.    If this is the same one
3  that you're assuring me of, yes, this
4  is it.
5       Q.    So it didn't go through
6  any revision process?
7            MR. MALOFIY:
8       Objection.
9            THE WITNESS:  The
10      amended complaint, that, the
11      revised one?
12 BY MR. DAVIS:
13      Q.    That's right.  So you
14 saw one draft of the amended
15 complaint, you read it, approved it,
16 and Mr. Malofiy filed it for you?
17      A.    That's correct.
18      Q.    And you authorized
19 Mr. Malofiy to file that document for
20 you?
21      A.    I did.
22      Q.    Okay.  Tell me, do you
23 have an engagement letter with
24 Mr. Malofiy?

1       A.    An engagement letter,
2  what are you defining an engagement
3  letter to be?
4       Q.    A contract with Mr.
5  Malofiy in connection with his
6  representation of your interests in
7  this case?
8            MR. MALOFIY:
9       Objection.
10           THE WITNESS:  Do I have
11      a letter, I believe I do.
12      Yeah.
13 BY MR. DAVIS:
14      Q.    Okay.  And what does
15 that letter say?
16           MR. MALOFIY:  *
17      Objection, don't answer.  Next
18      question.
19           MR. DAVIS:  Are you
20      instructing him not to answer?
21           MR. MALOFIY:  Yes.
22           MR. DAVIS:  You are not
23      going to allow me to know what
24      the terms of your engagement



1   are?
2           MR. MALOFIY:  Of course
3   I'm not going to allow you to
4   know that.  Next question.
5           MR. DAVIS:  Mark that
6   as an instruction not to
7   answer.
8           MR. MALOFIY:  That's
9   right.  Next question.
10  BY MR. DAVIS:
11      Q.    Turning back to
12  Exhibit 2, I want you to turn to page
13  -- it is the very last page of the
14  document, and it says, verification.
15  Do you see that?
16      A.    Yeah.
17      Q.    Are you familiar with
18  that verification?
19      A.    Just give me a moment
20  to read it.
21          MR. MALOFIY:  This is
22  page 78?
23          MR. DAVIS:  It doesn't
24  show a page number on there.

1       It is page 28 of 28 of the
2   document.
3           MR. MALOFIY:  The last
4   page.
5           THE WITNESS:  Can you
6   repeat that question?
7   BY MR. DAVIS:
8       Q.    Are you familiar with
9   this verification?
10      A.    I am.
11      Q.    Is that your signature
12  above the, I guess that would be the
13  typed electronic signature?
14      A.    Yup.
15      Q.    So in this verification
16  you said that the statements of fact
17  made in the foregoing plaintiff's
18  amended complaint are true and correct
19  upon personal knowledge and to the
20  best of my information and belief; is
21  that correct?
22      A.    That is what it says,
23  yeah.
24      Q.    Well, you signed this.

1   Did you accept that as something that
2   you were prepared to swear to?
3       A.    Yes.
4       Q.    And you understood that
5   anything you said in here that turned
6   out to be untruthful could subject you
7   to penalties?
8       A.    I do.
9       Q.    Okay.  Mr. Marino, are
10  you presently employed?
11      A.    I am.
12      Q.    What is your
13  occupation?
14      A.    Well, I work for a
15  company out in Haverford,
16  Pennsylvania, technology company.  I
17  do many different things for that
18  technology company.  I do a lot of
19  multimedia work.  I do ads, stuff like
20  that, and I also have a recording
21  studio that I run that belongs to me,
22  and a record label.
23      Q.    What is your position
24  at this multimedia firm?

1       A.    They have me as
2   manager, as a clients' manager, client
3   services manager.
4       Q.    What is the name of the
5   company?
6       A.    The name of the company
7   is called Prodigio RTS.
8       Q.    And what is the address
9   of the company?
10      A.    541 -- 521, I'm sorry.
11  521 West Lancaster Avenue, Haverford,
12  Pennsylvania 19041.
13      Q.    And you are an employee
14  there?
15      A.    That's correct.
16      Q.    You get a W2?
17      A.    Yes, sir.
18      Q.    Now, you said you have
19  a record label?
20      A.    That's correct.
21      Q.    What is the name of the
22  record label?
23      A.    Fuzztone Records, LLC.
24      Q.    Where is that located?



1      A.    In Springfield,
2  Pennsylvania.
3      Q.    And is there an address
4  in Springfield --
5      A.    Yes.
6      Q.    -- Pennsylvania?  What
7  is the address?
8      A.    901 Greenbriar Lane,
9  that is G-R-E-E-N-B-R-I-A-R, Lane,
10  Springfield, Pennsylvania 19064.
11      Q.    Is that an office
12  building?
13      A.    It is a house.
14      Q.    Whose house is it?
15      A.    Mine.
16      Q.    So you have a recording
17  -- record label, excuse me, at your
18  home?
19      A.    Correct.
20      Q.    Do you have any
21  employees?
22      A.    No.
23      Q.    Is it just you?
24      A.    I have a partner.

1      Q.    Who is your partner?
2      A.    Brett Haas.
3      Q.    Is your record label a
4  corporation?
5      A.    It is an LLC.
6      Q.    And where was it
7  formed?
8      A.    In Pennsylvania.
9      Q.    And it is active?
10      A.    It is.
11      Q.    When was it formed?
12      A.    Oh, I'm not sure,
13  roughly 2009, 2010.  I'm not exactly
14  sure what date I filed that.
15      Q.    Now, are you an
16  employee of Fuzztone Records?
17      A.    I am a partner of the
18  record label.  It is -- me and my
19  partner own it.
20      Q.    No employees?
21      A.    No employees.
22      Q.    And you said you have a
23  studio?
24      A.    Correct.

1      Q.    Does the studio have a
2  name?
3      A.    The studio and the
4  record label are both -- yeah, the
5  same.
6      Q.    And it goes under
7  Fuzztone Records, LLC, is that the
8  name of it?
9      A.    That's correct.
10      Q.    And the studio has no
11  name?
12      A.    You know, I never
13  really -- I always thought the two
14  were two and the same, so I had a
15  studio in that building that I use, so
16  I guess you could say it probably
17  doesn't have a name.  We always
18  operate under Fuzztone.
19      Q.    You said building this
20  time.  Is it a house or a building?
21      A.    It is a structure.
22  It's a house.
23      Q.    And you live in that
24  house?

1      A.    I do not.
2      Q.    Does anyone live in
3  that house?
4      A.    Yes.
5      Q.    Who lives in this
6  house?
7      A.    Brett.
8      Q.    It is his home, his
9  regular --
10      A.    It is my home.  I own
11  it.  I have a mortgage.  He lives
12  there.
13      Q.    Where do you live?
14      A.    At the address I stated
15  earlier.
16      Q.    Is that in the same
17  town?
18      A.    That is in
19  Philadelphia.
20      Q.    Philadelphia.  Does the
21  studio have any employees?
22      A.    No.
23      Q.    Okay.  How long have
24  you resided at the address in



Page 38

1  Philadelphia?
2      A.    Well, when I met my
3  girlfriend, who I recently married, I
4  moved in with her shortly thereafter,
5  and I believe she bought it almost
6  five years ago.
7      Q.    And you lived at that
8  address for the past five years?
9      A.    Almost.
10     Q.    And when I asked you
11 questions about Internet service
12 before, you have Internet service at
13 that location?
14     A.    In which location?
15     Q.    In Philadelphia.
16     A.    Yes.
17     Q.    At your residence with
18 your now wife, former girlfriend?
19     A.    Yes.
20     Q.    Okay.  And you have
21 access to mail service there?
22     A.    Everyone has access,
23 yes.
24         MR. DAVIS:  I'm going

Page 39

1         to mark as Marino Exhibit 3 a
2         single-page document, which I
3         will ask the witness to
4         identify for me.
5             - - -
6         (At this time a
7         document was marked for
8         identification as Exhibit No.
9         Marino-3.)
10            - - -
11        MR. MALOFIY:  This is
12     Guice-3 -- excuse me,
13     Marino-3?
14        MR. DAVIS:  Yes.
15        MR. MALOFIY:  All
16     right.  Thanks.
17 BY MR. DAVIS:
18     Q.    Can you identify that?
19     A.    Yeah.
20     Q.    What is it?
21     A.    My resume.
22     Q.    When was this prepared?
23     A.    I really can't say.
24 Give me a moment to look at it.  I

Page 40

1  don't recall.
2      Q.    Do you think you may
3  have prepared this in the last five
4  years?
5      A.    I couldn't say.  I
6  don't know.
7      Q.    Okay.  Under employment
8  it says from 1988 to 1996 you were a
9  busboy/dishwasher at Alberto's
10 Restaurant.  Do you see that?
11     A.    I do.
12     Q.    Were you an employee
13 there?
14     A.    Yeah.
15     Q.    Okay.  In 1997 to 1998
16 it ways waiter, Croce's Restaurant.
17 Do you see that?
18     A.    I do.
19     Q.    Okay.  Were you an
20 employee?
21     A.    Yes.
22     Q.    Okay.  And 1998 through
23 2008 it says you were the general
24 manager of Il Portico Restaurant,

Page 41

1  slash, Tiramisu.  Do you see that?
2      A.    I do.
3      Q.    Is it known by both
4  names?
5      A.    No, it's not.  I was
6  managing two restaurants.
7      Q.    Two restaurants during
8  that time period?
9      A.    That's correct.
10 Actually, yeah, two.
11     Q.    All right.  Were you an
12 employee of Il Portico Restaurant?
13     A.    I was.
14     Q.    Was that a full-time
15 position?
16     A.    Yes.
17     Q.    Okay.  And Tiramisu,
18 were you an employee there?
19     A.    I can't recall which --
20 they are two separate companies, and I
21 don't recall if, within that time
22 frame, I was an employee of both.  It
23 bounced back and forth, but I managed
24 both places simultaneously at one



1  point, and I worked at each place
2  individually only -- like for a while
3  I worked at just Tiramisu, for a while
4  I worked just at Portico, and for a
5  time I worked at both.
6      Q.    Il Portico Restaurant
7  was your employer?
8      A.    They both were.
9      Q.    Tiramisu was also your
10 employer?
11     A.    Correct.
12     Q.    Thank you.  It says
13 2001 through 2008 you were the CEO of
14 Underworld Entertainment.  Do you see
15 that?
16     A.    I do.
17     Q.    Underworld
18 Entertainment was your employer?
19     A.    I was an owner of
20 Underworld Entertainment.
21     Q.    Well, Chief Executive
22 Officer is what I think you mean by
23 CEO; am I correct?
24     A.    I believe you're

1  correct.
2      Q.    And you don't
3  understand that Underworld
4  Entertainment was your employer, you
5  thought it was something different
6  than that?
7          MR. MALOFIY:  He just
8      said it.
9          THE WITNESS:  I just
10     said it.
11         MR. DAVIS:  You can
12     state an objection.  That is
13     all you can say.
14         MR. MALOFIY:  You can't
15     check the guy.
16 BY MR. DAVIS:
17     Q.    Did you understand
18 Underworld Entertainment to be your
19 employer?
20     A.    I understand that
21 Underworld Entertainment was a company
22 that I had 50-percent ownership in.
23     Q.    Okay.  And did you
24 receive a salary from Underworld

1  Entertainment?
2      A.    I did not.
3      Q.    Did you receive any
4  compensation from Underworld
5  Entertainment?
6      A.    No.
7      Q.    No.  What were you
8  doing as CEO?
9      A.    Of Underworld
10 Entertainment?
11     Q.    Yes.
12     A.    Let me think about that
13 for a minute.  As the CEO of
14 Underworld Entertainment I scouted for
15 talent.  I brought them into the
16 studio.  I worked with various
17 artists.  I went all over different
18 places to find these various artists
19 to bring them in, to work with them,
20 and it was a very, obviously, small
21 company.  There was only two of us.
22 So we had many tasks and many duties,
23 everything from creating the actual
24 space from where it was derived from,

1  where we housed Underworld
2  Entertainment.  We spent a lot of time
3  with a lot of different artists to try
4  to develop them into something
5  successful.  So I did many different
6  chores and duties, everything from
7  cleaning to recording to engineering
8  to managing personalities.  I can go
9  on and on.  I mean, very small
10 business.
11     Q.    Did you write music,
12 too, for Underworld?
13     A.    I wrote music for
14 myself.
15     Q.    Not for Underworld?
16     A.    Not -- what did you
17 say?
18     Q.    Did you, as one of your
19 tasks as the CEO/owner of Underworld
20 Entertainment, did you write music?
21     A.    I would say yes.
22     Q.    And did you do some
23 production work as well as part of
24 those tasks?



Page 46

1    A.    Yes.
2    Q.    Okay.  And did you
3  consider yourself working for
4  Underworld Entertainment?
5    A.    You know, I don't know
6  that I would say I consider myself
7  working for Underworld Entertainment,
8  simply because it was something that I
9  created and owned.  It was more of,
10  like, an identity, you know.
11    Q.    But it was a company?
12    A.    But it was a company.
13    Q.    And you were providing
14  services to that company?
15        MR. MALOFIY:
16    Objection.
17  BY MR. DAVIS:
18    Q.    Fair statement?
19    A.    No.
20    Q.    No, you were not
21  providing services to Underworld
22  Entertainment?
23    A.    I was providing
24  services that were required to take

Page 47

1  artists in and develop them, but I'm
2  really not quite sure of your
3  question.
4    Q.    I'm trying to
5  understand why you say you were the
6  owner of Underworld Entertainment, you
7  were performing various tasks for that
8  company, but you refuse to say that
9  you were providing services or working
10  for the company?
11        MR. MALOFIY:
12    Objection.  He also didn't
13    established whether it was a
14    company.  You keep saying
15    company, company, company, you
16    haven't asked him, was it a
17    company?
18        MR. DAVIS:  Mr.
19    Malofiy, you understand what
20    the rules are with respect to
21    objections.  You heard it from
22    the judge directly, and I'd
23    ask you to please heed those
24    instructions.

Page 48

1        THE WITNESS:  Can you
2    repeat that?
3  BY MR. DAVIS:
4    Q.    You were performing
5  tasks for Underworld Entertainment?
6    A.    Yes.
7    Q.    Which you described.
8    A.    Right.
9        MR. MALOFIY:
10    Objection, go ahead.
11  BY MR. DAVIS:
12    Q.    Were those tasks for
13  the purpose of Underworld
14  Entertainment or for yourself
15  individually?
16    A.    Both.
17    Q.    Both.  Okay.
18    A.    Both.  Well, because
19  you have to understand it was a
20  building, it was a studio, and I did
21  things for myself as well.
22    Q.    You're familiar with a
23  company called Destro Music
24  Productions, Inc.?

Page 49

1    A.    I am.
2    Q.    And what was your
3  relationship to Destro Music
4  Productions, Inc.?
5    A.    I was a part owner of
6  that.
7    Q.    Is that a corporation?
8    A.    I believe so.
9    Q.    And was Underworld
10  Entertainment connected in any way
11  with Destro Music Productions, Inc.?
12    A.    You know, I don't
13  recall, because I didn't really take
14  care of the business aspect of the --
15  of Underworld and Destro.
16    Q.    As an owner, you didn't
17  understand the relationships between
18  Underworld Entertainment and Destro
19  Music Productions, Inc.?
20    A.    I understand to a
21  degree, but I was not the individual
22  taking care of the business affairs.
23    Q.    Share with me what you
24  understood the relationship between



1 Underworld Entertainment and Destro
2 Music Productions to be.
3     A.     Just give me a moment
4 to answer that. From what I recall,
5 the Underworld Entertainment is the
6 record label and the Destro Music
7 Productions is the production company.
8     Q.     Destro was a
9 corporation, and was Underworld
10 Entertainment connected with that
11 corporation?
12         MR. MALOFIY:
13     Objection. When you use
14     Destro, you have to be clear,
15     because your questions are
16     unclear, and -- no, you can't
17     say Destro. You have to
18     define what Destro. There are
19     three different things defined
20     as Destro.
21         MR. DAVIS: To be
22     clear, you object all you
23     want. If we need to, we'll
24     play it for the judge and show

1     him how you are interfering
2     with the deposition.
3         MR. MALOFIY: Don't
4     play tricks, Mr. Davis. No
5     claptrap.
6 BY MR. DAVIS:
7     Q.     The question is, did
8 you understand Destro Music
9 Productions, Inc. to include
10 Underworld Entertainment?
11     A.     I don't recall.
12     Q.     And you were an owner
13 of Destro Productions, Inc.?
14     A.     That's correct.
15     Q.     And you just don't
16 know?
17     A.     I wasn't the individual
18 that really maintained all the
19 business affairs.
20     Q.     Did you ever get issued
21 shares of stock from Destro Music
22 Productions, Inc.?
23     A.     Shares?
24     Q.     Stock certificates?

1     A.     No.
2     Q.     How did you know that
3 you actually had an ownership interest
4 in Destro Music Productions, Inc.?
5     A.     Because it was
6 discussed with my partner.
7     Q.     Who is your partner?
8     A.     Was my partner, Dante
9 Barton was my partner.
10     Q.     How much of Destro
11 Music Productions, Inc., did you
12 understand that you owned?
13     A.     Fifty percent.
14     Q.     Who owned the other 50
15 percent?
16     A.     Dante Barton.
17     Q.     Are you familiar with a
18 company called Wavelab Recording
19 Studio?
20         MR. MALOFIY:
21     Objection, company. You have
22     to be very specific here. You
23     are playing games. If it's a
24     company, it's a company. If

1     it's an LLC, it's an LLC. If
2     it's an Inc., it's an Inc.
3     Don't play games and call it
4     something it is not.
5         MR. DAVIS: You are
6     coaching the witness.
7         MR. MALOFIY: You can't
8     play tricks.
9         MR. DAVIS: Mr. Malofiy
10     --
11         MR. MALOFIY: You can't
12     do it.
13         MR. DAVIS: -- you are
14     coaching the witness.
15         MR. MALOFIY: No, it is
16     not.
17         THE WITNESS: I do, I
18     do know what Wavelab Recording
19     Studios is.
20 BY MR. DAVIS:
21     Q.     What is it?
22     A.     It's a recording
23 studio.
24     Q.     Of what?



14 (Pages 50 to 53)

1     A.   Of the -- so -- I don't
2 understand what you mean, of what.
3     Q.   Well, are you saying it
4 has no connection to any of the other
5 two companies?
6        MR. MALOFIY:
7        Objection.
8        THE WITNESS:  It was
9        the place where we recorded
10        the productions for Destro
11        Music and for the artists that
12        were part of Underworld
13        Entertainment.
14 BY MR. DAVIS:
15     Q.   Was there any business
16 relationship between Destro Music
17 Productions, Inc. and Wavelab
18 Recording Studio?
19     A.   I would say yes.
20     Q.   And what was that
21 relationship?
22     A.   I believe I just said
23 it.
24     Q.   Were you an owner of

1 Wavelab Recording Studio?
2     A.   Absolutely, yes.
3     Q.   Explain to me what you
4 owned.
5     A.   I owned majority of the
6 equipment that was inside of the
7 recording studio. I was on the lease
8 for the space that we rented. I paid
9 for -- you know, I had the telephone
10 there. You know, I mean I paid for
11 telephone services, Internet services,
12 gas, electric, I mean.
13     Q.   Did you consider
14 Wavelab Recording Studio a division of
15 Destro Music Productions, Inc.?
16     A.   I never really thought
17 about it like that, like, considered
18 it to be a division of. It was just
19 where I recorded, where I worked
20 daily.
21     Q.   Do you understand what
22 the word proprietorship means?
23     A.   I believe so, but I
24 would like you to define it so we

1 are --
2     Q.   Was this a business
3 that you ran using that name without
4 any corporate or other legal form?
5     A.   Again, I don't recall,
6 because I wasn't the individual taking
7 care of the business affairs.
8     Q.   So do you know whether
9 or not Wavelab Recording Studio was a
10 corporation?
11     A.   I don't recall.
12     Q.   Do you know if it was
13 an LLC?
14     A.   I can't say. I don't
15 remember.
16     Q.   Was it a partnership?
17     A.   Mr. Davis, I just don't
18 remember. I can't say.
19     Q.   Don't know. Okay.
20 With respect to Underworld
21 Entertainment, I think you already
22 said you don't know whether it was a
23 corporation. Did you know if it was
24 an LLC?

1     A.   I don't. I remember
2 that we went to the bank and we opened
3 a bank account under Underworld, but I
4 don't remember. Maybe a check may
5 reflect that. You have one as an
6 exhibit.
7     Q.   It was your
8 understanding that of these three
9 companies, you owned 50 percent of
10 each?
11     A.   That's correct.
12     Q.   And Mr. Barton was the
13 other 50-percent owner?
14     A.   Yeah.
15     Q.   Who was taking care of
16 the business affairs of the three
17 businesses; Underworld Entertainment,
18 Destro Music Productions, Inc., and
19 Wavelab Recording Studio?
20     A.   Dante Barton.
21     Q.   You had no role in
22 that?
23     A.   Very, very little, if
24 any. I was more the person that



15 (Pages 54 to 57)

Page 58

1    handled the music.  I was more of the
2    music person, Dante was the more
3    businessperson.  That was our
4    understanding.
5         Q.    Are you still a 50/50
6    owner of each of these businesses?
7         A.    Am I still an owner of
8    these businesses?  Well, the studio is
9    no longer there, so I really can't
10   say.  I don't know how I would be an
11   owner of something that is no longer
12   there.
13        Q.    What about Destro Music
14   Productions, Inc.?
15        A.    I haven't been working
16   underneath that business for quite
17   some time now, so I really don't know.
18        Q.    Do you know if the
19   company was dissolved?
20        A.    Again, I'm not the
21   person handling those affairs, nor did
22   I have the paperwork, per se, for
23   those companies in my possession, so I
24   don't know what happened --

Page 59

1         Q.    Do you know what
2    happened --
3         A.    -- to those companies.
4         Q.    Are you still a
5    50-percent owner of Underworld
6    Entertainment?
7         A.    I really don't know at
8    this time, just simply because I
9    haven't operated underneath that
10   company for a while.  If you read the
11   complaint, you will know our
12   relationship dissolved.  And he was
13   the person handling those affairs so I
14   never consider thinking about it.
15        Q.    You left it to Mr.
16   Barton to handle business affairs of
17   Underworld Entertainment, Destro Music
18   Productions, Inc., and Wavelab
19   Recording Studio?
20        MR. MALOFIY:
21        Objection.  You can answer.
22        THE WITNESS:  Can you
23        repeat the question?
24   BY MR. DAVIS:

Page 60

1         Q.    You left it to Mr.
2    Barton to handle the business affairs
3    of Underworld Entertainment, Destro
4    Music Productions, Inc., and Wavelab
5    Recording Studio?
6         A.    That's correct.
7         Q.    Until what time were
8    you active in any one of those
9    businesses?  When I say time, I mean
10   what year.
11        A.    Yeah, I'm trying to
12   think.  Somewhere around 2009, 2000 --
13   whenever, you know, my partner left me
14   high and dry.  Shortly thereafter I
15   had to go in and get the equipment,
16   sell it, pay for rent, so I would
17   assume around that time.
18        Q.    Did you take any steps
19   to disassociate yourself with any of
20   these companies through a lawyer?
21        A.    No.
22        Q.    Does the 2009 date
23   apply for each of Underworld
24   Entertainment, Destro Music

Page 61

1    Productions, Inc., and Wavelab
2    Recording Studio?
3         A.    In regards to?
4         Q.    When you thought it was
5    the end of your relationship, your
6    connection with those companies.
7         A.    You know, I associate
8    those companies with my partner --
9    ex-partner, Dante Barton.  So when our
10   partnership terminated, when he
11   disappeared and I found out all this
12   information, I would say around that
13   time.
14        Q.    2009?
15        A.    Yeah.
16        Q.    Okay.  What title, if
17   any, did you have with Destro Music
18   Productions, Inc.?
19        A.    Title?
20        Q.    Title.
21        A.    Title in regards to the
22   company?
23        Q.    Yes.  You said you were
24   the chief executive officer of



Page 62

1  Underworld Entertainment?
2      A.    Right.
3      Q.    What was your position
4  at Destro Music Productions, Inc.?
5      A.    I would just say that I
6  was a partner, 50-percent partner in
7  the business.
8      Q.    Okay.  Were there any
9  other persons involved in Destro Music
10  Productions, Inc., besides yourself
11  and Mr. Barton?
12     A.    No.
13     Q.    You were the only
14  employees of the company?
15           MR. MALOFIY:
16  Objection.  Now you are
17  getting tricky again there.
18  Can't do that.  Can't do that.
19           MR. DAVIS:
20  Mr. Malofiy, I warn you once
21  more.  You are making
22  objections that are not
23  permitted by the order of the
24  court.

Page 63

1           MR. MALOFIY:  You
2  are --
3           MR. DAVIS:  You
4  are making speaking
5  objections.
6           MR. MALOFIY:  You are
7  telling him what he said, and
8  it's wrong.  That is not what
9  he said.
10           MR. DAVIS:  Repeat the
11  question, please, so the
12  witness can answer.  You can
13  object to the question, Mr.
14  Malofiy --
15           MR. MALOFIY:  Don't be
16  tricky, ask straight
17  questions, get a straight
18  answer.  Isn't that what you
19  want, the truth, or do you
20  want something else?  Do you
21  want lies?  Do you want to ask
22  him a lied question and then
23  you want him to answer a lied
24  question?

Page 64

1           MR. DAVIS:  Madam
2  reporter, would you repeat the
3  question?
4           - - -
5           (At this time the court
6  reporter read back from the
7  record as was requested.)
8           - - -
9           THE WITNESS:  You know,
10  you said employees, I find
11  myself saying I'm a partner of
12  the company.  I don't know if
13  that constitutes an
14  employee.  I'm not an
15  attorney.  I'm not sure how
16  legally they break down, so I
17  can tell you that I was a
18  50-percent partner in the
19  company.  I don't know,
20  employee.  I don't know how --
21  I don't know how it breaks
22  down.  I don't know.
23  BY MR. DAVIS:
24     Q.    Well, you understood

Page 65

1  yourself to be the chief executive
2  officer of Underworld Entertainment,
3  that you know; is that correct?
4      A.    Yeah.
5      Q.    Is it your testimony
6  you don't know what your position was
7  at Destro Music Productions, Inc.,
8  other than to say you were a partner?
9           MR. MALOFIY:
10  Objection.
11           THE WITNESS:  I mean, I
12  did a lot of the same duties
13  for Underworld that I did for
14  Destro Music.  I never
15  considered having a title.  It
16  really didn't matter amongst
17  us and what we did, so I
18  really don't know how to
19  answer the question.
20  BY MR. DAVIS:
21     Q.    Were there any
22  employees of Destro Music Productions,
23  Inc.?
24           MR. MALOFIY:



17 (Pages 62 to 65)

1    Objection, asked and answered.
2         THE WITNESS:  No.
3    There was just myself and
4    Dante were the partners who
5    worked together daily.  So how
6    you guys define breaking down
7    the business, and how you want
8    a response from me, I just
9    don't know how to answer it.
10    I was there every day working
11    day in and day out for years
12    writing songs, producing
13    artists.  So you say, were you
14    an employee, I never got a
15    check from Destro Music so.
16    BY MR. DAVIS:
17         Q.    So you were writing and
18    producing songs for Destro Music
19    Productions, Inc.?
20         A.    I was writing and
21    producing music for myself, for
22    Underworld and for Destro, for various
23    people that came in.
24         Q.    Were you ever paid any

1    compensation by Destro --
2         MR. MALOFIY:
3    Objection.
4    BY MR. DAVIS:
5         Q.    -- Music Productions,
6    Inc.?
7         A.    Not that I recall.
8         Q.    Do you know if Destro
9    Music Productions, Inc., had a bank
10    account?
11         A.    I believe so.
12         Q.    Where was the banking
13    conducted for Destro Music
14    Productions, Inc.?
15         A.    It would have been one
16    of two banks.  It would have been
17    either Citizens Bank or at the time
18    First Union.
19         Q.    Did you have check
20    signing power?
21         A.    I did.
22         Q.    Okay.  What about
23    Underworld, did Underworld maintain
24    any checking accounts?

1         A.    Yes.
2         Q.    Did you have check
3    signing power at that account?
4         A.    I did.
5         Q.    If I -- do you recall
6    the name of the bank?
7         A.    For Underworld?
8         Q.    Yes.
9         A.    First Union.
10         Q.    First Union?
11         A.    I believe if we look --
12    if we look at the exhibit, I believe
13    there is a check in this exhibit.
14         Q.    Which exhibit are you
15    looking at, the complaint?
16         A.    I don't know.  I am not
17    certain, but I know that there is a --
18    that I have given you guys everything
19    that I have, and I'm pretty certain
20    that there is Underworld checks with
21    my name on it.  And I'm not sure if it
22    is in the complaint, but if it is not
23    in the complaint, I'm sure we can
24    arrange it, for you to have it.

1         Q.    Did you have a title at
2    Wavelab Recording Studio?
3         MR. MALOFIY:
4    Objection.
5         THE WITNESS:  Again,
6    the title is like -- I'm just
7    being honest with you, I never
8    really considered too much I
9    had a title, especially in a
10    recording studio I owned.
11    BY MR. DAVIS:
12         Q.    But you had a title at
13    Underworld Entertainment?
14         A.    I had a title because
15    Dante and I discussed titles, and he
16    said, we are both CEOs, so I didn't
17    really think too much of it, and what
18    it meant and how much clout that meant
19    I had.  It had a nice ring to it, so.
20         Q.    Is that why you put it
21    on your resume?
22         A.    That's correct.
23         Q.    But you didn't think it
24    really meant anything?



Page 70

1    MR. MALOFIY:
2 Objection.
3    THE WITNESS: I really
4 didn't know -- I always
5 thought it just meant an
6 owner, being at the top of the
7 food chain, since I spent so
8 much money and time and effort
9 and energy in creating this
10 entity.
11 BY MR. DAVIS:
12    Q.   Were you paid any
13 compensation by Wavelab Studio
14 Recording?
15    MR. MALOFIY:
16 Objection.
17    THE WITNESS: No, I'm
18 sorry, I'm shaking my head. I
19 don't see the check in here
20 that we were discussing. Do
21 you recall seeing it?
22 BY MR. DAVIS:
23    Q.   We are going to search
24 and see if we see a check.

Page 71

1    A.   I believe -- I don't
2 know -- I'm not allowed to talk to
3 him, but if you want to ask him I
4 believe he may know the answer.
5    Q.   I'm not going to ask
6 him any questions.
7    Do you know if Wavelab
8 Studio Recording maintained any bank
9 accounts?
10    A.   I don't remember. I
11 don't remember if we had banking
12 accounts at that time.
13    Q.   Did Underworld
14 Entertainment, Destro Music
15 Productions, Inc., and Wavelab Studio
16 Recording maintain separate locations?
17    A.   I believe -- I believe
18 yes. In regards to, I believe the
19 Destro and Underworld were in Yeadon,
20 I believe. I'm not 100 percent
21 certain.
22    Q.   Is there any reason --
23    MR. MALOFIY:
24 Objection. I apologize. I

Page 72

1 was distracted. Can you read
2 back that question?
3    - - -
4    (At this time the court
5 reporter read back from the
6 record as was requested.)
7    - - -
8    THE WITNESS: So let me
9 ask you the question here,
10 when you say, different
11 locations, do you mean
12 physically where we worked out
13 of?
14 BY MR. DAVIS:
15    Q.   Yes.
16    A.   No.
17    Q.   What was the address of
18 the location that each of these
19 businesses operated from?
20    A.   1 Old Bridge Road,
21 Philadelphia, Pennsylvania 19029.
22    Q.   You produced a lease as
23 part of your production documents, do
24 you recall that?

Page 73

1    A.   Absolutely.
2    Q.   Do you recall whether
3 the lease was in the name of any one
4 of those businesses?
5    A.   I don't.
6    MR. DAVIS: I'm going
7 to mark as Marino-4 a document
8 entitled, Commercial Lease.
9    - - -
10    (At this time a
11 document was marked for
12 identification as Exhibit No.
13 Marino-4.)
14    - - -
15    MR. MALOFIY: Thank
16 you, Mr. Davis.
17 BY MR. DAVIS:
18    Q.   I ask you to look at
19 that document, please.
20    A.   Sure.
21    Q.   Do you recognize it?
22    A.   Yes.
23    Q.   Who is the lease
24 between? I refer you to the first



1  paragraph of the lease.
2      A.    I just want to see what
3  the rest of this is.
4      Q.    This is a document that
5  was Bates stamped by your counsel and
6  produced to us.
7      A.    It was between -- you
8  are saying the first paragraph, I see
9  signatures on the back of it.
10     Q.    Okay.  Look there, too.
11     A.    Massoud Mantinfar,
12 Dante Edward Barton and myself, Daniel
13 V. Marino.
14     Q.    Is there any reason why
15 this lease is between the lessor, who
16 is this Massoud Mantinfar, and
17 yourself and Mr. Barton --
18     A.    Yeah.
19     Q.    -- rather than the
20 companies?
21     A.    Oh, you mean why him
22 and not companies and why him and me
23 and Barton?
24     Q.    What I'm asking you is,

1  why isn't this lease in the name of
2  Underworld Entertainment or Destro
3  Music Productions, Inc., or Wavelab
4  Studio Recordings?
5      MR. MALOFIY:
6      Objection.  The document
7      speaks for itself.  You can
8      answer the question.
9      THE WITNESS:  I believe
10     it's because we had started
11     the names of the company,
12     Wavelab, Underworld
13     Entertainment and Destro,
14     shortly after or right around
15     this time.
16 BY MR. DAVIS:
17     Q.    Well, don't you recall
18 in your complaint that you allege that
19 Mr. Barton had already formed Destro
20 Music Productions, Inc., and he
21 suggested that you use that entity so
22 that you wouldn't have to expend money
23 to form a new corporation, do you
24 recall that?

1      A.    I do.
2      Q.    Are you saying to me
3  that you believe this lease was before
4  he had formed Destro Music
5  Productions, Inc.?
6      A.    No.  I don't believe
7  that.
8      Q.    Destro Music
9  Productions, Inc., was already formed?
10     A.    As far as I know.
11     Q.    Was there any reason
12 why Destro Music Productions, Inc.,
13 didn't enter into this lease?
14     A.    I couldn't answer that.
15 I mean, we were the partners paying
16 for the lease, so I thought it all
17 made sense, the individuals that are
18 paying for it.
19     Q.    The occupants of the
20 space that was being leased was for
21 Destro Music Productions, Inc.,
22 Underworld Entertainment and Wavelab
23 Studio Recording?
24     A.    We did operate out of

1  this building.
2      Q.    Well, did you live in
3  that building?
4      A.    I did not.
5      Q.    Did Mr. Barton live in
6  that building?
7      A.    He did not.  We spent
8  enough time there to say we almost
9  lived there, though.
10     Q.    Okay.  I don't have a
11 copy of this, but we can mark this --
12     A.    Can I ask you a
13 question, Mr. Davis?
14     Q.    I ask the questions.
15 If you want to ask me a question about
16 procedure, that is fine but --
17     A.    It is sort of
18 procedure.  I just want to know, the
19 gentleman to your right, who is he?
20     Q.    This is Derek Williams
21 from my office.
22     MR. MALOFIY:  Perhaps I
23     should have introduced you.  I
24     didn't realize that you didn't



1    --
2         THE WITNESS:  He was
3    the only person that I really
4    didn't understand who he was.
5         MR. MALOFIY:  I don't
6    think you met.
7         THE WITNESS:  We met.
8         MR. DAVIS:  I'll show
9    your counsel.
10        THE WITNESS:  Oh, yeah,
11   there is the check.
12        MR. DAVIS:  This will
13   be marked as Marino-6, a
14   one-page document that bears a
15   check.
16        - - -
17        (At this time a
18   document was marked for
19   identification as Exhibit No.
20   Marino-5.)
21        - - -
22   BY MR. DAVIS:
23        Q.    I'll show you what has
24   been marked as Marino Exhibit 6.  Can

1    you identify that?
2         MR. MALOFIY:  Can I
3    just see it?
4         MR. DAVIS:  We gave you
5    one.
6         MR. MALOFIY:  You did.
7    I'm sorry.  This is Marino
8    what?
9         MR. DAVIS:  Five, I'm
10   sorry.  Marino-5.
11        THE WITNESS:  Thank
12   you.
13   BY MR. DAVIS:
14        Q.    Do you recognize that
15   check?
16        A.    I do.
17        Q.    Can you tell me what it
18   says in the left-hand corner at the
19   top?
20        A.    It says Daniel V.
21   Marino, Dante E. Barton, 1 Old Bridge
22   Road, Philadelphia, PA 19129.
23        Q.    And is that the bank
24   account that you were testifying about

1    previously?
2         A.    No.
3         Q.    What account is this,
4    if you know?
5         A.    This is a joint account
6    that we had.
7         Q.    What was the purpose of
8    this account?
9         A.    I don't recall.  The
10   purpose of this account?
11        Q.    Yes.
12        A.    I don't recall.  I mean
13   -- yeah, I don't recall.
14        Q.    Well, on the reference
15   line it says rent.  Do you see that?
16        A.    Yeah.
17        Q.    Does that refresh your
18   recollection of what this account
19   would have been for?
20        MR. MALOFIY:  Memo
21   line.
22   BY MR. DAVIS:
23        Q.    Memo line?
24        A.    No, we had a lot of

1    things going on.  I just -- again, I
2    didn't really take track of, you know,
3    what Dante was doing business-wise.  I
4    trusted him with everything.
5         Q.    You have no idea?
6         MR. MALOFIY:
7    Objection.
8         THE WITNESS:  I have an
9    idea that I had a bank account
10   with him, absolutely.  What
11   was the purpose of the bank
12   account, I don't recall.
13   BY MR. DAVIS:
14        Q.    You didn't bother
15   yourself with the business details of
16   any of the businesses that you
17   co-owned with Mr. Barton?
18        MR. MALOFIY:
19   Objection.  Can you restate
20   that question?  I missed it.
21   The sirens are going.
22        MR. DAVIS:  Madam
23   reporter, would you please
24   reread the question.



1           - - -
2           (At this time the court
3    reporter read back from the
4    record as was requested.)
5           - - -
6           MR. MALOFIY:
7    Objection.  You can answer it.
8           THE WITNESS:  Can you
9    explain to me what you mean by
10   bother?
11   BY MR. DAVIS:
12        Q.    Did you participate in
13   any of the business matters that Mr.
14   Barton was handling on behalf of any
15   of the businesses you were running
16   with him?
17        MR. MALOFIY:
18   Objection.  You can answer.
19        THE WITNESS:  Very
20   little.
21   BY MR. DAVIS:
22        Q.    And why is that?
23        A.    Again, I was more in
24   control of the creative aspect of the

1    company.  He was more in the business
2    aspect of the company.
3         Q.    You trusted him?
4         A.    Absolutely.
5         Q.    Prior to 2009, your
6    complaint contains many allegation
7    about your feelings toward Mr. Barton.
8    Do you recall some of those feelings
9    that you expressed in the complaint?
10        A.    When you say prior to
11   2009, do you mean prior to the
12   fall-out we had?
13        Q.    Yes.
14        A.    I did.
15        Q.    Okay.  You considered
16   him a close friend and partner?
17        A.    I did.
18        Q.    And you trusted and
19   admired him?
20        A.    I did.
21        Q.    It was someone you
22   enjoyed a sincere friendship with?
23        A.    He was like my brother.
24        Q.    He was someone you

1    respected?
2         A.    Absolutely.
3         Q.    Okay.  You thought of
4    him as a brother?
5         A.    I considered him a
6    brother.
7         Q.    When was the last time
8    you spoke with Mr. Barton?
9         A.    I couldn't tell you
10   exactly, but sometime, I would say
11   2009, 2008. I'm not quite sure.  I
12   couldn't tell you exactly the last
13   time I spoke to him.
14        Q.    It wasn't recently?
15        A.    I haven't talked to
16   him, no.
17        Q.    Have you communicated
18   with him by e-mail, letter, text or
19   otherwise in writing?
20        A.    No.
21        Q.    Okay.  Now, you say you
22   were like brothers, very close.  Did
23   you know something about Mr. Barton's
24   family?

1         A.    I knew his kids,
2    ex-wife, his sister.  I met his mom a
3    couple times.
4         Q.    Are you still in touch
5    with any of them?
6         A.    No.
7         Q.    When did you cease
8    having contact with any of his family
9    members or --
10        A.    Prior to us breaking
11   up.  It is not like I hung out with
12   his family all the time.  I couldn't
13   tell you when the last time I saw one
14   of them.  I probably saw maybe his
15   ex-wife and daughter close to the time
16   that we parted ways.
17        Q.    So in 2009 you knew
18   where they were?
19        A.    I can't say '09 or '08,
20   around that time.
21        Q.    When you say you knew
22   where they were, you knew where they
23   lived in 2009, his ex-wife and his
24   children?



Page 86

1      A.    I knew the apartment
2  building they lived in, very large
3  apartment building.  I couldn't say,
4  you know, which one.
5      Q.    But you knew the
6  address?
7      A.    No, I didn't know the
8  number of the address.
9      Q.    You could find the
10 building if you had to?
11     A.    Yeah, sure.
12     Q.    Okay.  Did you know Mr.
13 Barton's in-laws?
14         MR. MALOFIY:
15     Objection.
16 BY MR. DAVIS:
17     Q.    The father and mother
18 of his wife or ex-wife, whatever the
19 case may be?
20     A.    You know, no, I never
21 met them.
22     Q.    You never met them?
23     A.    No.
24     Q.    You are sure about

Page 87

1  that?
2      A.    Yeah.
3      Q.    Do you know where Mr.
4  Barton's ex-wife is today?
5      A.    No.
6      Q.    Well, did you ever
7  learn that they had moved from this
8  apartment building that you know where
9  to find?
10     A.    Ex-wife?
11     Q.    Yes.
12     A.    No.
13     Q.    You were never told
14 that they had moved?
15     A.    I have no idea.  It is
16 not like I kept communication with
17 them.  The only time I ever saw them
18 was with him.
19     Q.    Did you know any of Mr.
20 Barton's friends?
21     A.    Yes.
22     Q.    Do you stay in touch
23 with any of his friends today?
24     A.    No.

Page 88

1      Q.    You know a man named
2  Wil Guice, don't you?
3      A.    Yes.
4      Q.    You saw him yesterday
5  at his deposition?
6      A.    I did.
7      Q.    Prior to yesterday,
8  when was the last time you saw Mr.
9  Guice?
10     A.    I couldn't tell you,
11 years and years ago.
12     Q.    Do you know when Mr.
13 Guice arrived in Philadelphia for his
14 deposition yesterday?
15     A.    I found out during the
16 deposition, so yes.
17     Q.    You didn't meet him the
18 day before?
19     A.    No.
20     Q.    You didn't call him the
21 night before?
22     A.    I have not had any
23 communications with Wil Guice since
24 the last time I saw him.

Page 89

1      Q.    Did you participate in
2  arranging for Mr. Guice to come to
3  Philadelphia?
4      A.    No.
5      Q.    That was done by your
6  lawyer?
7      A.    I would assume so.
8      Q.    You don't know?
9      A.    I don't know.  I don't
10 know.  Unless you did it.  Somebody in
11 this party must have, right?
12     Q.    And you are aware of
13 the statement that he submitted in
14 this case back in February of 2012?
15     A.    Which statement are you
16 referring to?
17     Q.    The written statement
18 that he reviewed with your lawyer
19 yesterday during the deposition.
20     A.    Can you ask that
21 question again?
22     Q.    You are familiar with
23 that statement?
24     A.    I am familiar with the



1  statement.
2          MR. MALOFIY:  What I
3  have termed as an affidavit,
4  the title is affidavit.  You
5  have an issue with that, but
6  nonetheless.
7          MR. DAVIS:  Marino-6.
8          - - -
9          (At this time a
10  document was marked for
11  identification as Exhibit No.
12  Marino-6.)
13         - - -
14 BY MR. DAVIS:
15     Q.   I show you a copy of
16 Mr. Guice's statement, marked as
17 Marino-6.  You have seen that before,
18 haven't you?
19     A.   Yeah, I have.
20     Q.   Did you speak with Mr.
21 Guice prior to receiving that
22 statement?
23     A.   No.
24     Q.   You didn't discuss with

1  him any of the details of what was
2  contained in this statement?
3      A.   No.  I thought I was
4  fairly clear in the last answer that I
5  haven't had any communications with
6  him in any way, shape or form in many
7  years.
8      Q.   Did you have someone
9  speak to him for you?
10     A.   No.
11     Q.   Other than your lawyer?
12         MR. MALOFIY:
13     Objection.
14         THE WITNESS:  I didn't
15     have my lawyer speak with him.
16     He called him.
17 BY MR. DAVIS:
18     Q.   Did you promise Mr.
19 Guice anything for giving that
20 statement?
21         MR. MALOFIY:
22     Objection.
23         THE WITNESS:  I just
24     told you I haven't spoken to

1      him.  How could I make
2      promises?
3          MR. MALOFIY:  Playing
4      games.
5  BY MR. DAVIS:
6      Q.   Did you promise it
7  through a third party?
8      A.   No.
9          MR. MALOFIY:  Asked and
10     answered, objection.  You can
11     answer.
12 BY MR. DAVIS:
13     Q.   Did you ever tell Mr.
14 Guice that you wouldn't pursue him for
15 money damages if he gave you a
16 statement?
17     A.   No.
18     Q.   You heard yesterday,
19 when Mr. Guice testified that he
20 didn't realize that he was being
21 pursued for money damages in this
22 case, do you remember that?
23     A.   What is that?
24         MR. MALOFIY:

1      Objection.
2  BY MR. DAVIS:
3      Q.   You heard Mr. Guice
4  testify yesterday that he was unaware
5  that you were suing him for money
6  damages?
7      A.   No, I did not.
8      Q.   You didn't hear that
9  yesterday?
10     A.   I heard him say clearly
11 that he was a defendant in the case in
12 the beginning of the testimony.
13     Q.   You didn't witness the
14 testimony in which we went through the
15 causes of action that apply to him,
16 and he responded in each case that he
17 was unaware that he was being sued for
18 those claims?
19     A.   I think --
20         MR. MALOFIY:  Is this
21     -- objection, to be clear --
22         THE WITNESS:  Can I
23     answer that?
24         MR. DAVIS:



1     Mr. Malofiy, please stop
2   interrupting the examination.
3     THE WITNESS:  I think
4   what happened was you really
5   confused him, and you really
6   got him excited and he didn't
7   know how to handle it.
8   BY MR. DAVIS:
9     Q.   Is that what you think?
10    A.   That is what I think.
11    Q.   Okay.  Do you know Wil
12  Guice to be a liar?
13    A.   No.
14    Q.   So if the testimony
15  actually portrayed him demonstrating
16  cluelessness about you suing him for
17  money damage, would you believe that
18  he is not telling the truth?
19    MR. MALOFIY:
20  Objection.  This is just
21  getting so far afield.
22    THE WITNESS:  I don't
23  really know.
24    MR. MALOFIY:  Don't

1   speculate.
2     THE WITNESS:  Okay.
3   BY MR. DAVIS:
4     Q.   Well, do you know Mr.
5   Guice to be a liar?
6     A.   No.
7     Q.   You believe him to be a
8   truthful person?
9     A.   Very.
10    Q.   If you -- you've
11  entered a default against him through
12  your counsel in this case, are you
13  aware of that?
14    A.   I am.
15    Q.   And if you get a
16  default judgment against him, meaning
17  a judgment is entered against him for
18  a dollar amount, do you intend to
19  enforce it against him?
20    MR. MALOFIY:
21  Objection.  These are legal
22  questions.
23  BY MR. DAVIS:
24    Q.   Do you intend to

1   collect money from Mr. Guice if you
2   get a judgment against him?
3     A.   I'm not sure what a
4   judgment is.
5     Q.   A ruling or an order or
6   a declaration by the court that you
7   are entitled to collect money from Mr.
8   Guice.  Will you enforce that against
9   Mr. Guice?
10    MR. MALOFIY:
11  Objection.  This is a legal
12  question.  It is far afield.
13    MR. DAVIS:  No, it is
14  not.
15    MR. MALOFIY:  Yeah, it
16  is.  Yeah, it is.  Ask him
17  about judgments.
18    MR. DAVIS:  Mr.
19  Malofiy, the record is going
20  to show what you are doing
21  during the course of this
22  deposition.
23    MR. MALOFIY:  Don't ask
24  a legal question.

1   BY MR. DAVIS:
2     Q.   If you get a judgment
3   against Mr. Guice, do you intend to
4   enforce it against him?
5     A.   I'm not quite sure of
6   the question.
7     Q.   Well, you are seeking a
8   judgment against my clients, aren't
9   you?  You want money from my clients,
10  don't you?
11    A.   I want to be properly
12  credited as a songwriter, as a
13  producer, as an engineer, and I would
14  like to be compensated.
15    Q.   You want money?
16    A.   Yes.
17    Q.   Among other things?
18    A.   Yes.
19    Q.   And you made similar
20  claims against Mr. Guice, you know
21  that, right?
22    A.   Yes.
23    Q.   So the same things you
24  want against my clients you want



1  against Mr. Guice, too?
2       A.    I believe everyone in
3  the complaint, yes, and every company.
4       Q.    So if you get a
5  judgment against Mr. Guice for the
6  same things that you're seeking
7  against my clients, do you intend to
8  enforce it against Mr. Guice?
9       A.    I would say at this
10  time, yes.
11       Q.    Yes.  You said you want
12  to be properly credited.  What do you
13  want to be properly credited for?
14       A.    I just said it.
15       Q.    What?
16       A.    Songwriting.
17       Q.    Of what?
18       A.    The song Club Girl, Bad
19  Girl, and the underlying composition.
20       Q.    Now, if you get a
21  judgment against Mr. Barton, who you
22  also sued for this -- many of the same
23  claims that you sued my clients, do
24  you intend to enforce that judgment

1  against Mr. Barton?
2            MR. MALOFIY:
3       Objection.  Asking legal
4       questions.  You can answer.
5            THE WITNESS:  As I
6       stated, as far as I know,
7       everyone in the complaint and
8       every company.
9  BY MR. DAVIS:
10       Q.    So you have made no
11  arrangements with either Mr. Guice or
12  Mr. Barton that you will not pursue
13  them to collect any money that you
14  might be awarded in this case?
15       A.    I haven't had any
16  communications myself in any way,
17  shape or form or through any third
18  party with either of those
19  individuals.
20       Q.    So you just mentioned
21  the composition Club Girl, are you
22  familiar with that title?
23       A.    Club Girl?
24       Q.    Yes.

1       A.    Yes, I am.
2       Q.    And were you involved
3  in any aspect of Club Girl?
4       A.    Every aspect.
5       Q.    Okay.  Who else was
6  involved in Club Girl?
7       A.    There was only three of
8  us involved in Club Girl.  I believe
9  you have that in front of you; myself,
10  William Guice and Dante Barton.
11       Q.    What did you write?
12       A.    I wrote the music and
13  the lyrics and the melody.
14       Q.    You wrote the whole
15  song yourself?
16       A.    No.
17       Q.    So did you write all of
18  the music yourself?
19       A.    Yes.
20       Q.    Did you write all of
21  the lyrics yourself?
22       A.    No.
23       Q.    Did you write all of
24  the melody yourself?

1       A.    No.
2       Q.    Who wrote the lyrics
3  besides yourself?
4       A.    Wil Guice.
5       Q.    And who wrote the
6  melody besides yourself?
7       A.    Wil Guice.
8       Q.    The parts that you
9  claim that you created, when did you
10  create them?
11            MR. MALOFIY:
12       Objection.  You can answer.
13            THE WITNESS:  When you
14       say, when, like day?
15  BY MR. DAVIS:
16       Q.    Can you give me a
17  month, a year?
18       A.    I wrote that song right
19  after I purchased my guitar, and I
20  have the receipt for that guitar, and
21  I believe it is around 2001.
22            MR. MALOFIY:  Say it
23       again.
24            THE WITNESS:  2001.



Page 102

1    BY MR. DAVIS:
2        Q.    In 2001 you created the
3    music, some of the lyrics and some of
4    the melody?
5        A.    That's correct.
6        Q.    Do you know what month
7    in 2001?
8        A.    No.  I'm sorry.  No.
9        Q.    Now, you mentioned that
10   Dante Barton was also a writer of Club
11   Girl; is that correct?
12       A.    Yeah.
13       Q.    What did Dante Barton
14   write?
15       A.    Dante Barton wrote the
16   drum parts around my recording of the
17   guitar.
18       Q.    Now, you don't consider
19   the drum parts part of the music?
20           MR. MALOFIY:
21       Objection.
22           THE WITNESS:  I do.
23   BY MR. DAVIS:
24       Q.    You do.  So then he

Page 103

1    also participated in creating music
2    besides yourself?
3        A.    Yes, but I was the
4    original person who created the song,
5    and he added to it.  So he helped
6    write it, yes.
7        Q.    So he helped write the
8    music with you?
9        A.    Yes.
10       Q.    Do you know when Mr.
11   Barton created that drum beat?
12       A.    Within two to
13   three days after I did my part.
14       Q.    Again --
15       A.    After I created my
16   part.
17       Q.    So that would be
18   sometime in 2001?
19       A.    Yeah.
20       Q.    Okay.  Now, you
21   testified that Mr. Guice wrote lyrics,
22   as well as yourself, for Club Girl; is
23   that correct?
24       A.    Yes.

Page 104

1        Q.    When did Mr. Guice
2    write his lyrics?
3        A.    The same time -- the
4    same day.  We collaborated in the
5    studio shortly after Dante put his
6    drum parts in.
7        Q.    So again, it's in 2001?
8        A.    Yeah.
9        Q.    All right.  Did you,
10   Mr. Barton, Mr. Guice, agree to merge
11   all of these different contributions
12   into a single work?
13           MR. MALOFIY:
14       Objection.  You can answer.
15           THE WITNESS:  Can you
16       rephrase that?
17   BY MR. DAVIS:
18       Q.    Did you, Mr. Barton,
19   and Mr. Guice agree to combine the
20   respective parts of the song that you
21   were each creating into a single work?
22           MR. MALOFIY:
23       Objection.
24           THE WITNESS:  I would

Page 105

1        say yes, it just evolved that
2        way.  That is how we worked,
3        always.
4    BY MR. DAVIS:
5        Q.    You each had
6    contributions?
7        A.    Yeah, to a song.
8        Q.    You put them together,
9    and you created the song?
10       A.    That's correct.
11       Q.    Okay.  And you intended
12   to do that?
13           MR. MALOFIY:
14       Objection.
15           THE WITNESS:  Yeah.  I
16       intended to do that with the
17       -- you know, knowing that we
18       all shared a certain
19       percentage of the song.  That
20       was our agreement.
21   BY MR. DAVIS:
22       Q.    I'm not quibbling with
23   that, I am just asking you, you
24   intended to create this song together?

MAGNA
LEGAL SERVICES

1           MR. MALOFIY:
2      Objection.  You can answer.
3           THE WITNESS:  Yes.
4      Yes.
5  BY MR. DAVIS:
6      Q.    Was Club Girl ever
7  mixed?
8           MR. MALOFIY:
9      Objection.
10          THE WITNESS:  Define
11     mixed.
12 BY MR. DAVIS:
13     Q.    Well, you know that you
14 are in the recording business, and you
15 are a producer -- you are not familiar
16 with the term mixing a record?
17     A.    I've dealt with so many
18 people over the years and everyone's
19 version of what they define as mix is
20 a little skewed from what maybe I may
21 think, so that is why I'm asking, can
22 you please clarify when you say mix.
23     Q.    I'll ask you to define
24 for me what you understand mixing a

1  record to be.
2      A.    I define mixing a
3  record to get all of the components,
4  guitars, every different instrument,
5  every different sound, every different
6  vocal track, and find their -- the
7  right space sonically so that you can
8  hear everything clearly from the
9  direction of the producer.
10     Q.    Did you do that with
11 Club Girl?
12     A.    I did.
13     Q.    Okay.  And after you --
14 did anyone help you mix the record?
15     A.    Dante.
16     Q.    Did Wil Guice?
17     A.    No.
18     Q.    After you and Mr.
19 Barton mixed Club Girl, did you master
20 it, master the record?
21     A.    No.
22     Q.    Did you do anything
23 after you mixed it?
24          MR. MALOFIY:

1           Objection.
2  BY MR. DAVIS:
3      Q.    With Club Girl?
4      A.    What do you mean,
5  anything?
6      Q.    Any other kind of
7  musical application or production
8  application to the product that
9  existed after you mixed it?
10          MR. MALOFIY:  Just --
11          THE WITNESS:  Yes.
12 BY MR. DAVIS:
13     Q.    What did you do?
14     A.    We went after some of
15 the defendants took hold of the music,
16 we went back and did some revisions.
17     Q.    You are getting ahead
18 of me, but --
19     A.    That did happen.
20     Q.    I understand --
21          MR. MALOFIY:  Don't cut
22     him off.
23          THE WITNESS:  But
24     normally what we did was we

1      wrote songs.  Our intention
2      was to write songs, or try to
3      write hit songs, and we would
4      archive them and hand them
5      over to Tommy Van Dell and
6      other people.
7  BY MR. DAVIS:
8      Q.    That wasn't my
9  question.  I didn't ask that question,
10 but thank you for the information.
11     A.    Sure.
12     Q.    In your mind, was Club
13 Girl a finished work?
14     A.    In my mind?
15     Q.    Yes, after you mixed
16 it, aside from the mastering of it?
17     A.    It is so hard to say.
18 It is just a hard thing, as an artist,
19 as a musician, as a producer, it is
20 really hard to put that final stamp on
21 a song.
22     Q.    You considered it a
23 musical work at that point?
24     A.    It was definitely a

Page 110

1   musical work at that point.
2        MR. MALOFIY:
3   Gentlemen, I'm going to need
4   to take a bathroom brake.  Is
5   this a good stopping point.
6        MR. DAVIS:  Why don't
7   we take a break.
8        VIDEOGRAPHER:  The time
9   is 12:30 p.m.  We are going
10  off the record.
11       - - -
12       (At this time a short
13  break was taken.)
14       - - -
15       VIDEOGRAPHER:  The time
16  is now 12:46 p.m.  We are back
17  on the record.
18  BY MR. DAVIS:
19       Q.    Okay.  We are just back
20  from a break.  I'm going to show you
21  Document 75 from the court docket.
22       MR. DAVIS:  Mr.
23  Malofiy, I don't have an extra
24  copy of it.

Page 111

1        MR. MALOFIY:  Can I see
2   it?
3        MR. DAVIS:  This is the
4   order from Judge Diamond in
5   this case.  Did you have an
6   opportunity to look at it?
7        MR. MALOFIY:  You are
8   asking me?
9        MR. DAVIS:  I'm going
10  to give you an opportunity to
11  look at it.
12       MR. MALOFIY:  Thank
13  you.  This is the one that
14  just came through, right?
15       MR. DAVIS:  Yes.
16       MR. MALOFIY:  Like,
17  last week.
18  BY MR. DAVIS:
19       Q.    Mr. Marino, I'm going
20  to show you what --
21       MR. MALOFIY:  Is that
22  marked as Marino --
23       MR. DAVIS:  I'm not
24  going to mark it.

Page 112

1        MR. MALOFIY:  Seven.
2   Okay.
3        MR. DAVIS:  I'm just
4   going to show it to him.
5   BY MR. DAVIS:
6        Q.    Document 75, this is an
7   order from Judge Diamond in this case.
8   Have you seen that order before?
9        A.    I'm not sure if I saw
10  it or not.
11       Q.    Are you aware that
12  Judge Diamond ruled that any damages
13  that you may be entitled to in
14  connection with your claims against my
15  clients are barred from the period
16  from before October 28, 2008?
17       A.    Can you say that again?
18       Q.    Are you aware that
19  Judge Diamond ruled in this case that
20  you cannot seek any damages against my
21  clients for copyright infringement for
22  the period before October 28, 2008?
23       A.    No.
24       Q.    You are not aware of

Page 113

1   that?
2        A.    I was told, but I'm not
3   quite sure what it all means.
4        MR. MALOFIY:  You can't
5   talk about our communications.
6   BY MR. DAVIS:
7        Q.    This opinion says that
8   any claim that you have for copyright
9   damages, whether it be damages or
10  profits or statutory damages that
11  arose prior to October 28, 2008 cannot
12  be pursued by you, that they are
13  dismissed from the case?
14       MR. MALOFIY:  Let's be
15  clear, with the right to
16  amend.
17  BY MR. DAVIS:
18       Q.    Do you understand that?
19       MR. MALOFIY:  Let's be
20  clear, with the right to
21  amend.
22       THE WITNESS:  You said
23  an opinion?  Did you say
24  opinion at the beginning of



1        that?
2   BY MR. DAVIS:
3       Q.    No, I didn't.
4       A.    Okay.  I hear what you
5   are saying.
6       Q.    I said, do you
7   understand that?
8       A.    Yeah.  Sure.
9       Q.    Is this the first time
10  that you were aware of that?
11      A.    No.
12      Q.    You knew that
13  previously?
14      A.    I did, but I don't
15  really understand it all, so I've
16  heard it, but I don't quite -- I'm not
17  an attorney so I don't quite --
18          MR. MALOFIY:  You can't
19      talk about our communications.
20  BY MR. DAVIS:
21      Q.    As part of your prior
22  answer, when we were talking about --
23  when you were testifying about Club
24  Girl, and I asked you, did you do

1   anything after the work was mixed, you
2   began to tell me about other work that
3   was done to Club Girl at some later
4   point.  Do you recall that?
5       A.    I do.
6       Q.    All right.  And would
7   you describe for me this other work
8   that you allege was done to Club Girl?
9       A.    Sure.  What I would
10  like to make clear, and I don't think
11  you understand is that the song Club
12  Girl I wrote originally on my own, I
13  recorded on my own, and now you are
14  defending those clients that stole
15  that song from me.
16      Q.    You are making a
17  statement that is not responsive to my
18  question.
19          MR. MALOFIY:  I believe
20      it is.
21  BY MR. DAVIS:
22      Q.    My question to you was,
23  you had testified earlier about other
24  contributions that were made --

1          MR. MALOFIY:
2      Objection.
3   BY MR. DAVIS:
4       Q.    -- to the Club Girl --
5          MR. MALOFIY:  That is
6      not what was stated.
7   BY MR. DAVIS:
8       Q.    -- work.  Do you recall
9   testifying about that?
10      A.    I do.  I do.
11          MR. MALOFIY:
12      Objection.
13  BY MR. DAVIS:
14      Q.    Okay.  What other work
15  was done to Club Girl?
16          MR. MALOFIY:
17      Objection.  You can answer.
18          THE WITNESS:  The other
19      work that was done to Club
20      Girl was when I tried to work
21      on it with Jimmy Jam or Terry
22      Lewis, one of those guys, and
23      Mark Pitts, with Dante Barton.
24  BY MR. DAVIS:

1       Q.    What did you do?
2       A.    They asked us to try to
3   rewrite the hook.
4       Q.    Did you do that?
5       A.    We did.
6       Q.    Did you agree to do
7   that?
8       A.    Did I agree to do that?
9       Q.    To do it?
10      A.    I did it.
11      Q.    You were not forced to
12  do it, were you?
13      A.    Was I forced to do it?
14      Q.    Yes.
15      A.    No.
16      Q.    And did you want to
17  give this new material to Mr. -- Jimmy
18  Jams and Mr. Pitts?
19      A.    I didn't want to have
20  it stolen from me, but I -- absolutely
21  I wanted to make it a part of
22  something bigger.
23      Q.    You wanted the new
24  elements that you claim that you

1  created made part of Club Girl?
2         MR. MALOFIY:
3     Objection.  You can answer.
4         THE WITNESS:  I don't
5     understand what you are
6     saying.
7  BY MR. DAVIS:
8     Q.    You are describing that
9  you did additional work for the song
10  Club Girl.
11     A.    Uh-huh.
12     Q.    Did you intend for
13  those additional parts that you worked
14  on to be part of Club Girl?
15         MR. MALOFIY:
16     Objection.  You can answer.
17  BY MR. DAVIS:
18     Q.    To be included in Club
19  Girl?
20     A.    If I wrote additional
21  parts to the song that I originally
22  wrote, yes, I would want them to be on
23  there.
24     Q.    And the material that

1  you say you created, you --
2     A.    That I did create.  I'm
3  the only person that created that
4  song.
5     Q.    You in some way got
6  that new material to Jimmy Jams?
7     A.    Yes.
8     Q.    And did he include that
9  additional material in Club Girl?
10     A.    It was for a short
11  while, yes.
12     Q.    Was it taken out?
13     A.    I don't know what
14  happened to it.  I guess it was taken
15  out.  I can't say what happened to it.
16     Q.    Well, when you gave it
17  to Mr. -- Jimmy Jams --
18     A.    I don't know what they
19  did with it.
20     Q.    You didn't have any
21  objection to them including it, if
22  they wanted to?
23         MR. MALOFIY:
24     Objection.

1  BY MR. DAVIS:
2     Q.    Is that true?
3         MR. MALOFIY:  You can
4     answer.
5         THE WITNESS:  Well, it
6     was to be talked about
7     afterwards, sure.  I mean,
8     they were going to give their
9     opinion and see what I felt
10     about it.
11  BY MR. DAVIS:
12     Q.    See what you felt about
13  it?
14     A.    That's right.  You got
15  to understand, that's my song
16  originally.
17     Q.    Did you not want to
18  include this additional material that
19  you created as part of this song?
20     A.    It is hard to say.  I
21  mean, you write songs, and sometimes
22  you just listen to it for a few days
23  and feel it out.
24     Q.    Tell me, Mr. Marino,

1  did you ever have any written
2  agreement with Mr. Barton and Mr.
3  Guice concerning Club Girl?
4     A.    Look, I come from a
5  family -- my parents come from Italy,
6  they came here in the boat from Italy.
7  They taught you to be honest, and a
8  lot of times you say your word, that
9  was your word, and my relationship
10  with Dante was all a handshake,
11  verbally.
12     Q.    So you didn't have a
13  written agreement with Mr. Barton or
14  Mr. Guice with respect to Club Girl?
15     A.    No.
16     Q.    The record will be
17  better if I finish my question before
18  you answer.
19     A.    Okay.
20     Q.    So you didn't have a
21  written agreement with Mr. Guice or
22  Mr. Barton for Club Girl; is that
23  correct?
24     A.    No agreement.

MAGNA
LEGAL SERVICES

Page 122

```
 1       Q.    Did you have --
 2           MR. MALOFIY:
 3       Objection.
 4  BY MR. DAVIS:
 5       Q.    -- any written
 6  agreements between yourself and Dante
 7  Barton?
 8       A.    We may have, yeah.
 9       Q.    Well, could you tell me
10  which ones you had?
11       A.    Production agreements.
12       Q.    Between you and Mr.
13  Barton, between you?
14       A.    Yeah, between us.
15       Q.    Production agreements
16  for what?
17       A.    For songs that we
18  worked on.
19       Q.    It is an agreement that
20  you made with him with respect to a
21  particular song?
22       A.    Artist.
23       Q.    Oh, an artist.  So was
24  it agreement with you and Mr. Barton
```

Page 123

```
 1  on one side of the contract, and the
 2  artist on the other side of the
 3  contract?
 4           MR. MALOFIY:
 5       Objection.
 6  BY MR. DAVIS:
 7       Q.    Is that what you mean?
 8       A.    Yeah, we were
 9  production contracts between an
10  artist.
11       Q.    Yeah.  What I'm asking
12  you is, did you have an agreement
13  between you and Mr. Barton?
14       A.    Yes.
15       Q.    That was in writing?
16       A.    Not in writing, no, but
17  we did have an agreement.
18       Q.    Oral agreements?
19       A.    Verbal, on a handshake.
20       Q.    Okay.  Did you have any
21  written agreements between yourself
22  and Mr. Guice?
23       A.    Just verbal agreements.
24       Q.    Okay.  Did you have any
```

Page 124

```
 1  written agreements between -- I should
 2  say among you, Mr. Barton and Mr.
 3  Guice?
 4       A.    The only agreements we
 5  had --
 6           MR. MALOFIY:  Can you
 7       repeat that question?  I'm
 8       sorry.  I was writing.
 9             - - -
10           (At this time the court
11       reporter read back from the
12       record as was requested.)
13             - - -
14           THE WITNESS:  We had
15       agreements.
16  BY MR. DAVIS:
17       Q.    I'm asking you, did you
18  have any written agreements?
19       A.    No written agreements.
20       Q.    Thank you.  How long
21  have you been writing songs?
22       A.    Wow, a long time.
23  Since I was a kid.
24       Q.    How old are you today?
```

Page 125

```
 1       A.    Thirty-six.  I'll be
 2  thirty-seven next week.
 3       Q.    Approximately when did
 4  you begin writing songs?
 5       A.    Teenager.
 6       Q.    At some point in your
 7  writing career, did you know that
 8  songs needed to be copyrighted, or
 9  could be copyrighted?
10       A.    You know, again, I'm
11  not an attorney, especially at that
12  age.  Now, going through this entire
13  case, I'm a little more knowledgeable
14  on everything, but at that time, no, I
15  wasn't sure.
16       Q.    When did you become
17  aware of copyrighting the works that
18  you --
19       A.    I mean, I've always
20  heard of copyrights, but again, I'm
21  not an attorney.  I just don't know.
22       Q.    To this day, do you
23  have an understanding what it means to
24  copyright --
```

**MAGNA**
**LEGAL SERVICES**

Page 126

1      A.   I believe I have a
2  better understanding.
3      Q.   Please let me finish.
4         - - -
5      (At this time the court
6  reporter read back from the
7  record as was requested.)
8         - - -
9  BY MR. DAVIS:
10     Q.   Do you have an
11 understanding what it means to
12 copyright a musical work today?
13     A.   I believe I do.
14     Q.   What is your
15 understanding?
16     A.   I believe that your
17 song is automatically copy written
18 upon recording it for the first time.
19     Q.   When did you have an
20 understanding of filing any paperwork
21 with the copyright office?
22     A.   I didn't know it was
23 necessary.
24     Q.   Do you know it to be

Page 127

1  necessary today?
2      A.   I think it helps.
3      Q.   When did you get this
4  understanding that it could help to
5  copyright a wrong in the copyright
6  office?
7      A.   In the past several
8  years.
9      Q.   Could you fix it with
10 any greater certainty than the past
11 several years?
12     A.   No.
13     Q.   Did you know that back
14 in 2001?
15     A.   No.
16     Q.   What about 2002?
17     A.   No.
18     Q.   2003?
19     A.   No.
20     Q.   2004?
21     A.   No.
22     Q.   2005?
23     A.   No.
24     Q.   2006?

Page 128

1      A.   No.
2      Q.   What about in 2007?
3      A.   No.
4      Q.   2008?
5      A.   No.
6      Q.   Did you register Club
7  Girl with the US Copyright Office at
8  any time?
9      A.   No.
10     Q.   Did you ever think to
11 do so?
12     A.   I didn't think I needed
13 to.
14     Q.   Did you have any
15 understanding that someone was doing
16 that for you?
17        MR. MALOFIY:
18     Objection.  You can't talk
19     about our communications.
20 BY MR. DAVIS:
21     Q.   Besides anything your
22 lawyer may have told you.
23     A.   I believe that Tommy
24 Van Dell was handling that for us.

Page 129

1      Q.   So you understood that
2  Tommy Van Dell was doing something to
3  copyright Club Girl?
4      A.   I heard about it and I
5  heard copyrights, and again, I wasn't
6  on the business side, so I would
7  assume he was taking care it.
8      Q.   Tell me how you heard
9  that from Tommy Van Dell.
10     A.   I didn't hear it from
11 Tommy Van Dell.  I said I assumed that
12 he was doing this.
13     Q.   Why did you assume it?
14     A.   Because Dante was
15 taking care of everything.
16     Q.   And you had an
17 understanding that he was going to
18 file some kind of document to register
19 the copyright?
20     A.   Again, I really am not
21 sure.
22     Q.   Well, tell me what your
23 understanding of what you thought he
24 was going to be doing was.

Page 130

1    A.    Who?
2    Q.    Van Dell.
3    A.    Placing our music and
4  making sure that, you know, all the
5  legalities were taken care of.
6    Q.    Did Mr. Van Dell tell
7  you that, or did Mr. Barton tell you
8  that?
9         MR. MALOFIY:
10  Objection.  Are you asking --
11        MR. DAVIS:  Stop it.
12        MR. MALOFIY:  --
13  specific conversation or
14  something else?
15        THE WITNESS:  Can you
16  repeat that question?
17 BY MR. DAVIS:
18    Q.    Did Mr. Van Dell tell
19  you that or did Mr. Barton tell you
20  that?
21    A.    Tell me what?
22    Q.    That the legalities, as
23  you phrased it, were being handled by
24  Mr. Van Dell?

Page 131

1         MR. MALOFIY:  For what?
2  Objection.
3  BY MR. DAVIS:
4    Q.    For Club Girl.
5         MR. MALOFIY:
6  Objection.  Be clear.
7         THE WITNESS:  Like I
8         said, Dante always took care
9         of all the business aspects.
10        Van Dell was around from time
11        to time, but it was
12        communicated to me through
13        Dante that Tommy was taking
14        care of it.
15 BY MR. DAVIS:
16    Q.    That he was going to
17  protect --
18    A.    Just take care of us as
19  a publisher.
20    Q.    Okay.  Did you ever
21  check with Mr. Van Dell whether or not
22  he was doing what you thought he was
23  doing --
24    A.    I didn't check.

Page 132

1    Q.    You have to let me
2  finish the question.  I know you have
3  got prepared responses.
4         MR. MALOFIY:
5  Objection.
6  BY MR. DAVIS:
7    Q.    I have to at least ask
8  the question.
9         MR. MALOFIY:  The truth
10        is the truth.
11 BY MR. DAVIS:
12    Q.    Did you ever check with
13  Mr. Van Dell to see --
14        MR. MALOFIY:  Spare me
15        the --
16 BY MR. DAVIS:
17    Q.    -- if he was handling
18  Club Girl?
19    A.    I was led to believe
20  that he was taking care of it.
21    Q.    Who led you to believe
22  that?
23    A.    He did.
24    Q.    Did he?

Page 133

1    A.    Yes.
2    Q.    In specific
3  conversations you had with him?
4    A.    Just coming through the
5  studio, being a great, jolly guy,
6  coming in, sitting, hanging out with
7  me, listening to my songs, what do you
8  have next, let's hear the next, Dan,
9  what have you got, let's hear the
10  song, we can use this for so-and-so.
11  I mean, it happened.  I mean, he was
12  like my buddy, at least I thought he
13  was.
14    Q.    So he regularly came to
15  the studio?
16    A.    I would say maybe five
17  times a year.
18    Q.    And through these
19  appearances in the studio you thought
20  he was taking care of business for
21  you?
22    A.    Absolutely.
23    Q.    Did he ever
24  specifically tell you that he had

MAGNA
LEGAL SERVICES

Page 134

1  taken care of registering Club Girl on
2  your behalf?
3      A.   I don't recall who told
4  me, but within our camp it was either
5  him or Dante.
6      Q.   So you had some
7  understanding that a registration of
8  Club Girl had taken place?
9      A.   Yeah.  Yeah.  But I
10 didn't know, really, what that meant.
11     Q.   But you thought it had
12 been registered?
13     A.   I thought that I
14 recorded the song on my own and it was
15 my song, and I was dealing with people
16 that I trusted, but they stole it.
17     Q.   Did you ever ask to see
18 what they had done, if there was any
19 way that you could look at a piece of
20 paper to see whether or not they had
21 done what you understood them to have
22 done?
23     A.   If I didn't understand
24 it, why would I ask to see it?

Page 135

1      Q.   So the answer is no,
2  you never asked?
3      A.   I can't say no or yes
4  to that.  I don't even understand what
5  that question is.
6      Q.   Well, I'll take that as
7  a no, that you didn't ask.
8      A.   What is your question?
9      Q.   You never asked whether
10 or not Mr. Van Dell ever registered
11 Club Girl?
12         MR. MALOFIY:
13     Objection.  You can answer.
14         THE WITNESS:  Can you
15     rephrase that?
16 BY MR. DAVIS:
17     Q.   Did you ever ask Mr.
18 Van Dell if he registered Club Girl to
19 protect your rights?
20     A.   I don't recall.
21     Q.   Did you ever ask
22 Mr. Van Dell if he had registered any
23 work that you may have delivered to
24 him during the period you knew him?

Page 136

1      A.   I don't know why I
2  would have to ask him to register, if
3  he did or if he didn't, my work that I
4  recorded on my own that was mine.
5      Q.   Did you register your
6  own work?
7      A.   All I know is when I
8  record it, when I wrote it, it is my
9  wrong.
10     Q.   Did you ever have an
11 opportunity to look at any copyright
12 registration with respect to Club
13 Girl?
14     A.   Mr. Davis, I think I
15 said it several times.  The song that
16 I recorded that I wrote on my own,
17 that I produced and engineered on my
18 own is my song.  I didn't feel that I
19 really had to go check on my close
20 friends for anything until after I
21 realized it was stolen from me.
22     Q.   Let me understand that.
23 Based on your statement, are you
24 forgetting about your testimony that

Page 137

1  you said Mr. Guice and Mr. Barton
2  contributed to that song, Club Girl?
3      A.   After I wrote it, after
4  I recorded it on my own, they added to
5  it.
6      Q.   All right.  Did you
7  share that song with them?
8      A.   I let them listen to
9  it.  I played it for them.
10     Q.   When the song was --
11 all of these pieces that were put
12 together to create Club Girl, when it
13 was complete, did you have a
14 discussion of how you would own this
15 work together?
16         MR. MALOFIY:
17     Objection.  You can answer.
18         THE WITNESS:  We've had
19     that discussion prior to Club
20     Girl.
21 BY MR. DAVIS:
22     Q.   Okay.
23     A.   It is our understanding
24 we work as a team.  The song writing



1    is split three ways; myself, Dante and
2    Wil.  The production Wil had nothing
3    to do with.  So it was myself and
4    Dante that split the production 50/50.
5        Q.    Are you saying that the
6    three of you, with respect to the
7    composition, co-owned it equally?
8            MR. MALOFIY:
9        Objection.  You can answer.
10           THE WITNESS:  I owned
11       it on myself.  I created it by
12       myself, the underlying
13       composition.
14   BY MR. DAVIS:
15       Q.    So is it your position
16   that they don't have any ownership
17   interest in Club Girl?
18       A.    They do.
19       Q.    What his their
20   interest?
21       A.    Songwriting.
22       Q.    What does that mean to
23   you?
24       A.    They helped write the

1    song.
2        Q.    And what does that mean
3    in terms of their participation in
4    Club Girl?
5        A.    I don't understand your
6    question.
7        Q.    If you earned a dollar
8    from the exploitation of Club Girl,
9    would they be entitled to any part of
10   that dollar?
11           MR. MALOFIY:
12       Objection.  It is a legal
13       question.
14           THE WITNESS:  Again, I
15       was just going to say, I'm not
16       really quite sure how it all
17       breaks down, how it works, but
18       yes, they did get some
19       contribution to the song.
20   BY MR. DAVIS:
21       Q.    You said you made a
22   deal with them.  I just want to
23   understand what the deal was.
24       A.    I just told you.

1        Q.    Explain it to me again.
2            MR. MALOFIY:  He said
3        it five times.  Five times.
4    BY MR. DAVIS:
5        Q.    Just answer the
6    question.
7        A.    We are a trio.
8            MR. MALOFIY:  You are
9        unbelievable.  He said it
10       three to five times.  The
11       record will reflect that.
12       Your memory may be failing.
13           THE WITNESS:  We split
14       the song writing three ways,
15       between the three of us.  Do I
16       need to describe who the three
17       are?
18   BY MR. DAVIS:
19       Q.    You don't have to
20   describe who they are, but explain to
21   me what you mean when you split it
22   three ways.  What does that mean?
23       A.    One-third each.  The
24   songwriting credit, the songwriting,

1    whatever that brings in.
2        Q.    When you say, what it
3    brings in, what do you mean by that?
4        A.    Compensation.
5        Q.    Compensation -- take my
6    example, a dollar comes in.  Would you
7    each get?
8        A.    $0.33 on the
9    songwriting.
10       Q.    Songwriting.  Okay.  On
11   the production side, how would that be
12   split, if at all?
13       A.    $0.50 between myself
14   and Dante.
15       Q.    Thank you.  Was it the
16   original plan to have Wil Guice
17   exploit Club Girl as the singer?
18           MR. MALOFIY:
19       Objection.  You can answer.
20           THE WITNESS:  I'm not
21       sure what that question is.
22   BY MR. DAVIS:
23       Q.    Was it the initial plan
24   for Wil Guice to be the person who

**MAGNA**
LEGAL SERVICES

1   performed the song Club Girl?
2          MR. MALOFIY:
3          Objection.  You can answer, to
4          the best of your ability.
5          THE WITNESS:  Was it
6          the original plan to have Wil
7          Guice exploit Club Girl?
8   BY MR. DAVIS:
9          Q.    Yes.
10         A.    My original plan, I
11  didn't have an original, original
12  plan.  I just wrote the song and
13  recorded it on my own, and then I
14  worked together with them and we added
15  more to it, and we initially wanted
16  Wil Guice to have that as a single.
17  So I'm not sure if that answers your
18  question.
19         Q.    Look at paragraph 303
20  of your complaint and tell me if that
21  refreshes your recollection about what
22  the original plan was for Club Girl.
23  303.
24         A.    303.  303?

1          Q.    Three hundred and
2   three.
3          A.    I don't --
4          MR. MALOFIY:
5          Paragraph.
6          THE WITNESS:  Oh,
7          paragraph.  Thank you.
8   BY MR. DAVIS:
9          Q.    Do you want me to turn
10  it for you?
11         A.    No, I can find it.
12  Thank you.  303 you said, right?
13         Q.    Yes.
14         A.    Okay.  I read 303.
15         Q.    Was it the original
16  plan to have Wil Guice perform Club
17  Girl as a breakout hit?
18         MR. MALOFIY:
19         Objection.  Now you are
20         mischaracterizing what he said
21         before.
22         THE WITNESS:  I'm not
23         quite sure what you mean from
24         your question.

1   BY MR. DAVIS:
2          Q.    I'll read it for you
3   then.  Originally, Marino and Barton
4   were trying to brake Guice as an
5   artist, and had planned the song Club
6   Girl to be Guice's breakout hit.
7          What does that mean to
8   you?
9          A.    Like I stated earlier,
10  that we wanted to use it for him as a
11  single.
12         Q.    Okay.  You wanted him
13  to perform it?
14         A.    We wanted him to use
15  it, yeah.
16         Q.    Okay.  Did that happen?
17         A.    Did it happen?
18         Q.    Did he use it as a
19  single for his breakout performance?
20         A.    No. No.
21         Q.    Why not?
22         A.    Because it presented an
23  opportunity with Usher.
24         Q.    Okay.

1          A.    And I think you heard
2   from Wil's testimony yesterday that we
3   were left with the choice to either go
4   with it for himself --
5          Q.    Right.
6          A.    -- or to have Usher
7   perform Club Girl.
8          Q.    You knew about that
9   choice?
10         A.    I heard about it, yeah.
11         Q.    Okay.  And who told you
12  about that choice?
13         A.    Which?
14         Q.    The choice you are
15  saying, either for Wil Guice to
16  perform this song as a single --
17         A.    It was --
18         Q.    -- or Usher?
19         A.    Sorry.
20         Q.    Thank you.  You'll get
21  it.  We'll get it going.
22         A.    It was discussed
23  between myself, Dante and Wil.
24         Q.    Can you describe the

**MAGNA ▶**
LEGAL SERVICES

Page 146

1    conversation with any detail?
2        A.    Not really, other than
3    it was a decision we needed to make.
4    Are we going to use this for Wil or
5    are we going to use this opportunity
6    to have Usher sing the same song?
7        Q.    And what was the
8    decision?
9        A.    The decision was that
10   we were going to allow Usher to sing
11   the song.
12       Q.    And when was that
13   decision made?
14       A.    I couldn't tell you.
15   Before the record came out.
16       Q.    Fair statement.
17       A.    I just don't know when.
18       Q.    So it was sometime
19   before March of 2004?
20       A.    '04, yeah.
21       Q.    Okay.
22       A.    And with the
23   understanding that we all get our
24   equal songwriting and publish --

Page 147

1    production as we agreed upon.
2        Q.    That was an agreement
3    between you, Barton and Guice?
4        A.    It was an agreement
5    that the only way that song was to be
6    authorized to Usher was with that
7    understanding. Without that, there
8    would have been no authorization.
9        Q.    And Mr. Barton was
10   someone that was going to handle those
11   negotiations for you and Mr. Guice?
12       A.    That's right.
13       Q.    And you gave him the
14   authority to do that?
15       A.    With the understanding
16   that I was going to be credited
17   properly, as a songwriter, as a
18   producer and as an engineer.
19       Q.    But you gave him
20   permission to present the song to
21   Usher for his use?
22            MR. MALOFIY:
23            Objection.
24            THE WITNESS:  With that

Page 148

1    understanding.
2    BY MR. DAVIS:
3        Q.    Is it fair to say that
4    you, Mr. Barton and Mr. Guice wanted
5    Club Girl to be exploited
6    commercially?
7            MR. MALOFIY:
8            Objection.
9            THE WITNESS:  Not
10   stolen.
11   BY MR. DAVIS:
12       Q.    That is not my
13   question.
14            MR. MALOFIY:  He is
15            answering your questions very
16            thoroughly. That is the
17            problem, you don't like the
18            truth. You don't like the
19            truth, it disturbs you.
20            You've never seen the truth in
21            a deposition. You've seen
22            lots of lies by a lot of
23            people. This is the truth.
24   BY MR. DAVIS:

Page 149

1        Q.    Is it true that you,
2    Mr. Guice and Mr. Barton wanted Club
3    Girl to be commercially exploited?
4        A.    Only if we were
5    credited properly.
6        Q.    So the answer is yes?
7        A.    The answer is I didn't
8    want to have it taken from me without
9    being properly credited. That is my
10   answer.
11       Q.    But you left it to Mr.
12   Barton --
13            MR. MALOFIY:
14            Objection. He answered your
15            question thoroughly. You
16            don't like the answer, too
17            bad. The answer is the
18            answer.
19            MR. DAVIS:  Could you
20            read back the question,
21            please.
22                - - -
23            (At this time the court
24            reporter read back from the

1        record as was requested.)
2              - - -
3              MR. MALOFIY:  He
4        answered that repeatedly.
5    BY MR. DAVIS:
6        Q.    Please answer the
7    question.
8        A.    What is true is that I
9    wrote the song, and the song was
10   stolen from me.  That is what is true.
11       Q.    Mr. Marino, please
12   answer my question.  Did you, Mr.
13   Guice --
14             MR. MALOFIY:  He
15       answered it five times now.
16   BY MR. DAVIS:
17       Q.    -- and Mr. Marino [sic]
18   want Club Girl --
19             MR. MALOFIY:  Next
20       question.
21   BY MR. DAVIS:
22       Q.    -- to be commercially
23   exploited?
24             MR. DAVIS:  Are you

1        instructing him not to answer?
2              MR. MALOFIY:  I'm
3        telling you, you asked the
4        same question five times.  You
5        ask it one more time, you get
6        your answer, you go to the
7        next question.
8              MR. DAVIS:  Please, are
9        you instructing him not to
10       answer?
11             MR. MALOFIY:  You asked
12       him five times.
13             MR. DAVIS:  If you are
14       not instructing him not to
15       answer --
16             MR. MALOFIY:  Ask it
17       one more time.  You get the
18       same answer, then you go to
19       the next.
20             MR. DAVIS:  If you are
21       instructing him not to answer,
22       then I'll move on, but I'm not
23       moving on until he answers the
24       question.

1              MR. ROGERS:  Mr.
2        Malofiy, you are not letting
3        Mr. Davis finish the question.
4        I can't even hear him.
5              THE WITNESS:  He has
6        asked it five times.  I gave
7        him the same answer.
8              MR. ROGERS:  I can't
9        even hear the second part of
10       the question, so I don't know
11       if he's asked it before or
12       not.
13             MR. MALOFIY:  On the
14       transcript, it will show very
15       clearly, just like the
16       transcript from yesterday
17       showed that Guice knew he was
18       a defendant, just like you
19       misrepresented that to the
20       court.  So I don't want to
21       hear your claptrap.  I don't
22       want to hear these stories.
23       The transcript is the
24       transcript.  You asked him

1        five times the same question,
2        he gives the same answer.  You
3        don't like it, too bad.  That
4        is the truth.  Now ask it one
5        more time.
6              MR. ROGERS:  Let's
7        proceed.
8    BY MR. DAVIS:
9        Q.    Mr. Marino, did you,
10   Mr. Guice and Mr. Barton want Club
11   Girl to be commercially exploited?
12             MR. MALOFIY:
13       Objection.  You can answer it.
14             THE WITNESS:  With the
15       understanding that I was going
16       to be properly credited, Wil
17       was going to be properly
18       credited and Dante was going
19       to be properly credited for
20       our contributions of
21       songwriting, producing,
22       engineering, performing on the
23       song.
24   BY MR. DAVIS:



1    Q.    And you left that to
2  Mr. Barton to make sure that that
3  happened; is that right?
4           MR. MALOFIY:
5      Objection.  You can answer.
6           THE WITNESS:  I had Mr.
7      Barton take care of a lot of
8      my business affairs, but with
9      that being said -- I don't
10     even know how to really
11     answer.
12 BY MR. DAVIS:
13     Q.    Did you permit Mr.
14 Barton to negotiate with Usher or his
15 representatives for the use of Club
16 Girl that you have testified yourself,
17 Mr. Barton and Mr. Guice collaborated
18 on?
19          MR. MALOFIY:
20     Objection.  Asked and answered
21     about ten times.  You can
22     answer again.
23          THE WITNESS:  I've
24     given my answer to that.

1  BY MR. DAVIS:
2      Q.    So the answer is yes,
3  you did give --
4      A.    I never said yes.
5           MR. MALOFIY:
6      Objection.
7  BY MR. DAVIS:
8      Q.    Did you not give Mr.
9  Barton consent?
10     A.    I never authorized
11 anyone to steal my song.  Okay.  I
12 never authorized anyone to use my song
13 without me being properly credited,
14 and that is my answer.
15          MR. MALOFIY:  There you
16     go.
17          THE WITNESS:  That is
18     my answer.
19 BY MR. DAVIS:
20     Q.    Did you give Mr. Barton
21 permission to speak with the Usher
22 camp with respect to the use of Club
23 Girl?
24     A.    I never had to sit

1  there -- I never gave anyone
2  permission without me being properly
3  credited.
4      Q.    Are you telling me that
5  what you stated in your complaint is
6  not correct?
7           MR. MALOFIY:  Here you
8      go with your claptrap again.
9           THE WITNESS:  That is
10     not what I said.  My song was
11     stolen from me, and you defend
12     these people.
13          MR. DAVIS:  There is no
14     question.
15          MR. MALOFIY:  Let him
16     finish.
17          THE WITNESS:  And you
18     are defending these people,
19     and you're basically saying
20     that stealing is acceptable.
21 BY MR. DAVIS:
22     Q.    I'm going to turn to --
23 can I have the complaint, please.
24 Thank you.  I would like you to look

1  at paragraph 308.  Is that statement,
2  as you alleged it in the complaint,
3  true or false?
4           MR. MALOFIY:  Which
5      page?
6           MR. DAVIS:  Paragraph
7      308.
8           MR. MALOFIY:  On which
9      page?
10          MR. DAVIS:  It is
11     paragraph 308.
12          THE WITNESS:  I don't
13     have the rest of it.
14 BY MR. DAVIS:
15     Q.    It is right behind it.
16 Paragraph 308.  Just tell me whether
17 that allegation is true or false.
18          MR. MALOFIY:  He
19     answered this the last ten
20     minutes, and it is the same
21     answer he is going to give you
22     for the next ten minutes or
23     the next three hours.  You are
24     going to keep on asking the

Page 158

1      question trying to get an
2      answer that wants to fit your
3      lies and your stories, but the
4      answer is the answer, the
5      truth is the truth, and he'll
6      give it to you again, Mr.
7      Davis, because apparently you
8      are confused by what happened
9      here.
10          Give him the answer.
11          THE WITNESS: 308 is
12      with the understanding that I
13      would be properly credited and
14      compensated for the song.
15  BY MR. DAVIS:
16      Q.    My question is, is 308
17  in any way alleged inaccurately?
18      A.    No, it is -- it is with
19  the understanding that I, Wil and
20  Dante were to go off of our agreement.
21      Q.    I'm not quibbling with
22  you.  What I'm asking you is --
23      A.    I answered it.
24          MR. MALOFIY: He

Page 159

1      answered your question.
2  BY MR. DAVIS:
3      Q.    -- is paragraph 308, as
4  it is alleged, accurate and correct,
5  or do you want to change that
6  allegation?
7          MR. MALOFIY: He just
8      added -- he just told you.
9      You asked him the question
10      about 308, he told you his
11      answer, you don't like it, too
12      bad.  Next question.
13  BY MR. DAVIS:
14      Q.    Are you changing your
15  answer to --
16      A.    I'm not changing
17  anything from what I said.
18          MR. MALOFIY: He just
19      told you --
20          THE WITNESS: I just
21      told you what I said.
22          MR. MALOFIY: Listen,
23      now.  No.  No.  No.  We are
24      not playing this game where

Page 160

1      you sit here and ask the same
2      question because you don't
3      like the answer you get.  You
4      asked him multiple times the
5      same question, he's answered
6      it.  All right.  That is what
7      happened.  You don't like the
8      answer, too bad.  He is under
9      sworn testimony.  He is giving
10      you what you wanted.
11  BY MR. DAVIS:
12      Q.    I'm asking you one more
13  time, is there anything in 308, as
14  you've alleged it, that you would like
15  to change, yes or no?
16      A.    It is not a yes-or-no
17  answer.  I told you my answer.
18      Q.    The yes is yes, I
19  accept it as it's stated.  If it is
20  no, it is no, then you can tell me
21  what you want to change.
22          MR. MALOFIY: No, see,
23      he is not rewriting the
24      complaint here.

Page 161

1          THE WITNESS: I feel
2      like are you are tricking me
3      with law questions, and I just
4      don't feel comfortable.
5  BY MR. DAVIS:
6      Q.    I'm not trying to
7  trick you here.  I'm just trying to
8  get answers from you.
9      A.    I feel -- I don't trust
10  you.  You are defending people that
11  stole stuff from me, so I just don't
12  trust you.  I got to be straight with
13  you, Mr. Davis, you are defending
14  thieves.
15      Q.    I'm going to assume you
16  don't want to change anything from
17  308?
18      A.    I am not telling you
19  that.  I don't know how to answer your
20  question.
21          MR. MALOFIY: He is not
22      a lawyer, he is not writing
23      the complaint or amended
24      complaint.



41 (Pages 158 to 161)

Page 162

1    THE WITNESS:  I don't
2  know how to answer your
3  question --
4    MR. MALOFIY:  He
5  answered your question.
6    THE WITNESS:  -- other
7  than what I said.
8  BY MR. DAVIS:
9    Q.    Paragraph 309, is that
10 allegation accurate?
11   A.    I didn't understand
12 anything you just said.
13   Q.    Is paragraph 309, as it
14 is alleged, is it accurate?
15   A.    I need to read it.
16   Q.    It is right here.
17   A.    Marino, Barton and
18 Guice agree that each would share
19 equally a respective one-third
20 interest in the songwriting credits of
21 the song.  A previous --
22   Q.    I'm asking --
23   A.    -- before the comma --
24 before the comma it says, consistent

Page 163

1  with the prior agreement, okay, which
2  I don't know what that means in this
3  -- I'm confused here at this moment.
4  I don't know what consistent with the
5  prior agreement is referring to.
6    Q.    This your complaint,
7  Mr. Marino.
8    A.    I understand that, but
9  you are --
10   Q.    This is the one you
11 approved for filing.
12   MR. MALOFIY:  Let him
13   answer your question.  Don't
14   cut him off.
15   THE WITNESS:  I
16   understand that, but I don't
17   feel like you are being very
18   straight with me, and I feel
19   like you are tricking me with
20   your questions.  Okay?  And I
21   understand what you are
22   saying, you want me to agree
23   or not agree with 309.  What
24   I'm trying to tell you is I'm

Page 164

1    confused at this moment with
2    the first five words of that
3    statement.  I am.
4  BY MR. DAVIS:
5    Q.    So looking at your own
6  complaint, you can't tell me --
7    A.    I'm a bit confused.
8  I'm not an attorney.
9    Q.    So are you telling me
10 you are unfamiliar with your
11 complaint?
12   A.    I'm familiar with my
13 complaint --
14   MR. MALOFIY:  Ask him a
15   question.
16   THE WITNESS:  -- but
17   the way you are trying to get
18   -- the way you are approaching
19   this question, I don't feel
20   comfortable with -- I just
21   don't trust you, man, straight
22   up.
23 BY MR. DAVIS:
24   Q.    Let me ask you

Page 165

1  differently.
2    A.    It is like you are
3  tricking me.
4    Q.    Is there anything in
5  this complaint that you want to
6  change?
7    A.    No.
8    MR. MALOFIY:
9    Objection.  He is not a
10   lawyer.
11 BY MR. DAVIS:
12   Q.    You stand on this
13 complaint?
14   A.    No, I don't know --
15 right now I don't know what you are
16 trying to do, but I feel as though
17 whatever you did to Wil Guice
18 yesterday to fluster him, you are kind
19 of doing it to myself, and I would
20 like a break right now.
21   MR. DAVIS:  Take a
22   break.
23   VIDEOGRAPHER:  The time
24   is now 1:22 p.m.  We are going

1   off the record.
2       - - -
3       (At this time a short
4   break was taken.)
5       - - -
6       VIDEOGRAPHER: Okay.
7   The time is now 1:24 p.m. This
8   concludes DVD number one in
9   the deposition of Daniel
10  Marino. We are going off the
11  record.
12      - - -
13      (At this time a short
14  break was taken.)
15      - - -
16      VIDEOGRAPHER: The time
17  is now 1:36 p.m., and this
18  begins DVD number two in the
19  deposition of Daniel Marino.
20  BY MR. DAVIS:
21      Q.   Mr. Marino, tell me
22  what authority you gave Mr. Barton to
23  negotiate on your behalf for Club
24  Girl --

1       MR. MALOFIY:
2   Objection.
3   BY MR. DAVIS:
4       Q.   -- with the Usher
5   representatives who were interested in
6   recording Club Girl?
7       MR. MALOFIY: Objection
8   you can answer.
9       THE WITNESS: I'm
10  sorry. Can you rephrase that,
11  please?
12  BY MR. DAVIS:
13      Q.   You don't understand
14  that question?
15      A.   It is not that I don't
16  understand it.
17      MR. MALOFIY: It is a
18  long question, compound
19  question, and you got to break
20  it down.
21      MR. DAVIS: Before Mr.
22  Malofiy interrupted me, what
23  was the question, so that you
24  can repeat it to the witness?

1       - - -
2       (At this time the court
3   reporter read back from the
4   record as was requested.)
5       - - -
6       THE WITNESS: The
7   authority that I gave him was
8   that, with the understanding
9   that I was properly credited
10  as a songwriter, one-third, I
11  was properly credited as a
12  producer, 50 percent, to
13  negotiate Usher to re-sing and
14  rerecord my performance.
15  BY MR. DAVIS:
16      Q.   So subject to those
17  caveats, you did give Mr. Barton
18  authority to negotiate on your behalf
19  for Club Girl?
20      MR. MALOFIY:
21  Objection. I think he
22  answered this question before
23  the break. Now, after the
24  break you can ask it again as

1   many times as you want. Do it
2   100 times. What you want is
3   you want a little piece of
4   information, but what you are
5   getting is you are getting the
6   truth, and you can't handle
7   the truth.
8       MR. DAVIS: Mr.
9   Malofiy, you are interrupting
10  the answer. There is a
11  question posed, and it is
12  impermissible for you to do
13  that. I ask you not to do it.
14      MR. MALOFIY: What is
15  happening here is you are
16  going to sit here for three
17  hours asking the same
18  question, and you are going to
19  try to break my witness, but
20  he is not going to break
21  because he knows what the
22  story is, and the truth is
23  always the truth. There is
24  only one truth. Go ahead,

MAGNA
LEGAL SERVICES

1    answer the question.
2         THE WITNESS:  I feel
3    like this is the same question
4    you posed before the break.
5    BY MR. DAVIS:
6         Q.    I asked you fairly, and
7    I'm certainly not trying to trick you,
8    Mr. Marino, I just want your honest
9    and truthful testimony.  All I am
10   asking is subject to the caveats you
11   expressed, did you give Mr. Barton
12   authority to negotiate on your behalf
13   for Club Girl?
14        MR. MALOFIY:
15        Objection.  Asked and
16        answered, repeatedly.  All
17        right.  And furthermore,
18        caveats.
19        THE WITNESS:  With the
20        understanding that I, Wil and
21        Barton were to be properly
22        credited for the song Club
23        Girl that I originally wrote
24        on my own, Barton negotiated

1    with Usher, whom I met, okay,
2    and also knew that I wrote the
3    song and produced the song, as
4    well as Bobby Ross Avila, as
5    well as Jimmy Jam and Terry
6    Lewis, as well as Tommy Van
7    Dell, as well as Mark Pitts,
8    all knew that I originally
9    wrote that song.  He spoke to
10   your camp and negotiated the
11   song Club Girl.
12   BY MR. DAVIS:
13        Q.    Okay.  We'll get into
14   the conversations that you are
15   reporting in a moment.  So he had
16   authority?
17        MR. MALOFIY:
18        Objection.
19        THE WITNESS:  He had
20        authority on my behalf, so
21        long as, the only way --
22        otherwise, it would have been
23        no authorization, period.  The
24        only way he was authorized to

1    speak on my behalf was if I
2    was properly credited.
3    BY MR. DAVIS:
4         Q.    That was an
5    understanding you had with Mr. Barton?
6         MR. MALOFIY:
7         Objection.
8         THE WITNESS:  Mr.
9         Barton and everyone else that
10        knew in your camp and all the
11        other defendants on here that
12        knew about it, yes.  As long
13        as they all knew I was
14        properly credited, then he had
15        the authority.  Without that,
16        there was no authority.
17   BY MR. DAVIS:
18        Q.    The conversation you
19   had with Mr. Barton about Usher using
20   the song, was anyone else present when
21   you had that conversation?
22        A.    With Usher?
23        MR. MALOFIY:
24        Objection.

1         THE WITNESS:  I didn't
2         understand the question.
3    BY MR. DAVIS:
4         Q.    The conversation that
5    you are telling me about when you gave
6    Mr. Barton instructions of how Club
7    Girl could be used, was anyone else in
8    the room with you?
9         MR. MALOFIY:
10        Objection.  You characterized
11        it as a conversation.
12        THE WITNESS:  I can't
13        recall that anyone else was
14        there other than Wil.  Tommy
15        Van Dell was around.  Other
16        than that, I really don't
17        remember who was in the room.
18   BY MR. DAVIS:
19        Q.    Okay.  Where was this
20   conversation, or conversations, if it
21   was more?
22        A.    It was in the studio,
23   most likely.
24        Q.    In Pennsylvania?



Page 174

1    A.    Absolutely.
2    Q.    Okay.
3    A.    And also we did speak,
4  I did speak with Tommy Van Dell on the
5  airplane ride back from Nashville in
6  regards to this.
7    Q.    Okay.  I'll ask you
8  questions about that in a moment.
9         At some point did Mr.
10  Barton tell you that a deal had been
11  reached for Usher to record and
12  perform a version of Club Girl?
13       MR. MALOFIY:
14       Objection.  You can answer.
15       THE WITNESS:  I'm going
16       to say your question just to
17       make sure I heard it correct.
18       You are asking me, did Barton
19       tell me at some point that he
20       negotiated a deal with Usher?
21  BY MR. DAVIS:
22    Q.    For Usher to perform
23  and record a version of Club Girl.
24       MR. MALOFIY:

Page 175

1       Objection.  You can answer.
2       THE WITNESS:  Yes.
3  BY MR. DAVIS:
4    Q.    Do you remember when
5  that was?
6    A.    Exact date, no.
7    Q.    Wasn't that an
8  important moment for you when you
9  heard that?
10    A.    Very exciting.
11    Q.    Tell me more about how
12  you felt when you heard that.
13    A.    I felt like it was a
14  pretty surreal moment.  Like, you
15  know, I wrote a song that Usher is now
16  going to just re-sing and use my
17  original recording for.  It was
18  exciting.
19    Q.    Did you tell anybody
20  when you heard that news?
21    A.    I may have.  I don't
22  remember.  I had many situations where
23  one of my songs could have been picked
24  up by an artist.  As a matter of fact,

Page 176

1  that song was potentially going to go
2  to Santana for his record, so a lot of
3  times I don't like to overexcite
4  something.  So I may or may not have
5  told someone.  I don't know.
6    Q.    You just don't
7  remember?
8    A.    If I told someone else
9  that something may or may not be
10  negotiated?
11    Q.    No.  That is not my
12  question.  My question was, you just
13  don't remember if you told somebody
14  else?
15    A.    If I told someone else?
16    Q.    That you had heard that
17  Mr. Barton had arranged for Club Girl
18  to be recorded and performed by Usher?
19       MR. MALOFIY:
20       Objection.  You can answer.
21       THE WITNESS:  I'm
22       trying to remember if I told
23       anyone else.  I may have.  I
24       may not have.

Page 177

1  BY MR. DAVIS:
2    Q.    How did you and Mr.
3  Barton feel when you were together and
4  he told you that news?
5       MR. MALOFIY:
6       Objection.
7       THE WITNESS:  Excited,
8       but I didn't want to get too
9       excited about it because
10       nothing is really done until
11       it officially happens.
12  BY MR. DAVIS:
13    Q.    Okay.  Did you speak to
14  Mr. Guice about it?
15    A.    Of course, we were
16  working on the song together.
17    Q.    Well, what did Mr.
18  Guice have to say when he heard the
19  news?
20    A.    He was a little
21  apprehensive.  He wanted to use it for
22  himself, he wasn't sure.  I think you
23  heard that in his testimony yesterday.
24    Q.    But was he happy, too?



1       A.    Yeah, I would say he
2   was slightly happy.  Slightly
3   bittersweet.
4       Q.    Did you think about
5   what the possibilities were if Usher
6   sang a version of Club Girl and it
7   became a hit?
8       A.    I don't recall.
9       Q.    You don't remember
10  that?
11      A.    No.
12      Q.    Okay.  When Mr. Barton
13  told you the news that a deal was
14  being struck for Usher to record and
15  perform Club Girl, did you tell him,
16  no, I don't want to do it?
17      A.    I don't remember if I
18  did or if I didn't.
19      Q.    You don't remember?
20      A.    That's correct.  I
21  don't remember if I did or if I didn't
22  tell him no or yes.
23      Q.    Well, the fact that Mr.
24  Raymond Usher sang a version of Club

1   Girl which appeared in Confession,
2   would that lead you to believe that
3   you didn't tell Mr. Barton, no, I
4   don't want to do it?
5           MR. MALOFIY:
6       Objection.  You can answer.
7           THE WITNESS:  No.
8   BY MR. DAVIS:
9       Q.    No, what?
10      A.    Maybe I misunderstood
11  your question.  Can you say it again?
12      Q.    Well, we know that a
13  version of Club Girl was sung by
14  Usher.
15      A.    It was the same song.
16          MR. MALOFIY:
17      Objection.
18          THE WITNESS:  It wasn't
19      a different version.
20  BY MR. DAVIS:
21      Q.    I won't quibble with
22  you about the song, but Usher did sing
23  the song?
24          MR. MALOFIY:

1       Objection.
2           THE WITNESS:  Usher
3       copied the song, yeah.
4   BY MR. DAVIS:
5       Q.    Does that refresh your
6   recollection of whether or not, when
7   Mr. Barton told you that a deal was
8   being made for Usher to record and
9   perform the song, that you said to Mr.
10  Barton, no, I don't want to go forward
11  with it?
12          MR. MALOFIY:
13      Objection, are you trying to
14      say that he said this?
15          THE WITNESS:  I
16      don't --
17          MR. MALOFIY:  What are
18      you trying to do?
19          THE WITNESS:  I don't
20      recall.
21  BY MR. DAVIS:
22      Q.    Did you know at some
23  point that Club Girl was going to be
24  renamed Bad Girl?

1       A.    At some point before
2   the release of the record, I did know.
3       Q.    Okay.  Who told you
4   that?
5       A.    I'm not sure exactly
6   who was on the phone, but I recall on
7   the other side of the phone I believe
8   either Terry Lewis -- must have been
9   Terry Lewis, because Jimmy Jam
10  apparently got a credit on the record
11  for not doing anything.  He got credit
12  as a producer and songwriter on the
13  song that I wrote, and he didn't do
14  anything.  We heard that in his
15  testimony.  But on the other line,
16  when I heard it was Bad Girl, yeah,
17  that was before the record, I believe
18  Usher was in the room, Mark Pitts and
19  Terry Lewis.
20      Q.    You were in the room
21  with the three of them?
22      A.    I was in my studio,
23  they were in another studio on the
24  phone as we were working on the

1 revisions.
2     Q.    All I'm asking you is,
3 you did learn that at some point Club
4 Girl was being renamed Bad Girl?
5     A.    Yes.
6     Q.    And did you voice any
7 opinion about it?
8     A.    Yes.
9     Q.    What did you say?
10     A.    I didn't like it.
11     Q.    Did you tell them they
12 couldn't do that?
13     A.    I didn't tell them that
14 they couldn't do that.
15     Q.    Okay.  And you didn't,
16 because they changed the name, say,
17 Usher can't perform the song, record
18 it?
19         MR. MALOFIY:
20     Objection.  Objection.  You
21     can answer.
22         THE WITNESS:  What I
23     said was, I don't like it.
24 BY MR. DAVIS:

1     Q.    That's all you said?
2     A.    And I continued to try
3 to make it something better for what
4 they were looking for.
5     Q.    When you say you were
6 trying to make it something better for
7 what they were looking for, what do
8 you mean?
9     A.    Well, they wanted us;
10 me, Dante and Wil, to change the
11 original recording that I started and
12 change the chorus.  They changed it
13 from what I really enjoyed the song
14 being as Club Girl, talking about
15 girls in clubs, to talking about bad
16 girls, and I didn't like the way that
17 rang.
18     Q.    But you went along with
19 it anyway?
20     A.    Yeah.
21         MR. MALOFIY:
22     Objection.  You can answer.
23 BY MR. DAVIS:
24     Q.    And did there come a

1 point in time when you learned that
2 Club Girl, now renamed Bad Girl,
3 appeared on the Confessions album?
4     A.    Did I?
5     Q.    Yes.
6     A.    Yes, of course.
7     Q.    When was that?
8     A.    Prior to the release of
9 the record, like I just said, when we
10 were on the phone, working on the
11 revisions.
12     Q.    And who told you that
13 it had made the album?
14         MR. MALOFIY:  You are
15     talking about the first time
16     he heard it?
17         MR. DAVIS:  There is a
18     question pending, sir.
19         THE WITNESS:  I don't
20     remember --
21         MR. MALOFIY:  Really?
22         THE WITNESS:  -- who
23     the first person was.  To my
24     recollection, I would say the

1     official time that I heard it
2     was when I heard it on the
3     record, when I knew that it
4     was going to happen for sure.
5     You said, like, when is it
6     going to happen for sure, like
7     this is definitely going to
8     make the record.  And again
9     like I stated earlier, I never
10     like to get my hopes up too
11     high until it's pressed and
12     until I saw an official copy.
13     That is when I officially
14     knew.
15 BY MR. DAVIS:
16     Q.    I'm a little confused
17 by what you said.  So when was it that
18 you first learned that it had made the
19 album?
20         MR. MALOFIY:  He just
21     answered the question.
22         THE WITNESS:  The day
23     of the release of the record.
24 BY MR. DAVIS:

1      Q.    And what was your
2   reaction when you learned that Bad
3   Girl was going to be -- was on the
4   Confessions album?
5          MR. MALOFIY:
6      Objection.
7          THE WITNESS:  Excited,
8      happy.
9   BY MR. DAVIS:
10     Q.    You were happy?
11     A.    Yeah.
12     Q.    Why were you happy?
13     A.    Because I made it on a
14  very successful record.
15     Q.    Why would that be
16  important to you?
17     A.    Because you work your
18  whole life as a musician, as an
19  artist, as I did, to get to a point
20  where you can have everyone hear your
21  work.  I knew on an Usher record, that
22  millions of people would listen to my
23  work, that is why I was excited.  It
24  is an accomplishment.  People spend

1   their whole lives and never make it
2   there, and I did, and then they stole
3   it from me.
4      Q.    But at the time that
5   you learned that it was on the album,
6   it was being available, because you
7   said you learned when it was released?
8      A.    Correct.
9      Q.    You were excited, and
10  would it be a correct word be, proud
11  that it was on the album?
12     A.    I was proud of my work,
13  yes.
14     Q.    At the time of the
15  release did you ever have a desire to
16  tell the record company, stop the
17  presses, you cannot release this song
18  on this album?
19         MR. MALOFIY:
20     Objection.
21         THE WITNESS:  I don't
22     understand why you are asking
23     me that.
24  BY MR. DAVIS:

1      Q.    Did you ever, when you
2   learned that Bad Girl appeared on
3   Confessions, the Confessions album,
4   did you tell anyone, you can't sell
5   the record?
6      A.    Mr. Davis, this is why
7   I think you are being sneaky, because
8   I just told you how --
9      Q.    I'm not trying to be
10  sneaky.
11         MR. MALOFIY:  Let him
12     answer the question.
13         MR. DAVIS:  He is not
14     going to call me sneaky when I
15     ask him a direct question.
16         MR. MALOFIY:  You've
17     been sneaky this whole
18     litigation, you have.
19         MR. DAVIS:  Mr.
20     Malofiy, those are
21     inappropriate comments.
22         MR. MALOFIY:  You might
23     not like it, but it is the
24     truth.

1          MR. DAVIS:  It is
2      inappropriate, and I think it
3      is a violation of your ethical
4      duties.
5          MR. MALOFIY:  Let me
6      tell you something, I am not
7      afraid to call somebody out.
8          MR. DAVIS:  Before Mr.
9      Malofiy interrupted the
10     questioning, would you please
11     read back the question?
12         MR. MALOFIY:  You are
13     not used to someone who is
14     straight.
15            - - -
16         (At this time the court
17     reporter read back from the
18     record as was requested.)
19            - - -
20         MR. MALOFIY:  You were
21     going to answer, you
22     interrupted him.  You
23     interrupted him, Mr. Davis.
24  BY MR. DAVIS:

MAGNA
LEGAL SERVICES

1    Q.    Could you answer that
2  question for me?
3    A.    Why would I tell anyone
4  that when I'm so excited about it?
5  This is why I'm saying you're being
6  tricky. I don't get you, man. Like,
7  you are not being straight. For real,
8  what is going on?
9    Q.    Is the answer to the
10  question you didn't tell anyone to
11  stop selling the record?
12    A.    Absolutely I didn't.
13  Why would I tell anyone to stop
14  selling the record of my work that
15  millions of people are going to hear,
16  that I'm proud of, that it took me
17  years to get to, all the hard work,
18  all the hours, all the money, all the
19  time? Why on Earth would I tell
20  someone, don't put it on that record,
21  because I was told that it was going
22  to be my -- my song was going to be
23  properly credited?
24    Q.    It was a momentous day

1  for you?
2    A.    Yes, it was.
3    Q.    Would you say it was
4  the best day of your life?
5    A.    Absolutely not.
6    Q.    Besides your marriage?
7    A.    No.
8    Q.    One of the best days of
9  your life?
10    A.    Yes.
11    Q.    Okay. Can you share
12  with us what the best day of your life
13  is?
14    A.    That is private.
15    MR. MALOFIY: That is
16    when we win this case.
17  BY MR. DAVIS:
18    Q.    When the album
19  Confessions was released, you
20  understood that it was going to be
21  available for sale in stores and
22  online, did you not?
23    A.    Yes.
24    Q.    When did you first, to

1  the best of your memory, learn that
2  you could actually purchase
3  Confessions?
4    A.    The day it was
5  released.
6    Q.    And what date was that?
7    A.    I don't recall,
8  February -- I don't know. Whenever it
9  was released.
10    Q.    In 2004 though, do you
11  remember that?
12    A.    2004, yes.
13    Q.    Okay. Did you see
14  advertisements for the album
15  Confessions?
16    A.    I don't remember if I
17  did or didn't.
18    Q.    Did you understand that
19  they would probably be advertising the
20  album?
21    MR. MALOFIY:
22    Objection. You can answer.
23    THE WITNESS: I don't
24    know. The one advertisement

1    would have been the single,
2    yeah, that came out prior to
3    the record, I would say.
4  BY MR. DAVIS:
5    Q.    What single?
6    A.    Yeah.
7    Q.    Oh, Yeah.
8    A.    I would call that an
9  advertisement for the record.
10    Q.    Well, you are an
11  industry guy. You have been in the
12  record business for a long time, at
13  least that is what your resume says
14  and you testified to. Is that what
15  record companies normally do,
16  advertise albums that are available
17  for purchase?
18    MR. MALOFIY: Objection
19    to your characterization,
20    being in the record industry
21    for a long time. There is a
22    difference between a huge
23    label that you are used to
24    working with.

MAGNA
LEGAL SERVICES

Page 194

```
 1          MR. DAVIS:  Mr.
 2   Malofiy, can he answer the
 3   question?
 4          MR. MALOFIY:  Let's not
 5   be tricky.
 6          MR. DAVIS:  This is not
 7   a conversation.  I'm trying to
 8   get some answers.
 9          Before Mr. Malofiy
10   interrupted, can you read back
11   the question, please.
12          - - -
13          (At this time the court
14   reporter read back from the
15   record as was requested.)
16          - - -
17          THE WITNESS:  I would
18   say yes.
19   BY MR. DAVIS:
20      Q.    Okay.  So you
21   understood that it was likely that the
22   album Confessions, which had A Bad
23   Girl on the album --
24          MR. MALOFIY:
```

Page 195

```
 1      Objection, Bad Girl.
 2   BY MR. DAVIS:
 3      Q.    -- would be advertised,
 4   distributed and sold publicly?
 5      A.    I was aware that my
 6   song that I originally wrote called
 7   Club Girl, on my own, was going to go
 8   onto Usher's record that he just
 9   basically copied, was going to be for
10   sale, yes.
11      Q.    Okay.  Did you purchase
12   a copy of the Confessions album when
13   you learned it was available for
14   purchase?
15      A.    Yes.
16      Q.    Okay.  And where did
17   you purchase it?
18      A.    I believe it was called
19   Tower Record, now it is FYE or I or
20   something.  It's on the corner of
21   Broad and Chestnut.
22      Q.    Was there only -- how
23   many copies were -- strike that.
24          Was there more than
```

Page 196

```
 1   one copy of the album available for
 2   purchase when you went down to buy it
 3   that day?
 4      A.    I would think so.  I
 5   don't remember counting or looking, I
 6   just grabbed one, possibly, probably.
 7      Q.    When you went down to
 8   that store that day, were you thinking
 9   that this album was now available all
10   over the country for consumers to
11   purchase?
12      A.    I thought it was
13   available all over the world.
14      Q.    All over the world?
15      A.    Yes.
16      Q.    So you thought that
17   when you went into the store, that,
18   wow, everybody in the world can buy
19   this now?
20      A.    I believe so, yeah.
21      Q.    Did you hear any of the
22   songs on the Confessions album on the
23   radio?
24      A.    At what time?
```

Page 197

```
 1      Q.    At the time -- at or
 2   about the time of the release.
 3      A.    Prior to the release, I
 4   only heard Yeah on the radio, and then
 5   after the release, many.
 6      Q.    Many.  Was Bad Girl one
 7   of the songs that you heard on the
 8   radio?
 9      A.    Yes.
10      Q.    Do you have any
11   recollection about the period of time
12   in which you were hearing Bad Girl on
13   the radio?
14      A.    No.  After the record
15   was released.
16      Q.    Did it go on for six
17   months, a year?
18      A.    I don't remember.  No.
19   Shortly after.
20      Q.    Okay.  How did you feel
21   when you heard Bad Girl on the radio?
22      A.    I felt like that's
23   really cool, all my hard work, all of
24   my original composition and my writing
```

**MAGNA**
LEGAL SERVICES

Page 198

1  and my producing and engineering made
2  it on the record, and I heard it,
3  finally, on the radio.  Big
4  accomplishment.
5      Q.    You were proud of that?
6      A.    Absolutely.
7      Q.    Did you think that
8  you'd made it at that point?
9          MR. MALOFIY:
10         Objection.
11             THE WITNESS:  Define
12         made it.
13  BY MR. DAVIS:
14      Q.    Did you think you were
15  on your way as a songwriter?
16      A.    I was already on my way
17  as a songwriter, that helped.
18      Q.    It helped?
19      A.    Yes.
20      Q.    Did it help because
21  Usher was the performer?
22          MR. MALOFIY:
23         Objection.  You can answer.
24             THE WITNESS:  That's

Page 199

1      speculating.  I don't really
2      know, what if --
3  BY MR. DAVIS:
4      Q.    Well, explain to me --
5      A.    I want to finish.
6      Q.    I'm sorry.
7      A.    That is somewhat
8  speculating, because there is a
9  potential that Wil could have released
10  it as a single, and he could have
11  potentially been more successful.
12      Q.    Well, you had heard of
13  Usher before there was any talk about
14  this song being on his album, correct?
15      A.    I've heard of him, yes.
16      Q.    You heard of him.  Did
17  you know any of his work before your
18  involvement with Confessions?
19      A.    Very little.
20      Q.    Did you understand from
21  either Mr. Barton, Mr. Guice or
22  someone else that he was a superstar?
23      A.    I learned that, yes.
24      Q.    Did you confirm it by

Page 200

1  doing any reading or anything like
2  that?
3      A.    Yes.
4      Q.    He was, like, on top of
5  the world at that time, right?
6          MR. MALOFIY:
7         Objection.
8             THE WITNESS:  I mean,
9         there were stars -- there were
10         other artists that were more
11         successful than him at that
12         time.
13  BY MR. DAVIS:
14      Q.    Of course, there is
15  always somebody else.
16      A.    He was up there.  There
17  is no denying that.
18      Q.    How did it help you
19  that Bad Girl was on the Confessions
20  album?  You used those words, it
21  helped you.
22      A.    Yeah, it helped my
23  confidence big time.
24      Q.    Anything else besides

Page 201

1  your confidence?
2      A.    Not really.  No.
3      Q.    Did you think it would
4  give you more exposure?
5      A.    It should have, but it
6  didn't.
7      Q.    At the time?
8          MR. MALOFIY:  Let him
9         finish the question -- finish
10         the answer to your question.
11             MR. DAVIS:  Mr.
12         Malofiy, I'd prefer you to use
13         a different tone with me,
14         please.
15             MR. MALOFIY:  I'm not
16         going to use the tone I use,
17         and you are not going to
18         adjust my tone and my volume
19         knob over here.  All right.
20             THE WITNESS:  Can you
21         repeat that?
22             MR. DAVIS:  Your
23         counsel keeps interrupting me
24         so it is hard for me to keep

MAGNA
LEGAL SERVICES

1    track of --
2        MR. MALOFIY:  You keep
3    on interrupting his answers.
4    You've got to cut that out.
5        MR. DAVIS:  What was
6    the last question, please?
7            - - -
8        (At this time the court
9    reporter read back from the
10   record as was requested.)
11           - - -
12       THE WITNESS:  I thought
13   it did -- it thought it would,
14   excuse me.
15   BY MR. DAVIS:
16       Q.    When it was on the --
17   strike that.
18           When you learned that
19   the song had been -- album had been
20   released, And it was available in
21   stores, did you then talk about it
22   with friends and family?
23       A.    I did.
24       Q.    What did you say to

1    your friends and family?
2        A.    My song Club Girl,
3    Usher rewrote it -- sorry, didn't
4    rewrite it.  He re-sang it, and it
5    made it on his record.  Very excited.
6    Exciting.
7        Q.    What did they say to
8    you?
9        A.    Congratulations.
10       Q.    Anything else?
11       A.    No.  That's awesome,
12   congratulations, good work.  I can't
13   recall exact words, but what do
14   friends say to friends or family say
15   to friends when someone makes a huge
16   accomplishment?
17       Q.    You said in the
18   complaint that you felt that you were
19   one of the few who had, quote,
20   achieved a level of success in the
21   music industry most others have never
22   attained.  Do you still agree with
23   that statement?
24       A.    I feel like I just

1    recently said similar words in this
2    testimony.
3        Q.    So that would be
4    accurate?
5        A.    Absolutely.
6        MR. DAVIS:  Let's mark
7    this as Exhibit 7.
8            - - -
9        (At this time a
10   document was marked for
11   identification as Exhibit No.
12   Marino-7.)
13           - - -
14   BY MR. DAVIS:
15       Q.    I'm going to show you
16   what has been marked Marino Exhibit 7,
17   and this is a -- from one of the
18   documents you produced.
19       A.    Okay.
20       Q.    And it shows what you
21   have presented as the lyrics to Club
22   Girl and the lyrics to Bad Girl.  Are
23   the lyrics identical or not, between
24   the two songs?

1        A.    They are identical.
2        Q.    They are.  Look at the
3    third line on Club Girl on the intro.
4    Do you see that?  It says um.
5        A.    The third line, um,
6    yeah.
7        Q.    Go on the other side of
8    the intro.  You see what it says on
9    the third line there?
10       A.    Yes.
11       Q.    What it do, uh-uh?
12       MR. MALOFIY:  I just
13   want to be clear, are you
14   representing this is accurate?
15       MR. DAVIS:  I'm taking
16   your own document, sir.
17       MR. MALOFIY:  Are you
18   representing that Bad Girl is
19   accurate?
20       MR. DAVIS:  I'm asking
21   him what he presented to the
22   court as the lyrics of the two
23   longs.
24       MR. MALOFIY:  So you

MAGNA ▶
LEGAL SERVICES

1    are not making a
2    representation that these are
3    accurate?
4          MR. DAVIS:  Are you
5    testifying?
6          MR. MALOFIY:  I want to
7    know --
8          MR. DAVIS:  If you are
9    going to object --
10          MR. MALOFIY:  -- if you
11    are comparing things, I want
12    to know what you are comparing
13    is --
14          MR. DAVIS:  Francis,
15    you know, you can make an
16    objection, and then it is all
17    reserved for trial.
18          MR. MALOFIY:  I want it
19    to be clear.
20          MR. DAVIS:  Let's abide
21    by the rules, please.  Abide
22    by the rules.
23          MR. MALOFIY:  Listen,
24    you littered my record with

1    Van Dell.  You coached him to
2    hell, and the judge came and
3    slammed you.  Slammed you.
4          MR. DAVIS:  That is
5    improper for you to make such
6    statements on the record.
7          MR. MALOFIY:  It is the
8    truth.
9          MR. DAVIS:  It's not
10    the truth.
11          MR. MALOFIY:  You are
12    not used to that in New York.
13    This is Philly.
14    BY MR. DAVIS:
15          Q.    Mr. Marino, are the
16    lyrics the same on the third line of
17    Club Girl and the third line of Bad
18    Girl?
19          A.    To me, they are.
20          Q.    Even though they use
21    different words?
22          A.    You have to understand,
23    without the left column there would be
24    no right column.

1          Q.    Putting that aside --
2          A.    I can't put it aside.
3          Q.    Sir, you will not agree
4    with me that um, U-M, which is on the
5    Club Girl intro, and what it do, uh,
6    in the intro side of the Bad Girl
7    column, are not the same?
8          A.    They are the same.
9          Q.    They are the same?
10          A.    They are the same to
11    me.
12          Q.    Okay.  I want you to
13    look down to where it says, hook.  Do
14    you see -- that is in the Club Girl
15    column.  Do you see those lyrics
16    there?
17          A.    I do.
18          Q.    And do you see what
19    they are opposite to on the Bad Girl
20    side, chorus?
21          A.    I do.
22          Q.    Are those lyrics the
23    same?
24          A.    Mr. Davis, I said this

1    to you earlier, and I am going to say
2    it again.  I wrote the original song,
3    I recorded the original song, and this
4    Club Girl and Bad Girl are the same,
5    identical song.  Just because they may
6    or may not have changed a few words
7    doesn't mean that it is not the same
8    song.  It's the same song.  There is
9    no difference in the song.
10          Q.    Does the chorus that
11    appears in Bad Girl appear in Club
12    Girl?  The chorus I'm referring to is
13    on the right-hand bottom of the first
14    page of the Bad Girl column, you see
15    that chorus?
16          A.    I see it.
17          Q.    Does that appear in the
18    Club Girl column?
19          MR. MALOFIY:  Allow him
20    to answer your question before
21    you cut him short.
22    BY MR. DAVIS:
23          Q.    Please review the
24    document.  I want you to inspect the

1  whole document and tell me if you see
2  those lyrics in Club Girl.
3       A.    I just don't understand
4  how you know the truth now, and you
5  keep defending these people.  It is
6  unreal.  Like, you should be doing the
7  right thing, Mr. Davis.  You know that
8  is the same song.  You are asking me
9  that I gave them my original
10  composition, and the only thing that
11  they did was add to it, and you want
12  me to testify that it is not the same
13  song.  It is the same song.
14       Q.    I'm asking you --
15       A.    It is the same song.
16  That is my answer.
17       Q.    -- are the lyrics the
18  same in the Club Girl column and the
19  Bad Girl column?
20       A.    Yes.
21       Q.    Word for word?
22       A.    It is the same song.
23  I'm a producer, I'm a musician, I'm an
24  engineer, I can tell you, just like

1  everyone else did on your end, the
2  people that you are defending, saying
3  it is the same song.  I'm going to say
4  it again, it is the same song.
5       Q.    Mr. Marino, all I want
6  you to do is answer my question.
7  Answer my question.
8           MR. MALOFIY:  You asked
9       him a question.
10  BY MR. DAVIS:
11       Q.    Is it your testimony
12  that a side-by-side comparison between
13  Club Girl and Bad Girl would yield,
14  word for word, the same lyrics, is
15  that your testimony?
16       A.    It is the same song,
17  that is my testimony.
18       Q.    So you won't answer my
19  question?
20           MR. MALOFIY:  He did
21       earlier.
22           THE WITNESS:  I am
23       answering it, it's the same
24       song.

1  BY MR. DAVIS:
2       Q.    My question is --
3           MR. MALOFIY:  Stop.
4  BY MR. DAVIS:
5       Q.    -- whether it is the
6  same --
7           MR. DAVIS:  Unless you
8       direct him not to answer, you
9       cannot --
10           MR. MALOFIY:  Look, I'm
11       not going to play this game
12       where you asked the question
13       multiple times, he answered
14       it.  He answered the question
15       you asked about specific
16       lyrics.  It is actually in the
17       transcript, but maybe you have
18       a fleeting memory and you
19       don't remember what he said.
20       Ask him again.  He will answer
21       again.
22           MR. DAVIS:  Francis,
23       you understand, this is all on
24       tape and it is all captured

1       for the judge.
2           MR. MALOFIY:  Wow, you
3       know what, I know what the
4       truth is and I know what you
5       have done in this proceeding.
6  BY MR. DAVIS:
7       Q.    I'll ask you one more
8  time, Mr. Marino, and you can choose
9  not to answer if you want, but are you
10  testifying that the lyrics on the Club
11  Girl column are identical to the
12  lyrics on the Bad Girl column?
13       A.    Yes, it is the same
14  song.
15       Q.    Okay.  Does Club Girl
16  have a bridge in it?
17       A.    No.
18       Q.    Okay.  Does Bad Girl
19  have a bridge?
20       A.    My song Club Girl does
21  not have a bridge.  However, after I
22  handed them my original recordings,
23  they added a bridge to my song, which
24  is Club Girl, Bad Girl, same song.

Page 214

1      Q.    So Bad Girl has a
2 bridge but Club Girl doesn't have a
3 bridge?
4      A.    There was a bridge
5 added to Bad Girl.
6          MR. DAVIS:  Could you
7      read back his answer, please.
8              - - -
9          (At this time the court
10     reporter read back from the
11     record as was requested.)
12             - - -
13 BY MR. DAVIS:
14     Q.    My question is, there
15 -- was there a bridge added to Bad
16 Girl?
17         MR. MALOFIY:  He just
18     answer that.
19         THE WITNESS:  Can you
20     repeat, what I just answered?
21 By MR. DAVIS:
22     Q.    I'm sorry if I asked
23 you that before.
24     A.    Okay.  So there was a

Page 215

1 bridge added to Club Girl.  There was
2 a bridge added to Club Girl that was
3 renamed Bad Girl.
4      Q.    You are saying Club
5 Girl had a bridge originally?
6      A.    No, I'm saying there
7 was a bridge added to Club Girl, which
8 is Bad Girl, same song.
9      Q.    So, you are trying to
10 confuse me now.  I understand.
11     A.    I'm not.
12     Q.    So the newly named Club
13 Girl, Bad Girl, there was a bridge
14 added to it?
15         MR. MALOFIY:  When you
16     say, just to be clear on the
17     record, are you referring
18     to --
19         MR. DAVIS:  I'm not
20     taking questions from you.
21 BY MR. DAVIS:
22     Q.    The question is, Club
23 Girl, which was renamed Bad Girl, has
24 a bridge; is that correct?

Page 216

1      A.    Yes.
2      Q.    The original Club Girl
3 does not have a bridge?
4          MR. MALOFIY:  When you
5      say, original, it is very
6      confusing.  There are 50
7      different versions --
8          MR. DAVIS:  Will you
9      stop talking?
10         MR. MALOFIY:  No,
11     because you are playing games.
12 BY MR. DAVIS:
13     Q.    Did the Club Girl that
14 you originally wrote with Mr. Guice
15 and Mr. Barton have a bridge?
16     A.    We considered,
17 partially, the hook to be the bridge.
18     Q.    Was it the same bridge
19 that appears in the Club Girl that was
20 renamed Bad Girl?
21         MR. MALOFIY:  Music or
22     lyrics?  Be clear.
23 BY MR. DAVIS:
24     Q.    Is it the same?

Page 217

1      A.    No.
2      Q.    Thank you.  Does Club
3 Girl, that was renamed Bad Girl, have
4 a hook that is different than the one
5 in Club Girl that you, Mr. Guice and
6 Mr. Barton wrote?
7      A.    It is the same song,
8 Club Girl, Bad Girl.  They added
9 different words to the song.
10     Q.    Just words?
11     A.    To my recollection,
12 yes.
13     Q.    No additional melody?
14     A.    It is the same song.
15     Q.    Did the bridge that
16 appeared in the Club Girl that was
17 renamed Bad Girl have different
18 melodies than the Club Girl that you
19 and Mr. Guice and Mr. Barton --
20     A.    I got to hear it.  I
21 don't remember exactly.
22     Q.    Okay.  Did the Club
23 Girl that was renamed Bad Girl have
24 additional guitar parts than what

MAGNA ›
LEGAL SERVICES

1  appeared in the Club Girl that you,
2  Mr. Guice and Mr. Barton wrote?
3       A.   I need you to rephrase
4  that. That is confusing.
5       Q.   Did the Club Girl that
6  was renamed Bad Girl have additional
7  guitar parts added that were not in
8  the Club Girl that you, Mr. Barton and
9  Mr. Guice wrote?
10      A.   Yes.
11      Q.   Okay. Did the Club
12  Girl that was renamed Bad Girl have
13  additional drums, drumbeat, that was
14  not in the Club Girl that you, Mr.
15  Guice and Mr. Barton wrote?
16      A.   No.
17      Q.   No?
18      A.   There were
19  enhancements.
20      Q.   Okay. But there was
21  additions?
22      A.   Enhancements.
23           MR. MALOFIY:
24      Objection.

1           THE WITNESS: Same --
2  BY MR. DAVIS:
3       Q.   What do you describe an
4  enhancement as?
5       A.   I can say the word
6  enhancement, or I can say enhancement.
7  I put a little extra to it, same word,
8  a little flare to it.
9       Q.   And how do you do that
10  musically?
11      A.   You add on top of it.
12  They copied my song, man. They took
13  my song, they copied it, they re-sang
14  it, and they added on top of it, beat
15  for beat.
16      Q.   The enhancements that
17  you are describing --
18      A.   Yes.
19      Q.   -- would that -- can
20  you tell me what you heard as those
21  enhancements in the Club Girl that
22  became Bad Girl?
23      A.   Reverb.
24      Q.   What is reverb?

1       A.   Room sound.
2       Q.   Can you be more
3  specific?
4       A.   (Indicating.) Hear
5  that? That is reverb. They added
6  reverb in the drums.
7       Q.   Any other enhancements
8  that you recall?
9       A.   No.
10      Q.   All right. When you
11  went down to the record store to
12  purchase a copy of the Confessions
13  album, did you open the CD and look at
14  the liner notes?
15      A.   I did.
16      Q.   Okay. And did you look
17  for the information pertaining to Bad
18  Girl?
19      A.   Yes.
20      Q.   Okay. And were you
21  credited as a co-writer or coproducer?
22      A.   I was not.
23      Q.   Okay. And did you
24  receive credit as a guitarist on the

1  Bad Girl track?
2       A.   I did.
3       Q.   Did you believe you
4  should have been credited as a
5  co-writer and coproducer of Bad Girl?
6       A.   Without a doubt. Do I
7  believe, yes, I should have been as a
8  songwriter, as a producer, as an
9  engineer, as a guitar player, yes.
10      Q.   Did you speak to Mr.
11  Barton about this?
12      A.   I did.
13      Q.   Did you tell Mr. Barton
14  that there was a mistake in the liner
15  notes?
16      A.   He told me there was a
17  mistake in the liner notes.
18      Q.   Explain to me what
19  happened when you saw him, if you saw
20  him, when this conversation took
21  place.
22      A.   I said something along
23  the lines of -- I don't remember word
24  for word what I said, but there seems

Page 222

1  to be a mistake, and he agreed, and he
2  said, I will make sure to contact
3  Usher's camp and take care of it.
4      Q.    Where was this
5  conversation?
6      A.    In my studio.
7      Q.    Okay.  Was it a heated
8  discussion?
9      A.    It was -- it was really
10  a weird conversation, because I wanted
11  to be real excited, and I was, but you
12  know, being mis -- I was miscredited
13  on the liner notes, and I didn't know
14  if that meant I was miscredited on the
15  actual copyright.  I didn't know if
16  those two were the same or not.  So
17  when he assured me that he talked to
18  -- he was going to talk to Usher's
19  people, then he did, and Usher's
20  people told him that they were going
21  to take care of it, and he
22  communicated that to me, I felt
23  confident that everything was going to
24  be okay.

Page 223

1      Q.    Mr. Barton communicated
2  that to you?
3      A.    He told me that Usher's
4  people, corporate, would take care of
5  it.  They told him that.
6      Q.    You said that you were
7  concerned about the copyright?  That
8  was part of your answer.
9      A.    I said I wasn't sure.
10  I'm telling you now because now I'm
11  more attuned to it, and at the time I
12  wasn't really sure what it all meant,
13  but yeah, I wasn't sure if those two
14  were connected.  Something I see on a
15  piece of paper here, does it mean that
16  it didn't get on this piece of paper,
17  so I wasn't sure.
18      Q.    So you had an
19  understanding there was some kind of
20  copyright paper?
21      A.    Yeah.
22      Q.    And did you alert Mr.
23  Barton of your concern about the
24  copyright paper, too?

Page 224

1      MR. MALOFIY:
2  Objection.
3      THE WITNESS:  I alerted
4  him that I just wanted to make
5  sure that I get credited
6  properly.
7  BY MR. DAVIS:
8      Q.    Was anybody present
9  when you had this conversation with
10  Mr. Barton?
11      A.    I don't remember.  I'm
12  trying to think.  I'm trying to think.
13      Q.    Okay.
14      A.    I can't remember if
15  there was anyone present.  We were in
16  the studio, I know that.
17      Q.    Was this the same day
18  you purchased the Confessions album?
19      A.    Probably.
20      Q.    Did anyone other than
21  Mr. Barton directly tell you that the
22  mistake was going to be corrected?
23      A.    Yes.
24      Q.    Who else told you?

Page 225

1      A.    When I was at the
2  Grammies I had a quick conversation
3  with the brothers, Avila brothers, and
4  I mentioned it to them in passing, and
5  they said to me, you are with good
6  people, don't worry, they'll take care
7  of it.  I expressed it to Tommy Van
8  Dell.  He said, it will get taken care
9  of.  Wil Guice, they are the people I
10  actually told.  Usher, I met him, and
11  he recognized me as a producer and
12  songwriter and said, good work.  Other
13  than that, I'm not really quite sure.
14      Q.    Do you want to take a
15  phone call?
16      A.    No, I just wanted to
17  mute it.  It was buzzing.  It's quite
18  distracting.
19      Q.    When did you have the
20  conversation with Wil Guice about the
21  mistake?
22      A.    Did I say Wil Guice?
23      Q.    Yeah, I thought I heard
24  Wil Guice.  We can have the reporter

MAGNA
LEGAL SERVICES

Page 226

1  check.
2          THE WITNESS:  Did I say
3      Wil Guice?  I don't recall.
4                - - -
5          (At this time the court
6      reporter read back from the
7      record as was requested.)
8                - - -
9  BY MR. DAVIS:
10      Q.    So I want to focus on
11  the Wil Guice conversation.  Tell me
12  about that.
13      A.    I apologize, that is a
14  mistake.  I'm a little excited through
15  this conversation, and I meant to say
16  Dante Barton.
17          MR. DAVIS:  Just give
18      me one moment, please.
19          MR. MALOFIY:  Sure.
20  BY MR. DAVIS:
21      Q.    In your complaint, in
22  paragraph 376 on page 52, you say,
23  Marino also spoke to Guice, who agreed
24  with Marino that Marino should have

Page 227

1  been properly credited as an equal
2  songwriter with Barton and Guice, and
3  as an equal producer with Barton.
4  Guice further went on to say that the
5  whole thing was wrong, and that Barton
6  was the one who needed to fix the
7  credit to reflect Marino as a
8  songwriter and producer of the song
9  Bad Girl.  Guice additionally stated
10  that it was Barton's matter to handle
11  and postured a hands-off approach, and
12  that it was an issue that Marino
13  needed to resolve with Barton.  Do you
14  recall that allegation?
15          MR. MALOFIY:  Can you
16      just direct me to what
17      paragraph?  I apologize.
18          MR. DAVIS:  376.
19          THE WITNESS:  I do.
20  BY MR. DAVIS:
21      Q.    Did you speak with Mr.
22  Guice about the mistake?
23      A.    I did, and I spoke to
24  Mr. Barton as well.

Page 228

1      Q.    Okay.  And what did Mr.
2  Guice do to help you?
3      A.    I really don't recall
4  what he did to help me.
5      Q.    Did he do anything?
6      A.    At this moment I can't
7  remember.
8      Q.    Well, he said yesterday
9  that he didn't know about the problem
10  until he got the complaint in October
11  -- I mean November of 2012.  Do you
12  remember that?
13          MR. MALOFIY:
14      Objection.
15  BY MR. DAVIS:
16      Q.    Of 2011, I'm sorry.
17          MR. MALOFIY:
18      Objection.
19          THE WITNESS:  I do
20      remember.
21  BY MR. DAVIS:
22      Q.    Was he lying?
23      A.    I just --
24          MR. MALOFIY:

Page 229

1      Objection.
2          THE WITNESS:  -- like
3      he said in his testimony, he
4      doesn't have the best memory.
5  BY MR. DAVIS:
6      Q.    And he just forgot?
7          MR. MALOFIY:
8      Objection.
9          THE WITNESS:  It is
10      possible.  I do recall him
11      saying that.
12  BY MR. DAVIS:
13      Q.    Do you know Mr. Guice
14  to be forgetful?
15          MR. MALOFIY:
16      Objection.
17          THE WITNESS:  I
18      couldn't say.
19  BY MR. DAVIS:
20      Q.    But in your mind you
21  believe you definitely told him --
22      A.    Yeah.
23      Q.    -- that there was a
24  problem?



Page 230

1      A.    Yes.
2      Q.    Okay.  The day that you
3  told Mr. Barton that there was a
4  mistake in the credits, was that a day
5  that you were going to commemorate the
6  fact that the song Bad Girl appeared
7  on the Confessions album?
8      A.    Yes.
9      Q.    Had you planned
10 something in advance?
11     A.    No.
12     Q.    Was it an impromptu
13 party?
14         MR. MALOFIY:
15     Objection.
16         THE WITNESS:
17     Impromptu, can you please
18     elaborate?
19 BY MR. DAVIS:
20     Q.    It just -- suddenly
21 happened?
22     A.    Yeah, from my
23 recollection I came to the studio and,
24 yeah, he was happy.

Page 231

1      Q.    And you -- were there
2  any other people that were going to
3  participate in this celebration?
4      A.    I don't remember anyone
5  else.  Possibly Dante may have had
6  someone there, but I couldn't tell you
7  who it was, maybe a girl, some girl he
8  was dating or something.
9      Q.    I believe you said in
10 your complaint that he was popping
11 some champagne?
12     A.    Yes, he had champagne.
13 He was ready to go.
14     Q.    He was very happy?
15     A.    Yeah, who wouldn't be?
16     Q.    You were happy other
17 than the fact that the credit --
18     A.    There was a mistake.
19 Excuse me for interrupting, yes.
20     Q.    I'll say it again.  You
21 were happy other than the fact that
22 you were not credited in the liner
23 notes?
24     A.    I was happy that my

Page 232

1  song Club Girl made it on the
2  Confessions album.
3      Q.    And after you had your
4  discussion with Mr. Barton about the
5  mistake and he told you he would get
6  it fixed, did you participate in the
7  celebration?
8      A.    Yes.
9      Q.    How did you celebrate?
10     A.    How?
11     Q.    Yeah.
12     A.    Had a glass of
13 champagne, put in the record, the
14 Confessions album, and listened to it.
15     Q.    The one you just
16 purchased?
17     A.    That's correct.
18     Q.    And you put it in a
19 player and you listened --
20     A.    Put it in the computer,
21 yes.
22     Q.    Let me finish, please.
23     A.    Sorry.
24     Q.    You took the CD that

Page 233

1  you just purchased at the store, put
2  it in a CD player, and listened to the
3  song and drank champagne?
4      A.    I can't recall if I put
5  the CD in, if he put it in, if it was
6  a CD that I bought, a CD that he
7  bought.  I can't remember those
8  specific details, but we listened to
9  the entire album.
10     Q.    Bad Girl being one of
11 the songs?
12     A.    Number 12.
13     Q.    Number 12.  Was it a
14 very joyous time for you?
15         MR. MALOFIY:
16     Objection.
17         THE WITNESS:  For the
18     50th time, yes, it was a very
19     joyous time.  I'm going to say
20     for the record when the album
21     came out, I was very excited.
22     You don't have to ask it
23     again.
24 BY MR. DAVIS:

MAGNA
LEGAL SERVICES

1     Q.    Okay.  Tell me what Mr.
2   Barton told you he would do to fix the
3   mistake that day when you were
4   celebrating the release of the
5   Confessions album that included Bad
6   Girl.
7           MR. MALOFIY:
8           Objection.  You can answer.
9           THE WITNESS:  He said,
10          I'll take care of it, I'll
11          contact Usher's camp, Mark
12          Pitts, and make sure it gets
13          fixed.
14  BY MR. DAVIS:
15    Q.    When you refer to
16  Usher's camp, you mean Mr. Pitts?
17    A.    Mr. Pitts, corporate,
18  whoever he had contact with that --
19  you know, I really wasn't deeply
20  involved in, yeah, Jimmy Jam, Terry
21  Lewis, possibly Usher.
22    Q.    Other than Mr. Pitts,
23  you didn't have any names of people --
24          MR. MALOFIY:  He just

1           said --
2   BY MR. DAVIS:
3     Q.    -- you understood he
4   was going to speak with?
5           MR. MALOFIY:  He just
6           said.
7           THE WITNESS:  The
8           people that I mentioned, Mark
9           Pitts, he mentioned Mark
10          Pitts, and he said Usher's
11          camp, so when someone says
12          Usher's camp -- like if you
13          said that to me, we are going
14          to contact your camp, you are
15          going to contact someone
16          within my organization.
17  BY MR. DAVIS:
18    Q.    Okay.  Did Mr. Barton
19  tell you that the mistake in the liner
20  notes was a printing error?
21    A.    Yeah.
22    Q.    Did he also tell you it
23  was an accident?
24    A.    I don't remember if he

1   said it was an accident.  He said it
2   was an error, it was a mistake in the
3   liner notes.
4     Q.    And he told you that it
5   would be changed to reflect your name?
6     A.    Yes, as a songwriter
7   and a producer and an engineer, and as
8   a matter of fact, I pointed out that
9   Wavelab Studios, where I originally
10  recorded my composition of Club Girl,
11  needed to be fixed as well, because on
12  the liner notes it says that Wavelab
13  Studios is additional recording when
14  it is quite the opposite.  The
15  original song was recorded in Wavelab
16  Studios, the additional recordings
17  were done elsewhere.
18    Q.    You wanted all these
19  things fixed?
20    A.    Absolutely.
21    Q.    Other than Mr. Barton,
22  did anyone tell you to your face that
23  the credits were wrong?
24    A.    Wrong?

1     Q.    That there was a
2   mistake in them?
3     A.    Yeah, I said that
4   earlier, who that was.
5     Q.    Tommy Van Dell?
6     A.    Tommy Van Dell, the
7   Avila brothers.  Usher recognized us
8   as songwriter, producer, and -- who am
9   I missing?  I guess that's -- yeah,
10  those people.
11    Q.    Okay.  After you
12  discovered the mistake in the liner
13  notes, and you had the conversation
14  with Mr. Barton, did you continue to
15  work with Mr. Barton?
16    A.    Many years after that.
17    Q.    How many years?
18    A.    Until he disappeared.
19    Q.    2009, approximately?
20    A.    Roughly.
21    Q.    Came in each day?
22    A.    Everything was normal,
23  great friends, spent holidays
24  together, ate dinner, went out,

Page 238

1  partied, wrote probably three to
2  five-hundred songs together since
3  then.
4       Q.    And you continued to do
5  this even though during that period of
6  time, the credits had not been fixed
7  and you had not gotten --
8       MR. MALOFIY:
9  Objection.
10 BY MR. DAVIS:
11      Q.    -- until 2005, any
12 money on Bad Girl?
13      MR. MALOFIY:
14 Objection.
15 BY MR. DAVIS:
16      Q.    Is that correct?
17      MR. MALOFIY:  You are
18 misstating.
19      THE WITNESS:  I
20 continued to work with Dante
21 Barton after all of that
22 because he kept telling me
23 that Usher's people told him
24 that they were fixing the

Page 239

1       credits for songwriter,
2       producer, engineer, and
3       studio.
4  BY MR. DAVIS:
5       Q.    And Usher's people,
6  again, you are saying that was Usher
7  himself, Bobby and Izzy Avila, Tommy
8  Van Dell?
9       A.    Whoever else he had
10 communications with, I mean, you know.
11      MR. MALOFIY:  He also
12 said just --
13      MR. DAVIS:  Don't --
14 you are testifying.
15      MR. MALOFIY:  That is
16 not what he said.  That is not
17 what he said.
18      MR. DAVIS:  I don't
19 need you to tell me what he
20 said.  Read back the record
21 before the Mr. Malofiy
22 interrupted me.
23      MR. MALOFIY:  That is
24 not what he said.

Page 240

1       MR. DAVIS:  Would you
2  read back the question,
3  please.
4       MR. MALOFIY:  You
5  didn't read back every word he
6  said.  You are saying, you
7  said --
8       MR. DAVIS:  Mr.
9  Malofiy --
10      MR. MALOFIY:  You left
11 out half --
12      MR. DAVIS:  -- you are
13 interrupting the explanation.
14      MR. MALOFIY:  It is a
15 half truth.  You want to do
16 half truths?
17      MR. DAVIS:  You are not
18 going to make statements like
19 that and get away with it.
20      MR. MALOFIY:  I get
21 away with the truth.
22      MR. DAVIS:  Your
23 actions are being captured on
24 that camera.

Page 241

1       MR. MALOFIY:  I am very
2  comfortable with my actions.
3  They are not --
4       MR. DAVIS:  Could we
5  have the question read back,
6  please.
7           - - -
8       (At this time the court
9  reporter read back from the
10 record as was requested.)
11          - - -
12      THE WITNESS:  The Avila
13 brothers as well.
14 BY MR. DAVIS:
15      Q.    Bobby Avila?
16      A.    Bobby and Izzy.
17      Q.    So those four people?
18      A.    Mark Pitts.
19      Q.    And Mark Pitts.  Okay.
20      A.    And whoever else he was
21 communicating with, the names of whom
22 I may not know.
23      Q.    Okay.  Did you get
24 media attention after the Confessions



Page 242

1 album was released?
2       A.    We were, as you know,
3 in a magazine, a local magazine.
4       Q.    Did you arrange that
5 interview with the magazine?
6       A.    Did I arrange it?
7 People came to me and asked if I would
8 want to be a part of it, as well as my
9 writing and producer partner.
10       Q.    And who is that who
11 came to you?
12       A.    The person that came to
13 me for the magazine?
14       Q.    Yes.
15       A.    A person by the name of
16 Anthony, I believe Corrado was his
17 last name.
18       Q.    Was Anthony Corrado a
19 friend of yours?
20       A.    Acquaintance.
21       MR. MALOFIY:  Marino-8.
22       MR. DAVIS:  I'm going
23 to show you what has been
24 marked as Marino-8.

Page 243

1             - - -
2       (At this time a
3 document was marked for
4 identification as Exhibit No.
5 Marino-8.)
6             - - -
7       MR. MALOFIY:  Thank
8 you.  I appreciate it.
9 BY MR. DAVIS:
10       Q.    And you are familiar
11 with that, the exhibit?
12       A.    I am.
13       Q.    What is that exhibit?
14       A.    It is a magazine
15 entitled Origivation magazine, it is a
16 cover, a copy of, similar to my song.
17       Q.    And it says,
18 Confessions of a Record Producer, do
19 you see that in the title there?
20       A.    Confessions of a Record
21 Producer.
22       Q.    Is that a play on the
23 Confessions album?
24       A.    I would imagine so, but

Page 244

1 I can't say with certainty.
2       Q.    And are you telling me
3 this was the cover of the magazine?
4       A.    That's correct.
5       Q.    You were the feature
6 article?
7       A.    Yes.
8       Q.    Okay.  And the cover
9 has a photograph of Mr. Barton, Mr.
10 Guice and yourself in the studio?
11       A.    Yes.
12       Q.    And this was after
13 Confessions had been released, this
14 photograph?
15       A.    It says it in the top
16 left-hand corner, yes.
17       Q.    Where does it say --
18       MR. MALOFIY:  May 2004.
19 BY MR. DAVIS:
20       Q.    I know the date of the
21 magazine, but the photograph was taken
22 after the release of the Confessions
23 album?
24       A.    Yes.

Page 245

1       Q.    Okay.  And they came to
2 you, to your studio, in order to take
3 this photograph and support the album?
4       A.    Yes.
5       Q.    I mean the article?
6       A.    The article, yes.
7       Q.    No one forced you to be
8 in that picture?
9       A.    No.
10       Q.    You wanted to be in the
11 picture?
12       A.    Yes.
13       Q.    Why did you want to be
14 in the picture?
15       A.    Because I was proud of
16 my work.
17       Q.    You were proud of the
18 fact that your work had been used by
19 Usher on an album that had been
20 publicly released?
21       MR. MALOFIY:
22 Objection.
23       THE WITNESS:  I was
24 proud of the fact that my song

MAGNA
LEGAL SERVICES

Page 246

1    that I originally recorded,
2    that your defendants stole
3    from me, yes, I was proud of
4    that.
5    BY MR. DAVIS:
6        Q.    There is more than one
7    photograph of you and your partners,
8    songwriting partners --
9        A.    Yes.
10       Q.    -- in this article; is
11   that right?
12       A.    Yes.
13       Q.    On page -- the third
14   page of this exhibit, at the top, that
15   is a picture of the three of you
16   again, right?
17       A.    Yes.
18       Q.    And nobody forced you
19   to sit in that picture, did they?
20       A.    No.  I'd really
21   appreciate it if you just got to your
22   question, because it's --
23       Q.    Let's turn to the
24   fourth page.  That's yet another

Page 247

1    picture of you, Mr. Guice and Mr.
2    Barton posing for purposes of this
3    article; is that right?
4        A.    Yes.
5        Q.    And it says, welcome to
6    the word of Underworld Entertainment?
7        A.    That is what it says.
8        Q.    And you were an owner,
9    part owner, of Underworld
10   Entertainment?
11       A.    That's correct.
12       Q.    And are you smiling in
13   that photograph?
14       A.    As I said before, I was
15   very excited about it, so, yes, it is
16   a smile.
17       Q.    And you were all happy
18   --
19       A.    It would be odd if it
20   was a frown, wouldn't it?
21       Q.    I'd think it would be.
22   You are all very happy --
23       A.    Yes.
24       Q.    -- about this article

Page 248

1    coming out?
2        A.    Yes.  Yes.  Yes.
3        Q.    And tell me, you were
4    interviewed for the article; is that
5    correct?
6        A.    Yes.
7        Q.    Did you all -- when I
8    say all, were you, Mr. Guice, and Mr.
9    Barton interviewed at the same time?
10       A.    I really don't
11   remember.
12       Q.    Well, do you remember
13   speaking with the reporter together or
14   separately?
15       A.    That is what I'm
16   answering, I don't remember.
17       Q.    Did the reporter make a
18   date with you to sit for the
19   interview?
20       A.    I would imagine so.
21       Q.    You cooperated and made
22   yourself available for the interview
23   with the reporter?
24       A.    Naturally.

Page 249

1        Q.    And you wanted to tell
2    your story; is that right?
3        A.    Yeah.
4        Q.    Okay.  Did you tell the
5    reporter during your interview that
6    you objected to the release of the
7    Confessions album that included Bad
8    Girl?
9            MR. MALOFIY:
10   Objection.  You can answer.
11           THE WITNESS:  I don't
12   recall, I don't recall telling
13   him, otherwise I believe it
14   would have showed up in the
15   article.
16   BY MR. DAVIS:
17       Q.    So you didn't?
18           MR. MALOFIY:
19   Objection.
20           THE WITNESS:  No.
21   BY MR. DAVIS:
22       Q.    Did you tell the
23   reporter that you objected to the
24   commercial sale of the Confessions

Page 250

1  album, which included the Bad Girl
2  track?
3           MR. MALOFIY:
4       Objection.  You can answer.
5           THE WITNESS:  Why would
6  I?
7  BY MR. DAVIS:
8       Q.    The article refers to
9  Usher's team of producers asking for
10 the Pro Tools file so he could sing
11 over the verse and the hook.  It is in
12 here somewhere, I could find it for
13 you.
14      A.    Please do.
15      Q.    Okay.  Look at the box
16 on the bottom, middle column, and it's
17 the, call it the fourth full paragraph
18 there, beginning, Usher and his team
19 of producers?
20      A.    Okay.
21      Q.    Do you see that?
22      A.    Yes.
23      Q.    Is that an accurate
24 statement?

Page 251

1       A.    Let me read it.
2           MR. MALOFIY:  Are you
3       referring to the whole block,
4       or just the middle block, or
5       the --
6           MR. DAVIS:  I don't
7       believe the witness has a
8       question about what I'm asking
9       him to look at.
10          MR. MALOFIY:  Okay.
11          THE WITNESS:  That one
12      paragraph?
13 BY MR. DAVIS:
14      Q.    Yes.
15      A.    It is true.
16      Q.    It is true?
17      A.    Yes.
18      Q.    So you knew that the
19 Pro Tools files were being sent to
20 Usher's people?
21      A.    I did it myself.
22      Q.    Oh, you did it?
23      A.    Yes.
24      Q.    How did you do that?

Page 252

1       A.    Do you know how to use
2  Pro Tools?  Because if I explain it to
3  you, I don't know if you'll understand
4  it.
5       Q.    Maybe I'll ask you a
6  different question.  Did you mail the
7  Pro Tools files to them?
8       A.    I believe we mailed it.
9       Q.    And who did you address
10 it to?
11      A.    Whoever Dante, because
12 Dante and I did it together, whoever
13 we addressed it to is whoever he
14 provided the address and name for it.
15      Q.    So they -- you were
16 asked for the Pro Tool files, and you
17 sent them?
18      A.    Little bit of work
19 involved, it wasn't that simple, but
20 yes.
21      Q.    Tell me what the work
22 was.  Did it involve --
23      A.    Well, we -- sorry.  Go
24 ahead.

Page 253

1       Q.    What is involved in
2  getting Pro Tools files ready so that
3  you can send them to someone else?
4       A.    This particular
5  recording was originally recorded into
6  Logic, which is a different software
7  application.  So I transferred it, as
8  the engineer, from Logic to Pro Tools,
9  so that they could use it, because
10 they didn't use Logic.
11      Q.    So if you sent them
12 Logic, they couldn't use it?
13      A.    If I sent them Logic,
14 they could use it, they would have to
15 have a Logic system.
16      Q.    You wanted to make it
17 easier for them?
18      A.    Absolutely.  Excuse me,
19 that was at their request for Pro
20 Tools files.  They requested Pro Tools
21 files.
22      Q.    Right.  And you sent
23 them to them?
24      A.    Sure.



1    Q.    Did you learn that it
2  had been received by whomever you sent
3  it to?
4    A.    Yes.
5    Q.    Do you remember -- you
6  may not remember the specific name of
7  who you sent it to, but do you know if
8  it was a company that you sent it to?
9    A.    I don't.
10    Q.    You don't.  Okay.  Do
11  you have a recollection of when you
12  had sent it?
13    A.    I mean, obviously
14  before the release of the record,
15  before the revisions, because Terry
16  Lewis had the Pro Tools files and, you
17  know, just to be clear again, I mailed
18  those Pro Tools files with the
19  understanding that I would be properly
20  credited as the songwriter and
21  producer, and not have it stolen from
22  me.
23    Q.    Did you put a note in
24  the Pro Tools files that said that?

1    A.    No, that was not
2  necessary.
3    Q.    Okay.  When you sent
4  the Pro Tools, did you think in your
5  mind, this is really going to happen
6  now?
7    A.    No.
8    Q.    You thought it was
9  still --
10    A.    Potential.
11    Q.    -- potential?
12    A.    Yeah.
13    Q.    Since you have said
14  that this paragraph is accurate, you
15  understood that --
16      MR. MALOFIY:  Which
17  paragraph?
18      MR. DAVIS:  The one he
19  read.
20  BY MR. DAVIS:
21    Q.    The middle paragraph?
22      MR. MALOFIY:  Did he
23  read it?
24  BY MR. DAVIS:

1    Q.    You understood that the
2  Pro Tools files were being sent to cut
3  the first verse and hook, you
4  understood that?
5    A.    Yes.
6    Q.    Okay.
7    A.    And by cutting that, it
8  really just means rerecording, copying
9  what I had already done.
10    Q.    But you knew they were
11  going to do that?
12    A.    Yeah.
13    Q.    And you had no problem
14  with that?
15    A.    As long as I was going
16  to be properly credited.  If at any
17  point I had known that I wasn't going
18  to be properly credited as a
19  songwriter and as a producer, I would
20  have never sent it out.
21    Q.    But you didn't send a
22  note with the Pro Tools files?
23    A.    Not necessarily.  I was
24  dealing with good people.

1    Q.    And you had this
2  understanding with Mr. Barton about
3  the credit issue?
4      MR. MALOFIY:
5  Objection.  That is not what
6  he testified to.
7      THE WITNESS:  I had
8  this with multiple people.
9  BY MR. DAVIS:
10    Q.    I'm not talking about
11  what happened after the album was
12  released and you discovered the
13  mistake.  I'm talking about the
14  understanding about the permission to
15  use the work was one that you had with
16  Mr. Barton, who was going to --
17    A.    You've got to start
18  that over.  That is too long.  I'm not
19  following you.
20      MR. MALOFIY:  That is
21  not what he testified to.
22  That is not what he testified.
23  Keep it straight.
24  BY MR. DAVIS:

MAGNA
LEGAL SERVICES

Page 258

```
1        Q.    The conversation or the
2   understanding that you had about the
3   use of the Club Girl was one that you
4   had communicated to Mr. Barton before
5   the use of Club Girl in the making of
6   Bad Girl?
7        A.    This is the same
8   question as before.
9            MR. MALOFIY:  Let me
10       just put my objection, this is
11       asked --
12           MR. DAVIS:  That is all
13       you can do, is object.  Why
14       don't you understand that?
15           MR. MALOFIY:  Let me
16       tell you something, I don't
17       have to deal with this kind of
18       BS.  What is happening here --
19       what is happening here is you
20       ask the same question for
21       about an hour and a half.  And
22       then you keep on going back to
23       the question, and it is the
24       same answer.  All right.  You
```

Page 259

```
1        are going to get the same
2        answer every time you ask it.
3            MR. DAVIS:  Mr.
4        Malofiy, I'm allowed to use my
5        seven hours.
6            MR. MALOFIY:  Next
7        question.
8            MR. DAVIS:  I'm allowed
9        to use my seven hours as I
10       choose fit.  If I waste it, I
11       waste it.
12           MR. MALOFIY:  No, I'll
13       just shut it down.  I'll shut
14       it down.  That is what I will
15       do, I'll say, next question,
16       and we'll go.  That is what
17       I'll do.  That's what I do
18       when games are being played.
19  BY MR. DAVIS:
20       Q.    You had a conversation
21  with Mr. Barton about the terms upon
22  which your Club Girl, which you wrote
23  with Mr. Guice and Mr. Barton, could
24  be used.
```

Page 260

```
1            MR. MALOFIY:  The
2        record is replete with the
3        answer to this question.
4   BY MR. DAVIS:
5        Q.    Is that right?
6        A.    With the --
7            MR. MALOFIY:  This is
8        nauseating -- wait.  This is
9        nauseating.
10           MR. DAVIS:  You are
11       interrupting the answer.
12           MR. MALOFIY:  I am,
13       because this is a waste of
14       everyone's time.
15           MR. DAVIS:  Would you
16       reread the question?
17           MR. MALOFIY:  I'm
18       nauseated.
19           THE WITNESS:  You don't
20       need to.  I'm going to give
21       you the same answer, he is
22       absolutely right.  With the
23       understanding that I would be
24       properly credited as a
```

Page 261

```
1        producer, as a songwriter, as
2        an engineer, that then it
3        would be authorized.  Without
4        that, there would have been no
5        authorization.
6   BY MR. DAVIS:
7        Q.    All I am asking, that
8   was with Mr. Barton?
9            MR. MALOFIY:  No.  That
10       is not what he testified to
11       earlier, and now you are
12       playing games again.  That is
13       his understanding with all the
14       parties.  He said it 15 times.
15       You don't want to listen to
16       it, but you've got to open up
17       your ears and listen to what
18       the witness is saying.  It is
19       disrespectful and it's rude.
20  BY MR. DAVIS:
21       Q.    Mr. Marino?
22       A.    Yes.
23       Q.    What you are
24  communicating to me is the
```

Page 262

1  conversation you initially had with
2  Mr. Barton; is that correct?
3         MR. MALOFIY:
4         Objection.
5         THE WITNESS:  You got
6  to --
7  BY MR. DAVIS:
8         Q.    I'm not asking you
9  whether or not you had it with any
10 other people, you had it first with
11 Mr. Barton; is that correct?
12        MR. MALOFIY:
13        Objection.  You can answer.
14        If you know what conversation
15        he is talking about.
16        THE WITNESS:  I don't.
17        Actually, I don't.
18 BY MR. DAVIS:
19        Q.    Okay.  Let's move on,
20 then.
21        Did you know Yvonne
22 Gabai -- Gabai, I may be pronouncing
23 it wrong, from the Origivation?
24        A.    No.

Page 263

1         Q.    No?
2         A.    No.
3         Q.    But you knew Anthony
4  Corrado?
5         A.    I had met him prior to
6  that.
7         Q.    And he is the one who
8  reached out to you about doing this
9  article?
10        A.    Yes.
11        Q.    Okay.  How many times
12 did Mr. Barton tell you that he was
13 working on fixing the mistake on the
14 credits, approximately?
15        A.    I couldn't give you a
16 number.  Quite a few, though.
17        Q.    Over what period of
18 time did he make these statements to
19 you?
20        A.    From the day we were
21 celebrating, as we were discussing
22 earlier, not long prior to him
23 disappearing.  Years, several years.
24        Q.    Several years.  Okay.

Page 264

1  Did Mr. Barton ever tell you that Mr.
2  Guice was helping him work out this
3  mistake?
4         A.    I don't recall.
5         Q.    All right.  Your
6  complaint says that many times when
7  you spoke to Barton about correcting
8  the mistake and seeking the status of
9  correcting that mistake, he would say
10 that it was going through corporate,
11 do you recall that?
12        A.    Yup.
13        Q.    Did he ever tell you
14 who corporate was?
15        A.    Yes.
16        Q.    Who did you understand
17 corporate to be?
18        A.    Everyone that is part
19 of Usher's camp, including Mark Pitts.
20        Q.    Well, corporate sounds
21 like you mean people in suits, in a
22 business.
23        MR. MALOFIY:  He just
24        told you what he understood

Page 265

1         corporate to mean.  Now you
2         are playing a game.
3  BY MR. DAVIS:
4         Q.    Was there anyone other
5  than Mr. Pitts that you understood to
6  be corporate?
7         A.    By name?
8         Q.    Yes.
9         A.    You know, to me I would
10 say corporate would also entail, even
11 though he may not be the same party,
12 but someone to help, would be a Tommy
13 Van Dell, but we also spoke with other
14 people, whom I mentioned earlier,
15 Usher, one of them who knew, the Avila
16 brothers, and other people that I
17 mentioned.
18        - - -
19        (At this time a
20        document was marked for
21        identification as Exhibit No.
22        Marino-9.)
23        - - -
24 BY MR. DAVIS:

Page 266

1      Q.    All right.  Let me show
2  you your affidavit, which has been
3  marked as Marino-9.
4      A.    At some point after
5  this question, can we go on a lunch
6  break?
7      Q.    Sure.
8      A.    I haven't had anything
9  to eat yet.
10     Q.    Sure.  I'm sorry.
11          Let's talk about or
12  ask you questions from paragraph five
13  of your affidavit.  You are familiar
14  with this affidavit, aren't you?
15     A.    Yes, but let me read
16  paragraph five so I can figure out
17  what is paragraph five.
18     Q.    Sure.
19     A.    Okay.
20     Q.    You know, why don't we
21  just take the break now, before I
22  begin questions on this affidavit.  It
23  would be simpler.  How long would you
24  like to take?

Page 267

1      A.    I don't know.  What is
2  normal for lunch?
3          MR. MALOFIY:  Usually
4      it is an hour, but I know we
5      ran late, so what I would like
6      to do -- not you, we were here
7      late, all due respect, and so
8      why don't we try to keep it
9      shorter.  You want to say
10     40 minutes?
11          MR. DAVIS:  We can do
12     it in 30.  We would like to
13     get a train at a reasonable
14     hour.  This is going to take
15     the full seven yours.
16          MR. MALOFIY:  I
17     understand.  I'm not going to
18     clip you.  I'm not going to be
19     a jerk and pull my guy out
20     early.  Are we getting that?
21     That is excellent, some sauce
22     on the stenographic record.
23          MR. DAVIS:  You think
24     you can manage the 30 minutes?

Page 268

1          MR. MALOFIY:  I'll try
2  my best.
3          VIDEOGRAPHER:  The time
4  is now 2:54 p.m.  We are going
5  off the record.
6          - - -
7          (At this time a short
8  break was taken.)
9          - - -
10         VIDEOGRAPHER:  The time
11  is now 3:55 p.m.  We are back
12  on record.
13  BY MR. DAVIS:
14     Q.    Did you have a nice
15  lunch?
16     A.    Not really.
17     Q.    Okay.  Sorry.
18     A.    It's not your fault.
19     Q.    In your complaint you
20  allege that after you had discovered
21  that Mr. Barton and Mr. Guice had
22  received royalties, more royalties
23  than you had received --
24          MR. MALOFIY:

Page 269

1      Objection.
2  BY MR. DAVIS:
3      Q.    -- on the Bad Girl
4  track, you went into a, what you
5  called a depression.  Do you recall
6  making that allegation?
7      A.    I absolutely --
8          MR. MALOFIY:
9      Objection, to your statement.
10     You said more royalties than
11     he received.  The record is
12     clear, he didn't receive any
13     royalties.  Let's be clear,
14     let's be straight.
15          MR. DAVIS:  Mr. Malofiy
16     --
17          MR. MALOFIY:  Let's be
18     straight.
19          MR. DAVIS:  -- you can
20     object to the question, but
21     you cannot make a speaking
22     objection.
23          MR. MALOFIY:  You can't
24     say lies to the guy.



Page 270

1      MR. DAVIS:  You have
2  repeatedly made speaking
3  objections throughout the
4  course of this deposition, and
5  I ask you again to please
6  stop.
7      MR. MALOFIY:  If your
8  questions didn't contain an
9  assumption of facts which was
10  false, it wouldn't be an
11  issue.  That is what you do,
12  and that is why we have a
13  problem.  You say something
14  that is fake, a lie.
15  BY MR. DAVIS:
16     Q.    Mr. Marino -- Mr.
17  Marino, did Dante Barton share
18  royalties with you in 2005 from the
19  Bad Girl track?
20     A.    Dante Barton gave me a
21  check with some money that was part of
22  the royalties from Bad Girl.
23     Q.    And -- I'm sorry?
24     A.    Yes.

Page 271

1      Q.    And they were the
2  mechanical royalties that he had
3  received from IN2N Publishing; is that
4  correct?
5      A.    As far as I know.
6      Q.    Okay.  So it's accurate
7  to say that you did receive some
8  royalties from Bad Girl through Mr.
9  Barton?
10     A.    Some.
11         MR. MALOFIY:
12  Objection.  You can answer.
13         THE WITNESS:  A very
14  tiny portion.
15  BY MR. DAVIS:
16     Q.    It was $4,553 and some
17  change?
18     A.    I believe that's it,
19  yes.
20     Q.    And you thought you
21  should receive more; is that correct?
22     A.    At that time?
23     Q.    Yes.
24     A.    At that particular

Page 272

1  moment I didn't know anything in
2  regards to how much.
3      Q.    But your expectation
4  was that, if not then, at some point
5  you would receive more royalties?
6      A.    Yes.
7      Q.    Okay.  So getting back
8  to my question, when you discovered at
9  Wavelab Studios, or if it was
10  Underworld Entertainment or Destro
11  Music Productions, Inc. --
12         MR. MALOFIY:
13  Objection.
14  BY MR. DAVIS:
15     Q.    -- a place of business,
16  when you discovered this box that
17  contained items in it, you saw royalty
18  statements.  You said that caused you
19  to go into a depression at some point
20  thereafter; is that correct?
21     A.    Yes.
22     Q.    Okay.  And did you seek
23  treatment from a psychiatrist for that
24  depression?

Page 273

1      A.    No.
2      Q.    Did you see a
3  psychologist for treatment?
4      A.    I wouldn't have thought
5  of doing anything like that, because I
6  wouldn't have known to go to anyone.
7      Q.    The answer is no, you
8  didn't see a psychologist?
9      A.    No.
10     Q.    Did you seek out the
11  service of a therapist?
12     A.    No.
13     Q.    Did you seek any form
14  of professional counseling?
15     A.    I seeked my friends and
16  family.
17     Q.    I'm talking
18  professional counseling.
19     A.    To me that is
20  professional, real love.
21     Q.    Love is what you are
22  talking about?
23     A.    Yes.
24     Q.    But do you have a

MAGNA
LEGAL SERVICES

Page 274

1    family member that is a psychiatrist?
2        A.    I do not.
3        Q.    Do you have a family
4    member that is a psychologist?
5        A.    No.
6        Q.    Do you have a family
7    member that is a therapist?
8        A.    No.
9        Q.    In dealing with this
10   depression that you've described in
11   your complaint, did you take any
12   prescription drugs?
13       A.    Without going to a
14   doctor, no.
15       Q.    Were you ever diagnosed
16   by any medical doctor that you were
17   having a depression or emotional
18   instability?
19       A.    No, but I definitely
20   didn't leave my house.  I didn't talk
21   to anyone.  I just had a hard time
22   moving from day to day at that time.
23       Q.    Did you stop working?
24       A.    I was late for work and

Page 275

1    not really performing well.
2        Q.    Did you seek any
3    disability payments through any form
4    of insurance?
5        A.    No.
6            MR. MALOFIY:
7        Objection.
8    BY MR. DAVIS:
9        Q.    Is it accurate to say
10   that during this period you felt
11   depressed that you were still
12   supporting yourself financially?
13       A.    No.
14       Q.    You weren't?
15       A.    I wasn't able to keep
16   up with my bills at that time.
17       Q.    But you were working?
18       A.    Not as much.
19       Q.    You were working at the
20   restaurants --
21       A.    Correct.
22       Q.    -- that you had
23   previously identified as places of
24   employment that you worked?

Page 276

1        A.    Yes.
2        Q.    Okay.
3        A.    I went through a slump.
4    I actually almost foreclosed on my
5    house at that point.
6        Q.    But you were working?
7        A.    Barely.
8        Q.    How many hours a week
9    were you working at that time?
10       A.    Maybe 20.
11       Q.    And for how many weeks
12   or months did that go on?
13       A.    Couple years.
14       Q.    But you didn't seek any
15   kind of medical or psychological
16   assistance to help you through this
17   period?
18       A.    I wouldn't have known
19   which way to turn at that point in my
20   life.
21       Q.    Did you have a
22   girlfriend then?
23       A.    What year?
24       Q.    Would have been, you

Page 277

1    described in your complaint this
2    occurred sometime in 2009?
3        A.    At that time I had
4    already broken up with my girlfriend.
5        Q.    You just a moment ago
6    said that you sought out the
7    counseling and love of your family; is
8    that correct?
9        A.    That's correct.
10       Q.    So you had contact with
11   your family during this period?
12       A.    Yes.
13       Q.    And you also said your
14   friends?
15       A.    Correct.
16       Q.    When did you break up
17   with your girlfriend?
18       A.    I couldn't tell you the
19   exact date, time, but around the time
20   of maybe 2008 or so.  I'm just --
21   somewhere around there.
22       Q.    And then is your
23   current wife the next woman that you
24   became involved with after the breakup

Page 278

1    of that relationship?
2        A.    Yes.
3        Q.    What is your wife's
4    name?
5        A.    Tiffany.
6        Q.    And does she bear the
7    same last name as you, Tiffany Marino?
8        A.    Not yet.
9        Q.    What is her maiden
10   name, please?
11       A.    Brauer.
12       Q.    Is she from the
13   Philadelphia area?
14       A.    Region.
15       Q.    Region.  Does she work
16   in town?
17       A.    She does.
18       Q.    What does she do for a
19   living?
20       A.    She works for a real
21   estate firm.
22       Q.    What is her position?
23       A.    I don't really know.  I
24   guess assistant.

Page 279

1        Q.    Do you talk to her
2    about this case?
3        A.    Yes.
4        Q.    You alleged in your
5    complaint that when you were at the
6    studio sometime in 2009 and discovered
7    this box of materials, that there were
8    statements contained in that box, do
9    you recall that?
10       A.    I do.
11       Q.    Okay.  Where are those
12   statements?
13       A.    Where are those
14   statements, I believe I provided all
15   those statements.
16            MR. MALOFIY:  I believe
17       you are referring to
18       plaintiff's production 73 to
19       78, if I'm not mistaken.
20            MR. DAVIS:  Okay.  I
21       have that.  Let me mark as
22       Marino Exhibit 10, a
23       multi-page document that is
24       one, two -- six pages in

Page 280

1        length.
2            MR. MALOFIY:  Is that
3        73 to 78, plaintiff's
4        production?
5            MR. DAVIS:  I'll give
6        you a copy, sir.  I'll show it
7        to the witness.
8               - - -
9            (At this time a
10       document was marked for
11       identification as Exhibit No.
12       Marino-10.)
13              - - -
14   BY MR. DAVIS:
15       Q.    Just take a look at
16   that exhibit, please.  Do you
17   recognize that document?
18       A.    So far.
19       Q.    Was this the only
20   documentation that you had found that
21   day relating to payments of royalties?
22   What appears in Exhibit --
23            MR. MALOFIY:
24       Objection.

Page 281

1    BY MR. DAVIS:
2        Q.    -- 10?
3        A.    I believe so.
4        Q.    In your complaint you
5    allege that Barton and Guice had
6    received hundreds of thousands of
7    dollars over the course of many years,
8    in fact, right from the release of the
9    Usher Confessions album, including
10   tens of thousands of dollars in
11   advances.
12            MR. MALOFIY:  Where is
13       that?
14   BY MR. DAVIS:
15       Q.    Where did that
16   information come from?
17            MR. MALOFIY:  Where are
18       you reading from, if you are
19       going to mention the
20       complaint?
21            MR. DAVIS:  I already
22       mentioned it.  It's paragraph
23       406.
24            MR. MALOFIY:  I want to



Page 282

1  make sure you're reading it
2  correctly, because there were
3  issues with you stating things
4  incorrectly.
5      MR. DAVIS:  Mr.
6  Malofiy, I would appreciate
7  you not to denigrate me in the
8  course of this deposition.
9      MR. MALOFIY:  Listen,
10  everyone gets treated the way
11  they are supposed to be
12  treated.  When you haven't
13  been straight with me, I'm
14  going to call you out on it.
15  That is what you have to
16  understand you are dealing
17  with me.  All right.  I'm not
18  afraid to say it.
19      Which page?
20      MR. DAVIS:  I've said
21  it three times now, paragraph
22  406.
23      MR. MALOFIY:  Thank
24  you.  This is not in the

Page 283

1  facts, this is the claims
2  part, right?
3      MR. DAVIS:  Paragraph
4  406, that is all you need to
5  know, Mr. Malofiy, in order to
6  follow the question.
7      MR. MALOFIY:  Okay.
8  Thank you.
9      THE WITNESS:  Can I
10  also see the document, please.
11  BY MR. DAVIS:
12      Q.    Sure.  My question to
13  you, sir, is, where did you get the
14  information that there were hundreds
15  of thousands of dollars over the
16  course of many years that Mr. Barton
17  and Guice had received from the track
18  Bad Girl?
19      A.    These documents add up
20  to a certain amount to you?
21      Q.    What I see in this
22  document at the most is $112,196 on
23  page 00077 Bates stamp.
24      A.    Uh-huh, and these

Page 284

1  others?
2      MR. MALOFIY:  Are you
3  representing these are all the
4  royalties that these gentlemen
5  received?
6      MR. DAVIS:  Just
7  continue with what you are
8  doing, Mr. Malofiy.  It is
9  being captured on the record.
10  You can make an objection.
11      MR. MALOFIY:  You don't
12  get it.  That is fine, if you
13  want to play tricks.
14  BY MR. DAVIS:
15      Q.    This is the statement
16  that you produced in your production.
17  I'm just asking you is this the only
18  statement that you found at the
19  offices in 2009 with regard to royalty
20  payments?
21      A.    I'm not sure.
22      Q.    You are not sure?
23      A.    No, I'm not sure.
24      Q.    Well, what did you do

Page 285

1  to search your documents in response
2  to the request for documents that was
3  served on your counsel months ago?
4      A.    I went through all the
5  documents that I had taken from the
6  studio, and I believe I handed them
7  all in.
8      Q.    Did you take a computer
9  from the studio as well?
10      A.    Did I take?  I didn't
11  take anything, everything belonged to
12  me.
13      Q.    Did you remove a
14  computer from the studio?
15      MR. MALOFIY:  Objection
16  to the word remove.
17  BY MR. DAVIS:
18      Q.    When you were taking
19  things out of the space?
20      A.    Yes, I did.
21      Q.    And did you search that
22  computer in connection with your
23  document search?
24      A.    I did.



Page 286

1      Q.      And did you turn over
2   the contents of what you found to your
3   lawyer?
4      A.      I did.
5      Q.      Was this document on
6   that computer?
7      A.      I don't believe these
8   documents were on the computer, no.
9      Q.      Where were these
10  documents?
11     A.      I believe these
12  documents were inside of a binder type
13  of thing, you know, case in the
14  studio.
15     Q.      Were there any other
16  royalty statements besides this one
17  that is in front of you that you
18  recall finding?
19     A.      You know, it was a
20  really hard time for me, hard thing to
21  find, and I don't recall if these are
22  all of them.
23     Q.      Did you look anywhere
24  besides your home for documents in

Page 287

1   response to the document request?
2      A.      Would be the only
3   place.
4      Q.      Tell me everything you
5   did to look for documents in response
6   to the document request that were
7   served on you?
8      A.      I went through whatever
9   files I had on my computer saved, and
10  whatever I had left over that I had
11  taken to my home from the studio.
12     Q.      Did you maintain the
13  same computer from 2009 as you have
14  today?
15     A.      No.
16     Q.      Did you transfer files
17  from the computer you had in 2009 to a
18  new computer?
19     A.      I did.
20     Q.      Was what you
21  transferred onto your new computer
22  everything that you had as of 2009?
23           MR. MALOFIY:
24       Objection.  You can answer.

Page 288

1           THE WITNESS:  I believe
2   so but I'm not certain.
3   BY MR. DAVIS:
4      Q.      You are not certain,
5   why are you not certain?
6      A.      Because I could have
7   made a mistake.  I'm a human being.
8      Q.      Did you delete any
9   files?
10          MR. MALOFIY:
11      Objection.  You can answer.
12          THE WITNESS:  Not that
13      I recall.
14  BY MR. DAVIS:
15     Q.      Did you maintain any of
16  your records at any outside location,
17  like a storage facility?
18     A.      No.
19     Q.      No.  Where did you find
20  the records that you did produce that
21  were not on your computer?
22     A.      In my home.
23     Q.      Where in your home?
24     A.      I have -- at the time I

Page 289

1   had a desk set up in my bedroom, which
2   is like the corner of my room.  That
3   was like my office, there.
4      Q.      Any place else?
5      A.      Any place else what?
6      Q.      That you maintained
7   records?
8      A.      Not that I can think
9   of, no.
10     Q.      Did you withhold the
11  production of any documents in
12  response to the document request?
13     A.      Absolutely not.
14     Q.      Identify for me the
15  documents that you removed from the
16  premises that each of your businesses
17  were operating from?
18     A.      I couldn't possibly
19  tell you all of them because there was
20  a lot of paperwork there when I
21  removed it from the studio to my home,
22  and you got to remember at that time
23  it was very difficult for me to even
24  really think straight because I was in

Page 290

1   that slump of a depression.  But to my
2   knowledge I removed everything from
3   there and brought it to my home.  But
4   you also have to remember that I got
5   stuck selling a lot of equipment, so I
6   would assume everything made it to my
7   home.
8       Q.    Tell me what you
9   remember that you brought from the
10  premises where you operated your
11  businesses to your home?
12      A.    What I brought?  I
13  brought, obviously, this box of
14  documents, pens, pencils, computers,
15  screens, cords, quarter-inch cables,
16  XLR cables, headphones, microphones,
17  microphone stands, my guitars, my
18  base, my keyboard, my clavinet, sound
19  panel that I removed off the wall,
20  sofa -- sofas I should say, chairs,
21  brooms, paintings -- or pictures I
22  should say, they weren't paintings,
23  pre- amps, CD players, recorders,
24  mixing boards, mixing board tables,

Page 291

1   MPC, lots of floppy disks, CDs.  I'm
2   just going through the items that were
3   in the studio.  I'm sure I could keep
4   going but just everything had to be
5   removed because I needed to get out of
6   the space.
7       Q.    This document that has
8   been marked Marino-10 is -- at least a
9   cover page has Dante Barton's name on
10  it.  Did you take home other documents
11  that were in some way either addressed
12  to or referred to Dante Barton?
13      A.    I don't think so.
14      Q.    This is the only
15  document that has Dante Barton's name
16  on it?
17          MR. MALOFIY:  You say
18      document, you are referring to
19      all six pages?
20          MR. DAVIS:
21      Document 10.
22          THE WITNESS:
23      Document 10.  Again, Mr.
24      Davis, I can't be 100 percent

Page 292

1       certain.  It was a couple
2       years ago, and as I told you
3       it was a very bad situation
4       for me so my head was not all
5       there at the time removing
6       everything and bringing it
7       back.
8   BY MR. DAVIS:
9       Q.    When you found this
10  document, this collection of documents
11  with Dante Barton's name on it did you
12  renew your efforts to try to contact
13  him?
14      A.    At the time when I
15  found it?  No, I think I was coming at
16  the tail end of trying to contact him
17  when I did find these documents.  So I
18  think this was the moment -- the
19  moment at which I realized that
20  something bad had happened.
21      Q.    Something bad had
22  happened to whom or what?
23      A.    Myself, I had been
24  taken advantage of.

Page 293

1       Q.    You said in your
2   complaint or the complaint alleges
3   that you had concern that something
4   might have happened to Mr. Barton, do
5   you recall that?
6       A.    Yeah.
7       Q.    And you thought it
8   might have been something serious; is
9   that correct?
10      A.    Yeah.
11      Q.    Did you attempt to
12  contact any law enforcement agency to
13  advise them that someone that you had
14  worked with was now missing?
15      A.    No.
16      Q.    Why didn't you do that?
17      A.    I really don't know.  I
18  contacted him.  I contacted a few
19  friends, people that know him.  But,
20  no, I didn't contact any law
21  enforcement.  I mean, he is an adult,
22  you know.
23      Q.    As I understood the
24  complaint you thought something bad

MAGNA
LEGAL SERVICES

Page 294

```
1   might have happened to him?
2        A.    Yeah, possibly.
3        Q.    And this was before you
4   learned that there were royalty
5   statements in a box in the office?
6        A.    That's correct.
7        Q.    And your urgency about
8   his will being was not heightened
9   enough to go to the police or to any
10  authorities to say that my friend is
11  missing and I can't find him, what can
12  we do?
13       A.    No.  No.  There were
14  other times where Dante may have just,
15  you know, jumped up and left town with
16  a friend or a girl and did his thing,
17  so I didn't want to push it into
18  something that severe, per se, to call
19  the law enforcement.
20       Q.    For how long did you
21  make efforts to locate him?
22       A.    I really don't -- I
23  really don't remember how long.
24       Q.    And after you stopped
```

Page 295

```
1   looking for him was there at any point
2   in time that you renewed your efforts
3   to try to find Mr. Barton to talk to
4   him about these statements?
5        A.    Can you say that again?
6        Q.    After you had ceased
7   looking for Mr. Barton did there come
8   a point in time when you renewed your
9   efforts to find him?
10       A.    No, I did not.
11       Q.    Weren't you interested
12  in speaking with him about the check
13  and statement that you found at the
14  studio?
15       A.    No.
16       Q.    Why is that?
17       A.    Because it was apparent
18  what had happened to me.
19       Q.    What was apparent to
20  you?
21       A.    That my song was stolen
22  from me.
23       Q.    Can you elaborate at
24  all?
```

Page 296

```
1        A.    Well, it was apparent
2   to me that when I found these royalty
3   statements without my name on them
4   that they had been receiving monies on
5   the song that I had wrote on my own.
6   It was apparent to me that he must
7   have grabbed some sort of big paycheck
8   that was not part of these documents
9   and taken off.  That is the way I felt
10  when I found this.
11       Q.    He being Mr. Barton?
12       A.    Yes.
13       Q.    What about Mr. Guice?
14       A.    What about Mr. Guice?
15       Q.    Did you think he was
16  part of this circumstance where money
17  had gone to Mr. Barton and presumably
18  to Mr. Guice?
19       A.    Yes.
20       Q.    You did think that?
21       A.    Possibly, yes.
22       Q.    Did you try to reach
23  Mr. Guice at that time?
24       A.    I did.
```

Page 297

```
1        Q.    Did you reach him?
2        A.    No.
3        Q.    Did you know where to
4   find him?
5        A.    No idea.  He had been
6   missing prior to this and I had no
7   idea where he was.
8        Q.    For how long did you
9   search for Mr. Guice?
10       A.    I can't recall.
11       Q.    You gave up?
12       A.    Yeah, as soon as I
13  found this I gave up.
14       Q.    And you gave up looking
15  for Mr. Barton?
16       A.    That's correct.
17       Q.    Now you believe that
18  they were in it -- in on it together?
19       MR. MALOFIY:
20  Objection.  Mischaracterizes
21  his testimony completely.
22       THE WITNESS:  Not
23  necessarily.  I didn't know
24  anything.  Like I said, I was
```

**MAGNA** ▶
LEGAL SERVICES

1    in this deep depression and
2    couldn't figure out which way
3    was up, so I really didn't
4    know.
5  BY MR. DAVIS:
6    Q.    After you came out of
7  that depression what did you figure
8  out?
9    A.    After I came out of
10  that I seeked counsel and a lot of it
11  came out.
12    Q.    What did you think Mr.
13  Barton had done to you?
14    A.    What do I think he had
15  done to me?
16    Q.    Yes.
17    A.    I really don't know in
18  the sense of what I think he had done.
19  What I know happened was that I didn't
20  get credited properly and that all
21  your defendants made lots of money on
22  a song that I wrote on my own and
23  basically just stole my song.
24    Q.    Did you see any of the

1  -- strike that.
2    A.    You know, additionally
3  I also want to say that with that
4  there hasn't been anyone, not one
5  person on this entire plant that has
6  come up and said, he didn't write the
7  song.  So with that you have these
8  people that are just collecting money.
9  This is just a small example of what
10  Dante and Wil grabbed, and I still
11  haven't grabbed anything.  And you are
12  sitting here and you keep deposing me
13  and defending these people that are
14  like thieves.  What else do you want?
15    Q.    Mr. Marino, is it
16  accurate to say that what you want
17  from this lawsuit is credit on the Bad
18  Girl track?
19    A.    Partially credit --
20  partially -- excuse me, partially
21  accurate.
22    Q.    And is it accurate that
23  what you are also looking for is to be
24  paid your share of money --

1       MR. MALOFIY:
2       Objection.
3  BY MR. DAVIS:
4    Q.    -- for the song?
5    A.    Partially accurate.
6    Q.    Is it your desire to
7  stop sales of the Bad Girl track?
8       MR. MALOFIY:
9       Objection.
10  BY MR. DAVIS:
11    Q.    Is that what you want
12  to achieve from this lawsuit?
13    A.    I'm not sure what you
14  mean by stop sales.
15    Q.    Stop the ability for
16  anyone to buy that track in the
17  future?
18       MR. MALOFIY:
19       Objection.  You can answer.
20       THE WITNESS:  No.
21  BY MR. DAVIS:
22    Q.    You want the track to
23  continue to be distributed and sold?
24    A.    Yes.

1    Q.    Okay.
2    A.    With -- with me being
3  properly credited, right.
4    Q.    So you don't want
5  record stores to, if there were any
6  today --
7    A.    Online record stores.
8    Q.    -- to clean off their
9  shelves and not sell the Confessions
10  album any more; is that correct?
11       MR. MALOFIY:
12       Objection.  You can answer.
13       THE WITNESS:  Say that
14  again.
15  BY MR. DAVIS:
16    Q.    It is not your desire
17  to have, if there were record stores,
18  for them to remove from their shelves
19  copies of the Confessions album?
20    A.    That is not my desire.
21    Q.    Okay.  And you would
22  like to see the public have the
23  ability to purchase copies of the
24  Confessions album or Bad Girl as a

Page 302

1  track by itself?
2      A.    What I would really
3  like to see is that you and your
4  defense, the people that you are
5  defending be honest and realize that I
6  did write the song, I did produce the
7  song on my own, and that they have all
8  collected monies on my behalf, on a
9  song that I created and just be honest
10  and do the right thing, that is what I
11  would like to see, and for the song to
12  continue to sell, yes.
13      Q.    Because you want Bad
14  Girl to be available to the public; is
15  that right?
16          MR. MALOFIY:  He just
17      answered that question at
18      length.
19          THE WITNESS:  As long
20      as I'm properly credited.  If
21      I'm not, yes, I want it
22      pulled.
23  BY MR. DAVIS:
24      Q.    Do you think you have

Page 303

1  sole control over the use or
2  exploitation of Club Girl?
3          MR. MALOFIY:
4      Objection.  You can answer.
5          THE WITNESS:  Do I
6      believe -- can you say that
7      again?
8  BY MR. DAVIS:
9      Q.    I said, do you believe
10  that you have sole control over the
11  use and exploitation of Club Girl?
12          MR. MALOFIY:
13      Objection.  You can answer.
14          THE WITNESS:  Can you
15      define sole control?
16  BY MR. DAVIS:
17      Q.    That only you can
18  decide what happens to that track?
19      A.    Yes.
20      Q.    You believe that?
21      A.    I do.
22      Q.    Even though you
23  acknowledge and have a few times today
24  admitted that you had contributions

Page 304

1  from Dante Barton and from Wil Guice?
2          MR. MALOFIY:
3      Objection.  His answer is his
4      answer.
5          THE WITNESS:  The
6      contributions they made were
7      contributions added to the
8      song that I originally
9      created, so I find that I am
10      the original copyright on it,
11      on that song.
12  BY MR. DAVIS:
13      Q.    So it is your position
14  that you have the sole right to be the
15  copyright owner of Club Girl?
16          MR. MALOFIY:  He
17      already answered that.
18          THE WITNESS:  Yes.
19  BY MR. DAVIS:
20      Q.    That is your position?
21      A.    Yes.
22      Q.    Do you believe you have
23  the sole right to determine the use
24  and exploitation of Bad Girl?

Page 305

1      A.    Yes.
2      Q.    I want you to look at
3  the affidavit that I had marked before
4  the break.  I think it's right in
5  front of you.
6          MR. MALOFIY:  What is
7      it marked as?
8          MR. DAVIS:  Exhibit
9      Marino-9.
10  BY MR. DAVIS:
11      Q.    And I would like you to
12  look at paragraph five.  Have you had
13  a chance to look at that?
14      A.    I did.
15          MR. MALOFIY:  Just give
16      me a second to get my papers
17      here.  Thank you.
18  BY MR. DAVIS:
19      Q.    How many times have you
20  met Usher in person?
21      A.    Twice.
22      Q.    Twice.  Would you tell
23  me each instance, just the approximate
24  date, of when those occurrences were?



Page 306

1      A.    2004, which it says on
2  the affidavit.
3      Q.    In August of 2004?
4      A.    Yeah.
5      Q.    Okay.  And when was the
6  other time?
7      A.    In Los Angeles a couple
8  weeks ago.
9      Q.    You are referring to
10  the deposition?
11      A.    Yes.
12      Q.    And you were in
13  attendance at his deposition in Los
14  Angeles?
15      A.    That's correct.
16      Q.    So there were only two
17  instances in which you met him in
18  person?
19      A.    Yes, actually the last
20  --
21      Q.    I'm asking you in
22  person?
23      A.    Yeah, and the last one
24  he actually apologized to me that this

Page 307

1  happened.  He said it was very
2  unfortunate and that he is sorry.  He
3  also said that when this is over he
4  would like for me to reach out to Mark
5  Pitts and see if we could possibly
6  write some songs together.
7      Q.    Is that when we, Mr.
8  Malofiy and I, both asked you both to
9  speak aside and was off the record,
10  whatever you discussed?
11      A.    I don't recall off the
12  record or not but --
13      MR. MALOFIY:  It wasn't
14      on the stenographic record,
15      was it?  Was it on the
16      stenographic record?  I don't
17      believe so.  Mr. Davis, I
18      don't believe it was on the
19      stenographic record.
20      MR. DAVIS:  I'm really
21      not asking you to testify, Mr.
22      Malofiy, but if you would like
23      to we can swear you in and you
24      can sit in the chair.

Page 308

1      MR. MALOFIY:  I think
2      the memory might have
3      forgotten we were off the
4      record at that time.
5  BY MR. DAVIS:
6      Q.    Where was this
7  August 2004 after party?
8      A.    It was at a club here
9  in Philadelphia.  I don't recall the
10  name of the club because I do believe
11  it was closed down since then.  As you
12  know, clubs -- or may not know, clubs
13  don't really have a long life
14  expectancy, but I'm sure if we did
15  some research and looked into it and
16  found out after that concert where the
17  after party was, that place.
18      Q.    Oh, there was a concert
19  in Philadelphia that you attended?
20      A.    Yeah, this was the
21  after party.
22      Q.    For what concert?
23      A.    Usher's concert.
24      Q.    Was it a concert that

Page 309

1  you went to?
2      A.    It is.
3      Q.    And did you purchase
4  tickets for the concert?
5      A.    I did.
6      Q.    And did you go with
7  someone?
8      A.    Dante.
9      Q.    Anyone else go with
10  you?
11      A.    No.
12      Q.    And how was it that you
13  came to be at the after party?
14      A.    Dante had spoken to
15  someone in the Usher camp.  I'm not
16  sure who.  I never really asked.  And
17  we went there and got to the VIP
18  section and got to meet him in person.
19      Q.    So this concert that
20  you went to was in support of the
21  Confessions album?
22      A.    It was whatever the
23  name of the tour was.  Yeah, Usher
24  performed and after the show he had an

MAGNA
LEGAL SERVICES

Page 310

1 after party.
2    Q.    Did he perform Bad Girl
3 at the concert?
4    A.    He did.
5    Q.    How did that make you
6 feel?
7    A.    At the time I felt
8 great about it because I was under the
9 impression that I was properly being
10 credited, and -- you know as a
11 producer and as a song writer, but had
12 I not -- I had known that I wasn't
13 going to be I wouldn't have been
14 excited about it.
15    Q.    Well, at the time you
16 attended the concert you knew you had
17 not been credited and you were working
18 that out through Dante Barton?
19        MR. MALOFIY:
20    Objection.
21        THE WITNESS:  I knew
22    from --
23 BY MR. DAVIS:
24    Q.    Is that right?

Page 311

1    A.    No.
2    Q.    It is not right what I
3 said?
4    A.    Maybe I misunderstood
5 you.  Maybe you can rephrase it.
6    Q.    I said at the time you
7 went to the concert?
8    A.    Yeah.
9    Q.    Which was after the
10 releases the Confessions album?
11    A.    Yes.
12    Q.    You had already knew
13 that you were not identified in the
14 writer credits?
15    A.    In the writer credits
16 on the liner notes, right.
17    Q.    Yes.
18    A.    That's correct.
19    Q.    But you went to the
20 concert and you were pretty happy he
21 was playing the song; is that right?
22        MR. MALOFIY:
23    Objection.  He answered this
24    question already.  My, God.

Page 312

1        THE WITNESS:  I was
2    happy that he was playing my
3    song on stage and performing
4    my song because I was told
5    that these credits were all
6    being fixed and I was going to
7    be properly credited.  Had I
8    known that that was not going
9    to happen it would have been a
10    completely different
11    situation.
12 BY MR. DAVIS:
13    Q.    Well, in August 2004 by
14 that time the only person you had been
15 talking to was Dante Barton about it;
16 is that correct?
17    A.    I don't recall.
18    Q.    Okay.
19    A.    I don't recall.
20    Q.    You didn't run up on
21 the stage and tell Usher to stop
22 performing Bad Girl when he started to
23 play it, did you?
24    A.    I think I would have

Page 313

1 gotten arrested.
2    Q.    But you didn't do it,
3 did you?
4        MR. MALOFIY:
5    Objection.
6        THE WITNESS:  I don't
7    do things like that to
8    jeopardize myself to go and
9    get put in jail.
10 BY MR. DAVIS:
11    Q.    So the answer is, no,
12 you didn't do that?
13    A.    The answer is I
14 wouldn't have done that, no.
15    Q.    And you were proud that
16 he was singing a song that you were
17 apart of?
18        MR. MALOFIY:
19    Objection.  You can answer.
20        THE WITNESS:  Again, I
21    was proud --
22        MR. MALOFIY:  Having
23    trouble.
24        THE WITNESS:  -- but I

**MAGNA**
LEGAL SERVICES

1    was -- I was supposed to be
2    properly credited for this
3    song.  If I knew I wasn't
4    being properly credited for
5    this song chances are I
6    wouldn't have gone to the
7    concert.
8  BY MR. DAVIS:
9        Q.    How did it come to be
10  that you had an opportunity to meet
11  Usher at this party?
12       A.    How did -- I told you.
13       Q.    Well, I'm not saying
14  how you got to the party.  Now I'm
15  asking you how is it that you got in
16  front of Usher at this after party?
17       A.    Dante Barton had made a
18  phone call to someone in the camp.  We
19  went to the after party.  We got to
20  the VIP section.  He said who we were
21  to the person at the front, and we
22  were the front at the VIP area.  I
23  remember it being on a second floor of
24  some sort of like balcony area that

1  overlooked the whole dance floor and
2  stuff.  We went in there and they
3  said, you know, he is right over
4  there.  We walked up to him and we
5  basically said, hey, how you doing,
6  I'm Dan Marino, this is Dante Barton,
7  we wrote and produced the song Club
8  Girl that you are using at Bad Girl.
9  He said great job.  We shook hands.
10  It wasn't much more than a few minutes
11  of a conversation and that was it.
12       Q.    That was it?
13       A.    That was it.
14       Q.    Okay.
15       A.    But he did recognize it
16  and he said thank you, great job.
17       Q.    And after that
18  August 2004 introduction to Usher and
19  the brief exchange that you had you
20  didn't meet Usher in person again
21  until his deposition in April of this
22  year?
23       A.    That's correct.  And
24  even at that time --

1        Q.    That is --
2        A.    -- and even at that
3  time he didn't even dispute the fact
4  that I wrote the song or produced the
5  song or performed the song or
6  anything, even at that time.  He just
7  recognized me as a producer and as a
8  song writer, and he said thank you.
9        Q.    All I asked you was,
10  you didn't see him between August 2004
11  until April of 2013?
12       A.    No, I did not.
13       Q.    Okay.  Did you ever try
14  to telephone Usher between 2004 and
15  2013?
16       A.    Mr. David -- Davis?
17       Q.    Davis is my name.
18       A.    How would I possibly
19  call Usher on the telephone?
20       Q.    I'm just asking you,
21  did you try to telephone him?
22       A.    No.  No, and had I
23  known that he was going to steal my
24  song I would have definitely tried to

1  call him.  I would have definitely
2  tried to reach lengths to get his
3  phone number or people that know him,
4  but I didn't know that at that time.
5        Q.    You are telling me that
6  as of August 2004 you knew you still
7  had not been credited?
8        MR. MALOFIY:
9        Objection.
10  BY MR. DAVIS:
11       Q.    So are you saying that
12  as the years went by and you still
13  were not credited you didn't feel any
14  urgency to try to contact Usher?
15       MR. MALOFIY:  I got to
16       cut you off because you are
17       mischaracterizing his
18       testimony repeatedly.  Not
19       just once, not just twice,
20       hours of testimony you are
21       mischaracterizing.  You can't
22       do that.  I'm not going to
23       allow it to happen.  All
24       right.  That is not what he

1    said.  He said it was a
2    mistake in the liner credits,
3    not that anyone did not
4    recognize him as a song
5    writer.  Okay.  You got to be
6    clear when you're asking
7    questions.  What you are doing
8    is playing games.
9  BY MR. DAVIS:
10       Q.    Mr. Marino --
11          MR. MALOFIY:  I'm tired
12    of it.  I'm tired of it.
13    Everybody is tired of it.
14          MR. DAVIS:  Have you
15    finished, are you finished
16    with your speech?
17          MR. MALOFIY:  Are you
18    finished with
19    mischaracterizing the man's
20    testimony and then trying to
21    play games with words because
22    you are a shrewd lawyer?
23  BY MR. DAVIS:
24       Q.    Mr. Marino, at any time

1  between August of 2004 and April of
2  2013 did you ever try to telephone
3  Usher?
4       A.    Look --
5       Q.    I'm just asking you to
6  answer that question.
7       A.    All I know is that I
8  wrote this song and that your
9  defendants stole it from me.
10       Q.    I'll accept that as a
11  no, you didn't try to call him?
12          MR. MALOFIY:
13    Objection.
14  BY MR. DAVIS:
15       Q.    Is that fair, the
16  answer is no, you didn't try to call
17  him?
18       A.    Why would I try to call
19  him?  Why?  Why, when they already
20  assured me that they were fixing the
21  credits.  His camp, your defendants
22  already told me that they were going
23  to take care of the credits, why would
24  I try to contact him?

1       Q.    Mr. Marino --
2       A.    I don't understand the
3  question.  Why would you even ask
4  that?
5       Q.    Mr. Marino --
6          MR. MALOFIY:  Let him
7    finish.  Let him finish.
8  BY MR. DAVIS:
9       Q.    I'm asking --
10       A.    It doesn't even make
11  sense why you are asking me that.
12       Q.    Did you ever attempt to
13  contact Usher between August of 2004
14  and April of 2013 when you saw him at
15  his deposition, it is a very simple
16  question?
17       A.    I don't recall.
18          MR. MALOFIY:
19    Objection.  Can you answer.
20          THE WITNESS:  I don't
21    recall.
22  BY MR. DAVIS:
23       Q.    Did you ever try to
24  text him during that period of time?

1       A.    I don't recall.
2       Q.    Did you ever try to
3  e-mail him between 2004 and 2013?
4          MR. MALOFIY:  I mean,
5    it is a silly question you are
6    asking.
7  BY MR. DAVIS:
8       Q.    Did you?
9          MR. MALOFIY:  Childish.
10          THE WITNESS:  Mr.
11    Davis, you are defending
12    thieves and you are acting
13    like somebody who should be
14    hanging out with them at that
15    point.
16  BY MR. DAVIS:
17       Q.    Mr. Marino, I'm just
18  asking --
19       A.    I don't have his e-mail
20  address.
21       Q.    So the answer is you
22  didn't try to e-mail him?
23       A.    No, I did not try to
24  e-mail Usher because I don't have his

Page 322

1  e-mail address.
2      Q.   Did you ever tell Usher
3  between -- okay.
4          VIDEOGRAPHER:  The time
5  is now 4:38 p.m., and this
6  ends DVD number two in the
7  deposition of Daniel Marino.
8          THE WITNESS:  This is
9  so ridiculous.
10         - - -
11         (At this time a short
12  break was taken.)
13         - - -
14         VIDEOGRAPHER:  The time
15  is now 4:48 p.m.  This begins
16  DVD number three and the
17  deposition of Daniel Marino
18  and we are now on the record.
19  MR. DAVIS:  Thank you.
20  BY MR. DAVIS:
21      Q.   Mr. Marino, you had
22  testified earlier of the efforts that
23  you took to locate documents and you
24  mentioned that you looked on your

Page 323

1  computer, and it was a computer that
2  you had after being at the business
3  premises where your businesses were
4  operated from; is that correct?
5      A.   Yes.
6      Q.   When you went to the
7  computer to look for documents did you
8  have any e-mails that were stored on
9  that document -- on that computer?
10  Excuse me.
11      A.   Can you please say that
12  again.
13      Q.   Were there any e-mails
14  messages on the computer that you
15  searched that were stored on the
16  computer?
17      A.   No.
18      Q.   Did you ever e-mail Mr.
19  Barton?
20      A.   We e-mailed often.
21      Q.   Did you ever e-mail Mr.
22  Guice?
23      A.   I don't think Guice and
24  I really e-mailed.  I lot of texting

Page 324

1  going on.
2      Q.   Texting?
3      A.   Yeah.
4      Q.   Did you ever look for
5  any of these text messages that you
6  had with Mr. Guice?
7      A.   That was way back.  I
8  mean that phone -- I don't have that
9  phone anymore.
10      Q.   What about the e-mail
11  communications that you had with Mr.
12  Barton, did you search for those
13  e-mails?
14      A.   I did do some searching
15  for e-mails.
16      Q.   So you had some e-mails
17  from back in 2003, 2004?
18      A.   No.
19          MR. MALOFIY:
20  Objection.  You can answer.
21          THE WITNESS:  No.
22  BY MR. DAVIS:
23      Q.   You didn't have?
24      A.   No, I did not have any.

Page 325

1      Q.   From what period of
2  time did you have e-mails between
3  yourself and Mr. Barton?
4      A.   I don't recall.
5      Q.   Were there some?
6      A.   There must have been.
7      Q.   And did you look
8  through each e-mail to see whether or
9  not it was responsive to any of the
10  requests that were contained on the
11  document response served by the
12  defendants?
13          MR. MALOFIY:
14  Objection.  You can answer.
15          THE WITNESS:  I did
16  look and I didn't see anything
17  that was relevant.
18  BY MR. DAVIS:
19      Q.   Did your lawyer assist
20  in the search of those documents with
21  you?
22          MR. MALOFIY: *
23  Objection.  You don't have to
24  answer that.

Page 326

1      MR. DAVIS:  Are you
2  instructing him not to answer?
3      MR. MALOFIY:  Yup.
4      MR. DAVIS:  Did you
5  turn over the records to you
6  to inspect?
7      MR. MALOFIY:  All
8  right.  You can ask me that in
9  a discovery request.  That is
10  how it is done, but I'm not
11  being deposed right now, Mr.
12  Davis.
13      MR. DAVIS:  Okay.
14  We'll ask you later.
15      MR. MALOFIY:  You can
16  do it quick, because we have a
17  discovery deadline.  I'll be
18  happy to wright you a letter,
19  respond to a letter or e-mail
20  even.  No issue there.
21      MR. DAVIS:  Okay.
22  BY MR. DAVIS:
23      Q.    In your search for
24  those document --

Page 327

1      MR. MALOFIY:  I don't
2  mean to interrupt.
3      MR. DAVIS:  You're
4  instructing him, we'll discuss
5  that later.
6      MR. MALOFIY:  We
7  probably should just all tee
8  off maybe at the end of the
9  deposition and kind of get an
10  understanding going forward
11  because we have Barton's
12  deposition on --
13      MR. DAVIS:  Mr.
14  Malofiy, you are interrupting
15  the deposition.
16      MR. MALOFIY:  We were
17  talking about discovery.  You
18  asked me a question.  I just
19  wanted to raise in issue that
20  we are having.  I'm not trying
21  --
22      MR. DAVIS:  We can
23  discuss that after the
24  deposition, Mr. Malofiy.

Page 328

1      MR. MALOFIY:  I just
2  wanted to raise it.
3      MR. DAVIS:  We are not
4  going to discuss it now.
5      MR. MALOFIY:  We have
6  Barton on Tuesday.
7  BY MR. DAVIS:
8      Q.    Mr. Malofiy did you
9  look through every e-mail that you
10  found -- Mr. Marino, did you look
11  through every e-mail that you had
12  between yourself and Mr. Barton on
13  your computer?
14      A.    I did.
15      Q.    You did?
16      A.    Did I look you are
17  asking me?
18      Q.    Yes.
19      A.    Yes.
20      Q.    And there were no
21  responsive documents in the emails
22  that you reviewed?
23      A.    No.
24      Q.    Okay.  How did you come

Page 329

1  to learn of Mark Pitts?
2      A.    Originally through a
3  gentleman that would come through the
4  studio.  I never really knew his real
5  name, but his nickname was General.
6      Q.    What did General do?
7      A.    I really don't know.  I
8  think he was just somebody that
9  shopped music.
10      Q.    How did you understand
11  that?
12      A.    From the minimal
13  conversations we had.
14      Q.    You spoke with General?
15      A.    Yes.
16      Q.    Okay.  Did he shop any
17  of your music?
18      A.    Yes.
19      Q.    Did he shop music that
20  you had worked on with Mr. Barton and
21  Mr. Guice?
22      A.    He had shopped music
23  that I had worked on with Barton and
24  Guice and my own.



1     Q.     Did you ever meet Mr.
2   Pitts in person?
3     A.     Maybe.
4     Q.     Why do you say maybe?
5     A.     Because I believe I met
6   him in the studio once.
7     Q.     He came to the
8   Philadelphia studio, Wavelab studio?
9     A.     Yes, I believe he may
10  have.
11    Q.     Do you remember when he
12  did that?
13    A.     Prior to the release of
14  the Confessions album.
15    Q.     Do you remember the
16  reason why you believe he may have
17  come to the studio?
18    A.     To meet Dante and
19  myself.
20    Q.     But you are not sure of
21  this happening?
22    A.     I'm not sure, no.
23    Q.     Would that be the only
24  time that you have any recollection of

1   meeting him in person?
2     A.     In person, yes.
3     Q.     Okay.  And that was
4   prior to the release of the
5   Confessions album?
6     A.     Yes.
7     Q.     You said General
8   shopped music.  Did he shop Club Girl?
9     A.     Yes.
10    Q.     Did you know he was
11  shopping Club Girl?
12    A.     No.
13    Q.     What does shopping
14  mean?
15    A.     To me it means he would
16  take my work or work that I worked on
17  with Will and Dante and try to find
18  other artists that would want to use
19  that song and song recording for their
20  album or single, like that.
21    Q.     But in order to shop
22  your music he had to have a recording
23  of the music; is that correct?
24    A.     Yes.

1     Q.     Okay.  You call that a
2   demo?
3     A.     Not necessarily.
4         MR. MALOFIY:
5         Objection.  You can answer.
6   BY MR. DAVIS:
7     Q.     What do they call it?
8     A.     Music.
9     Q.     Okay.  So you say that
10  you didn't know that General was
11  shopping Club Girl?
12    A.     That's correct.
13    Q.     Did there come a time
14  when you did know that?
15    A.     Yes.
16    Q.     How did you find that
17  out?
18    A.     When Usher received the
19  song that I originally wrote and
20  eventually wound up stealing it.
21    Q.     When was that?
22    A.     Again, it was obviously
23  prior to the release of the
24  Confessions album.

1     Q.     Were you upset that
2   General had shopped the Usher
3   recording of Club Girl to -- strike
4   that.
5         Were you upset when
6   you learned that General had been
7   shopping Club Girl to Usher?
8     A.     I was not upset,
9   because I was supposed to get properly
10  credited for the song Club Girl and
11  any of the songs that he had in his
12  possession.
13    Q.     So you were okay with
14  him shopping it subject to you getting
15  credit?
16    A.     As long as I was
17  properly credited.
18    Q.     Did you ever put
19  together a recording that included
20  Club Girl to be shopped with other
21  songs?
22    A.     Can you please rephrase
23  that?
24    Q.     Did you create a

1  recording, a demo, I refer to it as,
2  that included Club Girl to be shopped
3  to third parties for potential use?
4      MR. MALOFIY:
5      Objection.  You can answer.
6      THE WITNESS:  Do you
7      mean a demo like a disk or
8      some sort of recording medium
9      where there would be multiple
10     songs on it?
11 BY MR. DAVIS:
12     Q.   Yes.
13     A.   Me personally?
14     Q.   Yes.
15     A.   No, I did not.
16     Q.   Do you know if Mr.
17 Barton did that?
18     A.   I don't know if Mr.
19 Barton did that.  Could have also been
20 Wil.
21     Q.   How did General get a
22 copy of Club Girl in order to present
23 it to Usher?
24     A.   I don't know.

1      Q.   Do you know if General
2  directly provided it to Usher or to
3  someone that represented Usher?
4      A.   To my understanding
5  General provided that demo, as you
6  call it, Club Girl, the song that I
7  wrote, to Mark Pitts.
8      Q.   Okay.  And how did you
9  learn that?
10     A.   I'm trying to remember
11 exactly how I remember -- how I came
12 to know that.  It had to be either one
13 of the two other people I worked with,
14 Dante or Wil.
15     Q.   Did you ever speak to
16 Mark Pitts on the phone?
17     A.   Yes.
18     Q.   How many times?
19     A.   I believe -- I can't
20 say a number, but during the time of
21 the revisions of the song I believe he
22 was on the phone multiple times.
23     Q.   Before the revisions,
24 did you speak to him at all?

1      A.   If it was Mark Pitts
2  that was in the studio in Wavelab that
3  came down, then that time.
4      Q.   Do you remember
5  anything about that possible time that
6  you met Mr. Pitts in your studio?
7      A.   I remember being in the
8  back room, because there was two
9  different recording studios within
10 that location, and I just remember
11 listening to songs with him.
12     Q.   You don't remember any
13 of the -- any conversation between
14 you?
15     A.   The conversation was
16 like, oh, that is all right, let's
17 listen to the next song, oh, that one
18 is pretty good, that is hot, we might
19 be able to do something with that.
20 And we just listened to a bunch of
21 songs that I wrote along with, you
22 know, my partners.
23     Q.   Anything else you want
24 to add to that?

1      A.   No, I don't recall the
2  in-depth conversation.
3      Q.   Okay.  Now you said you
4  had multiple, I think you used the
5  word, conversations during the
6  revisions period of Club Girl?
7      A.   That's correct.
8      Q.   When do you describe
9  the revisions period of Club Girl?
10     A.   Sometime in '03.  Maybe
11 towards the end of '03.
12     Q.   Where were you during
13 the revisions period?
14     A.   In my recording studio.
15     Q.   In Philadelphia?
16     A.   That's correct.
17     Q.   Was -- where was Mark
18 Pitts?
19     A.   That I don't know.
20     Q.   And your testimony is
21 that you spoke to him during this
22 period?
23     A.   It was a conversation
24 where he was in the studio, he, Mark

Page 338

1    Pitts was in the studio.
2        Q.    Not your studio?
3        A.    Not my studio.  In
4    another location on a speaker phone
5    where they were playing the song that
6    they were working on, my song Club
7    Girl, and doing Bad Girl, and just
8    getting ideas back and forth of what
9    could possibly work because they were
10   asking for, you know, a new hook, a
11   possible bridge, which we worked on --
12   I don't know how many different
13   bridges we recorded and sent over to
14   those guys, so -- yeah, during that
15   time.
16       Q.    This is in late '03?
17       A.    I believe.
18       Q.    Okay.  When you were
19   doing any of this revision phase were
20   you ever in the studio physically with
21   Mr. Pitts?
22       A.    No.
23       Q.    Okay.  Was the
24   conversations that you had with Mr.

Page 339

1    Pitts at that time, the revision
2    phase, only about what to do with the
3    track?
4        A.    Yes.
5        Q.    Okay.  And at some
6    point there came a conclusion to what
7    you call the revisions phase?
8        A.    Yes.
9        Q.    And was there changes
10   made to Club Girl based upon the
11   revisions phase?
12       A.    Yes, there was --
13       MR. MALOFIY:
14       Objection.  You can answer.
15       THE WITNESS:  Yes,
16   there were.  There were -- I'm
17   sorry, can you please repeat
18   the question.
19   BY MR. DAVIS:
20       Q.    There came a point in
21   time when the revisions phase was over
22   and that things that were done during
23   the revisions phase were made part of
24   Club Girl?

Page 340

1        MR. MALOFIY:
2        Objection.  You can answer.
3        THE WITNESS:
4        Obviously, yes, there was an
5        end at some point.
6    BY MR. DAVIS:
7        Q.    You were a participant
8    in that?
9        A.    I was a participant in
10   the revisions of the song, actually
11   like things that, you know, went onto
12   the final Bad Girl song.
13       Q.    You are saying you were
14   a contributor to those changes?
15       A.    Absolutely.
16       Q.    And it was your
17   judgment based upon their requests
18   that this material should be included
19   on the track?
20       A.    Yes.
21       Q.    Okay.  And you approved
22   of those changes in your own mind?
23       MR. MALOFIY:
24       Objection.  You can answer.

Page 341

1        THE WITNESS:  I mean, I
2        don't know that I really
3        approved of any of the
4        changes.
5    BY MR. DAVIS:
6        Q.    In your own mind, did
7    you like the work that you had added
8    to Club Girl?
9        A.    Some of it, yes, some
10   of it, no.
11       Q.    But you were not
12   opposed to including it as part of the
13   work?
14       A.    The work that I did?
15       MR. MALOFIY:
16       Objection.  You can answer.
17   BY MR. DAVIS:
18       Q.    The additional material
19   that was added to Club Girl?
20       A.    Can you please state --
21       Q.    I'm asking you --
22       A.    Yes.
23       Q.    -- you are saying that
24   you created some new material during



Page 342

1  this revisions phase, and that this
2  was incorporated in the Club Girl
3  track?
4      A.    It was incorporated
5  into the Bad Girl version of the
6  track.
7      Q.    The Bad Girl version,
8  and you knew it was being
9  incorporated?
10     A.    I played it, I recorded
11 it, I wrote it, yes.
12     Q.    And you didn't object
13 to it being included?
14     A.    I didn't object because
15 I thought that I was going to be
16 properly credited for it.
17     Q.    I'm simply stating --
18         MR. MALOFIY: Let him
19     finish his answer.  You keep
20     on cutting him short.  It is
21     not fair.  It is not fair.
22     You can't do that.
23         THE WITNESS:  I did --
24     I did -- I was okay with

Page 343

1      making the revisions and
2      mailing them the disks.
3  BY MR. DAVIS:
4      Q.    Oh, you mailed the
5  disks?
6      A.    The final revisions --
7  let me finish, please.  So we made
8  revisions to the Bad Girl.  We made
9  many revision.  I can't even tell you
10 how many.  And because their request
11 was multiple or different verse --
12 excuse me, different chorus, they
13 wanted to change the chorus.  We made
14 several different chorus changes to
15 the song and we mailed them those
16 changes, and some of those changes
17 they redid and it came up on the final
18 version of the Bad Girl track.
19         So, yes, I was okay
20 with giving them with the knowledge
21 knowing that I was going to be
22 properly credited for my contribution
23 to the song that I had already written
24 on my own.

Page 344

1      Q.    You say that Mark Pitts
2  was on the speaker phone.  Do you know
3  who else was with, if anyone, Mark
4  Pitts?
5      A.    I can say with
6  certainty Mark Pitts, Terry Lewis and
7  Usher.
8      Q.    And did this all happen
9  in one day or was it multiple days?
10     A.    No, it was over an
11 extended period of time.  If I had to
12 make a guess, couple weeks to a month
13 maybe.
14     Q.    It was around-the-clock
15 work?
16     A.    No.
17     Q.    Sporadic?
18     A.    It was not
19 around-the-clock work because I had a
20 day job, so I couldn't just be in the
21 studio around the clock, but a lot of
22 late nights.
23     Q.    Did you send the new
24 files that you had created for the

Page 345

1  revisions phase to that studio where
2  Mark Pitts had been calling you from?
3      A.    No, I did not mail
4  those disks.
5      Q.    Who did?
6      A.    Dante.
7      Q.    You knew he was mailing
8  them to them?
9      A.    Yes, again with the
10 understanding that I was going to be
11 properly credited for the song that I
12 originally wrote.
13     Q.    I understand.
14     A.    I was not expecting it
15 to be stollen from me at the end of
16 all this.
17     Q.    Now, was someone
18 working with you in the studio when
19 you were doing this revisions phase?
20     A.    Yes.
21     Q.    Who was that?
22     A.    Dante.
23     Q.    Anyone else?
24     A.    And Wil, I believe Wil

MAGNA ►
LEGAL SERVICES

Page 346

1  may have been there or maybe -- I'm
2  not sure. Maybe Wil was there during
3  the daytime when I did my parts and
4  then he went in and did his part when
5  I was at work. I'm not quite sure.
6      Q.    Now did you have any
7  conversation with -- I think you said
8  Terry Lewis was there?
9      A.    Yes.
10     Q.    Do you speak directly
11 with Terry at any point in time during
12 these conversations with Mark Pitts?
13     A.    You are going to have
14 to start that over.
15     Q.    Well, you said Mark
16 Pitts initiated these calls?
17         MR. MALOFIY:
18     Objection.
19         THE WITNESS: I don't
20     recall saying Mark Pitts
21     initiated the calls. I don't
22     recall saying that.
23 BY MR. DAVIS:
24     Q.    Someone called you from

Page 347

1  the studio where they were and Mark
2  Pitts got on the phone?
3      A.    Let me make it clear,
4  someone called -- I'm not sure if
5  Dante called or they called us, but we
6  spoke on the phone, again, generally
7  over the speaker phone so that we can
8  have discussion as a group, where they
9  were doing revisions, meaning Usher
10 and Terry Lewis and Mark Pitts.
11     Q.    I thought you were
12 doing the revisions in Philadelphia?
13     A.    That's correct.
14     Q.    What were they doing at
15 the other studio?
16     A.    Couldn't tell you,
17 possibly making their own revisions.
18 I wasn't there.
19     Q.    Did you ever have any
20 one-on-one conversations with Terry
21 Lewis during this period?
22         MR. MALOFIY:
23     Objection. You can answer.
24         THE WITNESS:

Page 348

1      One-on-one via the speaker
2      phone: Dan, that guitar is
3      fucking hot. That was pretty
4      much the gift of our
5      one-on-one.
6  BY MR. DAVIS:
7      Q.    Okay.
8      A.    They really loved the
9  guitar.
10     Q.    Did he say anything
11 else to you that you can recall?
12     A.    Not like a
13 word-for-word thing, but the gist was
14 like, try and get that same hot of the
15 guitar into the bridge.
16     Q.    Did you have any
17 one-on-one conversations with Usher
18 while you were doing these revisions?
19     A.    No.
20     Q.    Did you have any
21 one-on-one conversations with Mark
22 Pitts that you haven't described
23 already?
24     A.    I can't recall.

Page 349

1      Q.    Okay. And this
2  occurred over a multiple number of
3  evening or days?
4      A.    I would say up to a
5  month.
6      Q.    Was it every day during
7  a month?
8      A.    Almost, not the
9  discussions on the telephone every
10 day, but the working in the studio on
11 my end.
12     Q.    Okay.
13     A.    Yes.
14     Q.    During that one-month
15 period how many conversations can you
16 estimate that you had between your
17 studio and the studio that they were
18 at?
19         MR. MALOFIY:
20     Objection. You can answer.
21         THE WITNESS: Maybe
22     six, seven. I don't want it
23     to get confused with the
24     number of times I was in the

Page 350

1     studio over that month period
2     making the visions, but about
3     seven phone calls total over
4     that time.
5  BY MR. DAVIS:
6        Q.    And it was all about
7  the music and lyrics, the discussion,
8  and bridge and the other components of
9  the song?
10        MR. MALOFIY:
11    Objection.  You can answer, if
12    you understand his question.
13        THE WITNESS:  Can you
14    please restate that?
15  BY MR. DAVIS:
16        Q.    The substance of those
17  conversations concerned the changes
18  that were being affected on Club Girl?
19        MR. MALOFIY:
20    Objection.  You can answer.
21        THE WITNESS:  Club
22    Girl, Bad Girl, same song,
23    yes.
24  BY MR. DAVIS:

Page 351

1        Q.    Other than these, would
2  it be fair to say, conference calls
3  with one studio to the other --
4        MR. MALOFIY:
5    Objection.
6  BY MR. DAVIS:
7        Q.    -- did you ever have a
8  conversation where only you and Mr.
9  Pitts were on the phone?
10        MR. MALOFIY:
11    Objection.  You can answer.
12        THE WITNESS:  I really
13    don't recall.
14  BY MR. DAVIS:
15        Q.    Did you ever write to
16  Mr. Pitts at any time?
17        A.    No.
18        Q.    Did you ever e-mail Mr.
19  Pitts at any time?
20        A.    No.
21        Q.    Did you ever text Mr.
22  Pitts at any time?
23        A.    I didn't have his phone
24  number.

Page 352

1        Q.    You knew where he
2  worked, though, did you not?
3        A.    You know, I really
4  forget where he worked.  I knew he was
5  working for a major label, but maybe
6  at the time I remembered, now I don't.
7        Q.    But back then you think
8  you probably knew which label he was
9  at?
10        A.    I could have found out.
11        Q.    Okay.  And you
12  testified that it was your
13  understanding that General was the one
14  who got a copy of Club Girl to Mr.
15  Pitts?
16        A.    Yes.
17        Q.    Okay.  When you learned
18  that Mr. Pitts had a copy of Club Girl
19  and he had expressed interest in the
20  song did you ever attempt to dissuade
21  Mr. Pitts from using Club Girl?
22        A.    Had I known that the
23  song was going to be stolen from me, I
24  would have.  But I was not under the

Page 353

1  impression that that would ever happen
2  to me and that I would not be credited
3  properly.
4        Q.    So the answer is, no,
5  you never tried to dissuade him from
6  using Club Girl?
7        A.    That's correct.
8        Q.    Thank you.  You say in
9  your complaint that Mr. Pitts put the
10  deal together, those are your words in
11  the complaint --
12        MR. MALOFIY:
13    Objection.
14  BY MR. DAVIS:
15        Q.    -- for Club Girl?
16        MR. MALOFIY:  Where are
17    you referring to?
18        MR. DAVIS:  Paragraph
19    307.
20        THE WITNESS:  Can I see
21    that document, please?
22  BY MR. DAVIS:
23        Q.    Sure.
24        A.    What was the number



Page 354

1   again?
2        Q.      307, paragraph 307.
3   Very short paragraph.
4        A.      Okay.
5        Q.      Do you see that?
6        A.      Yes.
7        Q.      What do you -- tell me
8   what you know from first-hand
9   knowledge what Mr. Pitts did to put a
10  deal together for Club Girl?
11       A.      From my knowledge my
12  understanding was Mark Pitts being
13  Usher's A and R had the ability to
14  almost sway Usher into which songs he
15  believes should go on the record, and
16  it was my understanding that because
17  of him doing so he would require a
18  percentage of the song.  That was my
19  understanding.
20       Q.      Who would require a
21  percentage?
22       A.      Mark Pitts.
23       Q.      What do you mean by a
24  percentage?

Page 355

1        A.      A slice of the pie, a
2   partial, I guess, I don't want to say
3   credit, but if he made the deal go
4   through he was going to get, if I'm
5   not mistaken, something like
6   20 percent or something like that.
7        Q.      Well, Bad Girl did
8   appear on Confessions.  Do you have
9   any information that Mr. Pitts got any
10  percentage of Bad Girl?
11       MR. MALOFIY:
12  Objection.  You can answer.
13       THE WITNESS:  You know,
14       I don't think I ever really
15       even looked into it.  I just
16       remember that as my
17       recollection at the time of
18       how he put the deal together.
19  BY MR. DAVIS:
20       Q.      So the answer is, no,
21  you don't have any information whether
22  or not he got a percentage of Bad
23  Girl?
24       MR. MALOFIY:

Page 356

1        Objection.  You can answer.
2        THE WITNESS:  I don't
3        have any information.
4   BY MR. DAVIS:
5        Q.      Did you have any
6   conversations with Mr. Pitts in the
7   ones that you have described already
8   in which you discussed putting a deal
9   together for Club Girl?
10       A.      You know, I think I
11  answered this question earlier.  I
12  don't recall having one-on-one
13  conversations with him.
14       Q.      Did you ever try to
15  prevent Mr. Pitts from putting a deal
16  together for Club Girl, which
17  ultimately became Bad Girl?
18       MR. MALOFIY:
19       Objection.
20       THE WITNESS:  Had I
21       known that the song was going
22       to be stolen from me and I
23       wasn't going to be properly
24       credited I would have, but at

Page 357

1        the time, no, because I didn't
2        think that that was going to
3        happen.
4   BY MR. DAVIS:
5        Q.      So the answer is, no,
6   you didn't try to prevent Mr. Pitts
7   from trying to put a deal together?
8        MR. MALOFIY:  No, that
9        is not his answer.
10       THE WITNESS:  Yeah,
11       that's not -- he's right, that
12       is not what I said.
13  BY MR. DAVIS:
14       Q.      Subject to your
15  caveats?
16       THE WITNESS:  Can you
17       please read back what I said
18       as an answer, would you do
19       that, please?
20            - - -
21       (At this time the court
22       reporter read back from the
23       record as was requested.)
24            - - -



Page 358

1    THE WITNESS:  That is
2  my answer.  Thank you.
3  BY MR. DAVIS:
4    Q.    Okay.  So I'll ask you
5  again, subject to that caveat of
6  getting credit, you didn't try to
7  prevent Mr. Pitts from trying to put a
8  deal together for Club Girl?
9    MR. MALOFIY:
10   Objection.  His answer is his
11   answer.  It was read back, he
12   said it again.  He said that
13   is his answer.  You are using
14   the words caveat and this and
15   that and you are not being
16   straight.
17   THE WITNESS:  Yeah, I
18   --
19   MR. DAVIS:  Object to
20  your characterization.
21   MR. MALOFIY:  This is
22   the truth.  You don't like the
23   truth, we know that.
24  BY MR. DAVIS:

Page 359

1    Q.    Is that accurate,
2  subject to your caveats, you didn't do
3  anything to prevent Mr. Pitts from
4  putting a deal together?
5    MR. MALOFIY:
6    Objection.  His answer is his
7    answer.  Do you want it read
8    back?
9    THE WITNESS:  Mr.
10   Davis, can you please repeat
11   that question because I don't
12   quite understand what you mean
13   --
14  BY MR. DAVIS:
15   Q.    Subject to --
16   A.    Please didn't interrupt
17  me.  I don't understand what you are
18  referring to when you are saying
19  subject to that caveat.  Could you
20  please be a little bit more straight?
21   Q.    Do you understand what
22  the word caveat means?
23   A.    No.
24   Q.    Okay.  Subject to you

Page 360

1  getting credit, because you said that
2  in every answer that you've given me,
3  you didn't try to prevent Mr. Pitts
4  from putting a deal together for Club
5  Girl?
6    A.    No.
7    Q.    Thank you.  Did you
8  ever attempt to dissuade Usher from
9  using Club Girl, which became Bad
10  Girl, on the Confessions album?
11   A.    I believe I answered
12  this already.
13   Q.    You might have.
14   A.    Again, I'm going to say
15  the same thing that I continue to say,
16  had I known that this song was going
17  to be stolen from me, and that I was
18  not going to be properly credited as a
19  producer, as a song writer, as an
20  engineer, as a musician, I would have
21  not allowed any of this.  I would have
22  never authorized any of this to
23  happen.  And, again, to date, and it
24  will never happen, there has not been

Page 361

1  anyone ever to dispute that I
2  originally wrote the song, produced
3  the song and created the song on my
4  own.
5    Q.    Are you saying now that
6  Mr. Guice and Mr. Barton didn't help
7  you with Club Girl?
8    A.    I never said that.
9    MR. MALOFIY:
10   Objection.
11  BY MR. DAVIS:
12   Q.    Well, you keep saying
13  you solely wrote, you solely owned.
14  Are you discounting what they did?
15   MR. MALOFIY:
16   Objection.  This has been
17   asked and answered, but you
18   can answer it again.
19   THE WITNESS:  Please
20   rephrase that question?  Did I
21   discount?
22  BY MR. DAVIS:
23   Q.    Did you want to change
24  your testimony about previously



Page 362

```
1   identifying them as being
2   collaborators with you on Club Girl?
3        A.   I'll be clear, they
4   were people that I worked with.
5   However, originally I wrote that song
6   on my own without anyone else.  I also
7   recorded that song on my own without
8   anyone else, and then people whom I
9   worked with, who are Dante Barton and
10  Wil Guice, added to my song,
11  collaborated after I created the song.
12       Q.   Their collaboration --
13       A.   Yes.
14       Q.   -- was added to what
15  you had done to make a song?
16       MR. MALOFIY:
17  Objection.  That is not what
18  he said.  He said the song was
19  done.  You are playing games
20  now.  Cut it out.  This is the
21  stuff that bothers me that
22  drives someone up the wall.  I
23  never seen any lawyer do this
24  so bad ever.  He just said it.
```

Page 363

```
1        MR. DAVIS:  Mr.
2   Malofiy, I will ask you to
3   stop denigrating me during the
4   course of this deposition.
5        MR. MALOFIY:
6   Objection.
7        MR. DAVIS:  You have
8   been doing it throughout, I
9   ask you again that you stop
10  doing it.
11       MR. MALOFIY:  Mr.
12  Davis, you are asking the man
13  the same questions over and
14  over and trying to trick him.
15  After he says something you
16  mischaracterize his testimony,
17  you assume facts not in
18  evidence and then you ask him
19  questions related to that
20  after he just told you his
21  testimony.  All right.  That
22  is not fair, and I'm going to
23  call you out on it.
24       MR. DAVIS:  Okay.
```

Page 364

```
1   BY MR. DAVIS:
2        Q.   You've told me that you
3   had the conversations with Mr. Pitts
4   when he was in the studio and you were
5   in your studio, and you told me that
6   perhaps you may have me him ones at
7   the Wavelab studios in Philadelphia,
8   correct?
9        A.   Correct.
10       Q.   Did you -- is it true
11  that you never told Mr. Pitts that you
12  were excluded as a co-writer or
13  co-producer of Bad Girl?
14       A.   Dante Barton told me
15  that he had spoke to Mark Pitts and
16  expressed that to him that that had
17  happened, that there was an improper
18  credit in the liner notes.  Mark Pitts
19  told Dante that they were going to
20  take care of it, meaning his team and
21  Usher's team.  So did I directly tell
22  him or hear from him, no.
23       Q.   Okay.  And the only way
24  that you have any understanding that
```

Page 365

```
1   that conversation between Mr. Pitts
2   and Mr. Barton took place is because
3   Mr. Barton told you?
4        A.   That particular
5   conversation -- that particular
6   conversation Dante told me.
7        Q.   Did you ever have any
8   conversation by telephone, e-mail or
9   text with a man named Wayne Barrow?
10       A.   I couldn't say.  I
11  don't recognize the name.
12       Q.   Did you ever
13  communicate by any means with anyone
14  at Bystorm Entertainment?
15       A.   Not that I can recall.
16  It was a long time ago.
17       Q.   Did you ever notify
18  anyone directly at Arista, LaFace,
19  BMG, or Sony that you had not been
20  credited as a co-writer, or
21  co-producer, or engineer or any of the
22  other credits that you think you were
23  denied at any time?
24       MR. MALOFIY:
```

Page 366

1    Objection.  Just to be clear,
2  you are talking about before
3  the lawsuit?
4         MR. DAVIS:  Yes.
5         MR. MALOFIY:  Just to
6    be clear.
7         THE WITNESS:  Can you
8    name those entities again?
9  BY MR. DAVIS:
10    Q.    Sure, I'll be happy to.
11  Did you ever notify anyone at Arista,
12  LaFace, BMG or Sony that you had not
13  received proper credit on the Bad Girl
14  track that was on the Confessions
15  album?
16         MR. MALOFIY:
17    Objection.  You can answer.
18         THE WITNESS:  Which
19    company did Mark Pitts work
20    for?
21  BY MR. DAVIS:
22    Q.    Well, these companies
23  name changed over the course of time.
24  So he at one time was at Arista, then

Page 367

1  LaFace, BMG, Sony.  They all can be
2  viewed as Usher's label.
3    A.    So the only direct
4  communication I had with those
5  companies would have been -- and I
6  don't know if Jam and Lewis were with
7  those companies.
8    Q.    No.
9    A.    So it would have been
10  Mark Pitts who would have.
11    Q.    I didn't ask you -- I
12  asked you did you ever have any
13  conversation with anyone at those
14  companies to tell them that you had
15  not been properly credited on the Bad
16  Girl track that appeared on the
17  Confessions album?
18    A.    Dante told me that he
19  contacted them and that they were
20  aware of it, and they told him that
21  they were going to fix it and he
22  relayed that information to me.
23    Q.    But you didn't have
24  that conversation with any one at

Page 368

1  those companies?
2    A.    I didn't deal with the
3  business affairs, Dante did.
4    Q.    And whatever you know
5  about any contact with those entities
6  was through Dante Barton?
7    A.    The contact I had,
8  other than the cell phone calls for
9  the revisions and stuff like that.
10         MR. MALOFIY:
11    Objection.
12  BY MR. DAVIS:
13    Q.    Right.  I'm not talking
14  about revisions.  I'm simply talking
15  about any call that you directly had
16  with those companies to advise them
17  that you had not been properly
18  credited on the Bad Girl track on the
19  Confessions album?
20    A.    You know, had I known
21  that there were going to be dishonest
22  people on the other end and people
23  that were untrustworthy I would have
24  made those calls, but because I didn't

Page 369

1  know and because my business partner
2  was taking care of those deals I never
3  felt the need to call that record
4  myself.
5         Can I ask you a quick
6  question?
7    Q.    You can ask your
8  lawyer?
9         THE WITNESS:  How much
10    time do we have left in the
11    deposition?
12         MR. MALOFIY:  I don't
13    know.
14         MR. DAVIS:  We have a
15    lot of time.
16         THE WITNESS:  I'm just
17    curious.
18         MR. MALOFIY:  I think
19    it's probably about
20    45 minutes.
21         MR. DAVIS:  We have
22    another two-and-a-half hours.
23         MR. MALOFIY:  When did
24    we start?



Page 370

1    BY MR. DAVIS:
2        Q.    Okay.  You ready?
3        A.    Absolutely.
4            MR. MALOFIY:  We
5        started at 11:00.
6    BY MR. DAVIS:
7        Q.    Your affidavit, which
8    is Marino-9 --
9            MR. MALOFIY: Just, I'm
10       not going to rush you for
11       time.  I want to let you know.
12           MR. DAVIS:  I beg of
13       you to stop interrupting me
14       while I am in the middle of
15       the question.  You have done
16       that --
17           MR. MALOFIY:  You know,
18       there is something called
19       professional courtesy.  I'm
20       trying to let you know that
21       I'm not trying to crimp your
22       questions and I'm not trying
23       to rush you on time so you
24       done feel the need to --

Page 371

1            MR. DAVIS:  You are
2        eating up my time, Mr.
3        Malofiy.  I have seven hours.
4            MR. MALOFIY:  I had two
5        hours with Usher, so deal with
6        it.  Okay.
7    BY MR. DAVIS:
8        Q.    Your affidavit, which
9    is now before you, said that you met
10   the Avila brothers at the Grammies in
11   2000 -- February of 2005.  Do you see
12   that in there?
13       A.    Yeah.
14       Q.    Had you ever met either
15   Bobby or Izzy Avila before the 2005
16   Grammies in person?
17       A.    No.
18       Q.    Had you ever spoken to
19   them by phone prior to the 2005
20   Grammies?
21       A.    I don't recall speaking
22   to them directly, but I believe they
23   may have been on the other line during
24   the course of the revisions while we

Page 372

1    were talking.
2        Q.    So you don't recall any
3    conversation between you and either
4    one of them?
5            MR. MALOFIY:
6        Objection.
7            THE WITNESS:  No.
8            MR. MALOFIY:  That is
9        not what he said.
10   BY MR. DAVIS:
11       Q.    Did you have occasion
12   to meet either Izzy or Bobby Avila
13   after the February 2005 Grammies?
14       A.    Yes.
15       Q.    Where did you meet
16   them?
17       A.    At the depositions in
18   Los Angeles a couple weeks ago.
19       Q.    So between February of
20   2005 and the depositions in April this
21   year you had no contact with either of
22   them?
23       A.    No, I don't think so.
24       Q.    Did you exchange any

Page 373

1    e-mails with either Izzy or Bobby
2    Avila between February 2005 and when
3    you saw them at the depositions last
4    month in Los Angeles?
5        A.    I don't think so.
6        Q.    Did you have occasion
7    to exchange any text between either
8    Izzy or Bobby Avila and yourself
9    between February 2005 and when you saw
10   them at the depositions last month?
11           MR. MALOFIY:  I'm just
12       going to object.  You can ask
13       him this question.  The more
14       appropriate question would be
15       did you have his number, did
16       you have his e-mail.
17           THE WITNESS:  No.
18   BY MR. DAVIS:
19       Q.    Thank you.  So the only
20   occasion that you had to meet either
21   of the Avila brothers was in
22   February 2005 at the Grammies and at
23   their deposition?
24       A.    Correct.

MAGNA
LEGAL SERVICES

Page 374

1    Q.    Okay.  Did you ever
2  attempt to notify Izzy or Bobby Avila
3  that you objected to the inclusion of
4  Bad Girl on the Confessions album?
5         MR. MALOFIY:
6  Objection.  You can answer.
7         THE WITNESS:  Can you
8  please.
9         MR. DAVIS:  Please
10  repeat the question, madam
11  reporter.
12         - - -
13         (At this time the court
14  reporter read back from the
15  record as was requested.)
16         - - -
17         THE WITNESS:  Did I
18  contact them that I object?
19  BY MR. DAVIS:
20    Q.    Yes.
21         MR. MALOFIY:
22  Objection.  You can answer.
23         THE WITNESS:  I don't
24  recall contacting them to

Page 375

1  object.  Like I said in my
2  affidavit, we briefly met and
3  it came on topic that I hadn't
4  been properly credited.  And
5  they said, you are with good
6  people, basically, I think
7  that is -- and I trust people.
8  I trust people, I trust their
9  word so.
10  BY MR. DAVIS:
11    Q.    What you stated in
12  paragraph six is what you recall them
13  saying to you?
14    A.    Let me read paragraph
15  six.
16         What was the question
17  again, Mr. Davis?
18    Q.    Is that what you recall
19  having said between you and the Avilas
20  on February 2005 at the Grammies?
21    A.    Yes.
22    Q.    Thank you.  Have you
23  ever met in person Terry Lewis or
24  James Harris?

Page 376

1    A.    Prior to the
2  depositions, no.
3    Q.    And prior to the
4  depositions had you ever spoken
5  directly with James Harris?
6         MR. MALOFIY:
7  Objection.  You can answer.
8         THE WITNESS:  You know,
9  at the time I thought Jimmy
10  Jam and Terry Lewis were both
11  on the other line when we were
12  doing those revisions, but
13  during the deposition a couple
14  weeks ago in Los Angeles I
15  found out that -- Samuel
16  Harris, is his name -- is that
17  his name?
18  BY MR. DAVIS:
19    Q.    That is what the
20  complaint says.
21    A.    Okay.  He testified to
22  not doing anything to the song,
23  however somehow he was credited as a
24  song writer and a producer on my song,

Page 377

1  which is beyond me how that happens,
2  and so I can't say that I have ever
3  had direct communications with him.
4    Q.    Okay.  Now, you
5  testified a few moments ago about the
6  conversations that you had during the
7  revision phase of Club Girl, which
8  became Bad Girl, and that Terry Lewis
9  was one of the persons that was part
10  of those calls; is that correct?
11    A.    Uh-huh.
12    Q.    Okay.  Did you have any
13  direct communications with Terry Lewis
14  during those conference calls?
15    A.    Direct?
16    Q.    Where you spoke to him?
17    A.    Yes, on the telephone.
18    Q.    And what did you speak
19  about with Terry Lewis on the
20  telephone?
21    A.    The music, the
22  revisions, what needs to get done, you
23  know, about having something hook in
24  the bridge as it did in the rest of

MAGNA
LEGAL SERVICES

Page 378

1  the song to keep that momentum, that
2  feel, that life in the song.
3      Q.    Do you recall
4  discussing anything else with him?
5      A.    It was strictly in
6  regards to the music.
7      Q.    Okay.  Did you ever
8  have a conversation with Mr. Lewis on
9  the telephone after the revisions
10  phase?
11      A.    Not that I can recall.
12      Q.    Did you ever e-mail Mr.
13  Lewis or Mr. Harris?
14      MR. MALOFIY:
15      Objection.  You can ask these
16      questions, but.
17      THE WITNESS:  Had I
18      known that my song was going
19      to be stolen from me and I
20      wasn't going to be properly
21      credited I would have
22      absolutely credited everyone,
23      everyone, but I did not.
24  BY MR. DAVIS:

Page 379

1      Q.    Okay.  Did you ever
2  write to either Terry Lewis or Jimmy
3  -- James Harris after the revision
4  phase of the song Club Girl, which
5  became Bad Girl?
6      A.    If I knew the song was
7  going to be stolen from me then I
8  would have, but I trusted people's,
9  you know, just character and judgment
10  that they would be honest individuals,
11  so I did not.
12      Q.    Okay.  Did you ever
13  notify Mr. Lewis or Mr. Harris that
14  you didn't want Bad Girl to be
15  commercially exploited on the
16  Confessions album?
17      A.    That is going to be the
18  same answer as prior.  I wouldn't have
19  authorized anything had I known that
20  my song was going to be stolen and I
21  wasn't going to be properly credited
22  as a song writer, producer, engineer.
23  So I would have contacted them had I
24  known that the dishonesty was going to

Page 380

1  come into play.
2      Q.    What is your answer?
3      A.    I did not contact them
4  because I thought they were going to
5  be honest people.
6      Q.    Did you ever discuss
7  with Terry Lewis at any time anything
8  about the credits to Club Girl, which
9  became Bad Girl?
10      A.    Dante Barton was again
11  the person who dealt with the business
12  affairs and that would have been a
13  business affair.  So again, it just
14  goes down to the same answer as the
15  prior answer, I would have contacted
16  him had I known there was going to be
17  -- had I known I was going to be
18  dealing with dishonest people.
19      Q.    So the answer is, no,
20  you didn't contact Mr. Lewis?
21      MR. MALOFIY:
22      Objection, he answered.
23      THE WITNESS:  I did not
24      contact Mr. Lewis because I

Page 381

1      thought he was an honest
2      individual.
3  BY MR. DAVIS:
4      Q.    Did you ever contact
5  the Avilas after the meeting -- the
6  time you met them at Grammies in
7  February of 2005 to tell them you had
8  not been credited on the Confessions
9  album?
10      A.    Same answer.  If I knew
11  that I was dealing with organizations
12  that had people within that
13  organization who were dishonest and
14  that weren't going to the steel my
15  song I would have contacted them, but
16  I did not.
17      Q.    Did you ever attempt to
18  contact anyone at EMI to notify them
19  that you had not been credited on the
20  Bad Girl track on the Confessions
21  album?
22      MR. MALOFIY:
23      Objection.  Can you answer.
24      THE WITNESS:  Which

MAGNA
LEGAL SERVICES

Page 382

1      company?
2  BY MR. DAVIS:
3      Q.    EMI?
4      A.    As far as I know Dante
5  contacted all the corporate entities
6  to make sure that my credit was going
7  to be fixed, and that he communicated
8  to me that the powers that be were
9  going to take care of it.
10      Q.    So you relied on what
11  Dante told you about what he had done?
12      A.    My business partner.
13      Q.    You don't know
14  firsthand whether or not Dante did
15  what he told you in terms of
16  contacting any of these people to
17  raise the issue about whether or not
18  they were going to fix the credits to
19  reflect you as a co-writer,
20  co-producer, or engineer or any of the
21  other credits that you believe you
22  were entitled to receive?
23      MR. MALOFIY:
24  Objection.

Page 383

1  BY MR. DAVIS:
2      Q.    Is that true?
3      MR. MALOFIY:
4  Objection.
5      THE WITNESS:  No, it is
6  not true.
7      MR. MALOFIY:  You can
8  answer.
9      THE WITNESS:  No, that
10  is not true.
11  BY MR. DAVIS:
12      Q.    It is not true?
13      A.    No, it is not true.
14  Dante spoke to people directly, and
15  what happened was apparently there was
16  problems with the credits, not just
17  mine, other people's credits.  And he
18  had shown me documentation that there
19  was money tied up and there was
20  discrepancies in production rates and
21  song writing credits or one or the
22  other or both, and that things were
23  being worked out, and as soon as that
24  was going to be worked out then I was

Page 384

1  going to be properly credited.
2      Q.    Did he show you
3  anything that he had received from any
4  of these individuals, Usher, Mark
5  Pitts, the Avila brothers, Terry
6  Lewis, James Harris, EMI,
7  Warner-Tamerlane, or Sony, that
8  addressed the issue of you not getting
9  credit on Bad Girl?
10      MR. MALOFIY:
11  Objection.  You can answer.
12      THE WITNESS:  I believe
13  he did.  I believe he did.
14  BY MR. DAVIS:
15      Q.    What did he show you?
16      A.    He showed me all the
17  discrepancies that were going on and
18  once they would get fixed then my
19  credit would get fixed.
20      Q.    What discrepancies did
21  he show you in terms of a document or
22  letter from any of these individuals?
23      A.    Document.
24      Q.    What document?

Page 385

1      A.    I'm not quite sure.  I
2  believe it is in here.
3      Q.    Are you referring to
4  the invoice from Wallace Collins?
5      MR. MALOFIY:
6  Objection.
7      THE WITNESS:  I don't
8  recall off the top of my head.
9  There are so many documents,
10  but I believe there is a
11  document in there.
12  BY MR. DAVIS:
13      Q.    We'll find out.
14      A.    Yeah.
15      MR. DAVIS:  What are we
16  up to?
17      MR. MALOFIY:  I believe
18  we are up to 11.
19      MR. DAVIS:  I'm marking
20  as Marino-11 a one-page
21  document on the letterhead of
22  Wallace Collins dated
23  November 22nd, 2005.
24      - - -

MAGNA
LEGAL SERVICES

1   (At this time a
2 document was marked for
3 identification as Exhibit No.
4 Marino-11.)
5   - - -
6   MR. MALOFIY:  Could I
7 see that just to make sure it
8 is the same one?
9   MR. DAVIS:  I'm sorry.
10   MR. MALOFIY:  This is
11 what was attached to the
12 complaint, correct?
13   MR. DAVIS:  I got this
14 document from you, Mr.
15 Malofiy, Bates stamp 00010.
16   MR. MALOFIY:
17 Plaintiff's production.
18 Right.  It was on the
19 complaint.
20   THE WITNESS:  I believe
21 there is another document.
22 BY MR. DAVIS:
23   Q.   What document?
24   A.   Another document that

1 talks about the matter going on --
2 ongoing negotiations with legal
3 counsel, I believe there is more.
4   MR. MALOFIY:  Would you
5 like to hand him the
6 complaint?
7 BY MR. DAVIS:
8   Q.   You think it is part of
9 the complaint?
10   A.   I believe -- I think I
11 may have the complaint.  It may be in
12 here.  This is one of them for sure.
13   Q.   Show me the other one.
14 I would be happy to look at it?
15   A.   Sure.  Would they all
16 be in the back?
17   MR. MALOFIY:  Yeah, the
18 exhibit are attached to the
19 back of the complaint.
20   MR. DAVIS:  The exhibit
21 are attach to the back of the
22 complaint.
23   THE WITNESS:  Thank
24 you.  I believe there is

1   another document somewhere.
2   Would it not be --
3 BY MR. DAVIS:
4   Q.   Well, these are the
5 documents that were attached to the
6 complaint, and of your production.
7   MR. MALOFIY:  I have a
8   -- I don't mean to interrupt,
9   but -- this can be off the
10   record.
11   MR. DAVIS:  Nothing is
12 off the record.  We are still
13 on the camera and we are in
14 the middle of a question.
15   MR. MALOFIY:  Go ahead.
16   THE WITNESS:  I
17 believe --
18   MR. MALOFIY:  It was an
19 emergency.
20   THE WITNESS:  I believe
21 there's -- I believe there is
22 another document.  If it is
23 not here I'll do my best to
24 find it, but I believe there

1   is another document.
2 BY MR. DAVIS:
3   Q.   What do you believe
4 that document says and who is it from?
5   A.   I don't recall, I mean,
6 who it is from, but I believe there
7 was a document in regards to credits.
8 You had asked me earlier a question --
9   Q.   I had -- go ahead.  I'm
10 sorry.
11   A.   -- if I'm not mistaken,
12 if there was any type of documentation
13 from someone within a handful of
14 companies that you had mentioned and I
15 couldn't tell you which company, that
16 there was something about credits
17 being fixed.
18   Q.   Credits being fixed?
19   A.   That is what you had
20 asked, correct?
21   Q.   If you find that
22 document just advise your counsel and
23 your counsel will supply me with that
24 document.

1      MR. MALOFIY:  We will
2  be happy to respond to that.
3  Just shoot over a quick
4  e-mail.
5      THE WITNESS:  I do
6  believe there is something
7  somewhere.
8  BY MR. DAVIS:
9      Q.   When did you see the
10  document?
11      A.   I believe I saw these
12  documents at some point when I was
13  having discussions with Dante and I
14  asked him to, you know, show me some
15  proof.  This is one of the documents.
16      Q.   I think I know what you
17  are referring to.
18      MR. MALOFIY:  Now that
19  the question is not pending
20  there is an emergency.  Your
21  wife -- because you want to
22  keep this on the record, okay,
23  she is locked out and she
24  thinks your deposition is

1  going in my office at the
2  Beasley Firm, and she needs
3  someone to run her out keys.
4      THE WITNESS:  Can you
5  text her to come here?
6      MR. MALOFIY:  That is
7  what I would like to do.  This
8  is on the record.
9      THE WITNESS:  That is
10  fine, it is on the record.
11  Whatever.  Do you mind telling
12  her to come by?
13      MR. MALOFIY:  2000
14  Market Street.
15      THE WITNESS:  Yeah,
16  just tell her to come to the
17  20th floor and I'll give it to
18  her.
19      MR. MALOFIY:  2000
20  Marked Street.  Someone will
21  -- do you want to take a
22  break?
23      THE WITNESS:  Not yet.
24  Not yet.  Not yet.

1  BY MR. DAVIS:
2      Q.   Is this the document
3  you are referring to?  It has writing
4  on the top.
5      A.   No.  No.  No.  This is
6  something else.  This is a document
7  that, if I'm not mistaken, I believe
8  came from one of the entities that you
9  described.
10      Q.   And is that a document
11  you produced in this case?
12      A.   I think I did.
13      Q.   Okay.  So you have it,
14  you'll -- why don't we take a break
15  and see -- deal with that issue and
16  then see --
17      MR. MALOFIY:  We can go
18  for a little while.  She is
19  not going to be here --
20      THE WITNESS:  Yeah,
21  that is what I was going to
22  say.  It is going to her ten
23  minutes to get here.
24      MR. MALOFIY:  Keep

1  moving on.
2      THE WITNESS:  Sorry
3  about that.
4      MR. MALOFIY:  I'll
5  speak to -- just for the
6  record, I'll speak to my
7  client tonight, if there is
8  something I'll be happy to
9  provide it to you gentlemen.
10      MR. DAVIS:  If you
11  produced it, it is in that.
12      MR. MALOFIY:  Yeah,
13  just for the record,
14  everything I have, you have.
15  BY MR. DAVIS:
16      Q.   Did you ever ask Wil
17  Guice if he received any money for Bad
18  Girl?
19      A.   I don't recall asking
20  him, no.
21      Q.   Is there any reason you
22  didn't ask him?
23      A.   He wasn't around.
24      Q.   Well, he was from the

MAGNA
LEGAL SERVICES

Page 394

1  period of time when the album was
2  released in March of 2004, and
3  according to your complaint, sometime
4  in the fall of 2004 he moved out of
5  the Philadelphia area?
6      A.    That's correct.
7      Q.    All right.  So during
8  that period of time it never occurred
9  to you to ask Mr. Guice if he had
10 received any money on Bad Girl?
11     A.    No, and I don't recall
12 asking him.  NO.
13     Q.    Did you ask Mr. Barton
14 if he had receive any money during
15 that period of time when Guice was
16 still around?
17     A.    Possibly.
18     Q.    Did Mr. Barton tell you
19 that he had received a $15,000 advance
20 on Bad Girl?
21     A.    No, not that I recall.
22     Q.    But he -- I'm sorry.
23     A.    I'm just trying to
24 think.  It was a while ago.  I can't

Page 395

1  -- I don't recall.
2      Q.    But he did tell you he
3  was working to fix the credit issue
4  for you?
5      A.    He told me that the
6  Usher camp and corporate was working
7  on fixing it.
8      Q.    But he was the one who
9  told you that?
10     A.    He was the one that was
11 told that, that communicated that to
12 me.
13     Q.    And you are relaying on
14 what Mr. Barton told you?
15     A.    My business partner and
16 good friend, yes.
17         MR. MALOFIY:
18     Objection, but go ahead.
19 BY MR. DAVIS:
20     Q.    But you weren't privy
21 to any conversation that Mr. Barton
22 may have had with any of these
23 corporate people that you are
24 referring to?

Page 396

1      A.    Say that again.
2      Q.    You were not present
3  during any of these conversations that
4  Mr. Barton says he was having with the
5  corporate people?
6         MR. MALOFIY:
7     Objection.  You can answer.
8         THE WITNESS:  I believe
9     I was.  I believe I was around
10    while he was on the telephone
11    with them.
12 BY MR. DAVIS:
13     Q.    Were you on the
14 telephone?
15     A.    No.
16     Q.    Okay.  You know that
17 Mr. Barton was lying to you, don't
18 you?
19         MR. MALOFIY:
20     Objection.
21 BY MR. DAVIS:
22     Q.    About fixing the
23 credits and getting you paid?
24         MR. MALOFIY:

Page 397

1     Objection.
2         THE WITNESS:  I can't
3     say for certain.
4  BY MR. DAVIS:
5      Q.    Well, you can't?
6      A.    That he was lying to
7  me?
8      Q.    Yes.
9      A.    No.
10     Q.    Well, did he after he
11 disappeared in 2009 ever come clean
12 and tell you that he had been paid
13 money for the exploitation of Bad Girl
14 and say here is your share?
15         MR. MALOFIY:
16     Objection.
17         THE WITNESS:  I
18     think --
19         MR. MALOFIY:  You can
20     answer.
21         THE WITNESS:  If you
22     could just be clear what time
23     frame you are speaking of.
24 BY MR. DAVIS:

MAGNA
LEGAL SERVICES

Page 398

1    Q.    I'm talking about after
2  2009.
3    A.    After 2009?
4    Q.    Yes.
5    A.    Can you rephrase the
6  question again.
7        MR. DAVIS: Could you
8  read it back.
9        - - -
10       (At this time the court
11 reporter read back from the
12 record as was requested.)
13       - - -
14       THE WITNESS: I
15 misunderstood that. No, I
16 haven't had any communications
17 with Dante.
18 BY MR. DAVIS:
19   Q.    You know that Mr.
20 Barton was lying to you for years,
21 don't you?
22       MR. MALOFIY:
23 Objection. You can answer.
24       THE WITNESS: I don't

Page 399

1  know for sure if he was lying
2  for years. It is possible he
3  wasn't and then something else
4  happened. I really don't know
5  what the truth is. I have
6  been dealing with a bunch of
7  people that have been lying to
8  me, so from your end all the
9  defendants on your end to
10 Dante.
11       All I know is that I
12 wrote the song and people
13 stole it from me and I have
14 not been properly credited for
15 it to date. I wrote the song,
16 I produced the song on my own.
17 There hasn't been anyone to
18 dispute it, and there won't be
19 anyone. I promise you there
20 will be no one to dispute that
21 I originally wrote that song.
22 BY MR. DAVIS:
23   Q.    The only conversations
24 you had were with Mr. Barton, though?

Page 400

1        MR. MALOFIY:
2  Objection. That is not what
3  he said.
4        THE WITNESS: I had
5  conversations --
6        MR. MALOFIY: That is
7  not what he said repeatedly
8  and it is getting tiring now
9  again.
10       THE WITNESS: I have
11 had conversations with other
12 people as well.
13 BY MR. DAVIS:
14   Q.    What other people?
15   A.    I have had other
16 conversations with other people.
17   Q.    What people?
18   A.    Tommy Van Dell.
19   Q.    Okay. Tell me the
20 conversations you had with Tommy Van
21 Dell?
22       MR. MALOFIY: All
23 right. I'm just going to go
24 -- perhaps you forgot the

Page 401

1  first two hours of his
2  testimony. Didn't we go
3  through this at length?
4        MR. DAVIS: Mr.
5  Malofiy, this is becoming
6  vexatious and deplorable --
7        MR. MALOFIY: You are
8  right. You are absolutely --
9        MR. DAVIS: -- that you
10 are continuing to interrupt my
11 deposition.
12       MR. MALOFIY: You are
13 absolutely right, this is
14 becoming vexatious and it is
15 almost overbearing because
16 what is happening here is you
17 ask the question 30 times,
18 then you ask it another 30
19 times, then you wait two hours
20 and you go back and ask it 30
21 times. It is the same answer
22 over, and over, and over, and
23 over again.
24       I want to be

**MAGNA**
LEGAL SERVICES

1    abundantly fair.  I would have
2    shut this deposition down,
3    said next question and walked
4    out, but I haven't done that
5    because I want to be sure I'm
6    being fair with you and all
7    the parties here to get what
8    you want or what you think you
9    need because we have a
10   discovery deadline coming up
11   on the eighth, but if we
12   didn't have that I would have
13   shut this down a long time
14   ago.
15        MR. DAVIS:  You are
16   eating up my time, sir.
17        MR. MALOFIY:  I'm not
18   going to push you for time.
19   BY MR. DAVIS:
20   Q.    Mr. Marino --
21        MR. MALOFIY:  I want
22   you to get all the questions
23   you want.  I just want you to
24   be fair with this man, and if

1    he answers the question 50
2    times, it is the same answer.
3    You are trying to get a piece
4    of the transcript to show
5    something different.
6    BY MR. DAVIS:
7    Q.    Mr. Van Dell -- Mr.
8    Marino, tell me about the
9    conversations that you had with Mr.
10   Van Dell that you are now referring
11   to?
12   A.    I need to -- you need
13   to refresh me on --
14   Q.    You said that you spoke
15   with other people and you identified
16   Mr. Van Dell?
17   A.    Yes.
18   Q.    I want to know what
19   those conversations were with Mr. Van
20   Dell?
21   A.    I would like for you to
22   remind me where we were going with
23   these questions.
24   Q.    I asked you -- I asked

1    you whether or not anyone other than
2    Dante Barton did you speak to about
3    the credit issue, and you said other
4    people?
5    A.    Yes.
6    Q.    And I asked you what
7    other people, and in response you said
8    Mr. Van Dell.
9    A.    Right, as one of them.
10   Q.    What conversations did
11   you have with Mr. Van Dell about
12   credits?
13   A.    Van Dell assured me in
14   the studio that he would fix the
15   credits.
16   Q.    When was that
17   conversation?
18        MR. MALOFIY:
19   Objection.  Asked and
20   answered, but just keep on
21   going and asking and
22   answering.
23        THE WITNESS:  I'm not
24   sure exactly when, but it was

1    in Wavelab studio after the
2    record came out during the
3    time of the disputes that we
4    had these documents out
5    earlier.  I cannot give you an
6    exact date.  I don't remember
7    an exact date.
8    BY MR. DAVIS:
9    Q.    Can you tell me what
10   year it was?
11        MR. MALOFIY:
12   Objection.
13        THE WITNESS:  I would
14   be -- I can't tell you an
15   exact year.
16   BY MR. DAVIS:
17   Q.    You said it was at
18   Wavelab studios?
19   A.    That was one of the
20   conversations.
21   Q.    Where else did you have
22   a conversation?
23   A.    On the airplane coming
24   back from Nashville.

MAGNA
LEGAL SERVICES

Page 406

1      Q.    Well, that was before
2  Confessions was released, wasn't it?
3      A.    That is correct.
4      Q.    So you couldn't have
5  talked about credits about Bad Girl on
6  that trip?
7          MR. MALOFIY:
8      Objection.
9          THE WITNESS:  Yes.
10 BY MR. DAVIS:
11     Q.    So other than the
12 conversation you just testified about
13 at Wavelab, a date of which you don't
14 recall, what other conversations, if
15 any, did you have with Mr. Van Dell
16 about the credit issues?
17         MR. MALOFIY:
18     Objection, credit issue.  He
19     could have talked about
20     credits back in the plane, so
21     you are trying to be tricky
22     again.
23         THE WITNESS:  I don't
24     recall, but I definitely had a

Page 407

1      conversation with Mr. Van
2      Dell.
3  BY MR. DAVIS:
4      Q.    I'm going to give you
5  all the time you want to think of any
6  other conversation that you had with
7  Mr. Van Dell?
8      A.    In regards to fixing
9  the credits?
10     Q.    Yes.
11     A.    Let me think about it.
12         MR. MALOFIY:  She is
13     calling.  Why don't you answer
14     the question then we'll take a
15     quick break?
16         THE WITNESS:  I can't
17     remember.
18         MR. DAVIS:  Okay.  Why
19     don't we take a quick break.
20         VIDEOGRAPHER:  The time
21     is now 5:57 p.m. and we are
22     going off the record.
23         - - -
24     (At this time a short

Page 408

1      break was taken.)
2          - - -
3          VIDEOGRAPHER:  The time
4      is now 6:10 p.m.  We are back
5      on the record.
6  BY MR. DAVIS:
7      Q.    Were you a participant
8  in any of the conversations that Mr.
9  Barton told you he had with any of the
10 clients that I represent?
11         MR. MALOFIY:
12     Objection.  You can answer.
13 BY MR. DAVIS:
14     Q.    Regarding the credit
15 issue?
16         MR. MALOFIY:
17     Objection.  You can answer.
18 BY MR. DAVIS:
19     Q.    So that I can tell you
20 the clients, so you have a clear idea
21 of who I mean.
22     A.    Okay.
23     Q.    Usher, Sony, EMI, Mr.
24 Harris, Mr. Lewis, Mr. Avila, Mr.

Page 409

1  Avila, Mr. Pitts, Defenders of Music,
2  Flyte Ty Me Tunes, Sublime Basement
3  Tunez, UR-IV Music, Warner-Tamerlane
4  Publishing Corp., Bystorm
5  Entertainment, and Mark Pitts?
6          MR. MALOFIY:
7      Objection.  You can answer.
8          THE WITNESS:  I don't
9      recall having direct
10     communication, other than the
11     communication Dante had with
12     the other people.
13 BY MR. DAVIS:
14     Q.    I don't understand your
15 answer.
16     A.    Maybe I misunderstood
17 your question.
18     Q.    I'm asking you -- I'll
19 restate it.  Did you participate in
20 any conversation that Mr. Barton
21 initiated --
22     A.    All those people?
23     Q.    -- with any of the
24 people that you believe were telling

**MAGNA** ▶
LEGAL SERVICES

Page 410

1  him that they were going to fix the
2  credits?
3          MR. MALOFIY:
4      Objection, want to make
5      participate clearer for him.
6  BY MR. DAVIS:
7      Q.    You were on the phone
8  with Mr. Barton?
9      A.    No. No. Dante, again,
10  was the business -- my business
11  partner who took care of all the
12  business.
13     Q.    Were you a participant,
14  meaning on the phone, with Mr. Barton
15  in any calls that may have been
16  initiated by any of the individuals
17  you understand Mr. Barton was talking
18  to regarding fixing the credits?
19         MR. MALOFIY:
20     Objection. You can answer.
21         THE WITNESS: I don't
22     recall being on the phone at
23     the same time.
24  BY MR. DAVIS:

Page 411

1      Q.    Okay. Thank you. Who
2  is Simon Rosen?
3      A.    Sounds very familiar.
4  Simon.
5      Q.    Rosen?
6      A.    Do you have a document
7  or anything like that? Simon Rosen.
8      Q.    He is someone you have
9  identified in your complaint,
10  paragraphs 378 and 381. I'll get it
11  for you right away.
12     A.    Okay. Yeah, I remember
13  who he is. I remember who Simon Rosen
14  is.
15     Q.    Who is he?
16     A.    Simon Rosen is an
17  attorney that I went to go see to
18  speak to him in regards to not being
19  properly credited for the song Club
20  Girl, Bad Girl.
21     Q.    How did you meet Mr.
22  Rosen?
23     A.    I went to his office.
24     Q.    Did someone recommend

Page 412

1  that you go see him?
2      A.    I don't recall if I
3  just looked him up or -- I must have
4  looked him up. I don't recall anyone
5  recommending him.
6      Q.    So this was the first
7  time you had seen Mr. Rosen for legal
8  advice?
9      A.    First time, yeah.
10     Q.    And you went to see him
11  for legal advice?
12     A.    I went to go see him to
13  talk to him about this issue that was
14  going on with the credits.
15     Q.    Was the issue then
16  related to Mr. Barton, Mr. Guice, and
17  the credits with respect to Bad Girl?
18         MR. MALOFIY:
19     Objection. That is not what
20     the document says and that is
21     not what he said.
22         MR. DAVIS: Mr.
23     Malofiy, I ask you again if
24     you will not interrupt my

Page 413

1      deposition.
2          MR. MALOFIY: The
3      document speaks for itself.
4      If you would like him to read
5      the document first to answer
6      the question --
7          MR. DAVIS: I would
8      like to repeat what you told
9      me many times at deposition.
10     This is my deposition, and
11     I'll conduct it the way that I
12     see fit.
13         MR. MALOFIY: You are
14     conducting it. You have been
15     asking the same question for
16     six hours. I wouldn't have
17     done it that way.
18  BY MR. DAVIS:
19     Q.    Tell me what you went
20  to consult with Mr. Rosen about?
21     A.    The credits in Bad Girl
22  and Club Girl.
23     Q.    And why did you do
24  that?

Page 414

1    A.    I wasn't sure what was
2  going on.
3    Q.    What do you mean by
4  that?
5    A.    I wasn't sure of my
6  credits and how to deal with the
7  situation in regards to not being
8  credited.
9    Q.    You went to see Mr.
10 Rosen after Mr. Barton had told you
11 that he would fix the mistake; is that
12 right?
13   A.    I don't remember off
14 the top of my head if I went before or
15 after.
16   Q.    Well, Mr. Barton --
17 sorry?
18   A.    Yeah, I believe after.
19   Q.    Okay.  Well, Mr. Barton
20 had the conversation with you about
21 the credits sometimes in March of
22 2004, and what you testified earlier
23 was he said he would get the credits
24 fixed?

Page 415

1    A.    Right.
2    Q.    And what I'm looking at
3  in the complaint at Exhibit C, which
4  you have in front of you, is a
5  contingent fee agreement that is
6  identifying you as a party and with
7  Mr. Rosen's office, that is dated
8  October, without a day, 2004.  So you
9  went to see him after Mr. Barton told
10 you that he was going to fix the
11 credits; is that correct?
12         MR. MALOFIY:
13         Objection.  You can answer.
14         THE WITNESS:  I believe
15         that is correct.
16 BY MR. DAVIS:
17   Q.    All right.  Thank you.
18 And did you meet with Mr. Rosen more
19 than one time?
20   A.    No.
21   Q.    Was a plan determined
22 when you went to see Mr. Rosen on the
23 first occasion?
24         MR. MALOFIY:

Page 416

1    Objection.
2         THE WITNESS:  I don't
3    know what you mean by plan.
4  BY MR. DAVIS:
5    Q.    Well, was there a plan
6  of action on how to deal with the
7  problem that you communicated to Mr.
8  Rosen that you were having?
9    A.    It was more of try to
10 get some understanding of how things
11 worked in the music business, and I
12 expressed to him my participation in
13 the song, what I did, how I created
14 it, and how I wasn't properly credited
15 in the liner notes, and he wanted to
16 pursue a lawsuit, and I just -- you
17 know, I didn't go in there to pursue a
18 lawsuit.  I wanted to get some
19 knowledge and I guess he just wanted
20 to jump the gun and push on this
21 thing.  But, you know, that was --
22 that was my plan right there.
23   Q.    What knowledge did he
24 impart to you having met with him?

Page 417

1    A.    Not much, he was pretty
2  pushy in wanting to pursue the suit.
3         MR. MALOFIY:  12,
4  Marino 12.
5         MR. DAVIS:  That is
6    what I think it is.
7         - - -
8    (At this time a
9  document was marked for
10 identification as Exhibit No.
11 Marino-12.)
12         - - -
13 BY MR. DAVIS:
14   Q.    I'm going to show you
15 what has been marked as Marino-12, and
16 this is a draft -- it says draft on
17 it, that is a one-page
18 document that appears to have been
19 authored by Simon J. Rosen, Esquire.
20 Are you familiar with this letter?
21   A.    I am, but I would like
22 to read it again just to
23 refamiliarize.  It has been a while.
24   Q.    Did you familiarize

MAGNA
LEGAL SERVICES

1    yourself with it?
2         A.    Yes.
3         Q.    This came out of your
4    files; is that correct?
5         A.    Yes.
6         Q.    So you've seen this
7    document before; is that correct?
8         A.    Yes.
9         Q.    Did you see it at or
10   about October of 2004?
11        A.    Sounds about right.
12        Q.    Do you remember
13   discussing the contents of this letter
14   with Mr. Rosen?
15            MR. MALOFIY:  Just so
16        you know, this is
17        attorney-client privilege.
18        You don't have to discuss the
19        contents of the letter.  What
20        you can discuss is -- this
21        document you can discuss
22        whether or not you understand
23        if it was sent to Zomba or
24        Jive, you can discuss that,

1        but you can't discuss -- you
2        can't discuss --
3            MR. DAVIS:  Before you
4        say --
5            MR. MALOFIY:  No. Whoa.
6        Whoa.
7            MR. DAVIS:  Mr.
8        Malofiy, if you are asserting
9        privilege -- if you are
10        asserting privilege here just
11        assert the privilege.
12            MR. MALOFIY:  He does
13        not understand -- if I say
14        assert privilege he will not
15        understand what it means.  I'm
16        here to protect the record.
17            MR. DAVIS:  You can
18        object when I ask a question
19        that you believe invades
20        attorney-client privilege.
21        That is the way it is done,
22        Mr. Malofiy.
23            MR. MALOFIY:  No.  When
24        it deals with attorney-client

1        privilege there is a
2        heightened level of -- of care
3        that needs to be addressed,
4        because you are going into not
5        an issue of just an objection
6        but an issue where you are
7        asking about sensitive,
8        private and legally privileged
9        communications far greater
10        than any other privilege that
11        exists.
12            MR. DAVIS:  Object to
13        my question.
14            MR. MALOFIY:  Can I
15        finish?
16            MR. DAVIS:  This is a
17        speech.
18            MR. MALOFIY:  Do you
19        want to hold the baton.
20            MR. DAVIS:  You are
21        spending time of my tape and I
22        have a limited time --
23            MR. MALOFIY:  I have a
24        baton.

1            MR. DAVIS:  -- with
2        this witness.  You asserted an
3        objection based on privilege.
4            MR. MALOFIY:  You can't
5        --
6    BY MR. DAVIS:
7        Q.    Did you discuss this
8    letter with Mr. Rosen?
9            MR. MALOFIY:  Here you
10        go.  Next question.
11    BY MR. DAVIS:
12        Q.    Did you discuss this
13    letter with Mr. Rosen?
14            MR. MALOFIY:  Dan, when
15        I object you just sit there.
16            MR. DAVIS:  You are
17        instructing him not to answer
18        that question.
19            MR. MALOFIY:  No, I'm
20        going to say something on the
21        record.  You are going to
22        listen to what I say.
23            MR. DAVIS:  I got your
24        --

Page 422

1     MR. MALOFIY:  You are
2  not going to ask him about his
3  communications back and forth
4  with his prior attorney
5  because that is privileged.
6     MR. DAVIS:  Mr.
7  Malofiy, listen to my
8  question.  I asked him did you
9  discuss the letter with your
10  attorney.
11     MR. MALOFIY:  Yeah, you
12  can't even do that.
13     MR. DAVIS:  I can ask
14  him that.
15     MR. MALOFIY:  No, you
16  can't.
17     MR. DAVIS:  I can't ask
18  him about the contents of that
19  discussion, but I can ask him
20  if he had a discussion about
21  it.
22     MR. MALOFIY:  No, you
23  can't even do that.
24     MR. DAVIS:  Then

Page 423

1  instruct him not to answer and
2  we'll get a ruling.
3     MR. MALOFIY:  * Okay.
4  You don't have to answer any
5  questions regarding any
6  communications you had with
7  your prior lawyer or with your
8  current lawyer.  Do you
9  understand that?
10     THE WITNESS:  I do.
11  BY MR. DAVIS:
12     Q.    Did your lawyer give
13  you this letter?
14     A.    He did.
15     Q.    Okay.  Did you put the
16  draft on the document or did Mr. Rosen
17  do that?
18     A.    Mr. Rosen did that.
19     Q.    What is the markings at
20  bottom by the signature line?  Do you
21  know what that is?
22     A.    No.
23     Q.    Did you put them there?
24     A.    No.

Page 424

1     Q.    Do you know why there
2  is line on a diagonal across the typed
3  paragraphs?
4     MR. MALOFIY:
5     Objection.  The document
6     speaks for itself, but you can
7     answer.
8     THE WITNESS:  I do not.
9  BY MR. DAVIS:
10     Q.    Okay.  Did you
11  authorize Mr. Rosen to send this
12  letter?
13     MR. MALOFIY:
14     Objection.  You can answer.
15     THE WITNESS:  I don't
16     recall him -- telling him to
17     send this letter.  He may or
18     may have not, I don't know,
19     but I don't recall telling him
20     to do so.
21  BY MR. DAVIS:
22     Q.    Okay.  Did you ever get
23  a copy of this letter that was
24  actually signed by Mr. Rosen that

Page 425

1  didn't have draft on it?
2     MR. MALOFIY:
3     Objection.  You can answer.
4     THE WITNESS:  I believe
5     that is the way he gave it to
6     me.
7  BY MR. DAVIS:
8     Q.    Okay.  You don't
9  remember any other version of this
10  letter?
11     A.    This particular letter?
12     Q.    Yes.
13     A.    No.
14     Q.    Okay.  Now, as part of
15  the complaint, Exhibit C, if you want
16  me I'll turn to that page for you.
17     A.    Exhibit C?
18     Q.    Yes.  That is Exhibit
19  C, and if you can turn to the next
20  page, please.
21     A.    Sure.
22     Q.    You'll see the document
23  behind Exhibit C of your complaint
24  says contingent fee agreement?

Page 426

1    A.    Oh, okay.
2    Q.    Do you see that?
3    A.    Yeah.
4    Q.    Did you ever sign this
5  document?
6         MR. MALOFIY:  Allow him
7  a chance to review it.
8         THE WITNESS:  Yeah,
9  just give me a minute.  It has
10  been a long time.
11         MR. WILLIAMS:  Do you
12  have the original for
13  Exhibit 11?
14         MR. MALOFIY:  The
15  original?
16         MR. WILLIAMS:  Yeah.
17         MR. MALOFIY:  You mean
18  on me right now?
19         MR. WILLIAMS:  Yeah,
20  I'm just wondering --
21         MR. DAVIS:  That we
22  marked.
23         MR. WILLIAMS:  With the
24  sticker, do you happen to have

Page 427

1  that?
2         THE WITNESS:  This one.
3         MR. DAVIS:  That is 12.
4         MR. WILLIAMS:  The
5  invoice.
6  BY MR. DAVIS:
7    Q.    Have you reviewed the
8  document?
9    A.    Yes, just give me one
10  second.  I'm on the last paragraph.
11         MR. MALOFIY:  I've
12  checked my records, gentleman,
13  I do not see it in my records,
14  but give me one more moment
15  and I'll just confirm that.
16  BY MR. DAVIS:
17    Q.    Have you completed your
18  review?
19    A.    Yes.
20    Q.    Did you -- do you
21  recall ever signing that agreement?
22    A.    No.
23    Q.    Is there a reason you
24  didn't sign it?

Page 428

1         MR. MALOFIY:
2  Objection.  If it goes into
3  attorney-client issues you
4  don't have to discuss it, just
5  say --
6  BY MR. DAVIS:
7    Q.    Was there a reason you
8  didn't sign it?
9    A.    Was there a reason I
10  didn't sign it?  I'm trying to
11  remember this.  Yeah, he wanted me to
12  go back and sign this letter and I did
13  not go back and sign this letter.  I
14  did not.
15         MR. MALOFIY:  Just to
16  be clear, you mean the
17  contingency fee agreement?
18         THE WITNESS:  This.
19  BY MR. DAVIS:
20    Q.    That is what we are
21  referring to?
22    A.    Yeah, I didn't sign it.
23    Q.    Is it because you
24  didn't want to pursue litigation, as

Page 429

1  he was recommending?
2         MR. MALOFIY:  *
3  Objection.  You don't have to
4  answer that.
5         MR. DAVIS:  Are you
6  instructing him not to answer?
7         MR. MALOFIY:  I am.
8         MR. DAVIS:  You are.
9  Okay.  Mark that instruction
10  not to answer.
11  BY MR. DAVIS:
12    Q.    This fee agreement says
13  that -- and I understand you didn't
14  sign it.  I, Daniel Marino, agree to
15  employ the Law Office of Simon Jeffrey
16  Rosen, Esquire, as my attorney to
17  represent my legal interest against
18  all responsibility parties regarding
19  my claims arising out of my
20  co-production, co-authorship,
21  co-publishing, co-administration and
22  musicianship regarding the song Club
23  Girl, which was used on Usher's song
24  Bad Girl.  Do you see that?

MAGNA
LEGAL SERVICES

Page 430

```
 1        A.    I do.
 2        Q.    Is that a fair
 3   statement of what you were discussing
 4   with Mr. Rosen about his possible
 5   representation of your interest?
 6        MR. MALOFIY:  * Hold
 7   on.  Objection you don't have
 8   to answer that.
 9        MR. DAVIS:  He has
10   waived it by producing this
11   document.
12        MR. MALOFIY:  Producing
13   the document does not mean you
14   can talk about --
15        MR. DAVIS:  It
16   certainly does.
17        MR. MALOFIY:  No, it
18   doesn't.  It doesn't mean you
19   can talk about --
20   BY MR. DAVIS:
21        Q.    Is that what --
22        MR. MALOFIY:  You are
23   not his lawyer.  Do you
24   understand that?  Now, if I'm
```

Page 431

```
 1   making an objection that
 2   relates to attorney/client
 3   privilege, I'll make my
 4   objection and it will be
 5   heard.
 6        MR. DAVIS:  Then, sir,
 7   instruct him not to answer.
 8        MR. MALOFIY:  Okay.
 9   I'm going to instruct him --
10        MR. DAVIS:  If that is
11   what you want to do, do so.
12        MR. MALOFIY:  Listen,
13   don't cut me off.  If there
14   are questions relating to
15   communication you had with
16   your attorney they are
17   privileged, and what this man
18   says about how he can go ask
19   all these sorts of questions
20   about that is wrong and it's
21   improper and it's incorrect.
22   All right.  So to the extent
23   any of the questions he is
24   asking relates to
```

Page 432

```
 1   communications you had with
 2   your attorney that is
 3   improper.
 4        MR. DAVIS:  Sir, are
 5   you instructing him not to
 6   answer?
 7        MR. MALOFIY:  Yup.
 8        MR. DAVIS:  * Okay.
 9   Mark that, please.
10   BY MR. DAVIS:
11        Q.    You testified that you
12   didn't sign this agreement and that
13   Mr. Rosen wanted you to come back with
14   it, presumed, signed?
15        MR. MALOFIY:  *
16   Objection, you don't have to
17   answer what Mr. Rosen wanted.
18        MR. DAVIS:  Are you
19   instructing him again not to
20   answer?
21        MR. MALOFIY:  You are
22   asking him about
23   attorney-client --
24        MR. DAVIS:  * Are you
```

Page 433

```
 1   instructing him not to answer?
 2   Just tell me one way or the
 3   other.
 4        MR. MALOFIY:  Yes.
 5        MR. DAVIS:  Fine.
 6        MR. MALOFIY:  If you
 7   are going to ask question
 8   about attorney-client
 9   privilege I will just keep on
10   objecting and we'll go back
11   and forth like this.
12        MR. DAVIS:  We'll let
13   the judge decide.
14        MR. MALOFIY:  Fine, let
15   the judge decide.
16   BY MR. DAVIS:
17        Q.    You testified about
18   going to see Mr. Rosen once.  Did you
19   ever go back to his office?
20        A.    No.
21        Q.    Okay.  Did you go to
22   see any other lawyer regarding the
23   credit issue or anything to do with
24   Club Girl or Bad Girl after you saw
```

Page 434

| 1 | Mr. Rosen? |
| 2 | A.    No. |
| 3 | Q.    Until, of course, you |
| 4 | saw Mr. Malofiy? |
| 5 | A.    Of course. |
| 6 | Q.    So from 2004 until |
| 7 | sometime in 2011 you didn't speak to |
| 8 | any other lawyer concerning the credit |
| 9 | issue or any issue with respect to |
| 10 | Club Girl or Bad Girl? |
| 11 | MR. MALOFIY: |
| 12 | Objection. You can answer. |
| 13 | THE WITNESS: That's |
| 14 | correct. |
| 15 | BY MR. DAVIS: |
| 16 | Q.    And so that I have a |
| 17 | complete record on this point, after |
| 18 | that initial meeting with Mr. Rosen I |
| 19 | know you said that you never went to |
| 20 | see him again, did you ever call him |
| 21 | again? |
| 22 | A.    No. |
| 23 | Q.    So there was no contact |
| 24 | with Mr. Rosen again? |

Page 435

| 1 | A.    None whatsoever. |
| 2 | Q.    Thank you. In 2005 you |
| 3 | testified earlier that you went to the |
| 4 | Grammies where you saw Mr. -- where |
| 5 | you saw the Avila brothers? |
| 6 | A.    And many other people, |
| 7 | yes. |
| 8 | Q.    Okay. You saw a lot of |
| 9 | other people? |
| 10 | A.    Right. |
| 11 | Q.    Okay. Now, I'm going |
| 12 | to show you what we marked as Guice |
| 13 | deposition as Exhibit 4. Do you |
| 14 | recall that photograph? |
| 15 | A.    Yes. |
| 16 | Q.    And is that a |
| 17 | photograph of you and Mr. Barton and |
| 18 | Stevie G. at the 2005 Grammy awards? |
| 19 | A.    Yes. |
| 20 | Q.    Where were they held? |
| 21 | A.    Los Angeles. |
| 22 | Q.    Did you travel with |
| 23 | anyone else to the Grammies? |
| 24 | A.    I traveled with those |

Page 436

| 1 | gentlemen there. |
| 2 | Q.    You went together? |
| 3 | A.    Yes. |
| 4 | MR. MALOFIY: Did you |
| 5 | mark that? |
| 6 | MR. DAVIS: This is |
| 7 | from the Guice deposition. |
| 8 | MR. MALOFIY: 0h, so |
| 9 | you didn't mark it as an |
| 10 | exhibit? |
| 11 | MR. DAVIS: No, it is |
| 12 | already an exhibit. |
| 13 | MR. MALOFIY: Okay. |
| 14 | MR. DAVIS: Let's just |
| 15 | refer on the record that I |
| 16 | used in the course of this |
| 17 | deposition a previously marked |
| 18 | exhibit in the Guice |
| 19 | deposition. |
| 20 | MR. MALOFIY: Do you |
| 21 | want to mark it, even though |
| 22 | you don't have other copies? |
| 23 | I don't have a problem with |
| 24 | you marking it. |

Page 437

| 1 | MR. DAVIS: We know it |
| 2 | is part of the record. |
| 3 | MR. MALOFIY: Okay. |
| 4 | You referred to an exhibit I |
| 5 | thought you want might to mark |
| 6 | it. If you don't, fine. If |
| 7 | you don't have copies for |
| 8 | opposing counsel I'm not going |
| 9 | to make an issue of it if you |
| 10 | want to keep the record |
| 11 | complete. It would be Exhibit |
| 12 | Marino 13. |
| 13 | BY MR. DAVIS: |
| 14 | Q.    Now, how did you get a |
| 15 | ticket to the Grammies? |
| 16 | A.    Two tickets were given |
| 17 | to us from Usher's camp. I don't know |
| 18 | who they came from. |
| 19 | Q.    And how do you know |
| 20 | that they came from Usher's camp? |
| 21 | A.    Dante had received them |
| 22 | in the mail at the studio and he came |
| 23 | in and neither of us had paid for |
| 24 | them. |

MAGNA ▶
LEGAL SERVICES

Page 438

1     Q.    Well, did Dante tell
2  you that he had gotten them from
3  anyone that worked with Usher?
4     A.    He did.
5     Q.    What did he say
6  precisely, that you can recall?
7     A.    He said that -- he
8  mentioned the person's name so-and-so
9  sent us tickets to go to the Grammies
10  because it is being nominated for
11  multiple Grammies.
12     Q.    He didn't tell you that
13  because he was credited as a producer
14  on the album that the Grammy
15  Association was providing tickets to
16  him to appear at the Grammies?
17     A.    I don't remember
18  exactly what he said, but I knew that
19  we received free tickets because it is
20  our song.
21     Q.    Do you have any
22  personal knowledge other than what Mr.
23  Barton told you of where the tickets
24  came from?

Page 439

1         MR. MALOFIY:
2     Objection.
3         THE WITNESS:  I believe
4     there may be some markings on
5     the actual Grammy tickets.  I
6     don't recall.
7  BY MR. DAVIS:
8     Q.    Do you have those
9  tickets?
10     A.    Maybe.
11     Q.    Oh, you do?
12     A.    Maybe, yeah.
13     Q.    Did you save them?
14     A.    Yeah, I saved them.
15     Q.    Why would you have
16  saved them?
17     A.    I saved them because at
18  that time it was a very special time
19  for me, however I didn't know I was
20  being crooked over by all these very,
21  you know, high end people that work
22  for the record label.
23     Q.    So it was a special
24  moment for you to go to the Grammies?

Page 440

1     A.    It was a special --
2         MR. MALOFIY:
3     Objection.  You can answer.
4         THE WITNESS:  It was a
5     special moment because I
6     didn't know the song was being
7     stolen from me, had I known
8     the song was being stolen from
9     me and I wasn't being properly
10     credited then I don't even
11     know if I would have attended
12     and nor no way in any shape or
13     form would I have been happy
14     about it.  I wouldn't have had
15     that smile on my face.
16  BY MR. DAVIS:
17     Q.    Well, when you went to
18  Grammies you knew, and this was almost
19  a year after the album was released
20  and Bad Girl had been included on it,
21  that you still had not been credit as
22  a co-writer, co-producer, engineer and
23  the other credits that you say you
24  were denied; isn't that correct?

Page 441

1         MR. MALOFIY:
2     Objection.
3         THE WITNESS:  No.
4         MR. MALOFIY:  Hold on.
5     Objection.  You can answer.
6         THE WITNESS:  It is not
7     correct.
8  BY MR. DAVIS:
9     Q.    You mean the credits
10  had been fixed at that point?
11     A.    No, I mean it was the
12  credits on the liner notes.  I don't
13  know about the other real credits.
14  I'm not a business person.  I'm not a
15  lawyer.  I don't really know how that
16  works in the background.
17     Q.    At the time that you
18  went to the Grammies did you have any
19  information from any source that the
20  credit issue that you had complained
21  about had been fixed?
22     A.    I was --
23         MR. MALOFIY:
24     Objection.  You can answer.

MAGNA
LEGAL SERVICES

Page 442

1      THE WITNESS:  I was
2  told by Dante that Usher's
3  people were fixing it.  They
4  told him that and he
5  communicated that to me.
6  BY MR. DAVIS:
7      Q.   I understand that, but
8  it wasn't fixed at the time you
9  attended the Grammies?
10     A.   It still couldn't been
11 fixed, and you know that I wrote the
12 song and I produced the song and you
13 are still defending these people.  I
14 don't understand how you can, like, do
15 that.
16     Q.   Sir, I don't have any
17 personal knowledge of any of these
18 affairs.  So --
19     A.   Has anyone come forward
20 saying they, other people wrote the
21 song?  It is my song.
22     Q.   Let's continue the
23 deposition.
24     A.   There is no one here

Page 443

1  and there will be no one to testify to
2  say that they wrote, produced the
3  original song and composition of Club
4  Girl which is Bad Girl.
5      Q.   May I continue?
6      A.   You are continuing to,
7  like, run this deposition as if I
8  didn't, and you're trying to -- it is
9  like black and white.  How do you do
10 that?
11     Q.   Can I continue my
12 questions, please?
13     A.   I would like you to
14 answer that, how do you do that?
15     Q.   Unfortunately this is
16 not an occasion for me to answer
17 questions, it is for you to answer
18 questions.
19     A.   It is so untruthful,
20 man, lying, stealing and cheating.
21 You are a part of it.  You are making
22 money on my song that was stolen from
23 me.
24     MR. MALOFIY:  They are

Page 444

1  all making money.
2  BY MR. DAVIS:
3      Q.   Mr. Marino --
4      A.   I'm sorry.  I'm sorry.
5  I'm a little upset.
6      Q.   May I ask you a
7  question?
8      A.   Yes.
9      Q.   Did you ever speak
10 directly with anyone in what you call
11 Usher's camp about the tickets you
12 believed that they had sent to Dante
13 Barton?
14     MR. MALOFIY:
15 Objection.  You can answer.
16     THE WITNESS:  I don't
17 recall.  I may have.
18 BY MR. DAVIS:
19     Q.   Did you send a thank
20 you note to anyone for giving you
21 tickets to the Grammies from what you
22 call Usher's camp?
23     A.   I don't recall.  Maybe.
24     Q.   Maybe, why do you say

Page 445

1  maybe?
2      A.   Because I'm the type of
3  person that sends thank you cards.
4      Q.   But you don't recall
5  that of such a momentous moment in
6  your life that you were going to
7  Grammies, you don't recall whether or
8  not you thanked the persons that you
9  believe gave you tickets?
10     A.   I don't remember.
11     Q.   You say in your
12 complaint that you were comped for the
13 Grammies, do you recall that?
14     A.   Yes.
15     Q.   What do you mean by
16 comped?
17     A.   Free tickets.
18     Q.   It was just the tickets
19 that you received free?
20     A.   That's correct.
21     Q.   Who paid for the trip
22 out there?
23     A.   I did.
24     Q.   You paid yourself?

Page 446

1      A.     Myself.  He paid his
2  own way, yes.
3      Q.     Who is he?
4      A.     Dante.
5      Q.     Did you each bear the
6  cost of your experiences for the trip?
7      A.     Yes.
8      Q.     So what you meant in
9  the complaint was what was comped was
10 the tickets?
11     A.     Correct.
12     Q.     Did you ever thank
13 Usher for the tickets?
14     A.     I don't recall thanking
15 Usher for the tickets.
16     Q.     Did you ever thank Mark
17 Pitts for the tickets?
18     A.     No.
19     Q.     Did you ever thank the
20 Avila brothers for the tickets?
21     A.     I don't believe any of
22 the parties that you mentioned were
23 responsible for giving those tickets.
24     Q.     Then who from what you

Page 447

1  have described as Usher's camp would
2  be the persons that you believe sent
3  the tickets to Dante Barton?
4      A.     Whoever would be in
5  charge of distributing tickets to the
6  producers of the track.
7      Q.     How do you have this
8  understanding that there is someone in
9  charge of distributing tickets to
10 distributors -- producers on the
11 track?
12     A.     I thought that is
13 pretty much what you said earlier.
14 No?
15     Q.     No.  I said to you did
16 Dante Barton tell you that he was
17 given tickets as a producer on the
18 track from the Grammy association?
19     A.     Oh, no.
20     Q.     I prefer you not twist
21 my words.
22     A.     That is what I thought
23 you said.
24     Q.     Okay.

Page 448

1      A.     It has be a little bit
2  tricky throughout the day with you.
3      Q.     0h, really.  Okay.
4      A.     What was the question
5  again?
6          MR. DAVIS:  Would you
7  read it back, please.
8          MR. MALOFIY:  I think
9  the witness is getting tired.
10         THE WITNESS:  I am.
11         MR. MALOFIY:  We'll go
12 as long as we can.
13         MR. DAVIS:  I have
14 seven hours, if he wants to
15 take a break I'm happy to give
16 him a break after this
17 question is completed.  We
18 just took a break, I would
19 say, within the last
20 15 minutes.
21         MR. MALOFIY:  I don't
22 think so.
23         MR. DAVIS:  Can you
24 please read back the question.

Page 449

1          - - -
2          (At this time the court
3  reporter read back from the
4  record as was requested.)
5          - - -
6          THE WITNESS:  I guess
7  my understanding comes from
8  the notion that we received
9  free tickets.
10 BY MR. DAVIS:
11     Q.     It is your guess then,
12 it that right?
13     A.     That is what I was
14 told.
15     Q.     Who told you that?
16     A.     Dante.
17     Q.     Anybody else tell you
18 that?
19     A.     No.
20         MR. MALOFIY:  Do you
21 want to take a final break
22 before we wrap it up?
23         THE WITNESS:  How much
24 time do we have left?

Page 450

1      MR. MALOFIY:  Probably
2  about 15 minutes.
3      MR. DAVIS:  We have
4  almost two hours.
5      THE WITNESS:  No, not
6  even close.
7      VIDEOGRAPHER:  There is
8  20 minutes left on this DVD.
9  We are at five hours 30
10  minutes.
11      MR. DAVIS:  Do you want
12  to take a break?
13      THE WITNESS:  Let's go
14  a little longer.
15  BY MR. DAVIS:
16     Q.   Okay. I'm going to
17  show you what we have previously
18  marked as Exhibit Marino-11, which is
19  the invoice that bears Wallace Collins
20  letterhead.  Do you see that document?
21     A.   (Indicating.)
22     Q.   Are you familiar with
23  this document?
24     A.   I see it, yeah.

Page 451

1     Q.   Now in the complaint
2  you reference that Mr. Barton had
3  shown you a letter and an invoice.
4  When you were referring to the letter
5  did you mean just this invoice,
6  because there was no exhibit attached
7  to your complaint that was a letter?
8      MR. MALOFIY:
9  Objection.
10      THE WITNESS:  Are you
11  sure about that?
12      MR. MALOFIY:
13  Objection.  You can answer.
14      THE WITNESS:  I recall
15  a letter.
16  BY MR. DAVIS:
17     Q.   Please review paragraph
18  390 of the complaint.  It is on page
19  54.
20      MR. MALOFIY:  Paragraph
21  390?
22      MR. DAVIS:  Yes, sir.
23      MR. MALOFIY:  Thanks.
24      THE WITNESS:  Okay.

Page 452

1  BY MR. DAVIS:
2     Q.   It says that Barton
3  presented to Marino a letter from an
4  attorney in New York, drafted
5  recording agreements, that is only
6  partial of that sentence.  You see
7  that, don't you?
8     A.   I do.
9     Q.   What letter are you
10  referring to?
11     A.   I've got to read prior
12  to this because I'm not getting the
13  whole thing out of 390.  0h, okay.
14  You could have read 391 as well.
15  Okay.
16      MR. MALOFIY:  I think
17  you are getting hung up on
18  letter here, as I refer to
19  this as a letter.
20      MR. DAVIS:  I'm not
21  asking you to testify, Mr.
22  Malofiy.  We are in the middle
23  of a question and it is
24  improper to interject when

Page 453

1  there is a pending question.
2      MR. MALOFIY:  I thought
3  maybe you were confused.
4      MR. DAVIS:  I don't
5  want you to help, please.
6      THE WITNESS:  Yes, this
7  is probably the letter here.
8  Yeah.
9  BY MR. DAVIS:
10     Q.   So you are referring to
11  the document that has been marked as
12  Marino-11?
13     A.   Yes.
14     Q.   There is no letter as
15  referred to in paragraph 390 of your
16  complaint?
17     A.   I believe that is the
18  letter.
19     Q.   You are calling the
20  description under April through
21  November 2005 as the letter?
22     A.   Yes.
23      MR. MALOFIY:  Just to
24  be clear, he didn't write the

MAGNA
LEGAL SERVICES

1    complaint, the attorney did
2    so.
3         MR. DAVIS:  Mr. Marino
4    -- Mr. Malofiy, again, I have
5    a pending question and you are
6    interrupting.
7         MR. MALOFIY:  I'm just
8    trying to add --
9         MR. DAVIS:  Really
10   other than objections I just
11   ask you to be quiet, please.
12        MR. MALOFIY:  I'm
13   trying to help you.  Trying to
14   do my best.
15        MR. DAVIS:  What was
16   the question before Mr.
17   Malofiy interrupted me again?
18        MR. MALOFIY:  Assisted.
19        - - -
20        (At this time the court
21   reporter read back from the
22   record as was requested.)
23        - - -
24   BY MR. DAVIS:

1         Q.    Now, does your name
2    appear anywhere on this document?
3         A.    No.
4         Q.    And who is it addressed
5    to?
6         A.    Dante Barton and Wil
7    Guice.
8         Q.    And 835 Pleasant Road,
9    Yeadon, Pennsylvania 19050, what is
10   that -- what address is that?
11        A.    I believe that is
12   Dante's home.
13        Q.    And is that the same
14   residence at which Wil Guice resided
15   as well?
16        A.    At a certain period he
17   was, yes.
18        Q.    Okay.  How did you come
19   to have this document in your
20   production?
21        A.    Dante gave it to me.
22        Q.    When did Dante give
23   this to you?
24        A.    Somewhere it says it

1    here in the complaint.
2         Q.    November 22nd of 2005,
3    somewhere around that time?
4         A.    Yeah, I have the fall
5    of 2005 in my complaint.  Yeah, that
6    sounds right.
7         Q.    Was this document in
8    the folder or the box that you found
9    at the studio when you were cleaning
10   things out in 2009?
11        A.    He handed it to me in
12   2005.
13        Q.    Did he go over it with
14   you?
15        A.    Yes, I mean if you read
16   the complaint it tells you why he gave
17   me this.
18        Q.    Was this in the box or
19   folder of documents that you say you
20   removed from the studio in 2009?
21        MR. MALOFIY:
22        Objection.  You can answer.
23        THE WITNESS:  This?
24   BY MR. DAVIS:

1         Q.    This particular
2    document.
3         A.    This particular
4    document he handed to me.
5         Q.    I understand that, but
6    did you also find it in that file or
7    box?
8         A.    No, this was handed to
9    me by Dante Barton.
10        Q.    And you kept this
11   document?
12        A.    Obviously.
13        Q.    Why did you keep this
14   document?
15        A.    It was important to me.
16        Q.    Why was it important to
17   you?
18        A.    Because he told me when
19   the credit is fixed that is when my
20   credit was going to be applied.
21        Q.    Where does it talk
22   about fixing credits on this invoice?
23        A.    I apologize, not
24   credits.  Negotiation with HoriPro,

1  affairs -- preparation -- this was one
2  of the letters that they were talking
3  about -- what Dante had told me and
4  what it says here, that there was a
5  negotiation going on with the points
6  or credit percentage for song writers,
7  there was ongoing disputes and this
8  was one of the letters he had handed
9  me.
10        Q.    You would agree with me
11  this has nothing to do with any issue
12  regarding credits, is that correct?
13        MR. MALOFIY:
14        Objection.
15        THE WITNESS:  To me
16        that is all it means.
17  BY MR. DAVIS:
18        Q.    That is all it means?
19        A.    Yeah.
20        Q.    Even though the word
21  credit does not appear there anywhere,
22  fixing credits?
23        A.    I don't know if it does
24  or doesn't.

1        Q.    Correcting mistake
2  pertaining to --
3        MR. MALOFIY:  That is
4        what it says.
5  BY MR. DAVIS:
6        Q.    -- Mr. Marino's
7  attribution for the song Bad Girl, it
8  doesn't say anything like that, does
9  it?
10        MR. MALOFIY:
11        Objection.  Marino-11 speaks
12        for itself.
13        MR. DAVIS:  I ask you
14        again, Mr. Malofiy, this has
15        become tiresome.  You've done
16        it all afternoon, all morning.
17        MR. MALOFIY:  If you
18        sat -- every question, Derek
19        Williams objected to every
20        single question.  Every single
21        question I asked you objected
22        to every single question and
23        then you led and coached Van
24        Dell, who happens to be

1        represented by Manan, who
2        represents Usher in his other
3        copyright infringement case,
4        which was real slimy.  All
5        right.  And you didn't even
6        disclose that.  You didn't
7        disclose that and then you sat
8        there and coached him for at
9        length.
10        MR. DAVIS:  Mr. Malofiy
11        -- Mr. Malofiy, as a lawyer
12        you really should know better.
13        You really should know better.
14        MR. MALOFIY:  You know
15        what, you are not used to
16        someone who is straight and
17        calls people out.
18  BY MR. DAVIS:
19        Q.    Did you have more than
20  one conversation with Mr. Barton about
21  this document, which to me looks like
22  an invoice?  Do you think it is an
23  invoice?
24        A.    No, to me it looks like

1  a letter.
2        Q.    It is a letter.  Okay.
3        A.    It has a letterhead on
4  it, yeah.
5        Q.    Now, this letter as you
6  call it says there is a total
7  outstanding balance as of the above
8  date, $7,500.  Do you see that?
9        A.    Yes.
10        Q.    All right.  Did you pay
11  any portion of that $7,500 to a lawyer
12  named Wallace Collins?
13        A.    I have paid monies to
14  Wallace Collins in the past.  I don't
15  recall if it was for this or something
16  else.
17        Q.    Do you have any
18  evidence of any payments by you to
19  Wallace Collins?
20        A.    You know, I never
21  thought to look for that.  If I maybe
22  check my bank statements from the
23  past, possibly.
24        Q.    You would have paid him

Page 462

1  by check?
2       A.    Correct.
3       Q.    And would that have
4  been on a personal check?
5       A.    Yeah.
6       Q.    And is it your
7  testimony that you retained the
8  service of Mr. Collins to act on your
9  behalf as your lawyer?
10          MR. MALOFIY:
11      Objection.  You can answer.
12          THE WITNESS:  As my
13      lawyer, like, he wrote some
14      contracts for me in the past.
15  BY MR. DAVIS:
16      Q.    And you reimbursed --
17  you paid him for those service?
18      A.    Yeah.
19      Q.    Did you get any bills
20  from him for such services?
21      A.    I must have.
22      Q.    Do you have those
23  bills?
24      A.    I'd have to look.

Page 463

1       Q.    You didn't look before?
2       A.    I didn't look for bills
3  from Wallace Collins in regards to me
4  paying him anything, but it is
5  possible that I have them.
6       Q.    Did you ever meet with
7  Mr. Collins regarding the credit issue
8  that you claimed was not corrected by
9  Mr. Barton?
10      A.    No.
11      Q.    Regarding Bad Girl?
12      A.    No.
13      Q.    Did you ever call him
14  about it?
15      A.    No.
16      Q.    Did you ever send him
17  an e-mail about it?
18      A.    No.
19      Q.    Did you ever text him
20  about it?
21      A.    No.
22      Q.    So any services that
23  you may have engaged Mr. Collins for
24  had nothing to do with fixing credits

Page 464

1  on Bad Girl, which appeared on the
2  Confessions album?
3       A.    Not at all.
4          MR. MALOFIY:  What is
5      going on?  How much time do we
6      have?
7          VIDEOGRAPHER:  We've
8      got about six minutes.
9          MR. MALOFIY:  We can
10      run to the end of the tape.  I
11      don't have a problem.
12          MR. DAVIS:  Thank you.
13  BY MR. DAVIS:
14      Q.    What contracts did Mr.
15  Collins prepare for you?
16      A.    You have it in your
17  exhibits.
18      Q.    The recording agreement
19  that has blank spaces in it?
20      A.    You'd have to show it
21  to me.
22          MR. MALOFIY:  On time
23      we are down to an hour.
24          As the court reporter

Page 465

1      how are you doing?
2          THE COURT REPORTER:
3      I'm fine.  Thank you.
4          MR. DAVIS:  We are
5      going to mark as Marino-13 a
6      multi-page document that is
7      identified as exclusive artist
8      recording agreement.
9             - - -
10      (At this time a
11      document was marked for
12      identification as Exhibit No.
13      Marino-13.)
14             - - -
15          MR. DAVIS:  And this
16      was from the production of the
17      plaintiff.  I'm sorry, I don't
18      have a copy for you.
19          MR. MALOFIY:  That is
20      fine.  Let me look at it real
21      quick and I'll be fine with
22      it.  There is occasions when I
23      don't have copies as well.
24      Okay.

MAGNA
LEGAL SERVICES

Page 466

1  BY MR. DAVIS:
2      Q.    Just to go back to
3  Exhibit 11, which is in front of you,
4  you testified a moment ago believing
5  that you may have made some payments
6  to Mr. Collins, but the payments that
7  you are referring to have nothing to
8  do with the amount that appears on
9  Marino-11?
10         MR. MALOFIY:
11  Objection.  You can answer.
12         THE WITNESS:  I just
13     don't remember what the
14     payment was for.
15  BY MR. DAVIS:
16     Q.    Okay.
17         MR. WILLIAMS:  This is
18     one without hole punches.  We
19     are going to use this one
20     instead.
21  BY MR. DAVIS:
22     Q.    I pulled out of the
23  production that you previously made in
24  this case the recording contract that

Page 467

1  I described a moment ago.  Do you
2  recognize that document?
3      A.    Just give me a second.
4  You want these also.  Don't mix it up.
5  There is other pages on top that don't
6  belong in there.  See it?
7         MR. MALOFIY:  Do you
8     want to switch the tape?
9         VIDEOGRAPHER:  The time
10     is now 6:59 p.m. --
11         MR. DAVIS:  We were in
12     the middle of a question so.
13         MR. MALOFIY:  Then ask
14     your question, stay on the
15     tape.
16         MR. DAVIS:  You are off
17     already, right?
18         VIDEOGRAPHER:  No, not
19     yet.
20         THE WITNESS:  I just
21     wanted to read it first.
22  BY MR. DAVIS:
23     Q.    You want to read the
24  entire contract?

Page 468

1      A.    Kind of going through
2  it to make sure it is the same
3  contract.
4      Q.    We didn't have that
5  from our pile?
6         MR. MALOFIY:  You have
7     a contract that is multiple
8     pages.  You want to ask him
9     questions about it, he should
10     know what the contract says.
11  BY MR. DAVIS:
12     Q.    This is from your
13  files.
14     A.    Okay.  All right.
15     Q.    Okay.  Do you recognize
16  the document?
17     A.    I didn't get to go
18  through the whole thing but it looks
19  like it is the same one.
20     Q.    Okay.  Now, as I said
21  previously that the document has blank
22  spaces in it.  Do you see that?
23     A.    Oh, I see what you mean
24  now.  Okay.

Page 469

1      Q.    You see the top there
2  on page one?
3      A.    Uh-huh.
4      Q.    If you go to the last
5  page of the document it is not signed
6  by anyone?
7         MR. WILLIAMS:  We need
8     to cut the tape.
9         VIDEOGRAPHER:  The time
10     is now 7:00 p.m., and this
11     concludes DVD three in the
12     deposition of Daniel Marino.
13     We are going off the record.
14         - - -
15     (At this time a short
16     break was taken.)
17         - - -
18         VIDEOGRAPHER:  The time
19     is now 7:08 p.m.  This begins
20     DVD number four in the
21     deposition of Daniel Marino.
22     We are now on the record.
23  BY MR. DAVIS:
24     Q.    All right.  You were

Page 470

1  reviewing the exclusive artist
2  recording agreement and I had asked
3  you about the -- pointed out the
4  blanks on the first paragraph and then
5  I was turning to the last page to show
6  you that the document was unsigned.
7  Do you have in any of your files a
8  copy of this agreement that has been
9  filled in and signed by anyone?
10       A.    Not that I recall.
11       Q.    Do you know if this
12  contract had been prepared for a
13  particular artist that you were
14  considering signing?
15       A.    Yes.
16       Q.    Who is that artist?
17       A.    Melody Gardough.
18       Q.    And that artist was
19  going to be signed to Underworld
20  Entertainment, Inc.?
21       A.    That is what it says
22  there.
23       Q.    So looking at this
24  document does that refresh your

Page 471

1  recollection of whether or not
2  Underworld Entertainment was a
3  corporation?
4            MR. MALOFIY:
5            Objection.  You can answer.
6            THE WITNESS:  I wish I
7            could help you more.  I just
8            don't know what I-N-C really
9            stands for.
10  BY MR. DAVIS:
11       Q.    Incorporated?
12       A.    Incorporated, so there
13  is your answer.
14            MR. MALOFIY:
15            Objection.  The document speak
16            for itself.  You can answer.
17  BY MR. DAVIS:
18       Q.    Does this refresh your
19  recollection of whether or not
20  Underworld Entertainment was an
21  corporation?
22       A.    You brought it to my
23  attention.  It's a corporation.
24       Q.    And you were the chief

Page 472

1  executive officer of that corporation?
2       A.    I was an owner of the
3  company.
4       Q.    Well, in your resume
5  you call yourself CEO.  Is that
6  incorrect?
7            MR. MALOFIY:
8            Objection, you can answer.
9            THE WITNESS:  I really
10           -- Like I said earlier, I put
11           it on there because me and
12           Dante said we are both CEO's,
13           it sounds cool, and I'm not
14           too familiar with what that
15           really means.
16  BY MR. DAVIS:
17       Q.    Okay.  Now you
18  mentioned that there was a particular
19  artist in mind for this contract.  Was
20  that artist signed?
21       A.    No.
22       Q.    Is there a reason that
23  artist wasn't signed?
24       A.    Yes.

Page 473

1       Q.    What was the reason?
2       A.    She was in a terrible
3  car accident and almost died.
4       Q.    Did you have Mr.
5  Collins prepare any other exclusive
6  artist recording agreements for you?
7       A.    No.
8       Q.    Did he prepare any
9  other agreement at your request?
10       A.    Not that I can recall.
11       Q.    Is there any reason
12  that you selected Mr. Collins to be
13  your lawyer?
14       A.    This was an attorney
15  that Dante had already had ongoing
16  communications with.
17       Q.    Did you have an
18  engagement letter with Mr. Collins in
19  which he identified himself as your
20  lawyer and you his client and where it
21  identified what you had to pay him for
22  the services that he was rendering to
23  you?
24       A.    Which services are

MAGNA
LEGAL SERVICES

Page 474

1   you --
2       Q.    Any legal services?
3       A.    I don't remember
4   getting one of those letters.
5       Q.    Okay. All right. Who
6   requested this agreement?
7       A.    Requested it from whom?
8       Q.    From Mr. Wallace -- Mr.
9   Collins?
10      A.    Wallace Collins, right.
11  I would think Dante and I spoke about
12  getting this artist agreement. Well,
13  that is what happened, we needed
14  artists agreements because we were
15  getting artists under our label, and I
16  believe he was the person that
17  communicated with Wallace Collins.
18      Q.    Did you ever go to Mr.
19  Collins' office in New York City?
20      A.    No.
21      Q.    Did you ever speak with
22  Mr. Collins' on the telephone?
23      A.    Maybe. Maybe.
24      Q.    Does your maybe mean

Page 475

1   you think you might have spoken to him
2   once?
3       A.    I don't recall. I
4   can't say for sure.
5       Q.    So you don't have a
6   recollection of any specific
7   conversation with Mr. Collins?
8       A.    No.
9       Q.    Do you remember talking
10  to him about this particular contract?
11      A.    No.
12      Q.    Did Mr. Collins ever
13  come to your studio?
14      A.    Not when I was there.
15      Q.    Okay. If I asked you
16  forgive me, do you recall ever
17  communicating with Mr. Collins by
18  either e-mail or text?
19      A.    Again, it just goes
20  back to Dante was the person handling
21  the business affairs so he was the one
22  speaking directly with Mr. Collins.
23      Q.    I showed you previously
24  what has been marked Marino

Page 476

1   Exhibit 10. Do you recall that
2   document? It's a group of documents.
3       A.    I saw this earlier you
4   said?
5       Q.    Yes. This is one of
6   the documents that you said that you
7   found --
8       A.    Excuse me one second,
9   this things keeps falling. Do you
10  have a better way to possibly -- I
11  mean, you see how the clip just slides
12  off all the time. It is the same
13  clip, never mind.
14      Q.    This is the document I
15  showed you previously that you said
16  were statements that you had found
17  sometime in 2009 after Mr. Barton
18  disappeared.
19      A.    Okay.
20      Q.    Did Mr. Barton show you
21  these materials at or about the time
22  that he received them?
23      A.    These documents?
24      Q.    Yes.

Page 477

1       A.    No. No, not at all.
2       Q.    When he paid you a
3   partial payment of the mechanical
4   royalties for Bad Girl did he show you
5   a statement that he received from a
6   publisher or the record company with
7   respect to those royalties?
8       A.    I don't remember if he
9   did or if he didn't. If he showed me
10  a statement?
11      Q.    Yes, that he had
12  received?
13      A.    Maybe, possibly. I
14  don't know.
15      Q.    So it is possible that
16  he did?
17      A.    Possible that he did,
18  possible that he didn't. I mean, I
19  just don't remember. I remember
20  getting a check and cashing it and
21  being excited because I had some
22  money.
23      Q.    For Bad Girl?
24      A.    Club Girl, Bad Girl,

MAGNA
LEGAL SERVICES

Page 478

1    same song.
2        Q.    Whichever?
3        A.    But I don't remember.
4        Q.    When -- would you
5    describe the circumstances of this
6    conversation with Mr. Barton about the
7    payment of these mechanical royalties
8    for Bad Girl?
9            MR. MALOFIY:
10           Objection.  You can answer.
11           THE WITNESS:  I really
12       can't recall the conversation
13       that we had.  Just -- I just
14       remember that we got paid,
15       here is your cut.
16   BY MR. DAVIS:
17       Q.    When he said, we got
18   paid, what was he referring to?
19       A.    Let me say it again.
20   I'm saying these words, I'm not saying
21   word for word that is what he said.
22       Q.    I understand.
23       A.    That is just like how I
24   remember it.  But --

Page 479

1        Q.    I was going to say, in
2    words or substance he said something
3    like that?
4        A.    Yeah, words or
5    substance, you know, here, we got
6    paid, here is your cut.
7        Q.    When he said, we got
8    paid, what was he referring to?
9        A.    For the mechanical
10   royalties on the Club Girl song.
11       Q.    Do you know what
12   mechanical royalties?
13       A.    I believe so.
14       Q.    Could you tell me what
15   you think that they are?
16           MR. MALOFIY:
17           Objection.  Now or then, just
18       to be clear.
19   BY MR. DAVIS:
20       Q.    Then?
21       A.    Then, no.  Now I know,
22   because I went through extensive
23   reading and speaking with my attorney
24   who educated me, but at the time I

Page 480

1    just thought that was what we got
2    paid.  I didn't really I know.
3        Q.    What you got paid for
4    sales of Bad Girl?
5            MR. MALOFIY:
6        Objection, he said --
7            THE WITNESS:  Club
8        Girl.
9    BY MR. DAVIS:
10       Q.    Club Girl, Bad Girl?
11       A.    Correct, yes.
12       Q.    Yes?
13       A.    That is what I
14   believed.
15       Q.    Okay.  And did Mr.
16   Barton explain to you how he came up
17   with the number $4,553.06?
18       A.    No.  I didn't ask.
19       Q.    Do you recall the
20   circumstances of when he gave you the
21   check, aside from the fact you said
22   you were excited?
23       A.    Yeah, I mean -- no.
24   No, I don't.

Page 481

1        Q.    When he gave you that
2    check did you deposit it with your
3    bank?
4        A.    I believe I did, yes.
5        Q.    And at some point in
6    time you spent the money that you had
7    deposited from that check?
8        A.    I remember what I spent
9    the check on.
10       Q.    What did you spend it
11   on?
12       A.    My kitchen.  Went to
13   Ikea, purchased a kitchen for my
14   house.  Installed it myself.
15       Q.    The first monies that
16   you had received from Bad Girl?
17           MR. MALOFIY:
18           Objection.  You can answer.
19           THE WITNESS:  Club
20       Girl.  I needed a kitchen.
21   BY MR. DAVIS:
22       Q.    Are you still in that
23   space where you installed the kitchen?
24       A.    That house is the house

Page 482

1   where my current studio is.
2       Q.   Okay.  When you go in
3   that kitchen do you think of Club
4   Girl, Bad Girl?
5       A.   No.
6       Q.   No?
7       A.   No.
8       Q.   But you know it came
9   from sales of Club Girl, Bad Girl?
10          MR. MALOFIY:
11      Objection.
12          THE WITNESS:  Yeah, of
13      course I know.  Yeah.
14  BY MR. DAVIS:
15      Q.   So the documents that
16  comprise Marino-10, you never saw
17  these until sometime in 2009; is that
18  correct?
19      A.   That's correct.
20      Q.   In 2006 in your
21  complaint you refer to there still
22  being issues with the credits that
23  prevented you from getting paid.  This
24  is after you received that check?

Page 483

1       A.   Excuse me.  Can you
2   please say that again, I was yawning.
3   Just tired.
4       Q.   I'm sorry.  In your
5   complaint you refer to issues still
6   lingering in 2006 with respect to the
7   credits that were somehow preventing
8   you from getting more payments for Bad
9   Girl, do you recall that?
10          MR. MALOFIY:
11      Objection.
12          THE WITNESS:  Can I see
13      it.  I don't --
14  BY MR. DAVIS:
15      Q.   Sure, it is 394,
16  paragraph 394.
17      A.   Hold on a second.  I
18  want to take this off.
19      Q.   Sure.
20      A.   394 okay.  What is your
21  question?
22      Q.   You mentioned in that
23  paragraph that the matter was tied up
24  with the attorneys trying to rectify

Page 484

1   the situation.  Do you see that?
2       A.   Yes.
3           MR. MALOFIY:
4       Objection.
5           THE WITNESS:  Yes.
6   BY MR. DAVIS:
7       Q.   What attorneys are you
8   referring to?
9       A.   The -- I would assume
10  -- I can't say assume, but it was
11  HoriPro -- HoriPro, H-O-R-I, P-R-O, I
12  believe, HoriPro the publisher, our
13  publisher, and I guess whoever handles
14  the money on the other end, Sony.  I
15  don't know.
16      Q.   You guess?
17      A.   Well, it has to be
18  another attorney because our attorney
19  was dealing with some other attorney
20  or HoriPro's attorneys.
21      Q.   The word attorneys is
22  used there.  Other than HoriPro can
23  you identify who the other attorneys
24  were, if any?

Page 485

1           MR. MALOFIY:  He said
2       Sony.
3           THE WITNESS:  That was
4       my recollection.
5   BY MR. DAVIS:
6       Q.   Sony.  Okay.  Did you
7   ever try to contact those attorneys?
8           MR. MALOFIY:
9       Objection.  You can answer.
10          THE WITNESS:  No.
11  BY MR. DAVIS:
12      Q.   The complaint alleges
13  that the money was in trust.  Do you
14  see that?
15      A.   Yes.
16      Q.   Did you know where it
17  was in trust?
18      A.   No.
19      Q.   Did Dante Barton know
20  where it was in trust?
21          MR. MALOFIY:
22      Objection.  You can answer if
23      you know what Dante Barton
24      knew.

Page 486

1           THE WITNESS:  I just
2     know -- I just know what Dante
3     told me.
4     BY MR. DAVIS:
5           Q.    What did Dante tell
6     you?
7           A.    That --
8           Q.    That it was in trust?
9           A.    Yes.
10          Q.    You didn't ask him if
11    he knew where it was in trust?
12          A.    I trusted him.
13          Q.    In paragraph 395 you
14    refer to industry executives.  Do you
15    see that?
16          MR. MALOFIY:
17          30 minutes left.
18          MR. WILLIAMS:  More
19    than that.
20          MR. MALOFIY:  What do
21    you have on your clock?
22          MR. ROGERS:  What
23    difference does it make.  You
24    said that you are not going to

Page 487

1     hold us to the time and I have
2     questions also.
3           MR. MALOFIY:  I'm not
4     going to cut it early on a
5     Friday because I have a date,
6     that is what I was saying.  I
7     always have a date on Friday,
8     maybe a few, strapping young
9     lad.
10          THE WITNESS:  Okay.
11    What is the question again?
12    BY MR. DAVIS:
13          Q.    I asked you, do you see
14    where it refers to industry
15    executives?
16          A.    Yeah.
17          Q.    Okay.  Did you ask Mr.
18    Barton who they were, those industries
19    executives?
20          A.    No.
21          Q.    So if you didn't know
22    who they were, because you didn't asks
23    Mr. Barton, is it accurate to say you
24    didn't try to contact them?

Page 488

1           A.    Say that again.
2           MR. MALOFIY:
3     Objection.  You can answer.
4     BY MR. DAVIS:
5           Q.    You didn't ask Mr.
6     Barton who the industry executives
7     were, so you didn't know who to
8     contact if you wanted to contact them?
9           MR. MALOFIY:
10    Objection.  You can answer.
11          THE WITNESS:  Yeah, I
12    never tried to contact them.
13          MR. DAVIS:  I'm going
14    to mark as Marino-14 a
15    one-page document which
16    appears to be a letter and it
17    has handwriting on it.
18          - - -
19          (At this time a
20    document was marked for
21    identification as Exhibit No.
22    Marino-14.)
23          - - -
24          MR. MALOFIY:  Can I see

Page 489

1     it before you show it to the
2     witness.
3           MR. DAVIS:  I have a
4     copy for you.
5           MR. MALOFIY:  Thank
6     you.  You are always good like
7     that.  Thank you.
8     BY MR. DAVIS:
9           Q.    Have you seen that
10    document before?
11          A.    I have.
12          Q.    Okay.  Now this appears
13    to be similar to Marino-12, which I'm
14    showing you now.  Do you see that?
15          A.    Yes.
16          Q.    But it's different
17    because it has additional handwriting
18    on it; is that correct?
19          MR. MALOFIY:  Which one
20    are you looking at?
21          MR. DAVIS:  Marino-12.
22          MR. MALOFIY:  I'm
23    sorry.  I got it.  Thank you.
24          THE WITNESS:  I see it.

MAGNA
LEGAL SERVICES

Page 490

1  BY MR. DAVIS:
2        Q.    Okay.  Now, whose
3  handwriting is on the very top where
4  it says October/2007 and then it says,
5  Daniel Marino co-authored, co-produced
6  & co-owns, co-owners I think that
7  says?
8        A.    Co-owns.
9        Q.    Co-owns, quote, Club
10  Girl and Bad Girl, close quote?
11        A.    What is the question?
12        Q.    Who quote that?
13        A.    I did.
14        Q.    That's your
15  handwriting?
16        A.    That is my handwriting.
17        Q.    Is it your handwriting
18  for the line and X that appears below
19  that?
20        A.    No.
21        Q.    Okay.  Do you recognize
22  what is written above that line?
23        MR. MALOFY:  Which
24  line?

Page 491

1        MR. DAVIS:  The line
2  I've just described, where the
3  X is.
4        THE WITNESS:  Yes.
5  BY MR. DAVIS:
6        Q.    What is that?
7        A.    Are you referring to
8  this line?
9        Q.    Yes.
10        A.    Yes.  That is Dante
11  Barton, his signature.
12        Q.    Okay.  And is it your
13  testimony that he wrote the X, the
14  line and signed it?
15        A.    He signed it.  I don't
16  recall if he wrote the X and the line.
17  Could have been me or could have been
18  him, but he definitely signed it.
19        Q.    Did you put the arrow
20  in there or did he put the arrow in
21  there or somebody else?
22        A.    I don't remember --
23  well, it was just me and Dante, so I
24  don't know if I put the arrow or Dante

Page 492

1  put the arrow.  It kind of looks like
2  my arrow.
3        Q.    And can you tell me why
4  there is an arrow?
5        A.    It's pointing down to
6  the Usher song Bad Girl.
7        Q.    Right.  Explain to me
8  the connection between the signature
9  line and the arrow to the second
10  paragraph of that letter?
11        A.    I'm not quite sure.
12        Q.    Okay.  When did you --
13  when was this document with the
14  additional handwritten notes created?
15        A.    It is dated at the top.
16        Q.    Well, there is no date
17  there.  It says what month it was that
18  was inserted there and the year, but
19  it doesn't have a date.
20        A.    Yeah, I don't know.
21        Q.    Can you describe for me
22  the circumstances surrounding this
23  document?
24        A.    Yeah, it was me wanting

Page 493

1  more reassurance because more time had
2  gone past.  And I showed this to
3  Dante, I said, look, you know, I
4  really would like for you to make me
5  feel better and sign this and say that
6  this is my song.  And he said, yeah,
7  sure, it is your song, and he signed
8  it for me.
9        Q.    Is there any reason you
10  wrote it on the letter that Simon J.
11  Rosen had drafted three years before?
12        MR. MALOFY:
13        Objection.  You can answer.
14        THE WITNESS:  Yeah,
15        because I wanted him to know
16        that look, you know, I love
17        you, I trust you, but I really
18        don't want to have to pursue
19        anything like this, so please
20        reassure me that everything
21        that you are telling me is
22        true.
23  BY MR. DAVIS:
24        Q.    Were you signaling to

MAGNA
LEGAL SERVICES

Page 494

```
1    Mr. Barton that if he didn't sign it
2    you were going to sue him?
3         A.    No.
4         Q.    Well, I'm trying to
5    understand why you used Mr. Rosen's
6    letter for something that could have
7    been written on any piece of paper, if
8    you can explain that to me?
9         A.    Let me read the letter
10   and then maybe I can remember why.
11        MR. MALOFIY:  About
12   25 minutes.
13        MR. WILLIAMS:  No, not
14   quite, more than that.
15        MR. MALOFIY:  What do
16   you got?  You got 40?
17        VIDEOGRAPHER:  About
18   44.
19        MR. MALOFIY:  44,
20   honest to God?
21        THE WITNESS:  I read
22   it.  What was the question?
23   BY MR. DAVIS:
24        Q.    The question was why
```

Page 495

```
1    you chose to make that notation on Mr.
2    Rosen's letter that was a draft that
3    was prepared three years before?
4         A.    I guess for me it felt
5    like it was a confirmation that it
6    says up here in the first paragraph,
7    Mr. Marino co-authored, co-produced
8    and co-owned the master recording and
9    performed lead guitar on a song
10   entitled Club Girl.  Mr. Marino
11   publishing entity co-administers and
12   co-owns publishing on Club Girl,
13   Usher's song Bad Girl.  And I'm not a
14   lawyer, I'm not a writer in regards to
15   drafting legal documents or something
16   of some sort of a contract, so for me
17   this was assurance that everything
18   that it says here is true and then I
19   rewrote it up here and he confirmed
20   it.
21        Q.    So you believed what
22   you had handwritten above his
23   signature was accurate, that Daniel
24   Marino co-author, co-produced and
```

Page 496

```
1    co-owns Club Girl and Bad Girl?
2         A.    You know, at the time
3    without having as much knowledge as I
4    do today, yeah.
5         Q.    Where did you present
6    this letter to Mr. Barton?
7         A.    In the studio.
8         Q.    Okay.
9         A.    We spent a lot of time
10   there.
11        Q.    Was anyone else present
12   when you presented it to him?
13        A.    No.
14        Q.    Do you know where the
15   original is?
16        A.    Is -- the original?
17        Q.    The one with your
18   handwritten?
19        A.    No, I don't recall.
20        Q.    Did you possibly give
21   that to your lawyer who then copied it
22   and gave us copies of the original?
23        A.    It is possible, I just
24   don't recall.
```

Page 497

```
1         Q.    Okay.  When you, as you
2    say in the complaint, you confronted
3    Mr. Barton --
4         A.    Excuse me.  Let me
5    interrupt, go ahead.
6         Q.    In the complaint you
7    say you confronted Mr. Barton, had you
8    already handwritten the notation on
9    the top before you confronted him?
10        A.    I don't remember,
11   maybe, maybe while he was there.  I
12   don't remember.  You are asking me if
13   I wrote on the top of that letter
14   before I saw him.
15        Q.    Yes.
16        A.    Or while he was with
17   me?
18        Q.    Before you saw him?
19        A.    Repeat the question.
20        Q.    Did you write that
21   notation on the top of Marino-14
22   before or during your meeting with Mr.
23   Barton?
24        A.    I didn't understand you
```

Page 498

1    correctly.  I don't remember.
2         Q.   Okay.  Did you have a
3    plan of what you were going to do if
4    he didn't sign the letter?
5         MR. MALOFIY:
6    Objection.  You can answer.
7         THE WITNESS:  No.
8    BY MR. DAVIS:
9         Q.   Do you have any song
10   writing credits on any commercially
11   available recording?
12        A.   Yes.
13        Q.   What recordings,
14   please?
15        A.   I guess you could
16   checkout the last one that went out.
17   Song writing you said?
18        Q.   Yes.
19        A.   Jessi Teich, is the
20   name of the artist.  I can spell it
21   out for you if you like.  It is Jessi,
22   J-E-S-S-I, and the last name Teich,
23   T-E-I-C-H.  And what is interesting
24   that I would like to let you know

Page 499

1    about this particular album is that I
2    wrote and produced a lot of the songs
3    on the album, however, unlike Jim Jam
4    and Terry Lewis, even though we had an
5    agreement to split it 50/50 there were
6    songs on there that I didn't write and
7    I did not put a writers credit on
8    there, however the publishing came
9    through and we did split it 50/50.  If
10   you recall Samuel went ahead and got a
11   credit on my song that I created on my
12   own that they stole from me and he got
13   a credit on the song and he admitted
14   in his deposition that he didn't do
15   anything to that song.  Just like that
16   to be heard.
17        Q.   Thank you.  It is not
18   responsive to my questions.
19        A.   But you should know.
20   It is not fair.  It is not right.  It
21   is completely wrong.
22        Q.   You allege in the
23   complaint that Tommy Van Dell worked
24   with you, Wil Guice and Dante Barton,

Page 500

1    do you recall that?
2         MR. MALOFIY:  I'm
3    sorry.  I got distracted.
4    Could you repeat that
5    question?
6         THE WITNESS:  I was
7    going to ask the same thing.
8    BY MR. DAVIS:
9         Q.   You allege in your
10   complaint that Tom Van Dell worked
11   with you, Wil Guice and Dante Barton?
12        A.   Correct.
13        Q.   Okay.  And when did
14   that working relationship begin?
15        A.   Prior to flying down to
16   Nashville, and I guess that was in
17   2002, I believe.  I'm not exactly
18   sure.
19        Q.   What was his role?
20        A.   Publisher.
21        Q.   Right from the
22   beginning?
23        A.   Well, you know, as far
24   as I know, yes, publisher.

Page 501

1         Q.   Why do you say as far
2    as you know?
3         A.   Because that's -- he
4    referred to himself as our publisher.
5    We referred to him as our publisher.
6    Publisher.
7         Q.   Did you ever see an
8    agreement between yourself and his
9    company IN2N?
10        MR. MALOFIY:
11   Objection.  Written or oral?
12        MR. DAVIS:  Written.
13   How could you see an oral
14   agreement?
15        THE WITNESS:  We had a
16   written agreement -- I mean an
17   oral agreement, not a written
18   agreement.
19   BY MR. DAVIS:
20        Q.   Do you know what the
21   terms of that oral agreement were?
22        A.   Well, it was a little
23   interesting because when we were on
24   our plane on the way back from

Page 502

1  Nashville he said -- because he had
2  mentioned it down in Nashville how
3  much he loved my playing, how much he
4  loved the way I interacted with
5  people, and how ease going I was
6  playing with other people.  And on the
7  way back on the plane from Nashville
8  we were sitting next to the each other
9  and we were talking about, you know,
10  signing us, is he signing us, and we
11  started talking about what does that
12  mean in regards to splitting
13  publishing.  He said, well, I get
14  50 percent of the publishing, and I
15  said, well, that's a little high,
16  don't you think.  And he said, not
17  really.  I said, well, you are just
18  going to be making a few phone calls,
19  and I don't think that entitles you to
20  half of my publishing, I think
21  seventy-five twenty-five would be more
22  fair.  And he said, that is fine,
23  we'll work it out.
24      Q.    Okay.  We'll work it

Page 503

1  out, did there occur another
2  conversation about it?
3      A.    Other than him coming
4  in the studio and asking me for more
5  music every time he came in there, and
6  I gave him CD's and loving it and
7  trying to place it around, which to me
8  says, hey, I'm taking your music and
9  I'm going to try to place it, to me
10  that means, you know, he's okay with
11  being my publisher.
12      Q.    So based on his conduct
13  by taking your music and you thinking
14  that he was trying to place it with
15  artists you presumed that he had
16  accepted your terms, seventy-five
17  twenty-five?
18      A.    Yeah.  He loved my
19  music.  He loved my playing.  He loved
20  the way I interacted with people.  He
21  would come in, play this song again, I
22  love this song.  There was this one
23  song I wrote in Nashville with him
24  that he loved so much that was an

Page 504

1  acoustic song that he mentioned that
2  it sounded like Steve Nicks, Fleetwood
3  MAC and -- yeah, and it was a really
4  pretty song.
5          I'm just -- what I'm
6  trying to say is that he really
7  enjoyed my playing, and my writing and
8  my production, and when he would come
9  to the studio he would always ask me
10  for a disk and I would give him a
11  disk.
12          As a matter of fact,
13  when we went through the documents I
14  also found out that there was his
15  artist, part of his publishing label,
16  or whatever you call it, company that
17  I wrote in Nashville with -- the
18  girl's name is Bradshaw, Kate
19  Bradshaw, and the other girl is there,
20  the woman that wrote the song Kiss the
21  Rain.  We wrote a song.  I recorded a
22  song.  I have a copy of the song when
23  I wrote it with them, and, again, I
24  never got properly credited.

Page 505

1      Q.    But based on your
2  course of dealing with him --
3          MR. MALOFIY:  Another
4          lawsuit.  Another lawsuit.
5  BY MR. DAVIS:
6      Q.    -- you know, creating
7  tracks -- creating tracks, giving them
8  to Mr. Van Dell, you understood that
9  the conversation that you had on the
10  airplane --
11      A.    Yeah.
12      Q.    -- of a understanding
13  of 75 percent to you, 25 percent to
14  him or his company had been accepted
15  by him?
16      A.    They were.
17      Q.    Orally?
18      A.    When someone says to
19  you, we'll work it out, here is my
20  hand, shake it, to me that is an
21  agreement.  That is the way I was
22  raised.
23      Q.    That is what he did, he
24  shook your hand?

**MAGNA** ▶
**LEGAL SERVICES**

Page 506

1      A.    Yeah.
2      Q.    And he said, we'll work
3  it out?
4      A.    Yeah.
5      Q.    Okay.
6          MR. MALOFIY:  Time to
7      pack it up?
8  BY MR. DAVIS:
9      Q.    Is there any way to
10  estimate the number of times you saw
11  Mr. Van Dell?
12      A.    No, I saw him a bunch
13  of -- I mean, I can't estimate that.
14      Q.    Was it under 25 times?
15      A.    I couldn't say.  It was
16  a lot.  I mean, I've known Tom from a
17  good chunk of time during that course
18  of the studio and I saw him, you know,
19  a bunch of times.
20      Q.    There is no way that
21  you can give me some range?
22      A.    I mean --
23          MR. MALOFIY:
24      Objection.  I think he

Page 507

1      testified to it earlier.
2          THE WITNESS:  I did.
3      And, you know, I testified
4      about maybe I think seven
5      times or so, five times or so
6      he came in.  I seen him a
7      bunch of times in the studio.
8      He would come, he would hang
9      out with us.
10  BY MR. DAVIS:
11      Q.    Did you see him after
12  the Club Girl, Bad Girl song was
13  released?
14          MR. MALOFIY:
15      Objection.  Asked and
16      answered.
17          THE WITNESS:  Yes.
18  BY MR. DAVIS:
19      Q.    Did you see him more
20  times after it was released or before
21  it was released?
22      A.    I would say after.
23      Q.    After, and did you have
24  Mr. Van Dell's telephone number?

Page 508

1      A.    I don't think I did,
2  no.
3      Q.    Did you know what
4  company he worked for?
5      A.    Yes.
6      Q.    What was the name of
7  the company?
8      A.    HoriPro.
9      Q.    And did you know where
10  it was located?
11      A.    HoriPro is in
12  Nashville.  He took us to the studios
13  where we wrote songs.  He took us
14  there to meet all the top executives.
15      Q.    So you knew how reach
16  them?
17      A.    If I wanted to, I just
18  had to ask Dante or Wil for his
19  number.  I just never had his number
20  in my pocket.
21      Q.    Okay.  But it was
22  available if you needed it?
23      A.    If I needed it.
24      Q.    Did you have his e-mail

Page 509

1  address?
2      A.    Maybe.  Maybe.
3      Q.    Do you remember ever
4  telephoning him?
5      A.    Possibly.
6      Q.    Do you remember him
7  ever telephoning you?
8      A.    I just can't recall.
9      Q.    Did Mr. Van Dell ever
10  present you with any written contract
11  at any time for you to consider and
12  review for possible signature?
13          MR. MALOFIY:
14      Objection.  You can answer.
15          THE WITNESS:  No.
16  BY MR. DAVIS:
17      Q.    Did Mr. Barton or Mr.
18  Guice ever show you the agreements
19  that they had entered into with IN2N
20  or HoriPro?
21          MR. MALOFIY:
22      Objection.  You can answer.
23          THE WITNESS:  Did they
24      ever show me their agreements

MAGNA
LEGAL SERVICES

1    with them?
2  BY MR. DAVIS:
3       Q.    Yes.
4       A.    I don't think so.
5       Q.    Was the idea that you
6  would each have separate agreements
7  with Mr. Van Dell's company?
8          MR. MALOFIY:
9       Objection.  You can answer.
10         THE WITNESS:  I
11      wouldn't know.
12 BY MR. DAVIS:
13      Q.    Well, did you think
14 that Mr. Barton and Mr. Guice had the
15 same deal that you had with the
16 publisher 75/25?
17      A.    I don't know.
18      Q.    Did you ever get a
19 statements from Mr. Van Dell's
20 publishing company with respect to any
21 of the works that you had presented to
22 him?
23      A.    The only thing that I
24 saw with my work presented on it was

1  what we've gotten from HoriPro that I
2  got an opportunity to see in Los
3  Angeles.  That is the only document
4  that I saw with my work on it.
5          Actually, there were
6  other songs on there, too.  There were
7  songs that I wrote with Wil, that him
8  and I had done that were on there as
9  well.
10      Q.    You misunderstand my
11 question.  I'll repeat it.
12      A.    Okay.  Go ahead.
13      Q.    Did you ever receive a
14 statement from HoriPro or from IN2N
15 which purported to account to you for
16 anything with respect to the music
17 that you had presented to Mr. Van Dell
18 in these various occasions that you
19 met with him?
20         MR. MALOFIY:
21      Objection.  You can answer.
22         THE WITNESS:
23      Statement?
24 BY MR. DAVIS:

1       Q.    A statement, royalty
2  statement?
3       A.    You know, he would come
4  in with his little briefcase when he
5  did sometimes.  I don't remember if he
6  did or didn't.
7       Q.    Did he ever give you a
8  list that identified the works that
9  you had given to him for possible
10 exploitation by his publishing
11 company?
12      A.    No, we had -- no, I
13 don't believe so.
14         MR. DAVIS:  I'll turn
15      it over to you for a moment.
16      I may have some follow up that
17      I missed, and I'll check what
18      I've got in my --
19         MR. MALOFIY:  It has to
20      be responsive to his
21      questions.
22         MR. DAVIS:  No, I'm
23      giving him an opportunity to
24      speak.  I'm not done, but I

1       want him to get his questions
2       in and whatever time we have
3       remaining I will utilize.
4          MR. ROGERS:  Thank you,
5       Mr. Davis.
6          - - -
7          EXAMINATION
8          - - -
9  BY MR. ROGERS:
10      Q.    Mr. Marino, good
11 evening.  My name is Lance Rogers.  We
12 met yesterday for the first time.  As
13 I explained then I represent IN2N
14 Entertainment Group, LLC, one of the
15 defendants in this lawsuit.
16         I know it has been a
17 long day and I'll do my best to move
18 this along.  The same instructions
19 that Mr. Davis supplied you at the
20 beginning of this deposition apply for
21 my questions.  Do you understand that?
22      A.    Yeah.  You said the
23 beginning of today?
24      Q.    Yes.

Page 514

1      A.    Was it the -- can you
2  just give me a quick fly by, reminder
3  what you meant by that?
4      Q.    If you don't understand
5  my question will you let me know?
6      A.    Oh, yeah. Yeah. Yeah.
7      Q.    Okay. There was some
8  testimony earlier today that you
9  didn't receive any money from Destro.
10  I just wanted to follow up and ask
11  you, did you receive any money from
12  Underworld?
13     A.    No, I don't believe I
14  received money from my own company.
15  No.
16     Q.    What about Wavelab?
17     A.    Wavelab, Wavelab, you
18  know, yes, actually.
19     Q.    What did you receive
20  from Wavelab?
21     A.    Wavelab, there was a
22  few years during Wavelab where we
23  decided to conduct classes, and those
24  classes were to teach Pro Tools.  So

Page 515

1  what we did was we partnered up with
2  another individual who was a Pro Tools
3  expert, and we decided to invest some
4  money and buy a really nice Pro Tools
5  board, Control 24 I believe it was
6  called.  And what we did is we held
7  some classes there, and what we did --
8  we only had a few classes, maybe like
9  four or five people in those classes.
10  And people would come in, I think
11  there was like maybe a two or
12  three-hour class or something like
13  that, and we advertised in the local
14  magazine.  People would come in.  We
15  would instruct them on how to use Pro
16  Tools, we would have different
17  sessions with them, show them how to
18  open sessions, how to close sessions,
19  how to record, how to route, how to
20  use the board.  And there were very,
21  very, very -- when I say little
22  monies, maybe like -- I don't know, a
23  hundred dollars within the course of
24  possibly, I think we ran three classes

Page 516

1  in a couple months period.
2      Q.    Other than those monies,
3  did you receive any other monies from
4  Wavelab?
5      A.    I don't think so, no.
6      Q.    Okay.  Yesterday when
7  we were deposing Mr. Guice we saw the
8  February 2012 statement that he
9  offered in this case.  Do you recall
10  seeing that?
11     A.    No, the February 2012
12  statement, do you have a copy of it?
13     Q.    I do.  I'm going to ask
14  you simply to let me know if you've
15  ever seen any other statements, ever,
16  that Mr. Guice has offered.  This is
17  the statement that?
18         MR. MALOFIY:  You mean
19     the affidavit which I referred
20     to?
21  BY MR. ROGERS:
22     Q.    That might refresh your
23  recollection?
24     A.    Oh, yes, if you said

Page 517

1  that I would have understood.
2      Q.    Are you aware of any
3  other statements that Mr. Guice has
4  offered in this matter?
5      A.    Not that I know of, no.
6      Q.    Earlier today you
7  testified to an agreement between you
8  and Mr. Guice and Mr. Barton.
9         MR. MALOFIY:
10        Objection.
11  BY MR. ROGERS:
12     Q.    What was that
13  agreement?
14     A.    You know, you would
15  have to refresh my memory as to what
16  agreement you are talking earlier
17  today.
18     Q.    Are you aware of any
19  agreements between yourself and Mr.
20  Guice and Mr. Barton?
21     A.    Yes.
22     Q.    What agreements are you
23  aware of?
24     A.    The agreements that I

Page 518

1  had discussed with Mr. Davis earlier
2  where between the three of us the work
3  that we did together on the song
4  writing credits we would split one
5  third, one third, one third for the
6  song we did together.
7       Q.    And you testify about
8  that.  My apologies.
9            Are you aware of any
10 other agreements between the three of
11 you?
12           MR. MALOFIY:
13 Objection.  You can answer.
14           THE WITNESS:  No.
15 BY MR. ROGERS:
16      Q.    What was the point --
17 there has been testimony in this case
18 that you gave that at some point you
19 had to make a decision between giving
20 the song Club Girl to Usher to use or
21 to have Mr. Guice use the song Club
22 Girl; is that correct?
23      A.    Yes.
24      Q.    What was the point in

Page 519

1  giving it to Usher to use?
2       A.    I think that's pretty
3  obvious.  The idea to give it to Usher
4  is that Usher is a well established
5  artist and it would not necessarily
6  mean guaranteed success but a good
7  chance for success, but with that
8  being said it is all speculating,
9  because with Wil Guice if we were to
10 release it with a single and if Mark
11 Pitts took him as a single as the
12 artist, you know, the potential is
13 unlimited.  He could have been the
14 next big super star himself, and the
15 song could have been very successful.
16 So, you know, that's -- that was, the
17 decision was between giving it to Wil
18 let him keep it for himself as a
19 single.  Let him roll with Mark Pitts,
20 as you heard in Wil's testimony
21 yesterday, he had that opportunity,
22 and instead it went to Mr. Usher.
23      Q.    Before the Confessions
24 album was released, other than Mr.

Page 520

1  Barton, did you talk to anybody about
2  ownership or credit for the song Club
3  Girl or Bad Girl?
4            MR. MALOFIY:
5  Objection.  Can you read that
6  back?  I lost that one.  I
7  apologize.
8            - - -
9            (At this time the court
10 reporter read back from the
11 record as was requested.)
12           - - -
13           MR. MALOFIY:
14 Objection.  You can answer.
15 It was asked and answered.
16           THE WITNESS:  I'm
17 sorry.  I'm so sorry.  I just
18 passed him the paper and I
19 didn't catch the second half
20 of it.
21           - - -
22           (At this time the court
23 reporter read back from the
24 record as was requested.)

Page 521

1            - - -
2            THE WITNESS:  Before
3  the release?
4            MR. MALOFIY:
5  Objection.  Asked and
6  answered.  Go ahead.
7            THE WITNESS:  I'm just
8  getting tired.  I don't
9  recall.
10           MR. MALOFIY:  Do you
11 need a break?  We'll stop the
12 time obviously if you need a
13 break.
14 BY MR. ROGERS:
15      Q.    Do you need a break?
16      A.    Yeah, I wouldn't mind.
17 I'm just, like, fading.  I might go
18 get a cup of coffee.  Is that coffee
19 machine still going there.  I barely
20 slept last night.
21      Q.    Let's take a break.
22           VIDEOGRAPHER:  The time
23 is now 7:54 p.m.  We are going
24 off the record.

**MAGNA** ▶
LEGAL SERVICES

Page 522

1           - - -
2           (At this time a short
3    break was taken.)
4           - - -
5           VIDEOGRAPHER:  The time
6    is now 8:05 p.m.  We are back
7    on the record.
8           MR. MALOFIY:  We are
9    just going to put something on
10   the record.  It's not going to
11   count against your time.  I
12   just want to put something on
13   the record.  Do you want to
14   put your time concern on the
15   record?
16          MR. ROGERS:  I don't
17   know.  But let's hear what he
18   has to say.
19          MR. MALOFIY:  Can you
20   estimate how much time you
21   think you may need with this
22   witness?
23          MR. ROGERS:  I don't
24   know.  I'm just trying to get

Page 523

1    through all this as quickly as
2    possible.  As you know, I just
3    got the witness about ten
4    minutes ago.
5           MR. MALOFIY:  I'm just
6    going to put on the record
7    that I don't believe defense
8    counsel properly allocated
9    their time of what questions
10   they should ask and how they
11   should ask it, and because of
12   that, because they asked the
13   same questions over and over
14   and over and over and over and
15   over again at nauseam that we
16   are not going to call this guy
17   back.  The discovery deadline
18   is on the 8th.  We'll object
19   to that.
20          So I'm going to try to
21   be as considerate and
22   conscientious as I can be, as
23   patient and courteous.  And in
24   you asking your questions, at

Page 524

1    the same time my client is
2    exhausted and tired, so do
3    your best to ask questions
4    that have not been answered --
5    or questions that have not
6    been asked and answered and
7    I'll try to work with you
8    guys.
9           MR. DAVIS:  I have a
10   couple more, so I won't keep
11   him long.
12          MR. MALOFIY:  Dan, how
13   do you feel?
14          THE WITNESS:  Like
15   shit.
16          MR. MALOFIY:  Are you
17   exhausted.  You are on camera.
18   You don't want to do that.
19          THE WITNESS:  I'm
20   sorry.  I forgot we were on
21   the air.
22   BY MR. ROGERS:
23       Q.    Mr. Marino, are you
24   able to proceed?  I have some more

Page 525

1    questions for you.  Are you able to
2    answer those questions?
3        A.    Yes.
4        Q.    Okay.  If at any time
5    you aren't able to answer them
6    truthfully, honestly and accurately
7    will you please let me know?
8        A.    Sure.
9        Q.    All right.  Just before
10   we broke you were giving me an answer
11   to a question.  I would like to
12   ask the court reporter to read that
13   answer back.
14          - - -
15          (At this time the court
16   reporter read back from the
17   record as was requested.)
18          - - -
19   BY MR. ROGERS:
20       Q.    That is what I was
21   trying to figure out.  Did you hear
22   the question, Mr. Marino?
23       A.    Yes, I think I got it.
24   One more time.  Sorry.

MAGNA ▶
LEGAL SERVICES

Page 526

1    Q.    Let me see if I can
2  simplify it.  Before Confessions was
3  released as an album?
4    A.    Yes.  Yes.
5    Q.    Other than Mr. Barton
6  did you talk to anybody about
7  ownership or receiving money from the
8  release the song Bad Girl or Club
9  Girl?
10         MR. MALOFIY:
11         Objection, but you can answer.
12         THE WITNESS:  Yes,
13         before the release of the
14         record I worked on my song
15         Club Girl with other people
16         who knew that I was the sole
17         author of that recording,
18         including Jimmy Jam, Terry
19         Lewis -- or I'm sorry, Terry
20         Lewis, apparently Jimmy Jam
21         got a credit that he should
22         have never gotten, Terry
23         Lewis, I guess the Avila
24         brothers.

Page 527

1  BY MR. ROGERS:
2    Q.    Let me jump in here.  I
3  don't mean to interrupt you but I
4  think you are answering a different
5  question.  I want to save you the
6  concentration and hassle of doing
7  that.
8    A.    I understand --
9         MR. MALOFIY:  I ask
10         that you allow him to finish
11         his answer.  You asked him
12         about ownership of the song
13         and he is answering that.
14         THE WITNESS:  You said
15         ownership of the song.  So
16         those people know, Dante, Wil,
17         the people that worked on --
18         prior to the record release I
19         did all the revisions with
20         these people.  Tommy Van Dell
21         also knew about it.  So all
22         these people knew that I
23         originated the song, I created
24         the song, I wrote the song, I

Page 528

1         produced the song and then I
2         also was writing the revisions
3         for the song.
4  BY MR. ROGERS:
5    Q.    I'm not asking about
6  who knew about what you did on the
7  song.  What I'm asking you is, did you
8  have any conversations with anyone
9  other than Mr. Barton about your
10  ownership interest in the song Club
11  Girl or Bad Girl prior to the release
12  of Confessions?
13         MR. MALOFIY:
14         Objection.  Asked and
15         answered, repeatedly.
16         THE WITNESS:  Yeah, I
17         feel like that is the same,
18         what I just said is the same.
19         MR. MALOFIY:  We are
20         probably just going to shut
21         this down unless you ask some
22         real questions.  This is
23         ridiculous.
24         THE WITNESS:  Right, I

Page 529

1         mean, isn't that -- they know
2         about the ownership.
3         MR. MALOFIY:  He just
4         testified.
5  BY MR. ROGERS:
6    Q.    I'm not asking you
7  about who knew about ownership.  What
8  I'm asking you is, did you, Daniel
9  Marino, have any conversations with
10  anyone other than Mr. Barton about the
11  ownership of Club Girl or Bad Girl
12  prior to the release of Confessions?
13         MR. MALOFIY:
14         Objection.  Asked and
15         answered.  The witness is
16         obviously tired and this is
17         the same question that has
18         been asked 50,000 different
19         ways.  This is an ineffective
20         use of your time.  This is an
21         ineffective use of my time.
22         Everyone here is tired.  My
23         client is tired.  You guys
24         asked the same question over

Page 530

1    and over and over again, and
2    you haven't properly allocated
3    your time, and now you want to
4    ask him it again.
5         I'm trying to be as
6    patient and courteous but I
7    would have never let this go
8    on if the discovery deadline
9    wasn't the 8th, and I want to
10   be fair and respectful of your
11   questions, but it is the same
12   question.  He is tired and he
13   answered it a million times.
14        MR. ROGERS:  You're
15   filibustering.  Let him answer
16   the question.
17        THE WITNESS:  Lance --
18   Lance, right?
19   BY MR. ROGERS:
20   Q.    Yes.
21        MR. MALOFIY:  Call him
22   Mr. Rogers.
23        THE WITNESS:  Mr.
24   Rogers.  I'm sorry.  In 2001

Page 531

1    when I wrote the song,
2    produced the song, no one ever
3    disputed that I didn't write
4    the song Club Girl.  The 2002
5    I wrote -- no one ever
6    disputed that I wrote the
7    song, I produced the song Club
8    Girl.  In 2003 prior to the
9    release no one ever disputed
10   that I wrote the song,
11   produced the song Club Girl.
12   When the record came out in
13   2004 no one ever disputed that
14   I wrote the song and produced
15   the song Club Girl.  In 2005
16   no one ever disputed that I
17   wrote the song, that I
18   produced the song Club Girl
19   and Bad Girl.  In 2006 no one
20   has yet come up and said
21   anything with any dispute that
22   I wrote the song and produced
23   the song the Club Girl and Bad
24   Girl.  Again, in 2007 no one

Page 532

1    ever disputed the fact that I
2    wrote and produced song Club
3    Girl and Bad Girl.  In 2008 no
4    one ever disputed the fact
5    that I wrote and produced the
6    song Club Girl.  2009 no one
7    ever disputed that I wrote and
8    produced the song Club Girl.
9    In 2010 no one has ever come
10   here and disputed the fact
11   that I wrote and produced the
12   song Club Girl.  Again, in
13   2011 no one has made any
14   disputes that I am the person
15   that wrote, produced the song
16   Club Girl and Bad Girl.  Last
17   year in 2012 no one disputed
18   that I wrote and produced the
19   song Bad Girl and Club Girl.
20   And now we are in 2013, we are
21   at depositions.  We went
22   through all these depositions.
23   We went to L A, we went
24   everywhere.  Mr. Davis can

Page 533

1    tell you that no one has come
2    here and disputed the fact
3    that I wrote, and produced the
4    song Club Girl, Bad Girl.
5         Now you are asking me,
6    Mr. Rogers, did I have any
7    conversations with someone
8    about credits in 2003.  No one
9    has ever disputed the fact
10   that I wrote and produced the
11   song Bad Girl.  So I just
12   don't understand why that
13   question keeps coming up.  If
14   no one else has said this man
15   has not -- he is not the guy
16   that did it, I did it or
17   someone else, or I know the
18   person then why are we even in
19   this room, and you guys are
20   defending these people that
21   stole my song.  Like, aren't
22   we trustworthy people?  Like I
23   feel like I look at look you
24   guys and you look like honest



Page 534

1    people, but on the back end I
2    don't feel like I can trust
3    you guys at all.
4  BY MR. ROGERS:
5        Q.    Mr. Marino, are you
6  able and willing to answer my
7  questions?
8            MR. MALOFIY:  He did.
9    He did answer all your
10   questions for eight hours now.
11   You keep on asking these
12   questions and you keep on
13   getting the same question over
14   and over again.
15           MR. DAVIS:  Francis, we
16   got your rap.  We know what
17   you are saying.
18           MR. MALOFIY:  I'm going
19   to shut it down.
20           MR. DAVIS:  I have a
21   few questions left to do.  I
22   want --
23           MR. MALOFIY:  I'm about
24   to shut it down.  Ask your

Page 535

1    question.
2  BY MR. ROGERS:
3        Q.    Mr. Marino, if we need
4  to recall this deposition on another
5  day, I'm happy to do that, if you are
6  not feeling up to answering these
7  questions?
8        A.    Maybe we will he do
9  that.
10           MR. DAVIS:  I want to
11   finish the few that I have.
12           MR. MALOFIY:  Do you
13   have any important questions
14   that haven't been asked?
15  BY MR. ROGERS:
16       Q.    Are you able to
17  continue in this deposition on another
18  day?
19       A.    No.
20           MR. MALOFIY:  No, he is
21   not.
22           MR. DAVIS:  I'm ready
23   to finish my question with
24   you.  I'm going to finish.

Page 536

1            MR. MALOFIY:  That is
2    fine, before you jump back in
3    with the same questions with
4    the same answers that is going
5    to happen over and over again,
6    do you have additional
7    questions you would like to
8    ask him that haven't been
9    asked as of yet, Mr. Rogers?
10           MR. ROGERS:  I have
11   more questions, Mr. Marino.
12   I'm happy to have him answer
13   them or we can adjourn this
14   deposition right now and we
15   can continue tomorrow or next
16   week at some point.
17           MR. MALOFIY:  No, that
18   is not going to happen.
19  BY MR. ROGERS:
20       Q.    I don't have very many
21  questions for you, but I would like to
22  get through them tonight.
23       A.    I get frustrated with
24  the same questions, and the fact that

Page 537

1  no one is disputing anything that I
2  say.  No one is disputing the fact
3  that I wrote and produced the song,
4  the song that was stolen from me that
5  people made -- the record itself
6  generated over $200 million or so.
7  And you guys are fighting this.  Like,
8  you all know at this point.  I just
9  don't understand it.  I want to answer
10  your questions, but if it is going to
11  be the same question you just asked me
12  I answered it.
13           MR. ROGERS:  I'm going
14   to reserve my right to ask
15   that question again.  I'm
16   going to move on.
17           THE WITNESS:  Okay.
18  BY MR. ROGERS:
19       Q.    Mr. Marino, I think
20  earlier you indicated that you believe
21  that the defendants in this case have
22  lied to you.  That was your testimony.
23  How did my client, defendant IN2N
24  Entertainment Group lie to you?

Page 538

1      A.    He lied to me because
2  he told me he was going to be my
3  publisher and I don't really know what
4  happened, obviously he lied.
5      Q.    And who is he?
6      A.    Tommy Van Dell.
7      Q.    And you don't think
8  that he was your publisher?
9          MR. MALOFIY:  No, that
10          is not what he said.
11          THE WITNESS:  He was --
12          I think he was my publisher.
13          I always thought he was my
14          publisher.  Clearly in his
15          deposition he told me he was
16          not my publisher.
17  BY MR. ROGERS:
18      Q.    Earlier you testified
19  about defendant stealing your song?
20      A.    Yes.
21      Q.    How did defendant IN2N
22  Entertainment Group steal your song?
23      A.    They collected money on
24  my song on behalf of IN2N

Page 539

1  Entertainment.  They made money.
2  Tommy Van Dell knew about me.  We've
3  had ongoing communications.  He knew
4  who I was.  We've had conversations
5  about me being a part of his
6  publishing company, him being my
7  publisher, and he, without my
8  knowledge, collected publishing money
9  and kept it, which he said he didn't
10  make any money, but I don't know how
11  that happened.
12      Q.    When did you come to
13  the conclusion that IN2N stole your
14  song?
15      A.    I'm not really quiet
16  sure when I came to that conclusion.
17      Q.    When did you come to
18  the conclusion that Usher stole your
19  song?
20      A.    I'm going to say that I
21  came to the conclusion sometime around
22  2009.
23          MR. MALOFIY:  Again,
24          these are all the same

Page 540

1  questions that have been asked
2  and answered.  I mean it is
3  over and over and over and
4  over again.
5          MR. ROGERS:  You are
6  just drawing this out.
7          MR. MALOFIY:  Well,
8  we'll shut it down.
9          MR. ROGERS:  You are
10  just drawing it out.
11          MR. DAVIS:  Francis,
12  please, let him finish.
13          MR. MALOFIY:  Because
14  the judge is going to laugh at
15  this.
16          MR. DAVIS:  Francis,
17  please, let him finish so I
18  can finish.
19          MR. MALOFIY:  I'm
20  trying.
21          MR. DAVIS:  But if you
22  would stop talk.
23          MR. MALOFIY:  Just ask
24  questions that haven't been

Page 541

1  asked before.  It is that
2  simple.  We has been here --
3          MR. DAVIS:  He can use
4  his time the way he chooses.
5  Okay.  Please, can we just
6  finish.
7          MR. MALOFIY:  You lost
8  Guice, you are going to lose
9  this guy, too.
10          MR. ROGERS:  When you
11  say -- well, forget it.
12  BY MR. ROGERS:
13      Q.    Mr. Marino, you claim
14  that you originally wrote the song
15  Club Girl; is that correct?
16      A.    Yes.
17      Q.    When you wrote the song
18  what was it originally called?
19      A.    Club Girl.
20      Q.    Was it you that came up
21  with the lyrics for the song?
22      A.    I came up with the
23  concept and some of the lyrical
24  content.

Page 542

```
1      Q.    How was it called Club
2  Girl?
3      A.    I decided to call it
4  Club Girl because that is what I
5  decide to call the song.
6      Q.    Why did you decide to
7  use the words Club Girl or the name
8  Club Girl?
9      A.    I was at home when I
10 was writing the song.  There was a
11 video or something, and I thought to
12 myself I want to get me one of them,
13 that is how I came up with the -- and
14 saw that on the screen, and it is Club
15 Girl.  They were in a club dancing.
16 That is how I came up with the song
17 Club Girl.
18     Q.    Is it fair to say that
19 the song was then named before the
20 lyrics were developed?
21     A.    That was in the process
22 of being developed.  I mean, you know,
23 writing a song sometimes they are in
24 stages.  It could take -- I mean, I
```

Page 543

```
1  can write a song sometimes, seriously,
2  in ten minutes.  I've had it done.
3  Sometimes it will take me a month to
4  get a song done, sometimes it is never
5  done.
6      Q.    But did you name the
7  song before the lyrics were added?
8          MR. MALOFIY:
9          Objection.
10         THE WITNESS:  I
11     added --
12         MR. MALOFIY:  You can
13     answer.
14         THE WITNESS:  What I'm
15     trying to say is I came up
16     with some of the lyrics as I
17     was playing my guitar.  That
18     is where I said Club Girl, and
19     Club Girl stuck, until Usher
20     decided to change it and call
21     it Bad Girl.
22 BY MR. ROGERS:
23     Q.    Did you add any other
24 lyrics other than the words club and
```

Page 544

```
1  girl to the song?
2      A.    I added many of the
3  lyrics.  I worked with Wil on it.
4      Q.    What, if anything, did
5  you do to prepare for today's
6  deposition?
7      A.    What did I do?  I did
8  -- I sat down and I looked at the Pro
9  Tools files that you guys provided us
10 with or I don't know who, and I talked
11 to Francis and he told me to come here
12 and just be honest.
13     Q.    Did you do anything
14 else?
15     A.    That was it.
16     Q.    Did you look at any
17 other files?
18     A.    No.
19     Q.    How did you come to
20 retain Mr. Malofiy to represent you in
21 that matter?
22     A.    Interesting story.
23         MR. MALOFIY:
24         Objections.  You don't have to
```

Page 545

```
1      get into any communications
2      with us.
3          THE WITNESS:  Well, it
4      is not communications.  How we
5      met you said?
6  BY MR. ROGERS:
7      Q.    That is what I'm
8  asking.
9      A.    There is a place that I
10 get my equipment fixed at.  Actually,
11 Dante introduced me to this place
12 called Pro -- that is where I work.
13 I'm sorry.  Pro Digital is the name of
14 the place, and it's where a guy that
15 fix music equipment.  He fixes TVs,
16 fixes keyboards, all kinds of stuff.
17 And this gentleman where I would go to
18 with Dante and sometimes on my own
19 found out that the situation occurred,
20 and Francis also gets his equipment
21 fixed there as well, and he decided to
22 introduce us, and that is how I got to
23 meet Francis Malofiy.
24         MR. ROGERS:  All right.
```

1    I'm going to turn the
2    deposition back over to Mr.
3    Davis to wrap up.  Thank you.
4         - - -
5         EXAMINATION
6         - - -
7    BY MR. DAVIS:
8         Q.    Mr. Marino, I'm going
9    to show you what has been marked
10   Marino Exhibit 15.  I'm going to hand
11   your counsel a copy as well.
12        MR. MALOFIY:  Thank
13   you.
14        THE WITNESS:  Marino
15   Exhibit 15.
16        - - -
17        (At this time a
18   document was marked for
19   identification as Exhibit No.
20   Marino-15.)
21        - - -
22   BY MR. DAVIS:
23        Q.    This document has been
24   produced in the course of discovery in

1    this case.  Have you ever had a chance
2    to look at this agreement?
3         A.    I have to look at it
4    for a few minutes to recognize what it
5    is.  Did this come from us?
6         Q.    No.  This is a document
7    that we produced.
8         A.    Oh, I'm sorry, you said
9    that.  I'm tired, man.
10        Q.    Okay, that is okay.
11        A.    Okay.  Do I recognize
12   this?
13        Q.    Maybe I can help you a
14   little bit.  It is an agreement
15   between Fast Pace, Inc., and
16   Underworld Entertainment, your
17   company.
18        A.    Okay.
19        Q.    And it's dated as of
20   February 1st, 2004.  Do you see that
21   at the top of the first page?
22        A.    Yes.
23        Q.    Now, Underworld
24   Entertainment was the company that you

1    were a co-owner of?
2         A.    That's correct.
3         Q.    And that you were CEO
4    of?
5         A.    Like I said, we talked
6    about it.  Yes, I'm an owner of
7    Underworld Entertainment.
8         MR. MALOFIY:
9    Objection.  I know he is
10   tired.  Objection.
11   BY MR. DAVIS:
12        Q.    As reflected in your
13   resume you show yourself as the Chief
14   Executive Officer of Underworld
15   Entertainment?
16        MR. MALOFIY:
17   Objection.
18   BY MR. DAVIS:
19        Q.    And I think you may
20   have testified you are co-CEO with
21   Dante Barton?
22        A.    I don't recall saying
23   co-CEO.  I don't know what that means.
24        Q.    Well, let's just

1    quickly look for your resume again?
2         A.    Please do.  You said
3    co-CEO?
4         MR. MALOFIY:  This is
5    just so silly.
6    BY MR. DAVIS:
7         Q.    Well, I think you
8    testify to it, but in the resume you
9    say you are the CEO?
10        A.    Okay.
11        Q.    All right.  This is a
12   contract with your company?
13        MR. MALOFIY:
14   Objection.
15   BY MR. DAVIS:
16        Q.    Is it your position
17   that you are a beneficiary as a
18   co-owner of any contracts that are
19   entered into by Underworld
20   Entertainment?
21        MR. MALOFIY:
22   Objection.
23        THE WITNESS:  No, I
24   have not received anything.

1    I'm just saying -- you asked
2    me a question, right, your
3    question is?
4         MR. MALOFIY:  Wait
5    until I object.  Objection.
6    This is a legal question.
7    There is a lot of terms that
8    you used.  It's confusing.
9         THE WITNESS:  Yeah, I'm
10   not quite following you.
11        MR. MALOFIY:  This man
12   is tired and it's late in the
13   day.
14        MR. DAVIS:  Would you
15   read back the question?
16        MR. MALOFIY:  You are
17   using a lot of legal-- I
18   couldn't even answer that
19   questions.  I couldn't answer
20   it if I wanted to.
21            - - -
22        (At this time the court
23   reporter read back from the
24   record as was requested.)

1            - - -
2    BY MR. DAVIS:
3         Q.    I'll try to make it
4    simpler for you.
5         MR. MALOFIY:
6    Objection.
7    BY MR. DAVIS:
8         Q.    If Underworld enters
9    into a contract with a third party
10   while you are a owner of that company
11   with Dante Barton do you think you are
12   entitled to the benefits of whatever
13   that contract is?
14        MR. MALOFIY:
15   Objection.
16        THE WITNESS:  I really
17   don't know.
18   BY MR. DAVIS:
19        Q.    You don't know?
20        MR. MALOFIY:  I think
21   he is tired, it is obvious.
22        THE WITNESS:  I don't
23   know.
24        MR. MALOFIY:  Are you

1    tired?
2         THE WITNESS:  Right
3    now, I'm exhausted.
4    BY MR. DAVIS:
5         Q.    Is that a contract --
6         A.    Mr. Davis, you just
7    handed me this contract, and I believe
8    this is the first time I'm looking at
9    it.  And I hear what you are saying,
10   but I would need some time to look at
11   it, read it and I don't know because
12   I'm not a lawyer.
13        Q.    I'll ask you a more
14   general question.  If Underworld
15   Entertainment enters into a contract
16   during the period that you are a
17   co-owner of that company, and I think
18   you testified that was up to about
19   2009 when Mr. Barton disappeared,
20   according to your complaint, do you
21   think you are entitled to the
22   benefits, you know what benefits are,
23   of contracts entered into by the
24   company you co-owned with Mr. Barton?

1         MR. MALOFIY:
2    Objection.
3         THE WITNESS:  I really
4    don't --
5         MR. MALOFIY:  Hold on.
6    Wait.  Objection.  The witness
7    is tired.  You are asking
8    legal questions and I'm going
9    to ask him to answer it as
10   best you can.
11        MR. DAVIS:  That's
12   fine.
13        MR. MALOFIY:  All
14   right.
15        THE WITNESS:  I'm going
16   to be honest with you, Mr.
17   Davis, I don't know how to
18   answer the question, and I'm
19   going to be honest with you
20   why, because I feel like you
21   are being tricky with this
22   question and I don't trust
23   you, and I don't know how to
24   answer that.  So I don't know

Page 554

1        how to answer your question.
2   BY MR. DAVIS:
3        Q.     Well, I'll ask you
4   another question.  Do you think that
5   there are contracts that you get to
6   participate in that Underworld enters
7   into and others that you don't, even
8   though you are a co-owner?
9        A.     I really don't know how
10  to answer the question.
11       Q.     Okay.  Look at page,
12  the Bates stamp is SME ten.  Do you
13  see in the middle of the page it says,
14  agreed and accepted Underworld
15  Entertainment, by, and then it says
16  authorized signature?
17       MR. MALOFIY:
18       Authorized.
19  BY MR. DAVIS:
20       Q.     Signatory?
21       A.     I don't see it.  Can
22  you point it out?
23       Q.     Sure.  Right there.
24       A.     Okay.  I see it.

Page 555

1        Q.     And Underworld
2   Entertainment is your company, isn't
3   it?
4        MR. MALOFIY:
5        Objection.
6   BY MR. DAVIS:
7        Q.     With Dante Barton, at
8   least up until 2009?
9        MR. MALOFIY:
10       Objection.  You can answer.
11       THE WITNESS:  It was.
12  BY MR. DAVIS:
13       Q.     And you were an equal
14  shareholder with Mr. Barton, and we
15  looked at another document that showed
16  that Underworld Entertainment is a
17  corporation?
18       MR. MALOFIY:
19       Objection.  To be clear, just
20       because a document states it
21       is a corporation doesn't mean
22       it is a corporation.  It
23       speaks for itself.  He also
24       said he doesn't know the

Page 556

1        business intricacies of what
2   you are talking about.  Now
3   you are trying to play fast
4   and loose and try to trick the
5   man.
6        MR. DAVIS:  I'm not
7   trying to trick anybody.
8        MR. MALOFIY:  Ask you
9   your questions.  All right.
10  He already said -- you are
11  trying to establish something
12  as fact because it says it on
13  an agreement.  You can't do
14  that.
15  BY MR. DAVIS:
16       Q.     Mr. Marino, you were a
17  50 percent co-owner with Mr. Barton in
18  Underworld Entertainment; is that
19  correct?
20       A.     Listen --
21       Q.     Is that correct?
22       A.     I worked with Dante
23  Barton, and we started a company
24  called Underworld Entertainment.  And

Page 557

1   if he is signing something without my
2   knowledge and he was being deceitful,
3   I don't know.  I really don't even
4   understand the question, but all I can
5   say is that had I known the song was
6   going to get stolen from me -- okay,
7   if I knew that he is signing something
8   on behalf of my company that was being
9   stolen from me by your defendants, I
10  would never have authorized this.
11       Q.     If you benefited from
12  that --
13       A.     That is my answer.
14       Q.     If you benefited from
15  that contract in the same way that Mr.
16  Barton did, wouldn't you agree that if
17  he signed on behalf of Underworld
18  Entertainment you would get the
19  benefits of that contract?
20       MR. MALOFIY: *
21       Objection.  You don't have to
22       answer that.
23       THE WITNESS:  I don't
24       understand.

MAGNA
LEGAL SERVICES

1           MR. MALOFIY:  Hold on.
2       Objection.  Calls for
3       speculation.  Calls for a
4       legal opinion, and you are
5       asking him if the dog didn't
6       stop to take a -- you know,
7       that whole route.
8           MR. DAVIS:  Is that
9       your objection?
10          MR. MALOFIY:  That is
11      my objection, yeah.
12  BY MR. DAVIS:
13      Q.    Is it your contention
14  that contracts entered on behalf of
15  Underworld Entertainment during the
16  period of time in which you were a
17  co-owner weren't contracts --
18      A.    One more time.  Can you
19  keep it shorter?  My attention span is
20  shot.  I'm really tired.
21      Q.    If Underworld
22  Entertainment, a company that you
23  co-owned with Mr. Barton, enters into
24  a contract --

1           MR. MALOFIY:
2       Fraudulent contract.
3   BY MR. DAVIS:
4       Q.    -- do you believe that
5   you are entitled to the same benefits
6   as your partner, Mr. Barton, with
7   respect to that contract?
8       A.    I don't -- I can't
9   answer this question.  I don't know.
10  I just don't know.  I don't know the
11  legalities of contracts and you are
12  asking me -- I'm not an attorney.
13      Q.    You do know you were a
14  co-owner of Underworld Entertainment?
15      A.    I know that I would
16  have never authorized my song that I
17  wrote and produced on my own to be
18  used anywhere with anyone unless I was
19  properly credited, bottom line.  That
20  is my answer.
21      Q.    Between --
22      A.    You are being tricky.
23  Man, like I don't -- you keep going to
24  the same things, because you want an

1   answer from me.
2       Q.    I'm not doing that, and
3   you know that, Mr. Marino.
4       A.    No, I do know.
5       Q.    Your lawyer coached you
6   to say that throughout the course of
7   these depositions.
8       A.    No.  No. I completely
9   --
10          MR. MALOFIY:  Now I
11      object to that.  No.  No.  You
12      can't say your lawyer coached.
13  BY MR. DAVIS:
14      Q.    Mr. Marino --
15      A.    Is my seven hours up?
16          MR. MALOFIY:  It has
17      been up.
18          THE WITNESS:  I'm done.
19      I'm tired.
20  BY MR. DAVIS:
21      Q.    I am going to finish my
22  questioning.  In 2004 did you bring an
23  action against any of these
24  defendants?

1           MR. MALOFIY:  I'm going
2       to stop here.  Just for the
3       record, he said I coached him.
4       He said a lot of things that
5       are improper.  That is a bunch
6       of BS.  If you have some facts
7       of that, you bring them to the
8       table, but don't give me
9       claptrap.
10          MR. DAVIS:  You like
11      that word.
12  BY MR. DAVIS:
13      Q.    In 2004 did bring an
14  action against any of the defendants,
15  a lawsuit?
16      A.    In 2004?
17      Q.    Yes.
18      A.    No.
19      Q.    And you knew that the
20  album Confessions, which included Club
21  Girl, Bad Girl was being sold; is that
22  correct?
23          MR. MALOFIY:
24      Objection.

MAGNA
LEGAL SERVICES

Page 562

1           THE WITNESS:  I knew
2     about it, of course I did.
3  BY MR. DAVIS:
4        Q.    In 2005 you didn't
5  bring a lawsuit against those
6  defendants?
7        A.    No.
8        Q.    In 2006 you didn't
9  bring a lawsuit against those
10  defendants, is that true or false?
11        A.    I'm thinking.  I'm
12  tired.  I'm like ready to fall asleep
13  right know.
14        Q.    I think you would know
15  if you brought a lawsuit in 2006?
16        A.    Yeah.  No, I did.
17        Q.    Okay.  And you knew
18  that the album was being sold in 2006;
19  is that correct?
20        A.    I would have brought a
21  lawsuit if I knew that my song was
22  stolen from me.  I would have, but I
23  didn't know.
24        Q.    You didn't bring --

Page 563

1        A.    I was being lied by
2  your people the whole time.
3        Q.    You didn't --
4        A.    Otherwise I would have,
5  and we wouldn't be at this table right
6  now.
7           MR. MALOFIY:  I think
8     you are asking the same thing.
9           THE WITNESS:  This is
10     the same thing.
11  BY MR. DAVIS:
12        Q.    You didn't bring a
13  lawsuit in 2006, did you?
14           MR. MALOFIY:  Do you
15     need --
16           THE WITNESS:  You know
17     when I brought the lawsuit.
18     You are asking me questions
19     you know the answers to.
20  BY MR. DAVIS:
21        Q.    So between 2006 and
22  2011 there was no lawsuit brought
23  until November of that year?
24           MR. MALOFIY:

Page 564

1     Objection.
2  BY MR. DAVIS:
3        Q.    Is that correct?
4           MR. MALOFIY:  He might
5     not know when the lawsuit was
6     actually filed and we are not
7     going to go down this road.
8           MR. DAVIS:  October --
9           MR. MALOFIY:  The
10     record speaks for itself.
11           MR. DAVIS:  You are
12     interrupting.
13           MR. MALOFIY:  No.  No.
14     Where are we at on time, sir?
15           VIDEOGRAPHER:  We have
16     approximately 15 minutes on
17     left on this DVD, but we are
18     seven hours and six minutes.
19           MR. DAVIS:  Okay.  I'm
20     going to wrap it up in two
21     minutes, okay, if you won't
22     interrupt me.
23           MR. MALOFIY:  I'm
24     trying to be fair here.

Page 565

1  BY MR. DAVIS:
2        Q.    In 2007 you didn't
3  bring an action against any of these
4  defendants, did you?
5        A.    No.
6        Q.    And you knew that the
7  Confessions album was being sold; is
8  that correct?
9           MR. MALOFIY:
10     Objection, asked and answered.
11           THE WITNESS:  What I
12     didn't know, was I was being
13     rooked.  What I didn't know
14     was that all the people that
15     you are working for that you
16     are getting paid from stole my
17     song.  You're working with
18     them who stole my song.  There
19     still hasn't been anyone here
20     today that can say I didn't
21     write the song, but you keep
22     asking me questions you know
23     the answers to --
24        Q.    I --

1       A.     -- or you want to ask
2    me the same questions.
3             MR. MALOFIY:  Let him
4       finish.
5    BY MR. DAVIS:
6       Q.     What I want to know is,
7    if you filed an action in --
8       A.     You know I didn't.
9       Q.     And you didn't do it in
10   2008, did you?
11            MR. MALOFIY:  Give him
12      the same answer, just so it
13      can be on the record.
14   BY MR. DAVIS:
15      Q.     You didn't do it in
16   2008?
17      A.     I just told you, know
18   that I hadn't filed one.
19      Q.     And in 2009?
20            MR. MALOFIY:  Answer.
21   BY MR. DAVIS:
22      Q.     Just answer, and we'll
23   get through it.
24            MR. MALOFIY:  No.

1       Answer your full answer so he
2       gets it.
3             MR. DAVIS:  You are
4       directing him to say now.
5    BY MR. DAVIS:
6       Q.     In 2009 --
7             MR. MALOFIY:  We are
8       going to take a break.  We are
9       done.
10            MR. DAVIS:  We are
11      going to finish it.  If you
12      give me one minute I can be
13      done.
14            THE WITNESS:  I want to
15      take a break at this point.
16      Seriously.
17   BY MR. DAVIS:
18      Q.     You want to break,
19   rather than let me finish?
20      A.     I want a break.
21            MR. MALOFIY:  How many
22      questions do you have.
23            MR. DAVIS:  I will be
24      done in a minute if you stop

1       interrupting me.
2             MR. MALOFIY:  The only
3       thing I'm going to say is give
4       him the patients you can.  I
5       know you are tired.
6             THE WITNESS:  I'm
7       sorry.  I'm getting like --
8             MR. MALOFIY:  I know
9       you are exhausted.
10            THE WITNESS:  I'm
11      exhausted.  I'm getting
12      cranky.
13            MR. MALOFIY:  Can you
14      listen to me, man, for a
15      second?  I know you are
16      exhausted.  Let's try to wrap
17      this up.  He has a couple more
18      questions he said.  I know it
19      is the same question he asked
20      a hundred times.
21            MR. DAVIS:  This is --
22      come on, Francis, enough of
23      this.
24            MR. MALOFIY:  It is the

1       same question.
2             MR. DAVIS:  If you let
3       me finish, we will be done.
4             MR. MALOFIY:  I could
5       have done this deposition in
6       two hours.
7             MR. DAVIS:  What was
8       the last question I asked,
9       before we were interrupted
10      again?
11            - - -
12            (At this time the court
13      reporter read back from the
14      record as was requested.)
15            - - -
16   BY MR. DAVIS:
17      Q.     In 2009 you didn't
18   bring a lawsuit against any of the
19   defendants in this action?
20      A.     I didn't bring a
21   lawsuit in 2009, because I didn't know
22   the song was being stolen from me, had
23   I known I would have pursued suit.
24      Q.     You knew that the album

Page 570

1    Confessions was being sold in 2009?
2         A.    I knew that the song
3    was being sold in 2009.  Had I known
4    that the song was being stolen from me
5    from your defendants I would have not
6    allowed any of this to happen.
7         Q.    And in 2010 you didn't
8    bring a lawsuit; is that correct?
9         A.    In 2010 if I had known
10   I would -- that I was getting rooked
11   and the song was being stolen from me
12   from your defendants, and that I was
13   not properly credited as a song
14   writer, producer, engineer I would
15   have filed a lawsuit.
16        Q.    In 2009 you knew that
17   Barton and Guice had received monies
18   on the exploitation of Club Girl, Bad
19   Girl when you cleaned out the studio,
20   didn't you?
21        MR. MALOFIY: He is
22        obviously tired.
23        THE WITNESS: Yes.
24   BY MR. DAVIS:

Page 571

1         Q.    All right.  And in
2    2000 --
3         A.    But I want to make it
4    clear, I am tired, and you started
5    from 2000 something and you keep going
6    up, and I'm giving you the same answer
7    because you are being redundant.  So
8    now is this a trick thing you are
9    trying to do with 2010?  I don't --
10        Q.    You know you can't get
11   away with that, Mr. Marino.
12        A.    Get away with what?
13   Get away with what?
14        Q.    In 2010 did you
15   commence a lawsuit against any of
16   those defendants?
17        A.    In 2010, I did not.
18        Q.    And in 2011 it was not
19   until October of that year that you
20   commenced an action against these
21   defendants?
22        A.    I think you know the
23   answer.
24        Q.    Is that correct?

Page 572

1         A.    I think you know the
2    answer.
3         Q.    Is that correct?
4         A.    Of course it is
5    correct.
6         Q.    And in all those years
7    from 2004 to 2011 you knew that
8    Confessions was being sold?
9         MR. MALOFIY:
10        Objection.
11   BY MR. DAVIS:
12        Q.    Is that correct?
13        MR. MALOFIY:
14        Objection.  Asked and
15        answered.  Answer it fully for
16        this gentleman who is
17        confused.
18   BY MR. DAVIS:
19        Q.    I'm asking if you knew
20   it was sold?
21        A.    If I knew that the song
22   was being stolen from me I would not
23   have allowed this to go that far.  I
24   had no idea that this was happening.

Page 573

1         Q.    Even after you
2    discovered the statements at your
3    studio when you found them when you
4    were cleaning them out?
5         MR. MALOFIY: He
6        already testified he was
7        depressed.
8         THE WITNESS: It says
9        that in my testimony earlier.
10        MR. MALOFIY: He
11        testified --
12        THE WITNESS: I'm not
13        answering the same question
14        again.
15        MR. MALOFIY: You are
16        asking the same question over
17        and over again.  You are not
18        getting --
19        MR. DAVIS: Nobody is
20        getting.  You are talking over
21        everybody.
22        MR. MALOFIY: Okay.
23        The man is tired.  He is
24        exhausted.  You are asking him

Page 574

1    the same silly questions over
2    and over about over again.  All
3    right.  He said he didn't file
4    because he was depressed,
5    state of depression.
6        MR. DAVIS:  Are you
7    testifying now?
8        MR. MALOFIY:  No, but
9    when you are sitting here
10   badgering this man after
11   eight, nine hours.  We have
12   been here since 11:00.  It is
13   9:00 now.  It is getting too
14   much.
15       MR. DAVIS:  Mr.
16   Malofiy, the deposition was
17   noticed for 9:30.  You didn't
18   bother to show up until after
19   11:00.
20       MR. MALOFIY:  There is
21   reason for that, because of
22   your failures.  Your failures.
23       MR. DAVIS:  Our
24   failures.  Our notice said to

Page 575

1    be here at 9:30.
2        MR. MALOFIY:  Yeah,
3    your failures.
4        MR. DAVIS:  Okay.  Let
5    me just look through my notes
6    and I think we might be done.
7        MR. MALOFIY:  I'll just
8    state it on the record unless
9    you want to ask him why we
10   were late and he'll explain it
11   to you.  You want me to state
12   it on the record why.
13       MR. DAVIS:  I'm only
14   responding to your question
15   about why we are here.
16       MR. MALOFIY:  You
17   provided me the Pro Tools
18   files a week late, and I got
19   them yesterday in my office.
20   They were in a format from
21   years ago and my client needed
22   to review those before his
23   deposition here today to be
24   prepared for the deposition so

Page 576

1    when and if you asked
2    questions about those Pro
3    Tools files he would be able
4    to be responsive to those
5    questions and so we wouldn't
6    have to continue his
7    deposition to another day.
8        MR. DAVIS:  Are you
9    waiving the attorney-client
10   privilege?
11       MR. MALOFIY:  No, that
12   is what I'm telling you.
13       MR. DAVIS:  I think you
14   are waiving the
15   attorney-client privilege.
16       MR. MALOFIY:  Is that
17   what you think?  I'm telling
18   you why we were late.
19       MR. ROGERS:  It would
20   have been courteous if you
21   were going to review those
22   files that you let us know so
23   we didn't sit around waiting
24   for you.

Page 577

1        MR. MALOFIY:  I called
2    you --- I e-mail you guys.
3        MR. ROGERS:  I never
4    got an e-mail.
5        MR. MALOFIY:  Well, I
6    don't know why, but I
7    definitely did, and it was
8    before 10 o'clock, which is
9    the time we said we would be
10   here.
11       MR. ROGERS:  None of us
12   got an e-mail.
13       MR. MALOFIY:  I don't
14   know why, and I'll have to
15   check that.  Okay.
16       MR. DAVIS:  Okay.  Mr.
17   Marino, I have no further
18   questions for you.
19       MR. ROGERS:  No further
20   questions.
21       VIDEOGRAPHER:  Okay.
22   The time is now 8:38 p.m.
23   This concludes DVD number four
24   and the deposition of Daniel

MAGNA ▶
LEGAL SERVICES

Page 578

```
 1        Marino.
 2          - - -
 3        (Whereupon, the
 4    deposition concluded at
 5    approximately 8:38 p.m.)
 6          - - -
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 580

```
 1        LAWYER'S NOTES
 2    PAGE  LINE
 3    ____ ____  _____
 4    ____ ____  _____
 5    ____ ____  _____
 6    ____ ____  _____
 7    ____ ____  _____
 8    ____ ____  _____
 9    ____ ____  _____
10    ____ ____  _____
11    ____ ____  _____
12    ____ ____  _____
13    ____ ____  _____
14    ____ ____  _____
15    ____ ____  _____
16    ____ ____  _____
17    ____ ____  _____
18    ____ ____  _____
19    ____ ____  _____
20    ____ ____  _____
21    ____ ____  _____
22    ____ ____  _____
23    ____ ____  _____
24    ____ ____  _____
```

Page 579

```
 1        C E R T I F I C A T I O N
 2
 3        I, Kathleen Ruccolo,
 4    Professional Reporter and Notary
 5    Public, do hereby certify that the
 6    foregoing is a true and accurate
 7    transcript of the stenographic
 8    notes taken by me in the
 9    aforementioned matter.
10
11          - - -
12
13
14
15
16
17
18
19
20
21
22
23    DATE:    _____
24          KATHLEEN RUCCOLO
```

Page 581

```
 1
 2        INSTRUCTIONS TO WITNESS
 3
 4        Please read your deposition
 5    over carefully and make any necessary
 6    corrections.  You should state the
 7    reason in the appropriate space on the
 8    errata sheet for any corrections that
 9    are made.
10        After doing so, please sign the
11    errata sheet and date it.
12        You are signing same subject to
13    the changes you have noted on the
14    errata sheet, which will be attached
15    to your deposition.
16        It is imperative that you
17    return the original errata sheet to
18    the deposing attorney within thirty
19    (30) days of receipt of the deposition
20    transcript by you.  If you fail to do
21    so, the deposition transcript may be
22    deemed to be accurate and may be used
23    in court.
24
```

Page 582

```
 1
 2              - - -
 3        E R R A T A  S H E E T
 4              - - -
 5     PAGE    LINE     CHANGE
 6     ____    ____    _____
 7     ____    ____    _____
 8     ____    ____    _____
 9     ____    ____    _____
10     ____    ____    _____
11     ____    ____    _____
12     ____    ____    _____
13     ____    ____    _____
14     ____    ____    _____
15     ____    ____    _____
16     ____    ____    _____
17     ____    ____    _____
18     ____    ____    _____
19     ____    ____    _____
20     ____    ____    _____
21     ____    ____    _____
22     ____    ____    _____
23     ____    ____    _____
24
```

Page 583

```
 1
 2         ACKNOWLEDGMENT OF DEPONENT
 3         I, _____ , do
 4     hereby certify that I have read the
 5     foregoing pages, and that the same is
 6     a correct transcription of the answers
 7     given by me to the questions therein
 8     propounded, except for the corrections
 9     or changes in form or substance, if
10     any, noted in the attached errata
11     sheet.
12
13
14     _____  _____
15     DATE       SIGNATURE
16
17
18     Subscribed and sworn to before me.
19     My commission expires: _____
20
21
22
23         _____
24         Notary Public
```

**A**

**abide** 206:20,21
**ability** 11:20 21:4
  142:4 300:15
  301:23 354:13
**able** 275:15 336:19
  524:24 525:1,5
  534:6 535:16
  576:3
**absolutely** 22:1
  26:3 55:2 73:1
  81:10 83:4 84:2
  117:20 133:22
  174:1 190:12
  191:5 198:6 204:5
  236:20 253:18
  260:22 269:7
  289:13 340:15
  370:3 378:22
  401:8,13
**abundantly** 402:1
**accept** 32:1 160:19
  319:10
**acceptable** 156:20
**accepted** 503:16
  505:14 554:14
**access** 20:6 21:10
  21:21 38:21,22
**accident** 235:23
  236:1 473:3
**accomplishment**
  186:24 198:4
  203:16
**account** 57:3 67:10
  68:3 79:24 80:3,5
  80:8,10,18 81:9
  81:12 511:15
**accounts** 67:24
  71:9,12
**accurate** 159:4
  162:10,14 204:4
  205:14,19 206:3
  250:23 255:14
  271:6 275:9
  299:16,21,22

300:5 359:1
  487:23 495:23
  579:6 581:22
**accurately** 525:6
**achieve** 300:12
**achieved** 203:20
**acknowledge**
  303:23
**ACKNOWLED...**
  583:2
**acoustic** 504:1
**Acquaintance**
  242:20
**act** 462:8
**acting** 321:12
**action** 22:19 93:15
  416:6 560:23
  561:14 565:3
  566:7 569:19
  571:20
**actions** 240:23
  241:2
**active** 35:9 60:8
**actual** 44:23 222:15
  439:5
**add** 210:11 219:11
  283:19 336:24
  454:8 543:23
**added** 103:5 137:4
  142:14 159:8
  213:23 214:5,15
  215:1,2,7,14
  217:8 218:7
  219:14 220:5
  304:7 341:7,19
  362:10,14 543:7
  543:11 544:2
**additional** 118:9,13
  118:20 119:9
  120:18 217:13,24
  218:6,13 236:13
  236:16 341:18
  489:17 492:14
  536:6
**additionally** 227:9
  299:2

**additions** 218:21
**address** 10:8 20:10
  20:14,16 33:8
  34:3,7 37:14,24
  38:8 72:17 86:6,8
  252:9,14 321:20
  322:1 455:10
  509:1
**addressed** 252:13
  291:11 384:8
  420:3 455:4
**addresses** 20:12
**adjourn** 536:13
**adjust** 201:18
**admired** 83:19
**admitted** 303:24
  499:13
**ads** 32:19
**adult** 293:21
**advance** 230:10
  394:19
**advances** 281:11
**advantage** 292:24
**advertise** 193:16
**advertised** 195:3
  515:13
**advertisement**
  192:24 193:9
**advertisements**
  192:14
**advertising** 192:19
**advice** 412:8,11
**advise** 293:13
  368:16 389:22
**affair** 380:13
**affairs** 49:22 51:19
  56:7 57:16 58:21
  59:13,16 60:2
  154:8 368:3
  380:12 442:18
  458:1 475:21
**affect** 11:20
**affidavit** 4:16,19
  90:3,4 266:2,13
  266:14,22 305:3
  306:2 370:7 371:8

375:2 516:19
**afield** 94:21 96:12
**aforementioned**
  579:9
**afraid** 189:7 282:18
**afternoon** 459:16
**age** 125:12
**agency** 293:12
**ago** 14:5 19:17,17
  38:6 88:11 277:5
  285:3 292:2 306:8
  365:16 372:18
  376:14 377:5
  394:24 402:14
  466:4 467:1 523:4
  575:21
**agree** 104:10,19
  117:6,8 162:18
  163:22,23 203:22
  208:3 429:14
  458:10 557:16
**agreed** 12:12 147:1
  222:1 226:23
  554:14
**agreement** 4:23 7:1
  105:20 121:2,13
  121:21,24 122:19
  122:24 123:12,17
  147:2,4 158:20
  163:1,5 415:5
  425:24 427:21
  428:17 429:12
  432:12 464:18
  465:8 470:2,8
  473:9 474:6,12
  499:5 501:8,14,16
  501:17,18,21
  505:21 517:7,13
  517:16 547:2,14
  556:13
**agreements** 122:6
  122:11,15 123:18
  123:21,23 124:1,4
  124:15,18,19
  452:5 473:6
  474:14 509:18,24

510:6 517:19,22
  517:24 518:10
**ahead** 48:10 108:17
  169:24 252:24
  388:15 389:9
  395:18 497:5
  499:10 511:12
  521:6
**air** 524:21
**airplane** 174:5
  405:23 505:10
**al** 1:5 7:16
**Alberto's** 40:9
**album** 184:3,13
  185:19 186:4
  187:5,11,18 188:3
  191:18 192:14,20
  194:22,23 195:12
  196:1,9,22 199:14
  200:20 202:19
  220:13 224:18
  230:7 232:2,14
  233:9,20 234:5
  242:1 243:23
  244:23 245:3,19
  249:7 250:1
  257:11 281:9
  301:10,19,24
  309:21 311:10
  330:14 331:5,20
  332:24 360:10
  366:15 367:17
  368:19 374:4
  379:16 381:9,21
  394:1 438:14
  440:19 464:2
  499:1,3 519:24
  526:3 561:20
  562:18 565:7
  569:24
**albums** 193:16
**alcohol** 11:20
**alert** 223:22
**alerted** 224:3
**ALEXANDER** 2:2
**allegation** 83:6



157:17 159:6
162:10 227:14
269:6
**allegations** 24:9
25:16
**allege** 75:18 115:8
268:20 281:5
499:22 500:9
**alleged** 157:2
158:17 159:4
160:14 162:14
279:4
**alleges** 293:2
485:12
**allocated** 523:8
530:2
**allow** 29:23 30:3
146:10 209:19
317:23 426:6
527:10
**allowed** 12:21 71:2
259:4,8 360:21
570:6 572:23
**amend** 113:16,21
**amended** 4:12 13:9
22:18 23:14,17
26:5,24 27:5,8,11
28:10,14 31:18
161:23
**amount** 95:18
283:20 466:8
**amps** 290:23
**Angeles** 306:7,14
372:18 373:4
376:14 435:21
511:3
**annoying** 14:12
**answer** 6:5 11:21
12:24 27:17 29:17
29:20 30:7 50:4
59:21 63:12,18,23
65:19 66:9 71:4
75:8 76:14 82:7
82:18 91:4 92:11
93:23 99:4 101:12
104:14 106:2

114:22 116:17
118:3,16 120:4
121:18 135:1,13
137:17 138:9
140:5 141:19
142:3 149:6,7,10
149:16,17,18
150:6,12 151:1,6
151:10,15,18,21
152:7 153:2,13
154:5,11,22,24
155:2,14,18
157:21 158:2,4,4
158:10 159:11,15
160:3,8,17,17
161:19 162:2
163:13 167:8
169:10 170:1
174:14 175:1
176:20 179:6
182:21 183:22
188:12 189:21
190:1,9 192:22
194:2 198:23
201:10 209:20
210:16 211:6,7,18
212:8,20 213:9
214:7,18 223:8
234:8 249:10
250:4 258:24
259:2 260:3,11,21
262:13 271:12
273:7 287:24
288:11 300:19
301:12 303:4,13
304:3,4 313:11,13
313:19 319:6,16
320:19 321:21
324:20 325:14,24
326:2 332:5 334:5
339:14 340:2,24
341:16 342:19
347:23 349:20
350:11,20 351:11
353:4 355:12,20
356:1 357:5,9,18

358:2,10,11,13
359:6,7 360:2
361:18 366:17
374:6,22 376:7
379:18 380:2,14
380:15,19 381:10
381:23 383:8
384:11 396:7
397:20 398:23
401:21 403:2
407:13 408:12,17
409:7,15 410:20
413:5 415:13
421:17 423:1,4
424:7,14 425:3
429:4,6,10 430:8
431:7 432:6,17,20
433:1 434:12
440:3 441:5,24
443:14,16,17
444:15 451:13
456:22 462:11
466:11 471:5,13
471:16 472:8
478:10 481:18
485:9,22 488:3,10
493:13 498:6
509:14,22 510:9
511:21 518:13
520:14 525:2,5,10
525:13 526:11
527:11 530:15
534:6,9 536:12
537:9 543:13
550:18,19 553:9
553:18,24 554:1
554:10 555:10
557:13,22 559:9
559:20 560:1
566:12,20,22
567:1,1 571:6,23
572:2,15
**answered** 11:9 66:1
92:10 149:14
150:4,15 154:20
157:19 158:23

159:1 160:5 162:5
168:22 170:16
185:21 212:13,14
214:20 302:17
304:17 311:23
356:11 360:11
361:17 380:22
404:20 507:16
520:15 521:6
524:4,6 528:15
529:15 530:13
537:12 540:2
565:10 572:15
**answering** 148:15
211:23 248:16
404:22 527:4,13
535:6 573:13
**answers** 142:17
151:23 161:8
194:8 202:3 403:1
536:4 563:19
565:23 583:6
**Anthony** 242:16,18
263:3
**anybody** 175:19
224:8 449:17
520:1 526:6 556:7
**anymore** 324:9
**anyway** 183:19
**apart** 313:17
**apartment** 86:1,3
87:8
**apologies** 518:8
**apologize** 71:24
226:13 227:17
457:23 520:7
**apologized** 306:24
**apparent** 295:17,19
296:1,6
**apparently** 158:7
181:10 383:15
526:20
**appear** 209:11,17
355:8 438:16
455:2 458:21
**appearances** 2:1

3:1 8:11 133:19
**appeared** 179:1
184:3 188:2
217:16 218:1
230:6 367:16
464:1
**appears** 23:7
209:11 216:19
280:22 417:18
466:8 488:16
489:12 490:18
**application** 108:7,8
253:7
**applied** 457:20
**apply** 60:23 93:15
513:20
**appreciate** 243:8
246:21 282:6
**apprehensive**
177:21
**approach** 227:11
**approaching**
164:18
**appropriate** 11:11
373:14 581:7
**approved** 28:15
163:11 340:21
341:3
**approximate**
305:23
**approximately**
15:20 16:1,13
125:3 237:19
263:14 564:16
578:5
**April** 2:10,19 8:16
315:21 316:11
319:1 320:14
372:20 453:20
**archive** 109:4
**area** 278:13 314:22
314:24 394:5
**arises** 13:4
**arising** 429:19
**Arista** 365:18
366:11,24



**arose** 113:11
**around-the-clock**
  344:14,19
**arrange** 68:24
  242:4,6
**arranged** 176:17
**arrangements**
  99:11
**arranging** 89:2
**arrested** 313:1
**arrival** 16:20
**arrived** 88:13
**arrow** 491:19,20,24
  492:1,2,4,9
**article** 4:18 244:6
  245:5,6 246:10
  247:3,24 248:4
  249:15 250:8
  263:9
**artist** 109:18
  122:22,23 123:2
  123:10 144:5
  175:24 186:19
  465:7 470:1,13,16
  470:18 472:19,20
  472:23 473:6
  474:12 498:20
  504:15 519:5,12
**artists** 44:17,18
  45:3 47:1 54:11
  66:13 200:10
  331:18 474:14,15
  503:15
**aside** 109:16 208:1
  208:2 307:9
  480:21
**asked** 38:10 47:16
  66:1 92:9 114:24
  117:2 135:2,9
  151:3,11 152:6,11
  152:24 154:20
  159:9 160:4 170:6
  170:15 211:8
  212:12,15 214:22
  242:7 252:16
  258:11 307:8

309:16 316:9
327:18 361:17
367:12 389:8,20
390:14 403:24,24
404:6,19 422:8
459:21 470:2
475:15 487:13
507:15 520:15
521:5 523:12
524:6 527:11
528:14 529:14,18
529:24 535:14
536:9 537:11
540:1 541:1 550:1
565:10 568:19
569:8 572:14
576:1
**asking** 25:7 74:24
  99:3 105:23
  106:21 111:8
  123:11 124:17
  130:10 157:24
  158:22 160:12
  162:22 169:17
  170:10 174:18
  182:2 187:22
  205:20 210:8,14
  250:9 251:8 261:7
  262:8 284:17
  306:21 307:21
  314:15 316:20
  318:6 319:5 320:9
  320:11 321:6,18
  328:17 338:10
  341:21 363:12
  393:19 394:12
  404:21 409:18
  413:15 420:7
  431:24 432:22
  452:21 497:12
  503:4 523:24
  528:5,7 529:6,8
  533:5 534:11
  545:8 553:7 558:5
  559:12 563:8,18
  565:22 572:19

573:16,24
**asks** 487:22
**asleep** 562:12
**aspect** 49:14 82:24
  83:2 100:3,4
**aspects** 131:9
**assert** 419:11,14
**asserted** 19:3 421:2
**asserting** 419:8,10
**assist** 24:13 325:19
**assistance** 276:16
**assistant** 278:24
**Assisted** 454:18
**associate** 61:7
**ASSOCIATES** 3:2
**association** 438:15
  447:18
**assume** 60:17 89:7
  129:7,13 161:15
  290:6 363:17
  484:9,10
**assumed** 129:11
**assumption** 270:9
**assurance** 495:17
**assure** 26:17
**assured** 222:17
  319:20 404:13
**assuring** 28:3
**ate** 237:24
**attach** 387:21
**attached** 26:12
  386:11 387:18
  388:5 451:6
  581:14 583:10
**attained** 203:22
**attempt** 293:11
  320:12 352:20
  360:8 374:2
  381:17
**attempting** 18:24
**attendance** 306:13
**attended** 10:13
  308:19 310:16
  440:11 442:9
**attention** 241:24
  471:23 558:19

**attorney** 13:2 14:6
  64:15 114:17
  125:11,21 164:8
  411:17 422:4,10
  429:16 431:16
  432:2 452:4 454:1
  473:14 479:23
  484:18,18,19
  559:12 581:18
**attorneys** 483:24
  484:7,20,21,23
  485:7
**attorney-client**
  27:14 418:17
  419:20,24 428:3
  432:23 433:8
  576:9,15
**attorney/client**
  431:2
**attribution** 459:7
**attuned** 223:11
**August** 306:3 308:7
  312:13 315:18
  316:10 317:6
  319:1 320:13
**author** 526:17
**authored** 417:19
**authorities** 294:10
**authority** 147:14
  166:22 168:7,18
  170:12 171:16,20
  172:15,16
**authorization**
  147:8 171:23
  261:5
**authorize** 424:11
**authorized** 28:18
  147:6 155:10,12
  171:24 261:3
  360:22 379:19
  554:16,18 557:10
  559:16
**automatically**
  126:17
**available** 187:6
  191:21 193:16

195:13 196:1,9,13
202:20 248:22
302:14 498:11
508:22
**Avenue** 2:8 3:3
  33:11
**Avila** 2:12,13,21,22
  8:21,22 171:4
  225:3 237:7 239:7
  241:12,15 265:15
  371:10,15 372:12
  373:2,8,21 374:2
  384:5 408:24
  409:1 435:5
  446:20 526:23
**Avilas** 375:19
  381:5
**awarded** 99:14
**awards** 435:18
**aware** 14:23 15:1
  23:11 89:12 95:13
  112:11,18,24
  114:10 125:17
  195:5 367:20
  517:2,18,23 518:9
**awesome** 203:11
**a.m** 1:14 7:23 15:7
  15:9,13,16

**B**

**B** 4:8 5:2
**back** 16:11 22:21
  30:11 41:23 64:6
  72:2,5 74:9 82:3
  89:14 108:16
  110:16,19 124:11
  126:6 127:13
  149:20,24 168:3
  174:5 189:11,17
  194:10,14 202:9
  214:7,10 226:6
  239:20 240:2,5
  241:5,9 258:22
  268:11 272:7
  292:7 324:7,17
  336:8 338:8 352:7



357:17,22 358:11
359:8 374:14
387:16,19,21
398:8,11 401:20
405:24 406:20
408:4 422:3
428:12,13 432:13
433:10,19 448:7
448:24 449:3
454:21 466:2
475:20 501:24
502:7 520:6,10,23
522:6 523:17
525:13,16 534:1
536:2 546:2
550:15,23 569:13
**background** 441:16
**bad** 98:18 149:17
153:3 159:12
160:8 180:24
181:16 182:4
183:15 184:2
186:2 188:2
194:22 195:1
197:6,12,21
200:19 204:22
205:18 207:17
208:6,19 209:4,11
209:14 210:19
211:13 213:12,18
213:24 214:1,5,15
215:3,8,13,23
216:20 217:3,8,17
217:23 218:6,12
219:22 220:17
221:1,5 227:9
230:6 233:10
234:5 238:12
249:7 250:1 258:6
269:3 270:19,22
271:8 283:18
292:3,20,21
293:24 299:17
300:7 301:24
302:13 304:24
310:2 312:22

315:8 338:7
340:12 342:5,7
343:8,18 350:22
355:7,10,22
356:17 360:9
362:24 364:13
366:13 367:15
368:18 374:4
377:8 379:5,14
380:9 381:20
384:9 393:17
394:10,20 397:13
406:5 411:20
412:17 413:21
429:24 433:24
434:10 440:20
443:4 459:7
463:11 464:1
477:4,23,24 478:8
480:4,10 481:16
482:4,9 483:8
490:10 492:6
495:13 496:1
507:12 520:3
526:8 528:11
529:11 531:19,23
532:3,16,19 533:4
533:11 543:21
561:21 570:18
**badgering** 574:10
**balance** 461:7
**balcony** 314:24
**bank** 57:2,3 67:9
67:17 68:6 71:8
79:23 81:9,11
461:22 481:3
**banking** 67:12
71:11
**banks** 67:16
**barely** 276:7
521:19
**barred** 112:15
**Barrow** 365:9
**Barton** 52:9,16
57:12,20 59:16
60:2 61:9 62:11

74:12,17,23 75:19
77:5 79:21 81:17
82:14 83:7 84:8
98:21 99:1,12
100:10 102:10,13
102:15 103:11
104:10,18 107:19
116:23 121:2,13
121:22 122:7,13
122:24 123:13
124:2 130:7,19
137:1 144:3 147:3
147:9 148:4 149:2
149:12 153:10
154:2,7,14,17
155:9,20 162:17
166:22 168:17
170:11,21,24
172:5,9,19 173:6
174:10,18 176:17
177:3 178:12
179:3 180:7,10
199:21 216:15
217:6,19 218:2,8
218:15 221:11,13
223:1,23 224:10
224:21 226:16
227:2,3,5,13,24
230:3 232:4 234:2
235:18 236:21
237:14,15 238:21
244:9 247:2 248:9
257:2,16 258:4
259:21,23 261:8
262:2,11 263:12
264:1,7 268:21
270:17,20 271:9
281:5 283:16
291:12 293:4
295:3,7 296:11,17
297:15 298:13
304:1 310:18
312:15 314:17
315:6 323:19
324:12 325:3
328:6,12 329:20

329:23 334:17,19
361:6 362:9
364:14 365:2,3
368:6 380:10
394:13,18 395:14
395:21 396:4,17
398:20 399:24
404:2 408:9
409:20 410:8,14
410:17 412:16
414:10,16,19
415:9 435:17
438:23 444:13
447:3,16 451:2
452:2 455:6 457:9
460:20 463:9
476:17,20 478:6
480:16 485:19,23
487:18,23 488:6
491:11 494:1
496:6 497:3,7,23
499:24 500:11
509:17 510:14
517:8,20 521:9
526:5 528:9
529:10 548:21
551:11 552:19,24
555:7,14 556:17
556:23 557:16
558:23 559:6
570:17
**Barton's** 84:23
86:13 87:4,20
227:10 291:9,15
292:11 327:11
**base** 290:18
**based** 136:23
339:10 340:17
421:3 503:12
505:1
**Basement** 2:14,23
8:23 409:2
**basically** 156:19
195:9 298:23
315:5 375:6
**Bates** 74:5 283:23

386:15 554:12
**bathroom** 110:4
**baton** 420:19,24
**bear** 278:6 446:5
**bears** 78:14 450:19
**Beasley** 2:3 391:2
**beat** 103:11 219:14
219:15
**becoming** 401:5,14
**bedroom** 289:1
**beg** 370:12
**began** 15:20 115:2
**beginning** 15:16
93:12 113:24
250:18 500:22
513:20,23
**begins** 7:13 166:18
322:15 469:19
**behalf** 9:5 25:15
82:14 134:2
166:23 168:18
170:12 171:20
172:1 302:8 462:9
538:24 557:8,17
558:14
**belief** 31:20
**beliefs** 26:1
**believe** 16:16 21:9
23:2,5 29:11 38:5
42:24 49:8 54:22
55:23 67:11 68:11
68:12 71:1,4,17
71:17,18,20 75:9
76:3,6 94:17 95:7
98:2 100:8 101:21
115:19 126:1,13
126:16 128:23
132:19,21 179:2
181:7,17 195:18
196:20 221:3,7
229:21 231:9
242:16 249:13
251:7 252:8
271:18 279:14,16
281:3 285:6 286:7
286:11 288:1



297:17 303:6,9,20
304:22 307:17,18
308:10 330:5,9,16
335:19,21 338:17
345:24 360:11
371:22 382:21
384:12,13 385:2
385:10,17 386:20
387:3,10,24
388:17,20,21,24
389:3,6 390:6,11
392:7 396:8,9
409:24 414:18
415:14 419:19
425:4 439:3 445:9
446:21 447:2
453:17 455:11
474:16 479:13
481:4 484:12
500:17 512:13
514:13 515:5
523:7 537:20
552:7 559:4
**believed** 444:12
480:14 495:21
**believes** 354:15
**believing** 466:4
**belong** 467:6
**belonged** 285:11
**belongs** 32:21
**beneficiary** 549:17
**benefited** 557:11
557:14
**benefits** 551:12
552:22,22 557:19
559:5
**best** 19:8 31:20
142:4 191:4,8,12
192:1 229:4 268:2
388:23 454:14
513:17 524:3
553:10
**better** 121:17 126:2
183:3,6 460:12,13
476:10 493:5
**beyond** 377:1

**big** 198:3 200:23
296:7 519:14
**bigger** 117:22
**bills** 275:16 462:19
462:23 463:2
**binder** 286:12
**bit** 164:7 252:18
359:20 448:1
547:14
**bittersweet** 178:3
**black** 443:9
**Blackwood** 2:11,20
8:17
**blank** 464:19
468:21
**blanks** 470:4
**block** 251:3,4
**BMG** 365:19
366:12 367:1
**board** 290:24 515:5
515:20
**boards** 290:24
**boat** 121:6
**Bobby** 2:13,22 8:22
171:4 239:7
241:15,16 371:15
372:12 373:1,8
374:2
**bother** 81:14 82:10
574:18
**bothers** 362:21
**bottom** 209:13
250:16 423:20
559:19
**bought** 38:5 233:6
233:7
**bounced** 41:23
**box** 250:15 272:16
279:7,8 290:13
294:5 456:8,18
457:7
**Bradshaw** 504:18
504:19
**brake** 110:4 144:4
**Brauer** 278:11
**break** 11:8,11

64:16 110:7,13,20
165:20,22 166:4
166:14 167:19
168:23,24 169:19
169:20 170:4
266:6,21 268:8
277:16 305:4
322:12 391:22
392:14 407:15,19
408:1 448:15,16
448:18 449:21
450:12 469:16
521:11,13,15,21
522:3 567:8,15,18
567:20
**breaking** 66:6
85:10
**breakout** 143:17
144:6,19
**breaks** 64:21
139:17
**breakup** 277:24
**Brett** 35:2 37:7
**bridge** 72:20 79:21
213:16,19,21,23
214:2,3,4,15
215:1,2,5,7,13,24
216:3,15,17,18
217:15 338:11
348:15 350:8
377:24
**bridges** 338:13
**brief** 315:19
**briefcase** 512:4
**briefly** 375:2
**bring** 44:19 560:22
561:7,13 562:5,9
562:24 563:12
565:3 569:18,20
570:8
**bringing** 292:6
**brings** 141:1,3
**Broad** 195:21
**broke** 525:10
**broken** 277:4
**brooms** 290:21

**brother** 83:23 84:4
84:6
**brothers** 84:22
225:3,3 237:7
241:13 265:16
371:10 373:21
384:5 435:5
446:20 526:24
**brought** 44:15
290:3,9,12,13
471:22 562:15,20
563:17,22
**Bryn** 3:3
**BS** 258:18 561:6
**buddy** 133:12
**building** 2:3 34:12
36:15,19,20 48:20
77:1,3,6 86:2,3,10
87:8
**bunch** 336:20
399:6 506:12,19
507:7 561:5
**Bus** 21:24
**busboy/dishwash...**
40:9
**business** 45:10
49:14,22 51:19
54:15 56:2,7
57:16 58:16 59:16
60:2 62:7 66:7
81:15 82:13 83:1
106:14 129:6
131:9 133:20
154:8 193:12
264:22 272:15
323:2 368:3 369:1
380:11,13 382:12
395:15 410:10,10
410:12 416:11
441:14 475:21
556:1
**businesses** 57:17
58:6,8 60:9 72:19
73:4 81:16 82:15
289:16 290:11
323:3

**businessperson**
58:3
**business-wise** 81:3
**buttocks** 14:12
**buy** 196:2,18
300:16 515:4
**buzzing** 225:17
**Bystorm** 2:12,21
8:20 365:14 409:4

──────────

**C**

**C** 415:3 425:15,17
425:19,23 579:1,1
**cables** 290:15,16
**call** 53:3 88:20
188:14 189:7
193:8 225:15
250:17 282:14
294:18 314:18
316:19 317:1
319:11,16,18
332:1,7 335:6
339:7 363:23
368:15 369:3
434:20 444:10,22
461:6 463:13
472:5 504:16
523:16 530:21
542:3,5 543:20
**called** 33:7 48:23
52:18 91:16 195:6
195:18 269:5
346:24 347:4,5,5
370:18 515:6
541:18 542:1
545:12 556:24
577:1
**calling** 345:2
407:13 453:19
**calls** 346:16,21
350:3 351:2 368:8
368:24 377:10,14
410:15 460:17
502:18 558:2,3
**camera** 240:24
388:13 524:17



**camp** 134:4 155:22
171:10 172:10
222:3 234:11,16
235:11,12,14
264:19 309:15
314:18 319:21
395:6 437:17,20
444:11,22 447:1
**Capitanio** 3:7 8:5
**captioned** 1:14
**captured** 212:24
240:23 284:9
**car** 21:24 473:3
**cards** 445:3
**care** 49:14,22 56:7
57:15 129:7,15
130:5 131:8,14,18
132:20 133:20
134:1 154:7 222:3
222:21 223:4
225:6,8 234:10
319:23 364:20
369:2 382:9
410:11 420:2
**career** 125:7
**carefully** 581:5
**case** 10:16,22 29:7
86:19 89:14 92:22
93:11,16 95:12
99:14 111:5 112:7
112:19 113:13
125:13 191:16
279:2 286:13
392:11 460:3
466:24 516:9
518:17 537:21
547:1
**cashing** 477:20
**catch** 520:19
**caused** 272:18
**causes** 93:15
**caveat** 358:5,14
359:19,22
**caveats** 168:17
170:10,18 357:15
359:2

**CD** 220:13 232:24
233:2,5,6,6
290:23
**CDs** 291:1
**CD's** 503:6
**cease** 85:7
**ceased** 295:6
**celebrate** 232:9
**celebrating** 234:4
263:21
**celebration** 231:3
232:7
**cell** 19:11,20 20:4
368:8
**Center** 1:23
**CEO** 42:13,23 44:8
44:13 472:5 548:3
549:9
**CEOs** 69:16
**CEO's** 472:12
**CEO/owner** 45:19
**certain** 68:17,19
71:21 105:18
283:20 288:2,4,5
292:1 397:3
455:16
**certainly** 170:7
430:16
**certainty** 127:10
244:1 344:6
**certificates** 51:24
**certification** 7:3
**certify** 579:5 583:4
**chain** 70:7
**chair** 307:24
**chairs** 290:20
**champagne** 231:11
231:12 232:13
233:3
**chance** 305:13
426:7 519:7 547:1
**chances** 314:5
**change** 159:5
160:15,21 161:16
165:6 183:10,12
271:17 343:13

361:23 543:20
582:5
**changed** 182:16
183:12 209:6
236:5 366:23
**changes** 27:9 339:9
340:14,22 341:4
343:14,16,16
350:17 581:13
583:9
**changing** 159:14,16
**character** 379:9
**characterization**
193:19 358:20
**characterized**
173:10
**charge** 447:5,9
**cheating** 443:20
**check** 4:15 43:15
57:4 66:15 67:19
68:2,13 70:19,24
78:11,15 79:15
131:21,24 132:12
136:19 226:1
270:21 295:12
461:22 462:1,4
477:20 480:21
481:2,7,9 482:24
512:17 577:15
**checked** 427:12
**checking** 67:24
**checkout** 498:16
**checks** 68:20
**Chestnut** 195:21
**chief** 42:21 61:24
65:1 471:24
548:13
**Childish** 321:9
**children** 85:24
**choice** 145:3,9,12
145:14
**choose** 213:8
259:10
**chooses** 541:4
**chores** 45:6
**chorus** 183:12

208:20 209:10,12
209:15 343:12,13
343:14
**chose** 495:1
**Chris** 3:7
**Christopher** 8:4
**chunk** 506:17
**circumstance**
296:16
**circumstances**
478:5 480:20
492:22
**Citizens** 67:17
**City** 474:19
**claim** 101:9 113:8
117:24 541:13
**claimed** 463:8
**claims** 19:2 25:3
93:18 97:20 98:23
112:14 283:1
429:19
**claptrap** 17:1 51:5
152:21 156:8
561:9
**clarify** 106:22
**class** 515:12
**classes** 514:23,24
515:7,8,9,24
**clavinet** 290:18
**clean** 301:8 397:11
**cleaned** 570:19
**cleaning** 45:7 456:9
573:4
**clear** 17:10 50:14
50:22 91:4 93:21
113:15,20 115:10
131:6 205:13
206:19 215:16
216:22 254:17
269:12,13 318:6
347:3 362:3 366:1
366:6 397:22
408:20 428:16
453:24 479:18
555:19 571:4
**clearer** 410:5

**clearly** 14:11 93:10
107:8 152:15
538:14
**client** 13:2 17:7
33:2 393:7 473:20
524:1 529:23
537:23 575:21
**clients** 19:3 33:2
97:8,9,24 98:7,23
112:15,21 115:14
408:10,20
**clip** 267:18 476:11
476:13
**clock** 344:21
486:21
**close** 83:16 84:22
85:15 136:19
450:6 490:10
515:18
**closed** 308:11
**clout** 69:18
**club** 98:18 99:21,23
100:3,6,8 102:10
103:22 106:6
107:11,19 108:3
109:12 114:23
115:3,8,11 116:4
116:15,19 118:1
118:10,14,18
119:9 121:3,14,22
128:6 129:3 131:4
132:18 134:1,8
135:11,18 136:12
137:2,12,19
138:17 139:4,8
141:17 142:1,7,22
143:16 144:5
145:7 148:5 149:2
150:18 153:10
154:15 155:22
166:23 167:6
168:19 170:13,22
171:11 173:6
174:12,23 176:17
178:6,15,24
179:13 180:23



182:3 183:14
184:2 195:7 203:2
204:21 205:3
207:17 208:5,14
209:4,11,18 210:2
210:18 211:13
213:10,15,20,24
214:2 215:1,2,4,7
215:12,22 216:2
216:13,19 217:2,5
217:8,16,18,22
218:1,5,8,11,14
219:21 232:1
236:10 258:3,5
259:22 303:2,11
304:15 308:8,10
315:7 331:8,11
332:11 333:3,7,10
333:20 334:2,22
335:6 337:6,9
338:6 339:10,24
341:8,19 342:2
350:18,21 352:14
352:18,21 353:6
353:15 354:10
356:9,16 358:8
360:4,9 361:7
362:2 377:7 379:4
380:8 411:19
413:22 429:22
433:24 434:10
443:3 477:24
479:10 480:7,10
481:19 482:3,9
490:9 495:10,12
496:1 507:12
518:20,21 520:2
526:8,15 528:10
529:11 531:4,7,11
531:15,18,23
532:2,6,8,12,16
532:19 533:4
541:15,19 542:1,4
542:7,8,14,15,17
543:18,19,24
561:20 570:18

**clubs** 183:15
  308:12,12
**cluelessness** 94:16
**coached** 207:1
  459:23 460:8
  560:5,12 561:3
**coaching** 53:6,14
**coffee** 521:18,18
**collaborated** 104:4
  154:17 362:11
**collaboration**
  362:12
**collaborators** 362:2
**collect** 96:1,7 99:13
**collected** 302:8
  538:23 539:8
**collecting** 299:8
**collection** 292:10
**Collins** 385:4,22
  450:19 461:12,14
  461:19 462:8
  463:3,7,23 464:15
  466:6 473:5,12,18
  474:9,10,17,19,22
  475:7,12,17,22
**colloquy** 12:22
**column** 207:23,24
  208:7,15 209:14
  209:18 210:18,19
  213:11,12 250:16
**combine** 104:19
**come** 89:2 121:4,5
  183:24 281:16
  295:7 299:6 314:9
  328:24 329:3
  330:17 332:13
  380:1 391:5,12,16
  397:11 432:13
  442:19 455:18
  475:13 503:21
  504:8 507:8 512:3
  515:10,14 531:20
  532:9 533:1
  539:12,17 544:11
  544:19 547:5
  568:22

**comes** 141:6 449:7
**comfortable** 161:4
  164:20 241:2
**coming** 133:4,6
  248:1 292:15
  402:10 405:23
  503:3 533:13
**comma** 162:23,24
**commemorate**
  230:5
**commence** 571:15
**commenced** 571:20
**commencing** 1:13
**comments** 188:21
**commercial** 4:14
  73:8 249:24
**commercially**
  148:6 149:3
  150:22 153:11
  379:15 498:10
**commission** 583:19
**Commonwealth**
  1:17
**communicate**
  365:13
**communicated**
  24:5 84:17 131:12
  222:22 223:1
  258:4 382:7
  395:11 416:7
  442:5 474:17
**communicating**
  241:21 261:24
  475:17
**communication**
  87:16 367:4
  409:10,11 431:15
**communications**
  88:23 91:5 99:16
  113:5 114:19
  128:19 239:10
  324:11 377:3,13
  398:16 420:9
  422:3 423:6 432:1
  473:16 539:3
  545:1,4

**companies** 41:20
  54:5 57:9 58:23
  59:3 60:20 61:6,8
  74:20,22 193:15
  366:22 367:5,7,14
  368:1,16 389:14
**company** 32:15,16
  32:18 33:5,6,9
  43:21 44:21 46:11
  46:12,14 47:8,10
  47:14,15,15,15,17
  48:23 50:7 52:18
  52:21,24,24 58:19
  59:10 61:22 62:14
  64:12,19 75:11
  83:1,2 98:3 99:8
  187:16 254:8
  366:19 382:1
  389:15 472:3
  477:6 501:9
  504:16 505:14
  508:4,7 510:7,20
  512:11 514:14
  539:6 547:17,24
  549:12 551:10
  552:17,24 555:2
  556:23 557:8
  558:22
**comparing** 206:11
  206:12
**comparison** 211:12
**comped** 445:12,16
  446:9
**compensated** 97:14
  158:14
**compensation** 44:4
  67:1 70:13 141:4
  141:5
**complained** 441:20
**complaint** 4:12
  22:17,18 23:4,10
  23:18,20 24:15,22
  25:17 26:5,13,24
  27:5,11 28:10,15
  31:18 59:11 68:15
  68:22,23 75:18

83:6,9 98:3 99:7
  142:20 156:5,23
  157:2 160:24
  161:23,24 163:6
  164:6,11,13 165:5
  165:13 203:18
  226:21 228:10
  231:10 264:6
  268:19 274:11
  277:1 279:5 281:4
  281:20 293:2,2,24
  353:9,11 376:20
  386:12,19 387:6,9
  387:11,19,22
  388:6 394:3 411:9
  415:3 425:15,23
  445:12 446:9
  451:1,7,18 453:16
  454:1 456:1,5,16
  482:21 483:5
  485:12 497:2,6
  499:23 500:10
  552:20
**complete** 137:13
  434:17 437:11
**completed** 427:17
  448:17
**completely** 297:21
  312:10 499:21
  560:8
**components** 107:3
  350:8
**composition** 98:19
  99:21 138:7,13
  197:24 210:10
  236:10 443:3
**compound** 167:18
**comprise** 482:16
**computer** 232:20
  285:8,14,22 286:6
  286:8 287:9,13,17
  287:18,21 288:21
  323:1,1,7,9,14,16
  328:13
**computers** 290:14
**concentration**



527:6
**concept** 541:23
**concern** 223:23
  293:3 522:14
**concerned** 223:7
  350:17
**concerning** 121:3
  434:8
**concerns** 13:1
**concert** 308:16,18
  308:22,23,24
  309:4,19 310:3,16
  311:7,20 314:7
**concluded** 578:4
**concludes** 166:8
  469:11 577:23
**conclusion** 339:6
  539:13,16,18,21
**conduct** 12:7
  413:11 503:12
  514:23
**conducted** 10:20
  67:13
**conducting** 413:14
**confer** 11:15
**conference** 351:2
  377:14
**Confession** 179:1
**Confessions** 184:3
  186:4 188:3,3
  191:19 192:3,15
  194:22 195:12
  196:22 199:18
  200:19 220:12
  224:18 230:7
  232:2,14 234:5
  241:24 243:18,20
  243:23 244:13,22
  249:7,24 281:9
  301:9,19,24
  309:21 311:10
  330:14 331:5
  332:24 355:8
  360:10 366:14
  367:17 368:19
  374:4 379:16

381:8,20 406:2
  464:2 519:23
  526:2 528:12
  529:12 561:20
  565:7 570:1 572:8
**confidence** 200:23
  201:1
**confident** 222:23
**confirm** 199:24
  427:15
**confirmation** 495:5
**confirmed** 495:19
**confronted** 497:2,7
  497:9
**confuse** 215:10
**confused** 94:5
  158:8 163:3 164:1
  164:7 185:16
  349:23 453:3
  572:17
**confusing** 216:6
  218:4 550:8
**congratulations**
  203:9,12
**connected** 49:10
  50:10 223:14
**connection** 29:5
  54:4 61:6 112:14
  285:22 492:8
**conscientious**
  523:22
**consent** 155:9
**consider** 46:3,6
  55:13 59:14
  102:18 509:11
**considerate** 523:21
**considered** 55:17
  65:15 69:8 83:15
  84:5 109:22
  216:16
**considering** 470:14
**consistent** 162:24
  163:4
**constitutes** 64:13
**consult** 413:20
**consumed** 11:19

**consumers** 196:10
**contact** 85:8 222:2
  234:11,18 235:14
  235:15 277:10
  292:12,16 293:12
  293:20 317:14
  319:24 320:13
  368:5,7 372:21
  374:18 380:3,20
  380:24 381:4,18
  434:23 485:7
  487:24 488:8,8,12
**contacted** 25:15
  293:18,18 367:19
  379:23 380:15
  381:15 382:5
**contacting** 374:24
  382:16
**contain** 270:8
**contained** 24:3,15
  91:2 272:17 279:8
  325:10
**contains** 83:6
**content** 541:24
**contention** 558:13
**contents** 286:2
  418:13,19 422:18
**contingency** 428:17
**contingent** 415:5
  425:24
**continue** 237:14
  284:7 300:23
  302:12 360:15
  442:22 443:5,11
  535:17 536:15
  576:6
**continued** 183:2
  238:4,20
**continuing** 401:10
  443:6
**contract** 29:4 123:1
  123:3 466:24
  467:24 468:3,7,10
  470:12 472:19
  475:10 495:16
  509:10 549:12

551:9,13 552:5,7
  552:15 557:15,19
  558:24 559:2,7
**contracts** 123:9
  462:14 464:14
  549:18 552:23
  554:5 558:14,17
  559:11
**contributed** 137:2
**contribution**
  139:19 343:22
**contributions**
  104:11 105:6
  115:24 153:20
  303:24 304:6,7
**contributor** 340:14
**control** 82:24 303:1
  303:10,15 515:5
**conversation** 18:9
  130:13 146:1
  172:18,21 173:4
  173:11,20 194:7
  221:20 222:5,10
  224:9 225:2,20
  226:11,15 237:13
  258:1 259:20
  262:1,14 315:11
  336:13,15 337:2
  337:23 346:7
  351:8 365:1,5,6,8
  367:13,24 372:3
  378:8 395:21
  404:17 405:22
  406:12 407:1,6
  409:20 414:20
  460:20 475:7
  478:6,12 503:2
  505:9
**conversations**
  133:3 171:14
  173:20 329:13
  337:5 338:24
  346:12 347:20
  348:17,21 349:15
  350:17 356:6,13
  364:3 377:6 396:3

399:23 400:5,11
  400:16,20 403:9
  403:19 404:10
  405:20 406:14
  408:8 528:8 529:9
  533:7 539:4
**cool** 197:23 472:13
**cooperated** 248:21
**copied** 180:3 195:9
  219:12,13 496:21
**copies** 195:23
  301:19,23 436:22
  437:7 465:23
  496:22
**coproducer** 220:21
  221:5
**copy** 4:15 13:13
  14:16 18:17 77:11
  90:15 110:24
  126:17 185:12
  195:12 196:1
  220:12 243:16
  280:6 334:22
  352:14,18 424:23
  465:18 470:8
  489:4 504:22
  516:12 546:11
**copying** 256:8
**copyright** 112:21
  113:8 125:24
  126:12,21 127:5,5
  128:7 129:3,19
  136:11 222:15
  223:7,20,24
  304:10,15 460:3
**copyrighted** 125:8
  125:9
**copyrighting**
  125:17
**copyrights** 125:20
  129:5
**cords** 290:15
**corner** 79:18
  195:20 244:16
  289:2
**Corp** 2:12,21 8:19



409:4
**corporate** 56:4
223:4 234:17
264:10,14,17,20
265:1,6,10 382:5
395:6,23 396:5
**corporation** 35:4
49:7 50:9,11
56:10,23 75:23
471:3,21,23 472:1
555:17,21,22
**Corrado** 242:16,18
263:4
**correct** 10:14,15
24:24 28:17 31:18
31:21 33:15,20
34:19 35:24 36:9
41:9 42:11,23
43:1 51:14 57:11
60:6 65:3 69:22
102:5,11 103:23
105:10 121:23
156:6 159:4
174:17 178:20
187:8,10 199:14
215:24 232:17
238:16 244:4
247:11 248:5
262:2,11 271:4,21
272:20 275:21
277:8,9,15 293:9
294:6 297:16
301:10 306:15
311:18 312:16
315:23 323:4
331:23 332:12
337:7,16 347:13
353:7 364:8,9
373:24 377:10
386:12 389:20
394:6 406:3
415:11,15 418:4,7
434:14 440:24
441:7 445:20
446:11 458:12
462:2 480:11

482:18,19 489:18
500:12 518:22
541:15 548:2
556:19,21 561:22
562:19 564:3
565:8 570:8
571:24 572:3,5,12
583:6
**corrected** 224:22
463:8
**correcting** 264:7,9
459:1
**corrections** 26:24
27:5 581:6,8
583:8
**correctly** 282:2
498:1
**cost** 446:6
**counsel** 7:2 8:9
13:14 14:16,17
15:10 16:6 17:9
17:16 74:5 78:9
95:12 201:23
285:3 298:10
387:3 389:22,23
437:8 523:8
546:11
**counseling** 273:14
273:18 277:7
**count** 522:11
**counting** 196:5
**country** 196:10
**couple** 85:3 276:13
292:1 306:7
344:12 372:18
376:13 516:1
524:10 568:17
**course** 13:13 30:2
96:21 177:15
184:6 200:14
270:4 281:7 282:8
283:16 363:4
366:23 371:24
434:3,5 436:16
482:13 505:2
506:17 515:23

546:24 560:6
562:2 572:4
**court** 1:1 7:17 8:6
9:18 27:7 62:24
64:5 72:4 82:2
96:6 110:21
124:10 126:5
149:23 152:20
168:2 189:16
194:13 202:8
205:22 214:9
226:5 241:8
357:21 374:13
398:10 449:2
454:20 464:24
465:2 520:9,22
525:12,15 550:22
569:12 581:23
**courteous** 523:23
530:6 576:20
**courtesy** 370:19
**cover** 23:16 26:9,9
26:21,21 243:16
244:3,8 291:9
**co-administers**
495:11
**co-administration**
429:21
**co-author** 495:24
**co-authored** 490:5
495:7
**co-authorship**
429:20
**co-CEO** 548:20,23
549:3
**co-owned** 81:17
138:7 495:8
552:24 558:23
**co-owner** 548:1
549:18 552:17
554:8 556:17
558:17 559:14
**co-owners** 490:6
**co-owns** 490:6,8,9
495:12 496:1
**co-produced** 490:5

495:7,24
**co-producer**
364:13 365:21
382:20 440:22
**co-production**
429:20
**co-publishing**
429:21
**co-writer** 220:21
221:5 364:12
365:20 382:19
440:22
**cranky** 568:12
**create** 101:10
105:24 119:2
137:12 333:24
**created** 46:9 101:9
102:2 103:4,11,15
105:9 118:1 119:1
119:3 120:19
138:11 302:9
304:9 341:24
344:24 361:3
362:11 416:13
492:14 499:11
527:23
**creating** 44:23 70:9
103:1 104:21
505:6,7
**creative** 82:24
**credit** 140:24
181:10,11 220:24
227:7 231:17
257:3 299:17,19
333:15 355:3
358:6 360:1
364:18 366:13
382:6 384:9,19
395:3 404:3
406:16,18 408:14
433:23 434:8
440:21 441:20
457:19,20 458:6
458:21 463:7
499:7,11,13 520:2
526:21

**credited** 97:12
98:12,13 147:16
149:5,9 153:16,18
153:19 155:13
156:3 158:13
168:9,11 170:22
172:2,14 190:23
220:21 221:4
224:5 227:1
231:22 254:20
256:16,18 260:24
298:20 301:3
302:20 310:10,17
312:7 314:2,4
317:7,13 333:10
333:17 342:16
343:22 345:11
353:2 356:24
360:18 365:20
367:15 368:18
375:4 376:23
378:21,22 379:21
381:8,19 384:1
399:14 411:19
414:8 416:14
438:13 440:10
504:24 559:19
570:13
**credits** 162:20
230:4 236:23
238:6 239:1
263:14 311:14,15
312:5 318:2
319:21,23 365:22
380:8 382:18,21
383:16,17,21
389:7,16,18
396:23 404:12,15
406:5,20 407:9
410:2,18 412:14
412:17 413:21
414:6,21,23
415:11 440:23
441:9,12,13
457:22,24 458:12
458:22 463:24



MAGNA ▶
LEGAL SERVICES

482:22 483:7
498:10 518:4
533:8
**crimp** 370:21
**Croce's** 40:16
**crooked** 439:20
**crossing** 25:5 27:14
**cup** 521:18
**curious** 369:17
**current** 277:23
423:8 482:1
**cut** 108:21 163:14
202:4 209:21
256:2 317:16
362:20 431:13
469:8 478:15
479:6 487:4
**cutting** 256:7
342:20

**D**

**D** 2:6,7 4:2
**daily** 55:20 66:5
**damage** 94:17
**damages** 92:15,21
93:6 112:12,20
113:9,9,10
**Dan** 13:21 133:8
315:6 348:2
421:14 524:12
**dance** 315:1
**dancing** 542:15
**Daniel** 1:3,9 4:4
7:14 9:15,20 10:6
74:12 79:20 166:9
166:19 322:7,17
429:14 469:12,21
490:5 495:23
529:8 577:24
**Dante** 52:8,16
57:20 58:2 61:9
66:4 69:15 74:12
79:21 81:3 100:10
102:10,13,15
104:5 107:15
116:23 121:10

122:6 129:14
131:8,13 134:5
138:1,4 141:14
145:23 153:18
158:20 183:10
226:16 231:5
238:20 252:11,12
270:17,20 291:9
291:12,15 292:11
294:14 299:10
304:1 309:8,14
310:18 312:15
314:17 315:6
330:18 331:17
335:14 345:6,22
347:5 362:9
364:14,19 365:6
367:18 368:3,6
380:10 382:4,11
382:14 383:14
390:13 398:17
399:10 404:2
409:11 410:9
437:21 438:1
442:2 444:12
446:4 447:3,16
449:16 455:6,21
455:22 457:9
458:3 472:12
473:15 474:11
475:20 485:19,23
486:2,5 491:10,23
491:24 493:3
499:24 500:11
508:18 527:16
545:11,18 548:21
551:11 555:7
556:22
**Dante's** 455:12
**date** 1:15 35:14
60:22 175:6 192:6
244:20 248:18
277:19 305:24
360:23 399:15
405:6,7 406:13
461:8 487:5,7

492:16,19 579:23
581:11 583:15
**dated** 385:22 415:7
492:15 547:19
**dating** 231:8
**daughter** 85:15
**David** 316:16
**Davis** 2:6,7 4:5
8:13,14 9:9 10:3
12:4,15 13:7
14:15,18 15:18
16:9 18:4,8,16,22
22:16 24:19 25:7
25:9 27:16,21
28:12 29:13,19,22
30:5,10,23 31:7
38:24 39:14,17
43:11,16 46:17
47:18 48:3,11
50:21 51:4,6 53:5
53:9,13,20 54:14
56:17 59:24 62:19
63:3,10 64:1,23
65:20 66:16 67:4
69:11 70:11,22
72:14 73:6,16,17
75:16 77:13 78:8
78:12,22 79:4,9
79:13 80:22 81:13
81:22 82:11,21
86:16 90:7,14
91:17 92:5,12
93:2,24 94:8 95:3
95:23 96:13,18
97:1 99:9 101:15
102:1,23 104:17
105:4,21 106:5,12
108:2,12 109:7
110:6,18,22 111:3
111:9,15,18,23
112:3,5 113:6,17
114:2,20 115:21
116:3,7,13,24
118:7,17 120:1,11
122:4 123:6
124:16 126:9

128:20 130:11,17
131:3,15 132:6,11
132:16 135:16
136:14 137:21
138:14 139:20
140:4,18 141:22
142:8 143:8 144:1
148:2,11,24
149:19 150:5,16
150:21,24 151:8
151:13,20 152:3
153:8,24 154:12
155:1,7,19 156:13
156:21 157:6,10
157:14 158:7,15
159:2,13 160:11
161:5,13 162:8
164:4,23 165:11
165:21 166:20
167:3,12,21
168:15 169:8
170:5 171:12
172:3,17 173:3,18
174:21 175:3
177:1,12 179:8,20
180:4,21 182:24
183:23 184:17
185:15,24 186:9
187:24 188:6,13
188:19 189:1,8,23
189:24 191:17
193:4 194:1,6,19
195:2 198:13
199:3 200:13
201:11,22 202:5
202:15 204:6,14
205:15,20 206:4,8
206:14,20 207:4,9
207:14 208:24
209:22 210:7
211:10 212:1,4,7
212:22 213:6
214:6,13,21
215:19,21 216:8
216:12,23 219:2
224:7 226:9,17,20

227:18,20 228:15
228:21 229:5,12
229:19 230:19
233:24 234:14
235:2,17 238:10
238:15 239:4,13
239:18 240:1,8,12
240:17,22 241:4
241:14 242:22
243:9 244:19
246:5 249:16,21
250:7 251:6,13
255:18,20,24
257:9,24 258:12
259:3,8,19 260:4
260:10,15 261:6
261:20 262:7,18
265:3,24 267:11
267:23 268:13
269:2,15,19 270:1
270:15 271:15
272:14 275:8
279:20 280:5,14
281:1,14,21 282:5
282:20 283:3,11
284:6,14 285:17
288:3,14 291:20
291:24 292:8
298:5 300:3,10,21
301:15 302:23
303:8,16 304:12
304:19 305:8,10
305:18 307:17,20
308:5 310:23
312:12 313:10
314:8 316:16,17
317:10 318:9,14
318:23 319:14
320:8,22 321:7,11
321:16 322:19,20
324:22 325:18
326:1,4,12,13,21
326:22 327:3,13
327:22 328:3,7
332:6 334:11
339:19 340:6



341:5,17 343:3
346:23 348:6
350:5,15,24 351:6
351:14 353:14,18
353:22 355:19
356:4 357:4,13
358:3,19,24
359:10,14 361:11
361:22 363:1,7,12
363:24 364:1
366:4,9,21 368:12
369:14,21 370:1,6
370:12 371:1,7
372:10 373:18
374:9,19 375:10
375:17 376:18
378:24 381:3
382:2 383:1,11
384:14 385:12,15
385:19 386:9,13
386:22 387:7,20
388:3,11 389:2
390:8 392:1
393:10,15 395:19
396:12,21 397:4
397:24 398:7,18
399:22 400:13
401:4,9 402:15,19
403:6 405:8,16
406:10 407:3,18
408:6,13,18
409:13 410:6,24
412:22 413:7,18
415:16 416:4
417:5,13 419:3,7
419:17 420:12,16
420:20 421:1,6,11
421:16,23 422:6
422:13,17,24
423:11 424:9,21
425:7 426:21
427:3,6,16 428:6
428:19 429:5,8,11
430:9,15,20 431:6
431:10 432:4,8,10
432:18,24 433:5

433:12,16 434:15
436:6,11,14 437:1
437:13 439:7
440:16 441:8
442:6 444:2,18
448:6,13,23
449:10 450:3,11
450:15 451:16,22
452:1,20 453:4,9
454:3,9,15,24
456:24 458:17
459:5,13 460:10
460:18 462:15
464:12,13 465:4
465:15 466:1,15
466:21 467:11,16
467:22 468:11
469:23 471:10,17
472:16 478:16
479:19 480:9
481:21 482:14
483:14 484:6
485:5,11 486:4
487:12 488:4,13
489:3,8,21 490:1
491:1,5 493:23
494:23 498:8
500:8 501:12,19
505:5 506:8
507:10,18 509:16
510:2,12 511:24
512:14,22 513:5
513:19 518:1
524:9 532:24
534:15,20 535:10
535:22 540:11,16
540:21 541:3
546:3,7,22 548:11
548:18 549:6,15
550:14 551:2,7,18
552:4,6 553:11,17
554:2,19 555:6,12
556:6,15 558:8,12
559:3 560:13,20
561:10,12 562:3
563:11,20 564:2,8

564:11,19 565:1
566:5,14,21 567:3
567:5,10,17,23
568:21 569:2,7,16
570:24 572:11,18
573:19 574:6,15
574:23 575:4,13
576:8,13 577:16
**day** 66:10,11,11
88:18 101:14
104:4 125:22
185:22 190:24
191:4,12 192:4
196:3,8 224:17
230:2,4 234:3
237:21 263:20
274:22,22 280:21
344:9,20 349:6,10
415:8 448:2
513:17 535:5,18
550:13 576:7
**days** 103:13 120:22
191:8 344:9 349:3
581:19
**daytime** 346:3
**deadline** 326:17
402:10 523:17
530:8
**deal** 139:22,23
174:10,20 178:13
180:7 258:17
353:10 354:10
355:3,18 356:8,15
357:7 358:8 359:4
360:4 368:2 371:5
392:15 414:6
416:6 510:15
**dealing** 134:15
256:24 274:9
282:16 380:18
381:11 399:6
484:19 505:2
**deals** 369:2 419:24
**dealt** 106:17 380:11
**deceitful** 557:2
**decide** 303:18

433:13,15 542:5,6
**decided** 514:23
515:3 542:3
543:20 545:21
**decision** 146:3,8,9
146:13 518:19
519:17
**declaration** 96:6
**deemed** 581:22
**deep** 298:1
**deeply** 234:19
**default** 95:11,16
**defend** 156:11
**defendant** 9:5
93:11 152:18
537:23 538:19,21
**defendants** 8:15
9:9 108:15 172:11
246:2 298:21
319:9,21 325:12
399:9 513:15
537:21 557:9
560:24 561:14
562:6,10 565:4
569:19 570:5,12
571:16,21
**Defenders** 2:13,22
8:23 409:1
**defending** 115:14
156:18 161:10,13
210:5 211:2
299:13 302:5
321:11 442:13
533:20
**defense** 302:4
523:7
**define** 21:12 50:18
55:24 66:6 106:10
106:19,23 107:2
198:11 303:15
**defined** 50:19
**defining** 29:2
**definitely** 109:24
185:7 229:21
274:19 316:24
317:1 406:24

491:18 577:7
**degree** 49:21
**delete** 288:8
**delivered** 135:23
**Dell** 109:5 128:24
129:2,9,11 130:2
130:6,18,24
131:10,21 132:13
135:10,18,22
171:7 173:15
174:4 207:1 225:8
237:5,6 239:8
265:13 400:18,21
403:7,10,16,20
404:8,11,13
406:15 407:2,7
459:24 499:23
500:10 505:8
506:11 509:9
511:17 527:20
538:6 539:2
**Dell's** 507:24 510:7
510:19
**demo** 332:2 334:1,7
335:5
**demonstrating**
94:15
**denied** 365:23
440:24
**denigrate** 282:7
**denigrating** 363:3
**denying** 200:17
**deplorable** 401:6
**DEPONENT** 583:2
**deposed** 9:16
326:11
**deposing** 299:12
516:7 581:18
**deposit** 481:2
**deposited** 481:7
**deposition** 1:9 6:2
7:14,23 10:20
11:2 12:8 13:10
14:24 15:2,6,20
16:18 17:12 18:10
51:2 88:5,14,16



89:19 96:22
148:21 166:9,19
270:4 282:8
306:10,13 315:21
320:15 322:7,17
327:9,12,15,24
363:4 369:11
373:23 376:13
390:24 401:11
402:2 413:1,9,10
435:13 436:7,17
436:19 442:23
443:7 469:12,21
499:14 513:20
535:4,17 536:14
538:15 544:6
546:2 569:5
574:16 575:23,24
576:7 577:24
578:4 581:4,15,19
581:21
**depositions** 10:14
12:19 372:17,20
373:3,10 376:2,4
532:21,22 560:7
**depressed** 275:11
573:7 574:4
**depression** 269:5
272:19,24 274:10
274:17 290:1
298:1,7 574:5
**Derek** 2:7 8:14
77:20 459:18
**derived** 44:24
**describe** 115:7
140:16,20 145:24
219:3 337:8 478:5
492:21
**described** 48:7
274:10 277:1
348:22 356:7
392:9 447:1 467:1
491:2
**describing** 118:8
219:17
**description** 4:10

5:4 453:20
**desire** 187:15 300:6
301:16,20
**desk** 289:1
**Destro** 48:23 49:3
49:11,15,18 50:1
50:6,8,14,17,18
50:20 51:8,13,21
52:4,10 54:10,16
55:15 57:18 58:13
59:17 60:3,24
61:17 62:4,9 65:7
65:14,22 66:15,18
66:22 67:1,8,13
71:14,19 75:2,13
75:19 76:4,8,12
76:21 272:10
514:9
**detail** 146:1
**details** 81:15 91:1
233:8
**determine** 304:23
**determined** 415:21
**develop** 45:4 47:1
**developed** 542:20
542:22
**developing** 24:14
**diagnosed** 274:15
**diagonal** 424:2
**Diamond** 111:4
112:7,12,19
**died** 473:3
**difference** 193:22
209:9 486:23
**different** 32:17
43:5 44:17 45:3,5
50:19 72:10
104:11 107:4,5,5
179:19 201:13
207:21 216:7
217:4,9,17 252:6
253:6 312:10
336:9 338:12
343:11,12,14
403:5 489:16
515:16 527:4

529:18
**differently** 165:1
**difficult** 289:23
**Digital** 545:13
**dinner** 237:24
**direct** 188:15 212:8
227:16 367:3
377:3,13,15 409:9
**directing** 567:4
**direction** 6:5 107:9
**directly** 47:22
224:21 335:2
346:10 364:21
365:18 368:15
371:22 376:5
383:14 444:10
475:22
**disability** 275:3
**disagree** 18:14
**disappeared** 61:11
237:18 397:11
476:18 552:19
**disappearing**
263:23
**disassociate** 60:19
**disclose** 460:6,7
**discount** 361:21
**discounting** 361:14
**discovered** 237:12
257:12 268:20
272:8,16 279:6
573:2
**discovery** 326:9,17
327:17 402:10
523:17 530:8
546:24
**discrepancies**
383:20 384:17,20
**discuss** 90:24 327:4
327:23 328:4
380:6 418:18,20
418:21,24 419:1,2
421:7,12 422:9
428:4
**discussed** 52:6
69:15 145:22

307:10 356:8
518:1
**discussing** 70:20
263:21 378:4
418:13 430:3
**discussion** 137:14
137:19 222:8
232:4 347:8 350:7
422:19,20
**discussions** 349:9
390:13
**dishonest** 368:21
380:18 381:13
**dishonesty** 379:24
**disk** 334:7 504:10
504:11
**disks** 291:1 343:2,5
345:4
**dismissed** 113:13
**dispute** 316:3 361:1
399:18,20 531:21
**disputed** 531:3,6,9
531:13,16 532:1,4
532:7,10,17 533:2
533:9
**disputes** 405:3
458:7 532:14
**disputing** 537:1,2
**disrespectful**
261:19
**dissolved** 58:19
59:12
**dissuade** 352:20
353:5 360:8
**distracted** 72:1
500:3
**distracting** 225:18
**distributed** 195:4
300:23
**distributing** 447:5
447:9
**distributors** 447:10
**District** 1:1,2 7:17
7:18
**disturbs** 148:19
**division** 55:14,18

**docket** 7:19 110:21
**doctor** 274:14,16
**document** 13:17
14:4,20 22:12,23
24:3 26:2 28:19
30:14 31:2 39:2,7
73:7,11,19 74:4
75:6 78:14,18
90:10 110:21
112:6 129:18
204:10 205:16
209:24 210:11
243:3 265:20
279:23 280:10,17
283:10,22 285:23
286:5 287:1,6
289:12 291:7,15
291:18,21,23
292:10 323:9
325:11 326:24
353:21 384:21,23
384:24 385:11,21
386:2,14,21,23,24
388:1,22 389:1,4
389:7,22,24
390:10 392:2,6,10
411:6 412:20
413:3,5 417:9,18
418:7,21 423:16
424:5 425:22
426:5 427:8
430:11,13 450:20
450:23 453:11
455:2,19 456:7
457:2,4,11,14
460:21 465:6,11
467:2 468:16,21
469:5 470:6,24
471:15 476:2,14
488:15,20 489:10
492:13,23 511:3
546:18,23 547:6
555:15,20
**documentation**
280:20 383:18
389:12



**documents** 4:20
  6:11 14:23 72:23
  204:18 283:19
  285:1,2,5 286:8
  286:10,12,24
  287:5 289:11,15
  290:14 291:10
  292:10,17 296:8
  322:23 323:7
  325:20 328:21
  385:9 388:5
  390:12,15 405:4
  456:19 476:2,6,23
  482:15 495:15
  504:13
**dog** 558:5
**doing** 9:12 27:20
  44:8 81:3 96:20
  128:15 129:2,12
  129:24 131:22,23
  165:19 181:11
  200:1 210:6 263:8
  273:5 284:8 315:5
  318:7 338:7,19
  345:19 347:9,12
  347:14 348:18
  354:17 363:8,10
  376:12,22 465:1
  527:6 560:2
  581:10
**dollar** 95:18 139:7
  139:10 141:6
**dollars** 281:7,10
  283:15 515:23
**Dorin** 10:9
**doubt** 221:6
**draft** 27:11 28:14
  417:16,16 423:16
  425:1 495:2
**drafted** 27:2 452:4
  493:11
**drafting** 495:15
**drafts** 27:12,22
**drank** 233:3
**drawing** 540:6,10
**drives** 362:22

**drugs** 274:12
**drum** 102:16,19
  103:11 104:6
**drumbeat** 218:13
**drums** 218:13
  220:6
**dry** 60:14
**due** 267:7
**duly** 9:21
**duties** 44:22 45:6
  65:12 189:4
**DVD** 7:13 166:8,18
  322:6,16 450:8
  469:11,20 564:17
  577:23

_____

**E**

**E** 4:2,8 5:2 79:21
  579:1 582:3,3,3
**earlier** 37:15
  115:23 144:9
  185:9 209:1
  211:21 237:4
  261:11 263:22
  265:14 322:22
  356:11 389:8
  405:5 414:22
  435:3 447:13
  472:10 476:3
  507:1 514:8 517:6
  517:16 518:1
  537:20 538:18
  573:9
**early** 267:20 487:4
**earned** 139:7
**ears** 261:17
**Earth** 190:19
**ease** 502:5
**easier** 253:17
**Eastern** 1:2 7:17
**eat** 266:9
**eating** 371:2 402:16
**Edile** 9:4
**educated** 479:24
**Edward** 74:12
**efficiently** 11:4

**effort** 70:8
**efforts** 292:12
  294:21 295:2,9
  322:22
**Eidel** 2:16 9:7,8
  12:12 17:14,18,22
  18:1,6
**eight** 534:10 574:11
**eighth** 402:11
**either** 18:7 67:17
  99:11,18 134:4
  145:3,15 181:8
  199:21 291:11
  335:12 371:14
  372:3,12,21 373:1
  373:7,20 379:2
  475:18
**elaborate** 230:18
  295:23
**electric** 55:12
**electronic** 31:13
**elements** 117:24
**Elliott** 3:3
**emails** 328:21
**emergency** 388:19
  390:20
**EMI** 2:10,11,19,20
  8:16,17 381:18
  382:3 384:6
  408:23
**emotional** 274:17
**employ** 429:15
**employed** 32:10
**employee** 33:13
  35:16 40:12,20
  41:12,18,22 64:14
  64:20 66:14
**employees** 34:21
  35:20,21 37:21
  62:14 64:10 65:22
**employer** 42:7,10
  42:18 43:4,19
**employment** 40:7
  275:24
**ends** 322:6
**energy** 70:9

**enforce** 95:19 96:8
  97:4 98:8,24
**enforcement**
  293:12,21 294:19
**engaged** 463:23
**engagement** 28:23
  29:1,2,24 473:18
**engineer** 97:13
  147:18 210:24
  221:9 236:7 239:2
  253:8 261:2
  360:20 365:21
  379:22 382:20
  440:22 570:14
**engineered** 136:17
**engineering** 45:7
  153:22 198:1
**enhancement** 219:4
  219:6,6
**enhancements**
  218:19,22 219:16
  219:21 220:7
**enjoyed** 83:22
  183:13 504:7
**entail** 265:10
**enter** 76:13
**entered** 95:11,17
  509:19 549:19
  552:23 558:14
**enters** 551:8 552:15
  554:6 558:23
**Entertainment**
  2:10,12,19,21 3:5
  8:16,20 9:6 42:14
  42:18,20 43:4,18
  43:21 44:1,5,10
  44:14 45:2,20
  46:4,7,22 47:6
  48:5,14 49:10,18
  50:1,5,10 51:10
  54:13 56:21 57:17
  59:6,17 60:3,24
  62:1 65:2 69:13
  71:14 75:2,13
  76:22 247:6,10
  272:10 365:14

**enforce** 409:5 470:20
  471:2,20 513:14
  537:24 538:22
  539:1 547:16,24
  548:7,15 549:20
  552:15 554:15
  555:2,16 556:18
  556:24 557:18
  558:15,22 559:14
**entire** 125:12 233:9
  299:5 467:24
**entities** 366:8 368:5
  382:5 392:8
**entitled** 73:8 96:7
  112:13 139:9
  243:15 382:22
  495:10 551:12
  552:21 559:5
**entitles** 502:19
**entity** 70:10 75:21
  495:11
**equal** 146:24 227:1
  227:3 555:13
**equally** 138:7
  162:19
**equipment** 55:6
  60:15 290:5
  545:10,15,20
**errata** 581:8,11,14
  581:17 583:10
**error** 235:20 236:2
**especially** 69:9
  125:11
**Esquire** 2:3,7,7,16
  3:2 417:19 429:16
**establish** 556:11
**established** 47:13
  519:4
**estate** 278:21
**estimate** 349:16
  506:10,13 522:20
**et** 1:5 7:16
**ethical** 189:3
**evening** 349:3
  513:11
**eventually** 332:20



everybody 16:5
196:18 318:13
573:21
everyone's 106:18
260:14
evidence 363:18
461:18
evolved 105:1
exact 175:6 203:13
277:19 405:6,7,15
exactly 35:13 84:10
84:12 181:5
217:21 335:11
404:24 438:18
500:17
examination 10:1
94:2 513:7 546:5
examined 9:22
example 141:6
299:9
excellent 267:21
exchange 315:19
372:24 373:7
excited 94:6 177:7
177:9 186:7,23
187:9 190:4 203:5
222:11 226:14
233:21 247:15
310:14 477:21
480:22
exciting 175:10,18
203:6
excluded 364:12
exclusive 465:7
470:1 473:5
excuse 34:17 39:12
202:14 231:19
253:18 299:20
323:10 343:12
476:8 483:1 497:4
executive 42:21
61:24 65:1 472:1
548:14
executives 486:14
487:15,19 488:6
508:14

exhausted 524:2,17
552:3 568:9,11,16
573:24
exhibit 13:9,18
22:8,9,13 26:12
26:21 30:12 39:1
39:8 57:6 68:12
68:13,14 73:12
78:19,24 90:11
204:7,11,16 243:4
243:11,13 246:14
265:21 279:22
280:11,16,22
305:8 386:3
387:18,20 415:3
417:10 425:15,17
425:18,23 426:13
435:13 436:10,12
436:18 437:4,11
450:18 451:6
465:12 466:3
476:1 488:21
546:10,15,19
exhibits 464:17
existed 108:9
exists 420:11
expectancy 308:14
expectation 272:3
expecting 345:14
expend 75:22
experiences 446:6
expert 515:3
expires 583:19
explain 55:3 82:9
140:1,20 199:4
221:18 252:2
480:16 492:7
494:8 575:10
explained 513:13
explanation 240:13
exploit 141:17
142:7
exploitation 139:8
303:2,11 304:24
397:13 512:10
570:18

exploited 148:5
149:3 150:23
153:11 379:15
exposure 201:4
Express 21:17
expressed 83:9
170:11 225:7
352:19 364:16
416:12
extended 12:22
344:11
extensive 479:22
extent 431:22
extra 110:23 219:7
ex-partner 61:9
ex-wife 85:2,15,23
86:18 87:4,10
e-mail 16:4,5 17:16
18:18 20:10,12,13
20:15 84:18 321:3
321:19,22,24
322:1 323:18,21
324:10 325:8
326:19 328:9,11
351:18 365:8
373:16 378:12
390:4 463:17
475:18 508:24
577:2,4,12
e-mailed 323:20,24
e-mails 323:8,13
324:13,15,16
325:2 373:1

_____
**F**
_____

F 579:1
face 236:22 440:15
facility 288:17
fact 25:8 31:16
175:24 178:23
230:6 231:17,21
236:8 245:18,24
281:8 316:3
480:21 504:12
532:1,4,10 533:2
533:9 536:24

537:2 556:12
facts 24:2,6,8,12
270:9 283:1
363:17 561:6
fading 521:17
fail 581:20
failing 140:12
failures 574:22,22
574:24 575:3
fair 46:18 146:16
148:3 319:15
342:21,21 351:2
363:22 402:1,6,24
430:2 499:20
502:22 530:10
542:18 564:24
fairly 91:4 170:6
fake 270:14
fall 394:4 456:4
562:12
falling 13:24 476:9
fall-out 83:12
false 157:3,17
270:10 562:10
familiar 10:18
30:17 31:8 48:22
52:17 89:22,24
99:22 106:15
164:12 243:10
266:13 411:3
417:20 450:22
472:14
familiarize 417:24
family 24:20 84:24
85:8,12 121:5
202:22 203:1,14
273:16 274:1,3,6
277:7,11
far 76:10 94:21
96:12 99:6 271:5
280:18 382:4
420:9 500:23
501:1 572:23
fast 547:15 556:3
father 86:17
fault 268:18

feature 244:5
February 89:14
192:8 371:11
372:13,19 373:2,9
373:22 375:20
381:7 516:8,11
547:20
Federal 21:17
fee 415:5 425:24
428:17 429:12
feel 120:23 136:18
161:1,4,9 163:17
163:18 164:19
165:16 170:2
177:3 197:20
203:24 310:6
317:13 370:24
378:2 493:5
524:13 528:17
533:23 534:2
553:20
feeling 535:6
feelings 83:7,8
Feet 22:3
felt 120:9,12 175:12
175:13 197:22
203:18 222:22
275:10 296:9
310:7 369:3 495:4
Fifty 52:13
fighting 537:7
figure 266:16 298:2
298:7 525:21
file 23:5 28:19
129:18 250:10
457:6 574:3
filed 22:19 26:6
27:1,6,23 28:16
35:14 564:6 566:7
566:18 570:15
files 251:19 252:7
252:16 253:2,20
253:21 254:16,18
254:24 256:2,22
287:9,16 288:9
344:24 418:4



468:13 470:7
544:9,17 575:18
576:3,22
**filibustering**
530:15
**filing** 7:2 126:20
163:11
**filled** 470:9
**final** 109:20 340:12
343:6,17 449:21
**finally** 198:3
**financially** 275:12
**find** 44:18 64:10
86:9 87:9 107:6
143:11 250:12
286:21 288:19
292:17 294:11
295:3,9 297:4
304:9 331:17
332:16 385:13
388:24 389:21
457:6
**finding** 286:18
**fine** 11:8,13 12:5,14
77:16 284:12
391:10 433:5,14
437:6 465:3,20,21
502:22 536:2
553:12
**finish** 121:17 126:3
132:2 152:3
156:16 199:5
201:9,9 232:22
320:7,7 342:19
343:7 420:15
527:10 535:11,23
535:24 540:12,17
540:18 541:6
560:21 566:4
567:11,19 569:3
**finished** 109:13
318:15,15,18
**firm** 32:24 278:21
391:2
**first** 67:18 68:9,10
73:24 74:8 114:9

126:18 164:2
184:15,23 185:18
191:24 209:13
256:3 262:10
401:1 412:6,9
413:5 415:23
467:21 470:4
481:15 495:6
513:12 547:21
552:8
**firsthand** 382:14
**first-hand** 354:8
**fit** 158:2 259:10
413:12
**five** 38:6,8 40:3
79:9 133:16 140:3
140:3,10 150:15
151:4,12 152:6
153:1 164:2
266:12,16,17
305:12 450:9
507:5 515:9
**five-hundred** 238:2
**fix** 127:9 227:6
234:2 367:21
382:18 395:3
404:14 410:1
414:11 415:10
545:15
**fixed** 232:6 234:13
236:11,19 238:6
312:6 382:7
384:18,19 389:17
389:18 414:24
441:10,21 442:8
442:11 457:19
545:10,21
**fixes** 545:15,16
**fixing** 238:24
263:13 319:20
395:7 396:22
407:8 410:18
442:3 457:22
458:22 463:24
**flare** 219:8
**fleeting** 212:18

**Fleetwood** 504:2
**floor** 1:23 314:23
315:1 391:17
**floppy** 291:1
**fluster** 165:18
**fly** 514:2
**flying** 500:15
**Flyte** 2:13,22 8:24
409:2
**focus** 226:10
**folder** 456:8,19
**follow** 283:6 512:16
514:10
**following** 257:19
550:10
**follows** 9:23
**food** 70:7
**forced** 117:11,13
245:7 246:18
**foreclosed** 276:4
**foregoing** 31:17
579:6 583:5
**forget** 352:4 541:11
**forgetful** 229:14
**forgetting** 136:24
**forgive** 475:16
**forgot** 229:6 400:24
524:20
**forgotten** 308:3
**form** 7:5 12:9 56:4
75:23 91:6 99:17
273:13 275:3
440:13 583:9
**format** 575:20
**formed** 35:7,11
75:19 76:4,9
**former** 38:18
**forth** 41:23 338:8
422:3 433:11
**forward** 180:10
327:10 442:19
**found** 21:20 61:11
88:15 280:20
284:18 286:2
292:9,15 295:13
296:2,10 297:13

308:16 328:10
352:10 376:15
456:8 476:7,16
504:14 545:19
573:3
**four** 241:17 469:20
515:9 577:23
**fourth** 246:24
250:17
**Fox** 1:11 2:15 8:3
9:8
**frame** 41:22 397:23
**Francis** 2:2,3 9:12
206:14 212:22
534:15 540:11,16
544:11 545:20,23
568:22
**Fraudulent** 559:2
**free** 438:19 445:17
445:19 449:9
**Friday** 7:21 487:5,7
**friend** 83:16 242:19
294:10,16 395:16
**friends** 24:21 87:20
87:23 136:20
202:22 203:1,14
203:14,15 237:23
273:15 277:14
293:19
**friendship** 83:22
**front** 100:9 286:17
305:5 314:16,21
314:22 415:4
466:3
**frown** 247:20
**frustrated** 536:23
**fucking** 348:3
**full** 250:17 267:15
567:1
**fully** 572:15
**full-time** 41:14
**further** 12:1 227:4
577:17,19
**furthermore**
170:17
**future** 300:17

**Fuzztone** 33:23
35:16 36:7,18
**FYE** 195:19

---

**G**

**G** 435:18
**Gabai** 262:22,22
**game** 159:24
212:11 265:2
**games** 52:23 53:3
92:4 216:11
259:18 261:12
318:8,21 362:19
**Gardough** 470:17
**gas** 55:12
**general** 40:23
329:5,6,14 331:7
332:10 333:2,6
334:21 335:1,5
352:13 552:14
**generally** 347:6
**generated** 537:6
**gentleman** 77:19
329:3 427:12
545:17 572:16
**gentlemen** 110:3
284:4 393:9 436:1
**getting** 17:1 62:17
94:21 108:17
169:5,5 253:2
267:20 272:7
333:14 338:8
358:6 360:1 384:8
396:23 400:8
448:9 452:12,17
474:4,12,15
477:20 482:23
483:8 521:8
534:13 565:16
568:7,11 570:10
573:18,20 574:13
**gift** 348:4
**girl** 98:18,19 99:21
99:23 100:3,6,8
102:11 103:22
106:6 107:11,19



108:3 109:13
114:24 115:3,8,12
116:4,15,20 118:1
118:10,14,19
119:9 121:3,14,22
128:7 129:3 131:4
132:18 134:1,8
135:11,18 136:13
137:2,12,20
138:17 139:4,8
141:17 142:1,7,22
143:17 144:6
145:7 148:5 149:3
150:18 153:11
154:16 155:23
166:24 167:6
168:19 170:13,23
171:11 173:7
174:12,23 176:17
178:6,15 179:1,13
180:23,24 181:16
182:4,4 183:14
184:2,2 186:3
188:2 194:23
195:1,7 197:6,12
197:21 200:19
203:2 204:22,22
205:3,18 207:17
207:18 208:5,6,14
208:19 209:4,4,11
209:12,14,18
210:2,18,19
211:13,13 213:11
213:12,15,18,20
213:24,24 214:1,2
214:5,16 215:1,2
215:3,5,7,8,13,13
215:23,23 216:2
216:13,19,20
217:3,3,5,8,8,16
217:17,18,23,23
218:1,5,6,8,12,12
218:14 219:21,22
220:18 221:1,5
227:9 230:6 231:7
231:7 232:1

233:10 234:6
236:10 238:12
249:8 250:1 258:3
258:5,6 259:22
269:3 270:19,22
271:8 283:18
294:16 299:18
300:7 301:24
302:14 303:2,11
304:15,24 310:2
312:22 315:8,8
331:8,11 332:11
333:3,7,10,20
334:2,22 335:6
337:6,9 338:7,7
339:10,24 340:12
341:8,19 342:2,5
342:7 343:8,18
350:18,22,22
352:14,18,21
353:6,15 354:10
355:7,10,23 356:9
356:16,17 358:8
360:5,9,10 361:7
362:2 364:13
366:13 367:16
368:18 374:4
377:7,8 379:4,5
379:14 380:8,9
381:20 384:9
393:18 394:10,20
397:13 406:5
411:20,20 412:17
413:21,22 429:23
429:24 433:24,24
434:10,10 440:20
443:4,4 459:7
463:11 464:1
477:4,23,24,24
478:8 479:10
480:4,8,10,10
481:16,20 482:4,4
482:9,9 483:9
490:10,10 492:6
495:10,12,13
496:1,1 504:19

507:12,12 518:20
518:22 520:3,3
526:8,9,15 528:11
528:11 529:11,11
531:4,8,11,15,18
531:19,23,24
532:3,3,6,8,12,16
532:16,19,19
533:4,4,11 541:15
541:19 542:2,4,7
542:8,15,17
543:18,19,21
544:1 561:21,21
570:18,19
**girlfriend** 38:3,18
276:22 277:4,17
**girls** 183:15,16
**girl's** 504:18
**gist** 348:13
**give** 12:22 13:13
19:7 22:21 30:19
39:24 50:3 101:16
111:10 117:17
120:8 155:3,8,20
157:21 158:6,10
168:17 170:11
201:4 226:17
260:20 263:15
280:5 305:15
391:17 405:5
407:4 423:12
426:9 427:9,14
448:15 455:22
467:3 496:20
504:10 506:21
512:7 514:2 519:3
561:8 566:11
567:12 568:3
**given** 68:18 154:24
360:2 437:16
447:17 512:9
583:7
**gives** 153:2
**giving** 91:19 160:9
343:20 444:20
446:23 505:7

512:23 518:19
519:1,17 525:10
571:6
**glass** 232:12
**go** 10:24 12:1 23:1
23:13 28:5 45:8
48:10 60:15
136:19 145:3
151:6,18 155:16
156:8 158:20
169:24 176:1
180:10 195:7
197:16 205:7
231:13 252:23
259:16 266:5
272:19 273:6
276:12 294:9
309:6,9 313:8
354:15 355:3
388:15 389:9
392:17 395:18
400:23 401:2,20
411:17 412:1,12
416:17 421:10
428:12,13 431:18
433:10,19,21
438:9 439:24
448:11 450:13
456:13 466:2
468:17 469:4
474:18 482:2
497:5 511:12
521:6,17 530:7
545:17 564:7
572:23
**God** 311:24 494:20
**goes** 36:6 380:14
428:2 475:19
**going** 10:24 12:1
13:11 15:2,6
16:22 22:6,7 23:1
29:23 30:3 38:24
70:23 71:5 73:6
81:1,21 96:19
110:3,9,20 111:9
111:19,24 112:4

120:8 125:12
129:17,24 131:16
139:15 145:21
146:4,5,10 147:10
147:16 153:15,17
153:18 156:22
157:21,24 161:15
165:24 166:10
169:16,18,20
174:15 175:16
176:1 180:23
185:4,6,7 186:3
188:14 189:21
190:8,15,21,22
191:20 195:7,9
201:16,17 204:15
206:9 209:1 211:3
212:11 222:18,20
222:23 224:22
230:5 231:2
233:19 235:4,13
235:15 240:18
242:22 255:5
256:11,15,17
257:16 258:22
259:1 260:20
264:10 267:14,17
267:18 268:4
274:13 281:19
282:14 291:2,4
310:13 312:6,8
316:23 317:22
319:22 324:1
327:10 328:4
342:15 343:21
345:10 346:13
352:23 355:4
356:21,23 357:2
360:14,16,18
363:22 364:19
367:21 368:21
370:10 373:12
378:18,20 379:7
379:17,20,21,24
380:4,16,17
381:14 382:6,9,18



383:24 384:1,17
387:1 391:1
392:19,21,22
400:23 402:18
403:22 404:21
407:4,22 410:1
412:14 414:2
415:10 417:14
420:4 421:20,21
422:2 431:9 433:7
433:18 435:11
437:8 445:6
450:16 457:20
458:5 464:5 465:5
466:19 468:1
469:13 470:19
479:1 486:24
487:4 488:13
494:2 498:3 500:7
502:5,18 503:9
516:13 521:19,23
522:9,10 523:6,16
523:20 528:20
534:18 535:24
536:4,18 537:10
537:13,16 538:2
539:20 540:14
541:8 546:1,8,10
553:8,15,19 557:6
559:23 560:21
561:1 564:7,20
567:8,11 568:3
571:5 576:21
**good** 110:5 203:12
225:5,12 256:24
336:18 375:5
395:16 489:6
506:17 513:10
519:6
**gotten** 238:7 313:1
438:2 511:1
526:22
**grabbed** 196:6
296:7 299:10,11
**Grammies** 225:2
371:10,16,20

372:13 373:22
375:20 381:6
435:4,23 437:15
438:9,11,16
439:24 440:18
441:18 442:9
444:21 445:7,13
**Grammy** 435:18
438:14 439:5
447:18
**great** 133:5 237:23
310:8 315:9,16
**greater** 127:10
420:9
**Greenbriar** 34:8
**group** 3:5 9:6 347:8
476:2 513:14
537:24 538:22
**guaranteed** 519:6
**guess** 31:12 36:16
119:14 237:9
278:24 344:12
355:2 416:19
449:6,11 484:13
484:16 495:4
498:15 500:16
526:23
**Guice** 88:2,9,13,23
89:2 90:21 91:19
92:14,19 93:3
94:12 95:5 96:1,8
96:9 97:3,20 98:1
98:5,8 99:11
100:10 101:4,7
103:21 104:1,10
104:19 107:16
121:3,14,21
123:22 124:3
137:1 141:16,24
142:7,16 143:16
144:4 145:15
147:3,11 148:4
149:2 150:13
152:17 153:10
154:17 162:18
165:17 177:14,18

199:21 216:14
217:5,19 218:2,9
218:15 225:9,20
225:22,24 226:3
226:11,23 227:2,4
227:9,22 228:2
229:13 244:10
247:1 248:8
259:23 264:2
268:21 281:5
283:17 296:13,14
296:18,23 297:9
304:1 323:22,23
324:6 329:21,24
361:6 362:10
393:17 394:9,15
412:16 435:12
436:7,18 455:7,14
499:24 500:11
509:18 510:14
516:7,16 517:3,8
517:20 518:21
519:9 541:8
570:17
**Guice's** 90:16
144:6
**Guice-3** 39:12
**guitar** 101:19,20
102:17 217:24
218:7 221:9 348:2
348:9,15 495:9
543:17
**guitarist** 220:24
**guitars** 107:4
290:17
**gun** 416:20
**guy** 43:15 133:5
193:11 267:19
269:24 523:16
533:15 541:9
545:14
**guys** 66:6 68:18
116:22 338:14
524:8 529:23
533:19,24 534:3
537:7 544:9 577:2

**G-R-E-E-N-B-R-...**
34:9

---

## H

**H** 4:8 5:2 582:3
**Haas** 35:2
**half** 240:11,15,16
258:21 502:20
520:19
**hand** 13:12 109:4
387:5 505:20,24
546:10
**handed** 14:5 26:16
213:22 285:6
456:11 457:4,8
458:8 552:7
**handful** 389:13
**Handing** 14:15
**handle** 59:16 60:2
94:7 147:10 169:6
227:10
**handled** 58:1
130:23
**handles** 484:13
**handling** 58:21
59:13 82:14
128:24 132:17
475:20
**hands** 315:9
**handshake** 121:10
123:19
**hands-off** 227:11
**handwriting**
488:17 489:17
490:3,15,16,17
**handwritten**
492:14 495:22
496:18 497:8
**hang** 507:8
**hanging** 133:6
321:14
**happen** 108:19
144:16,17 185:4,6
255:5 312:9
317:23 344:8
353:1 357:3

360:23,24 426:24
536:5,18 570:6
**happened** 58:24
59:2 94:4 119:14
119:15 133:11
154:3 158:8 160:7
221:19 230:21
257:11 292:20,22
293:4 294:1
295:18 298:19
307:1 364:17
383:15 399:4
474:13 538:4
539:11
**happening** 169:15
258:18,19 330:21
401:16 572:24
**happens** 12:23
177:11 303:18
377:1 459:24
**happy** 177:24
178:2 186:8,10,12
230:24 231:14,16
231:21,24 247:17
247:22 311:20
312:2 326:18
366:10 387:14
390:2 393:8
440:13 448:15
535:5 536:12
**hard** 109:17,18,20
120:20 190:17
197:23 201:24
274:21 286:20,20
**Harris** 2:14,23 9:1
375:24 376:5,16
378:13 379:3,13
384:6 408:24
**hassle** 527:6
**Haverford** 32:15
33:11
**head** 70:18 292:4
385:8 414:14
**headphones** 290:16
**hear** 15:23 16:12
93:8 107:8 114:4



129:10 133:8,9
152:4,9,21,22
186:20 190:15
196:21 217:20
220:4 364:22
522:17 525:21
552:9
**heard** 16:11 47:21
92:18 93:3,10
114:16 125:20
129:4,5,8 145:1
145:10 174:17
175:9,12,20
176:16 177:18,23
181:14,16 184:16
185:1,2 197:4,7
197:21 198:2
199:12,15,16
219:20 225:23
431:5 499:16
519:20
**hearing** 197:12
**heated** 222:7
**heed** 47:23
**heightened** 294:8
420:2
**held** 1:11 435:20
515:6
**hell** 207:2
**help** 107:14 127:4
198:20 200:18
228:2,4 265:12
276:16 361:6
453:5 454:13
471:7 547:13
**helped** 103:5,7
138:24 198:17,18
200:21,22
**helping** 264:2
**helps** 127:2
**hey** 315:5 503:8
**he'll** 158:5 575:10
**Hi** 9:11
**high** 60:14 185:11
439:21 502:15
**hit** 109:3 143:17

**hold** 108:15 420:19
430:6 441:4
483:17 487:1
553:5 558:1
**hole** 466:18
**holidays** 237:23
**home** 34:18 37:8,10
286:24 287:11
288:22,23 289:21
290:3,7,11 291:10
455:12 542:9
**honest** 69:7 121:7
170:8 302:5,9
379:10 380:5
381:1 494:20
533:24 544:12
553:16,19
**honestly** 525:6
**hook** 117:3 208:13
216:17 217:4
250:11 256:3
338:10 377:23
**hope** 19:6
**hopes** 185:10
**HoriPro** 457:24
484:11,11,12,22
508:8,11 509:20
511:1,14
**HoriPro's** 484:20
**hot** 336:18 348:3,14
**hour** 16:10 258:21
267:4,14 464:23
**hours** 157:23
169:17 190:18
259:5,9 276:8
317:20 369:22
371:3,5 401:1,19
413:16 448:14
450:4,9 534:10
560:15 564:18
569:6 574:11
**house** 34:13,14
36:20,22,24 37:3
37:6 274:20 276:5
481:14,24,24

**housed** 45:1
**huge** 193:22 203:15
**human** 288:7
**hundred** 143:1
515:23 568:20
**hundreds** 281:6
283:14
**hung** 85:11 452:17
**H-O-R-I** 484:11

**I**

**idea** 81:5,9 87:15
297:5,7 408:20
510:5 519:3
572:24
**ideas** 338:8
**identical** 204:23
205:1 209:5
213:11
**identification** 13:18
22:13 39:8 73:12
78:19 90:11
204:11 243:4
265:21 280:11
386:3 417:10
465:12 488:21
546:19
**identified** 275:23
311:13 403:15
411:9 465:7
473:19,21 512:8
**identify** 39:4,18
79:1 289:14
484:23
**identifying** 362:1
415:6
**identity** 46:10
**III** 2:14,23
**Ikea** 481:13
**Il** 40:24 41:12 42:6
**imagine** 243:24
248:20
**impart** 416:24
**imperative** 581:16
**impermissible**
169:12

**important** 175:8
186:16 457:15,16
535:13
**impression** 15:9
310:9 353:1
**impromptu** 230:12
230:17
**improper** 207:5
364:17 431:21
432:3 452:24
561:5
**inaccurately**
158:17
**inappropriate**
188:21 189:2
**include** 51:9 119:8
120:18
**included** 118:18
234:5 249:7 250:1
333:19 334:2
340:18 342:13
440:20 561:20
**including** 119:21
264:19 281:9
341:12 526:18
**inclusion** 374:3
**incorporated** 342:2
342:4,9 471:11,12
**incorrect** 431:21
472:6
**incorrectly** 282:4
**INDEX** 6:2
**indicated** 537:20
**Indicating** 220:4
450:21
**individual** 49:21
51:17 56:6 381:2
515:2
**individually** 42:2
48:15
**individuals** 76:17
99:19 379:10
384:4,22 410:16
**industries** 487:18
**industry** 193:11,20
203:21 486:14

**important** 487:14 488:6
**ineffective** 529:19
529:21
**information** 19:1
24:14,24 31:20
61:12 109:10
169:4 220:17
281:16 283:14
355:9,21 356:3
367:22 441:19
**infringement**
112:21 460:3
**initial** 141:23
434:18
**initially** 142:15
262:1
**initiated** 346:16,21
409:21 410:16
**inserted** 492:18
**inside** 55:6 286:12
**inspect** 209:24
326:6
**instability** 274:18
**installed** 481:14,23
**instance** 305:23
**instances** 306:17
**instruct** 13:3 423:1
431:7,9 515:15
**instructing** 27:17
29:20 151:1,9,14
151:21 326:2
327:4 421:17
429:6 432:5,19
433:1
**instruction** 30:6
429:9
**instructions** 11:1
47:24 173:6
513:18 581:2
**instrument** 107:4
**insurance** 275:4
**intend** 95:18,24
97:3 98:7,24
118:12
**intended** 105:11,16
105:24



**intention** 109:1
**interacted** 502:4
  503:20
**interest** 52:3
  138:17,20 162:20
  352:19 429:17
  430:5 528:10
**interested** 167:5
  295:11
**interesting** 498:23
  501:23 544:22
**interests** 29:6
**interfering** 51:1
**interject** 452:24
**Internet** 20:7 38:11
  38:12 55:11
**interrupt** 327:2
  359:16 388:8
  401:10 412:24
  497:5 527:3
  564:22
**interrupted** 167:22
  189:9,22,23
  194:10 239:22
  454:17 569:9
**interrupting** 94:2
  169:9 201:23
  202:3 231:19
  240:13 260:11
  327:14 370:13
  454:6 564:12
  568:1
**interview** 242:5
  248:19,22 249:5
**interviewed** 248:4
  248:9
**intricacies** 556:1
**intro** 205:3,8 208:5
  208:6
**introduce** 545:22
**introduced** 77:23
  545:11
**introduction**
  315:18
**invades** 419:19
**invest** 515:3

**investigation** 25:3
  25:11,13
**invoice** 4:21 385:4
  427:5 450:19
  451:3,5 457:22
  460:22,23
**involve** 252:22
**involved** 62:9 100:2
  100:6,8 234:20
  252:19 253:1
  277:24
**involvement**
  199:18
**in-depth** 337:2
**in-laws** 86:13
**IN2N** 3:5 9:5 271:3
  501:9 509:19
  511:14 513:13
  537:23 538:21,24
  539:13
**Issiah** 2:12,21 8:21
**issue** 17:3 90:5
  227:12 257:3
  270:11 326:20
  327:19 382:17
  384:8 392:15
  395:3 404:3
  406:18 408:15
  412:13,15 420:5,6
  433:23 434:9,9
  437:9 441:20
  458:11 463:7
**issued** 51:20
**issues** 282:3 406:16
  428:3 482:22
  483:5
**Italy** 121:5,6
**items** 272:17 291:2
**Izzy** 239:7 241:16
  371:15 372:12
  373:1,8 374:2
**I-N-C** 471:8

———————
**J**
———————
**J** 417:19 493:10
**jail** 313:9

**Jam** 116:21 171:5
  181:9 234:20
  367:6 376:10
  499:3 526:18,20
**James** 2:14,23 8:24
  375:24 376:5
  379:3 384:6
**Jams** 117:18 119:6
  119:17
**Jdd@jddavispc.c...**
  2:9
**Jeffrey** 429:15
**jeopardize** 313:8
**jerk** 267:19
**Jessi** 498:19,21
**Jim** 499:3
**Jimmy** 116:21
  117:17 119:6,17
  171:5 181:9
  234:20 376:9
  379:2 526:18,20
**Jive** 418:24
**job** 315:9,16 344:20
**joint** 80:5
**jolly** 133:5
**Jonathan** 2:6,7
  8:13
**joyous** 233:14,19
**Jr** 2:12,13,21,22
**judge** 47:22 50:24
  111:4 112:7,12,19
  207:2 213:1
  433:13,15 540:14
**judgment** 95:16,17
  96:2,4 97:2,8 98:5
  98:21,24 340:17
  379:9
**judgments** 96:17
**jump** 416:20 527:2
  536:2
**jumped** 294:15
**J-E-S-S-I** 498:22

———————
**K**
———————
**Kate** 504:18
**Kathleen** 1:15

579:3,24
**Kathy** 8:7
**keep** 47:14 157:24
  201:24 202:2
  210:5 257:23
  258:22 267:8
  275:15 291:3
  299:12 342:19
  361:12 378:1
  390:22 392:24
  404:20 433:9
  437:10 457:13
  519:18 524:10
  534:11,12 558:19
  559:23 565:21
  571:5
**keeps** 13:24 201:23
  476:9 533:13
**Kelly** 2:16
**kept** 87:16 238:22
  457:10 539:9
**keyboard** 290:18
**keyboards** 545:16
**keys** 391:3
**kid** 124:23
**kids** 85:1
**kind** 108:6 129:18
  165:18 223:19
  258:17 276:15
  327:9 468:1 492:1
**kinds** 545:16
**Kiss** 504:20
**kitchen** 481:12,13
  481:20,23 482:3
**knew** 21:16 85:1,17
  85:21,22 86:1,5
  114:12 135:24
  145:8 152:17
  171:2,8 172:10,12
  172:13 185:3,14
  186:21 251:18
  256:10 263:3
  265:15 310:16,21
  311:12 314:3
  317:6 329:4 342:8
  345:7 352:1,4,8

379:6 381:10
  438:18 440:18
  485:24 486:11
  508:15 526:16
  527:21,22 528:6
  529:7 539:2,3
  557:7 561:19
  562:1,17,21 565:6
  569:24 570:2,16
  572:7,19,21
**knob** 201:19
**know** 11:6 23:19
  25:14,21 29:23
  30:4 36:12 40:6
  46:5,5,10 49:12
  51:16 52:2 53:18
  55:9,10 56:8,12
  56:19,22,23 58:10
  58:17,18,24 59:1
  59:7,11 60:13
  61:7 64:9,12,19
  64:20,21,22 65:3
  65:6,18 66:9 67:8
  68:16,17 70:4
  71:2,4,7 76:10
  77:18 80:4 81:2
  84:23 86:4,7,12
  86:20 87:3,8,19
  88:1,12 89:8,9,10
  94:7,11,23 95:4
  97:20 99:6 102:6
  103:10 105:17
  106:13 119:13,18
  125:7,10,21
  126:22,24 127:13
  130:4 132:2
  134:10 136:1,7
  146:17 152:10
  154:10 161:19
  162:2 163:2,4
  165:14,15 175:15
  176:5 179:12
  180:22 181:2
  192:8,24 199:2,17
  206:7,12,15 210:4
  210:7 213:3,3,4



222:12,13,15
224:16 228:9
229:13 234:19
239:10 241:22
242:2 244:20
252:1,3 254:7,17
262:14,21 265:9
266:20 267:1,4
271:5 272:1
278:23 283:5
286:13,19 293:17
293:19,22 294:15
297:3,23 298:4,17
298:19 299:2
308:12,12 310:10
315:3 317:3,4
319:7 329:7
331:10 332:10,14
334:16,18,24
335:1,12 336:22
337:19 338:10,12
340:11 341:2
344:2 352:3 354:8
355:13 356:10
358:23 367:6
368:4,20 369:1,13
370:11,17,20
376:8 377:23
379:9 382:4,13
390:14,16 396:16
398:19 399:1,4,11
403:18 416:3,17
416:21 418:16
423:21 424:1,18
434:19 437:1,17
437:19 439:19,21
440:6,11 441:13
441:15 442:11
458:23 460:12,13
460:14 461:20
468:10 470:11
471:8 477:14
479:5,11,21 480:2
482:8,13 484:15
485:16,19,23
486:2,2 487:21

488:7 491:24
492:20 493:3,15
493:16 496:2,14
498:24 499:19
500:23,24 501:2
501:20 502:9
503:10 505:6
506:18 507:3
508:3,9 510:11,17
512:3 513:16
514:5,18 515:22
516:14 517:5,14
519:12,16 522:17
522:24 523:2
525:7 527:16
529:1 533:17
534:16 537:8
538:3 539:10
542:22 544:10
547:10 548:9,23
551:17,19,23
552:11,22 553:17
553:23,24 554:9
555:24 557:3
558:6 559:9,10,10
559:13,15 560:3,4
562:13,14,23
563:16,19 564:5
565:12,13,22
566:6,8,17 568:5
568:8,15,18
569:21 571:10,22
572:1 576:22
577:6,14
**knowing** 105:17
343:21
**knowledge** 31:19
290:2 343:20
354:9,11 416:19
416:23 438:22
442:17 496:3
539:8 557:2
**knowledgeable**
125:13
**known** 41:3 256:17
273:6 276:18

310:12 312:8
316:23 352:22
356:21 360:16
368:20 378:18
379:19,24 380:16
380:17 440:7
506:16 557:5
569:23 570:3,9
**knows** 169:21

---

**L**

**L** 532:23
**label** 32:22 33:19
33:22 34:17 35:3
35:18 36:4 50:6
193:23 352:5,8
367:2 439:22
474:15 504:15
**lad** 487:9
**LaFace** 365:18
366:12 367:1
**Lancaster** 33:11
**Lance** 3:2 9:3
513:11 530:17,18
**Lance@RogersC...**
3:4
**Lane** 34:8,9
**large** 86:2
**late** 16:7 17:4,6
267:5,7 274:24
338:16 344:22
550:12 575:10,18
576:18
**laugh** 540:14
**law** 1:11 161:3
293:12,20 294:19
429:15
**lawsuit** 299:17
300:12 366:3
416:16,18 505:4,4
513:15 561:15
562:5,9,15,21
563:13,17,22
564:5 569:18,21
570:8,15 571:15
**lawyer** 11:15 12:16

23:5 24:6 60:20
89:6,18 91:11,15
128:22 161:22
165:10 286:3
318:22 325:19
362:23 369:8
423:7,8,12 430:23
433:22 434:8
441:15 460:11
461:11 462:9,13
473:13,20 495:14
496:21 552:12
560:5,12
**lawyers** 16:19
**LAWYER'S** 580:1
**lead** 179:2 495:9
**learn** 87:7 182:3
192:1 254:1 329:1
335:9
**learned** 184:1
185:18 186:2
187:5,7 188:2
195:13 199:23
202:18 294:4
333:6 352:17
**lease** 4:14 55:7
72:22 73:3,8,23
74:1,15 75:1 76:3
76:13,16
**leased** 76:20
**leave** 11:13,14
274:20
**led** 132:19,21
459:23
**left** 59:15 60:1,13
145:3 149:11
154:1 207:23
240:10 287:10
294:15 369:10
449:24 450:8
486:17 534:21
564:17
**left-hand** 79:18
244:16
**legal** 1:22 8:5,8
56:4 95:21 96:11

96:24 99:3 139:12
387:2 412:7,11
429:17 474:2
495:15 550:6,17
553:8 558:4
**legalities** 130:5,22
559:11
**legally** 64:16 420:8
**length** 280:1
302:18 401:3
460:9
**lengths** 317:2
**lessor** 74:15
**letter** 4:22,24 5:5
28:23 29:1,3,11
29:15 84:18
326:18,19 384:22
417:17,20 418:13
418:19 421:8,13
422:9 423:13
424:12,17,23
425:10,11 428:12
428:13 451:3,4,7
451:15 452:3,9,18
452:19 453:7,14
453:18,21 461:1,2
461:5 473:18
488:16 492:10
493:10 494:6,9
495:2 496:6
497:13 498:4
**letterhead** 385:21
450:20 461:3
**letters** 458:2,8
474:4
**letting** 152:2
**let's** 18:12 113:14
113:19 133:8,9
153:6 194:4 204:6
206:20 246:23
262:19 266:11
269:13,14,17
336:16 436:14
442:22 450:13
521:21 522:17
548:24 568:16



**level** 203:20 420:2
**Lewis** 2:14,23 9:2
  116:22 171:6
  181:8,9,19 234:21
  254:16 344:6
  346:8 347:10,21
  367:6 375:23
  376:10 377:8,13
  377:19 378:8,13
  379:2,13 380:7,20
  380:24 384:6
  408:24 499:4
  526:19,20,23
**liar** 94:12 95:5
**lie** 270:14 537:24
**lied** 63:22,23
  537:22 538:1,4
  563:1
**lies** 63:21 148:22
  158:3 269:24
**life** 186:18 191:4,9
  191:12 276:20
  308:13 378:2
  445:6
**limited** 420:22
**line** 6:6,6,6,12,12
  6:12,16,16,16,21
  6:21,21 15:15
  80:15,21,23
  181:15 205:3,5,9
  207:16,17 371:23
  376:11 423:20
  424:2 490:18,22
  490:24 491:1,8,14
  491:16 492:9
  559:19 580:2
  582:5
**liner** 220:14 221:14
  221:17 222:13
  231:22 235:19
  236:3,12 237:12
  311:16 318:2
  364:18 416:15
  441:12
**lines** 221:23
**lingering** 483:6

**list** 512:8
**listen** 120:22 137:8
  159:22 186:22
  206:23 261:15,17
  282:9 336:17
  421:22 422:7
  431:12 556:20
  568:14
**listened** 232:14,19
  233:2,8 336:20
**listening** 133:7
  336:11
**litigation** 188:18
  428:24
**littered** 206:24
**little** 57:23 82:20
  106:20 125:13
  169:3 177:20
  185:16 199:19
  219:7,8 226:14
  252:18 359:20
  392:18 444:5
  448:1 450:14
  501:22 502:15
  512:4 515:21
  547:14
**live** 36:23 37:2,13
  77:2,5
**lived** 38:7 77:9
  85:23 86:2
**lives** 37:5,11 187:1
**living** 278:19
**LLC** 2:2 8:3 9:6
  33:23 35:5 36:7
  53:1,1 56:13,24
  513:14
**local** 242:3 515:13
**locate** 294:21
  322:23
**located** 33:24
  508:10
**location** 38:13,14
  72:18 288:16
  336:10 338:4
**locations** 71:16
  72:11

**locked** 390:23
**Logic** 253:6,8,10,12
  253:13,15
**long** 37:23 124:20
  124:22 167:18
  171:21 172:12
  193:12,21 256:15
  257:18 263:22
  266:23 294:20,23
  297:8 302:19
  308:13 333:16
  365:16 402:13
  426:10 448:12
  513:17 524:11
**longer** 58:9,11
  450:14
**longs** 205:23
**look** 26:11 39:24
  68:11,12 73:18
  74:10 111:6,11
  121:4 134:19
  136:11 142:19
  156:24 205:2
  208:13 212:10
  220:13,16 250:15
  251:9 280:15
  286:23 287:5
  305:2,12,13 319:4
  323:7 324:4 325:7
  325:16 328:9,10
  328:16 387:14
  461:21 462:24
  463:1,2 465:20
  493:3,16 533:23
  533:23,24 544:16
  547:2,3 549:1
  552:10 554:11
  575:5
**looked** 14:7 308:15
  322:24 355:15
  412:3,4 544:8
  555:15
**looking** 14:4 68:15
  164:5 183:4,7
  196:5 295:1,7
  297:14 299:23

  415:2 470:23
  489:20 552:8
**looks** 460:21,24
  468:18 492:1
**loose** 556:4
**Los** 306:7,13
  372:18 373:4
  376:14 435:21
  511:2
**lose** 541:8
**lost** 520:6 541:7
**lot** 32:18 45:2,3
  65:12 80:24 121:8
  148:22 154:7
  176:2 289:20
  290:5 298:10
  323:24 344:21
  369:15 435:8
  496:9 499:2
  506:16 550:7,17
  561:4
**lots** 148:22 291:1
  298:21
**love** 273:20,21
  277:7 493:16
  503:22
**loved** 348:8 502:3,4
  503:18,19,19,24
**loving** 503:6
**lunch** 266:5 267:2
  268:15
**lying** 228:22 396:17
  397:6 398:20
  399:1,7 443:20
**lyrical** 541:23
**lyrics** 4:17 100:13
  100:21 101:2
  102:3 103:21
  104:2 204:21,22
  204:23 205:22
  207:16 208:15,22
  210:2,17 211:14
  212:16 213:10,12
  216:22 350:7
  541:21 542:20
  543:7,16,24 544:3

-----

**M**

**MAC** 504:3
**machine** 521:19
**madam** 64:1 81:22
  374:10
**magazine** 4:18
  242:3,3,5,13
  243:14,15 244:3
  244:21 515:14
**Magna** 1:22 8:5,8
**maiden** 278:9
**mail** 21:11,12 38:21
  252:6 345:3
  437:22
**mailed** 252:8
  254:17 343:4,15
**mailing** 343:2
  345:7
**maintain** 20:10
  67:23 71:16
  287:12 288:15
**maintained** 51:18
  71:8 289:6
**major** 352:5
**majority** 55:5
**making** 62:21 63:4
  115:16 130:4
  206:1 258:5 269:6
  343:1 347:17
  350:2 431:1
  443:21 444:1
**Malofiy** 2:3 9:11,13
  11:24 12:13 13:3
  13:21 15:24 16:3
  16:12,22 17:15,17
  17:20,24 18:13
  24:16 25:2,4 26:5
  27:1,6,13,18 28:7
  28:16,19,24 29:5
  29:8,16,21 30:2,8
  30:21 31:3 39:11
  39:15 43:7,14
  46:15 47:11,19
  48:9 50:12 51:3



52:20 53:7,9,11
53:15 54:6 59:20
62:15,20 63:1,6
63:14,15 65:9,24
67:2 69:3 70:1,15
71:23 73:15 75:5
77:22 78:5 79:2,6
80:20 81:6,18
82:6,17 86:14
90:2 91:12,21
92:3,9,24 93:20
94:1,19,24 95:20
96:10,15,19,23
99:2 101:11,22
102:20 104:13,22
105:13 106:1,8
107:24 108:10,21
110:2,23 111:1,7
111:12,16,21
112:1 113:4,14,19
114:18 115:19
116:1,5,11,16
118:2,15 119:23
120:3 122:2 123:4
124:6 128:17
130:9,12 131:1,5
132:4,9,14 135:12
137:16 138:8
139:11 140:2,8
141:18 142:2
143:4,18 147:22
148:7,14 149:13
150:3,14,19 151:2
151:11,16 152:2
152:13 153:12
154:4,19 155:5,15
156:7,15 157:4,8
157:18 158:24
159:7,18,22
160:22 161:21
162:4 163:12
164:14 165:8
167:1,7,17,22
168:20 169:9,14
170:14 171:17
172:6,23 173:9

174:13,24 176:19
177:5 179:5,16,24
180:12,17 182:19
183:21 184:14,21
185:20 186:5
187:19 188:11,16
188:20,22 189:5,9
189:12,20 191:15
192:21 193:18
194:2,4,9,24
198:9,22 200:6
201:8,12,15 202:2
205:12,17,24
206:6,10,18,23
207:7,11 209:19
211:8,20 212:3,10
213:2 214:17
215:15 216:4,10
216:21 218:23
224:1 226:19
227:15 228:13,17
228:24 229:7,15
230:14 233:15
234:7,24 235:5
238:8,13,17
239:11,15,21,23
240:4,9,10,14,20
241:1 242:21
243:7 244:18
245:21 249:9,18
250:3 251:2,10
255:16,22 257:4
257:20 258:9,15
259:4,6,12 260:1
260:7,12,17 261:9
262:3,12 264:23
267:3,16 268:1,24
269:8,15,17,23
270:7 271:11
272:12 275:6
279:16 280:2,23
281:12,17,24
282:6,9,23 283:5
283:7 284:2,8,11
285:15 287:23
288:10 291:17

297:19 300:1,8,18
301:11 302:16
303:3,12 304:2,16
305:6,15 307:8,13
307:22 308:1
310:19 311:22
313:4,18,22 317:8
317:15 318:11,17
319:12 320:6,18
321:4,9 324:19
325:13,22 326:3,7
326:15 327:1,6,14
327:16,24 328:1,5
328:8 332:4 334:4
339:13 340:1,23
341:15 342:18
346:17 347:22
349:19 350:10,19
351:4,10 353:12
353:16 355:11,24
356:18 357:8
358:9,21 359:5
361:9,15 362:16
363:2,5,11 365:24
366:5,16 368:10
369:12,18,23
370:4,9,17 371:3
371:4 372:5,8
373:11 374:5,21
376:6 378:14
380:21 381:22
382:23 383:3,7
384:10 385:5,17
386:6,10,15,16
387:4,17 388:7,15
388:18 390:1,18
391:6,13,19
392:17,24 393:4
393:12 395:17
396:6,19,24
397:15,19 398:22
400:1,6,22 401:5
401:7,12 402:17
402:21 404:18
405:11 406:7,17
407:12 408:11,16

409:6 410:3,19
412:18,23 413:2
413:13 415:12,24
417:3 418:15
419:5,8,12,22,23
420:14,18,23
421:4,9,14,19
422:1,7,11,15,22
423:3 424:4,13
425:2 426:6,14,17
427:11 428:1,15
429:2,7 430:6,12
430:17,22 431:8
431:12 432:7,15
432:21 433:4,6,14
434:4,11 436:4,8
436:13,20 437:3
439:1 440:2 441:1
441:4,23 443:24
444:14 448:8,11
448:21 449:20
450:1 451:8,12,20
451:23 452:16,22
453:2,23 454:4,7
454:12,17,18
456:21 458:13
459:3,10,14,17
460:10,11,14
462:10 464:4,9,22
465:19 466:10
467:7,13 468:6
471:4,14 472:7
478:9 479:16
480:5 481:17
482:10 483:10
484:3 485:1,8,21
486:16,20 487:3
488:2,9,24 489:5
489:19,22 490:23
493:12 494:11,15
494:19 498:5
500:2 501:10
505:3 506:6,23
507:14 509:13,21
510:8 511:20
512:19 516:18

517:9 518:12
520:4,13 521:4,10
522:8,19 523:5
524:12,16 526:10
527:9 528:13,19
529:3,13 530:21
534:8,18,23
535:12,20 536:1
536:17 538:9
539:23 540:7,13
540:19,23 541:7
543:8,12 544:20
544:23 545:23
546:12 548:8,16
549:4,13,21 550:4
550:11,16 551:5
551:14,20,24
553:1,5,13 554:17
555:4,9,18 556:8
557:20 558:1,10
559:1 560:10,16
561:1,23 563:7,14
563:24 564:4,9,13
564:23 565:9
566:3,11,20,24
567:7,21 568:2,8
568:13,24 569:4
570:21 572:9,13
573:5,10,15,22
574:8,16,20 575:2
575:7,16 576:11
576:16 577:1,5,13
**man** 88:1 164:21
190:6 219:12
363:12 365:9
402:24 431:17
443:20 533:14
547:9 550:11
556:5 559:23
568:14 573:23
574:10
**manage** 267:24
**managed** 41:23
**manager** 33:2,2,3
40:24
**managing** 41:6



45:8
**Manan** 460:1
**Mantinfar** 74:11
74:16
**man's** 318:19
**March** 146:19
394:2 414:21
**Marino** 1:3,10 4:4
7:14,15 9:15,20
10:6,12 13:8 14:5
14:19 18:24 19:11
22:8 32:9 39:1
74:13 78:24 79:7
79:21 111:19,22
120:24 144:3
150:11,17 153:9
162:17 163:7
166:10,19,21
170:8 204:16
207:15 211:5
213:8 226:23,24
226:24 227:7,12
261:21 270:16,17
278:7 279:22
299:15 315:6
318:10,24 320:1,5
321:17 322:7,17
322:21 328:10
402:20 403:8
417:4 429:14
437:12 444:3
452:3 454:3
469:12,21 475:24
490:5 495:7,10,24
513:10 524:23
525:22 529:9
534:5 535:3
536:11 537:19
541:13 546:8,10
546:14 556:16
560:3,14 571:11
577:17 578:1
**Marino's** 459:6
**Marino-1** 4:11
13:19
**Marino-10** 4:20

280:12 291:8
482:16
**Marino-11** 4:21
385:20 386:4
450:18 453:12
459:11 466:9
**Marino-12** 4:22
417:11,15 489:13
489:21
**Marino-13** 4:23
465:5,13
**Marino-14** 4:24
488:14,22 497:21
**Marino-15** 5:5
546:20
**Marino-2** 4:12
22:14
**Marino-3** 4:13 39:9
39:13
**Marino-4** 4:14 73:7
73:13
**Marino-5** 4:15
78:20 79:10
**Marino-6** 4:16
78:13 90:7,12,17
**Marino-7** 4:17
204:12
**Marino-8** 4:18
242:21,24 243:5
**Marino-9** 4:19
265:22 266:3
305:9 370:8
**mark** 2:12,21 8:21
13:8 22:7 30:5
39:1 73:7 77:11
111:24 116:23
171:7 181:18
204:6 234:11
235:8,9 241:18,19
264:19 279:21
307:4 329:1 335:7
335:16 336:1
337:17,24 344:1,3
344:6 345:2
346:12,15,20
347:1,10 348:21

354:12,22 364:15
364:18 366:19
367:10 384:4
409:5 429:9 432:9
436:5,9,21 437:5
446:16 465:5
488:14 519:10,19
**marked** 6:15 13:17
22:12 39:7 73:11
78:13,18,24 90:10
90:16 111:22
204:10,16 242:24
243:3 265:20
266:3 280:10
291:8 305:3,7
386:2 391:20
417:9,15 426:22
435:12 436:17
450:18 453:11
465:11 475:24
488:20 546:9,18
**Market** 1:12,23
7:24 391:14
**marking** 385:19
436:24
**markings** 423:19
439:4
**marriage** 191:6
**married** 38:3
**Massoud** 74:11,16
**master** 107:19,20
495:8
**mastering** 109:16
**material** 117:17
118:24 119:6,9
120:18 340:18
341:18,24
**materials** 279:7
476:21
**matter** 7:15 9:14
13:1 65:16 175:24
227:10 236:8
387:1 483:23
504:12 517:4
544:21 579:9
**matters** 82:13

**Mawr** 3:3
**mean** 24:9 25:12
42:22 45:9 54:2
55:10,12 60:9
65:11 72:11 74:21
76:15 80:12 82:9
83:11 108:4 120:7
120:21 123:7
125:19 133:11,11
138:22 139:2
140:21,22 141:3
143:23 144:7
183:8 200:8 209:7
223:15 228:11
234:16 239:10
245:5 254:13
264:21 265:1
293:21 300:14
321:4 324:8 327:2
331:14 334:7
341:1 354:23
359:12 388:8
389:5 408:21
414:3 416:3
426:17 428:16
430:13,18 441:9
441:11 445:15
451:5 456:15
468:23 474:24
476:11 477:18
480:23 501:16
502:12 506:13,16
506:22 516:18
519:6 527:3 529:1
540:2 542:22,24
555:21
**meaning** 95:16
347:9 364:20
410:14
**means** 55:22 113:3
125:23 126:11
163:2 256:8
331:15 359:22
365:13 419:15
458:16,18 472:15
503:10 548:23

**meant** 69:18,18,24
70:5 134:10
222:14 223:12
226:15 446:8
514:3
**mechanical** 271:2
477:3 478:7 479:9
479:12
**media** 241:24
**medical** 274:16
276:15
**medication** 11:19
**medium** 334:8
**meet** 88:17 309:18
314:10 315:20
330:1,18 372:12
372:15 373:20
411:21 415:18
463:6 508:14
545:23
**meeting** 331:1
381:5 434:18
497:22
**Meidel@foxroth...**
2:18
**melodies** 217:18
**melody** 100:13,24
101:6 102:4
217:13 470:17
**member** 274:1,4,7
**members** 85:9
**Memo** 80:20,23
**memory** 140:12
192:1 212:18
229:4 308:2
517:15
**mention** 281:19
**mentioned** 99:20
102:9 225:4 235:8
235:9 265:14,17
281:22 322:24
389:14 438:8
446:22 472:18
483:22 502:2
504:1
**merge** 104:10



**messages** 323:14
324:5
**met** 38:2 78:6,7
85:2 86:21,22
171:1 225:10
263:5 305:20
306:17 330:5
336:6 364:6 371:9
371:14 375:2,23
381:6 416:24
511:19 513:12
545:5
**mic** 13:23
**Michael** 2:16 9:7
**microphone** 290:17
**microphones**
290:16
**middle** 250:16
251:4 255:21
370:14 388:14
452:22 467:12
554:13
**million** 530:13
537:6
**millions** 186:22
190:15
**mind** 109:12,14
229:20 255:5
340:22 341:6
391:11 472:19
476:13 521:16
**mine** 34:15 136:4
383:17
**minimal** 329:12
**minute** 44:13 426:9
567:12,24
**minutes** 15:21
157:20,22 267:10
267:24 315:10
369:20 392:23
448:20 450:2,8,10
464:8 486:17
494:12 523:4
543:2 547:4
564:16,18,21
**mis** 222:12

**mischaracterize**
363:16
**Mischaracterizes**
297:20
**mischaracterizing**
143:20 317:17,21
318:19
**miscredited** 222:12
222:14
**misrepresented**
152:19
**missed** 81:20
512:17
**missing** 237:9
293:14 294:11
297:6
**misstating** 238:18
**mistake** 221:14,17
222:1 224:22
225:21 226:14
227:22 230:4
231:18 232:5
234:3 235:19
236:2 237:2,12
257:13 263:13
264:3,8,9 288:7
318:2 414:11
459:1
**mistaken** 279:19
355:5 389:11
392:7
**misunderstand**
511:10
**misunderstood**
179:10 311:4
398:15 409:16
**mix** 106:19,22
107:14 467:4
**mixed** 106:7,11
107:19,23 108:9
109:15 115:1
**mixing** 106:16,24
107:2 290:24,24
**mom** 85:2
**moment** 11:12 14:5
30:19 39:24 50:3

163:3 164:1
171:15 174:8
175:8,14 226:18
228:6 272:1 277:5
292:18,19 427:14
439:24 440:5
445:5 466:4 467:1
512:15
**momentous** 190:24
445:5
**moments** 377:5
**momentum** 378:1
**money** 70:8 75:22
92:15,21 93:5
94:17 96:1,7 97:9
97:15 99:13
190:18 238:12
270:21 296:16
298:21 299:8,24
383:19 393:17
394:10,14 397:13
443:22 444:1
477:22 481:6
484:14 485:13
514:9,11,14 515:4
526:7 538:23
539:1,8,10
**monies** 296:4 302:8
461:13 481:15
515:22 516:2,3
570:17
**month** 101:17
102:6 344:12
349:5,7 350:1
373:4,10 492:17
543:3
**months** 197:17
276:12 285:3
516:1
**morning** 15:7
459:16
**mortgage** 37:11
**mother** 86:17
**move** 18:12,15
151:22 262:19
513:17 537:16

**moved** 38:4 87:7,14
394:4
**moving** 151:23
274:22 393:1
**MPC** 291:1
**multimedia** 32:19
32:24
**multiple** 160:4
212:13 257:8
334:9 335:22
337:4 343:11
344:9 349:2
438:11 468:7
**multi-page** 279:23
465:6
**music** 2:10,10,11
2:11,13,19,19,20
2:20,22 8:16,17
8:18,19,24 45:11
45:13,20 48:23
49:3,11,19 50:2,6
51:8,21 52:4,11
54:11,16 55:15
57:18 58:1,2,13
59:17 60:4,24
61:17 62:4,9 65:7
65:14,22 66:15,18
66:21 67:5,9,13
71:14 75:3,20
76:4,8,12,21
100:12,18 102:3
102:19 103:1,8
108:15 130:3
203:21 216:21
272:11 329:9,17
329:19,22 331:8
331:22,23 332:8
350:7 377:21
378:6 409:1,3
416:11 503:5,8,13
503:19 511:16
545:15
**musical** 108:7
109:23 110:1
126:12
**musically** 219:10

**musician** 109:19
186:18 210:23
360:20
**musicianship**
429:22
**mute** 225:17

———————————
**N**

**N** 4:2 579:1
**name** 9:12 10:5
33:4,6,21 36:2,8
36:11,17 56:3
68:6,21 73:3 75:1
182:16 236:5
242:15,17 252:14
254:6 265:7 278:4
278:7,10 291:9,15
292:11 296:3
308:10 309:23
316:17 329:5
365:11 366:8,23
376:16,17 438:8
455:1 498:20,22
504:18 508:6
513:11 542:7
543:6 545:13
**named** 88:1 215:12
365:9 461:12
542:19
**names** 41:4 75:11
234:23 241:21
**Nashville** 174:5
405:24 500:16
502:1,2,7 503:23
504:17 508:12
**Naturally** 248:24
**nauseam** 523:15
**nauseated** 260:18
**nauseating** 260:8,9
**necessarily** 256:23
297:23 332:3
519:5
**necessary** 126:23
127:1 255:2 581:5
**need** 11:10 50:23
110:3 140:16



162:15 218:3
239:19 260:20
283:4 369:3
370:24 402:9
403:12,12 469:7
521:11,12,15
522:21 535:3
552:10 563:15
**needed** 17:11 125:8
128:12 146:3
227:6,13 236:11
291:5 474:13
481:20 508:22,23
575:21
**needs** 377:22 391:2
420:3
**negotiate** 154:14
166:23 168:13,18
170:12
**negotiated** 170:24
171:10 174:20
176:10
**negotiation** 457:24
458:5
**negotiations** 147:11
387:2
**neither** 437:23
**never** 36:12 55:16
59:14 65:14 66:14
69:7 86:20,22
87:13 135:2,9
148:20 155:4,10
155:12,24 156:1
185:9 187:1
203:21 256:20
309:16 329:4
353:5 360:22,24
361:8 362:23
364:11 369:2
394:8 434:19
461:20 476:13
482:16 488:12
504:24 508:19
526:22 530:7
543:4 557:10
559:16 577:3

**new** 2:8,8 75:23
117:17,23 119:6
207:12 287:18,21
338:10 341:24
344:23 452:4
474:19
**newly** 215:12
**news** 175:20 177:4
177:19 178:13
**nice** 69:19 268:14
515:4
**nickname** 329:5
**Nicks** 504:2
**night** 88:21 521:20
**nights** 344:22
**nine** 574:11
**nominated** 438:10
**normal** 237:22
267:2
**normally** 108:24
193:15
**Notary** 1:16 579:4
583:24
**notation** 495:1
497:8,21
**note** 15:18,22
254:23 256:22
444:20
**noted** 581:13
583:10
**notes** 220:14
221:15,17 222:13
231:23 235:20
236:3,12 237:13
311:16 364:18
416:15 441:12
492:14 575:5
579:8 580:1
**notice** 1:10 4:11
13:10 14:16 15:15
574:24
**noticed** 17:13
574:17
**notify** 365:17
366:11 374:2
379:13 381:18

**notion** 449:8
**November** 23:6
228:11 385:23
453:21 456:2
563:23
**number** 7:13,19
10:13 30:24 86:8
166:8,18 233:12
233:13 263:16
317:3 322:6,16
335:20 349:2,24
351:24 353:24
373:15 469:20
480:17 506:10
507:24 508:19,19
577:23

---

## O

**O** 579:1
**object** 12:21 50:22
63:13 206:9
258:13 269:20
342:12,14 358:19
373:12 374:18
375:1 419:18
420:12 421:15
523:18 550:5
560:11
**objected** 249:6,23
374:3 459:19,21
**objecting** 433:10
**objection** 12:20
24:17 25:5 28:8
29:9,17 43:12
46:16 47:12 48:10
50:13 52:21 54:7
59:21 62:16 65:10
66:1 67:3 69:4
70:2,16 71:24
75:6 81:7,19 82:7
82:18 86:15 91:13
91:22 92:10 93:1
93:21 94:20 95:21
96:11 99:3 101:12
102:21 104:14,23
105:14 106:2,9

108:1 116:2,12,17
118:3,16 119:21
119:24 122:3
123:5 128:18
130:10 131:2,6
132:5 135:13
137:17 138:9
139:12 141:19
142:3 143:19
147:23 148:8
149:14 153:13
154:5,20 155:6
165:9 167:2,7
168:21 170:15
171:18 172:7,24
173:10 174:14
175:1 176:20
177:6 179:6,17
180:1,13 182:20
182:20 183:22
186:6 187:20
192:22 193:18
195:1 198:10,23
200:7 206:16
218:24 224:2
228:14,18 229:1,8
229:16 230:15
233:16 234:8
238:9,14 245:22
249:10,19 250:4
257:5 258:10
262:4,13 269:1,9
269:22 271:12
272:13 275:7
280:24 284:10
285:15 287:24
288:11 297:20
300:2,9,19 301:12
303:4,13 304:3
310:20 311:23
313:5,19 317:9
319:13 320:19
324:20 325:14,23
332:5 334:5
339:14 340:2,24
341:16 346:18

347:23 349:20
350:11,20 351:5
351:11 353:13
355:12 356:1,19
358:10 359:6
361:10,16 362:17
363:6 366:1,17
368:11 372:6
374:6,22 376:7
378:15 380:22
381:23 382:24
383:4 384:11
385:6 395:18
396:7,20 397:1,16
398:23 400:2
404:19 405:12
406:8,18 408:12
408:17 409:7
410:4,20 412:19
415:13 416:1
420:5 421:3 424:5
424:14 425:3
428:2 429:3 430:7
431:1,4 432:16
434:12 439:2
440:3 441:2,5,24
444:15 451:9,13
456:22 458:14
459:11 462:11
466:11 471:5,15
472:8 478:10
479:17 480:6
481:18 482:11
483:11 484:4
485:9,22 488:3,10
493:13 498:6
501:11 506:24
507:15 509:14,22
510:9 511:21
517:10 518:13
520:5,14 521:5
526:11 528:14
529:14 543:9
548:9,10,17
549:14,22 550:5
551:6,15 553:2,6



555:5,10,19
557:21 558:2,9,11
561:24 564:1
565:10 572:10,14
**objections** 7:4 12:8
12:10 47:21 62:22
63:5 270:3 454:10
544:24
**obtain** 19:1
**obvious** 519:3
551:21
**obviously** 22:24
44:20 254:13
290:13 332:22
340:4 457:12
521:12 529:16
538:4 570:22
**occasion** 13:4
372:11 373:6,20
415:23 443:16
**occasions** 465:22
511:18
**occupants** 76:19
**occupation** 32:13
**occur** 503:1
**occurred** 277:2
349:2 394:8
545:19
**occurrences** 305:24
**October** 112:16,22
113:11 228:10
415:8 418:10
564:8 571:19
**October/2007**
490:4
**odd** 247:19
**offered** 516:9,16
517:4
**office** 16:15 21:17
21:18 34:11 77:21
126:21 127:6
128:7 289:3 294:5
391:1 411:23
415:7 429:15
433:19 474:19
575:19

**officer** 42:22 61:24
65:2 472:1 548:14
**offices** 1:11 284:19
**official** 185:1,12
**officially** 177:11
185:13
**oh** 35:12 74:21
78:10 122:23
143:6 193:7
308:18 336:16,17
343:4 426:1
439:11 447:19
468:23 514:6
516:24 547:8
**okay** 13:8 19:6,13
22:20 24:11 26:4
26:19 28:22 29:14
32:9 37:23 38:20
40:7,15,19,22
41:17 43:23 46:2
48:17 56:19 61:16
62:8 67:22 74:10
77:10 83:15 84:3
84:21 86:12 94:11
95:2 100:5 103:20
105:11 107:13
110:19 112:2
114:4 116:14
121:19 123:20,24
131:20 137:22
141:10 143:14
144:12,16,24
145:11 146:21
155:11 163:1,20
166:6 171:1,13
173:19 174:2,7
177:13 178:12
181:3 182:15
191:11 192:13
194:20 195:11,16
197:20 204:19
208:12 213:15,18
214:24 217:22
218:11,20 220:16
220:20,23 222:7
222:24 224:13

228:1 230:2 234:1
235:18 237:11
241:19,23 244:8
245:1 249:4
250:15,20 251:10
254:10 255:3
256:6 262:19
263:11,24 266:19
268:17 271:6
272:7,22 276:2
279:11,20 283:7
301:1,21 306:5
312:18 315:14
316:13 318:5
322:3 326:13,21
328:24 329:16
331:3 332:1,9
333:13 335:8
337:3 338:18,23
339:5 340:21
342:24 343:19
348:7 349:1,12
352:11,17 354:4
358:4 359:24
363:24 364:23
370:2 371:6 374:1
376:21 377:4,12
378:7 379:1,12
390:22 392:13
396:16 400:19
407:18 408:22
411:1,12 414:19
423:3,15 424:10
424:22 425:8,14
426:1 429:9 431:8
432:8 433:21
435:8,11 436:13
437:3 447:24
448:3 450:16
451:24 452:13,15
455:18 461:2
465:24 466:16
468:14,15,20,24
472:17 474:5
475:15 476:19
480:15 482:2

483:20 485:6
487:10,17 489:12
490:2,21 491:12
492:12 496:8
497:1 498:2
500:13 502:24
503:10 506:5
508:21 511:12
514:7 516:6 525:4
537:17 541:5
547:10,11,18
549:10 554:11,24
557:6 562:17
564:19,21 573:22
575:4 577:15,16
577:21
**old** 72:20 79:21
124:24
**once** 12:23 62:20
317:19 330:6
384:18 433:18
475:2
**ones** 122:10 356:7
364:6
**one-month** 349:14
**one-on-one** 347:20
348:1,5,17,21
356:12
**one-page** 78:14
385:20 417:17
488:15
**one-third** 140:23
162:19 168:10
**ongoing** 387:2
458:7 473:15
539:3
**online** 191:22 301:7
**open** 220:13 261:16
515:18
**opened** 57:2
**operate** 36:18
76:24
**operated** 59:9
72:19 290:10
323:4
**operating** 289:17

**opinion** 113:7,23
113:24 120:9
182:7 558:4
**opportunity** 111:6
111:10 136:11
144:23 146:5
314:10 511:2
512:23 519:21
**opposed** 341:12
**opposing** 437:8
**opposite** 208:19
236:14
**oral** 123:18 501:11
501:13,17,21
**Orally** 505:17
**order** 62:23 96:5
111:4 112:7,8
245:2 283:5
331:21 334:22
**organization**
235:16 381:13
**organizations**
381:11
**original** 103:4
141:16 142:6,10
142:11,11,22
143:15 175:17
183:11 197:24
209:2,3 210:9
213:22 216:2,5
236:15 304:10
426:12,15 443:3
496:15,16,22
581:17
**originally** 17:13
115:12 118:21
120:16 144:3
170:23 171:8
195:6 215:5
216:14 236:9
246:1 253:5 304:8
329:2 332:19
345:12 361:2
362:5 399:21
541:14,18
**originated** 527:23



**Origivation** 243:15
  262:23
**outside** 288:16
**outstanding** 461:7
**overbearing** 401:15
**overexcite** 176:3
**overlooked** 315:1
**owned** 46:9 52:12
  52:14 55:4,5 57:9
  69:10 138:10
  361:13
**owner** 42:19 47:6
  49:5,16 51:12
  54:24 57:13 58:6
  58:7,11 59:5 70:6
  247:8,9 304:15
  472:2 548:6
  551:10
**ownership** 43:22
  52:3 138:16 520:2
  526:7 527:12,15
  528:10 529:2,7,11
**o'clock** 577:8

———————

**P**
**PA** 1:24 79:22
**Pace** 547:15
**pack** 506:7
**page** 4:10 5:4 6:6,6
  6:6,12,12,12,16
  6:16,16,21,21,21
  30:12,13,22,24
  31:1,4 157:5,9
  209:14 226:22
  246:13,14,24
  282:19 283:23
  291:9 425:16,20
  451:18 469:2,5
  470:5 547:21
  554:11,13 580:2
  582:5
**pager** 21:7,8
**pages** 279:24
  291:19 467:5
  468:8 583:5
**paid** 55:8,10 66:24

70:12 299:24
  396:23 397:12
  437:23 445:21,24
  446:1 461:13,24
  462:17 477:2
  478:14,18 479:6,8
  480:2,3 482:23
  565:16
**paintings** 290:21
  290:22
**panel** 290:19
**paper** 134:20
  223:15,16,20,24
  494:7 520:18
**papers** 305:16
**paperwork** 58:22
  126:20 289:20
**paragraph** 74:1,8
  142:19 143:5,7
  157:1,6,11,16
  159:3 162:9,13
  226:22 227:17
  250:17 251:12
  255:14,17,21
  266:12,16,17
  281:22 282:21
  283:3 305:12
  353:18 354:2,3
  375:12,14 427:10
  451:17,20 453:15
  470:4 483:16,23
  486:13 492:10
  495:6
**paragraphs** 411:10
  424:3
**parents** 121:5
**Park** 2:8
**part** 27:8 45:23
  49:5 54:12 72:23
  102:19 103:13,16
  114:21 117:21
  118:1,14 120:19
  139:9 152:9 223:8
  242:8 247:9
  264:18 270:21
  283:2 296:8,16

339:23 341:12
  346:4 377:9 387:8
  425:14 437:2
  443:21 504:15
  539:5
**parted** 85:16
**partial** 355:2 452:6
  477:3
**partially** 216:17
  299:19,20,20
  300:5
**participant** 340:7,9
  408:7 410:13
**participate** 82:12
  89:1 231:3 232:6
  409:19 410:5
  554:6
**participated** 103:1
**participation** 139:3
  416:12
**particular** 122:21
  253:4 271:24
  365:4,5 425:11
  457:1,3 470:13
  472:18 475:10
  499:1
**partied** 238:1
**parties** 8:10 261:14
  334:3 402:7
  429:18 446:22
**partner** 34:24 35:1
  35:17,19 52:6,7,8
  52:9 60:13 61:8
  62:6,6 64:11,18
  65:8 83:16 242:9
  369:1 382:12
  395:15 410:11
  559:6
**partnered** 515:1
**partners** 66:4
  76:15 246:7,8
  336:22
**partnership** 56:16
  61:10
**parts** 101:8 102:16
  102:19 104:6,20

118:13,21 217:24
  218:7 346:3
**party** 89:11 92:7
  99:18 230:13
  265:11 308:7,17
  308:21 309:13
  310:1 314:11,14
  314:16,19 415:6
  551:9
**passed** 520:18
**passing** 225:4
**patient** 523:23
  530:6
**patients** 568:4
**pay** 60:16 461:10
  473:21
**paycheck** 296:7
**paying** 76:15,18
  463:4
**payment** 466:14
  477:3 478:7
**payments** 275:3
  280:21 284:20
  461:18 466:5,6
  483:8
**penalties** 32:7
**pencils** 290:14
**pending** 184:18
  390:19 453:1
  454:5
**Penn** 1:23
**Pennsylvania** 1:2
  1:13,18 2:4,17 3:3
  7:18 8:2 10:10
  32:16 33:12 34:2
  34:6,10 35:8
  72:21 173:24
  455:9
**pens** 290:14
**people** 25:15 66:23
  106:18 109:6
  134:15 148:23
  156:12,18 161:10
  186:22,24 190:15
  210:5 211:2
  222:19,20 223:4

225:6,9 231:2
  234:23 235:8
  237:10 238:23
  239:5 241:17
  242:7 251:20
  256:24 257:8
  262:10 264:21
  265:14,16 293:19
  299:8,13 302:4
  317:3 335:13
  362:4,8 368:22,22
  375:6,7,8 380:5
  380:18 381:12
  382:16 383:14
  395:23 396:5
  399:7,12 400:12
  400:14,16,17
  403:15 404:4,7
  409:12,22,24
  435:6,9 439:21
  442:3,13,20
  460:17 502:5,6
  503:20 515:9,10
  515:14 526:15
  527:16,17,20,22
  533:20,22 534:1
  537:5 563:2
  565:14
**people's** 379:8
  383:17
**percent** 52:13,15
  57:9 71:20 168:12
  291:24 355:6
  502:14 505:13,13
  556:17
**percentage** 105:19
  354:18,21,24
  355:10,22 458:6
**perform** 143:16
  144:13 145:7,16
  174:12,22 178:15
  180:9 182:17
  310:2
**performance**
  144:19 168:14
**performed** 142:1



176:18 309:24
316:5 495:9
**performer** 198:21
**performing** 47:7
48:4 153:22 275:1
312:3,22
**period** 20:3 41:8
112:15,22 135:24
171:23 197:11
238:5 263:17
275:10 276:17
277:11 320:24
325:1 337:6,9,13
337:22 344:11
347:21 349:15
350:1 394:1,8,15
455:16 516:1
552:16 558:16
**permission** 147:20
155:21 156:2
257:14
**permit** 154:13
**permitted** 62:23
**person** 57:24 58:2
58:21 59:13 78:3
95:8 103:4 119:3
141:24 184:23
242:12,15 299:5
305:20 306:18,22
309:18 312:14
314:21 315:20
330:2 331:1,2
371:16 375:23
380:11 441:14
445:3 474:16
475:20 532:14
533:18
**personal** 31:19
438:22 442:17
462:4
**personalities** 45:8
**personally** 334:13
**persons** 62:9 377:9
445:8 447:2
**person's** 438:8
**pertaining** 220:17

459:2
**phase** 338:19 339:2
339:7,11,21,23
342:1 345:1,19
377:7 378:10
379:4
**Philadelphia** 1:13
1:24 2:4 8:1 10:10
37:19,20 38:1,15
72:21 79:22 88:13
89:3 278:13 308:9
308:19 330:8
337:15 347:12
364:7 394:5
**Philly** 207:13
**phone** 19:11,20
20:4 21:4 181:6,7
181:24 184:10
225:15 314:18
317:3 324:8,9
335:16,22 338:4
344:2 347:2,6,7
348:2 350:3 351:9
351:23 368:8
371:19 410:7,14
410:22 502:18
**photograph** 244:9
244:14,21 245:3
246:7 247:13
435:14,17
**phrased** 130:23
**physically** 72:12
338:20
**picked** 175:23
**picture** 245:8,11,14
246:15,19 247:1
**pictures** 290:21
**pie** 355:1
**piece** 134:19 169:3
223:15,16 403:3
494:7
**pieces** 137:11
**pile** 468:5
**Pitts** 2:12,21 8:21
116:23 117:18
171:7 181:18

234:12,16,17,22
235:9,10 241:18
241:19 264:19
265:5 307:5 329:1
330:2 335:7,16
336:1,6 337:18
338:1,21 339:1
344:1,4,6 345:2
346:12,16,20
347:2,10 348:22
351:9,16,19,22
352:15,18,21
353:9 354:9,12,22
355:9 356:6,15
357:6 358:7 359:3
360:3 364:3,11,15
364:18 365:1
366:19 367:10
384:5 409:1,5
446:17 519:11,19
**place** 15:2 42:1
54:9 134:8 221:21
272:15 287:3
289:4,5 308:17
365:2 503:9,14
545:9,11,14
**places** 41:24 44:18
275:23
**Placing** 130:3
**plaintiff** 2:5 9:14
465:17
**plaintiff's** 13:14
22:8 31:17 279:18
280:3 386:17
**plan** 141:16,23
142:6,10,12,22
143:16 415:21
416:3,5,22 498:3
**plane** 22:2 406:20
501:24 502:7
**planned** 144:5
230:9
**plant** 299:5
**play** 50:24 51:4
53:3,8 212:11
243:22 284:13

312:23 318:21
380:1 503:21
556:3
**played** 137:9
259:18 342:10
**player** 221:9
232:19 233:2
**players** 290:23
**playing** 52:23 92:3
159:24 216:11
261:12 265:2
311:21 312:2
318:8 338:5
362:19 502:3,6
503:19 504:7
543:17
**pleading** 24:1
**Pleasant** 455:8
**please** 9:18 10:4,8
11:6 47:23 63:11
73:19 81:23 94:1
106:22 126:3
149:21 150:6,11
151:8 156:23
167:11 189:10
194:11 201:14
202:6 206:21
209:23 214:7
226:18 230:17
232:22 240:3
241:6 250:14
270:5 278:10
280:16 283:10
323:11 333:22
339:17 341:20
343:7 350:14
353:21 357:17,19
359:10,16,20
361:19 374:8,9
425:20 432:9
443:12 448:7,24
451:17 453:5
454:11 483:2
493:19 498:14
525:7 540:12,17
541:5 549:2 581:4

581:10
**pocket** 508:20
**point** 42:1 109:23
110:1,5 115:4
125:6 174:9,19
180:23 181:1
182:3 184:1
186:19 198:8
256:17 266:4
272:4,19 276:5,19
295:1,8 321:15
339:6,20 340:5
346:11 390:12
434:17 441:10
481:5 518:16,18
518:24 536:16
537:8 554:22
567:15
**pointed** 236:8
470:3
**pointing** 492:5
**points** 458:5
**police** 294:9
**popping** 231:10
**Portico** 40:24 41:12
42:4,6
**portion** 271:14
461:11
**portrayed** 94:15
**posed** 169:11 170:4
**posing** 247:2
**position** 12:17
32:23 41:15 62:3
65:6 138:15
278:22 304:13,20
549:16
**possession** 58:23
333:12
**possibilities** 178:5
**possible** 11:4
229:10 336:5
338:11 399:2
430:4 463:5
477:15,17,18
496:23 509:12
512:9 523:2



**possibly** 196:6
  231:5 234:21
  289:18 294:2
  296:21 307:5
  316:18 338:9
  347:17 394:17
  461:23 476:10
  477:13 496:20
  509:5 515:24
**Postal** 21:14
**postured** 227:11
**potential** 199:9
  255:10,11 334:3
  519:12
**potentially** 176:1
  199:11
**power** 67:20 68:3
**powers** 382:8
**pre** 290:23
**precisely** 438:6
**prefer** 201:12
  447:20
**premises** 289:16
  290:10 323:3
**preparation** 458:1
**prepare** 464:15
  473:5,8 544:5
**prepared** 23:22
  32:2 39:22 40:3
  132:3 470:12
  495:3 575:24
**prescription**
  274:12
**present** 3:6 8:10
  21:1 147:20
  172:20 224:8,15
  334:22 396:2
  496:5,11 509:10
**presented** 144:22
  204:21 205:21
  452:3 496:12
  510:21,24 511:17
**presently** 32:10
**pressed** 185:11
**presses** 187:17
**presumably** 296:17

**presumed** 432:14
  503:15
**pretty** 68:19 175:14
  311:20 336:18
  348:3 417:1
  447:13 504:4
  519:2
**prevent** 356:15
  357:6 358:7 359:3
  360:3
**prevented** 482:23
**preventing** 483:7
**previous** 12:19
  162:21
**previously** 80:1
  114:13 275:23
  361:24 436:17
  450:17 466:23
  468:21 475:23
  476:15
**printing** 235:20
**prior** 83:5,10,11
  85:10 88:7 90:21
  113:11 114:21
  137:19 163:1,5
  184:8 193:2 197:3
  263:5,22 297:6
  330:13 331:4
  332:23 371:19
  376:1,3 379:18
  380:15 422:4
  423:7 452:11
  500:15 527:18
  528:11 529:12
  531:8
**private** 191:14
  420:8
**privilege** 25:6
  27:15 418:17
  419:9,10,11,14,20
  420:1,10 421:3
  431:3 433:9
  576:10,15
**privileged** 13:1
  420:8 422:5
  431:17

**privy** 395:20
**Pro** 250:10 251:19
  252:2,7,16 253:2
  253:8,19,20
  254:16,18,24
  255:4 256:2,22
  514:24 515:2,4,15
  544:8 545:12,13
  575:17 576:2
**probably** 36:16
  85:14 192:19
  196:6 224:19
  238:1 327:7 352:8
  369:19 450:1
  453:7 528:20
**problem** 148:17
  228:9 229:24
  256:13 270:13
  416:7 436:23
  464:11
**problems** 383:16
**procedure** 77:16,18
**procedures** 10:19
**proceed** 153:7
  524:24
**proceeding** 213:5
**PROCEEDINGS**
  7:9
**process** 28:6
  542:21
**Prodigio** 33:7
**produce** 288:20
  302:6
**produced** 72:22
  74:6 136:17 171:3
  204:18 284:16
  315:7 316:4 361:2
  392:11 393:11
  399:16 442:12
  443:2 499:2 528:1
  531:2,7,11,14,18
  531:22 532:2,5,8
  532:11,15,18
  533:3,10 537:3
  546:24 547:7
  559:17

**producer** 97:13
  106:15 107:9
  109:19 147:18
  168:12 181:12
  210:23 221:8
  225:11 227:3,8
  236:7 237:8 239:2
  242:9 243:18,21
  254:21 256:19
  261:1 310:11
  316:7 360:19
  376:24 379:22
  438:13 447:17
  570:14
**producers** 250:9,19
  447:6,10
**producing** 66:12,18
  66:21 153:21
  198:1 430:10,12
**product** 108:8
**production** 6:11
  45:23 50:7 72:23
  108:7 122:11,15
  123:9 138:2,4
  141:11 147:1
  279:18 280:4
  284:16 289:11
  383:20 386:17
  388:6 455:20
  465:16 466:23
  504:8
**productions** 48:24
  49:4,11,19 50:2,7
  51:9,13,22 52:4
  52:11 54:10,17
  55:15 57:18 58:14
  59:18 60:4 61:1
  61:18 62:4,10
  65:7,22 66:19
  67:5,9,14 71:15
  75:3,20 76:5,9,12
  76:21 272:11
**professional** 1:16
  273:14,18,20
  370:19 579:4
**profits** 113:10

**promise** 91:18 92:6
  399:19
**promises** 92:2
**pronouncing**
  262:22
**proof** 390:15
**proper** 366:13
**properly** 97:11
  98:12,13 147:17
  149:5,9 153:16,17
  153:19 155:13
  156:2 158:13
  168:9,11 170:21
  172:2,14 190:23
  224:6 227:1
  254:19 256:16,18
  260:24 298:20
  301:3 302:20
  310:9 312:7 314:2
  314:4 333:9,17
  342:16 343:22
  345:11 353:3
  356:23 360:18
  367:15 368:17
  375:4 378:20
  379:21 384:1
  399:14 411:19
  416:14 440:9
  504:24 523:8
  530:2 559:19
  570:13
**propounded** 583:8
**proprietorship**
  55:22
**protect** 131:17
  135:19 419:16
**proud** 187:10,12
  190:16 198:5
  245:15,17,24
  246:3 313:15,21
**provide** 24:2 393:9
**provided** 26:15
  252:14 279:14
  335:2,5 544:9
  575:17
**providing** 46:13,21



MAGNA
LEGAL SERVICES

46:23 47:9 438:15
**PSD** 7:20
**psychiatrist** 272:23
274:1
**psychological**
276:15
**psychologist** 273:3
273:8 274:4
**public** 1:17 301:22
302:14 579:5
583:24
**publicly** 195:4
245:20
**publish** 146:24
**publisher** 131:19
477:6 484:12,13
500:20,24 501:4,5
501:6 503:11
510:16 538:3,8,12
538:14,16 539:7
**publishing** 2:12,21
8:19 271:3 409:4
495:11,12 499:8
502:13,14,20
504:15 510:20
512:10 539:6,8
**pull** 267:19
**pulled** 302:22
466:22
**punches** 466:18
**purchase** 192:2
193:17 195:11,14
195:17 196:2,11
220:12 301:23
309:3
**purchased** 101:19
224:18 232:16
233:1 481:13
**purported** 511:15
**purpose** 48:13 80:7
80:10 81:11
**purposes** 247:2
**pursuant** 1:10
**pursue** 92:14 99:12
416:16,17 417:2
428:24 493:18

**pursued** 92:21
113:12 569:23
**push** 294:17 402:18
416:20
**pushy** 417:2
**put** 69:20 104:5
105:8 109:20
137:11 190:20
208:2 219:7
232:13,18,20
233:1,4,5 254:23
258:10 313:9
333:18 353:9
354:9 355:18
357:7 358:7
423:15,23 472:10
491:19,20,24
492:1 499:7 522:9
522:12,14 523:6
**putting** 208:1 356:8
356:15 359:4
360:4
**P-R-O** 484:11
**P.C** 2:6
**p.m** 110:9,16
165:24 166:7,17
268:4,11 322:5,15
407:21 408:4
467:10 469:10,19
521:23 522:6
577:22 578:5

---

## Q

**quarter-inch**
290:15
**question** 7:5 11:5,9
11:10 12:21,23,24
19:8 20:17 29:18
30:4,9 31:6 47:3
51:7 59:23 63:11
63:13,22,24 64:3
65:19 72:2,9 75:8
77:13,15 81:20,24
89:21 96:12,24
97:6 109:9,9
115:18,22 121:17

124:7 130:16
132:2,8 135:5,8
139:6,13 140:6
141:21 142:18
143:24 148:13
149:15,20 150:7
150:12,20 151:4,7
151:24 152:3,10
153:1 156:14
158:1,16 159:1,9
159:12 160:2,5
161:20 162:3,5
163:13 164:15,19
167:14,18,19,23
168:22 169:11,18
170:1,3 173:2
174:16 176:12,12
179:11 184:18
185:21 188:12,15
189:11 190:2,10
194:3,11 201:9,10
202:6 209:20
211:6,7,9,19
212:2,12,14
214:14 215:22
240:2 241:5
246:22 251:8
252:6 258:8,20,23
259:7,15 260:3,16
266:5 269:20
272:8 283:6,12
302:17 311:24
319:6 320:3,16
321:5 327:18
339:18 350:12
356:11 359:11
361:20 369:6
370:15 373:13,14
374:10 375:16
388:14 389:8
390:19 398:6
401:17 402:3
403:1 407:14
409:17 413:6,15
419:18 420:13
421:10,18 422:8

433:7 444:7 448:4
448:17,24 452:23
453:1 454:5,16
459:18,20,21,22
467:12,14 483:21
487:11 490:11
494:22,24 497:19
500:5 511:11
514:5 525:11,22
527:5 529:17,24
530:12,16 533:13
534:13 535:1,23
537:11,15 550:2,3
550:6,15 552:14
553:18,22 554:1,4
554:10 557:4
559:9 568:19
569:1,8 573:13,16
575:14
**questioning** 11:12
189:10 560:22
**questions** 6:15
11:21 12:18 38:11
50:15 63:17 71:6
77:14 95:22 99:4
148:15 161:3
163:20 174:8
215:20 266:12,22
270:8 318:7
363:13,19 370:22
378:16 402:22
403:23 423:5
431:14,19,23
443:12,17,18
468:9 487:2
499:18 512:21
513:1,21 523:9,13
523:24 524:3,5
525:1,2 528:22
530:11 534:7,10
534:12,21 535:7
535:13 536:3,7,11
536:21,24 537:10
540:1,24 550:19
553:8 556:9
563:18 565:22

566:2 567:22
568:18 574:1
576:2,5 577:18,20
583:7
**quibble** 179:21
**quibbling** 105:22
158:21
**quick** 225:2 326:16
369:5 390:3
407:15,19 465:21
514:2
**quickly** 11:3 523:1
549:1
**quiet** 454:11
539:15
**quite** 19:16 47:2
58:16 84:11 97:5
113:3 114:16,17
139:16 143:23
225:13,17 236:14
263:16 346:5
359:12 385:1
492:11 494:14
550:10
**quote** 203:19 490:9
490:10,12

---

## R

**R** 354:13 579:1
582:3,3
**radio** 196:23 197:4
197:8,13,21 198:3
**Rain** 504:21
**raise** 327:19 328:2
382:17
**raised** 505:22
**raising** 16:24
**ran** 56:3 267:5
515:24
**rang** 183:17
**range** 506:21
**rap** 534:16
**rates** 383:20
**Raymond** 1:5 2:10
2:19 7:16 8:15
178:24



**reach** 17:8 296:22
  297:1 307:4 317:2
  508:15
**reached** 15:24
  174:11 263:8
**reaction** 186:2
**read** 12:2 26:4,8,20
  28:15 30:20 59:10
  64:6 72:1,5 82:3
  124:11 126:6
  143:14 144:2
  149:20,24 162:15
  168:3 189:11,17
  194:10,14 202:9
  214:7,10 226:6
  239:20 240:2,5
  241:5,9 251:1
  255:19,23 266:15
  357:17,22 358:11
  359:7 374:14
  375:14 398:8,11
  413:4 417:22
  448:7,24 449:3
  452:11,14 454:21
  456:15 467:21,23
  494:9,21 520:5,10
  520:23 525:12,16
  550:15,23 552:11
  569:13 581:4
  583:4
**reading** 200:1
  281:18 282:1
  479:23
**ready** 231:13 253:2
  370:2 535:22
  562:12
**real** 190:7 222:11
  273:20 278:20
  329:4 441:13
  460:4 465:20
  528:22
**realize** 77:24 92:20
  302:5
**realized** 136:21
  292:19
**really** 36:13 39:23

47:2 49:13 51:18
  55:16 58:9,17
  59:7 65:16,18
  69:8,17,24 70:3
  78:3 81:2 94:4,5
  94:23 109:20
  114:15 129:20
  134:10 136:19
  139:16 146:2
  154:10 173:16
  177:10 183:13
  184:21 197:23
  199:1 201:2 222:9
  223:12 225:13
  228:3 234:19
  246:20 248:10
  255:5 256:8
  268:16 275:1
  278:23 286:20
  289:24 293:17
  294:22,23 298:3
  298:17 302:2
  307:20 308:13
  309:16 323:24
  329:4,7 341:2
  348:8 351:12
  352:3 355:14
  399:4 441:15
  448:3 454:9
  460:12,13 471:8
  472:9,15 478:11
  480:2 493:4,17
  502:17 504:3,6
  515:4 538:3
  539:15 551:16
  553:3 554:9 557:3
  558:20
**reason** 11:16 71:22
  74:14 76:11
  330:16 393:21
  427:23 428:7,9
  472:22 473:1,11
  493:9 574:21
  581:7
**reasonable** 267:13
**reasons** 17:5

**reassurance** 493:1
**reassure** 493:20
**recall** 14:21 21:6
  40:1 41:19,21
  49:13 50:4 51:11
  56:5,11 67:7 68:5
  70:21 72:24 73:2
  75:17,24 80:9,12
  80:13 81:12 83:8
  115:4 116:8 134:3
  135:20 173:13
  178:8 180:20
  181:6 192:7
  203:13 220:8
  226:3 227:14
  228:3 229:10
  233:4 249:12,12
  264:4,11 269:5
  279:9 286:18,21
  288:13 293:5
  297:10 307:11
  308:9 312:17,19
  320:17,21 321:1
  325:4 337:1
  346:20,22 348:11
  348:24 351:13
  356:12 365:15
  371:21 372:2
  374:24 375:12,18
  378:3,11 385:8
  389:5 393:19
  394:11,21 395:1
  406:14,24 409:9
  410:22 412:2,4
  424:16,19 427:21
  435:14 438:6
  439:6 444:17,23
  445:4,7,13 446:14
  451:14 461:15
  470:10 473:10
  475:3,16 476:1
  478:12 480:19
  483:9 491:16
  496:19,24 499:10
  500:1 509:8 516:9
  521:9 535:4

548:22
**receipt** 101:20
  581:19
**receive** 18:7 43:24
  44:3 220:24
  269:12 271:7,21
  272:5 382:22
  394:14 511:13
  514:9,11,19 516:3
**received** 18:21
  254:2 268:22,23
  269:11 271:3
  281:6 283:17
  284:5 332:18
  366:13 384:3
  393:17 394:10,19
  437:21 438:19
  445:19 449:8
  476:22 477:5,12
  481:16 482:24
  514:14 549:24
  570:17
**receiving** 90:21
  296:4 526:7
**recognize** 22:22
  23:3 73:21 79:14
  280:17 315:15
  318:4 365:11
  467:2 468:15
  490:21 547:4,11
**recognized** 225:11
  237:7 316:7
**recognizing** 16:17
**recollection** 80:18
  142:21 180:6
  184:24 197:11
  217:11 230:23
  254:11 330:24
  355:17 471:1,19
  475:6 485:4
  516:23
**recommend** 411:24
**recommending**
  412:5 429:1
**record** 7:12 10:5
  14:3,8,9 15:19,22

18:2,20 32:22
  33:19,22 34:17
  35:3,18 36:4 50:6
  64:7 72:6 82:4
  96:19 106:16
  107:1,3,14,20
  110:10,17 121:16
  124:12 126:7
  136:8 140:11
  146:15 150:1
  166:1,11 168:4
  174:11,23 176:2
  178:14 180:8
  181:2,10,17
  182:17 184:9
  185:3,8,23 186:14
  186:21 187:16
  188:5 189:18
  190:11,14,20
  193:3,9,12,15,20
  194:15 195:8,19
  197:14 198:2
  202:10 203:5
  206:24 207:6
  214:11 215:17
  220:11 226:7
  232:13 233:20
  239:20 241:10
  243:18,20 254:14
  260:2 267:22
  268:5,12 269:11
  284:9 301:5,7,17
  307:9,12,14,16,19
  308:4 322:18
  354:15 357:23
  369:3 374:15
  388:10,12 390:22
  391:8,10 393:6,13
  398:12 405:2
  407:22 408:5
  419:16 421:21
  434:17 436:15
  437:2,10 439:22
  449:4 454:22
  469:13,22 477:6
  515:19 520:11,24



521:24 522:7,10
522:13,15 523:6
525:17 526:14
527:18 531:12
537:5 550:24
561:3 564:10
566:13 569:14
575:8,12
**recorded** 54:9
55:19 115:13
134:14 136:4,16
137:4 142:13
176:18 209:3
236:10,15 246:1
253:5 338:13
342:10 362:7
504:21
**recorders** 290:23
**recording** 4:23
32:20 34:16 45:7
52:18 53:18,22
54:18 55:1,7,14
56:9 57:19 59:19
60:5 61:2 69:2,10
70:14 71:8,16
76:23 102:16
106:14 126:18
167:6 175:17
183:11 236:13
253:5 331:19,22
333:3,19 334:1,8
336:9 337:14
452:5 464:18
465:8 466:24
470:2 473:6 495:8
498:11 526:17
**recordings** 75:4
213:22 236:16
498:13
**records** 33:23
35:16 36:7 288:16
288:20 289:7
326:5 427:12,13
**rectify** 483:24
**redid** 343:17
**redundant** 571:7

**refamiliarize**
417:23
**refer** 73:24 234:15
334:1 436:15
452:18 482:21
483:5 486:14
**reference** 80:14
451:2
**referred** 291:12
437:4 453:15
501:4,5 516:19
**referring** 89:16
163:5 209:12
215:17 251:3
279:17 291:18
306:9 353:17
359:18 385:3
390:17 392:3
395:24 403:10
428:21 451:4
452:10 453:10
466:7 478:18
479:8 484:8 491:7
**refers** 250:8 487:14
**reflect** 14:9 57:5
140:11 227:7
236:5 382:19
**reflected** 26:1
548:12
**refresh** 80:17 180:5
403:13 470:24
471:18 516:22
517:15
**refreshes** 142:21
**refuse** 47:8
**regard** 284:19
**regarding** 408:14
410:18 423:5
429:18,22 433:22
458:12 463:7,11
**regards** 61:3,21
71:18 174:6 272:2
378:6 389:7 407:8
411:18 414:7
463:3 495:14
502:12

**Region** 278:14,15
**register** 128:6
129:18 136:2,5
**registered** 134:12
135:10,18,22
**registering** 134:1
**registration** 134:7
136:12
**regular** 37:9
**regularly** 133:14
**reimbursed** 462:16
**related** 363:19
412:16
**relates** 431:2,24
**relating** 280:21
431:14
**relationship** 49:3
49:24 54:16,21
59:12 61:5 121:9
278:1 500:14
**relationships** 49:17
**relayed** 367:22
**relaying** 395:13
**release** 181:2 184:8
185:23 187:15,17
197:2,3,5 234:4
244:22 249:6
254:14 281:8
330:13 331:4
332:23 519:10
521:3 526:8,13
527:18 528:11
529:12 531:9
**released** 187:7
191:19 192:5,9
197:15 199:9
202:20 242:1
244:13 245:20
257:12 394:2
406:2 440:19
507:13,20,21
519:24 526:3
**releases** 311:10
**relevant** 325:17
**reliable** 11:18
**relied** 382:10

**remaining** 513:3
**remember** 15:13
56:15,18 57:1,4
71:10,11 92:22
173:17 175:4,22
176:7,13,22 178:9
178:17,19,21
184:20 192:11,16
196:5 197:18
212:19 217:21
221:23 224:11,14
228:7,12,20 231:4
233:7 235:24
248:11,12,16
254:5,6 289:22
290:4,9 294:23
314:23 330:11,15
335:10,11 336:4,7
336:10,12 355:16
405:6 407:17
411:12,13 414:13
418:12 425:9
428:11 438:17
445:10 466:13
474:3 475:9 477:8
477:19,19 478:3
478:14,24 481:8
491:22 494:10
497:10,12 498:1
509:3,6 512:5
**remembered** 352:6
**remind** 403:22
**reminder** 514:2
**remove** 285:13,16
301:18
**removed** 289:15,21
290:2,19 291:5
456:20
**removing** 292:5
**renamed** 180:24
182:4 184:2 215:3
215:23 216:20
217:3,17,23 218:6
218:12
**rendering** 473:22
**renew** 292:12

**renewed** 295:2,8
**rent** 60:16 80:15
**rented** 55:8
**repeat** 31:6 48:2
59:23 63:10 64:2
124:7 130:16
167:24 201:21
214:20 339:17
359:10 374:10
413:8 497:19
500:4 511:11
**repeatedly** 150:4
170:16 270:2
317:18 400:7
528:15
**rephrase** 11:7
104:16 135:15
167:10 218:3
311:5 333:22
361:20 398:5
**replete** 260:2
**reporter** 1:16 8:7
9:18 64:2,6 72:5
81:23 82:3 124:11
126:6 149:24
168:3 189:17
194:14 202:9
214:10 225:24
226:6 241:9
248:13,17,23
249:5,23 357:22
374:11,14 398:11
449:3 454:21
464:24 465:2
520:10,23 525:12
525:16 550:23
569:13 579:4
**reporting** 171:15
**represent** 8:12 9:13
408:10 429:17
513:13 544:20
**representation**
29:6 206:2 430:5
**representatives**
154:15 167:5
**represented** 335:3



460:1
**representing** 2:5,10
  2:19 3:5 205:14
  205:18 284:3
**represents** 460:2
**request** 6:11 8:2
  253:19 285:2
  287:1,6 289:12
  326:9 343:10
  473:9
**requested** 64:7
  72:6 82:4 124:12
  126:7 150:1 168:4
  189:18 194:15
  202:10 214:11
  226:7 241:10
  253:20 357:23
  374:15 398:12
  449:4 454:22
  474:6,7 520:11,24
  525:17 550:24
  569:14
**requests** 325:10
  340:17
**require** 354:17,20
**required** 46:24
**reread** 81:24
  260:16
**rerecord** 168:14
**rerecording** 256:8
**research** 308:15
**reserve** 12:2 537:14
**reserved** 7:6 12:10
  206:17
**resided** 37:24
  455:14
**residence** 38:17
  455:14
**resolve** 227:13
**respect** 11:1 12:7
  12:17 19:2 25:16
  47:20 56:20
  121:14 122:20
  136:12 138:6
  155:22 267:7
  412:17 434:9

477:7 483:6
  510:20 511:16
  559:7
**respected** 84:1
**respectful** 530:10
**respective** 104:20
  162:19
**respond** 16:23
  326:19 390:2
**responded** 93:16
**responding** 575:14
**response** 66:8
  285:1 287:1,5
  289:12 325:11
  404:7
**responses** 132:3
**responsibility**
  429:18
**responsible** 446:23
**responsive** 115:17
  325:9 328:21
  499:18 512:20
  576:4
**rest** 74:3 157:13
  377:24
**restate** 81:19
  350:14 409:19
**Restaurant** 40:10
  40:16,24 41:12
  42:6
**restaurants** 41:6,7
  275:20
**resume** 4:13 39:21
  69:21 193:13
  472:4 548:13
  549:1,8
**retain** 544:20
**retained** 462:7
**return** 581:17
**reverb** 219:23,24
  220:5,6
**review** 209:23
  426:7 427:18
  451:17 509:12
  575:22 576:21
**reviewed** 89:18

328:22 427:7
**reviewing** 470:1
**revised** 28:11
**revision** 28:6
  338:19 339:1
  343:9 377:7 379:3
**revisions** 108:16
  182:1 184:11
  254:15 335:21,23
  337:6,9,13 339:7
  339:11,21,23
  340:10 342:1
  343:1,6,8 345:1
  345:19 347:9,12
  347:17 348:18
  368:9,14 371:24
  376:12 377:22
  378:9 527:19
  528:2
**rewrite** 117:3 203:4
**rewriting** 160:23
**rewrote** 203:3
  495:19
**re-sang** 203:4
  219:13
**re-sing** 168:13
  175:16
**ride** 174:5
**ridiculous** 322:9
  528:23
**right** 12:2 13:7 20:9
  22:5 25:1 28:13
  30:9 39:16 41:11
  48:8 62:2 75:14
  77:19 89:11 97:21
  101:18 104:9
  107:7 111:14
  113:15,20 115:6
  120:14 137:6
  143:12 145:5
  147:12 154:3
  157:15 160:6
  162:16 165:15,20
  170:17 200:5
  201:19 207:24
  210:7 220:10

246:11,16 247:3
  249:2 253:22
  258:24 260:5,22
  264:5 266:1 281:8
  282:17 283:2
  301:3 302:10,15
  304:14,23 305:4
  310:24 311:2,16
  311:21 315:3
  317:24 326:8,11
  336:16 357:11
  363:21 368:13
  386:18 394:7
  400:23 401:8,13
  404:9 411:11
  414:12 415:1,17
  416:22 418:11
  426:18 431:22
  435:10 449:12
  456:6 460:5
  461:10 467:17
  468:14 469:24
  474:5,10 492:7
  499:20 500:21
  525:9 528:24
  530:18 536:14
  537:14 545:24
  549:11 550:2
  552:2 553:14
  554:23 556:9
  562:13 563:5
  571:1 574:3
**rights** 135:19
**right-hand** 209:13
**ring** 69:19
**road** 2:16 72:20
  79:22 455:8 564:7
**Rogers** 3:2,2 4:6
  9:3,4,4 14:2,14
  152:1,8 153:6
  486:22 513:4,9,11
  516:21 517:11
  518:15 521:14
  522:16,23 524:22
  525:19 527:1
  528:4 529:5

530:14,19,22,24
  533:6 534:4 535:2
  535:15 536:9,10
  536:19 537:13,18
  538:17 540:5,9
  541:10,12 543:22
  545:6,24 576:19
  577:3,11,19
**role** 57:21 500:19
**roll** 519:19
**rooked** 565:13
  570:10
**room** 11:13,14
  173:8,17 181:18
  181:20 220:1
  289:2 336:8
  533:19
**Rosen** 411:2,5,7,13
  411:16,22 412:7
  413:20 414:10
  415:18,22 416:8
  417:19 418:14
  421:8,13 423:16
  423:18 424:11,24
  429:16 430:4
  432:13,17 433:18
  434:1,18,24
  493:11
**Rosen's** 415:7
  494:5 495:2
**Ross** 2:13,22 8:22
  171:4
**Rothschild** 1:12
  2:15 8:3 9:8
**roughly** 17:21
  35:13 237:20
**route** 515:19 558:7
**royalties** 268:22,22
  269:10,13 270:18
  270:22 271:2,8
  272:5 280:21
  284:4 477:4,7
  478:7 479:10,12
**royalty** 272:17
  284:19 286:16
  294:4 296:2 512:1



**RTS** 33:7
**Ruccolo** 1:15 8:7
  579:3,24
**rude** 261:19
**ruled** 112:12,19
**rules** 47:20 206:21
  206:22
**ruling** 96:5 423:2
**run** 32:21 312:20
  391:3 443:7
  464:10
**running** 16:7 17:4
  17:6 82:15
**rush** 370:10,23

**S**

**S** 4:8 5:2 582:3
**salary** 43:24
**sale** 191:21 195:10
  249:24
**sales** 300:7,14
  480:4 482:9
**Samuel** 2:14,23 9:1
  376:15 499:10
**sang** 178:6,24
**Santana** 176:2
**sat** 16:9 459:18
  460:7 544:8
**sauce** 267:21
**save** 439:13 527:5
**saved** 287:9 439:14
  439:16,17
**saw** 28:14 85:13,14
  87:17 88:4,8,24
  112:9 185:12
  221:19,19 272:17
  320:14 373:3,9
  390:11 433:24
  434:4 435:4,5,8
  476:3 482:16
  497:14,18 506:10
  506:12,18 510:24
  511:4 516:7
  542:14
**saying** 47:14 54:3
  64:11 74:8 76:2

114:5 118:6 138:5
  145:15 156:19
  163:22 190:5
  211:2 215:4,6
  229:11 239:6
  240:6 261:18
  314:13 317:11
  340:13 341:23
  346:20,22 359:18
  361:5,12 375:13
  442:20 478:20,20
  487:6 534:17
  548:22 550:1
  552:9
**says** 15:16 23:15,17
  30:14 31:22 40:8
  40:23 42:12 79:18
  79:20 80:15 113:7
  162:24 193:13
  205:4,8 208:13
  235:11 236:12
  243:17 244:15
  247:5,7 264:6
  306:1 363:15
  376:20 389:4
  396:4 412:20
  417:16 425:24
  429:12 431:18
  452:2 455:24
  458:4 459:4 461:6
  468:10 470:21
  490:4,4,7 492:17
  495:6,18 503:8
  505:18 554:13,15
  556:12 573:8
**scouted** 44:14
**screen** 542:14
**screens** 290:15
**se** 58:22 294:18
**sealing** 7:2
**search** 70:23 285:1
  285:21,23 297:9
  324:12 325:20
  326:23
**searched** 323:15
**searching** 324:14

**seat** 14:13
**second** 13:9 15:15
  22:18 152:9
  305:16 314:23
  427:10 467:3
  476:8 483:17
  492:9 520:19
  568:15
**section** 309:18
  314:20
**see** 13:22 15:14,17
  23:13 30:15 40:10
  40:17 41:1 42:14
  70:19,24,24 74:2
  74:8 79:3 80:15
  111:1 120:9,12
  132:13 134:17,20
  134:24 160:22
  192:13 205:4,8
  208:14,15,18
  209:14,16 210:1
  223:14 243:19
  250:21 273:2,8
  283:10,21 298:24
  301:22 302:3,11
  307:5 316:10
  325:8,16 353:20
  354:5 371:11
  386:7 390:9
  392:15,16 411:17
  412:1,10,12
  413:12 414:9
  415:9,22 418:9
  425:22 426:2
  427:13 429:24
  433:18,22 434:20
  450:20,24 452:6
  461:8 467:6
  468:22,23 469:1
  476:11 483:12
  484:1 485:14
  486:15 487:13
  488:24 489:14,24
  501:7,13 507:11
  507:19 511:2
  526:1 547:20

554:13,21,24
**seeing** 14:21 70:21
  516:10
**seek** 112:20 272:22
  273:10,13 275:2
  276:14
**seeked** 273:15
  298:10
**seeking** 97:7 98:6
  264:8
**seen** 12:19 14:20,22
  90:17 112:8
  148:20,21 362:23
  412:7 418:6 489:9
  507:6 516:15
**selected** 473:12
**sell** 60:16 188:4
  301:9 302:12
**selling** 190:11,14
  290:5
**send** 18:17 253:3
  256:21 344:23
  424:11,17 444:19
  463:16
**sends** 445:3
**sense** 76:17 298:18
  320:11
**sensitive** 420:7
**sent** 16:4,5 17:15
  18:19 251:19
  252:17 253:11,13
  253:22 254:2,7,8
  254:12 255:3
  256:2,20 338:13
  418:23 438:9
  444:12 447:2
**sentence** 452:6
**separate** 41:20
  71:16 510:6
**separately** 248:14
**serious** 293:8
**seriously** 543:1
  567:16
**served** 23:23 285:3
  287:7 325:11
**service** 21:11,13,14

38:11,12,21
  273:11 462:8,17
**services** 1:22 8:6,8
  33:3 46:14,21,24
  47:9 55:11,11
  462:20 463:22
  473:22,24 474:2
**sessions** 515:17,18
  515:18
**set** 289:1
**seven** 1:23 112:1
  259:5,9 267:15
  349:22 350:3
  371:3 448:14
  507:4 560:15
  564:18
**seventy-five** 502:21
  503:16
**severe** 294:18
**shake** 505:20
**shaking** 70:18
**shape** 91:6 99:17
  440:12
**share** 49:23 137:7
  162:18 191:11
  270:17 299:24
  397:14
**shared** 105:18
**shareholder** 555:14
**shares** 51:21,23
**sheet** 581:8,11,14
  581:17 583:11
**shelves** 301:9,18
**shit** 524:15
**shook** 315:9 505:24
**shoot** 390:3
**shop** 329:16,19
  331:8,21 503:7
**shopped** 329:9,22
  331:8 333:2,20
  334:2
**shopping** 331:11,13
  332:11 333:7,14
**short** 110:12
  119:10 166:3,13
  209:21 268:7



322:11 342:20
354:3 407:24
469:15 522:2
**shorter** 267:9
558:19
**shortly** 38:4 60:14
75:14 104:5
197:19
**shot** 558:20
**show** 22:6 30:24
50:24 78:8,23
90:15 96:20
110:20 111:20
112:4 152:14
204:15 242:23
266:1 280:6
309:24 384:2,15
384:21 387:13
390:14 403:4
417:14 435:12
450:17 464:20
470:5 476:20
477:4 489:1
509:18,24 515:17
546:9 548:13
574:18
**showed** 152:17
249:14 384:16
475:23 476:15
477:9 493:2
555:15
**showing** 489:14
**shown** 383:18
451:3
**shows** 204:20
**shrewd** 318:22
**shut** 259:13,13
402:2,13 528:20
534:19,24 540:8
**sic** 150:17
**side** 123:1,2 129:6
141:11 181:7
205:7 208:6,20
**side-by-side** 211:12
**sign** 12:3 426:4
427:24 428:8,10

428:12,13,22
429:14 432:12
493:5 494:1 498:4
581:10
**signaling** 493:24
**Signatory** 554:20
**signature** 31:11,13
423:20 491:11
492:8 495:23
509:12 554:16
583:15
**signatures** 74:9
**signed** 31:24
424:24 432:14
469:5 470:9,19
472:20,23 491:14
491:15,18 493:7
557:17
**signing** 67:20 68:3
427:21 470:14
502:10,10 557:1,7
581:12
**silly** 321:5 549:5
574:1
**similar** 97:19 204:1
243:16 489:13
**Simon** 411:2,4,7,13
411:16 417:19
429:15 493:10
**simple** 252:19
320:15 541:2
**simpler** 266:23
551:4
**simplify** 526:2
**simply** 46:8 59:8
342:17 368:14
516:14
**simultaneously**
41:24
**sincere** 83:22
**sing** 146:6,10
179:22 250:10
**singer** 141:17
**singing** 313:16
**single** 104:12,21
142:16 144:11,19

145:16 193:1,5
199:10 331:20
459:20,20,22
519:10,11,19
**single-page** 39:2
**sir** 33:17 184:18
205:16 208:3
280:6 283:13
402:16 431:6
432:4 442:16
451:22 564:14
**sirens** 81:21
**sister** 85:2
**sit** 23:1 155:24
160:1 169:16
246:19 248:18
307:24 421:15
576:23
**sitting** 14:13 16:19
133:6 299:12
502:8 574:9
**situation** 292:3
312:11 414:7
484:1 545:19
**situations** 175:22
**six** 197:16 279:24
291:19 349:22
375:12,15 413:16
464:8 564:18
**skewed** 106:20
**slammed** 207:3,3
**slash** 41:1
**slept** 521:20
**slice** 355:1
**slides** 476:11
**slightly** 178:2,2
**slimy** 460:4
**slump** 276:3 290:1
**small** 44:20 45:9
299:9
**SME** 554:12
**smile** 247:16
440:15
**smiling** 247:12
**sneaky** 188:7,10,14
188:17

**sofa** 290:20
**sofas** 290:20
**software** 253:6
**sold** 195:4 300:23
561:21 562:18
565:7 570:1,3
572:8,20
**sole** 303:1,10,15
304:14,23 526:16
**solely** 24:23 25:24
361:13,13
**somebody** 22:21
89:10 176:13
189:7 200:15
321:13 329:8
491:21
**somewhat** 199:7
**song** 4:17 98:18
100:15 101:18
103:4 104:20
105:7,9,19,24
109:21 115:11,15
118:9,21 119:4
120:15,19 122:21
126:17 133:10
134:14,15 136:15
136:18 137:2,7,10
137:24 139:1,19
140:14 142:1,12
144:5 145:16
146:6,11 147:5,20
150:9,9 153:23
155:11,12 156:10
158:14 162:21
170:22 171:3,3,9
171:11 172:20
175:15 176:1
177:16 179:15,22
179:23 180:3,9
181:13 182:17
183:13 187:17
190:22 195:6
199:14 202:19
203:2 209:2,3,5,8
209:8,9 210:8,13
210:13,15,22

211:3,4,16,24
213:14,20,23,24
215:8 217:7,9,14
219:12,13 227:8
230:6 232:1 233:3
236:15 243:16
245:24 295:21
296:5 298:22,23
299:7 300:4 302:6
302:7,9,11 304:8
304:11 310:11
311:21 312:3,4
313:16 314:3,5
315:7 316:4,5,5,8
316:24 318:4
319:8 331:19,19
332:19 333:10
335:6,21 336:17
338:5,6 340:10,12
343:15,23 345:11
350:9,22 352:20
352:23 354:18
356:21 360:16,19
361:2,3,3 362:5,7
362:10,11,15,18
376:22,24,24
378:1,2,18 379:4
379:6,20,22
381:15 383:21
399:12,15,16,21
411:19 416:13
429:22,23 438:20
440:6,8 442:12,12
442:21,21 443:3
443:22 458:6
459:7 478:1
479:10 492:6
493:6,7 495:9,13
498:9,17 499:11
499:13,15 503:21
503:22,23 504:1,4
504:20,21,22,22
507:12 518:3,6,20
518:21 519:15
520:2 526:8,14
527:12,15,23,24



527:24 528:1,3,7
528:10 531:1,2,4
531:7,7,10,11,14
531:15,17,18,22
531:23 532:2,6,8
532:12,15,19
533:4,11,21 537:3
537:4 538:19,22
538:24 539:14,19
541:14,17,21
542:5,10,16,19,23
543:1,4,7 544:1
557:5 559:16
562:21 565:17,18
565:21 569:22
570:2,4,11,13
572:21
**songs** 66:12,18
109:1,2,3 120:21
122:17 124:21
125:4,8 133:7
175:23 196:22
197:7 204:24
233:11 238:2
307:6 333:11,21
334:10 336:11,21
354:14 499:2,6
508:13 511:6,7
**songwriter** 97:12
147:17 168:10
181:12 198:15,17
221:8 225:12
227:2,8 236:6
237:8 239:1
254:20 256:19
261:1
**songwriting** 98:16
138:21 140:24,24
141:9,10 146:24
153:21 162:20
246:8
**sonically** 107:7
**Sony** 2:10,19 8:15
365:19 366:12
367:1 384:7
408:23 484:14

485:2,6
**soon** 297:12 383:23
**sorry** 33:10 70:18
79:7,10 102:8
124:8 145:19
167:10 199:6
203:3 214:22
228:16 232:23
252:23 266:10
268:17 270:23
307:2 339:17
386:9 389:10
393:2 394:22
414:17 444:4,4
465:17 483:4
489:23 500:3
520:17,17 524:20
525:24 526:19
530:24 545:13
547:8 568:7
**sort** 77:17 296:7
314:24 334:8
495:16
**sorts** 431:19
**sought** 277:6
**sound** 107:5 220:1
290:18
**sounded** 504:2
**sounds** 264:20
411:3 418:11
456:6 472:13
**source** 441:19
**South** 10:9
**so-and-so** 133:10
438:8
**space** 44:24 55:8
76:20 107:7
285:19 291:6
481:23 581:7
**spaces** 464:19
468:22
**span** 558:19
**Spare** 132:14
**speak** 90:20 91:9
91:15 155:21
172:1 174:3,4

177:13 221:10
227:21 235:4
307:9 335:15,24
346:10 377:18
393:5,6 404:2
411:18 434:7
444:9 471:15
474:21 512:24
**speaker** 338:4
344:2 347:7 348:1
**speaking** 63:4
248:13 269:21
270:2 295:12
371:21 397:23
475:22 479:23
**speaks** 75:7 413:3
424:6 459:11
555:23 564:10
**special** 439:18,23
440:1,5
**specific** 52:22
130:13 133:2
212:15 220:3
233:8 254:6 475:6
**specifically** 133:24
**speculate** 95:1
**speculating** 199:1,8
519:8
**speculation** 558:3
**speech** 318:16
420:17
**spell** 498:20
**spend** 186:24
481:10
**spending** 420:21
**spent** 45:2 70:7
77:7 237:23 481:6
481:8 496:9
**split** 138:1,4 140:13
140:21 141:12
499:5,9 518:4
**splitting** 502:12
**spoke** 84:8,13
171:9 226:23
227:23 264:7
265:13 329:14

337:21 347:6
364:15 377:16
383:14 403:14
474:11
**spoken** 91:24
309:14 371:18
376:4 475:1
**Sporadic** 344:17
**Springfield** 34:1,4
34:10
**stage** 312:3,21
**stages** 542:24
**stamp** 109:20
283:23 386:15
554:12
**stamped** 74:5
**stand** 165:12
**stands** 290:17
471:9
**star** 519:14
**stars** 200:9
**start** 17:11 257:17
346:14 369:24
**started** 75:10
183:11 312:22
370:5 502:11
556:23 571:4
**starting** 18:10
**state** 8:10 10:4
14:11 43:12
341:20 574:5
575:8,11 581:6
**stated** 37:14 99:6
116:6 144:9 156:5
160:19 185:9
227:9 375:11
**statement** 46:18
89:13,15,17,23
90:1,16,22 91:2
91:20 92:16
115:17 136:23
146:16 157:1
164:3 203:23
250:24 269:9
284:15,18 295:13
430:3 477:5,10

511:14,23 512:1,2
516:8,12,17
**statements** 31:16
207:6 240:18
263:18 272:18
279:8,12,14,15
286:16 294:5
295:4 296:3
461:22 476:16
510:19 516:15
517:3 573:2
**states** 1:1 7:17
555:20
**stating** 282:3
342:17
**status** 264:8
**statutory** 113:10
**stay** 87:22 467:14
**steal** 155:11 316:23
538:22
**stealing** 156:20
332:20 443:20
538:19
**steel** 381:14
**stenographic**
267:22 307:14,16
307:19 579:7
**steps** 60:18
**Steve** 504:2
**Steven** 2:14,23 9:1
**Stevie** 435:18
**sticker** 426:24
**stipulation** 12:6
**Stipulations** 6:20
**stock** 51:21,24
**stole** 115:14 134:16
161:11 187:2
246:2 298:23
319:9 399:13
499:12 533:21
539:13,18 565:16
565:18
**stolen** 117:20
136:21 148:10
150:10 156:11
254:21 295:21



352:23 356:22
360:17 378:19
379:7,20 440:7,8
443:22 537:4
557:6,9 562:22
569:22 570:4,11
572:22
**stollen** 345:15
**stop** 94:1 130:11
187:16 190:11,13
212:3 216:9 270:6
274:23 300:7,14
300:15 312:21
363:3,9 370:13
521:11 540:22
558:6 561:2
567:24
**stopped** 294:24
**stopping** 110:5
**storage** 288:17
**store** 196:8,17
220:11 233:1
**stored** 323:8,15
**stores** 191:21
202:21 301:5,7,17
**stories** 152:22
158:3
**story** 169:22 249:2
544:22
**straight** 63:16,17
161:12 163:18
164:21 189:14
190:7 257:23
269:14,18 282:13
289:24 358:16
359:20 460:16
**strapping** 487:8
**Street** 1:12,23 2:4
8:1 10:10 16:16
16:17 391:14,20
**strictly** 378:5
**strike** 195:23
202:17 299:1
333:3
**struck** 178:14
**structure** 36:21

**stuck** 290:5 543:19
**studio** 32:21 35:23
36:1,3,10,15
37:21 44:16 48:20
52:19 53:23 54:18
55:1,7,14 56:9
57:19 58:8 59:19
60:5 61:2 69:2,10
70:13 71:8,15
75:4 76:23 104:5
133:5,15,19
173:22 181:22,23
222:6 224:16
230:23 239:3
244:10 245:2
279:6 285:6,9,14
286:14 287:11
289:21 291:3
295:14 329:4
330:6,8,8,17
336:2,6 337:14,24
338:1,2,3,20
344:21 345:1,18
347:1,15 349:10
349:17,17 350:1
351:3 364:4,5
404:14 405:1
437:22 456:9,20
475:13 482:1
496:7 503:4 504:9
506:18 507:7
570:19 573:3
**studios** 53:19 236:9
236:13,16 272:9
336:9 364:7
405:18 508:12
**stuff** 32:19 161:11
315:2 362:21
368:9 545:16
**subject** 32:6 168:16
170:10 333:14
357:14 358:5
359:2,15,19,24
581:12
**Sublime** 2:13,22
8:22 409:2

**submitted** 89:13
**Subscribed** 583:18
**substance** 350:16
479:2,5 583:9
**success** 203:20
519:6,7
**successful** 45:5
186:14 199:11
200:11 519:15
**suddenly** 230:20
**sue** 494:2
**sued** 93:17 98:22
98:23
**suggested** 75:21
**suing** 93:5 94:16
**suit** 417:2 569:23
**Suite** 2:8,17
**suits** 264:21
**sung** 179:13
**super** 519:14
**superstar** 199:22
**supplied** 513:19
**supply** 389:23
**support** 6:2 245:3
309:20
**supporting** 275:12
**supposed** 282:11
314:1 333:9
**sure** 13:3 15:12
19:16 21:19 22:20
35:12,14 47:2
64:15 68:21,23
73:20 84:11 86:11
86:24 96:3 97:5
109:11 112:9
113:3 114:8 115:9
120:7 125:15
129:21 130:4
139:16 141:21
142:17 143:23
154:2 174:17
177:22 181:5
185:4,6 222:2
223:9,12,13,17
224:5 225:13
226:19 234:12

253:24 266:7,10
266:18 282:1
283:12 284:21,22
284:23 291:3
300:13 308:14
309:16 330:20,22
346:2,5 347:4
353:23 366:10
382:6 385:1 386:7
387:12,15 399:1
402:5 404:24
414:1,5 425:21
451:11 468:2
475:4 483:15,19
492:11 493:7
500:18 525:8
539:16 554:23
**surreal** 175:14
**surrounding**
492:22
**sway** 354:14
**swear** 9:18 32:2
307:23
**switch** 467:8
**sworn** 9:21 160:9
583:18
**system** 253:15

――――――――――
**T**
**T** 4:8 5:2 579:1,1
582:3,3
**table** 561:8 563:5
**tables** 290:24
**tail** 292:16
**take** 11:7,10 12:17
15:2 46:24 49:13
60:18 81:2 110:4
110:7 131:18
135:6 141:5 154:7
165:21 222:3,21
223:4 225:6,14
234:10 245:2
266:21,24 267:14
274:11 280:15
285:8,10,11
291:10 319:23

331:16 364:20
382:9 391:21
392:14 407:14,19
448:15 449:21
450:12 483:18
521:21 542:24
543:3 558:6 567:8
567:15
**taken** 1:10 7:24
110:13 119:12,14
130:5 134:1,8
149:8 166:4,14
225:8 244:21
268:8 285:5
287:11 292:24
296:9 322:12
408:1 469:16
522:3 579:8
**talent** 44:15
**talk** 71:2 113:5
114:19 128:18
199:13 202:21
222:18 266:11
274:20 279:1
295:3 412:13
430:14,19 457:21
520:1 526:6
540:22
**talked** 84:15 120:6
222:17 406:5,19
544:10 548:5
**talking** 14:22
183:14,15 184:15
216:9 257:10,13
262:15 273:17,22
312:15 327:17
366:2 368:13,14
372:1 398:1
410:17 458:2
475:9 502:9,11
517:16 556:2
573:20
**talks** 387:1
**tape** 212:24 420:21
464:10 467:8,15
469:8



**tasks** 44:22 45:19
  45:24 47:7 48:5
  48:12
**taught** 121:7
**teach** 514:24
**team** 137:24 250:9
  250:18 364:20,21
**technology** 32:16
  32:18
**tee** 327:7
**Teenager** 125:5
**Teich** 498:19,22
**telephone** 55:9,11
  316:14,19,21
  319:2 349:9 365:8
  377:17,20 378:9
  396:10,14 474:22
  507:24
**telephoning** 509:4
  509:7
**tell** 15:10 28:22
  64:17 79:17 84:9
  84:12 85:13 88:10
  92:13 115:2
  120:24 122:9
  129:8,22 130:6,7
  130:18,19,21
  133:24 142:20
  146:14 157:16
  160:20 163:24
  164:6 166:21
  174:10,19 175:11
  175:19 178:15,22
  179:3 182:11,13
  187:16 188:4
  189:6 190:3,10,13
  190:19 210:1,24
  219:20 221:13
  224:21 226:11
  231:6 234:1
  235:19,22 236:22
  239:19 248:3
  249:1,4,22 252:21
  258:16 263:12
  264:1,13 277:18
  287:4 289:19

290:8 305:22
312:21 322:2
343:9 347:16
354:7 364:21
367:14 381:7
389:15 391:16
394:18 395:2
397:12 400:19
403:8 405:9,14
408:19 413:19
433:2 438:1,12
447:16 449:17
479:14 486:5
492:3 533:1
**telling** 27:19 63:7
  94:18 151:3 156:4
  161:18 164:9
  173:5 223:10
  238:22 244:2
  249:12 317:5
  391:11 409:24
  424:16,19 493:21
  576:12,17
**tells** 456:16
**ten** 15:21 154:21
  157:19,22 392:22
  523:3 543:2
  554:12
**tens** 281:10
**term** 106:16
**termed** 90:3
**terminated** 61:10
**terms** 29:24 139:3
  259:21 382:15
  384:21 501:21
  503:16 550:7
**terrible** 473:2
**Terry** 2:14,23 9:1
  116:21 171:5
  181:8,9,19 234:20
  254:15 344:6
  346:8,11 347:10
  347:20 375:23
  376:10 377:8,13
  377:19 379:2
  380:7 384:5 499:4

526:18,19,22
**testified** 9:22 92:19
  103:21 115:23
  154:16 193:14
  257:6,21,22
  261:10 322:22
  352:12 376:21
  377:5 406:12
  414:22 432:11
  433:17 435:3
  466:4 507:1,3
  517:7 529:4
  538:18 548:20
  552:18 573:6,11
**testify** 93:4 210:12
  307:21 443:1
  452:21 518:7
  549:8
**testifying** 79:24
  114:23 116:9
  206:5 213:10
  239:14 574:7
**testimony** 4:4
  11:17 19:8 65:5
  93:12,14 94:14
  136:24 145:2
  160:9 170:9
  177:23 181:15
  204:2 211:11,15
  211:17 229:3
  297:21 317:18,20
  318:20 337:20
  361:24 363:16,21
  401:2 462:7
  491:13 514:8
  518:17 519:20
  537:22 573:9
**text** 21:4 84:18
  320:24 324:5
  351:21 365:9
  373:7 391:5
  463:19 475:18
**texting** 323:24
  324:2
**thank** 10:12 14:14
  42:12 73:15 79:11

109:10 111:12
124:20 141:15
143:7,12 145:20
156:24 217:2
243:7 282:23
283:8 305:17
315:16 316:8
322:19 353:8
358:2 360:7
373:19 375:22
387:23 411:1
415:17 435:2
444:19 445:3
446:12,16,19
464:12 465:3
489:5,7,23 499:17
513:4 546:3,12
**thanked** 445:8
**thanking** 446:14
**Thanks** 13:22
  39:16 451:23
**therapist** 273:11
  274:7
**thieves** 161:14
  299:14 321:12
**thing** 23:2,13
  109:18 210:7,10
  227:5 286:13,20
  294:16 302:10
  348:13 360:15
  416:21 452:13
  468:18 500:7
  510:23 563:8,10
  568:3 571:8
**things** 32:17 48:21
  50:19 81:1 97:17
  97:23 98:6 206:11
  236:19 282:3
  285:19 313:7
  339:22 340:11
  383:22 416:10
  456:10 476:9
  559:24 561:4
**think** 19:14 20:2
  40:2 42:22 44:12
  56:21 60:12 69:17

69:23 78:6 93:19
94:3,9,10 106:21
115:10 127:2
128:10,12 136:14
145:1 168:21
177:22 178:4
188:7 189:2 196:4
198:7,14 201:3
224:12,12 247:21
255:4 267:23
289:8,24 291:13
292:15,18 296:15
296:20 298:12,14
298:18 302:24
305:4 308:1
312:24 323:23
329:8 337:4 346:7
352:7 355:14
356:10 357:2
365:22 369:18
372:23 373:5
375:6 387:8,10
390:16 392:12
394:24 397:18
402:8 407:5,11
417:6 448:8,22
452:16 460:22
474:11 475:1
479:15 482:3
490:6 502:16,19
502:20 506:24
507:4 508:1 510:4
510:13 515:10,24
516:5 519:2
522:21 525:23
527:4 537:19
538:7,12 548:19
549:7 551:11,20
552:17,21 554:4
562:14 563:7
571:22 572:1
575:6 576:13,17
**thinking** 59:14
  196:8 503:13
  562:11
**thinks** 390:24



**third** 92:7 99:17
205:3,5,9 207:16
207:17 246:13
334:3 518:5,5,5
551:9
**thirty** 581:18
**thirty-seven** 125:2
**Thirty-six** 125:1
**thoroughly** 148:16
149:15
**thought** 36:13 43:5
55:16 61:4 70:5
76:16 84:3 91:3
129:23 131:22
133:12,19 134:11
134:13 196:12,16
202:12,13 225:23
255:8 271:20
273:4 293:7,24
342:15 347:11
376:9 380:4 381:1
437:5 447:12,22
453:2 461:21
480:1 538:13
542:11
**thousands** 281:6,10
283:15
**three** 50:19 57:8,16
100:7 103:13
138:1,6 140:10,14
140:15,16,22
143:1,2 157:23
169:16 181:21
238:1 246:15
282:21 322:16
469:11 493:11
495:3 515:24
518:2,10
**three-hour** 515:12
**ticket** 437:15
**tickets** 309:4
437:16 438:9,15
438:19,23 439:5,9
444:11,21 445:9
445:17,18 446:10
446:13,15,17,20

446:23 447:3,5,9
447:17 449:9
**tied** 383:19 483:23
**Tiffany** 278:5,7
**time** 7:6,22 11:14
12:11 13:16 18:11
18:18 19:15,18
21:1 22:11 36:20
39:6 41:8,21 42:5
45:2 58:17 59:8
60:7,9,17 61:13
64:5 67:17 70:8
71:12 72:4 73:10
75:15 77:8 78:17
82:2 84:7,13
85:12,13,15,20
87:17 88:8,24
90:9 98:10 104:3
110:8,12,15 114:9
124:10,22 125:14
126:5,18 128:8
131:10,11 149:23
151:5,17 153:5
160:13 165:23
166:3,7,13,16
168:2 184:1,15
185:1 187:4,14
189:16 190:19
193:12,21 194:13
196:24 197:1,2,11
200:5,12,23 201:7
202:8 204:9 213:8
214:9 223:11
226:5 233:14,18
233:19 238:6
241:8 243:2 248:9
259:2 260:14
263:18 265:19
268:3,7,10 271:22
274:21,22 275:16
276:9 277:3,19,19
280:9 286:20
288:24 289:22
292:5,14 295:2,8
296:23 306:6
308:4 310:7,15

311:6 312:14
315:24 316:3,6
317:4 318:24
320:24 322:4,11
322:14 325:2
330:24 332:13
335:20 336:3,5
338:15 339:1,21
344:11 346:11
350:4 351:16,19
351:22 352:6
355:17 357:1,21
365:16,23 366:23
366:24 369:10,15
370:11,23 371:2
374:13 376:9
380:7 381:6 386:1
394:1,8,15 397:22
398:10 402:13,16
402:18 405:3
407:5,20,24 408:3
410:23 412:7,9
415:19 417:8
420:21,22 426:10
439:18,18 441:17
442:8 449:2,24
454:20 456:3
464:5,22 465:10
467:9 469:9,15,18
476:12,21 479:24
481:6 487:1
488:19 493:1
496:2,9 503:5
506:6,17 509:11
513:2,12 520:9,22
521:12,22 522:2,5
522:11,14,20
523:9 524:1 525:4
525:15,24 529:20
529:21 530:3
541:4 546:17
550:22 552:8,10
558:16,18 563:2
564:14 569:12
577:9,22
**times** 85:3 121:8

133:17 136:15
140:3,3,10 150:15
151:4,12 152:6
153:1 154:21
160:4 169:1,2
176:3 212:13
261:14 263:11
264:6 282:21
294:14 303:23
305:19 335:18,22
349:24 401:17,19
401:21 403:2
413:9 506:10,14
506:19 507:5,5,7
507:20 530:13
568:20
**tiny** 271:14
**Tiramisu** 41:1,17
42:3,9
**tired** 17:2 318:11
318:12,13 448:9
483:3 521:8 524:2
529:16,22,23
530:12 547:9
548:10 550:12
551:21 552:1
553:7 558:20
560:19 562:12
568:5 570:22
571:4 573:23
**tiresome** 459:15
**tiring** 400:8
**title** 61:16,19,20,21
65:15 69:1,6,9,12
69:14 90:4 99:22
243:19
**titles** 69:15
**today** 7:21 11:17,22
15:3 87:4,23
124:24 126:12
127:1 287:14
301:6 303:23
496:4 513:23
514:8 517:6,17
565:20 575:23
**today's** 544:5

**told** 17:3 87:13
91:24 113:2
128:22 134:3
139:24 145:11
159:8,10,19,21
160:17 176:5,8,13
176:15,22 177:4
178:13 180:7
181:3 184:12
188:8 190:21
221:16 222:20
223:3,5 224:24
225:10 229:21
230:3 232:5 234:2
236:4 238:23
264:24 292:2
312:4 314:12
319:22 363:20
364:2,5,11,14,19
365:3,6 367:18,20
382:11,15 395:5,9
395:11,14 408:9
413:8 414:10
415:9 438:23
442:2,4 449:14,15
457:18 458:3
486:3 538:2,15
544:11 566:17
**Tom** 500:10 506:16
**Tommy** 109:5
128:23 129:2,9,11
131:13 171:6
173:14 174:4
225:7 237:5,6
239:7 265:12
400:18,20 499:23
527:20 538:6
539:2
**tomorrow** 536:15
**tone** 201:13,16,18
**tonight** 393:7
536:22
**Tool** 252:16
**Tools** 250:10
251:19 252:2,7
253:2,8,20,20



254:16,18,24
255:4 256:2,22
514:24 515:2,4,16
544:9 575:17
576:3
**top** 70:6 79:19
200:4 219:11,14
244:15 246:14
385:8 392:4
414:14 467:5
469:1 490:3
492:15 497:9,13
497:21 508:14
547:21
**topic** 375:3
**total** 350:3 461:6
**touch** 85:4 87:22
**tour** 309:23
**Tower** 195:19
**town** 37:17 278:16
294:15
**track** 81:2 107:6
202:1 221:1 250:2
269:4 270:19
283:17 299:18
300:7,16,22 302:1
303:18 339:3
340:19 342:3,6
343:18 366:14
367:16 368:18
381:20 447:6,11
447:18
**tracks** 505:7,7
**train** 22:2 267:13
**transcript** 152:14
152:16,23,24
212:17 403:4
579:7 581:20,21
**transcription** 583:6
**transfer** 287:16
**transferred** 253:7
287:21
**transportation**
21:22
**travel** 435:22
**traveled** 435:24

**treated** 282:10,12
**treatment** 272:23
273:3
**trial** 7:7 12:11
206:17
**trick** 161:7 170:7
363:14 556:4,7
571:8
**tricking** 161:2
163:19 165:3
**tricks** 51:4 53:8
284:13
**tricky** 62:17 63:16
190:6 194:5
406:21 448:2
553:21 559:22
**tried** 116:20 316:24
317:2 353:5
488:12
**trio** 140:7
**trip** 406:6 445:21
446:6
**trouble** 313:23
**true** 31:18 120:2
149:1 150:8,10
157:3,17 251:15
251:16 364:10
383:2,6,10,12,13
493:22 495:18
562:10 579:6
**trust** 161:9,12
164:21 375:7,8,8
485:13,17,20
486:8,11 493:17
534:2 553:22
**trusted** 81:4 83:3
83:18 134:16
379:8 486:12
**trustworthy** 533:22
**truth** 63:19 94:18
132:9,10 148:18
148:19,20,23
153:4 158:5,5
169:6,7,22,23,24
188:24 207:8,10
210:4 213:4

240:15,21 358:22
358:23 399:5
**truthful** 19:7 95:8
170:9
**truthfully** 525:6
**truths** 240:16
**try** 11:6 45:3 109:2
117:2 169:19
183:2 267:8 268:1
292:12 295:3
296:22 316:13,21
317:14 319:2,11
319:16,18,24
320:23 321:2,22
321:23 331:17
348:14 356:14
357:6 358:6 360:3
416:9 485:7
487:24 503:9
523:20 524:7
551:3 556:4
568:16
**trying** 13:24 47:4
60:11 144:4 158:1
161:6,7 163:24
164:17 165:16
170:7 176:22
180:13,18 183:6
188:9 194:7 215:9
224:12,12 292:16
318:20 327:20
335:10 357:7
358:7 363:14
370:20,21,22
394:23 403:3
406:21 428:10
443:8 454:8,13,13
483:24 494:4
503:7,14 504:6
522:24 525:21
530:5 540:20
543:15 556:3,7,11
564:24 571:9
**Tuesday** 328:6
**Tunes** 2:13,22 8:24
409:2

**Tunez** 2:14,23 8:23
409:3
**turn** 30:12 143:9
156:22 246:23
276:19 286:1
326:5 425:16,19
512:14 546:1
**turned** 32:5
**turning** 30:11
470:5
**TVs** 545:15
**twenty-five** 502:21
503:17
**twice** 305:21,22
317:19
**twist** 447:20
**two** 36:13,14 41:6,7
41:10,20 44:21
54:5 67:16 103:12
166:18 204:24
205:22 222:16
223:13 279:24
306:16 322:6
335:13 336:8
371:4 401:1,19
437:16 450:4
515:11 564:20
569:6
**two-and-a-half**
369:22
**Ty** 409:2
**Tyme** 2:13,22 8:24
**type** 286:12 389:12
445:2
**typed** 31:13 424:2
**T-E-I-C-H** 498:23

___U___

**uh** 208:5
**Uh-huh** 118:11
283:24 377:11
469:3
**uh-uh** 205:11
**ultimately** 356:17
**um** 205:4,5 208:4
**unaware** 93:4,17

**unbelievable** 140:9
**unclear** 50:16
**underlying** 98:19
138:12
**underneath** 58:16
59:9
**understand** 11:5
13:5 15:5 19:4
43:3,17,20 47:5
47:19 48:19 49:17
49:20 51:8 52:12
54:2 55:21 78:4
106:24 108:20
113:18 114:7,15
115:11 118:5
120:15 134:23
135:4 136:22
139:5,23 162:11
163:8,16,21
167:13,16 173:2
187:22 192:18
199:20 207:22
210:3 212:23
215:10 252:3
258:14 264:16
267:17 282:16
320:2 329:10
345:13 350:12
359:12,17,21
409:14 410:17
418:22 419:13,15
423:9 429:13
430:24 442:7,14
457:5 478:22
494:5 497:24
513:21 514:4
527:8 533:12
537:9 557:4,24
**understanding**
57:8 58:4 125:23
126:2,11,15,20
127:4 128:15
129:17,23 134:7
137:23 146:23
147:7,15 148:1
153:15 158:12,19



168:8 170:20
172:5 223:19
254:19 257:2,14
258:2 260:23
261:13 327:10
335:4 345:10
352:13 354:12,16
354:19 364:24
416:10 447:8
449:7 505:12
**understood** 32:4
49:24 64:24 129:1
134:21 191:20
194:21 235:3
255:15 256:1,4
264:24 265:5
293:23 505:8
517:1
**Underworld** 42:14
42:17,20 43:3,18
43:21,24 44:4,9
44:14 45:1,12,15
45:19 46:4,7,21
47:6 48:5,13 49:9
49:15,18 50:1,5,9
51:10 54:12 56:20
57:3,17 59:5,17
60:3,23 62:1 65:2
65:13 66:22 67:23
67:23 68:7,20
69:13 71:13,19
75:2,12 76:22
247:6,9 272:10
470:19 471:2,20
514:12 547:16,23
548:7,14 549:19
551:8 552:14
554:6,14 555:1,16
556:18,24 557:17
558:15,21 559:14
**unfamiliar** 164:10
**unfortunate** 307:2
**Unfortunately**
443:15
**Union** 67:18 68:9
68:10

**United** 1:1 7:16
**unlimited** 519:13
**unreal** 210:6
**unsigned** 470:6
**untrustworthy**
368:23
**untruthful** 32:6
443:19
**UPS** 21:17
**upset** 333:1,5,8
444:5
**urgency** 16:18
294:7 317:14
**UR-IV** 2:11,20 8:19
409:3
**use** 36:15 50:13
75:21 133:10
144:10,14,18
146:4,5 147:21
154:15 155:12,22
175:16 177:21
201:12,16,16
207:20 252:1
253:9,10,12,14
257:15 258:3,5
259:4,9 303:1,11
304:23 331:18
334:3 466:19
515:15,20 518:20
518:21 519:1
529:20,21 541:3
542:7
**Usher** 2:10,19 8:15
144:23 145:6,18
146:6,10 147:6,21
154:14 155:21
167:4 168:13
171:1 172:19,22
174:11,20,22
175:15 176:18
178:5,14,24
179:14,22 180:2,8
181:18 182:17
186:21 198:21
199:13 203:3
225:10 234:21

237:7 239:6
245:19 250:18
265:15 281:9
305:20 309:15,23
312:21 314:11,16
315:18,20 316:14
316:19 317:14
319:3 320:13
321:24 322:2
332:18 333:2,7
334:23 335:2,3
344:7 347:9
348:17 354:14
360:8 371:5 384:4
395:6 408:23
438:3 446:13,15
460:2 492:6
518:20 519:1,3,4
519:22 539:18
543:19
**Usher's** 195:8
222:3,18,19 223:3
234:11,16 235:10
235:12 238:23
239:5 250:9
251:20 264:19
308:23 354:13
364:21 367:2
429:23 437:17,20
442:2 444:11,22
447:1 495:13
**Usually** 267:3
**utilize** 513:3
**U-M** 208:4

**V**

**V** 1:3,10 4:4 74:13
79:20
**Van** 109:5 128:24
129:2,9,11 130:2
130:6,18,24
131:10,21 132:13
135:10,18,22
171:6 173:15
174:4 207:1 225:7
237:5,6 239:8

265:13 400:18,20
403:7,10,16,19
404:8,11,13
406:15 407:1,7
459:23 499:23
500:10 505:8
506:11 507:24
509:9 510:7,19
511:17 527:20
538:6 539:2
**various** 44:16,18
47:7 66:22 511:18
**verbal** 123:19,23
**verbally** 121:11
**verification** 30:14
30:18 31:9,15
**verse** 250:11 256:3
343:11
**version** 23:10
106:19 174:12,23
178:6,24 179:13
179:19 342:5,7
343:18 425:9
**versions** 216:7
**versus** 7:15
**vexatious** 401:6,14
**video** 542:11
**videographer** 3:7
7:11 8:4 9:17
110:8,15 165:23
166:6,16 268:3,10
322:4,14 407:20
408:3 450:7 464:7
467:9,18 469:9,18
494:17 521:22
522:5 564:15
577:21
**Videotape** 1:9
**videotaped** 13:11
14:24
**viewed** 367:2
**violation** 189:3
**VIP** 309:17 314:20
314:22
**visions** 350:2
**vocal** 107:6

**voice** 182:6
**volume** 201:18
**vs** 1:4

**W**

**wait** 260:8 401:19
550:4 553:6
**waiter** 40:16
**waiting** 16:20
576:23
**waived** 7:3 430:10
**waiving** 576:9,14
**walk** 22:4
**walked** 315:4 402:3
**walking** 16:14
**wall** 290:19 362:22
**Wallace** 385:4,22
450:19 461:12,14
461:19 463:3
474:8,10,17
**wallet** 14:7
**Walnut** 2:4
**want** 11:7 30:12
50:23 63:19,20,21
63:21,23 66:7
71:3 74:2 77:15
77:18 97:9,11,15
97:24,24 98:11,13
117:16,19 118:22
120:17 139:22
143:9 149:8
150:18 152:20,22
153:10 159:5
160:21 161:16
163:22 165:5
169:1,2,3 170:8
177:8 178:16
179:4 180:10
199:5 205:13
206:6,11,18
208:12 209:24
210:11 211:5
213:9 225:14
226:10 240:15
242:8 245:13
261:15 267:9



281:24 284:13
294:17 299:3,14
299:16 300:11,22
301:4 302:13,21
305:2 331:18
336:23 349:22
355:2 359:7
361:23 370:11
379:14 390:21
391:21 401:24
402:5,8,21,23,23
403:18 407:5
410:4 420:19
425:15 428:24
431:11 436:21
437:5,10 449:21
450:11 453:5
467:4,8,23 468:8
483:18 493:18
513:1 522:12,13
524:18 527:5
530:3,9 534:22
535:10 537:9
542:12 559:24
566:1,6 567:14,18
567:20 571:3
575:9,11
**wanted** 117:21,23
119:22 142:15
144:10,12,14
148:4 149:2
160:10 177:21
183:9 222:10
224:4 225:16
236:18 245:10
249:1 253:16
327:19 328:2
343:13 416:15,18
416:19 428:11
432:13,17 467:21
488:8 493:15
508:17 514:10
550:20
**wanting** 417:2
492:24
**wants** 158:2 448:14

**warn** 62:20
**Warner-Tamerla...**
2:11,20 8:18
384:7 409:3
**Warrington** 2:17
**wasn't** 51:17 56:6
84:14 109:8
125:15 129:5
175:7 177:22
179:18 223:9,12
223:13,17 234:19
252:19 256:17
275:15 307:13
310:12 314:3
315:10 347:18
356:23 378:20
379:21 393:23
399:3 406:2 414:1
414:5 416:14
440:9 442:8
472:23 530:9
**waste** 259:10,11
260:13
**Wavelab** 52:18
53:18 54:17 55:1
55:14 56:9 57:19
59:18 60:4 61:1
69:2 70:13 71:7
71:15 75:3,12
76:22 236:9,12,15
272:9 330:8 336:2
364:7 405:1,18
406:13 514:16,17
514:17,20,21,22
516:4
**way** 49:10 91:6
99:16 105:2 119:5
134:19 147:5
158:17 164:17,18
171:21,24 183:16
198:15,16 276:19
282:10 291:11
296:9 298:2 324:7
364:23 413:11,17
419:21 425:5
433:2 440:12

446:2 476:10
501:24 502:4,7
503:20 505:21
506:9,20 541:4
557:15
**Wayne** 365:9
**ways** 40:16 85:16
138:1 140:14,22
529:19
**week** 111:17 125:2
276:8 536:16
575:18
**weeks** 276:11 306:8
344:12 372:18
376:14
**weird** 222:10
**welcome** 247:5
**went** 44:17 57:2
93:14 108:14,16
183:18 196:2,7,17
220:11 227:4
237:24 269:4
276:3 285:4 287:8
309:1,17,20 311:7
311:19 314:19
315:2 317:12
323:6 340:11
346:4 411:17,23
412:10,12 413:19
414:9,14 415:9,22
434:19 435:3
436:2 440:17
441:18 479:22
481:12 498:16
499:10 504:13
519:22 532:21,23
532:23
**weren't** 275:14
290:22 295:11
381:14 395:20
558:17
**West** 33:11
**we'll** 18:23 50:23
145:21 171:13
259:16 326:14
327:4 385:13

407:14 423:2
433:10,12 448:11
502:23,24 505:19
506:2 521:11
523:18 540:8
566:22
**we've** 137:18 464:7
511:1 539:2,4
**whatsoever** 435:1
**Whichever** 478:2
**white** 443:9
**Whoa** 419:5,6
**wife** 38:18 86:18
277:23 390:21
**wife's** 278:3
**Wil** 88:2,23 94:11
101:4,7 107:16
138:2,2 141:16,24
142:6,16 143:16
145:15,23 146:4
153:16 158:19
165:17 170:20
173:14 183:10
199:9 225:9,20,22
225:24 226:3,11
299:10 304:1
334:20 335:14
345:24,24 346:2
362:10 393:16
455:6,14 499:24
500:11 508:18
511:7 519:9,17
527:16 544:3
**William** 100:10
**Williams** 2:7 8:14
9:10 77:20 426:11
426:16,19,23
427:4 459:19
466:17 469:7
486:18 494:13
**willing** 534:6
**Wil's** 145:2 519:20
**win** 191:16
**wish** 471:6
**withhold** 289:10
**witness** 6:5 9:19

10:21 13:12,23
14:10 16:21 24:18
28:9 29:10 31:5
39:3 43:9 48:1
53:6,14,17 54:8
59:22 63:12 64:9
65:11 66:2 69:5
70:3,17 72:8 75:9
78:2,7,10 79:11
81:8 82:8,19
91:14,23 93:13,22
94:3,22 95:2 99:5
101:13,24 102:22
104:15,24 105:15
106:3,10 108:11
108:23 113:22
116:18 118:4
120:5 124:14
130:15 131:7
135:14 137:18
138:10 139:14
140:13 141:20
142:5 143:6,22
147:24 148:9
152:5 153:14
154:6,23 155:17
156:9,17 157:12
158:11 159:20
161:1 162:1,6
163:15 164:16
167:9,24 168:6
169:19 170:2,19
171:19 172:8
173:1,12 174:15
175:2 176:21
177:7 179:7,18
180:2,15,19
182:22 184:19,22
185:22 186:7
187:21 192:23
194:17 198:11,24
200:8 201:20
202:12 211:22
214:19 219:1
224:3 226:2
227:19 228:19



229:2,9,17 230:16
233:17 234:9
235:7 238:19
241:12 245:23
249:11,20 250:5
251:7,11 257:7
260:19 261:18
262:5,16 271:13
280:7 283:9 288:1
288:12 291:22
297:22 300:20
301:13 302:19
303:5,14 304:5,18
310:21 312:1
313:6,20,24
320:20 321:10
322:8 324:21
325:15 334:6
339:15 340:3
341:1 342:23
346:19 347:24
349:21 350:13,21
351:12 353:20
355:13 356:2,20
357:10,16 358:1
358:17 359:9
361:19 366:7,18
369:9,16 372:7
373:17 374:7,17
374:23 376:8
378:17 380:23
381:24 383:5,9
384:12 385:7
386:20 387:23
388:16,20 390:5
391:4,9,15,23
392:20 393:2
396:8 397:2,17,21
398:14,24 400:4
400:10 404:23
405:13 406:9,23
407:16 409:8
410:21 415:14
416:2 421:2
423:10 424:8,15
425:4 426:8 427:2

428:18 434:13
439:3 440:4 441:3
441:6 442:1
444:16 448:9,10
449:6,23 450:5,13
451:10,14,24
453:6 456:23
458:15 462:12
466:12 467:20
471:6 472:9
478:11 480:7
481:19 482:12
483:12 484:5
485:3,10 486:1
487:10 488:11
489:2,24 491:4
493:14 494:21
498:7 500:6
501:15 507:2,17
509:15,23 510:10
511:22 518:14
520:16 521:2,7
522:22 523:3
524:14,19 526:12
527:14 528:16,24
529:15 530:17,23
537:17 538:11
543:10,14 545:3
546:14 549:23
550:9 551:16,22
552:2 553:3,6,15
555:11 557:23
560:18 562:1
563:9,16 565:11
567:14 568:6,10
570:23 573:8,12
581:2
**woman** 277:23
504:20
**wondering** 426:20
**word** 26:8 55:22
121:8,9 187:10
210:21,21 211:14
211:14 219:5,7
221:23,24 240:5
247:6 285:16

337:5 359:22
375:9 458:20
478:21,21 484:21
561:11
**words** 164:2 200:20
203:13 204:1
207:21 209:6
217:9,10 318:21
353:10 358:14
447:21 478:20
479:2,4 542:7
543:24
**word-for-word**
348:13
**work** 11:2 32:14,19
44:19 45:23
104:12,21 109:13
109:23 110:1
115:1,2,7 116:8
116:14,19,20
118:9 126:12
135:23 136:3,6
137:15,24 186:17
186:21,23 187:12
190:14,17 197:23
199:17 203:12
225:12 237:15
238:20 245:16,18
252:18,21 257:15
264:2 274:24
278:15 331:16,16
338:9 341:7,13,14
344:15,19 346:5
366:19 439:21
502:23,24 505:19
506:2 510:24
511:4 518:2 524:7
545:12
**worked** 42:1,3,4,5
44:16 55:19 66:5
72:12 105:2
118:13 122:18
142:14 275:24
293:14 329:20,23
331:16 335:13
338:11 352:2,4

362:4,9 383:23,24
416:11 438:3
499:23 500:10
508:4 526:14
527:17 544:3
556:22
**working** 46:3,7
47:9 58:15 66:10
177:16 181:24
184:10 193:24
263:13 274:23
275:17,19 276:6,9
310:17 338:6
345:18 349:10
352:5 395:3,6
500:14 565:15,17
**works** 125:17
139:17 278:20
441:16 510:21
512:8
**work-client** 25:6
**world** 196:13,14,18
200:5
**worry** 225:6
**wouldn't** 75:22
92:14 231:15
247:20 270:10
273:4,6 276:18
310:13 313:14
314:6 379:18
413:16 440:14
510:11 521:16
557:16 563:5
576:5
**wound** 332:20
**wow** 124:22 196:18
213:2
**wrap** 449:22 546:3
564:20 568:16
**wright** 326:18
**write** 45:11,20
100:11,17,20,23
102:14 103:6,7
104:2 109:2,3
120:21 138:24
299:6 302:6 307:6

351:15 379:2
453:24 497:20
499:6 531:3 543:1
565:21
**writer** 102:10
310:11 311:14,15
316:8 318:5
360:19 376:24
379:22 495:14
570:14
**writers** 458:6 499:7
**writing** 66:12,17,20
84:19 123:15,16
124:8,21 125:4,7
137:24 140:14
161:22 197:24
242:9 383:21
392:3 498:10,17
504:7 518:4 528:2
542:10,23
**written** 89:17 121:1
121:13,21 122:5
123:21 124:1,18
124:19 126:17
343:23 490:22
494:7 501:11,12
501:16,17 509:10
**wrong** 17:9 63:8
127:5 136:9 227:5
236:23,24 262:23
431:20 499:21
**wrote** 45:13 100:12
100:14 101:2,5,18
102:15 103:21
109:1 115:12
118:20,22 136:8
136:16 137:3
142:12 150:9
170:23 171:2,9
175:15 181:13
195:6 209:2
216:14 217:6
218:2,9,15 238:1
259:22 296:5
298:22 315:7
316:4 319:8



332:19 335:7
336:21 342:11
345:12 361:2,13
362:5 399:12,15
399:21 442:11,20
443:2 462:13
491:13,16 493:10
497:13 499:2
503:23 504:17,20
504:21,23 508:13
511:7 527:24
531:1,5,6,10,14
531:17,22 532:2,5
532:7,11,15,18
533:3,10 537:3
541:14,17 559:17
**W2** 33:16

**X**
**X** 4:2,8 5:2 490:18
  491:3,13,16
**XLR** 290:16

**Y**
**yawning** 483:2
**Yeadon** 71:19
  455:9
**yeah** 14:10 19:12
  19:23 26:22 29:12
  30:16 31:23 36:4
  39:19 40:14 41:10
  57:14 60:11 61:15
  65:4 74:18 78:10
  80:13,16 86:11
  87:2 90:19 96:15
  96:16 102:12
  103:19 104:8
  105:7,15 114:8
  122:8,14 123:8,11
  134:9,9 144:15
  145:10 146:20
  178:1 180:3
  181:16 183:20
  186:11 193:2,6,7
  196:20 197:4
  200:22 205:6

223:13,21 225:23
229:22 230:22,24
231:15 232:11
234:20 235:21
237:3,9 249:3
255:12 256:12
293:6,10 294:2
297:12 306:4,23
308:20 309:23
311:8 324:3
338:14 357:10
358:17 371:13
385:14 387:17
391:15 392:20
393:12 411:12
412:9 414:18
422:11 426:3,8,16
426:19 428:11,22
439:12,14 450:24
453:8 456:4,5
458:19 461:4
462:5,18 479:4
480:23 482:12,13
487:16 488:11
492:20,24 493:6
493:14 496:4
503:18 504:3
505:11 506:1,4
513:22 514:6,6,6
521:16 528:16
550:9 558:11
562:16 575:2
**year** 20:3,24 60:10
  101:17 133:17
  197:17 276:23
  315:22 372:21
  405:10,15 440:19
  492:18 532:17
  563:23 571:19
**years** 19:10,16,17
  38:6,8 40:4 66:11
  88:11,11 91:7
  106:18 127:8,11
  190:17 237:16,17
  263:23,23,24
  276:13 281:7

283:16 292:2
317:12 398:20
399:2 493:11
495:3 514:22
572:6 575:21
**yesterday** 88:4,7,14
  89:19 92:18 93:4
  93:9 145:2 152:16
  165:18 177:23
  228:8 513:12
  516:6 519:21
  575:19
**yes-or-no** 160:16
**yield** 211:13
**York** 2:8,8 207:12
  452:4 474:19
**young** 487:8
**Yup** 31:14 264:12
  326:3 432:7
**Yvonne** 262:21

**Z**
**Zomba** 418:23

**$**
**$0.33** 141:8
**$0.50** 141:13
**$112,196** 283:22
**$15,000** 394:19
**$200** 537:6
**$4,553** 271:16
**$4,553.06** 480:17
**$7,500** 461:8,11

**0**
**0h** 251:22 436:8
  448:3 452:13
**00010** 386:15
**00077** 283:23
**03** 337:10,11
  338:16
**04** 146:20
**08** 85:19
**09** 85:19

**1**

**1** 6:22 13:9 72:20
  79:21
**1st** 547:20
**1:22** 165:24
**1:24** 166:7
**1:36** 166:17
**10** 4:5 19:17 279:22
  281:2 291:21,23
  476:1 577:8
**10/5/04** 4:22,24
**10:00** 15:9,13 17:12
**10:25** 16:2
**10:30** 16:8,14
**100** 71:20 169:2
  291:24
**10016** 2:8
**11** 19:10,16 385:18
  426:13 466:3
**11-CV-6811** 7:19
**11-cv-6811(PSD)**
  1:6
**11:00** 15:21 370:5
  574:12,19
**11:14** 1:14 7:23
**1125** 2:4
**12** 233:12,13 417:3
  417:4 427:3
**12:30** 110:9
**12:46** 110:16
**13** 4:11 437:12
**15** 6:9 261:14
  448:20 450:2
  546:10,15 564:16
**1520** 10:9
**16** 6:7,13
**1600** 2:8
**1635** 1:23
**18** 6:13
**18976** 2:17
**19010** 3:3
**19029** 72:21
**19041** 33:12
**19050** 455:9
**19064** 34:10
**19103** 1:24
**19107** 2:4

**19129** 79:22
**19146** 10:11
**1988** 40:8
**1996** 40:8
**1997** 40:15
**1998** 40:15,22

**2**
**2** 6:8 22:8,9 30:12
**2-1-04** 5:5
**2:54** 268:4
**20** 6:9 276:10 355:6
  450:8
**20th** 16:17 391:17
**2000** 1:12 7:24
  60:12 371:11
  391:13,19 571:2,5
**2001** 42:13 101:21
  101:24 102:2,7
  103:18 104:7
  127:14 530:24
**2002** 19:19 20:7,10
  20:18 21:5,11,22
  127:16 500:17
  531:4
**2003** 19:22 20:21
  127:18 324:17
  531:8 533:8
**2004** 19:24 127:20
  146:19 192:10,12
  244:18 306:1,3
  308:7 312:13
  315:18 316:10,14
  317:6 319:1
  320:13 321:3
  324:17 394:2,4
  414:22 415:8
  418:10 434:6
  531:13 547:20
  560:22 561:13,16
  572:7
**2005** 127:22 238:11
  270:18 371:11,15
  371:19 372:13,20
  373:2,9,22 375:20
  381:7 385:23



435:2,18 453:21
456:2,5,12 531:15
562:4
**2006** 127:24 482:20
483:6 531:19
562:8,15,18
563:13,21
**2007** 128:2 531:24
565:2
**2008** 40:23 42:13
84:11 112:16,22
113:11 128:4
277:20 532:3
566:10,16
**2009** 35:13 60:12
60:22 61:14 83:5
83:11 84:11 85:17
85:23 237:19
277:2 279:6
284:19 287:13,17
287:22 397:11
398:2,3 456:10,20
476:17 482:17
532:6 539:22
552:19 555:8
566:19 567:6
569:17,21 570:1,3
570:16
**2010** 35:13 532:9
570:7,9 571:9,14
571:17
**2011** 23:6 228:16
434:7 532:13
563:22 571:18
572:7
**2012** 89:14 228:11
516:8,11 532:17
**2013** 1:8 7:22
316:11,15 319:2
320:14 321:3
532:20
**204** 4:17
**212** 2:9
**215** 2:5,18
**22** 4:12 6:7
**22nd** 385:23 456:2

**24** 6:9 515:5
**243** 4:18
**25** 3:3 494:12
505:13 506:14
**265** 4:19
**2700** 2:16
**28** 31:1,1 112:16,22
113:11
**280** 4:20
**29** 6:7

---

### 3

**3** 1:8 6:7 7:22 39:1
**3rd** 15:3,16
**3:55** 268:11
**30** 267:12,24
401:17,18,20
450:9 486:17
581:19
**300** 2:17
**303** 142:19,23,24
142:24 143:12,14
**307** 353:19 354:2,2
**308** 157:1,7,11,16
158:11,16 159:3
159:10 160:13
161:17
**309** 162:9,13
163:23
**325** 6:7
**345-7500** 2:18
**376** 226:22 227:18
**378** 411:10
**381** 411:10
**386** 4:21
**39** 4:13
**390** 451:18,21
452:13 453:15
**391** 452:14
**394** 483:15,16,20
**395** 486:13

---

### 4

**4** 435:13
**4:38** 322:5
**4:48** 322:15

**40** 267:10 494:16
**406** 281:23 282:22
283:4
**417** 4:22
**423** 6:7
**429** 6:8
**430** 6:8
**432** 6:8,9,9
**44** 494:18,19
**45** 369:20
**465** 4:23
**488** 4:24

---

### 5

**5:57** 407:21
**50** 52:14 57:9
168:12 216:6
403:1 502:14
556:17
**50th** 233:18
**50,000** 529:18
**50-percent** 43:22
57:13 59:5 62:6
64:18
**50/50** 58:5 138:4
499:5,9
**500-1000** 2:5
**513** 4:6
**52** 226:22
**521** 33:10,11
**54** 451:19
**541** 33:10
**546** 4:5 5:5
**557** 6:9

---

### 6

**6** 6:8 78:24
**6:10** 408:4
**6:59** 467:10
**610** 3:4
**649-1880** 3:4
**667-5464** 2:9

---

### 7

**7** 6:22 204:7,16
**7:00** 469:10

**7:08** 469:19
**7:54** 521:23
**73** 4:14 279:18
280:3
**75** 110:21 112:6
505:13
**75/25** 510:16
**78** 4:15 30:22
279:19 280:3

---

### 8

**8** 6:8
**8th** 1:23 523:18
530:9
**8:05** 522:6
**8:38** 577:22 578:5
**835** 455:8

---

### 9

**9th** 16:16
**9:00** 17:21,22
574:13
**9:30** 15:7,8,16
18:11 574:17
575:1
**90** 4:16
**901** 34:8
**99** 2:8

