UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

DANIEL V. MARINO,
*Plaintiff*

v.

USHER, *et al.*,
*Defendants*

No.: 11-cv-06811

BEFORE THE HONORABLE
PAUL S. DIAMOND

# PLAINTIFF'S BRIEF IN OPPOSITION TO GRANT OF SUMMARY JUDGMENT FOR DEFENDANT GUICE ON PLAINTIFF'S BREACH OF CONTRACT CLAIMS

**"Imagining [Club Girl or [Bad Girl] without the guitar parts would be like trying to imagine Beethoven's Symphony No. 5 without the opening four-note motif . . . ."** – Plaintiff's Musicologist Alexander Stewart

Plaintiff Daniel Marino wrote *Club Girl* and *Bad Girl*, and Defendants—including William Guice—deliberately took Plaintiff's credit and money for themselves and purposefully concealed this fact from Plaintiff for years. This is wrong.

The record clearly demonstrates that Plaintiff wrote the underlying musical composition for *Club Girl* and *Bad Girl*, then brought that composition to defendants Guice and Barton, who contributed lyrics and a beat. Plaintiff's musicologist expert Alexander Stewart notes in his rebuttal report:

> In assessing Mr. Marino's contribution to Club Girl, it is essential to note that the guitar parts [written by Marino] are by far the most important musical expression. Much of the musical expression including vocals, as discussed in my prior report, is derived from these guitar tracks. Clearly, the lion's share of the credit in the original songwriting team should go to Marino. . . . In this matter, since there appears to have been a deliberate effort to defraud Mr. Marino of *any* share of the songwriting credit, it seems appropriate to award him a more substantial portion of the song, particularly in view of his reported role as its original creator. No guitar part, no "Club Girl"; no "Club Girl," no Bad Girl.

<u>See</u> Expert Rebuttal Report of Alexander Stewart (emphasis in original).

Guice, Barton, and Marino operated as a trio and had an agreement that any song produced as a result of their collaboration would be credited equally among the three. Despite this, the evidence unequivocally demonstrates that defendants Guice, Barton, Tommy van Dell, IN2N, and Usher entered into secret contracts and agreements behind Plaintiff's back and without his knowledge—and fraudulently registered *Club Girl*'s and *Bad Girl*'s copyright without Daniel Marino as an author and owner—with the intent and result of deliberately extinguishing all of Plaintiff's undisputed ownership and authorship of the songs *Club Girl* and *Bad Girl*. Defendants improperly and illegally took Plaintiff's undisputed authorship credit, rights, and compensation for themselves. Such conduct the Court has blessed, by stating that Defendants did nothing wrong. In light of the undisputed facts, such a finding is absolutely inexplicable.

In considering Plaintiff's brief on why summary judgment should not be granted to Mr. Guice, the Court must construe all disputed facts in favor of Plaintiff. Given that copious evidence shows that Guice signed contracts with the IN2N and the Usher defendants behind by Plaintiff's back and without his knowledge that deliberately gave Guice Plaintiff's share of the credit for writing and producing *Club Girl/Bad Girl*, including $140,000 in royalties, this case must go to a jury for a trial against Mr. Guice on breach of contract.

*****

## I.   MATTER BEFORE THE COURT

Before the Court is PLAINTIFF'S BRIEF IN OPPOSITION TO GRANT OF SUMMARY JUDGMENT FOR DEFENDANT GUICE ON PLAINTIFF'S BREACH OF CONTRACT CLAIMS in response to Judge Diamond's Order of October 27, 2014 (*Doc. No. 194*) indicating the Court was "considering entering summary judgment in Mr. Guice's favor on Plaintiff's remaining claims for Breach of Songwriting Agreement (Count VI) and Breach of Publishing Agreement (Count VIII)." Id. at p.5.

## II.   QUESTION PRESENTED

Is there a dispute of material fact concerning whether Guice breached his songwriting and publishing agreement with Plaintiff when Guice signed secret contracts behind Plaintiff's back without his knowledge that deliberately extinguished all of Plaintiff's songwriting credit, royalties, and other?

    *Suggested Answer: Yes*

## III.  FACTS

### Plaintiff First Writes *Club Girl/Bad Girl*

Plaintiff Dan Marino first conceived of the musical composition that is now known as *Club Girl* in 2001, along with some of the lyrics. See Exhibit 1 – Deposition of Daniel Marino, p.101:18–21. Marino was explicit in his deposition that when he created the song that he did not originally intend for it to be merged with any other musical expression:

> Q.    Did you register your own work?
>
> A.    All I know is that when I record[ed] it, when I wrote it, it is my [song].
>
> Q.    Did you ever have an opportunity to look at any copyright registration with respect to *Club Girl*?
>
> A.    Mr. Davis, I think I said it several times. The song that I recorded that I wrote on my own, that I produced and engineered on my own is my song. I didn't feel that I really had to go check on my close friends for anything until after I realized it was stolen from me.
>
> Q.    Let me understand that. Based on your statement, are you forgetting about your testimony that you said Mr. Guice and Mr. Barton contributed to that song, *Club Girl*?
>
> A.    After I wrote it, after I recorded it on my own, they added to it.

Marino Depo, at pp.135–37; see also Exhibit 14 - Amended Complaint, Exhibit I (showing that a Marino-only version of *Club Girl* existed before Guice and Barton added to it). A few days after creating the song, Marino played the song for defendant Dante Barton, who later added drum parts, Marino Depo. at 102:15–103:19, and defendant William Guice, who later added lyrics, id. at 103:20–24. It was at this time that Marino, Barton, and Guice agreed to create a collaborative work named *Club Girl*. Id. at p.104. The Court correctly noted in an earlier opinion that: "Plaintiff created the basic melody, chord progressions, and tempo." Exhibit 11 - SJ Opinion (*Doc. No. 104*), at p.2. Plaintiff's musicologist Alexander Stewart found that:

> In assessing Mr. Marino's contribution to Club Girl, it is essential to note that the guitar parts [written by Marino] are by far the most important musical expression. Much of the musical expression including vocals, as discussed in my prior report, is derived from these guitar tracks. Clearly, the lion's share of the credit in the original songwriting team should go to Marino. . . . In this matter, since there appears to have been a deliberate effort to defraud Mr. Marino of *any* share of the songwriting credit, it seems appropriate to award him a more substantial portion of the song,

particularly in view of his reported role as its original creator. No guitar part, no "Club Girl"; no "Club Girl," no Bad Girl.

See Expert Rebuttal Report of Alexander Stewart (emphasis in original).

### Guice, Barton, and Plaintiff Enter into Contract to Split Credit for *Club Girl/Bad Girl* Equally

When collaborating on pieces of music, the trio had agreed that they would split the writing credit equally—and that Barton and Marino would split the producing credit in half. Marino Depo, pp.137–38. This was, in fact, the deal on *Club Girl*, as well as dozens if not hundreds of other songs created by the trio. Id. As a logical part of this deal, Marino only agreed to allow his musical composition to be used in the songs *Club Girl* and *Bad Girl* **on the condition** that he actually received the proper 33.33% credit from his collaborators, Guice and Barton. See generally Marino Depo.

There is contemporaneous evidence and **admissions from Guice** in 2004 demonstrating the trio had, in fact, entered into such a contract. In 2004, a local magazine named "Origivation" did an interview with Guice, Barton, and Marino and wrote an article about *Club Girl/Bad Girl*. See Amended Complaint, Exhibit A. In that article Guice represented that *Club Girl* and *Bad Girl* was the collaborative work of Barton, Marino, and himself and that credit for the songs was split equally. The writer of that article, Anthony Caroto, gave an affidavit in 2012 where he made it explicitly clear that when Guice was interviewed for the article that Guice stated that Marino, Barton, and Guice were equally credited for writing *Club Girl/Bad Girl*, and that Marino and Barton alone were the producers. See Affidavit/Declaration of Anthony Caroto (*Doc. No. 30-1*).

