# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| DANIEL V. MARINO, | : |
|  | : |
| Plaintiff, | :    11 Civ. 6811 (PSD) |
|  | : |
| v. | : |
|  | : |
| USHER (a/k/a Usher Terry Raymond IV); SONY | : |
| MUSIC ENTERTAINMENT; EMI APRIL MUSIC, | : |
| INC.; EMI BLACKWOOD MUSIC, INC.; JAMES | : |
| SAMUEL HARRIS III; TERRY STEVEN LEWIS; | : |
| BOBBY ROSS AVILA, JR.; ISSIAH AVILA, JR.; | : |
| WILLIAM C. GUICE; DANTE E. BARTON; | : |
| DESTRO MUSIC PRODUCTIONS, INC.; | : |
| DEFENDERS OF MUSIC; FLYTE TYME | : |
| TUNES; SUBLIME BASEMENT TUNEZ; UR-IV | : |
| MUSIC, INC.; WARNER-TAMERLANE | : |
| PUBLISHING CORP.; MARK PITTS; BYSTORM | : |
| ENTERTAINMENT; TOMMY VAN DELL; and | : |
| IN2N ENTERTAINMENT GROUP, LLC, | : |
|  | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SUPPLEMENTAL MEMORANDUM OF LAW
IN FURTHER SUPPORT OF DEFENDANTS'
MOTION FOR COSTS UNDER FED. RULE CIV. P. 54 AND 17 U.S.C. § 505**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

PLAINTIFF CONTINUES TO PLAY GAMES
AND BURDEN THE MOVING DEFENDANTS WITH COSTS ............................... 5

  A.  Income And Real And Tangible Property ......................................................... 6

  B.  Pending Lawsuit Against Barton, Guice, Destro Music And Van Dell ........................... 10

  C.  Plaintiff Has A Colorable Malpractice Claim Against Attorney Malofiy ......................... 12

DEFENDANTS' SUPPLEMENTAL REQUEST
FOR COSTS ALLOWABLE UNDER 28 U.S.C. § 1920 ......................................... 17

CONCLUSION ......................................................................................................... 18

## TABLE OF AUTHORITIES

**Cases**

*Agee v. Paramount Commc'ns, Inc.*,
   869 F. Supp. 209 (S.D.N.Y. 1995) .............................................................. 5

*Fogerty v. Fantasy, Inc.*,
   510 U.S. 517 (1994) ...................................................................................... 5

*Hoyer v. Frazee*,
   323 Pa. Super. Ct. 421, 470 A.2d 990 (Pa. 1984) ................................... 12

*Kituskie v. Corbman*,
   552 Pa. 275, 714 A.2d 1027 (Pa. 1998) ................................................... 12

*Lieb v. Topstone Indus., Inc.*,
   788 F.2d 151 (3d Cir. 1986) ......................................................................... 5

*Maldonado v. Houstoun*,
   256 F.3d 181 (3d Cir. 2001) ......................................................................... 2

*Sokolsky v. Eidelman*,
   93 A.3d 858 (Pa. Super. Ct. 2014) ........................................................... 12

*Storm v. Golden*,
   371 Pa. Super. 368, 538 A.2d 61 (Pa. Super. Ct. 1988) ......................... 12

*Washington v. Philadelphia Cty. Ct. of Common Pleas*,
   89 F.3d 1031 (3d Cir. 1996) ......................................................................... 2

**Statutes**

28 U.S.C. § 1920 ............................................................................................... 17

The Moving Defendants[1] respectfully submit this supplemental memorandum of law in further support of their Motion for Costs.[2]  Defendant IN2N Entertainment Group, LLC ("IN2N") joins this submission.

## PRELIMINARY STATEMENT

In its November 3, 2014 Order ("November 3 Order"), the Court granted Moving Defendants' Motion for Costs, in part, by awarding the Moving Defendants attorney's fees totaling $693,995 and the right to submit a "supplemental request for only those costs allowed under 28 U.S.C. § 1920." (Doc. No. 195 at 8-9.)[3]  Defendant IN2N was awarded attorney's fees totaling $366,800 with the same right to submit a supplemental cost request.  *Id.*

The Court "stay[ed] payment of any award pending a determination of Plaintiff's ability to pay them."  (*Id.*)  This memorandum addresses "the subject of Plaintiff's ability to pay

---

[1] The Moving Defendants comprise Defendants Usher Raymond IV, Sony Music Entertainment, EMI April Music Inc., EMI Blackwood Music Inc., UR-IV Music, Inc., Warner-Tamerlane Publishing Corp., Mark Pitts, Bystorm Entertainment, Issiah Avila, Bobby Ross Avila, Defenders of Music, Flyte Tyme Tunes, Sublime Basement Tunez, James Samuel Harris III, and Terry Steven Lewis.  The Moving Defendants and Defendant IN2N are collectively referred to as "Defendants."  The Defendants' separately filed motions for costs are referred to herein as the "Defendants' Motions for Costs."

