UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIEL V. MARINO,<br>*Plaintiff*<br><br>V.<br><br>USHER, *et al.,*<br>*Defendants* | NO.: 11-CV-06811<br><br>BEFORE THE HONORABLE<br>PAUL S. DIAMOND |

# PLAINTIFF'S BRIEF IN OPPOSITION TO GRANT OF SUMMARY JUDGMENT FOR DANTE BARTON

Plaintiff has maintained since the beginning of this litigation and throughout that he, Dante Barton, and Wil Guice entered into a songwriting agreement where they would each retain a 1/3 share of any songs created by the trio. The ownership, authorship, and compensation of the song *Club Girl* was governed and controlled by this contract. This contract was valid and preexisted the creation of the song *Club Girl*. These facts are undisputed. The Amended Complaint states:

> 456. Consistent with their prior and continuing agreement, Marino, Barton, and Guice agreed that they would share equally (a respective 1/3 interest) in the songwriting credits for the song "Club Girl" and "Bad Girl" and in any monies, royalty credits, or any royalties or any credits they received on behalf of the publishing and/or individually for the songs "Club Girl" and "Bad Girl".
> 457. The songwriting agreement was breached and Marino did not receive his respective 1/3 interest in the songwriting credit or the conferred benefits that would naturally flow, monetary and otherwise.

See Amended Complaint. It is established law that the authors of a song may contractually agree on the ownership rights in a particular song. When the authors of a song do so, the Copyright Act's default ownership rules simply do not apply.

The Court, however, previously and incorrectly found that *Club Girl* was a "joint work" under the Copyright Act's ownership rules, and found that Plaintiff, Barton, and Guice were co-authors. However, the Court can only find a joint work exists in the absence of a songwriting agreement. Under the Copyright Act, a coauthor of a "joint work" may use and license the work

without permission of his co-authors. Thus, the Court found that no Defendant could be found liable for copyright infringement, because Guice and Barton authorized the use of *Club Girl*.

This ruling was clearly wrong, and appears to be the basis on which the Court seeks to dismiss the copyright claims against defendant Barton. Plaintiff Daniel Marino contracted with defendants Barton and Guice for a one-third ownership share in the song Club Girl. Thus, *Club Girl* is not a joint work by virtue of the preexisting contract, nor could Barton and Guice use the song or authorize its use without Marino's permission—which he manifestly never gave.

Plaintiff asks the Court to enforce the ownership contract entered into by Plaintiff, Barton, and Guice. The contract's existence makes it clear that *Club Girl* was not a joint work and that Guice and Barton had no authority to use Plaintiff's one-third share of *Club Girl*.

Moreover, Plaintiff never gave an implied license for his share of *Club Girl* to be used as any use of *Club Girl* was predicated upon him receiving fully credit and compensation, as Barton and all Defendants knew. Plaintiff received almost no compensation and no credit; in essence Defendants, including Barton, took his song without paying for it. That is theft. Furthermore, Plaintiff's Amended Complaint extensively asks for equitable relief against all Defendants under the Copyright Act, including an accounting, and ownership determination, and a correction of the fraudulently misregistered copyright registration. All these valid equitable claims remain before this Court and are applicable to defendant Barton.

Plaintiff is disappointed the Court is considering lifting defendant Barton's default on any of the claims against him. Defendant Barton has acted in bad faith throughout the events that are the subject of this lawsuit and has refused to participate in this litigation. If the Court is going to dismiss claims against Barton, Plaintiff asks that Barton at least be ordered to finish the deposition which he appeared for and then discontinued before answering any substantive questions.

It is important in understanding this dispute not to lose the forest for the trees.  The simple fact that must not be forgotten is that plaintiff Daniel Marino wrote *Club Girl* and *Bad Girl*, and that Defendants—including Dante Barton—deliberately took more credit and money than they were legally due and hid this from Plaintiff for years. This is wrong and it must be corrected.

The record clearly demonstrates that Plaintiff wrote the underlying musical composition for *Club Girl* and *Bad Girl* and that all Defendants were aware that he was the main songwriter of these songs. The evidence further demonstrates that defendants Guice, Barton, Tommy van Dell,

and IN2N entered into secret, illegal contracts and agreements—and fraudulently registered *Club Girl*'s and *Bad Girl*'s copyright without Daniel Marino as an author and owner—in such a way as to attempt to deliberately extinguish all of Plaintiff's undisputed ownership and authorship of the songs *Club Girl* and *Bad Girl* and claim the resulting benefits for themselves.

In considering Plaintiff's brief on why the default should not be opened on Dante Barton, and why summary judgment should not be granted for defendant Dante Barton, the Court must construe all disputed facts in favor of Plaintiff.  Given that copious evidence shows that Barton and all other Defendants engaged in a purposeful scheme to completely erase Plaintiff's rights out of existence so they could claim more credit than they were due, this case must go to a jury to decide if Daniel Marino is an author and owner of *Club Girl/Bad Girl* and whether defendants are liable to Plaintiff for an accounting, copyright infringement, and other relief.

*****

## I.    Matter before the Court

Before the Court is the Order (*Doc. No. 230*) by Judge Paul S. Diamond instructing Plaintiff that he is considering opening the entries of default against defendants Dante Barton and Destro Music Productions on Counts I–III (Direct, Contributory, and Vicarious Copyright Infringement) of the Amended Complaint. The entry of default against Barton and Destro is now almost three years old, and this action has been taken *sua sponte* by the Court.

## II.    Questions Presented:

Was there a songwriting agreement between Marino, Barton, and Guice?
   Suggested Answer: Yes.

Did the songwriting agreement between Marino, Barton, and Guice govern the ownership, credit, and compensation that each were supposed to receive?
   Suggested Answer: Yes.

Was the songwriting agreement breached by Barton and Guice to the detriment of Marino?
   Suggested Answer: Yes.

Because the songwriting agreement was breach by Barton and Guice, are Barton and Guice liable for direct copyright infringement?
   Suggested Answer: Yes.

Because Barton and Guice are liable for direct copyright infringement, was it a mistake for the court to dismiss all other defendants from the case?
   Suggested Answer: Yes

Did the Court ignore the fact that there was a songwriting agreement between Marino, Barton, and Guice which was valid and enforceable and predated the creation of Club Girl?
   Suggested Answer: Yes.

Did Marino ever give an implied license for anyone to use his song without him receiving credit and compensation?
   Suggested Answer:

Did Plaintiff adequately plead equitable relief in the Amended Complaint?
   Suggested Answer: Yes.

Does justice dictate Plaintiff must be credited as an author of *Club Girl*/*Bad Girl* when he is not recognized because of a fraudulent copyright registration and his authorship is not in dispute?
   Suggested Answer: Yes.

## III.  FACTS

It must be noted that defendants Barton and Destro (collectively "Barton") had entries of default declared against them because they refused to answer the Amended Complaint. All factual claims in the Amended Complaint are therefore admitted. Furthermore, defendant Barton was subpoenaed for deposition but refused to answer questions, which furthermore militates in favor of construing all facts against him. See Exhibit 33 – Barton Deposition.

### Plaintiff First Writes *Club Girl/Bad Girl*

Plaintiff Dan Marino first conceived of the musical composition that is now known as *Club Girl* in 2001, along with some of the melody and lyrics. See Exhibit 1 – Deposition of Daniel Marino, p.101:18–21. Marino was explicit in his deposition that when he created the song that he did not originally intend for it to be merged with any other musical expression:

Q.    Did you register your own work?

A.    All I know is that when I record[ed] it, when I wrote it, it is my [song].

Q.    Did you ever have an opportunity to look at any copyright registration with respect to *Club Girl*?

A.    Mr. Davis, I think I said it several times. The song that I recorded that I wrote on my own, that I produced and engineered on my own is my song. I didn't feel that I really had to go check on my close friends for anything until after I realized it was stolen from me.

Q.    Let me understand that. Based on your statement, are you forgetting about your testimony that you said Mr. Guice and Mr. Barton contributed to that song, *Club Girl*?

A.    After I wrote it, after I recorded it on my own, they added to it.

Marino Depo, at pp.135–37; see also Exhibit 14 - Amended Complaint, Exhibit I (showing that a Marino-only version of *Club Girl* existed before Guice and Barton added to it). A few days after creating the song, Marino played the song for defendant Dante Barton, who later added drum parts, Marino Depo. at 102:15–103:19, and defendant William Guice, who later added lyrics, id. at 103:20–24. It was at this time that Marino, Barton, and Guice agreed to create a collaborative work named *Club Girl*. Id. at p.104. The Court correctly noted in an earlier opinion that: "Plaintiff created the basic melody, chord progressions, and tempo." Exhibit 11 - SJ Opinion (*Doc. No. 104*), at p.2. Plaintiff's musicologist Alexander Stewart found that:

In assessing Mr. Marino's contribution to Club Girl, it is essential to note that the guitar parts [written by Marino] are by far the most important musical expression. Much of the musical expression including vocals, as discussed in my prior report, is derived from these guitar tracks. Clearly, the lion's share of the credit in the original songwriting team should go to Marino. . . . In this matter, since there appears to have been a deliberate effort to defraud Mr. Marino of *any* share of the songwriting credit, it seems appropriate to award him a more substantial portion of the song, particularly in view of his reported role as its original creator. No guitar part, no "Club Girl"; no "Club Girl," no "Bad Girl."