### Guice, Barton, and Thomas Van Dell Worked Behind Plaintiff's Back Without His Knowledge to Purposefully Cut Plaintiff Out of the Publishing Contracts and Extinguish His Rights in the Song He Wrote—Unlawfully Taking His Ownership as Their Own

Around the time the trio created *Club Girl* in 2002, Marino, Guice, and Barton grew acquainted with a certain publishing figure, defendant Thomas ("Tommy") van Dell and his company defendant IN2N. Van Dell was intimately aware that Guice, Barton, and Marino collaborated to create *Club Girl*, and that Marino was a driving force in the song's creation. Marino

Depo., at pp.501–02. Van Dell and Plaintiff discussed the exploitation of *Club Girl*, and van Dell told Plaintiff that van Dell's company, defendant IN2N, was Plaintiff's publisher. Id. Plaintiff and van Dell agreed that Marino, Guice, and Barton would keep 75% of the song while IN2N, van Dell's company, would keep 25%.[1]

What Plaintiff did not know is that while van Dell was making these representations to Plaintiff, van Dell was working behind his back orchestrating the signing of secret publishing agreements with only Guice and Barton. See Exhibit 4 - IN2N Co-Publishing Agreements. In these publishing agreements, Guice and Barton took 100% of the songwriting credit for themselves and cut Plaintiff out entirely. The publishing agreement which Guice and Barton entered into with Van Dell was 50/50 deal. Guice and Barton retained 50% of the rights in the song, and the publisher received 50%. See Publishing Agreements; see generally Exhibit 5 – Deposition of Thomas van Dell (stating that he did not think Marino was a songwriter, never credited him for writing *Club Girl*, and that Marino was never part of the deal). Marino retained 0%. As part of these publishing deals with van Dell and IN2N, Guice and Barton received substantial lump sum advances from IN2N of at least $40,000 *each*. See Publishing Agreements, at ¶4. The advances paid to Guice and Barton were payment for **future royalties of the trio's songs**, including *Club Girl/Bad Girl*. Thus, at least part of the advances paid to Guice and Barton are owed to Plaintiff under the trio's songwriting agreement.

To be clear, the publishing contracts that Guice and Barton signed with IN2N assigned the exclusive right to publish Guice, Barton, and Marino's work to IN2N. See Exhibit A to Publishing Agreements. In other words, the trio's work product formed the basis of the publishing agreements, and at a minimum one-third of the money that Barton and Guice obtained from those deals rightfully belongs to Plaintiff.

---

[1] Plaintiff had a conversation with van Dell on an airplane back from a songwriting trip to Nashville in 2002 that was sponsored by van Dell. Van Dell was instantly drawn to Club Girl, a song he knew Plaintiff had written. Van Dell told Plaintiff he would give him 50/50 of his song as part of the publisher/songwriter split, but Plaintiff told van Dell that 75/25 was more fair. Marino Depo., at pp.501–02. Van Dell shook his hand. Van Dell orchestrated a secret deal with Guice and Barton because they were willing to cut Plaintiff out and take the fifty percent van Dell originally offered. IN2N, van Dell's company, also failed to properly credit Marino on songs van Dell knew Plaintiff wrote. Id. at p.504.

Mr. Guice's current claims to have been ignorant of Marino's exclusion from the publishing agreement are wholly incredible for three reasons: (1) Marino's exclusion from the publishing agreements that Guice and Barton signed in 2002 is rather glaring given that the trio agreed to share the songs equally, (2) Guice had participated in a major music deal in 1999–2000 with Boyz II Men and through this experience would have discerned that Marino was excluded, Guice Depo. II, at pp.22–24 (Guice states that he had a written contract with a Boyz II Men label as a "signed head artist," along with other artists like Pink), and (3) Guice has explicitly stated that he signed a "co-pub" agreement, showing that he was fully aware that the publishing deal he entered into was one where he *and* Dante Barton were getting credit but Daniel Marino was not, Guice Depo II, p.101 ("I was in a co-pub situation").

### Guice, Barton, Van Dell, and Usher Worked Behind Plaintiff's Back and Without His Knowledge Cut Plaintiff Out of the Songwriting and Production Credits for *Bad Girl*

After obtaining the rights to *Club Girl* in the publishing agreements, Van Dell then negotiated with Usher's agent, Mark Pitts, to have the song *Club Girl* placed on Usher's upcoming *Confessions* album as the song *Bad Girl*. Van Dell Depo, p.189. Van Dell admits that Marino was entirely cut out of this process. See id. at p.188 (stating that only Guice and Barton, not Marino, retained a combined 75% royalty credit for writing *Bad Girl*).[2] As part of this deal Guice and Barton signed a contract called the Underworld Agreement ("UW Agreement"). See Exhibit 6 – Underworld Agreement. This UW Agreement shows just how underhanded Guice and Barton behaved toward Plaintiff and how they unequivocally broke their contract with Plaintiff. There are three key points:

**First**, the UW Agreement explicitly identifies that Guice and Barton each retain 37.5% of the songwriting credit for *Bad Girl*:

---

[2] Given that the Court acknowledges, as it must, that plaintiff Daniel Marino wrote *Club Girl* and *Bad Girl*, and given that all defendants admit he was not credited, it is beyond plaintiff's understanding how the Court could have entirely dismissed all defendants but Guice, Barton, and Destro from the suit. Very clearly, even if no infringement occurred, Daniel Marino is entitled to relief from breach of contract and for the equitable relief pled in the Amended Complaint for a determination of ownership, accounting, constructive trust, and a correction of the fraudulently registered copyrights.

> **(b)** You and Producer hereby acknowledge that Producer controls the following percentages in and to the underlying composition (exclusive of any conveyance of copyright in connection with any Samples) embodied in the Masters as follows:
>
> | Composition | Writer | Percentage |
> | --- | --- | --- |
> | "Bad Girl" | Dante Barton | 37.5% |
> | "Bad Girl" | Will Guice | 37.5% |

See UW Agreement at p.7. Patently, on the face of this contract, it is explicit that Marino has been totally excluded from this agreement—Marino's name appears nowhere in this document. Instead, Dante Barton and Wil Guice are the only listed songwriters. Given that the trio's deal was to split the songwriting credit equally, that Guice signed this contract is definitive proof he deliberately broke his contract with Plaintiff. No one showed this contract to Plaintiff, no one told Plaintiff about this contract, and Will Guice never bothered to ask Plaintiff why his name is not is not there. Simple math dictates, given that Marino, Guice, and Barton were each supposed to get 33.33% credit of whatever the trio earned, that Guice must have known he was taking some of Marino's credit for writing *Bad Girl* as only 25% remained to be distributed. Of course, this remaining 25% was split between the Usher defendants, not Plaintiff. Yet, Mr. Guice unbelievably stated in his deposition that he thought the 37.5% he got "was fair." Guice Depo II, at 135:21. Mr. Guice was not being honest when he stated that he did not know Plaintiff was not credited, especially given his experience in the music industry.[3]

**Second**, the Underworld Agreement is principally a production agreement, and in it Usher engages Barton and Guice to produce *Bad Girl*.[4] Guice is explicitly identified as a "Co-Producer." See UW Agreement ¶1(a). However, **Guice, by his own admission, never did any production with Plaintiff or Barton**. Guice Depo. II, p.75. Mr. Guice has explicitly testified that Marino and

---

[3] Although the Court apparently believes that the Usher "Defendants paid all writing and producing royalties to "Destro Music c/o Dante Barton," this is incorrect. Usher Def. SJ Opinion, at p.4. This is absolutely incorrect as Destro never received songwriting royalties, only production revenue. See generally UW Agreement.

[4] The UW Agreement was actually signed in early 2004, after all production on Bad Girl had finished, so the contract's language is retrospective.