[2] This supplemental memorandum incorporates the definitions in the Memorandum Of Law In Support Of The Moving Defendants' Motion For Costs Under Fed. Rule Civ. P. 54 And 17 U.S.C. § 505 ("Motion for Costs") (Doc. No. 177-2) and Reply Memorandum In Further Support Of The Moving Defendants Motion For Costs Under Fed. Rule Civ. P. 54 And 17 U.S.C. § 505 ("Reply Memo") (Doc. No. 185).  Page references to ECF filed documents refer to the ECF-assigned page numbers appearing at the top of each page.   Accompanying this memorandum are the Second Supplemental Declaration of Jonathan D. Davis, dated January 22, 2015 ("Second Supp. Davis Decl."), the Second Supplemental Declaration of Mark S. Lee, dated January 23, 2015 ("Second Supp. Lee Decl."), and the Second Supplemental Declaration of Lance S. Rogers, dated January 23, 2015 ("Second Supp. Rogers Decl.").   "Marino Supp. Dep." refers to the transcript of the deposition of Daniel Marino, taken on December 19, 2014.  (Second Supp. Davis Decl., Ex. A.)

[3] The Court reduced the Moving Defendants' fee request by 50% because defense counsel's permissible use of "block-billing" prevented the Court from making an "informed evaluation" of the reasonableness of "approximately half of the claimed hours."  (Doc. No. 195 at 7-8.)

fees and costs." (*Id.* at 10; *see* Reply Memo at 9-11.)   In opposing Defendants' Motions for

Costs, Plaintiff claimed he has "no assets to speak of" and "no money to pay these fees." (Opp.

at 17.)   Because the Court found "no supporting evidence" for either statement, it permitted

Defendants to pursue financial discovery from Plaintiff. (November 3 Order at 9-10.)

The attorney's fees awarded against Plaintiff should not be reduced.   Because

Defendants met their burden of proof, the aggregate fee award of $1,060,795 is presumptively

reasonable as a matter of law. *See Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001)

(citing *Washington v. Philadelphia Cty. Ct. of Common Pleas*, 89 F.3d 1031, 1035 (3d Cir.

1996)).

Moreover, Plaintiff misrepresented and/or intentionally omitted facts about his

financial circumstances.   During his deposition, Plaintiff reverted to his familiar ways, which

were on display at the sanctions hearing and his earlier deposition.   He was vague, evasive, and

inexplicably forgetful about obvious matters.   His attitude was flippant and aggressive.   Attorney

Malofiy joined the fray, unnecessarily interfering with the deposition at the start by demanding

stipulations about the scope and use of the deposition transcript and Plaintiff's financial

documents.   Plaintiff did not move for a protective order before the deposition.

In his opposing papers to the Motions for Costs, Plaintiff relapsed into predictable

behavior, including telling this Court to ignore controlling legal precedent while falsely and

maliciously accusing Defendants of "highly unethical and illegal conduct," when this Court had

already found "Defendants did nothing wrong." (November 3 Order at 4.)

Despite this Court having unqualifiedly determined that Plaintiff's claims were

"frivolous" and "objectively unreasonable, both in fact and law," and that Plaintiff continues to

make frivolous arguments, *id.* at 3-4, Plaintiff testified that he lacks remorse for causing

Defendants to incur millions of dollars in defense costs – not to mention the incalculable grief they suffered from the false charges of plagiarism:

> Q.  Mr. Marino, do you have any remorse for unnecessarily causing my clients so much expense to have your claims dismissed against them?

> * * * *

> A.  Remorse?

> Q.  Remorse.

> A.  No, I don't.  I don't have any remorse.  That's my answer.

(Marino Supp. Dep. at 236-37.)  Plaintiff admits that his lawyer told him "[s]everal years ago" that it was possible for him to be found liable for Defendants' defense costs.  (*Id*. at 36-37.)  But even though Plaintiff's claims entirely failed against Defendants, he does not believe he is liable for their costs.  (*Id*. at 41-44.)  He makes this pronouncement, despite declaring:  "I believe I understand just about as much as someone who is not an attorney can understand about the case," adding: "I felt like I was in the loop."  (*Id*. at 49.)

Rather than take responsibility for having filed a "frivolous" and "objectively unreasonable" lawsuit, Plaintiff reflexively blames defense counsel for his predicament:

> Q.  Do you think it was appropriate to force them to spend all of this money to get the claims dismissed that you brought against them?

> * * * *

> A.  *I think that you personally did that to your clients*.  I think you went ahead and spent so much money when you should have done the right thing when you recognized that it was my song and you should have saved them money and offered me what I should have received.  That's what I think.  *I think you did it, not me*.