See Expert Rebuttal Report of Alexander Stewart (emphasis in original).

### Guice, Barton, and Plaintiff Enter into Contract to Split Credit for *Club Girl/Bad Girl* Equally

When collaborating on pieces of music, the trio had previously agreed that they would split the songwriting credit, compensation, and ownership equally—and that Barton and Marino would split the producing credit in half. Marino Depo, pp.137–38. It is undisputed the songwriting agreement predated the creation of Club Girl and that Marino was the author, owner and was to receive one-third compensation:

Q.    [E]xplain to me what you mean when you split it three ways. What does that mean?

A.    One-third each. The songwriting credit, the songwriting, whatever that brings in.

Q.    When you say, what it brings in, what do you mean by that?

A.    Compensation.

Q.    Compensation -- take my example, a dollar comes in. Would you each get?

A.    $0.33 on the songwriting.

Q.    Songwriting. Okay. On the production side, how would that be split, if at all?

A.    $0.50 between myself and Dante.

Exhibit 1 – Marino Depo. at pp.140–41. Any violation of this was a breach of this agreement.

This was, in fact, the songwriting agreement that applied to *Club Girl*, as well as dozens if not hundreds of other songs created by the trio. Id. As a logical part of this songwriting agreement, Marino only agreed to allow his musical composition to be used in the songs *Club Girl* and *Bad Girl* **on the condition** that he actually received the proper 33.33% credit from his collaborators, Guice and Barton. See generally Marino Depo.

There are contemporaneous evidence and **admissions from Guice** in 2004 demonstrating the trio had, in fact, entered into such a contract. In 2004, a local magazine named "Origivation" did an interview with Guice, Barton, and Marino and wrote an article about *Club Girl/Bad Girl*. See Amended Complaint, Exhibit A. In that article Guice represented that *Club Girl* and *Bad Girl* was the collaborative work of Barton, Marino, and himself and that credit for the songs was split equally. The writer of that article, Anthony Caroto, gave an affidavit in 2012 where he made it explicitly clear that when Guice was interviewed for the article that Guice stated that Marino, Barton, and Guice were equally credited for writing *Club Girl/Bad Girl*, and that Marino and Barton alone were the producers. See Affidavit/Declaration of Anthony Caroto (*Doc. No. 30-1*).

### Guice, Barton, and Thomas Van Dell Worked Behind Plaintiff's Back Without His Knowledge to Purposefully Cut Plaintiff Out of the Publishing Contracts and Extinguish His Rights in the Song He Wrote—Unlawfully Taking His Ownership as Their Own

Around the time the trio created *Club Girl* in 2002, Marino, Guice, and Barton grew acquainted with a certain publishing figure, defendant Thomas ("Tommy") van Dell and his company defendant IN2N. Van Dell was intimately aware that Marno, Guice, and Barton collaborated to create *Club Girl*, and that Marino was a driving force in the song's creation. Marino Depo., at pp.501–02. Van Dell and Plaintiff discussed the exploitation of *Club Girl*, and van Dell told Plaintiff that van Dell's company, defendant IN2N, was Plaintiff's publisher. Id. Plaintiff and van Dell agreed that Marino, Guice, and Barton would keep 75% of the song while IN2N, van Dell's company, would keep 25%.[1]

However, what Plaintiff did not know is that while van Dell was duplicitously making these representations to Plaintiff, van Dell was working behind his back orchestrating the signing of

---

[1] Plaintiff had a conversation with van Dell on an airplane back from a songwriting trip to Nashville in 2002 that was sponsored by van Dell. Van Dell was instantly drawn to Club Girl, a song he knew Plaintiff had written. Van Dell told Plaintiff he would give him 50/50 of his song as part of the publisher/songwriter split, but Plaintiff told van Dell that 75/25 was more fair. Marino Depo., at pp.501–02. Van Dell shook his hand. Van Dell double crossed Plaintiff and orchestrated a secret deal with Guice and Barton because they were willing to cut Plaintiff out and take the fifty percent van Dell originally offered. IN2N, van Dell's company, also failed to properly credit Marino on songs van Dell knew Plaintiff wrote. Id. at p.504.

secret publishing agreements with only Guice and Barton. <u>See</u> Exhibit 4 - IN2N Co-Publishing Agreements. In these publishing agreements, Guice and Barton took 100% of the songwriting credit for themselves and cut Plaintiff out entirely. The publishing agreement which Guice and Barton entered into with Van Dell was a 50/50 deal. Guice and Barton retained 50% of the rights in the song, and the publisher received 50%. <u>See</u> Publishing Agreements; <u>see generally</u> Exhibit 5 – Deposition of Thomas van Dell (stating that he did not think Marino was a songwriter, never credited him for writing *Club Girl*, and that Marino was never part of the deal). Marino retained 0%, even though van Dell, Guice, and Barton knew he was the original songwriter and knew that he had entered into a songwriting agreement with Guice and Barton that entitled him to one-third of the ownership of Club Girl. The Amended Complaint states:

> 456. Consistent with their prior and continuing agreement, Marino, Barton, and Guice agreed that they would share equally (a respective 1/3 interest) in the songwriting credits for the song "Club Girl" and "Bad Girl" and in any monies, royalty credits, or any royalties or any credits they received on behalf of the publishing and/or individually for the songs "Club Girl" and "Bad Girl".
> 457. The songwriting agreement was breached and Marino did not receive his respective 1/3 interest in the songwriting credit or the conferred benefits that would naturally flow, monetary and otherwise.

<u>See</u> Amended Complaint. As part of these publishing deals with van Dell and IN2N, Guice and Barton received substantial lump sum advances from IN2N of at least $40,000 *each*. <u>See</u> Publishing Agreements, at ¶4. The advances paid to Guice and Barton were payment for **future royalties of the trio's songs**, including *Club Girl/Bad Girl*. Thus, at least part of the advances paid to Guice and Barton are owed to Plaintiff under the trio's songwriting agreement.

To be clear, the publishing contracts that Guice and Barton dishonestly signed with IN2N assigned the exclusive right to publish Guice, Barton, and Marino's work to IN2N, and also 50% of the royalties. <u>See</u> Exhibit A to Publishing Agreements. **Marino, of course, never agreed to these terms** as this contract was completely concealed from him. Given that the trio had entered into a songwriting agreement which predated the creation of Club Girl, and which applied to Club Girl, at a minimum one-third of the money that Barton, Guice, van Dell, and IN2N obtained from those deals rightfully belongs to Plaintiff.

**<u>Guice, Barton, Van Dell, and Usher Worked Behind Plaintiff's Back and Without His Knowledge Cut Plaintiff Out of the Songwriting and Production Credits for *Bad Girl*</u>**

After deceptively obtaining the rights to *Club Girl* in the publishing agreements, Van Dell then negotiated with Usher's agent, Mark Pitts, to have the song *Club Girl* placed on Usher's upcoming *Confessions* album as the song *Bad Girl*. Van Dell Depo., p.189. Van Dell admits that Marino was entirely cut out of this process. <u>See</u> id. at p.188 (stating that only Guice and Barton, not Marino, retained a combined 75% royalty credit for writing *Bad Girl*).[2] As part of this unscrupulous deal Guice and Barton signed a contract with Usher called the Underworld Agreement ("UW Agreement"), of which the terms were negotiated by van Dell. <u>See</u> Exhibit 6 – Underworld Agreement; Exhibit 5 – van Dell Depo. at p.188 (stating that van Dell had negotiated for Guice and Barton—not Marino—a combined 75% royalty credit for writing *Bad Girl*).

This UW Agreement shows just how underhanded Guice, Barton, and van Dell behaved toward Plaintiff. There are two key points: **First**, the UW Agreement explicitly identifies that Guice and Barton each retain 37.5% of the songwriting credit for *Bad Girl*:

---

(b)  You and Producer hereby acknowledge that Producer controls the following percentages in and to the underlying composition (exclusive of any conveyance of copyright in connection with any Samples) embodied in the Masters as follows:

| Composition | Writer | Percentage |
|---|---|---|
| "Bad Girl" | Dante Barton | 37.5% |
| "Bad Girl" | Will Guice | 37.5% |

---

<u>See</u> UW Agreement at p.7. Patently, on the face of this contract negotiated by van Dell, it is explicit that Marino has been totally excluded from this agreement—Marino's name appears nowhere in this document. Instead, Dante Barton and Wil Guice are the only listed songwriters, something

---

[2] Given that the Court acknowledges, as it must, that plaintiff Daniel Marino wrote *Club Girl* and *Bad Girl*, and given that all defendants admit he was not credited, it is beyond plaintiff's understanding how the Court could have entirely dismissed all defendants but Guice, Barton, and Destro from the suit. Very clearly, even if no infringement occurred, Daniel Marino is entitled to relief from breach of contract and for the equitable relief pled in the Amended Complaint for a determination of ownership, accounting, constructive trust, and—at the very least—a correction of the fraudulently registered copyrights.

van Dell and Barton knew was incorrect and illegally excluded Marino. Given that Marino, Guice, and Barton's songwriting agreement specified that each individual would retain one-third credit, compensation, and ownership of *Club Girl*, this UW Agreement illegally apportions Plaintiff's credit to Guice and Barton. No one showed this contract to Plaintiff, no one told Plaintiff about this contract, and Plaintiff never had any idea that defendants van Dell, Barton, and Guice negotiated Plaintiff out of receiving any compensation for his own song. Simple math dictates, given that Marino, Guice, and Barton were each supposed to get 33.33% credit of whatever the trio created, that Guice, Barton, and van Dell obviously knew that Guice and Barton were taking Marino's credit for writing *Bad Girl* as only 25% remained to be distributed. Of course, this remaining 25% was split between the Usher defendants, not Plaintiff. Yet, Mr. Guice unbelievably stated in his deposition that he thought the 37.5% he got "was fair" and that he had no idea Marino did not get credited or compensated pursuant to the songwriting agreement. Guice Depo II, at 135:21. Defendant van Dell implausibly and dishonestly claims complete ignorance of Plaintiff's extensive writing, production, and recording of *Club Girl/Bad Girl*. [3] See generally Exhibit 5 –van Dell Depo. (stating that he did not think Marino was a songwriter, never credited him for writing *Club Girl*, and that Marino was never part of the deal).