Barton "did the production, they did the music, they created music, created beats, created tracks" in the trio's collaborations. Guice Depo. II, p.52. Mr. Marino has testified that any production was supposed to be split between himself and Barton, Marino Depo. at 137–38, and Barton has admitted that Marino coproduced *Bad Girl* and *Club Girl*. Exhibit 12 – Barton Note to Marino – Oct. 2007 (signed note from Dante Barton stating that Plaintiff coauthored and coproduced *Club Girl* and *Bad Girl*). Anthony Caroto has confirmed that Guice himself in 2004 acknowledged that Marino and Barton produced all of the trio's songs, including Bad Girl. See Caroto Declaration (*Doc. No. 30-1*). Yet, despite Guice and Barton's public statements in 2004, Guice—behind Plaintiff's back and without his knowledge—had already signed a production agreement with Usher that improperly gave Plaintiff's production credit to Guice. Again, Mr. Guice is not being honest when he states he had no idea Plaintiff got cut out of the deal. Guice simply is not a producer and for him to claim credit and royalties on that basis is outrageous. Guice taking credit for producing *Bad Girl* is even more troubling given the fact that Marino, over the course of six phone calls with Usher and his people, actually did the production of *Bad Girl*. Marino Depo., at 346–351 (describing how Plaintiff worked extensively with defendants to produce and revise *Bad Girl*). Given that Mr. Guice was frequently in the studio with Barton and Marino, and was keenly interested in the progress of the song, there is virtually no way he could not have known that it was Marino who actually produced the song. And, in fact, Guice is clear in his testimony that he knew Marino produced the song.

**Third**, Barton and Guice were both paid an advance pursuant to the UW Agreement by Usher, and production royalties. Specifically, the UW agreement states that Barton and Guice received a $15,000 advance for their production work, in addition to a 3% royalty. See UW Agreement, p.1–3. Of course, Guice took what should have been Plaintiff's half of this advance.

### Defendants Purposefully Deceived Plaintiff Extinguishing All His Right sand Ownership—Taking Them for Their Own—and Concealed, Lied, and Covered up This Fact until 2009

During this time period in 2002–2004, Plaintiff believed that he was part of this deal due to the representations of van Dell, Guice, and Barton, and also that he was being credited for his intellectual property. See generally Marino Depo. To that end, Plaintiff helped Usher, Pitts, and

Lewis engineer and produce the song *Bad Girl* and all defendants knew, or should have known, with certainty that defendant Marino was the original author of *Club Girl* and *Bad Girl* given his extensive participation in crafting the final product. For instance, Plaintiff participated in at least six phone calls between defendants Pitts, Lewis, and Usher regarding the production of *Bad Girl*, and all defendants were explicitly aware that Marino had written the guitar music that drove the track. Marino Depo., at pp.346–51 (stating that defendant Lewis told Plaintiff, "Dan, that guitar [in *Club Girl* and *Bad Girl*] is f***ing hot"); see also Exhibit 2 - Marino Affidavit, ¶6. In addition, the sound recording of *Club Girl*, which Plaintiff produced and engineered, is used in *Bad Girl*, which Plaintiff produced and engineered. See Deposition of Plaintiff's Engineering and Production Expert Brian Bricklin, at pp.296–301 (stating that *Bad Girl* and *Club Girl* use the "same exact sound recordings"). Plaintiff did this work, and allowed Defendants, including Guice, to work with his musical composition only because it was understood he was to be credited—as it was undisputed that it is his song. See generally Marino Depo. This was clearly a reasonable expectation, as everyone else who worked on the songs received more than their fair share of credit. However, when *Confessions* was released, Plaintiff was only credited as playing guitar. Marino Depo., p.441: 11–16; see Exhibit 10 – *Confessions* Liner Notes.

Plaintiff asked defendants Barton, Guice, van Dell, and Bobby Ross Avila about his writing credit[5] and was repeatedly told by Barton and van Dell that it was a mistake and it was being fixed; Bobby Avila assured him it would get worked out. Id. at 225, 232:3–7, 234:9–13, 237; 374–84; 403–04; Marino Affidavit, ¶6. In addition, Mr. Marino consulted an attorney who drafted a letter to Usher and his people notifying them of the problem; that lawyer testified that he believed the letter had been sent. Exhibit 8 – Deposition of Simon Rosen, at p.34:10–16[6]; Exhibit 9 – Simon Rosen Draft Letter. Defendant Guice specifically admits that Marino approached him after *Confessions* was released because Marino was confused about not receiving writing credit on the song. Guice

---

[5] The Court found that Plaintiff only confronted defendant Barton about the incorrect credits. SJ Opinion (*Doc. No. 154*), p.3–4. Plaintiff clearly stated in his deposition and Affidavit that many other defendants were confronted, Marino Depo, at pp.232:3–7, 234:9–13, 237; Marino Affidavit, ¶¶4–7, and defendant Guice specifically admitted Marino approached him about the matter. Guice Depo II, p.37:7–11. The Court had a duty to construe all disputes of fact in favor of Plaintiff and failed to do so.

[6] Notably, the letter, dated October 5, 2004, shows that Marino believed at that time that IN2N was his publisher.

Depo. II, p.37:7–11. Defendant Guice also saw that Marino was not credited as a writer on the album's liner notes. See *Confessions* Liner Notes; Guice Depo. II, at pp.33–35, 56:20–25. **Guice obviously knew why Marino was not credited as a writer given that Guice had helped cut Plaintiff out, but Guice indisputably never said a word to inform Plaintiff that Guice and Barton had breached their contract with Plaintiff.**

Plaintiff's concerns about the credits were assuaged at the time in 2004, and he did not retain the attorney or further investigate the matter, because van Dell—whom Plaintiff believed to be his publisher—and his business partner, Dante Barton, told him there was a problem with the credit splits for **all the authors** and that Marino's incorrect credits on the liner notes were being rectified. Marino Depo., at p.374–84; Marino Affidavit, at ¶4. In February 2005, nearly a full year after *Confessions* was released, he spoke with defendants Bobby Ross Avila at the Grammy Awards. Marino Depo., at 374; Marino Affidavit, at ¶4. Again, Marino was assured by defendants that he was working with "good people" and that it would get worked out. Marino Depo., at 374; Marino Affidavit, ¶6. Marino told friends during this time period between 2004 and 2009 that "no one had been paid yet for *Club Girl* because there were administrative problems in fixing credits and royalty things and that Barton was fixing it." See Affidavit/Declaration of Adam Cordes.

In fact, the actual credit splits for *Bad Girl* **were** still being determined as late as November 2005. We know this because Barton showed Plaintiff a letter from attorney Wallace Collins in November 22, 2005—approaching two years after the release of *Bad Girl*—proving that money for the song was "tied up" and not moving. Marino Depo., at p.383; Marino Affidavit, ¶7; Amended Complaint, at ¶391; Exhibit 13 - Collins Nov. 2005 Invoice. The letter was an invoice for legal services Collins had provided and stated that the bill was

> "in connection with **extensive, ongoing negotiation with IN2N and HoriPRO's legal counsel**, and with RCA/BMG business affairs department (and accounting personnel), and preparation and reivsions [sic] to letter of direction **for release of mechanical royalties on Usher's recording of "*Bad Girl*"**; correspondence, discussion and miscellaneous disbursements related thereto."

Collins Nov. 2005 Invoice. Plaintiff, believing that Collins was his attorney[7] and that IN2N was his publisher, relied on Barton's representations and the content of the letter which stated that

---

[7] Marino Depo, at p.473.

negotiations on the royalties continued until at least early 2006. Around this time, Plaintiff did receive a check for $4,553.06 that defendant Barton maintained was part of their overdue songwriting (mechanical) royalties—leading Plaintiff to believe that he was a recognized songwriter. Marino Depo., at p.477–80.[8] Barton told Plaintiff when giving him the check, "we got paid, here is your cut." Id. at 478. Plaintiff took Barton's representation at face value that these were royalties for *Club Girl/Bad Girl* as he had no reason to dispute it—however, this was just part of the cover up.[9]

In June 2006, Plaintiff was again told by Barton that negotiations were ongoing. Marino Affidavit, ¶7.  Barton even went so far as to reassure plaintiff by signing and endorsing a statement in October 2007 declaring "Daniel Marino co-authored, co-produced & co-owens [sic] '*Club Girl & Bad Girl.*'" Barton Note to Marino – Oct. 2007; Marino Depo., pp.492–93 (recounting Barton saying "yeah, sure, it is your song, and he signed it for me").