> Q.  So you have no remorse?

3

      A.  No.

(*Id.* at 237-38 (emphasis added).)

After numerous rulings, Plaintiff remains defiant that his cockeyed view of the law entitles him to millions of dollars from the innocent Defendants.  When asked if he plans to continue pursuing this case, he responded:  "It's my intent to pursue this claim against everyone that has gotten a credit for the song, [sic] that has made money off my song; so, yes.  The answer is yes."  (*Id*. at 47.)  Plaintiff filed a Notice of Appeal to challenge the Court's prior rulings and award of summary judgment in Defendants' favor.  (Doc. No.168.)

Only by strict adherence to the Court's fee award in the November 3 Order (plus any costs yet-to-be awarded) will Plaintiff and others like him be deterred from pursuing frivolous lawsuits against blameless parties.  Plaintiff is capable of paying the awards over time.

Reducing the fee awards for this Plaintiff sends the wrong message.  It would promote frivolous litigation by diminishing the importance of the Copyright Act's fee shifting provision.  And it would change the advice that copyright lawyers give to clients about the meaning of Section 505.  Congress never intended the Copyright Act to protect malefactors who allege meritless copyright claims and then try to illegitimately plead poverty once they have lost their cases.

Unless this Court imposes the full attorney's fee awards on Plaintiff, he will have little incentive to stop this farcical case against Defendants that is financed through a contingency fee agreement with his lawyer.  He has never advanced a dime to prosecute this case, which has cost Defendants collectively more than $2 million dollars to defend.  (Marino Supp. Dep. at 47-48.)  The awards must stand to have any impact on Plaintiff.

4

## PLAINTIFF CONTINUES TO PLAY GAMES
## AND BURDEN THE MOVING DEFENDANTS WITH COSTS

Despite filing a deceptive affidavit opposing the Motions for Costs in which he described himself as impoverished, Plaintiff revealed at his deposition, and through his supplemental document production, that he can afford to maintain a very comfortable lifestyle. In short, he is succeeding in an upwardly moving economy. The fees and costs to be awarded are not "excessive in light of the plaintiff's resources," November 3 Order at 3 (quoting *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 156 (3d Cir. 1986)), and are a necessary consequence that Plaintiff should have anticipated from filing, and doggedly pursuing, frivolous claims against Defendants.

This Court observed that "'frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence'" are appropriate criteria in deciding whether to award fees and costs under the Copyright Act. (*Id.* at 3 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, n.19 (1994)).) And the Court recognized a party's financial ability to pay an award is *a* consideration in determining whether to reduce an award, but only where it would cause a losing party's "ruination" and not foster the Copyright Act's aims of "compensation and deterrence." *Lieb*, 788 F.2d at 156.

The relevant case law does not provide specific guidance in weighing a party's financial instability in reducing, if at all, an attorney's fee award in a copyright case precisely because the amount awarded is within the exclusive discretion of the trial court. The cases comment only that financial wherewithal "*can* be considered in awarding attorney's fees to the prevailing party[.]" *Agee v. Paramount Commc'ns, Inc.*, 869 F. Supp. 209, 212 (S.D.N.Y. 1995) (emphasis added).

5

Adherence to the Court's awards will neither ruin Plaintiff nor impoverish him. Plaintiff cannot support his assertion that he lacks assets or financial wherewithal to satisfy, albeit over time, the fees awarded to Defendants and the permissible costs yet-to-be awarded that are recounted in the accompanying submissions.

### A.  <u>Income And Real And Tangible Property</u>

Plaintiff is 38 years old, has a high school education, and has attended some college. (Marino Supp. Dep. at 50-54, 81.)  Since late 2012, he has maintained full-time employment as a "client service representative" at mPower Trading Systems (*Id*. at 73-74.)  He testified that in 2014 he received an annual salary of "$70,000 ... Maybe 72, 71 … Somewhere around there." (*Id*. at 77.)  He plans to work for long as he can.  (*Id*. at 224.)  Plaintiff is not physically or mentally impaired to prevent him from working in an office environment.  (*Id*. at 225-26.)

When he was asked about other sources of income, he first denied having any.  (*Id*. at 77-78.)  But, after further prodding, Plaintiff admitted he earns outside income from other endeavors.  (*Id*. at 146-47.)  Because Plaintiff claimed that he could not remember the source of that income for 2012 and 2013, he offered guesses and claimed forgetfulness.[4]  (*Id*. at 142-47, 153-56, 158-60, 195.)  And he was unable to recall any of the expenses he deducted from that income.  (*Id*. at 146, 161-62.)