**Second**, the Underworld Agreement is principally a production agreement, and in it Usher engages Barton and Guice to produce *Bad Girl*.[4] Guice is explicitly identified as a "Co-Producer." See UW Agreement ¶1(a). However, **Guice, by his own admission, never did any production with Plaintiff or Barton** and did not produce *Club Girl* or *Bad Girl*. Guice Depo. II, p.75. Van Dell, due to his extensive involvement in this matter, would have known this. Mr. Guice has explicitly testified that Marino and Barton "did the production, they did the music, they created music, created beats, created tracks" in the trio's collaborations. Guice Depo. II, p.52. Mr. Marino has testified that any production was supposed to be split between himself and Barton, Marino Depo.

---

[3] Although the Court apparently believes that the Usher "Defendants paid all writing and producing royalties to "Destro Music c/o Dante Barton," this is incorrect. Usher Def. SJ Opinion, at p.4. Destro Mustic never received songwriting royalties, only production revenue. See generally UW Agreement.

[4] The UW Agreement was actually signed in early 2004, *after* all production on *Bad Girl* had finished and the song was completed, so the contract's language is retrospective. It should be noted that all copyrights for Club Girl and Bad Girl were registered after the sale and release of the songs to the public.

at 137–38, and Barton has admitted that Marino coproduced *Bad Girl* and *Club Girl*. Exhibit 12 – Barton Note to Marino – Oct. 2007 (signed note from Dante Barton stating that Plaintiff coauthored and coproduced *Club Girl* and *Bad Girl*). Anthony Caroto has confirmed that Guice himself in 2004 acknowledged that Marino and Barton produced all of the trio's songs, including Bad Girl. See Caroto Affidavit (*Doc. No. 30-1*). Yet, despite Guice and Barton's public statements in 2004, Guice and Barton, behind Plaintiff's back and without his knowledge, had already breached their songwriting agreement with him and entered into publishing agreements with van Dell and a production agreement with Usher—negotiated in large part by van Dell—that improperly gave Plaintiff's production credit to Guice.

In light of this evidence, it is simply dishonest for van Dell to maintain that he had no idea Plaintiff was a central creator of *Club Girl/Bad Girl*. Barton and Guice obviously did not write *Club Girl/Bad Girl* by themselves as neither of them could play the guitar, the primary and driving instrument in the song, nor did Guice have any role producing it. Guice taking credit for producing *Bad Girl* without objection from van Dell is even more troubling given the fact that Marino, over the course of six phone calls with Usher and his people, actually did the production of *Bad Girl*. Marino Depo., at 346–51 (describing how Plaintiff worked extensively with defendants to produce and revise *Bad Girl*). Given that van Dell frequently interacted with Barton and Marino, including coming to the studio to work them and flying them to Nashville—and was keenly interested in the progress of their songs—it is implausible he did not have know it was Marino who actually produced the song.

### Defendants Purposefully Breached their Songwriting Agreement and Deceived Plaintiff, Extinguishing All His Rights and Ownership—Taking Them for Their Own—and Concealed, Lied, and Covered up This Fact until 2009

During this time period in 2002–2004, Plaintiff believed that he was part of this publishing deal due to his songwriting agreement with Barton and Guice and the representations of van Dell, Guice, and Barton—and also that he was being credited for authorship and ownership in the song. See generally Marino Depo. To that end, Plaintiff helped Usher, Pitts, and Lewis engineer and produce the song *Bad Girl* and all defendants knew, or should have known, with certainty that defendant Marino was the original author of *Club Girl* and *Bad Girl* given his extensive participation in crafting the final product. For instance, Plaintiff participated in at least six phone

calls between defendants Pitts, Lewis, and Usher regarding the production of *Bad Girl*, and all defendants were explicitly aware that Marino had written the guitar music that drove the track. Marino Depo., at pp.346–51 (stating that defendant Lewis told Plaintiff, "Dan, that guitar [in *Club Girl* and *Bad Girl*] is f***ing hot"); see also Exhibit 2 - Marino Affidavit, ¶6.

In addition, the sound recording of *Club Girl*, which Plaintiff played guitar on, produced, and engineered, is exactly copied in *Bad Girl*, which Plaintiff produced, and engineered. See Deposition of Plaintiff's Engineering and Production Expert Brian Bricklin, at pp.296–301 (stating that *Bad Girl* and *Club Girl* use the "same exact sound recordings"). Plaintiff owns fifty-perfect of the interest in the sound recording of *Club Girl*, all of which is used in *Bad Girl*. Plaintiff did this work, and allowed Defendants, including Guice, to work with his musical composition only because it was understood he was to be credited—as it was undisputed that it is his song. See generally Marino Depo. This was clearly a reasonable expectation, as everyone else who worked on the songs received more than their fair share of credit. However, when *Confessions* was released, Plaintiff was **only** credited as playing guitar. Marino Depo., p.441: 11–16; see Exhibit 10 – *Confessions* Liner Notes.

Plaintiff asked defendants Barton, Guice, van Dell, and Bobby Ross Avila about his writing credit[5] and was repeatedly told by Barton and van Dell that it was a mistake and it was being fixed; Bobby Avila assured him it would get worked out. Id. at 225, 232:3–7, 234:9–13, 237; 374–84; 403–04; Marino Affidavit, ¶6. In addition, Mr. Marino consulted an attorney who drafted a letter to Usher and his people notifying them of the problem; that lawyer testified that he believed the letter had been sent. Exhibit 8 – Deposition of Simon Rosen, at p.34:10–16[6]; Exhibit 9 – Simon Rosen Draft Letter. Defendant Guice specifically admits that Marino approached him after *Confessions* was released because Marino was confused about not receiving writing credit on the song. Guice Depo. II, p.37:7–11. Defendant Guice also saw that Marino was not credited as a writer on the

---

[5]  The Court found that Plaintiff only confronted defendant Barton about the incorrect credits. SJ Opinion (*Doc. No. 154*), p.3–4. Plaintiff clearly stated in his deposition and Affidavit that many other defendants were confronted, Marino Depo, at pp.232:3–7, 234:9–13, 237; Marino Affidavit, ¶¶4–7, and defendant Guice specifically admitted Marino approached him about the matter. Guice Depo II, p.37:7–11. The Court had a duty to construe all disputes of fact in favor of Plaintiff and failed to do so.

[6]  Notably, the letter, dated October 5, 2004, shows that Marino believed at that time that IN2N was his publisher.

album's liner notes. See *Confessions* Liner Notes; Guice Depo. II, at pp.33–35, 56:20–25. **Guice obviously knew why Marino was not credited as a writer given that Guice had helped cut Plaintiff out, but Guice indisputably never said a word to inform Plaintiff that Guice and Barton had breached their songwriting agreement with Plaintiff.**

Plaintiff's concerns about the credits were assuaged at the time in 2004, and he did not retain the attorney or further investigate the matter, because van Dell—whom Plaintiff believed to be his publisher—and his business partner, Dante Barton, told him there was a problem with the credit splits for **all the authors** and that Marino's incorrect credits on the liner notes were being rectified. Marino Depo., at p.374–84; Marino Affidavit, at ¶4. In February 2005, nearly a full year after *Confessions* was released, he spoke with defendants Bobby Ross Avila at the Grammy Awards. Marino Depo., at 374; Marino Affidavit, at ¶4. Again, Marino was assured by defendants that he was working with "good people" and that it would get worked out. Marino Depo., at 374; Marino Affidavit, ¶6. Marino told friends during this time period between 2004 and 2009 that "no one had been paid yet for *Club Girl* because there were administrative problems in fixing credits and royalty things and that Barton was fixing it." See Affidavit of Adam Cordes.

In fact, the actual credit splits for *Bad Girl* **were** still being determined as late as November 2005, which was roughly 1 year 8 months after the song was released. We know this because Barton showed Plaintiff a letter from attorney Wallace Collins in November 22, 2005—approaching two years after the release of *Bad Girl*—proving that money for the song was "tied up" and not moving. Marino Depo., at p.383; Marino Affidavit, ¶7; Amended Complaint, at ¶391; Exhibit 13 - Collins Nov. 2005 Invoice. The letter was an invoice for legal services Collins had provided and stated that the bill was

> "in connection with extensive, ongoing negotiation with IN2N and HoriPRO's legal counsel, and with RCA/BMG business affairs department (and accounting personnel), and preparation and reivsions [sic] to letter of direction for release of mechanical royalties on Usher's recording of "*Bad Girl*"; correspondence, discussion and miscellaneous disbursements related thereto."