Up until Barton disappeared in 2009, Plaintiff was told repeatedly by Barton that the splits were being worked out by lawyers and that the money was in trust. Marino Affidavit, ¶7; Amended Complaint, ¶391.  Marino chose not to proceed with legal action before 2009 because Barton, his best friend and business partner, assured him everything was being worked out, as did the man he believed was his publisher, Tommy van Dell. Relying on the continued assurances of these two men was objectively reasonable. At no point during this time did William Guice ever try

---

[8] The Court found that Plaintiff received royalties for his work as a musician on *Bad Girl*. SJ Opinion, p.4. There seems to be a misunderstanding on the Court's part because musicians, unless also a songwriter, do not receive royalties. Thus, when Barton gave money to Marino, and Marino understood it to be mechanical royalties, Marino Depo., p.270–72, those royalties could only have been for being a songwriter.

[9] The Court found that: "Once the UW Agreement was executed, Barton, Guice, and Plaintiff each received a lump sum payment." SJ Opinion, p.3. The record is undisputed that only Barton and Guice received an advance once the UW Agreement was executed in 2004. The Court fails to offer a citation to the record for its assertion. Moreover, the lump sums paid to Barton and Guice were advance payments for future royalties. Given that Plaintiff was not given any credit or royalties on *Bad Girl*, it would be impossible for him to have received such a lump sum from the Usher Defendants. Contrary to the Court's unsupported assertion in its fee opinion (*Doc. No. 195*) that Plaintiff "concedes" the $4,000 payment from Barton was a "lump sum payment," Plaintiff has done no such thing and notes that the Court's construing Plaintiff's argument as a "concession" is totally unwarranted. Plaintiff must point out that Guice and Barton each received hundreds of thousands of dollars, while Plaintiff has received nothing. It was an abuse of discretion and reversible error for the Court to find as it did, and shows a lack of familiarity with the most basic facts of this case.

to contact Plaintiff and correct the record, despite knowing that Plaintiff had improperly not been credited.

After the *Confessions* album was released in 2005—and while reassuring Plaintiff about the credit issue—defendant van Dell, Guice, and Barton engaged in blatantly illegal conduct behind Plaintiff's back. Despite van Dell acknowledging to Plaintiff that the writing credits were wrong, and assuring Plaintiff that the writing credits were being fixed (Marino Depo. at pp.403–05; Marino Affidavit, ¶4) van Dell's company, defendant IN2N, fraudulently and illegally misregistered the copyright for *Club Girl* and *Bad Girl* in 2004, falsely representing to the Copyright Office that only Guice and Barton had written *Club Girl*.[10] See Copyright Registrations for *Club Girl*, *Bad Girl*. It should be noted that under the Copyright Act, such an act is subject to criminal penalties. See 17 U.S.C § 506(e). Later, *Bad Girl* was similarly misregistered by IN2N, see Copyright Registrations for *Club Girl*, *Bad Girl*, although it took years following the release of *Confessions* to figure out the appropriate credit splits. Marino Affidavit, ¶7; Collins November 2005 Invoice.

It is important to view these illegal registrations alongside Guice and Barton signing the secret publishing deals with IN2N, and their later UW Agreement with Usher; both claimed more credit than they were due under the trio's oral songwriting agreement. This illegal and fraudulent registration shows that all defendants at all points intended to completely divest Daniel Marino of any claim in his own work by working behind his back without his knowledge and take the credit and money for themselves.

The record is thus explicitly clear that van Dell, Barton, and Guice were all fully aware of Marino's role in writing *Club Girl* and *Bad Girl* and, in concert, deliberately robbed Marino of credit and payment by filing a false copyright registration and signing void contracts.

---

[10] The Court found that defendant Barton registered the *Club Girl* copyright. SJ Opinion, at p.2. It is undisputed that IN2N, Tommy van Dell's company, actually registered the copyright. See Copyright Registration for *Club Girl*, *Bad Girl*. For the Court to essentially create this "fact" out of thin air is manifestly reversible error, as was the finding that defendants van Dell and IN2N did nothing wrong.

### Plaintiff Only Became Aware of Defendants' Betrayal In 2009 and Only Realized that Guice was Fully Engaged in the Fraudulent Scheme to Deprive Plaintiff of His Rights Until the Usher Defendants Provided Plaintiff with the UW Agreement in 2012

In the summer or fall of 2009, Dante Barton abruptly stopped communicating with Plaintiff. Plaintiff was perplexed by Barton's behavior until in November 2009 he accidentally discovered financial documentation showing that Barton, and Guice, had received huge sums of money for the exploitation of *Bad Girl*. See generally Marino Depo. at pp.61, 237; see also Amended Complaint at ¶¶401–06. Up until this point, Plaintiff had assumed that the money was being kept in escrow by the Usher and Sony defendants and would be distributed when appropriate. See Amended Complaint, at ¶400. Plaintiff, it should be noted, was incredibly unsophisticated at this time concerning the business side of the music industry and relied on Barton to conduct most of the business concerning the Trio's exploitation of songs. Plaintiff had not even contemplated until 2009 that Guice would have any role in betraying him.

Plaintiff spoke to his friends in late 2009 about this discovery, who all confirmed that Marino was shocked and utterly dumbfounded by Barton, and Guice's, betrayal of Marino. See Affidavit/Declaration of Paul Coppola; Affidavit/Declaration of Michael Domizio; Affidavit/Declaration of Chris Burkett; Affidavit/Declaration of Adam Cordes.

### Guice Made over a Quarter of a Million Dollars Off of Bad Girl, While Plaintiff was Given Nothing[11]

When questioned on how much compensation Guice received from the exploitation of *Club Girl/Bad Girl* Guice claims that he only received "five figures." See Exhibit 28 – Transcript of 1/6/14 Hearing, at p.57. This number is impossibly low and cannot be correct; Guice lied on the stand. According to Plaintiff's expert Michael Einhorn, Guice received hundreds of thousands of dollars.

---

[11] Although this Court ruled earlier in the case the Plaintiff's copyright damages were limited to the three years before his filing, no such limit on damages applies to Plaintiff's breach of contract claims.

- **Songwriting Royalties**: Guice, Barton, IN2N (van Dell) received domestic songwriting royalties from 2004 to 2013 in the amount of $676,740. <u>See</u> Exhibit 22 - Einhorn Report, at p.24.  Guice and Barton collectively took received $338,370 ($169,185 each). <u>Id.</u> If Marino, Barton, and Guice were each to be credited according to their songwriting and publishing agreements they each should have received a 1/3 share of $112,790. Guice and Barton took more than their fair share and each took part of Plaintiff's songwriting royalties. This breached the songwriting and publishing contracts.

- **Production Royalties**: In addition, Guice received $54,955 as a producer since 2004. <u>See</u> <u>id.</u>, at p.12 (stating that Guice and Barton combined earned $109,910 in production royalties). Since Guice did no production work and it was understood that Marino and Barton were splitting the production credit, all of the $54,955 Guice received rightfully belongs to Plaintiff.

## IV. Plaintiff Objects to this Court's Factual Findings, Often Completely Unsupported by the Record, Especially Regarding what Compensation was Paid to Plaintiff

A district court's role is not to decide disputed issues of fact and, at the summary judgment stage, is to credit all disputes of fact in favor of Plaintiff. Yet, throughout this case, this Court has made finding after finding against Plaintiff that has no support in the record. Of importance to this particular motion, the Court has previously found that Plaintiff was paid for the use of Club Girl/Bad Girl. This is manifestly and completely false.

The Court, for instance, found when granting summary judgment for the Usher Defendants:

> Plaintiff testified that he was excited when he learned of the contract. (Marino Dep. at 174-75.) He did not ask to see the contract, however, nor did he seek to determine why he was not asked to sign it. Had he reviewed the contract, he would have learned that, consistent with the copyright registration form, only Barton and Guice were credited as the song's writers. (UW Agreement at 7.)
>
> . . . .

> Once the UW Agreement was executed, Barton, Guice, and Plaintiff each received a lump sum payment.