Plaintiff's testimony was incredible given that his tax returns were filed only shortly before his deposition.  (*Id*. at 153.)  Moreover, all of the tax returns he produced were unsigned and, in some cases, incomplete.  (*Id*. at 110, 114, 119, 138, 157-58, 163-64.)[5]  In yet another

---

[4] He also sells merchandise on eBay for which he maintains a Pay-Pal account.  (Marino Supp. Dep. at 176-78.)  But the specific details and activity for that account were not fully revealed or produced in discovery.  (*Id*. at 177-79.)

[5] At Plaintiff's deposition, defense counsel requested that he sign and deliver an authorization to them so they could obtain from the IRS the tax returns he signed and filed.  Plaintiff's counsel

twist, Plaintiff first testified that he did not contact his accountant to obtain copies of those returns or accounting records, and then later contradicted himself by admitting that he did. (*Id.* at 86-87, 127-29, 137-38.)  Plaintiff makes it impossible to take him at his word as shown below.

Plaintiff acknowledged that he married in April 2013.  (*Id.* at 78, 174-75.)  In 2013, he reported gross joint income of $90,249.  (*Id.* at 151; Second Supp. Davis Decl., Ex. B (Marino 0026-0041.))  Despite that disclosure, he testified that his wife earns approximately $32,000 per year, performing "administrative work," which did not comport with the income reported on their 2013 joint tax return, assuming he earned between $70,000 and $72,000 from his day job.  (Marino Supp. Dep. at 80.)  He even claimed to be uncertain of the name of his wife's employer, or whether she receives bonuses or incentives for work.  (*Id.*)

Plaintiff testified his wife has no sources of outside income, despite evidence that his wife received approximately $10,000 in rental commissions.  (*Id.* at 156-57; *see* Second Supp. Davis Decl., Ex. B at Marino 0031.)  He claimed he was unaware of that income, which was reported on their 2013 joint return, and he could not say for sure whether his wife held a real estate license, despite having passed the real estate exam.  (Marino Supp. Dep. at 156-57, 161, 229.)  Plaintiff also had trouble accounting for the manner in which household bills were handled or paid and the sources from which they were paid, offering testimony that was mostly confusing rather than clarifying.  (*Id.* at 98-100, 157.)  Plaintiff demonstrated the dimmest knowledge of his wife's employment and financial circumstances even though they live together full-time.  (*Id.* at 106-07, 229.)

---

demanded a formal request from defense counsel.  (*Id.* at 129-30.)  Although defense counsel promptly sent the demand, Plaintiff's counsel did not provide the authorization in a form acceptable to the IRS in sufficient time for Defendants to obtain the tax returns before the deadline to file this supplemental submission.  Thus, Defendants possess only unsigned, incomplete tax returns.

Plaintiff gave inconsistent and incomplete testimony about his real estate ownership. Although Plaintiff temporarily quibbled about whether he owns a house at 901 Greenbriar Lane in Springfield, Pennsylvania, he later acknowledged ownership of that asset, stating that he rents the home to a person who he could not identify by full name, and for a rental amount that very closely covers its monthly costs. (*Id*. at 90-92, 95-96, 98-99, 197; Second Supp. Davis Decl., Ex. C (Marino 0504-0513).) In describing the value of his house as being less than the amount of his mortgage, he relies on an outdated 2013 appraisal for $161,000. (Marino Supp. Dep. at 228; Second Supp. Davis Decl, Ex. D (Marino 0474-0503).) The restated mortgage on the property is $188,825. (Second Supp. Davis Decl., Ex. E (Marino 0515-0516).)

His wife owns a home at 1520 South Dorrance Street, in Philadelphia, Pennsylvania. (Marino Supp. Dep. at 96-98.) Since their marriage, she has acquired from the City of Philadelphia the empty lot adjacent to that house. (*Id*. at 103-04.) Plaintiff testified that if his wife and he maintain the new property for 10 years she will own it outright without having to pay the City any money for it. (*Id*. at 104-06.) If she sells it sooner, Plaintiff and his wife apparently must share the profits with the City. (*Id*.) Plaintiff could not or would not say for sure whether he has contributed to the taxes and upkeep of those properties. (*Id.* at 96-101.)

In 2012, Plaintiff received a workman's compensation award of $61,000. (*Id.* at 203-05; Second Supp. Davis Decl., Ex. F (Marino 0620-0629).) With that money, which he received the following year, he paid his lawyer a $12,200 contingent fee, Second Supp. Davis Decl., Ex. F, and kept the balance for himself. He used a portion of the money to engage in high-risk securities day trading, which proved to be an unsuccessful gambit for him. (Marino Supp. Dep. at 171-76.) He apparently did not use the money for any injury-related purpose.

Plaintiff apparently can afford – alone or in conjunction with his wife – the costs of maintaining and insuring three vehicles:  a pickup truck, a late model Honda Civic, and a Harley Davidson motorcycle.  (*Id.* at 99, 186; Second Supp. Davis Decl., Ex. G at Marino 0563, Marino 0581, and Ex. H (Marino 0544, 0616, 0618).)