Collins Nov. 2005 Invoice. Plaintiff, believing that Collins was his attorney[7] and that IN2N was his publisher, relied on Barton's representations and the content of the letter which stated that

---

[7]  Marino Depo., at p.473.

negotiations on the royalties continued until at least early 2006. Around this time, Plaintiff did receive a check for $4,553.06 that defendant Barton maintained was part of their overdue songwriting (mechanical) royalties—leading Plaintiff to believe that he was a recognized songwriter. Marino Depo., at p.477–80.[8] Barton told Plaintiff when giving him the check, "we got paid, here is your cut." Id. at 478. Plaintiff took Barton's representation at face value that these were royalties for *Club Girl*/*Bad Girl* as he had no reason to dispute it—however, this was just part of the cover up and lulled Marino into a false sense of security.[9]

In June 2006, Plaintiff was again told by Barton that negotiations were ongoing. Marino Affidavit, ¶7.  Barton even went so far as to reassure plaintiff by signing and endorsing a statement in October 2007 declaring "Daniel Marino co-authored, co-produced & co-owens [sic] '*Club Girl & Bad Girl*.'" Barton Note to Marino – Oct. 2007; Marino Depo., pp.492–93 (recounting Barton saying "yeah, sure, it is your song, and he signed it for me").

Up until Barton disappeared in 2009, Plaintiff was told repeatedly by Barton that the splits were being worked out by lawyers and that the money was in trust. Marino Affidavit, ¶7; Amended Complaint, ¶391.  Marino chose not to proceed with legal action before 2009 because Barton, his best friend and business partner, assured him everything was being worked out, as did the man he believed was his publisher, Tommy van Dell. Relying on the continued assurances of Barton and van Dell was objectively reasonable. At no point during this time did William Guice

---

[8] The Court found that Plaintiff received royalties for his work as a musician on *Bad Girl*. SJ Opinion, p.4. There seems to be a misunderstanding on the Court's part because musicians, unless also a songwriter, do not receive royalties. Thus, when Barton gave money to Marino, and Marino understood the money to be mechanical royalties, Marino Depo., p.270–72, those royalties could only have been for being a songwriter as mechanical royalties are only given for being a songwriter.

[9] The Court found that: "Once the UW Agreement was executed, Barton, Guice, and Plaintiff each received a lump sum payment." SJ Opinion, p.3. The record is undisputed that only Barton and Guice received an advance once the UW Agreement was executed in 2004. The Court fails to offer a citation to the record for its assertion. Moreover, the lump sums paid to Barton and Guice were advance payments for future royalties. Given that Plaintiff was not given any credit or royalties on *Bad Girl*, it would be impossible for him to have received such a lump sum from the Usher Defendants. Contrary to the Court's unsupported assertion in its fee opinion (*Doc. No. 195*) that Plaintiff "concedes" the $4,000 payment from Barton was a "lump sum payment," Plaintiff has done no such thing and notes that the Court's construing Plaintiff's argument as a "concession" is totally unwarranted. Plaintiff must point out that Guice and Barton each received hundreds of thousands of dollars, while Plaintiff has received nothing. It was an abuse of discretion and reversible error for the Court to find as it did, and shows a lack of familiarity with the most basic facts of this case.

ever try to contact Plaintiff and correct the record, despite knowing that Plaintiff had improperly not been credited. In fact, Guice vanished after getting paid hundreds of thousands of dollars on the song.

### Van Dell, IN2N, Barton and Guice Illegally Misregistered the Copyrights for *Club Girl/Bad Girl* without Plaintiff's Name

After the *Confessions* album was released in 2005—and while reassuring Plaintiff about the credit issue—defendant van Dell, Guice, and Barton engaged in blatantly illegal conduct behind Plaintiff's back. Despite van Dell acknowledging to Plaintiff that the writing credits were wrong, and assuring Plaintiff that the writing credits were being fixed (Marino Depo. at pp.403–05; Marino Affidavit, ¶4) van Dell's company, defendant IN2N, fraudulently and illegally misregistered the copyright for *Club Girl* and *Bad Girl* in 2004, falsely representing to the Copyright Office that only Guice and Barton had written *Club Girl*.[10] See Copyright Registrations for *Club Girl*, *Bad Girl*. It should be noted that under the Copyright Act, such an act is subject to criminal penalties. See 17 U.S.C § 506(e). Later, *Bad Girl* was similarly misregistered by IN2N, see Copyright Registrations for *Club Girl*, *Bad Girl*, although it took years following the release of *Confessions* to figure out the appropriate credit splits. Marino Affidavit, ¶7; Collins November 2005 Invoice.[11]

It is important to view these illegal registrations alongside Guice and Barton breaching their songwriting agreement with Plaintiff and signing the secret publishing deals with van Dell and IN2N, and their later UW Agreement with Usher; van Dell, IN2N, Guice, and Barton claimed more credit than they were due under the trio's songwriting agreement. This illegal and fraudulent registration shows that all defendants at all points intended to completely divest Daniel Marino of

---

[10] The Court found that defendant Barton registered the *Club Girl* copyright. SJ Opinion, at p.2. It is undisputed that IN2N, Tommy van Dell's company, actually registered the copyright. See Copyright Registration for *Club Girl*, *Bad Girl*. For the Court to essentially create this "fact" out of thin air is manifestly reversible error, as was the finding that defendants van Dell and IN2N did nothing wrong. However, it should be noted that it is obvious that Barton and Guice knew that van Dell and IN2N were excluding Plaintiff.

[11] The Court found that Usher and IN2N "acted properly in obtaining authorization to copy the song from Barton and Guice—the only individuals listed on the copyright as authors—and in acting within the scope of that license." See Doc. No. 154, at p.14. The Court appears not to understand that the UW Agreement purportedly authorizing Usher to use the song was negotiated and signed many months before any copyright registration for *Club Girl* or *Bad Girl* was ever filed.

any claim in his own work by working behind his back without his knowledge and take the credit and money for themselves.

The record is thus explicitly clear that Barton, Guice, van Dell, IN2N, and Usher defendants were all fully aware of Marino's role in writing *Club Girl* and *Bad Girl* and, in concert, deliberately robbed Marino of credit and payment by filing a false copyright registration and signing void contracts.

### Plaintiff Only Became Aware of Defendants' Betrayal In 2009 and Only Realized that Guice was Fully Engaged in the Fraudulent Scheme to Deprive Plaintiff of His Rights Until the Usher Defendants Provided Plaintiff with the UW Agreement in 2012

In the summer or fall of 2009, Dante Barton abruptly stopped communicating with Plaintiff and vanished from their studio. Plaintiff was perplexed by Barton's behavior until in November 2009 he accidentally discovered financial documentation showing that Barton, and Guice, had received huge sums of money for the exploitation of *Bad Girl*. See generally Marino Depo. at pp.61, 237; see also Amended Complaint at ¶¶401–06. Up until this point, Plaintiff had assumed, as had been represented to him, that the money was being kept in escrow by the Usher and Sony defendants and would be distributed when appropriate. See Amended Complaint, at ¶400. Plaintiff, it should be noted, was young and incredibly unsophisticated at this time concerning the business side of the music industry and relied on Barton to conduct most of the business concerning the Trio's exploitation of songs. Plaintiff had not even contemplated until 2009 that Guice, Barton, or van Dell would have any role in breaching the songwriting agreement and betraying him.

Plaintiff spoke to his friends in late 2009 about this discovery, who all confirmed that Marino was shocked and utterly dumbfounded by Barton, van Dell, and Guice's betrayal of Marino. See Affidavit of Paul Coppola; Affidavit of Michael Domizio; Affidavit of Chris Burkett; Affidavit of Adam Cordes.

### Guice, Barton, van Dell, and IN2N Made over a Quarter of a Million Dollars Each Off of *Bad Girl*, While Plaintiff was Given Nothing[12]

When questioned on how much compensation Guice received from the exploitation of *Club Girl/Bad Girl* Guice claims that he only received "five figures." See Exhibit 28 – Transcript of 1/6/14 Hearing, at p.57. This number is impossibly low and cannot be correct; **Guice lied on the stand**. According to defendant IN2N's own records, defendant Guice and Barton each received $112,196.11 through 2006 in songwriting royalties. See Exhibit 31 – IN2N Disco. at p.2, 3. Van Dell and IN2N, pursuant to the publishing agreements, received twice this, $224,392.22. Wil Guice received a roughly $70,000 advance, and Dante Barton received a roughly $50,000 advance. Id. According to Plaintiff's expert Michael Einhorn, Guice, Barton, van Dell, and IN2N received hundreds of thousands of dollars from 2004 to 2013, including songwriting and production:

- **Songwriting Royalties**: Guice, Barton, IN2N (van Dell) received domestic songwriting royalties from 2004 to 2013 in the amount of $676,740. See Exhibit 22 - Einhorn Report, at p.24.  Guice and Barton collectively took received $338,370 ($169,185 each). Id. If Marino, Barton, and Guice were each to be credited according to their songwriting and publishing agreements they should have received a 1/3 share equaling $112,790 each.