Usher Def. SJ Opinion, at p.3. These findings by the Court—that Plaintiff knew about the UW Agreement and was paid an advance when it was executed--are demonstrably false and no party has ever claimed they are true. In fact, once the UW Agreement was executed in 2004, Plaintiff did not receive a lump sum payment **as he had no idea the UW Agreement existed**. The Court's finding is simply wrong; the UW Agreement specifies that Guice and Barton are the only individuals to receive a lump sum "advance."[12]

In the Court's recent opinion imposing costs and fees on Plaintiff (*Doc. No. 195*), the Court incredibly claims that Plaintiff conceded receiving a lump sum payment. Fee Opinion, at p.4. To be clear: the only "payment" ever received by Plaintiff was an insubstantial sum of around $4,000 in 2006 or 2007, **years after the UW Agreement**, from Dante Barton. Barton told Plaintiff this money was accrued songwriting (mechanical) "royalties." Marino Depo., at pp.477–80. This small amount of money was no "lump sum" payment given to Plaintiff after the UW Agreement was executed and it is absurd for the Court to repeatedly and erroneously claim it was. As Plaintiff explained above, the lump sum advances in question from the UW Agreement were actually advances of production royalty payments—not songwriting mechanical royalties which are entirely different. Given that Plaintiff was excluded from receiving any production credit on *Bad Girl*, the money he received from Barton could not have been Plaintiff's royalties or a lump sum advance of those royalties. It is important to place this miniscule payment in context: **Guice and Barton collected hundreds of thousands of dollar *each*** as a result of the exploitation of Bad Girl, while Plaintiff, at most, received approximately $4,000.

The Court outrageously wrote in its fee opinion that Plaintiff "concedes" he actually did receive a lump sum payment. Fee Opinion, at p.4. Plaintiff never conceded any such thing, and for the Court to twist the evidence and Plaintiff's argument in such a manner is shocking. Even if Plaintiff did receive a lump sum payment of $4,000, focusing on that payment ignores that Guice and Barton collected hundreds of thousands of dollars each as a result of the exploitation of Bad Girl. The Court has a duty to construe facts in Plaintiff's favor at this stage in the litigation, and

---

[12] Barton and Guice did receive a lump sum payment from the other Defendants pursuant to the secret contracts Barton and Guice executed with defendants Van Dell, IN2N, and Usher.

yet the Court is contorting Plaintiff's arguments and the undisputed facts to justify its completely unsupported findings that Plaintiff was somehow adequately compensated for his work. He was not, and Guice clearly went behind Plaintiff back without his knowledge to Plaintiff's credit and compensation, thereby extinguishing all rights and ownership Plaintiff had in the song.

The Court has also repeatedly proclaimed that the only party who committed any wrongdoing in this case is Barton, apparently having already decided to dismiss all other parties; yet the Court sedulously ignores the secret publishing and recording contracts entered into by *Guice* and Barton. Despite there being no real dispute of fact that although Guice, Barton, and Marino agreed to split the credit and proceeds from *Club Girl/Bad Girl* equally, Guice and Barton repeatedly entered into contracts behind Plaintiff's back and without his knowledge to deliberately cut Plaintiff out. Guice and Barton explicitly took 100% of the songwriting and authorship credit for *Club Girl* in the publishing agreements, giving themselves each a 50% interest, entirely excluding Marino. As it relates to *Bad Girl*, Guice and Barton took 75% of the authorship for themselves, and the Usher defendants took the remaining 25%, again leaving Plaintiff with nothing. This was done behind Plaintiff's back, without his knowledge, as part of a concerted effort to extinguish Plaintiff's rights and steal his compensation. Guice and Barton profited enormously from the exploitation of *Club Girl/Bad Girl*. **To date Plaintiff has received practically nothing.** Guice presented himself as completely innocent, but the documents produced by the Usher defendants show that he is just as culpable as Dante Barton in the deception of Plaintiff.

## V.   Plaintiff Objects to this Court Granting Summary Judgment when Defendant Guice has Not Filed an Answer, Even After Being Informed by the Court Such an Answer was necessary

This Court is considering granting summary judgment on Plaintiff's breach of contract claims against defendant Guice. Guice has not answered the Complaint since nearly six months ago he received notice that the default against him was removed,[13] he has not filed anything

---

[13] Plaintiff vigorously contests the Court's finding that Guice was directed in 2012 by Plaintiff's counsel not to file an Answer. The objective evidence in the record clearly demonstrates that such a thing was never said to Mr. Guice. Mr. Guice now knows beyond any doubt that he has been personally sued, but has still not responded.

*knowing* that an Answer is required, and he has not attempted to take any action to defend this case although he is aware he is a defendant in this matter and knows a response is required. This Court should not consider granting of summary judgment in favor of Mr. Guice when the evidence clearly implicates Mr. Guice and Mr. Guice has not formally responded to the allegations in the Amended Complaint.

## VI.  Legal Standard for Summary Judgment

Under Rule 56(f) summary judgment may be granted for a party, "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There must be an absence of any genuine issue of material fact. See Celotex, 477 U.S. at 323. An issue is material only if it could affect the result of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The facts must be viewed "in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). Summary judgment is only appropriate if the party in entitled to judgment as a matter of law. See Celotex, 477 U.S. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

## VII.  Argument – Defendant Guice Must Face a Jury Trial for Breach of Contract

### a.  There is a Dispute of Fact for the Jury When Plaintiff Should Have Known Guice Breached the Songwriting Contract

#### i.  The Discovery Rule and Doctrine of Fraudulent Concealment Toll The Statute of Limitations

In Pennsylvania, the statute of limitations is 4 years for breach of contract. Perelman v. Perelman, 545 Fed. Appx. 142, 149–50 (3d Cir. 2013) (not precedential). The statute of limitations starts running under the discovery rule when a plaintiff reasonably should have been aware of his injury and its cause. Knopick v. Connelly, 639 F.3d 600, 607 (3d Cir. 2011). "Pennsylvania common law does not hold that an exception to application of the occurrence rule requires fraud or concealment," but they can be significant factors in the application of the discovery rule. Id. at 607 n.9. The equitable doctrine of fraudulent concealment can toll the statute of limitations if there

is the presence of "clear or unequivocal evidence of 'unintentional or intentional' fraud or concealment." Id. (quoting Fine v. Checcio, 582 Pa. 253, 870 A.2d 850, 860 (Pa. 2005)). As with any issue at the summary judgment stage, disputes of fact such as when a plaintiff reasonably should have known of his injury and its cause are left to the jury's consideration. Id. at 616 (holding "[r]easonable minds could disagree as to whether [the plaintiff] had the necessary clues that set off his obligation to investigate"); Perelman, 545 Fed. Appx. at 149–50 (stating "[t]he question of reasonable diligence is ordinarily a matter for the factfinder" and stating that the "reasonable diligence test accounts for the difference capacities of different Plaintiffs"). The Third Circuit recently held that when it comes to statute of limitations type issues even a plaintiff's explicit knowledge of an erroneous copyright registration does not allow a court to decide there is no triable issue of fact for the jury. Brownstein v. Lindsay, 742 F.3d 55, 72–75 (3d Cir. 2014).

### ii. Plaintiff filed his Breach of Contract Claim Against Guice within the Statute of Limitations

Plaintiff only became aware of Guice's breach of contract in 2009 because his friends and partners executed secret contracts behind his back without his knowledge and engaged in a years long scheme to take credit and compensation that contractually belongs to Plaintiff. Plaintiff, due to his lack of music business experience and naiveté, was taken advantage of by Barton and Guice.

Plaintiff is a high school graduate who had no business experience, especially in the music industry at the time of the events in question. Plaintiff relied entirely upon defendant Dante Barton to conduct the business aspects of the music Guice, Marino, and Barton were trying to sell together. Marino Depo. at pp.82–83. **Significantly, Marino was the only one of the three who had no experience in the music industry**. Barton was a businessman, and Guice had been involved in a major music business deal with Boyz II Men in 1999–2000, where he was signed as an artist on their label. Guice Depo. II, at pp.22–24 (Guice states that he had a written contract with a Boyz II Men label as a "signed head artist," along with other artists like Pink).

In or around 2002, Guice, Marino, and Barton entered into a songwriting agreement to equally split the proceeds and credit from any song the three worked on together. Marino Depo, pp.137–38; Amended Complaint, Exhibit A; Affidavit/Declaration of Anthony Caroto (*Doc. No. 30-1*). The trio were good friends and Plaintiff trusted Guice and Barton. However, in 2002 and

2004, Guice and Barton entered into secret contracts behind Plaintiff's back with IN2N/Tommy van Dell and Usher that cut Plaintiff out of receiving any credit or money for the exploitation of *Bad Girl*. See Exhibit 4 - IN2N Co-Publishing Agreements; Exhibit 6 – Underworld Agreement. Barton, van Dell, and Guice then engaged in a years long project of deception, continually assuring Plaintiff that the credit problem was being fixed and that the royalties for Bad Girl were being held in escrow.