Finally, Plaintiff owns a record/production company called Fuzztone LLC or Fuzztown Entertainment, LLC.  (Marino Supp. Dep. At 120-24.)  The records produced for this entertainment business are meager, but Plaintiff claims it has lost money.  (*Id.* at 120.)  He produced a tax return for 2011, which was purportedly filed in 2014, and claims the company's assets have been returned to him and his partner in anticipation of dissolving the business.  (*Id.* at 122-23, 233-34.)[6]

None of Plaintiff's disclosures relating to his business appear complete or genuine.  (*Id*. at 138-39.)  In addition to the testimony referenced above, he received an insurance recovery of more than $18,600 for flood damage, including damage to some of the musical equipment and instruments he owned and then contributed to the business.  (*Id.* at 180, 234; Second Supp. Davis Decl., Ex. I (Marino 0550-0559).)  But he retained the insurance settlement.  (Marino Supp. Dep. at 179-80.)  Based on the records produced, it is impossible to ascertain the status, value, or existence of the assets of his business, despite it having reported losses on tax returns.  Not long ago, the business received a $25,000 payment for releasing an artist who was signed to the record label, demonstrating activity.  (*Id*. at 125-26.)

\* \* \* \*

---

[6] Plaintiff apparently claims the assets from his entertainment business, which he and his partner divided between them, are exhibited in an array of photographs as part of his supplemental document production, but many of those images are pixelated or out of focus. (Second Supp. Davis Decl., Ex. G at Marino 0565-0615.)

At a minimum, Plaintiff has a high five-figure annual income, obtained a personal injury settlement of which he still retains tens of thousands of dollars that he has partially gambled away, and he received a property settlement award for flood damage.  He intends to remain gainfully employed for years to come, and his wife materially contributes to the household income through full-time employment, including earning real estate commissions, reducing his burden as the marital breadwinner.

**B.  Pending Lawsuit Against Barton, Guice, Destro Music And Van Dell**

Plaintiff has active claims in this action against Defendants Barton, Guice, Destro Music, and Van Dell.  Plaintiff testified he intends to proceed with these claims:

> Q.  Do you intend to proceed with what is left in this case against
> Mr. Barton, Mr. Guice, De[s]tro Music, and Mr. Van Dell?
>
> A. Yes.
>
> Q.  Do you understand that there are motions pending with respect
> to the claims against Mr. Van Dell and Mr. Guice?
>
> A. Yes.
>
> Q.  Okay.  If they are dismissed from the case, do you intend on
> appealing those determinations, if they are made?
>
> *  *  *  *
>
> A. Yes.

(Marino Supp. Dep. at 208-09.)

Although Plaintiff testified that he had "no idea" how much money he is seeking from the remaining defendants, *id.* at 209-10, Plaintiff has claimed those defendants received hundreds, if not millions of dollars, of which he wants his share as a joint owner of *Club Girl*, and as a co-producer with Barton.  (Doc. No. 2 at ¶¶ 406-07 and Doc. No. 29 at 23 (Barton allegedly hid royalty statements showing Barton and Guice receiving hundreds of thousands of

dollars, and tens of thousands of dollars in advances, for *Club Girl*/*Bad Girl*); Doc. No. 2 at ¶ 428 ("On information and belief, each and all of the Defendants received tens of thousands of dollars individually, in some cases hundreds of thousands individually, and collectively in excess of tens of millions of dollars … from their copying of both the underlying composition and the sound recording of 'Club Girl'[.]"); Doc. No. 201 at 12 n. 9, 16, 28-29 (according to Plaintiff's expert, "Guice, Barton, IN2N (van Dell) received domestic songwriting royalties from 2004 to 2013 in the amount of $676,740," and Guice and Barton received $109,910 in production royalties for *Bad Girl*).)

Defendants have always maintained that Plaintiff's dispute involving *Bad Girl* was one between himself and his alleged joint authors, Defendants Barton and Guice.  Because the U.S. Copyright Act permits Defendants Barton and Guice the unrestricted right to make derivative works of *Club Girl*, without Plaintiff's consent, Plaintiff was entitled to assert a claim against those joint authors to recover his share of profits allegedly kept from him.  Plaintiff also has alleged claims for breach of contract and fiduciary duty, fraud, and misrepresentation against some or all of the remaining defendants.

To the extent that Plaintiff prevails on one or more of his state law claims and recovers a money judgment, Defendants are entitled to satisfy their fee awards, and any costs yet-to-be awarded, from the proceeds of any money judgment awarded Plaintiff.  According to Plaintiff, such a judgment – which Plaintiff expects to receive (Marino Supp. Dep. at 210-11) – could exceed $1 million dollars, plus interest and costs.