- **Production Royalties**: In addition, Guice received $54,955 as a producer since 2004. See id., at p.12 (stating that Guice and Barton combined earned $109,910 in production royalties). Since Guice did no production work and it was understood that Marino and Barton were splitting the production credit, all of the $54,955 Guice received rightfully belongs to Plaintiff.

### Barton has Refused to Defend Himself in this Case and Default was Entered Against Him as He Failed to File an Answer or Participate in Discovery

---

[12] Although this Court ruled earlier in the case the Plaintiff's copyright damages were limited to the three years before his filing, no such limit on damages applies to Plaintiff's breach of contract claims.

Barton, despite being validly served and notified of the allegations against him in this case, has refused to defend himself. The allegations in the complaint should be construed against him. Barton even showed up a deposition, but after just a minute or two claimed he needed counsel and left. See Exhibit 33. He refused to reschedule. Barton, quite simply, has refused to defend himself in this case because there is no defense to the conspiracy that he engaged in with Mr. Guice, Mr. van Dell, and Usher.

## IV.   THE DEFAULT SHOULD NOT BE OPENED

Although a court may *sua sponte* set aside an entry of default, there are certain factors the court must weigh before doing so. The Third Circuit states that

> In exercising its discretion to set aside a default, a district court **must** consider (1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense, that is, whether the defendant's allegations, if established at trial, would constitute a complete defense to the action; and (3) whether the default was the result of the defendant's culpable conduct.

Dambach v. United States, 211 Fed. Appx. 105, 109 (3d Cir. 2006) (emphasis added).

It would be an abuse of discretion for this Court to *sua sponte* set aside this default as there is no good cause. **First of all**, Plaintiff will be severely prejudiced by such an action by the Court. Plaintiff, despite this Court's view to the contrary, has valid copyright infringement claims, especially against Dante Barton as is explained *infra*. Plaintiff, despite this Court's view to the contrary, pled equitable copyright ownership claims against Dante Barton and all other Defendants. Opening the default on Mr. Barton, after years of litigation, will result in severe prejudice to Plaintiff's rights. **Second**, defendant Dante Barton has no meritorious defense to the Copyright Act claims against him, equitable or otherwise for the reasons described infra.

**Third**, the default was 100% the result of defendant Barton's culpable conduct. Barton was served with the lawsuit and has at all points known about the allegations against him. Yet, he categorically refused to defend himself. When he was called in for a deposition in May 2013, he refused to answer any questions, left the deposition claiming he needed counsel, and never rescheduled even though attempts were made with his lawyer. Exhibit 33. As this Court has observed, defendant Barton played a key role in harming Plaintiff and his culpability and bad faith

is not seriously in doubt. The entry of the default against Barton was manifestly because of his bad faith and it would be an abuse of discretion for the Court to open the default at this time.

At a minimum, before the Court opens such a default, the Court should order that Barton be deposed. He has valuable information concerning this case that will help prove the legitimacy and validity of Plaintiff's claims, and seriously call into the question the credibility of certain Defendants. It would be prejudicial to dismiss defendant Barton without a deposition because, as a default had been entered against him before May 2013, Plaintiff did not seek to compel the deposition nor seek sanctions against him for failure to reappear as all allegations were admitted against him. If the Court is going to open the default, his deposition should be taken so as to avoid prejudice to Plaintiff.

*****

## V.   Legal Standard for Summary Judgment

Under Rule 56(f) summary judgment may be granted for a party, "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There must be an absence of any genuine issue of material fact. See Celotex, 477 U.S. at 323. An issue is material only if it could affect the result of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The facts must be viewed "in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). Summary judgment is only appropriate if the party in entitled to judgment as a matter of law. See Celotex, 477 U.S. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

*****

## VI.  Argument

### a.  Defendant Barton Deliberately and Deceptively Breached his Songwriting Agreement with Plaintiff and Behaved in An Unethical and Illegal Manner Throughout the Events in This Lawsuit

As the Court noted, defendant Barton clearly wronged Plaintiff. See (*Doc. No. 154*, p.14). Marino, Barton, and Guice had a songwriting agreement for the credit, compensation, and ownership stakes in *Club Girl*, which Barton and Guice breached. They did so in conjunction with all other named defendants in this lawsuit. Barton's underhanded actions include:

- Despite having a songwriting agreement with Marino for Club Girl—and despite knowing that Marino wrote, recorded, produced, and engineered Club Girl/Bad Girl—Barton, along with Guice, deliberately breached the songwriting agreement and signed publishing contracts with defendant van Dell behind Plaintiff's back and without his knowledge. In these contracts, Barton and Guice divvied up Plaintiff's songwriting credit for *Club Girl/Bad Girl* with van Dell and IN2N—completely extinguishing Plaintiff's authorship and ownership rights.

- Van Dell and Barton negotiated a 75% songwriting share in *Bad Girl* for only Guice and Barton, completely cutting Plaintiff out, despite both knowing Plaintiff was the song's main author and that Barton and Guice were deliberately breaching the songwriting agreement. Barton and van Dell also helped negotiate a producing credit for Guice, even though Guice is not a producer, and even though everyone involved with the song knew Marino had produced it. Barton especially knew giving Guice production credit was absurd, as he had produced the song hand in hand with Marino.

- Van Dell, IN2N, Barton, Guice, and Usher defendants illegally and fraudulently misregistered copyrights for *Club Girl/Bad Girl* at the Copyright Office, purposefully excluding Plaintiff's name, despite knowing that Plaintiff was the main author. Barton had to have been aware of, and complicit, in this illegal act as him

and Guice were clearly and deliberately breaching their songwriting agreement with Plaintiff.

### b. Defendant Barton is Liable for Copyright Infringement

#### i. Barton is Liable for Direct Copyright Infringement

Marino, Barton, and Guice has a valid songwriting agreement which was valid and its existence predated the creation of *Club Girl*.

Direct copyright infringement occurs when a person violates one of a Plaintiff's exclusive rights in the Plaintiff's work without authorization. Parker v. Google, 242 Fed. Appx. 833, 836 (3d Cir. 2007) (not precedential). Section 106 of the Copyright Act gives an author of a work the exclusive right to reproduce the work, prepare derivative works, distribute copies, and perform the work publicly. See 17 USC § 106.

Here, defendant Barton had entered into a songwriting agreement with Plaintiff and Guice where each was to retain one-third ownership, authorship, and compensation on each song they created.[13] This agreement predated the creation of Club Girl. However, Barton and Guice breached the songwriting agreement by illegally signing publishing contracts which effectively gave them Plaintiff's ownership rights in *Club Girl*. Barton then negotiated with van Dell and Usher, and illegally "authorized"—without any authorization from Plaintiff—van Dell and Usher to use Plaintiff's share of *Club Girl*, which resulted in the unauthorized reproduction, distribution, and derivative use of *Club Girl* in *Bad Girl* by all Defendants, including Barton.

#### ii. Barton is Liable for Contributory Copyright Infringement

Marino, Barton, and Guice has a valid songwriting agreement which was valid and its existence predated the creation of *Club Girl*.

Contributory copyright infringement is a form of secondary copyright infringement that requires "(1) **direct copyright infringement** of a third-party; (2) knowledge by the defendant that the third-party was directly infringing; and (3) material contribution to the infringement." Parker, 242 Fed. Appx. at 836.

---

[13] This one‑third interest created by the songwriting agreement was necessarily divisible, as opposed to the indivisible ownership shared by coauthors of a "joint work" created by the Copyright Act's ownership rules.

Here, there was direct copyright infringement by all other Defendants—as explained *infra*, Barton and Guice breached the songwriting agreement, did not have Marino's permission to use Marino's share of *Club Girl*, and Guice and Barton did not have the ability to transfer a license permitting the use of Marino's work. In addition, defendant Barton was manifestly aware—having been a primary orchestrator breaching the songwriting agreement and of cutting Plaintiff out of receiving any compensation and credit for the deal to use *Club Girl* in *Bad Girl*—that Plaintiff's work was being infringed. Lastly, by negotiating deals with van Dell, Guice, and Usher to exploit Plaintiff's protected expression, and helping to fraudulently misregister the relevant copyrights, defendant Barton materially contributed to the infringement.

### iii.   Barton is Liable for Vicarious Copyright Infringement

Marino, Barton, and Guice has a valid songwriting agreement which was valid and its existence predated the creation of *Club Girl*.

Vicarious copyright infringement is a form of secondary copyright infringement and occurs when the defendant "has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." Parker, 242 Fed. Appx. at 836 (quotation marks omitted).

Again, Barton deliberately breached his songwriting agreement with Plaintiff. He illegally took ownership and compensation of and for Plaintiff's copyrights, and negotiated with defendant van Dell several deals to exploit *Club Girl/Bad Girl* behind Plaintiff's back without Plaintiff's knowledge or permission. Barton had the right and ability to supervise the ongoing infringement, failed to stop the ongoing infringement, and had a direct financial interest in the infringement of Plaintiff's work.