Plaintiff had no idea the songwriting contract with Guice was breached until 2009; it was then he found documentation of Barton's demonstrating that Barton and Guice had cut him out of the deal. See generally Marino Depo. at pp.61, 237; see also Amended Complaint at ¶¶401–06. Individuals who spoke with Marino at that time confirm that he had no idea he was being cheated until he accidentally discovered Barton's financial records in November 2009. See Affidavit/Declaration of Paul Coppola; Affidavit/Declaration of Michael Domizio; Affidavit/Declaration of Chris Burkett; Affidavit/Declaration of Adam Cordes. Given that Plaintiff filed his suit in October 2011, under two years after he found out about Barton and Guice's betrayal, he clearly timely filed his breach of contract claims. See Exhibit 4 - IN2N Co-Publishing Agreements; Exhibit 6 – Underworld Agreement.

The Court, however, inexplicably found in a prior opinion that Plaintiff was fully aware of the secret contracts that Guice and Barton were signing behind his back:

> Plaintiff testified that he was excited **when he learned of the contract**. (Marino Dep. at 174-75.) He did not ask to see the contract, however, nor did he seek to determine why he was not asked to sign it. Had he reviewed the contract, he would have learned that, consistent with the copyright registration form, only Barton and Guice were credited as the song's writers. (UW Agreement at 7.)

See Usher Def. SJ Opinion, at p.3 (emphasis added). Every part of this finding by the Court is impossible, plainly erroneous, and twists Plaintiff's testimony so as to make it unrecognizable. Besides usurping the role of the jury as fact finder, the Court is making plainly incorrect findings. **To be clear: Plaintiff never testified in any way, shape, or form that he knew about the UW Agreement, or any other written contract related to this case—he did not know written contracts existed until the Usher Defendants' filed their motion to dismiss in 2012 which the UW Agreement as an exhibit.**

On the deposition pages the Court cites to, Plaintiff actually testified that Barton told him that a deal had been reached for Usher to perform and record *Club Girl* on Usher's new album, ***not that a contract had been signed***:

> MARINO        You are asking me, did Barton tell me at some point that he negotiated a deal with Usher?
> MR. DAVIS     For Usher to perform and record a version of Club Girl.
> MARINO        Yes.

Marino Dep. at pp.174–75. The Court's finding that Marino knew about the UW Agreement itself, or any "contract," is not evidenced anywhere in the record and is an invention.

Moreover, the Court's finding that Plaintiff knew about the UW Agreement or a similar contract is impossible and shows that **the Court has issued findings of fact—usurping the jury's role—without even rudimentary knowledge of the dispute**. The Court fails to realize that the conversation between Marino and Barton referenced by the Court on pages 174–75 of Plaintiff's deposition occurred *well before the UW Agreement existed*. We know this because *after* Usher agreed to perform and record *Club Girl*—and *after* Barton told Marino that Usher had agreed to do so, <u>see id.</u> at pp. pp.174–75—Marino worked extensively with Usher's people to produce *Bad Girl*. <u>See id.</u> at pp.346–51 (stating that Plaintiff participated in at least a half dozen phone calls between defendants Pitts, Lewis, and Usher when producing *Bad Girl*); <u>see also</u> Exhibit 2 - Marino Affidavit, at ¶6. **The UW Agreement was only signed by Guice and Barton in February 2004 <u>well</u> <u>after</u> *Bad Girl* and the entire *Confessions* album had been recorded, engineered, and produced by Usher and Marino—indeed, the album was released to the public in March 2004 only a month after the UW Agreement was signed.** Therefore, it was ***<u>impossible</u>*** for Marino to have known about the UW Agreement when the Court claims he should have known because the **UW Agreement did not yet exist**. Likewise, *Club Girl* and *Bad Girl* were not copyrighted by IN2N and van Dell until after *Bad Girl* was released in March 2004.

This Court has a duty to construe disputed facts in favor of Plaintiff, yet this Court puts words in Plaintiff's mouth that he never uttered and issues findings that make no sense. That a supposedly impartial Court would twist a party's testimony in such an egregious manner to justify finding against that party is beyond belief. These types of errors unfortunately dominate the Court's opinions in this case.

The Court also implies that Plaintiff should have looked at the copyright registration for *Bad Girl* and apprehended that his name was not included. Usher Def. SJ Opinion, at p.3. Plaintiff was an unsophisticated songwriter who relied entirely on Dante Barton to consummate his business deals, and trusted Guice to abide by their contract. Plaintiff had no idea how to look up a copyright registration in 2004, and did not even know what "registration" actually meant or indicated. See Marino Depo. at pp.134, 136. Moreover, the Third Circuit recently held that when it comes to statute of limitations type issues even a plaintiff's explicit knowledge of an erroneous copyright registration does not allow a court to decide there is no triable issue of fact for the jury. Brownstein v. Lindsay, 742 F.3d 55, 72–75 (3d Cir. 2014). Indeed, the evidence is clear that there is a dispute of material fact about when Plaintiff knew his contract with Guice was breached given the concerted pattern to deceive him.

It is important to note that the issue in this brief is when Plaintiff should have been aware his contract *with Guice* was breached. Even though Plaintiff was initially worried in 2004 about what he thought was a mistake with his incorrect credits he never remotely comprehended that Guice was involved. When Plaintiff briefly sought out a lawyer to ask about the incorrect credits in 2004, the letter the lawyer sent was directed *to Usher*. Exhibit 8 – Deposition of Simon Rosen, at p.34:10–16; Exhibit 9 – Simon Rosen Draft Letter; Marino Depo. at pp.411–25. Thus, there is no indication anywhere in the record that Plaintiff should have known Guice was breaching his contract with Plaintiff.

The simple fact of the matter is that Plaintiff was unsophisticated, trusted his friends who had far more experience in the music business, and got taken advantage of. He was objectively reasonable in relying on Barton, Guice, and van Dell's assurances that the incorrect credits were a mistake and that they did not know why Plaintiff had not been included. Plaintiff's reliance on their assurances that nothing was amiss was reasonable and should trigger the discovery rule or equitable tolling can be distilled into eight primary reasons:

- **First**, not one of Plaintiff's cowriters of *Club Girl*—defendants Guice and Barton—ever told him he was not a songwriter. This Court has held that Plaintiff is, in fact, a songwriter of *Club Girl*, Usher Def. SJ Opinion at 2, and there is nothing in the record to show Plaintiff was ever put on notice that Guice did not view him as one. Consider, in 2004 Guice, Marino, and Barton did media interviews where they collectively represented themselves as a songwriting trio, and claimed that Marino and Barton were splitting production credit. See Amended Complaint, Exhibit A; Caroto Declaration; Cordes Declaration.

- **Second**, one of Plaintiff's co-writers, Dante Barton, far from denying that Plaintiff was a songwriter, even signed a note in October 2007 explicitly confirming that Plaintiff cowrote and owned *Club Girl* and *Bad Girl*: "Daniel Marino co-authored, co-produced & co-owens [sic] 'Club Girl & Bad Girl.'" Barton Note to Marino – Oct. 2007. He also told Marino face-to-face "it is your song." Marino Depo., at pp.492–93. These statements by Plaintiff's business partner and best friend were objectively reasonable to rely on.

- **Third**, Dante Barton took care of the business aspect of Plaintiff's music and continually represented to Plaintiff that the incorrect credits were being fixed. In furtherance of this lie, Barton showed Plaintiff documentation late in 2005 that the credit splits for all the authors of *Bad Girl* were in the process of being revised and that the money was "tied up." Marino Depo., at p.383; Marino Affidavit, ¶7; Amended Complaint, at ¶391; Collins Nov. 2005 Invoice. That documentation was a letter stating that "extensive, ongoing negotiation with IN2N and HoriPRO's legal counsel" for the release of mechanical royalties for *Bad Girl* were happening as late as November 22, 2005. Collins Nov. 2005 Letter. Based on this letter, which unequivocally states there are problems that prevent some portion of the mechanical royalties from being released, there was no objective indicia that Plaintiff should have been aware by lack of payment that Barton, and especially Guice, were cheating him.