Plaintiff's claims against the remaining defendants could fund the payment of the fees awarded by this Court to Defendants.  Plaintiff should not be permitted to profit from his

11

pointless lawsuit against Defendants by denying them their fees and costs while he enjoys the benefits of any money he recovers from the remaining defendants.

### C.  Plaintiff Has A Colorable Malpractice Claim Against Attorney Malofiy

To the extent Plaintiff's counsel failed to inform him of the risks of commencing or continuing this litigation, that failure should not impact Defendants' recovery of their fees and costs.  Based on the factual findings and rulings of this Court, Plaintiff has a colorable malpractice claim against his lawyer, which could provide Plaintiff with additional resources to pay the Defendants' fees and costs.

By law, Plaintiff's attorney must disclose whether he maintains professional liability insurance.[7]  Rule 1.4(c) of the Pennsylvania Rules of Professional Conduct provides:

> A lawyer in private practice shall inform a new client in writing if the lawyer does not have professional liability insurance of at least $100,000 per occurrence and $300,000 in the aggregate per year, subject to commercially reasonable deductibles, retention or co-insurance, and shall inform existing clients in writing at any time the lawyer's professional liability insurance drops below either of those amounts or the lawyer's professional liability insurance is terminated.  A lawyer shall maintain a record of these disclosures for six years after the termination of the representation of a client.

---

[7] A legal malpractice claim requires a plaintiff to prove that he or she "'had a viable cause of action against the party [s]he wished to sue in the underlying case and that the attorney [s]he hired was negligent in prosecuting or defending that underlying case[.]'"  *Sokolsky v. Eidelman*, 93 A.3d 858, 862 (Pa. Super. Ct. 2014) (quoting *Kituskie v. Corbman*, 552 Pa. 275, 714 A.2d 1027, 1030 (Pa. 1998)).  To establish the claim, plaintiff must show the following:  "1) employment of the attorney or other basis for a duty; 2) the failure of the attorney to exercise ordinary skill and knowledge; and 3) that such negligence was the proximate cause of damage to the plaintiff."  *Id.* (citing *Kituskie*, 714 A.2d at 1029); *see also Storm v. Golden*, 371 Pa. Super. 368, 375, 538 A.2d 61, 64 (Pa. Super. Ct. 1988) ("The standard of care in a legal malpractice case is whether the attorney has exercised ordinary skill and knowledge related to common professional practice.") (citing *Hoyer v. Frazee*, 323 Pa. Super. Ct. 421, 470 A.2d 990 (Pa. 1984)).

Attorney Malofiy's current online "PA Attorney Information" provides that "I maintain, either individually or through my firm, Professional Liability Insurance pursuant to the provisions of Rule of Professional Conduct 1.4 (C)."  *See* Second Supp. Davis Decl., Ex. J.

This case should never have been brought against Defendants.  An attorney exercising ordinary skill and knowledge contemplating an action for copyright infringement against Defendants would have recognized that the claim could not succeed and should not be pursued.  Plaintiff's admissions in his Amended Complaint established he had no claim against Defendants.  As this Court observed in its May 21, 2014 Memorandum (Doc. No. 154) granting summary judgment, Plaintiff, through his counsel, "misstates the law and contradicts his own deposition testimony and the allegations in his Amended Complaint."  (*Id.* at 7.)  This litigation tactic was pursued presumably to avoid the inevitable dismissal of the lawsuit.

Plaintiff admitted that he, Barton, and Guice are joint authors of the song *Club Girl*. He also admitted that, with his "approval, Barton sought to 'shop' 'Club Girl' to the music industry" and, "after some discussion in 2003, he, Barton, and Guice permitted Usher to use 'Club Girl.'"  (*Id.* at 2.)  In addition, "Plaintiff and Guice authorized Barton to negotiate the trio's writing, production, and royalty credits" for the inclusion of "'Club Girl' in Usher's next album" and "the three would share songwriting credit equally, and Plaintiff and Barton and royalty credits."  (*Id.* at 2-3.)

Plaintiff admitted "he was excited when he learned of the contract" to include the song in Usher's album, that he "mailed the 'Pro Tools' files to 'Usher's people' so they could work on the song[,]" and he assisted, when requested, to revise the work.  (*Id.* at 3).  "Plaintiff celebrated 'Bad Girl's' success, attending Usher's Philadelphia tour and the Grammy Awards." (*Id.* at 4.)  He did not dispute that he "never sought to enjoin the sale of 'Bad Girl' [formerly

13

Club Girl] or [the] *Confessions* [album]", and despite speaking with "Usher at a party soon after the release of *Confessions*, Plaintiff did not mention the issues." (*Id.*)

The Court ruled that Defendants did "nothing wrong" and had "acted properly in obtaining authorization to copy the song from Barton and Guice – the only individuals listed on the copyright as authors – and in acting within the scope of that license." (*Id.* at 14; *see* November 3 Order at 4.) The Court observed that "Plaintiff repeatedly admits the 'fundamental truth' that 'Club Girl' was jointly created," recognizing that "Plaintiff cannot maintain an infringement action against either Barton or Guice." (Doc. No. 154 at 7-8; November 3 Order at 3-4.)