### iv.   Plaintiff Never Gave an Implied License for the Use of His Work without Him Receiving All Due Credit and Compensation

Plaintiff did not authorize the use of *Club Girl/Bad Girl* because the use of his song by Barton—under the songwriting agreement—was explicitly conditioned on Marino being properly credited and compensated. All other Defendants knew Marino was authorizing the use of his work based on the expectation that he, like everyone else involved, would be credited and compensated. Defendants van Dell, Guice, and Barton each made hundreds of thousands of dollar from the

exploitation of this song, while Marino has received next to nothing. This Court previously found that Plaintiff gave defendants an implied license to use his work by working with Defendants to produce *Bad Girl*. SJ Opinion (*Doc. No. 154*), at p.11. But no implied license exists if Plaintiff is not fully compensated or credited for the use of his work.[14] If someone takes the property of another on the expectation of payment, but then does not pay for it, it is theft—not permission.

It is difficult to understand how the Court found that Plaintiff granted an implied license to Defendants when he ***was never appropriately credited and paid***, unlike everyone else involved. The conclusion of the Court defies logic and essentially authorizes the nonpayment of artists for their work. If there is no credit or payment—and Barton, Guice, van Dell, and Usher cut Plaintiff deliberately and illegally out of the publishing contracts, writer splits on *Bad Girl*, and the copyright registration—**there is no authorization**. Thus, Barton and all Defendants had no permission from Marino to use his work. Marino was explicitly clear in his contact with the parties, in the pleadings, and in his deposition that his song *Club Girl/Bad Girl* could only be used if credited and compensated—which he was not.

---

[14] In almost every single case the Court cites for the proposition that Plaintiff granted an implied license to Defendants, the person who granted an implied license was actually paid for his work. See MacLean Assoc., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc., 952 F.2d 769, 778-79 (3d Cir. 1991) (plaintiff gave implied license because he distributed his work to the defendants in return for payment); Nat'l Ass'n for Stock Car Auto Racing, Inc. v. Scharle, 184 F. App'x 270, 275 (3d Cir. 2006) (plaintiff gave implied license to his work because he was paid for his work and continued to create the work after being told he would not be credited); I.A.E., Inc. v. Shaver, 74 F.3d 768, 776 (7th Cir. 1996) (plaintiff gave implied license because he received compensation for his architectural drawings); see also Effects Associates, Inc. v. Cohen, 908 F.2d 555 (9th Cir. 1990) (widely cited case—plaintiff gave an implied license because he received fair compensation of over $50,000 for the work he gave defendants). The one exception is Lowe v. Loud Records, No. 01-1797, 2003 WL 22799698 (E.D. Pa. Nov. 20, 2003), where the plaintiff was not paid but only because the Plaintiff in that action stated explicitly that he had created the work voluntarily ***and that he expected nothing in return his work***. Id. In this case, there is copious evidence that Daniel Marino expected payment and credit from the very beginning, that it was the understanding of all parties that each individual was to be paid and credited, and furthermore that all writers and producers were actually credited and paid for their work except Marino.

> **v. There was a Songwriting Agreement between Marino, Barton, and Guice which was Valid and Predated the Creation of *Club Girl*— Therefore Joint Authorship Does Not Apply and Guice and Barton Could Not Grant a Valid Nonexclusive License to the Other Defendants to Use Marino's share of *Club Girl* in *Bad Girl***

In the absence of a songwriting agreement courts have construed collaborators as joint authors. This is not the case here as there was a songwriting agreement that was valid, existing, and predated the creation of the song *Club Girl*. This fact is undisputed. It created separate one-third ownership interests in *Club Girl* for Marino, Barton and Guice. This Court, however, has held that *Club Girl* is a joint work and that Barton and Guice granted a nonexclusive license to the other Defendants rendering any claims of copyright infringement against any Defendant impossible. For the Court to ignore the existence of songwriting agreement, which is a controlling and determinative fact that vitiates the Court's conclusion Barton and Guice could authorize the use of Plaintiff's share of *Club Girl*, is an abuse of discretion that requires reversals. It was clear legal error to find that a joint authorship existed.

**Legal Standard**

The Copyright Act defines a joint work as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. Joint authors are "co-owners" and share equal, undivided ownership in the work, and may license its use without restriction. 17 U.S.C. § 201(b); Childress v. Taylor, 945 F. 2d 500, 508–09 (2d Cir. 1991). However, the Copyright Act ownership rules are gap-fillers, and only apply when the parties have not already determined the work's ownership:

> The rules assigning ownership are only gap-filling rules. The parties can and should agree among themselves as to who will own the copyright. A party hiring an independent contractor can secure an assignment of the copyright in the contract. An employer can agree that an employee will own the copyright to works she creates. Joint authors can agree that the copyright in the work will belong to a single author or to a third party (such as a corporation formed by the joint authors). So the ownership assignment rules come into play only if the parties have not effectively addressed the issue.

Stephen M. McJohn, "Copyright: Examples & Explanations," Aspen Publishers (2006). The Third Circuit has recognized ownership of a copyrighted work may be contractually determined

by the parties. <u>Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.</u>, 797 F.2d 1222, 1228 (3d Cir. 1986) (stating "the contract between the parties . . . made clear that [the plaintiff] would retain full ownership over" the work). Other Courts of Appeal, such as the Second, have recognized that contracts alter the Copyright Act's ownership rules:

> That equal sharing of rights should be reserved for relationships in which all participants fully intend to be joint authors. The sharing of benefits in other relationships involving assistance in the creation of a copyrightable work can be more precisely calibrated by the participants in their contract negotiations regarding division of royalties or assignment of shares of ownership of the copyright, see 17 U.S.C. § 201(d).

<u>See</u> <u>Childress</u>, 045 F. 2d at 509. Indeed, the notion that contracts can determine ownership rights, instead of the Copyright Act, is not in dispute.

Courts in the Eastern district have noted that if a prior contract exists governing the ownership stakes of the work in question, as it does in this case, **there is no joint authorship.** <u>See</u> <u>IMS Health, Inc. v. Vality Tech., Inc.</u>, 2000 U.S. Dist. LEXIS 8635 (E.D. Pa. June 22, 2000) (stating that the existence of a prior contact would nullify any claim of joint authorship, and that there was a triable issue of fact as to whether ownership in the work was created by contract or joint authorship). In other words, ownership of a song governed by contract cannot be characterized as a joint work under copyright law.[15]

---

[15] It must be noted that for a joint authorship to exist, the works be intended to be merged **at the time a plaintiff is actually creating the work.** <u>See</u> <u>Shapiro Berstein v. Vogel</u>, 161 F.2nd 406 (1947); <u>Brownstein v. Lindsay</u>, 742 F.3d 55, 68–69 (3d Cir. 2014) (explaining a joint work exists only "if Person A writes lyrics to a song and intends for a composer to write the score, Person B who writes the score becomes a co-author in the work"). If a work is independently composed and copyrightable, but then later merged with another author's work into a single work, the resulting product is not a joint work, but a "composite" or collective work. <u>Edward B. Marks Music Corp. v. Jerry Vogel Music Co.</u>, 140 F. 2d 266, 267 (2d Cir. 1944); 17 U.S.C. §§ 101, 304 (recognizing composite and collective works other than joint works); <u>see also</u> <u>Thomson v. Larson</u>, 147 F.3d 195 (2d Cir. 1998). A joint work is distinguished from a composite work by the degree of ownership each author retains; specifically, coauthors of joint works are entitled to undivided ownership in the entire work and can authorize the use of their work, <u>Brownstein</u>, 742 F.3d at 64, while the owners of a collective work simply own only their distinctive parts of the copyright and cannot authorize the use of the whole work. 17 U.S.C. § 201.

**Application – There was a Valid, Preexisting Songwriting Agreement for *Club Girl* which Establishes the Ownership, Authorship, and Compensation Rights for the Song; the Song is Not a Joint Work under the Copyright Act because of Songwriting Agreement which Governed and Controlled**

The agreement of Marino, Barton, and Guice either controls or it does not; the Court must enforce the valid songwriting agreement. Here, it has been established, without dispute, that Plaintiff, Guice, and Barton entered into a songwriting agreement that governed *Club Girl*. When collaborating on pieces of music, the trio had previously agreed to split credit and compensation for any songs created by the trio three ways, with a separate one-third share for each—and that Barton and Marino would split the producing credit in half. Marino Depo, pp.137–38. Marino clearly explained the deal:

> Q.   [E]xplain to me what you mean when you split it three ways. What does that mean?
>
> A.   **One-third each. The songwriting credit,** the songwriting, whatever that brings in.
>
> Q.   When you say, what it brings in, what do you mean by that?
>
> A.   Compensation.
>
> Q.   Compensation -- take my example, a dollar comes in. Would you each get?
>
> A.   $0.33 on the songwriting.
>
> Q.   Songwriting. Okay. On the production side, how would that be split, if at all?
>
> A.   $0.50 between myself and Dante.

Exhibit 1 – Marino Depo. at pp.140–41 (emphasis added). This agreement was entered into before *Club Girl* was made.