- **Fourth**, other defendant coauthors and publishers of *Bad Girl*, including Tommy van Dell and Bobby Ross Avila, told Plaintiff that he was working with "good people" and that the credits on *Bad Girl* were being fixed. Id. at 225, 232:3–7, 234:9–13, 237; 374–84; 403–04; Marino Affidavit, ¶4–7.

- **Fifth**, Dante Barton gave Plaintiff a portion of what Barton represented were royalties from *Bad Girl* as an act of good faith to convince Plaintiff he was cowriter and that the credits were being fixed. Marino Depo., at p.477–80. In handing over the "royalties" Barton told Marino "we got paid, here is your cut." The Court acknowledged this in its Usher Def. SJ Opinion, at p.4. Marino reasonably believed that Barton was handing over a portion of the songwriter payments that had been delayed by the negotiations.

- **Sixth**, Plaintiff had absolutely no idea explicit publishing and production contracts between Guice and Barton and the other defendants existed until they were attached as exhibit to the Usher Defendants' motion to dismiss in 2012, thus he had no way of knowing he was cut out of the deal. Plaintiff was only aware that Barton had reached some sort of arrangement with Usher for Usher to record their song, but did not know the specifics. Marino Depo., pp.174–75.

- **Seventh**, although Plaintiff was not credited as a writer of *Bad Girl*, he was credited on Guitar, leading him to believe the error was merely an oversight that was being corrected. This was further confirmed, in Plaintiff's mind, by the aforementioned difficulty all parties had actually finalizing the credit splits.

- **Eight**, Plaintiff was lied to continuously and thoroughly for years by his best friends Dante Barton and William Guice; one who assured him he was a joint author and the other who feigned ignorance as to why Plaintiff was not properly credited. Plaintiff worked, ate, and basically lived with Barton for eight years, had every reason to trust him, and it was objectively reasonable for Plaintiff to rely on his representations. Marino Depo., pp.134,

486, 493. Barton was a businessman, who Marino was forced to rely on given his inexperience. Guice had recent, significant experience with major music deals, and would have been aware that Plaintiff was incorrectly not credited and that Plaintiff's share of the credit and royalties was going to Guice and Barton in breach of the trio's contract. Guice never corrected the record.

These eight indicators show that there were explicit reassurances by Defendants that Plaintiff was a songwriter, that Marino reasonably believed not being credited was a mistake, that Marino never even suspected Guice was involved in this deception until 2009,[14] and that Marino thought until 2009 that he would be getting fully paid when the credit split issues was determined—that Plaintiff was given some royalty money by Barton, and Barton put down in writing that he was a cowriter, were especially convincing to Plaintiff. Plaintiff only discovered he had been cut out as a songwriter when Dante Barton dropped the ruse and disappeared in November 2009.

Because of the factual disputes surrounding when and if Plaintiffs should have been aware when William Guice breached his contract, this issue must go to the jury. Plaintiff was lied to as part of a multi-year fraud to take away his rights and credit; it would be a manifest injustice if Guice was allowed to profit from the fraud he helped perpetrate.

## B. Wil Guice Breached His Contracts with Plaintiff

### i. Legal Standard for Breach of Contract

The elements of breach of contract require Plaintiff to prove (1) a contract exists between Guice and Plaintiff with definite terms, (2) that Guice breached a duty imposed by the contract, and (3) that breach caused damages to Marino. J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc., 792 A.2d 1269 (Pa. Super. 2002). An implied in fact contract can be implied by the conduct of the parties. Id. In establishing a breach of contract the plaintiff must first establish the existence of a contract and the identification of its material terms. Excalibur, 792 A.2d 1269. Contractual duties can derive from express contracts, implied-in-fact contracts given the course of dealing and business circumstances, or even "a quasi-contract implied by law despite any intention by the defendant to

---

[14] Guice's deep involvement in the scheme to divest Plaintiff all of his rights, ownership, authorship, compensation, and credit was only full realized when the Usher defendants filed their motion to dismiss in 2012 and included the UW Agreement as an exhibit.

the contrary." See Catania v. Corestates Bank, 1999 Pa. Dist. & Cnty. Dec. LEXIS 220, 21–22 (Pa. C.P. 1999).

A breach of a contract can occur based on nonperformance of a contractual duty, "the performance of an act which a defendant had contractually agreed not to perform," Id. at 21–22 (citing Sidco Paper Co. v. Aaron, 465 Pa. 586, 591, 351 A.2d 250, 252–53 (1976)), or the deficient undertaking of an "act which the defendant contractually agreed to perform in a particular manner." Id. (citing Carl Beasley Ford, Inc. v. Burroughs Corp., 361 F. Supp. 325, 334 (E.D. Pa. 1973), aff'd 493 F.2d 1400 (3d Cir. 1974)).

> ii. **Application – There are Disputes of Material Fact that A Contract Existed, and that Guice Breached that Contract Causing Damage to Plaintiff**

> 1. A Contract Existed between Guice and Plaintiff

Plaintiff, Wil Guice, and Dante Barton had a songwriting agreement and publishing agreement, the terms of which were that they agreed that any work resulting from the collaborative effort of the trio would be split equally, three ways. Marino Depo, pp.137–38; Amended Complaint, at Exhibits A, F; Affidavit/Declaration of Anthony Caroto (*Doc. No. 30-1*). Plaintiff wrote and produced a song named *Club Girl*, which had lyrics and a beat added to it by defendants Guice and Barton. Marino Depo, at pp.135–37; see also Amended Complaint, Exhibit I (showing that a Marino-only version of *Club Girl* existed before Guice and Barton added to it). This song was to be exploited pursuant to the songwriting agreement of Guice, Barton, and Marino. Marino Depo, at pp.135–37; see also Cordes Affidavit/Declaration

This is confirmed by a 2004 media interview done by Guice, Marino, and Barton with Origivation Magazine, a local Philadelphia-area publication. See Amended Complaint, Exhibit A. In that article Guice stated that *Club Girl/Bad Girl* was the collaborative work of Barton, Marino, and himself and that credit for the songs were split equally. Id. The trio also stated that production credit was split between Marino and Barton. Id. The writer of that article, Anthony Caroto, is explicitly clear that when Guice was interviewed for the article that Guice stated that Marino, Barton, and Guice wrote *Club Girl/Bad Girl*, and that Marino and Barton alone were the producers. See Caroto Affidavit/Declaration (*Doc. No. 30-1*); see also Cordes Affidavit/Declaration.

**2.** The Contract Between Guice and Marino was Unequivocally Breached

The record is clear that Guice breached this songwriting contract with Marino. The deal was that Marino, Guice, and Barton were to each receive a third of whatever was earned as a result of their exploitation of Club Girl/Bad Girl. In 2002, Guice and Barton signed a publishing agreement with IN2N and Thomas van Dell, which breached their contract with Plaintiff. See Exhibit 4 – Publishing Agreements with IN2N. It breached the contract with Plaintiff because Guice and Barton gave away 50% of the trio's songs to IN2N and van Dell. In return Guice and Barton each received lump sum advances in excess of $40,000. These lump sum advances were advances for royalties from the trio's music, primarily *Club Girl/Bad Girl*. In other words, Guice and Barton each owe Plaintiff for the advances they received, plus other accumulated royalties. This is not to mention that they signed away 50% of the trio's songs to van Dell, when Plaintiff never agreed to make such a deal.[15] In total, as described below, Guice owes Plaintiff $140,000.

Guice and Barton also breached the songwriting contract when they signed the UW Agreement with Usher. Firstly, Guice and Barton took Plaintiff's songwriting credit:

**(b)** You and Producer hereby acknowledge that Producer controls the following percentages in and to the underlying composition (exclusive of any conveyance of copyright in connection with any Samples) embodied in the Masters as follows:

| Composition | Writer | Percentage |
|-------------|--------|------------|
| "Bad Girl" | Dante Barton | 37.5% |
| "Bad Girl" | Will Guice | 37.5% |

See UW Agreement at p.7. Patently, on the face of this contract, it is explicit that Marino has been totally excluded from this agreement—Marino's name appears nowhere in this document. Instead, Dante Barton and Wil Guice are the only listed songwriters. The trio's deal was to split the songwriting credit equally, but Guice and Barton have clearly taken Plaintiff's credit and divided it up among themselves. Given that the songwriters were credited for writing 75% of Bad Girl,[16]

---

[15] Plaintiff believed van Dell should only take 25%, not 50%.