The Court went further to find that "Barton and Guice each had the authority to grant a non-exclusive license to a third-party without Plaintiff's consent" (Doc. No. 154 at 9; *see* November 3 Order at 4), making "[t]he license Barton and Guice conveyed to [Defendants] … a valid, non-exclusive license" to exploit the work and create "Bad Girl." (Doc. No. 154 at 10; *see* November 3 Order at 4.) The Court ruled that Defendants received not only express and implied licenses from Barton and Guice, but also from Plaintiff himself. (Doc. No. 154 at 9-12; *see* November 3 Order at 4.) The Amended Complaint had admitted as much.

The Court showed no reticence in calling the lawsuit "frivolous." In opposing the Motions for Costs, the Court noted Plaintiff's attempt "to demonstrate that *his claims were somehow other than frivolous*" resulted in him making "*arguments that are, again, frivolous*." (November 3 Order at 4 (emphasis added).) Giving examples, the Court denied "bungl[ing]" facts, and certainly not Plaintiff's admission about receiving money; denied improperly relying on "controlling authority" to find Defendants received a non-exclusive license; and the Court reiterated that it correctly "explained in considerable detail that Defendants did nothing wrong,"

14

decimating Plaintiff's argument that it was "inequitable" to award them fees and costs.  (*Id.*) Punctuating the need to deter frivolous claims, the Court unqualifiedly stated:  "As I have described, Plaintiff chose to litigate his *frivolous copyright infringement action* in an abusive manner."  (*Id.* (emphasis added).)

Compounding Plaintiff's audacity in bringing a lawsuit that had no chance of getting off the ground, his counsel ignored black letter copyright law.  On Defendants' motions to dismiss, Plaintiff's state law constructive trust and accounting claims were dismissed as a matter of law.  (Doc. Nos. 42 and 48.)   No discovery was required to achieve these assured victories.

In dismissing the constructive trust claim, the Court stated that "the Copyright Act preempts constructive trust claims, as long as the underlying claim and the copyright claim derive from the same actions."  (Doc. No. 42 at 8 (citing cases).)  The Court easily recognized that "[t]he *language of Plaintiff's constructive trust claim* … explicitly confirms that its gravamen comes within the subject matter of copyright" and that Plaintiff "bases his constructive trust allegations on the same conduct he uses to support his copyright claims."  (*Id.* at 8-9.) These obvious substantive defects rendered Plaintiff's claim frivolous.

Plaintiff's accounting claim was likewise frivolous.  The Court stated "[t]he Copyright Act also typically preempts accounting claims that are based on the underlying copyright infringement claims."  (*Id.* at 9 (citing cases).)  Again, the Court easily found that Plaintiff's demand for an accounting was barred because he sought an "accounting due to the 'profits and gross receipts arising from or attributable to Defendants' … infringement of Plaintiff's copyright," which claim is "more appropriately addressed through his copyright claims, which provide an equivalent right."  (*Id.*)

Not only were Plaintiff's claims frivolous in kind, they sought damages for periods disallowed under the Copyright Act.  Defendants moved for judgment on the pleadings to limit Plaintiff's copyright damage claims to not more than three years prior to the filing of the initial complaint on October 28, 2011.  Plaintiff impermissibly sought damages extending back to the release of *Bad Girl* in March 2004.

The Court recognized that "[t]he limitations period governing copyright infringement is three years" under the Copyright Act and it is black letter law that the time begins to run "'when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim.'"  (Doc. No. 75 at 4 (citing statute and case).)  The Court easily found that Plaintiff's initial complaint admitted that Plaintiff was aware of his legal rights when "'the Trio' agreed to share songwriting credits and royalties" and was aware his legal rights were abrogated when he "purchased the *Confessions* album in March 2004" and "had received no royalties."  (*Id*. at 4-5.)  Because of these admitted and unalterable facts in his pleading, the Court ruled that copyright damages were limited to those that "accrued after October 28, 2008." (*Id*. at 5.)  No discovery was required to achieve this assured victory.

Finally, Defendants moved to strike Plaintiff's demand for "punitive and exemplary damages" on his copyright claims. (*Id*.)  Ignoring black letter law, Plaintiff's counsel sought relief that is unattainable in a copyright action.  Relying on longstanding precedent, the Court easily struck Plaintiff's demand for such damages.  (*Id*. at 5-6.)  Once again, no discovery was required to achieve this assured victory.