Thus, by law, *Club Girl*'s ownership stakes are indisputably governed by the songwriting agreement between Plaintiff, Barton, and Guice, not the Copyright Act. The songwriting agreement indisputably demonstrates that Plaintiff, Guice, and Barton each owned *separate* one-third shares in the song pursuant to their contract. *Club Girl* is therefore not a joint work as defined by the Copyright Act because a prior contract exists that governs the ownership stakes in the song. See Whelan Associates, 797 F.2d at 1228; Childress, 045 F. 2d at 509; IMS Health, Inc. v. Vality Tech., Inc., 2000 U.S. Dist. LEXIS 8635 (E.D. Pa. June 22, 2000).[16] It follows that Guice and

---

[16] Note that the ownership splits for Bad Girl were also determined by contract; it is not a joint work. One of Bad Girl's purported "owners" is Defendant James Samuel Harris (Jimmy Jam) who admits doing no work at all on Bad Girl and is an owner solely by virtue of contract. In fact, no

Barton therefore had no right to authorize anyone else to use Plaintiff's portion of the song he created, or to copy the song themselves. Barton's use of the song, and his "authorizing" other Defendants to use the song, without Plaintiff's permission, is prima facie copyright infringement.

The Court has incorrectly ruled that *Club Girl* is a joint work (and therefore erroneously believes Guice and Barton could authorize the use of Plaintiff's work without Plaintiff's permission). A joint work only exists in the absence of a songwriting agreement; here, there *is* a preexisting songwriting agreement. Plaintiff asks the Court to revisit and reverse that ruling. The simple fact of the matter is that Barton and Guice deliberately breached the songwriting agreement with Plaintiff, extinguished all his rights, and then with van Dell and Usher used Plaintiff's share of *Club Girl*, without authorization or payment to him, and committed clear copyright infringement by using it to create *Bad Girl*. Thus, granting summary judgment in favor of Barton on the copyright claims (not to mention lifting the default) would be a clear injustice and abuse of discretion.[17]

The evidence indicates that *Club Girl* is not a joint work, that defendants Guice and Barton deliberately breached their songwriting agreement with Plaintiff and illegally took credit and royalties for Plaintiff's protected expression in *Club Girl*, and *Bad Girl*. There are therefore material questions of fact that allow a factfinder to find Barton and all other Defendants liable for copyright infringement; this case should proceed to a jury. This Court needs to enforce the valid and preexisting songwriting agreement.

If the Court is going to ignore the existence of a valid and preexisting songwriting agreement for *Club Girl/Bad Girl*, and come to find it is a joint work, then any claim to joint authorship by Guice and Barton should be declared void because of their deceit and theft. Furthermore, because

---

individual in this case retains any ownership interest in *Club Girl* or *Bad Girl* by way of the Copyright Act ownership rules, **only through contracts**.

[17] There is furthermore copious evidence that plaintiff Daniel Marino, at the time he originally created the musical composition underlying *Club Girl*, did not have the intention that his music be merged with any other work. Marino Depo., at pp. 135–37. Plaintiff created the music for *Club Girl* on his own, as a standalone song, and only later brought that music to the attention of Guice and Barton who, after hearing the material, voiced a desire to add to the material. Id. at pp.102:15–103:24, 104, 135–37. Given this evidence, there is a factual dispute for the jury about whether Plaintiff is the sole author of the underlying musical composition in *Club Girl*, and whether *Club Girl* is a joint or collective/composite work under the Copyright Act.

all Defendants were aware and participated in bad faith in the taking of Plaintiff's song, all Defendants should be liable for copyright infringement.

*****

### c. Even if All Copyright Infringement Claims Fail, New Third Circuit Precedent Requires this Case Be Sent to a Jury for An Ownership Determination—the Copyright Act Claims Against Barton Cannot be Dismissed from This Case

In a suit brought under the Copyright Act of 1976, a plaintiff may bring both legal and equitable claims. Chiste v. Hotels.com L.P., 756 F. Supp. 2d 382, 406–07 (S.D.N.Y 2010); Benefit Control Methods v. Health Care Servs., 1998 U.S. Dist. LEXIS 376, 5–6 (E.D. Pa. Jan. 16, 1998). Direct and secondary copyright infringement are legal claims, and equitable claims consist of something such as an ownership determinations and accounting of profits. See Teri Woods Publ, L.L.C. v. Williams, 2013 U.S. Dist. LEXIS 52745, 9–10 (E.D. Pa. Apr. 12, 2013) (stating that equitable remedies such as an accounting and constructive trust are appropriate when there are no valid infringement claims); see also Brownstein v. Lindsay, 742 F.3d 55, 68 (3d Cir. 2014). Equitable relief constitutes an independent basis for recovery under the Copyright Act, and is appropriate when the Plaintiff has no applicable legal claims for the relief sought. Teri Woods, 2013 U.S. Dist. LEXIS 52745 at 9–10. Equitable relief should be pled in the ad damnum "relief requested" section of the complaint; however, if pled as a legal cause of action, any cognizable equitable relief demanded should nevertheless be considered by the Court. Chiste, 756 F. Supp. 2d at 406–07. An uncredited, uncompensated, and otherwise unrecognized owner and author of a work is entitled to a jury trial to determine what portion of the song he owns;

> [E]ven if [a plaintiff] is not a co-author of some of the derivative versions of [the underlying work], he remains the co-author of the underlying work and has an ownership interest in derivative versions of the [the underlying work] to the extent that they incorporate the underlying work. **The extent of [plaintiff]'s authorship and ownership of these derivative works is a factual question that must be decided by a jury.**

Brownstein, 742 F.3d at 68 (emphasis added).

In Plaintiff's Amended Complaint, Plaintiff alleged direct and second copyright infringement against all Defendants, and also explicitly requested equitable relief of an ownership determination, an accounting, and a constructive trust. See generally Plaintiff's Amended Complaint. This Court has indicated that it does not believe that Plaintiff has valid copyright infringement causes of action.[18] Thus, consideration of Plaintiff's equitable claims is necessary. This Court has, however, also previously stated that Plaintiff did not adequately plead equitable relief in his Complaint. See (Doc. No. 172). The Court reasoned that equitable relief requested in the ad damnum section of a complaint does not afford a plaintiff an independent basis for recovery and also stated that—**even though the Court acknowledges that Plaintiff wrote, recorded, produced, and engineered *Club Girl/Bad Girl*—**Plaintiff has no right to any recovery or relief from the Usher defendants and defendant Guice (as well as, presumably, defendant van Dell). *Id.*

Plaintiff disagrees with this Court's prior decisions in all respects.

### Equitable Relief is Appropriately Requested in the Ad Damnum Clause

**First,** it is manifestly appropriate to request equitable relief in the ad damnum clause. The cases that the Court cites for the proposition that relief requested in the ad damnum clause is not actionable **say no such thing**—in fact, they say the complete opposite. See, e.g., Chiste, 756 F. Supp. 2d at 406–07. Those cases actually hold that equitable relief **should be** requested in a complaint's ad damnum clause, and that equitable relief requested in the ad damnum clause does constitute an independent basis for relief. Id. As can be seen from Plaintiff's Amended Complaint, the ad damnum clause explicitly identifies the equitable relief being sought by Plaintiff:

> 496. That the Court enter judgment against Defendants, and each of them, that the Court declares, adjudges, and decrees that Defendants, and each of them, have been and are involuntary and constructive trustees, holding the gross receipts from the aforesaid production, broadcast, distribution, sale, or other exploitation of "Bad Girl," to the extent attributable to "Club Girl" or Defendants' misuse of the protectable interests of Plaintiff in "Club Girl" and "Bad Girl", and that Defendants, and each of them, hold all such monies and funds on behalf of and subject to a first and prior lien against all others and in favor of Plaintiff.

> 497. That the Court enter judgment against Defendants, and each of them, that

---

[18] Plaintiff disagrees with this Court that his copyright infringement claims are invalid, and, in arguing for a trial to determine his ownership rights, he in no way is conceding his copyright infringement claims.

Defendants, and each of them, be required to account for and pay over to Plaintiff all gains and profits derived by Defendants, and each of them, from or attributable to production, broadcasting, licensing, distributing, sale, or other exploitation of "Club Girl" or "Bad Girl", or any other uses of all or part of "Club Girl" or "Bad Girl" made or authorized by Defendants, or any of them, in any format, media, or market, in connection with the composition and all sound recording of "Bad Girl".

498. That the Court enter judgment against Defendants, and each of them, and Order the injunctive relief of the correction of the copyright record of "Club Girl" and "Bad Girl" to reflect Plaintiff's authorship and ownership in the musical works copyright and sound recording copyright of both songs.

499. That the Court enter judgment against Defendants, and each of them, and Order a trustee of Plaintiff's choosing with the Court's approval, to manage all future income streams that flow from the authorship, ownership, or exploitation of the songs "Club Girl" and "Bad Girl".

500. That the Court enter judgment against Defendants, and each of them, and Order the injunctive relief in declaring that Plaintiff was denied his "right of attribution" and his due credit for his authorship, production, and recording of "Club Girl" and Bad Girl".

Plaintiff's Complaint explicitly and unambiguously asks for an ownership determination, a credit/attribution determination, an accounting of monies derived from the exploitation of Plaintiff's songs, and a constructive trust. In light of that fact Plaintiff is entitled to a jury trial on ownership under <u>Brownstein</u>, and an accounting, given **that even this Court agrees Plaintiff wrote, engineered, recorded, and produced** *Club Girl/Bad Girl*.