[16] Plaintiff vigorously contests that the 75% figure is fair. As he was illegally excluded from the negotiations he had no say in the matter. Plaintiff believes the trio should have been credited for far more than 75% given that the defendants credited with writing the remaining 25% contributed almost nothing substantive to the song.

simple math dictates, seeing as Marino, Guice, and Barton were each supposed to get 33.33% credit of whatever the trio earned, that Plaintiff, Guice, and Barton should have split the 75% three ways—resulting in 25% credit each. Yet, Mr. Guice unbelievably stated in his deposition that he thought the 37.5% he got "was fair." Guice Depo II, at 135:21. It was not fair, and it breached his contract with Plaintiff. Mr. Guice was not being honest when he stated that he did not know Plaintiff was not credited, especially given his experience in the music industry.[17]

Secondly, the UW Agreement also breached Guice's contract with Plaintiff because Guice brazenly took Plaintiff's production credit. The Underworld Agreement is principally a production agreement, and in it Usher engages Barton and Guice to produce *Bad Girl*. Guice is explicitly identified as a "Co-Producer." See UW Agreement ¶1(a). However, Guice, by his own admission, never did any production with Plaintiff or Barton. Guice Depo. II, p.75. Mr. Guice has explicitly testified that Marino and Barton "did the production, they did the music, they created music, created beats, created tracks" in the trio's collaborations. Guice Depo. II, p.52. Mr. Marino has testified that any production was supposed to be split between himself and Barton, Marino Depo. at 137–38, and Barton has admitted that Marino coproduced *Bad Girl* and *Club Girl*. Exhibit 12 – Barton Note to Marino – Oct. 2007 (signed note from Dante Barton stating that Plaintiff coauthored and coproduced *Club Girl* and *Bad Girl*). Anthony Caroto has confirmed that Guice himself in 2004 acknowledged that Marino and Barton produced all of the trio's songs, including Bad Girl. See Caroto Declaration (*Doc. No. 30-1*). Yet, despite Guice and Barton's public statements in 2004, Guice had actually signed a production agreement with Usher and Barton that gave *Guice* Plaintiff's production credit. Again, Mr. Guice is not being honest when he states he had no idea Plaintiff got cut out of the deal. Guice simply is not a producer and for him to claim credit and royalties on that basis is outrageous. Guice taking credit for producing *Bad Girl* is even more troubling given the fact that Marino, over the course of six phone calls with Usher and his people, actually did the production of *Bad Girl*. Marino Depo., at 346–351 (describing how Plaintiff worked extensively with defendants to produce and revise *Bad Girl*). Given that Mr. Guice was

---

[17] Although the Court apparently believes that the Usher "Defendants paid all writing and producing royalties to "Destro Music c/o Dante Barton," this is incorrect. Usher Def. SJ Opinion, at p.4. This is absolutely incorrect as Destro never received songwriting royalties, only production revenue. See generally UW Agreement.

frequently in the studio with Barton and Marino, and was keenly interested in the progress of the song, there is virtually no way he could not have known that it was Marino who actually produced the song. And, in fact, Guice is clear in his testimony that he knew Marino produced the song.

As a result of Guice splitting the production credits with Barton, they received a $15,000 advance, plus 3% royalties. See UW Agreement, p.1–3. Under the songwriting contract, Plaintiff owed all of the production royalties and advances that Guice illegally took from Plaintiff.

### 3.   Guice Received Significant Monetary Benefits at the Expense of Plaintiff[18]

When questioned on how much compensation Guice received from the exploitation of *Club Girl/Bad Girl* Guice claims that he only received "five figures." See Exhibit 28 – Transcript of 1/6/14 Hearing, at p.57. This number is impossibly low and cannot be correct; Guice lied on the stand. According to Plaintiff's expert Michael Einhorn, Guice received hundreds of thousands of dollars.

- **Songwriting Royalties**: Guice, Barton, IN2N (van Dell) received domestic songwriting royalties from 2004 to 2013 in the amount of $676,740. See Exhibit 22 - Einhorn Report, at p.24.  Guice and Barton collectively took received $338,370 ($169,185 each). Id. If Marino, Barton, and Guice were each to be credited according to their songwriting and publishing agreements they each should have received a 1/3 share of $112,790. Guice and Barton took more than their fair share and each took part of Plaintiff's songwriting royalties. This breached the songwriting and publishing contracts.

- **Production Royalties**: In addition, Guice received $54,955 as a producer since 2004. See id., at p.12 (stating that Guice and Barton combined earned $109,910 in production royalties). Since Guice did no production work and it was understood

---

[18] Although this Court ruled earlier in the case the Plaintiff's copyright damages were limited to the three years before his filing, no such limit on damages applies to Plaintiff's breach of contract claims.

that Marino and Barton were splitting the production credit, all of the $54,955 Guice received rightfully belongs to Plaintiff.

## VIII. Conclusion

Plaintiff asks for judgment in his favor.

*****

*Respectfully submitted,*

## Francis Alexander, LLC

*/s/ Francis Malofiy*
Francis Malofiy, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 105
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*

*/d/ November 10, 2014*

# Certificate of Service

I hereby certify that a true and correct copy of the foregoing PLAINTIFF'S BRIEF IN OPPOSITION TO GRANT OF SUMMARY JUDGMENT FOR DEFENDANT GUICE ON PLAINTIFF'S BREACH OF CONTRACT CLAIMS has been electronically filed with the Court via the ECF Filing System, served upon all counsel of record via electronic mail, and e-mailed to William Guice and Thomas van Dell.

JONATHAN D. DAVIS, P.C.
Jonathan D. Davis, Esquire
Derek A. Williams
99 Park Avenue | Suite 1600
New York, NY 10016
T: (212) 687-5464
E: jdd@jddavispc.com
E: DAW@jddavispc.com

FOX ROTHSCHILD, LLP
Michael Eidel, Esquire
Matthew Olesh, Esquire
2000 Market Street, 20th Floor
Philadelphia, PA 19103
T: (215) 299-2000
E: MEidel@foxrothschild.com

*Attorneys for Defendants*
*Usher Raymond IV a/k/a Usher ("Usher"), Sony Music Entertainment, EMI April Music, Inc., EMI Blackwood Music, Inc., Warner-Tamerlane Publishing Corp., UR-IV Music, Inc., Bystorm Entertainment, Mark Pitts, Issiah Avila, Jr., Bobby Ross Avila, Jr., Sublime Basement Tunez, Defenders of Music, Flyte Tyme Tunes, James Samuel Harris III, and Terry Steven Lewis*

MANATT, PHELPS & PHILLIPS, LLP
Mark S. Lee, Esquire
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
T: (310) 312-4000
F: (310) 312-4224
E: mlee@manatt.com

Rogers & Associates, LLC
Lance Rogers, Esquire
25 Elliot Avenue
Bryn Mawr, PA 19010
T:  (610) 649-1880
F:  (877) 649-1800
E:  lance@rogerscounsel.com
*Attorney for Defendant*
*IN2N Entertainment Group, LLC ("IN2N")*

Thomas Van Dell
10900 Wilshire Blvd., Suite 1400
Los Angeles, CA 90024
T:  (310) 443-5332
E:  vandell@hudcan.com
*Defendant, Pro Se*

William C. Guice
16794 East Tufts Avenue
Aurora, CO 80015
*Defendant, Pro Se*
E: guicemanmusic@gmail.com

Samuel C. Stretton, Esquire
301 South High Street
West Chester, PA 19381-3231
E: s.stretton@verizon.net

*****

*Respectfully submitted,*
Francis Alexander, LLC

*/s/ Francis Malofiy*
Francis Malofiy, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 105
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*

*/d/ November 10, 2014*