Plaintiff's malpractice claim against his lawyer is an asset.  His damages are easily measured by the more than $1 million dollars in fees already awarded Defendants, and any costs this Court awards.   Plaintiff's counsel filed documentation with the Commonwealth of

Pennsylvania disclosing that he maintains malpractice insurance.  If Plaintiff pursues a claim

against his attorney, Plaintiff's recovery would aid in the satisfaction of the Court's awards.

### DEFENDANTS' SUPPLEMENTAL REQUEST
### FOR COSTS ALLOWABLE UNDER 28 U.S.C. § 1920

The recoverable costs under 28 U.S.C. § 1920 are the following:

> (1) [f]ees of the clerk and marshal; (2) [f]ees for printed or
> electronically recorded transcripts necessarily obtained for use in
> the case; (3) [f]ees and disbursements for printing and witnesses;
> (4) [f]ees for exemplification and the costs of making copies of any
> materials where the copies are necessarily obtained for use in the
> case; (5) [d]ocket fees…; [and] (6) [c]ompensation of court
> appointed experts, compensation of interpreters, and salaries, fees,
> expenses, and costs of special interpretation services[.]"

(*See also* November 3 Order at 8.)

Moving Defendants originally sought $138,119.13 in costs, as detailed in the invoices

submitted with their Motion for Costs.[8]  (*See* Doc. No. 178 at ¶ 57 and Ex. A; Doc. No. 186 at

¶ 6 and Ex. A.)  Pursuant to the November 3 Order, the invoices have been edited to eliminate

various expenses.  (*See* Second Supp. Davis. Decl., Ex. K.)  Among the expenses eliminated are:

(1) postage and courier fees; (2) travel, lodging, meals, and other expenses associated with

attending out-of-town depositions; (3) expert witness fees and expenses; (4) WestLaw charges;

(5) expenses for obtaining physical compact disk copies of the songs at issue; and (6) expenses

for video files of depositions.

The Moving Defendants have recalculated their costs to be $39,391.05, comprising

their expenses for deposition transcripts and copying expenses, including the cost of copies made

by external vendors, the cost of certified copies of registrations and other documents from the

---

[8] The Moving Defendants' sought $137,311.85 in costs in their moving brief and an additional $807.28 in costs in their reply brief, representing the costs incurred in making their Motion for Costs.

U.S. Copyright Office, and copies of documents obtained from electronic docket services (PACER).

Defendant IN2N has also recalculated its costs and they now total $8,699.90.  These costs are comprised of copying, transcript, and filing fees.  (*See* Second Supp. Lee Decl., Exs. A and B; Second Supp. Rogers Decl., Exs. A and B.)

## CONCLUSION

For all of the foregoing reasons, Defendants, as "prevailing parties" under § 505 of the Copyright Act, respectfully request that the Court order Plaintiff to pay their costs as awarded in the amount of $693,995 for the Moving Defendants and $366,800 in favor of Defendant IN2N, together with their supplemental request for costs of $39,391.05 and $8,699.90, respectively.

Dated: January 23, 2015

Respectfully submitted,

JONATHAN D. DAVIS, P.C.

By:     /s/ Jonathan D. Davis
        Jonathan D. Davis
        Derek A. Williams
        10 Rockefeller Plaza,  Suite 1015
        New York, New York 10020
        (212) 687-5464

FOX ROTHSCHILD LLP

By:     /s/ Michael Eidel
        Michael Eidel
        Matthew Olesh
        2000 Market Street, 20th Floor
        Philadelphia, PA 19103
        (215) 299-2000

18

*Attorneys for Defendants*
*Usher Raymond IV, Sony Music*
*Entertainment, EMI April Music Inc., EMI*
*Blackwood Music Inc., UR-IV Music, Inc.,*
*Warner-Tamerlane Publishing Corp., Mark*
*Pitts, Bystorm Entertainment, Issiah Avila,*
*Bobby Ross Avila, Defenders of Music, Flyte*
*Tyme Tunes, Sublime Basement Tunez,*
*James Samuel Harris III, and Terry Steven*
*Lewis*

MANATT, PHELPS & PHILLIPS,
LLP

/s/ Mark S. Lee
Mark S. Lee
Admitted pro hac vice
11355 West Olympic Boulevard
Los Angeles, CA  90064-1614
Telephone:  (310) 312-4000
Fax:  (310) 312-4224
email:  mlee@manatt.com

ROGERS CASTOR

/s/ Lance Rogers
Lance Rogers
26 East Athens Avenue
Ardmore, PA 19003
Telephone:  (610) 649-1880
Fax:  (877) 649-1880
Email:  Lance@RogersCounsel.com

*Attorneys for Defendant*
*IN2N Entertainment Group, LLC*

19