### Plaintiff took a Belt and Suspenders Approach to Pleading Equitable Relief, and asked for Equitable Relief in the Ad Damnum Clause *and* as Causes of Action

**Second**, Plaintiff not only pled equitable relief in the ad damnum clause, but, to be explicitly clear that he was seeking equitable relief, he included two equitable claims in his "causes of action" section for an Accounting and for a Constructive Trust:

<u>COUNT IV - CONSTRUCTIVE TRUST</u>
<u>MARINO v. BARTON, GUICE, USHER, B. AVILA, I. AVILA, HARRIS, LEWIS, DEFENDERS OF MUSIC, EMI, FLYTE TYME, IN2N ENTERTAINMENT, SUBLIME BASEMENT, UR-IV, WARNER-TAMERLANE, DESTRO MUSIC, BYSTORM, SONY, PITTS, & VAN DELL</u>

441. Plaintiff hereby incorporates by reference the preceding paragraphs and repeats and realleges each of the allegations as if fully set forth herein.

442. By virtue of their wrongful conduct, Defendants illegally received money and profits that rightfully belonged to Plaintiff.

443. Defendants are therefore involuntary trustees, holding the gross receipts from their product sales and revenues to the extent attributable to the musical work and sound recording of "Bad Girl" and therefore attributable to the infringement of Plaintiff's copyrights herein.

444. Defendants hold such moneys and funds on behalf of and subject to a first and prior lien against all others and in favor of Plaintiff. On information and belief, Defendants hold this illegally received money and profits in the form of bank accounts, real property, and personal property that can be located and traced.

445. Plaintiff is entitled to the remedy of a constructive trust in view of Defendants' wrongful infringement of Plaintiff's copyright in the musical work and in the sound recording of "Club Girl" and "Bad Girl" which Plaintiff is the co-author, co-producer, and co-owner of.

COUNT V - FOR AN ACCOUNTING
MARINO v. BARTON, GUICE, USHER, B. AVILA, I. AVILA, HARRIS, LEWIS,
DEFENDERS OF MUSIC, EMI, FLYTE TYME, IN2N ENTERTAINMENT, SUBLIME
BASEMENT, UR-IV, WARNER-TAMERLANE, DESTRO MUSIC, BYSTORM, SONY,
PITTS, & VAN DELL

446. Plaintiff hereby incorporates by reference the preceding paragraphs and repeats and realleges each of the allegations as if fully set forth herein.

447. Under 17 U.S.C. Section 504, Plaintiff may recover any and all profits of Defendants that are attributable to their acts of infringement.

448. **A balance is due from Defendants, and each of them, to Plaintiff for misappropriation of profits and gross receipts arising from or attributable to Defendants' copying, reproduction, performance, use, sale, and exploitation of Plaintiff's musical work and sound recording of "Club Girl" and "Bad Girl"** and consequent violation and infringement of Plaintiff's copyrights in "Club Girl" and "Bad Girl".

449. The exact amount of money due from Defendants is unknown to Plaintiff and can only be ascertained though an accounting. Plaintiff seeks an order from this Court directing Defendants to provide Plaintiff with an accounting and payment of the amount due as a result of the accounting, plus interest.

Plaintiff wanted to make it explicitly clear that he was seeking an accounting from all defendants for their exploitation of his work without proper credit and compensation to him.[19]

---

[19] Judge Diamond dismissed these claims as subsumed by the Copyright Act earlier in the case. (*Doc. No. 42, 48*). Regardless, they constitute adequately pled requests for equitable relief that should be considered by the Court. Judge Diamond has also stated that the Accounting claim only applies to profits derived from "infringement," and, given that he has held there is no infringement, Plaintiff is owed no accounting. (*Doc. No. 194, at p.3*). The Accounting cause of action asks for an accounting for any infringing activity **and** for an accounting of what monies were improperly not paid to Plaintiff; the Court's interpretation of Plaintiff's Amended Complaint is clearly wrong. In any case, Plaintiff also validly requested equitable relief in the ad damnum section.

Given that Plaintiff pled equitable relief in ***both*** the ad damnum, and the causes of action section, Plaintiff does not know what else he could have done to indicate that he was seeking equitable relief. There are no other parts in the complaint where it is appropriate to ask for equitable remedies. And furthermore, this Court has irrationally and obviously incorrectly stated that equitable relief is not an independent basis for relief. Thus, Plaintiff is entitled to a trial on ownership of *Club Girl/Bad Girl* against all Defendants, including Barton because Barton, Guice, van Dell, and Usher took Plaintiff's ownership rights in *Club Girl/Bad Girl*, and an accounting of the profits that they illegally took and withheld from him.

### The Statute of Limitations Does Not Limit Plaintiff's Recovery or Ownership Claim

<u>Brownstein</u> adopts the express repudiation rule with respect to claims of joint authorship. 742 F.3d at 70. The express repudiation rule states that the Copyright Act's three year statute of limitations only begins to run against a joint author seeking to be declared a coowner when his coauthorship is ***expressly repudiated*** by another author. <u>Id.</u>

Here, Plaintiff's claim to be a author was never expressly repudiated, and thus there is no statute of limitations issue with respect to his request for an accounting. The Court noted in its Order denying Defendants' Motion to Dismiss (Doc. No. 42), that the "Parties do not dispute that Plaintiff co-authored the song" and that the statute of limitations would only be an issue if there was a question raised later in the litigation as to whether Plaintiff actually owns *Club Girl*. <u>Id.</u> at 6. This case is now at the summary judgment stage, and it is apparent that no defendant has managed to dispute that Plaintiff owns a third of *Club Girl*. The Court itself observed that the Plaintiff, Guice, and Marino agreed to "share songwriting credit if any of their co-authored songs became successful," and "Plaintiff created the basic melody, chord progressions, and tempo" for *Club Girl*, a joint work. SJ Opinion, at p.6. Moreover, there is no dispute that Plaintiff's co-authors never repudiated his authorship claim. Therefore, Plaintiff's ownership and accounting claims are not affected by the statute of limitations and he may recover an accounting back to the release of *Bad Girl* in 2004.

Plaintiff also notes that to the extent the other defendants in this case failed to raise Plaintiff's coownership and accounting claims, they have waived the right to oppose them and they must face a trial by jury.

## VII.  Plaintiff Has Valid Claims for Infringement of His Sound Recording

Defendants, including Barton, registered and exploited a sound recording of "*Bad Girl*" which uses Plaintiff's musical composition and sound recording that he personally wrote, recorded, played, engineered, and produced; a jury determination of ownership and an accounting with respect to that sound recording is also necessary.


## VIII. Conclusion

Plaintiff asks for judgment in its favor.

*****

*Respectfully submitted,*

Francis Alexander, LLC

*/s/ Francis Malofiy*
Francis Malofiy, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 105
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*

*/d/ April 10, 2015*

# Certificate of Service

I hereby certify that a true and correct copy of the foregoing Plaintiff's Brief in Opposition to Grant of Summary Judgment for Defendant Dante Barton has been electronically filed with the Court via the ECF Filing System, served upon all counsel of record via electronic mail, and e-mailed to William Guice and Thomas van Dell.

Jonathan D. Davis, P.C.
Jonathan D. Davis, Esquire
Derek A. Williams
99 Park Avenue | Suite 1600
New York, NY 10016
T:  (212) 687-5464
E: jdd@jddavispc.com
E: DAW@jddavispc.com

Fox Rothschild, LLP
Michael Eidel, Esquire
Matthew Olesh, Esquire
2000 Market Street, 20th Floor
Philadelphia, PA 19103
T:  (215) 299-2000
E: MEidel@foxrothschild.com

*Attorneys for Defendants*
*Usher Raymond IV a/k/a Usher ("Usher"), Sony Music Entertainment, EMI April Music, Inc., EMI Blackwood Music, Inc., Warner-Tamerlane Publishing Corp., UR-IV Music, Inc., Bystorm Entertainment, Mark Pitts, Issiah Avila, Jr., Bobby Ross Avila, Jr., Sublime Basement Tunez, Defenders of Music, Flyte Tyme Tunes, James Samuel Harris III, and Terry Steven Lewis*

Manatt, Phelps & Phillips, LLP
Mark S. Lee, Esquire
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
T:  (310) 312-4000
F:  (310) 312-4224
E:  mlee@manatt.com

ROGERS & ASSOCIATES, LLC
Lance Rogers, Esquire
25 Elliot Avenue
Bryn Mawr, PA 19010
T: (610) 649-1880
F: (877) 649-1800
E: lance@rogerscounsel.com
*Attorney for Defendant*
*IN2N Entertainment Group, LLC ("IN2N")*

THOMAS VAN DELL
10900 Wilshire Blvd., Suite 1400
Los Angeles, CA 90024
T: (310) 443-5332
E: vandell@hudcan.com
*Defendant, Pro Se*

WILLIAM C. GUICE
16794 East Tufts Avenue
Aurora, CO 80015
*Defendant, Pro Se*
E: guicemanmusic@gmail.com

SAMUEL C. STRETTON, ESQUIRE
301 South High Street
West Chester, PA 19381-3231
E: s.stretton@verizon.net

                                    *****

                    *Respectfully submitted,*

                    FRANCIS ALEXANDER, LLC

                    */s/ Francis Malofiy*
                    Francis Malofiy, Esquire
                    Attorney ID No.: 208494
                    280 N. Providence Road | Suite 105
                    Media, PA 19063
                    T: (215) 500-1000
                    F: (215) 500-1005
                    *Law Firm / Lawyer for Plaintiff*

                    */d/ April 10, 2015*